UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

CABLEVISION SYSTEMS CORPORATION )
and CSC HOLDINGS, LLC, )
)
Plaintiffs, )
)
-against- )
)
VIACOM INTERNATIONAL INC. and BLACK )
ENTERTAINMENT TELEVISION LLC, )
)
Defendants. )
_____ )

Civil Action No. 13 CIV 1278 (LTS)
(JLC)

**COMPLAINT**

**REDACTED PUBLIC VERSION**

Plaintiffs Cablevision Systems Corporation and CSC Holdings, LLC (collectively, "Cablevision"), by their attorneys Ropes & Gray LLP, bring this Complaint against Viacom International Inc. and Black Entertainment Television LLC (collectively, "Viacom") for violations of federal and state antitrust laws, and allege as follows:

## NATURE OF THE ACTION

1.     This case involves Viacom's abuse of its market power over access to commercially critical networks – its highly popular Nickelodeon, Comedy Central, BET, and MTV networks – to force Cablevision to license and distribute over scarce bandwidth some dozen other Viacom networks, which Viacom calls Suite Networks, that many Cablevision subscribers do not watch and for which Cablevision would prefer to substitute competing networks.  Viacom strong-armed Cablevision into carrying Suite Networks by threatening to impose a near $█ billion penalty if Cablevision licensed only the Viacom networks Cablevision wanted, networks Viacom calls its Core Networks.  Stated differently, unless Cablevision agreed to distribute Viacom's Suite, Cablevision would pay nearly ███████████ *as much* for *just* the Core (which includes commercially critical networks) than for the Core and Suite

1

combined.  Viacom's diabolical and coercive scheme, which harms competition, consumers, and Cablevision, constitutes tying and block booking in violation of the Sherman Act and New York law.  Viacom wielded the threat of effectively withholding commercially critical networks to force Cablevision and its subscribers to pay for unwanted Suite networks while foreclosing Cablevision from distributing competing networks that consumers would likely prefer.  Absent Viacom's illegal scheme, consumers would get more for what they pay for video services.

2.     Viacom's market power stems from its exclusive right to distribute commercially critical networks (the "Tying Networks"): Nickelodeon, Comedy Central, BET, and MTV. Viacom has called these networks, along with its popular VH1, TV Land, MTV2, and Spike TV ("Spike") networks, Viacom's "Core Networks."

3.     Viacom's Tying Networks are commercially critical because of the popularity of programming shown on each as well as each network's brand image and reputation among subscribers.  If Viacom withheld any, or all, of its Tying Networks from Cablevision for a significant period of time, Cablevision would be severely disadvantaged.  Cablevision operates in an intensely competitive environment against both established and new distributors of video services.  If Cablevision's video product offerings did not include Viacom's Tying Networks, a substantial number of subscribers would likely abandon (or refuse to consider) Cablevision and instead choose to receive video services from one of Cablevision's numerous competitors. Access to Viacom's Tying Networks is commercially critical even at the high prices Viacom charges for access to those networks.  The same is true of other major distributors of video services:  None can do without all (or at least many) of Viacom's Tying Networks for a significant period of time.  Control over the Tying Networks – each of which comprises a tying

product here – accordingly gives Viacom substantial market power no matter how the markets in which Viacom distributes those networks are defined.

4.      In addition to its Core Networks, which include the Tying Networks, Viacom also distributes other programming through additional networks.  These other networks – each a tied product here – include Centric, CMT, CMT Pure Country, Logo, MTV Hits, MTV Jams, Nick Jr., Nick 2, Nicktoons, Palladia, Teen Nick, Tr3s, VH1 Classic, and VH1 Soul.  Viacom calls these networks "Suite Networks."

5.      Unlike Viacom's Tying Networks, none of the Suite Networks is commercially critical to video providers such as Cablevision.  The Suite Networks feature general programming, not commercially critical programming.  Many Suite Networks have low or extremely low viewership.  Moreover, reasonable alternatives to Viacom's Suite Networks abound.  If the Suite Networks had to compete on their merits against alternative sources of general programming, many distributors – including Cablevision – would elect not to carry many or all Suite Networks and instead would distribute other networks.

6.      Viacom, however, has not been content to permit its Suite Networks to compete on their merits against other general programming networks.  Instead, Viacom has leveraged its substantial market power over the Tying Networks to force Cablevision to carry the Suite Networks, thereby foreclosing competitors and harming the competitive process.  Indeed, as the Suite Networks' value to subscribers declined, Viacom's exercise of raw market power to insulate those networks from competition became more brazen.  In early ██████ Viacom compelled Cablevision ████████████████████████████████████████████ ██████████████████████.  That agreement (and related agreements) lasted through

December 31, 2012.  During those ███ years, the ratings of many of Viacom's Suite Networks fell markedly.

7.     In late 2012, as the expiration of its principal agreements with Viacom approached, Cablevision again attempted to negotiate an agreement with Viacom under which Cablevision would distribute only Viacom's Core Networks (including all the Tying Networks), but no Suite Networks.  Cablevision believed that its subscribers would more highly value competing general programming networks over many or all of the Suite Networks, that carrying different networks in place of the Suite Networks would make better use of both funds spent to purchase programming and of scarce capacity on Cablevision's network, and that distributing different programming would better enable Cablevision to compete.

8.     Despite Cablevision's repeated requests, Viacom refused to make Cablevision any reasonable offer for only the Core Networks (which include the Tying Networks).  Viacom instead told Cablevision that, if Cablevision wished to license **only** the Tying Networks, Cablevision would need to pay an amount over ███████████ Viacom's proposal for carrying **both** the Core and the Suite.  If Cablevision wanted (as it did) the entire Core without the Suite, Cablevision would need to pay nearly ███████████ as much as Viacom's initial tied offer for both the Core and the Suite Networks.  In effect, Viacom sought to penalize Cablevision nearly $█ billion for distributing alternatives to the Suite Networks, a figure that exceeds Cablevision's entire 2013 programming budget (which encompasses, among other things, fees for hundreds of networks) and on information and belief exceeds Viacom's advertising revenues from Cablevision's carriage of the Suite Networks.  Although Cablevision repeatedly attempted to negotiate more reasonable terms for a Core-only agreement, Viacom flatly refused to provide any viable Core-only option.  By threatening to charge Cablevision a

4

ten-figure penalty for the Core Networks unless Cablevision distributed the Suite Networks,

Viacom effectively refused to license Cablevision the Core (including the Tying) Networks

unless Cablevision agreed to distribute Suite Networks.

   9. Viacom's coercive tactics left Cablevision with only one viable economic choice:

to accept a deal under which Cablevision would continue to carry both the Core Networks

(which Cablevision wants to distribute) and the Suite Networks (which Cablevision wishes to

replace with alternative networks).  Cablevision accordingly surrendered to Viacom's coercive

tactics and entered into an agreement with Viacom on December 31, 2012, for distribution of

both the Core and the Suite (the "2012 Tying Agreement" or "2012 Tying Arrangement").

Cablevision entered into the 2012 Tying Agreement only because Viacom refused to make an

economically viable stand-alone offer for all, or any subset of, the Core Networks, including the

Tying Networks.

   10. Viacom's coercive tie-in substantially forecloses competitors and thereby harms

the competitive process.  If Viacom did not force Cablevision to carry the Suite Networks,

Cablevision would carry other networks on the numerous channel slots that Viacom's Suite

Networks currently occupy (as many as 2 High Definition ("HD") and 10 Standard Definition

("SD") slots in Cablevision's eastern territories and 2 HD and 12 SD slots in Cablevision's

western territories).  Cablevision has identified other general programming networks that

Cablevision would prefer to distribute in place of the Suite Networks, including new networks it

has not carried in the past as well as HD versions of networks Cablevision already carries in SD.

Viacom's tie-in, however, forecloses Cablevision from carrying such other general programming

networks, for at least three reasons.  First, as with any tie-in, by satisfying some portion of

Cablevision's demand for the tied product (here, distribution of networks that feature general

programming), Viacom's coercive conduct reduces the value to Cablevision of obtaining substitutes to the tied product.  Second, Cablevision possesses a finite amount of network capacity available for channels.  Consequently, each channel Cablevision carries forecloses the opportunity to carry a non-Viacom channel that Cablevision's subscribers likely would enjoy more than a Suite Network.  Third, as with all distributors, Cablevision has a limited – yet due to the demands of programmers such as Viacom, increasingly strained – budget for acquiring programming.  Every dollar devoted to the Suite Networks subtracts from the budget for acquiring other programming.

11.    By foreclosing competitors to the Suite Networks, Viacom's tie-in inflicts concrete and ongoing harm and causes damage to Cablevision.  Cablevision could attract and retain more subscribers by distributing different programming on the channels that carry Viacom's Suite Networks.  Viacom's tying arrangement, however, forecloses Cablevision from distributing alternative general programming networks.  Viacom's tying arrangement also deprives Cablevision of an important avenue of differentiation, and thereby robs Cablevision of yet other potential subscribers, by limiting Cablevision's ability to assemble more appealing programming packages.  Absent Viacom's tie-in, moreover, Cablevision would expect to spend less in total to acquire programming.  The longer Viacom's unlawful tie-in forces Cablevision to carry the Suite Networks, the greater these ongoing harms to Cablevision.

12.    The above alleged harms to both competition and to Cablevision, in turn, injure consumers.  Viacom's tying arrangement forces consumers to pay for networks they do not value as much as competing networks that Cablevision, absent the tie-in, would distribute.  Absent Viacom's tying arrangement, therefore, Cablevision's subscribers would get more for their video subscription dollars.  Even if the price of Cablevision's packages stayed the same, consumers

would have access to programming they likely would prefer to Viacom's Suite Networks. Consumers also suffer because Viacom's tying arrangement blocks Cablevision from assembling subscriber-level packages that are more attractive to consumers.

13.     The anticompetitive impact of Viacom's policy of tying its Core and Suite Networks together extends beyond Cablevision and its subscribers; Viacom's conduct hinders competition nationally.  The top 15 video distributors in the United States, which together account for nearly 95% of the approximately 100 million subscribers to traditional video distribution services nationwide, carry every Viacom Core and Suite Network, with the exception that Viacom does not compel a handful of distributors to carry one or two Suite Networks.  These distributors include all the major video providers in the territories in which Cablevision operates, as well as operators throughout the country.  This is no accident: Cablevision believes that Viacom has applied the same coercive tactics that forced Cablevision to succumb to Viacom's tying arrangement to compel other video distributors to carry Viacom's Suite Networks.  Viacom's anti-consumer practices, therefore, work to foreclose competing networks not only in the territories in which Cablevision operates, including the New York Designated Market Area ("DMA"), but also nationally.  Absent Viacom's coercive tying arrangement, general programming networks that compete with Viacom's Suite Networks (some of which could evolve into threats to Viacom's Core Networks) would obtain greater distribution; subscribers to Cablevision and other video services would enjoy higher quality services (and, therefore, lower quality-adjusted prices); and video distributors such as Cablevision could better differentiate their channel line-ups to respond to consumer demand.

14.     Viacom's anti-consumer and coercive tactics are unlawful.  Viacom's conditioning of distribution of the Tying Networks (the tying products) on distribution of the

Suite Networks (the tied products) through the 2012 Tying Agreement comprises unlawful tying

and block booking in violation of federal and state law.  Cablevision accordingly seeks (a) a

declaration that the 2012 Tying Agreement is void as in violation of law; (b) recovery of its

damages trebled; and (c) an injunction (i) barring Viacom from conditioning carriage of any or

all of its Core Networks on Cablevision's licensing any or all of Viacom's Suite Networks or any

other network and (ii) requiring Viacom to grant Cablevision, until such a stand-alone agreement

for the Core Networks is reached, the right to distribute the Core Networks and related ancillary

services on terms specified for those services set forth in the 2012 Tying Agreement, both in

order to effectuate other relief and to protect consumers from ongoing harm.

## PARTIES

15.     Plaintiff Cablevision Systems Corporation is a Delaware corporation with its

principal place of business located at 1111 Stewart Avenue, Bethpage, New York.  Cablevision

Systems Corporation is a leading telecommunications and entertainment company that provides

a variety of services to subscribers including advanced digital television, voice, and high-speed

Internet through its wholly owned subsidiary CSC Holdings, LLC.

16.     Plaintiff CSC Holdings, LLC is a limited liability company organized and existing

under the laws of the state of Delaware, with its principal place of business located at 1111

Stewart Avenue, Bethpage, New York.

17.     Defendant Viacom International Inc. is a Delaware corporation with its principal

place of businesses located at 1515 Broadway, New York, New York.  Viacom Media Networks

is a division of Viacom International Inc.  Formerly known as MTV Networks, Viacom Media

Networks operates, among other things, much of Viacom International Inc.'s media networks

business, and is the Viacom International Inc. entity that is a party to the 2012 Tying Agreement.

18.     Defendant Black Entertainment Television, LLC is a subsidiary of Viacom Inc. (the parent corporation of Viacom International Inc.), and is a Washington, D.C. limited liability company with its principal place of business at 1235 W Street Northeast, Washington, District of Columbia.

19.     Defendants (collectively, "Viacom") own and license for distribution the Core Networks and the Suite Networks.  Defendants are parties to, and coerced Cablevision to enter into, the unlawful 2012 Tying Agreement in December 2012.

### JURISDICTION AND VENUE

20.     Cablevision brings claims under the Sherman Act, 15 U.S.C. § 1, and seeks damages and injunctive relief pursuant to 15 U.S.C. §§ 15(a) and 26, and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court accordingly has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.  This Court has supplemental jurisdiction over the New York State Donnelly Act claim pursuant to 28 U.S.C. § 1367.

21.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), because defendant Viacom is found in, and transacts business in, this District.

### BACKGROUND FACTUAL ALLEGATIONS

**A.**     **Cablevision's Video Services**

22.     Cablevision is a leading telecommunications and media company that offers advanced digital television, voice, and high-speed Internet-access services, among other services, to millions of households in New York, Connecticut, Pennsylvania, and New Jersey, and in parts of four Western states.

23.     Cablevision offers subscribers, among other services, multiple channels of video programming ("MVPD" video services).  The advent of digital technology has enabled Cablevision to offer subscribers an extensive portfolio of video programming options that

9

includes hundreds of available channels and numerous services through a variety of packages. Cablevision's video programming includes SD channels as well as HD channels (which occupy significantly more bandwidth than their SD counterparts). Cablevision also provides subscribers video on demand ("VOD") services, through which subscribers can access an array of movies, TV shows, and other programming. Cablevision also offers, among yet other services, "TV Everywhere" applications, whereby subscribers can stream select content to various mobile devices such as smartphones, tablets, and laptops via the Internet.

24.     Cablevision continually evaluates new services to improve its video and other offerings because Cablevision confronts a fierce competitive environment. Cablevision faces competition from other traditional video distributors, which include direct-broadcast satellite providers ("DBSs") such as DISH Network and DIRECTV; overbuilders such as RCN; and telecommunications companies that offer video and other services over fiber optic networks, including Verizon and AT&T. Cablevision also faces intense competition from Internet-based services. These include Internet-based multi-channel services such as SkyAngel, and video streaming services such as Netflix, Hulu, Vudu, Apple.TV, and Google.TV, to name just a few. Cablevision also competes with free streaming provided by networks through their websites.

25.     To attract and retain subscribers against these many different forms of competition, Cablevision must offer video services including SD and HD channels that its consumers find attractive. Certain networks are particularly important for Cablevision (and any other major video distributor) to carry. Cablevision views such networks as commercially critical (or "must-have") because, if unable to offer their programming for a significant period of time, Cablevision would likely shed a substantial number of subscribers. Commercially critical networks include a range of highly popular networks, including ESPN (the most popular sports

network in the United States and typically the most expensive network for a video distributor), the four major traditional broadcast networks (ABC, NBC, CBS, and FOX), and certain other highly popular networks (an example of which is Discovery Channel). If Cablevision lacked any of these networks for a substantial period of time throughout a major portion of its service area, Cablevision would face significant difficulties in retaining and obtaining video subscribers. Because of these networks' particular appeal to subscribers, control over these networks gives their suppliers market power even greater than, for example, what might otherwise be inferred from their overall ratings among all networks.

26. Commercially critical networks comprise only a portion of the SD and HD channels in Cablevision's line-up. Cablevision fills out its channel offerings with numerous other networks. Some of those networks are networks that feature general programming ("general programming networks"). General programming embraces a broad range of networks that offer programming Cablevision believes will appeal to its subscribers. But, in contrast to commercially critical networks, the absence of a particular general programming network or set of networks from Cablevision's channel line-up is unlikely to cause a substantial number of subscribers to drop Cablevision's video services. Accordingly, Cablevision (like other video distributors) selects from a wide range of competing general programming networks in order to construct the most appealing video product offering. Networks that feature general programming thus compete against one another for carriage by Cablevision and other video distributors, but do not compete for carriage against sources of commercially critical programming.

27. In determining the channels to offer subscribers, Cablevision must take into account not only the programming Cablevision's customers demand, but also the scarce capacity

on Cablevision's network that video channels consume.  At any given time, capacity available on

Cablevision's network (*i.e.*, how much data the network can carry per second) is finite.

Moreover, Cablevision can devote only a portion of its available capacity to channels because

Cablevision also offers other bandwidth intensive services (including high-speed Internet

access).  Cablevision would not reallocate bandwidth from these other services, which

consumers increasingly demand, to carry more channels.  Although Cablevision can and does

add capacity (also called bandwidth) periodically, expanding capacity is costly and time-

consuming.

28.     In addition to limited bandwidth, Cablevision confronts the reality of a limited

programming budget to acquire needed programming.  Cablevision, as with other video

distributors, enters into agreements with programmers to obtain the rights to distribute

programming.  Two aspects of such agreements are particularly salient here.  First, obtaining

programming is incredibly expensive.  Cablevision spends well over a billion dollars a year to

license programming it believes its subscribers will find valuable.  The fees programmers such as

Viacom demand and the fierce competition from other video distributors Cablevision confronts

squeeze Cablevision from both ends:  Programmers – particularly providers of commercially

critical programming – seek ever-increasing licensing fees for their networks; but intense

competition constrains Cablevision's ability to pass through those cost increases to subscribers.

29.     Second, programming agreements often specify not only that Cablevision (and

other video distributors) must carry certain programming, but also the manner in which such

programming must be distributed.  Cablevision, like many other video distributors, assembles

programming networks and other services into packages and tiers of service.  Cablevision offers

subscribers a broad array of packages ranging from the most basic tier, called "Broadcast Basic"

and containing only local broadcast channels and a limited selection of other networks, to more comprehensive, but more expensive, packages such as "Optimum Gold," which offers (among other services) more than 400 channels of SD and HD programming.  Cablevision's freedom to assemble packages that differentiate its video product offering from rivals' is limited by agreements that specify, for example, that programming must be carried on one of a distributor's most widely purchased (that is, highly penetrated) packages or tiers.  These agreements may also impose additional requirements, such as the number and location of Cablevision subscribers the programming must reach, and the type of signal (SD or HD) carried.

30.     As alleged below, Viacom has gone even further.  Viacom has not merely increased the price it charges for commercially critical programming and specified how Cablevision must distribute such programming.  Rather, Viacom has taken the additional and illegal step of conditioning the right to distribute commercially critical Viacom networks on Cablevision's licensing and distributing on highly penetrated tiers other Viacom networks: general programming networks for which Cablevision has, and would prefer to distribute, alternatives.

**B.**     **Viacom Possesses Market Power Over Commercially Critical Networks Which Comprise The Tying Product Markets**

**1.**     **Viacom's Key Core Networks Each Comprise A Relevant Tying Product Market Over Which Viacom Possesses Market Power**

31.     Viacom controls commercially critical networks that Cablevision and many other video distributors must offer or face a significant loss of subscribers.  Viacom's commercially critical networks include the Tying Networks: Nickelodeon, Comedy Central, BET, and MTV.  Certain programming featured on each of these networks is very popular and highly valued by a substantial number of subscribers, who expect video distributors such as Cablevision to carry

those networks; and each network possesses significant brand equity that makes viewers more willing to watch shows these networks carry.  Distribution of each of the Tying Networks, for the reasons alleged below, comprises a relevant market over which Viacom possesses market power.

32.     **Nickelodeon.**  Nickelodeon is the leading children's network, targeting school-aged children.  It has been the top (or among the top) rated cable channel for 17 consecutive years.  Nickelodeon's programming includes scripted shows – both live action and cartoons – geared toward children and young teens, with flagship hits such as *SpongeBob SquarePants*, *The Fairly Oddparents*, *Victorious*, *Dora the Explorer*, *Teenage Mutant Ninja Turtles*, and *Supah Ninjas*.  No other network is reasonably comparable to, or reasonably interchangeable with, Nickelodeon.  Although some other networks offer children-oriented programming or target a similar audience, such networks lack the high ratings and strong following that Nickelodeon enjoys, or offer somewhat differently targeted programming.  A distributor such as Cablevision would not substitute another such network, or any other network, in response to an exercise of market power over Nickelodeon.  Cross elasticity of demand between Nickelodeon and other networks is accordingly low.

33.     Directly evidencing that Nickelodeon is its own relevant market over which Viacom possesses substantial market power, all of the top 15 U.S. video distributors, accounting for nearly 95% of subscribers to traditional video distribution services (cable, satellite, and fiber-optic), carry Nickelodeon and many have for years.  Similarly directly evidencing Nickelodeon's market power, the rates charged to Cablevision for the package that includes Nickelodeon have increased over time, even as Nickelodeon's ratings have decreased.  For Nickelodeon and other Core Networks (███████████████████████████████████████████████),
Viacom charged Cablevision ███████████████████████████████████████.

Viacom also increased Nickelodeon's stand-alone "rate card" price during the same period: from ████████████████████████████████████████. Yet Nickelodeon's ratings, measured by Cablevision data gathered from subscribers' set-top boxes, declined from 2010 to 2012 – as did the ratings of every one of Viacom's Core Networks. National ratings also showed declines for Nickelodeon during the same period, with the *New York Times* on January 31, 2013 reporting "drastic ratings declines" for Nickelodeon that began in late 2011. Viacom has extracted even higher rates for 2013 to ████, as alleged below. Nickelodeon's popularity among advertisers further demonstrates Nickelodeon's attraction to consumers and, therefore, why Nickelodeon is commercially critical to Cablevision and to other distributors: Nickelodeon ranks among the top five networks with the highest gross advertising revenue in the nation. Moreover, Nickelodeon ranks second among nearly 200 networks for the highest annual cash flow. Accordingly, the distribution of Nickelodeon comprises a distinct relevant tying product market.

34.     **Comedy Central.**  Comedy Central, as its name suggests, is a comedy-focused network targeting adults aged 18 to 49. Comedy Central's programming includes news satire programs such as *The Daily Show with Jon Stewart* and *The Colbert Report*; stand-up, sketch, and variety comedy shows such as *Tosh.0* and *Key & Peele*; and scripted narrative programs such as *South Park, Futurama*, and *Workaholics*. No other network is reasonably comparable to, or reasonably interchangeable with, Comedy Central. Although some other networks offer comedy-oriented programming or target a similar audience, such networks lack the high ratings and strong following that Comedy Central enjoys, or offer somewhat differently targeted programming. A distributor such as Cablevision would not substitute another such network, or any other network, in response to an exercise of market power over Comedy Central. Cross elasticity of demand between Comedy Central and other networks is accordingly low.

15

35.     Directly evidencing that Comedy Central is its own relevant market over which Viacom possesses substantial market power, all of the top 15 U.S. video distributors, accounting for nearly 95% of subscribers to traditional video distribution services, carry Comedy Central and many have for years.  Similarly directly evidencing Comedy Central's market power, the rates charged to Cablevision for Comedy Central have steadily increased over time, even as Comedy Central's ratings have decreased.  For example, Viacom charged Cablevision ███████. Viacom's ██████████████████████  ██████████████. Yet Comedy Central's ratings, measured by Cablevision data gathered from subscribers' set-top boxes, declined from 2010 to 2012 – as did the ratings of every one of Viacom's Core Networks.  National ratings also showed declines for Comedy Central during the same period.  Viacom has extracted even higher rates for 2013 to ███ as alleged below. Comedy Central's popularity among advertisers further demonstrates Comedy Central's attraction to consumers and, therefore, why Comedy Central is commercially critical to Cablevision and to other distributors:  Comedy Central ranks among the top 20 networks with the highest gross advertising revenue in the nation.  Moreover, Comedy Central ranks among the top 25 of nearly 200 networks for the highest annual cash flow.  Accordingly, the distribution of Comedy Central comprises a distinct relevant tying product market.

36.     **BET.**  BET is the premier network for young African Americans, focused on African American teens and adults aged 18 to 34.  BET's programming includes scripted hits *Reed Between the Lines*, *Everybody Hates Chris*, *Girlfriends*, *My Wife and Kids*, and *Asylum*; reality shows *College Hill*, *Brothers to Brutha*, *Toya: A Family Affair*, *First In*, and *Baldwin Hill*; and awards and music-based programs *106 & Park*, *BET Awards*, *BET Honors*, *Black Girls*

*Rock*, *BET Hip Hop Awards*, *Sunday Best*, and *Soul Train Awards*.  No other network is reasonably comparable to, or reasonably interchangeable with, BET.  Although some other networks offer African American oriented programming or target a similar audience, such networks lack the high ratings and strong following that BET enjoys.  A distributor such as Cablevision would not substitute another such network, or any other network, in response to an exercise of market power over BET.  Cross elasticity of demand between BET and other networks is accordingly low.

37.     Directly evidencing that BET is its own relevant market over which Viacom possesses substantial market power, all of the top 15 U.S. video distributors, accounting for nearly 95% of subscribers to traditional video distribution services, carry BET and many have for years.  Similarly directly evidencing BET's market power, the rates charged to Cablevision for BET have steadily increased over time, even as BET's ratings have decreased.  For example, Viacom charged Cablevision ███████████████████████████████████████████████ ██████.  Yet BET's ratings during that same time period, measured by Cablevision data gathered from subscribers' set-top boxes, declined from 2010 to 2012.  National ratings also showed declines for BET during the same period.  Viacom has extracted even higher rates for 2013 to ████ as alleged below.  BET's popularity among advertisers further demonstrates BET's attraction to consumers and, therefore, why BET is commercially critical to Cablevision and to other distributors:  BET ranks among the top 20 networks with the highest gross advertising revenue in the nation.  Moreover, BET ranks among the top 25 of nearly 200 networks for the highest annual cash flow.  Accordingly, the distribution of BET comprises a distinct relevant tying product market.

38.     **MTV.**  MTV airs, among other programming, scripted and reality programming focused on youth and young adults.  Its key programs include reality hits such as *Jersey Shore*, *Teen Mom*, *16 and Pregnant*, *Punk'd*, and *The Real World*; scripted programs such as *Underemployed* and *Teen Wolf*; and signature awards shows such as the *MTV Video Music Awards* and the *MTV Movie Awards*.  MTV's target demographic is ages 12 to 34.  No other network is reasonably comparable to, or reasonably interchangeable with, MTV.  Although some other networks offer young adult oriented programming or target a similar audience, such networks lack the high ratings and strong following that MTV enjoys, or offer somewhat differently targeted programming.  A distributor such as Cablevision would not substitute another such network, or any other network, in response to an exercise of market power over MTV.  Cross elasticity of demand between MTV and other networks is accordingly low.

39.     Directly evidencing that MTV is its own relevant market over which Viacom possesses substantial market power, all of the top 15 U.S. video distributors, accounting for nearly 95% of subscribers to traditional video distribution services, carry MTV and many have for years.  Similarly directly evidencing MTV's market power, the rates charged to Cablevision for the package that includes MTV have increased over time, even as MTV's ratings have decreased.  For MTV and other Core Networks ███████████████████████████ ██████████████████████████), Viacom charged Cablevision ████████████████ ████████████████████████████.  Viacom also increased MTV's stand-alone "rate card" price during the same period: from ██████████████████████████ ██████.  Yet MTV's ratings during that same time period, measured by Cablevision's data gathered from subscribers' set-top boxes, declined from 2010 to 2012 – as did the ratings of every one of Viacom's Core Networks.  National ratings also showed declines for MTV during

the same period.  Viacom has extracted even higher rates for 2013 to ███ as alleged below.

MTV's popularity among advertisers further demonstrates MTV's attraction to consumers and,

therefore, why MTV is commercially critical to Cablevision and to other distributors:  MTV

ranks among the top 10 networks with the highest gross advertising revenue in the nation.

Moreover, MTV ranks among the top 10 of nearly 200 networks for the highest annual cash

flow.  Accordingly, the distribution of MTV comprises a distinct relevant tying product market.

40.    Viacom has substantial power in each relevant tying product market.  Viacom

possesses 100% of each relevant tying product market, because Viacom holds exclusive rights to

each Tying Network.  Barriers to entry into these markets are high.  Viacom possesses

intellectual property rights over its networks that confer on Viacom exclusive rights to distribute

Viacom programming.

41.    More generally, the barriers to developing commercially critical networks, such as

each of the Tying Networks, or popular networks are high.  Those barriers to entry and

expansion additionally protect the substantial market power enjoyed by Viacom's Tying

Networks.  A key asset of a commercially critical network is commercially critical programming

– programming that a substantial number of subscribers demand from video providers such as

Cablevision and without which a substantial number of subscribers will switch to a video

distributor's competitors.  Commercially critical programming can be acquired or it can be

created.  Either course involves risking significant sunk costs.

42.    Purchasing popular or commercially critical programming is expensive.  Viacom,

for example, reports that it spent approximately $3 billion on programming expenses in 2012 for

its Media Networks segment, which operates all of Viacom's Core and Suite Networks.  One

industry source indicates that Viacom spends many hundreds of millions of dollars per year on

the programming aired on MTV and Nickelodeon, both of which rank among the top 10 networks distributed in the United States as measured by programming expenses.  Comedy Central and BET are not far behind, with each estimated to spend more than a hundred million dollars on programming per year.

43.     Even if a network owner is willing to sink hundreds of millions of dollars into programming, the desired programming may not be available for acquisition, since such programming is typically tied up in multi-year or multi-season exclusive agreements.  For example, in recent years, the network Lifetime acquired the rights to air five seasons of *Project Runway* for $150 million.  Moreover, there is a risk that, having sunk hundreds of millions of dollars into particular programming, consumers will no longer find the programming desirable.

44.     Seeking to create commercially critical programming also confronts high barriers. Creating original programming can be very expensive.  For example, the FCC has reported that a typical original hour-long cable drama costs approximately $2 million per episode.  If a program catches on and becomes the sort of hit that can drive a network's brand and give it leverage in negotiations with distributors and advertisers, that program's cost of production will increase over time to several million dollars per episode and require paying star actors and directors millions of dollars per season in salaries.

45.     Moreover, original programming does not come with a guaranteed audience or distribution. According to one source, more than a third of the scripted dramatic series introduced on cable networks during the 1999 to 2000 through the 2011 to 2012 television seasons were cancelled before reaching their second season.  As *The Wall Street Journal* reported in "The Math of a Hit TV Show," published May 12, 2011, "almost all [new shows] will fail."  Big budget shows are not immune from the high risk of failure, as the fate of Starz's

*Camelot* and AMC's *Rubicon* – both cancelled after one season – demonstrates.  Networks featuring new original programming must also induce distributors to devote scarce capacity and other resources to carry such networks; in short, programmers must convince distributors to invest in the prospect that the network might succeed.  The need to overcome this "chicken and egg" problem (distributors may not be willing to share risk without a track record of success) also adds to entry barriers.

46.     Even if a network surmounts these barriers and acquires or develops programming that resonates with audiences, only a relatively small number of such networks become popular, let alone commercially critical.  Becoming popular can take many years, further increasing the sunk costs that must be risked.  For example, Disney Channel, now one of the longest running and most successful of the networks owned by The Walt Disney Company, first launched in 1983.  Yet the network became popular only in the late 1990s and early 2000s, after it was able to develop hit programs such as *Lizzie McGuire* and *High School Musical*.  That process took more than 15 years.  Many other networks, even those with significant financial backing, fail to achieve even modest popularity and, as a result, are dropped by providers (or never carried in the first place).

47.     Commercially critical networks may take even longer periods of time, and require risking even greater sunk costs, to achieve their position.  For example, Viacom's network MTV took many years to transition from, in 1981, a niche channel exclusively playing licensed music videos to today's iconic network with several top-rated series.  To obtain such popularity, MTV invested heavily in its own programming, at one point adding 16 original shows over the course of five months in order to overcome slumping ratings.

21

48.     Commercially critical networks, including each Tying Network, also possess significant brand equity.  Subscribers are more willing to try new shows on a network because of the network's reputation and brand image.  Viewers, for example, are more likely to watch a new series on HBO (such as *Boardwalk Empire*, *Treme*, *Girls*, or other recently launched series) than on a lesser-known network.  Networks seeking to become popular, or commercially critical, must overcome this advantage that incumbent popular or commercially critical networks possess.  That, too, adds to barriers to entry and expansion.  Lesser-known networks confront barriers that incumbents did not in seeking to establish their networks as popular or commercially critical.

49.     In short, creating a commercially critical network is very expensive, presents a high risk of failure, and takes a long period of time.  These factors create substantial entry barriers.  Viacom accordingly possesses substantial market power in each tying product market.

**2.     Viacom's Core Networks In the Alternative Comprise A Valid Tying Product Market**

50.     Because one or more Tying Networks confer upon Viacom market power in one or more relevant tying product markets, Viacom possesses market power in a relevant tying product market.  Moreover, were the tying product viewed as the set of Core Networks as a whole, Viacom plainly possesses market power, and it would be appropriate to define the tying market in the alternative as the Core Networks.

51.     Viacom's market power is directly evidenced by its ability to raise rates to Cablevision for the Core Networks during a period in which, as measured by Cablevision's set-top box data, the ratings for every Core Network fell.  Viacom told Cablevision that Viacom had also raised rates by an average of ██ to other distributors that operate in the New York area despite the ratings decline.  Moreover, every one of the top 15 U.S. video distributors, accounting for nearly 95% of subscribers to traditional video distribution services, distribute the

22

Core Networks.  The above facts demonstrate that a video distributor such as Cablevision would not substitute a different set of networks in response to an exercise of market power over the Core Networks; that other networks are not reasonably interchangeable with Viacom's Core Networks; and that cross elasticity of demand between the Core Networks and other networks is low.  Accordingly, in the alternative, distribution of the Core Networks comprises a relevant tying product and market over which Viacom, with a 100% share protected by high entry barriers for the reasons alleged above, possesses significant market power.

**3.  Viacom's Tying Networks Each Enjoy Substantial Market Power Even In Broader Markets**

52.  Viacom would still possess substantial market power in one or more tying product markets even if the relevant markets were not the individual Tying Networks or the Core Networks, but rather categories of programming.

53.  Networks are differentiated products that are imperfect substitutes for one another.  Whether networks are reasonably interchangeable with one another from the perspective of a distributor depends on a range of factors: target audience, programming genre, ratings, and importance of the category of programming for retaining subscribers, among other factors.  Even if each Tying Network were reasonably interchangeable with their next-best (or closest possible) substitutes, Viacom would still posses market power over each tying market, as alleged below.

**Popular Children's Programming**

54.  There is, in the alternative, a distinct tying product market for the distribution of networks that feature Popular Children's Programming.  Such networks (i) feature programming that appeals to a specific group – here, children between the ages of 6 and 14; and (ii) are highly rated.  Popular Children's Programming is a category that a video distributor must offer in its

channel line-up or risk losing a substantial number of subscribers to competitors.  Because

Popular Children's Programming is a commercially critical category, other networks are not

reasonably interchangeable with networks that feature Popular Children's Programming.  A

video distributor such as Cablevision would not substitute other networks for those featuring

Popular Children's Programming in response to a significant price increase.  There is low cross

elasticity of demand between networks that feature Popular Children's Programming and other

networks.  And a hypothetical monopolist over the distribution of networks that feature Popular

Children's Programming could successfully raise prices above competitive levels.

55.     Directly evidencing these realities, every one of the top 15 U.S. video distributors,

accounting for nearly 95% of subscribers to traditional video distribution services, has long

carried one or more networks that feature Popular Children's Programming.  And, as alleged

above, Viacom has succeeded in raising the rates for its Popular Children's Programming

offering, Nickelodeon, during a period in which Nickelodeon's ratings have declined.  Networks

that feature Popular Children's Programming, moreover, have been among the very highest rated

networks for well over a decade.

56.     As alleged above, Viacom's Nickelodeon network has no reasonable substitute.

But if the relevant market were expanded to distribution of networks that feature Popular

Children's Programming, that market might also include two other networks, Disney Channel

and Cartoon Network, but no other networks.  Regardless of the networks included in the market,

Viacom would possess substantial market power.

57.     Disney Channel is The Walt Disney Company's premier children's network,

targeted to children ages 6 to 14 and their families.  Disney Channel's programming includes

shows such as *A.N.T. Farm, Good Luck Charlie, Jessie, Shake It Up, Austin & Ally*, and *Disney's*

*Mickey Mouse Clubhouse*, among others.  Disney Channel's programming is similar to Nickelodeon's, but targets a somewhat narrower age range.  If Nickelodeon has a next-best substitute, it is Disney Channel.

58.     Cartoon Network, distributed by Turner Broadcasting (a Time Warner company), also targets children aged 6 to 14, with an emphasis on animated programs.  Cartoon Network's programming includes shows such as *Adventure Time*, *Ben 10: Ultimate Alien*, *Destroy Build Destroy*, *Dude*, *What Would Happen*, *Generator Rex*, *Hole in the Wall*, and *MAD*.  Cartoon Network's programming skews more toward boys than either Disney Channel or Nickelodeon and, like Disney Channel, targets a somewhat narrower age range than Nickelodeon.  Also unlike Disney Channel or Nickelodeon, Cartoon Network primarily airs cartoons.

59.     Disney Channel and Cartoon Network are the only other networks that offer children's oriented programming that remotely approach Nickelodeon's popularity.  A market confined to Popular Children's Programming would include no other networks.  Other networks, such as the broadcast network PBS, the network Sprout, and Viacom's Nick Jr. network, are not in this market because their programming and/or target audience differ.  PBS is a general broadcast network that shows children's programming only a small portion of the time (weekday mornings, for example, when *Sesame Street* airs); many of its other important programs are news, public interest, arts, or other programs that are clearly not substitutes for programming exclusively focused on children.  Likewise, both Sprout and Nick Jr. target very young children, aged 2 through 5.  Popular Children's Programming offered by networks such as Nickelodeon, Cartoon Network, or Disney Channel focuses on older, principally school-aged children.  Other children's oriented networks, such as The Hub, are not as widely viewed and, therefore, would not satisfy a video distributor's demand for a popular offering in this category.

60.     Viacom possesses substantial market power over the distribution of networks that feature Popular Children's Programming.  Measured by ratings, Viacom's share is approximately 40%.  Every one of the top 15 video distributors in the country carries Nickelodeon, and Nickelodeon has been the top rated cable network over the last 17 years.  Barriers to entry into the distribution of networks that feature Popular Children's Programming are high.  The same barriers to entry and expansion that make it difficult to develop commercially critical networks make it difficult to offer a network that features Popular Children's Programming.  Developing or acquiring quality children's programming is expensive, and even when such programming is developed or acquired, there is significant risk that it will fail to resonate with audiences, and new entrants must overcome the significant brand equity incumbents possess.

### Popular Comedy Programming

61.     There is an alternative distinct market for the distribution of networks that feature Popular Comedy Programming.  Such networks (i) feature programming that appeals to a specific group – here, adults and young adults seeking comedy entertainment; and (ii) are highly rated.  Popular Comedy Programming is a category that a video distributor must offer in its channel line-up or risk losing a substantial number of subscribers to competitors.  Because Popular Comedy Programming is a commercially critical category, other networks are not reasonably interchangeable with networks that feature Popular Comedy Programming.  A video distributor such as Cablevision would not substitute other networks for those featuring Popular Comedy Programming in response to a significant price increase.  There is low cross elasticity of demand between networks that feature Popular Comedy Programming and other networks.  And a hypothetical monopolist over the distribution of networks that feature Popular Comedy Programming could successfully raise prices above competitive levels.

62.     Directly evidencing these realities, every one of the top 15 U.S. video distributors, accounting for nearly 95% of subscribers to traditional video distribution services, has long carried one or more networks that feature Popular Comedy Programming.  And, as alleged above, Viacom has succeeded in raising the rates for its Popular Comedy Programming offering, Comedy Central, during a period in which Comedy Central's ratings have declined.

63.     As alleged above, Viacom's Comedy Central network has no reasonable substitute.  But if the relevant market were expanded to distribution of networks that feature Popular Comedy Programming, that market might also include Adult Swim but no other networks.  Regardless of the networks included in the market, Viacom would possess substantial market power.

64.     Adult Swim, which originated as a block of night-time programming on Cartoon Network but then became its own network for ratings purposes, airs its programs over Cartoon Network from 11 p.m. to 6 a.m.  During that time slot, and in contrast to Cartoon Network's daytime children's-focused programming, Adult Swim targets adults aged 18 to 34.  In contrast to Comedy Central, its programming is largely animated.  Much of Adult Swim's programming, however, is comedy-oriented, including *Aqua Unit Patrol Squad 1*, *Childrens Hospital*, *Delocated*, *Eagleheart*, *Metalocalypse*, *Mongo Wrestling Alliance*, *NTSF:SD:SUV::*, *Robot Chicken*, and *Squidbillies*.  However, in some contrast to Comedy Central, Adult Swim's programming is more irreverent and targets a younger and more male audience.

65.     Adult Swim is the only network that, like Comedy Central, focuses on comedy and approaches Comedy Central's ratings.  Other networks, such as FX or the Independent Film Channel (IFC), are not in this market because they feature different programming or seek to appeal to a different audience.  Although these networks may air some comedy-oriented

programming, they are better known for their non-comedy programming, such as drama series or feature films. The same is true of TBS, a network that features original and syndicated programming across a variety of genres, including comedy, as well as significant sports programming. TBS does not belong in the market with Comedy Central and Adult Swim, because non-comedy programming substantially contributes to TBS's popularity, as demonstrated by spikes in TBS's ratings when key sporting events air. Moreover, the network's comedy-oriented programming, which principally features re-runs of traditional "situation" comedy programs, differs from the satirical and irreverent programming that drives the popularity of Comedy Central and Adult Swim. Still other networks that offer comedy programming, such as Comedy.tv, are not widely viewed and, therefore, would not satisfy a video distributor's demand for a popular offering in the category. Accordingly, a market for the distribution of networks that feature Popular Comedy Programming would include no networks other than Comedy Central and Adult Swim.

66.     Viacom possesses substantial market power in this market. Measured by ratings, Viacom's market share exceeds 40%. Demonstrating Viacom's market power, every one of the top 15 video distributors in the country carries Comedy Central, and Comedy Central has been highly rated for nearly a decade. Barriers to entry into the distribution of networks that feature Popular Comedy Programming are high. The same barriers to entry and expansion that make it difficult to develop a commercially critical network make it difficult to offer a network that features Popular Comedy Programming. Developing or acquiring quality comedy programming is expensive, and even when such programming is developed or acquired, there is significant risk that it will fail to resonate with audiences, and new entrants must overcome the significant brand equity incumbents posses.

**Popular African American Programming**

67.     There is an alternative distinct market for the distribution of networks that feature Popular African American Programming.  Such networks (i) feature programming that appeals to a specific group – here, African American adults and young adults seeking African-American oriented programming; and (ii) are highly rated.  Popular African American Programming is a category that a video distributor must offer in its channel line-up or risk losing a substantial number of subscribers to competitors.  Because Popular African American Programming is a commercially critical category, other networks are not reasonably interchangeable with networks that feature Popular African American Programming.  A video distributor such as Cablevision would not substitute other networks for those featuring Popular African American Programming in response to a significant price increase.  There is low cross elasticity of demand between networks that feature Popular African American Programming and other networks.  And a hypothetical monopolist over the distribution of networks that feature Popular African-American Programming could successfully raise prices above competitive levels.

68.     Directly evidencing these realities, every one of the top 15 U.S. video distributors, accounting for nearly 95% of subscribers to traditional video distribution services, has long carried one or more networks that feature Popular African American Programming.  And, as alleged above, Viacom has succeeded in raising the rates for its Popular African American Programming offering, BET, during a period in which BET's ratings have declined.

69.     As explained above, Viacom's BET network has no reasonable substitute.  But if the relevant market were expanded to include distribution of networks that feature Popular African American Programming, that market might also include TV One but no other networks.

Regardless of the networks included in the market, Viacom would possess substantial market power.

70.     TV One, which is primarily owned by Radio One and Comcast Corporation, is a network that provides a range of entertainment, reality, and informational programming reflecting African American life, culture, and history.  Although, like BET, TV One targets African Americans, its programming is designed to target a slightly older set of viewers.  Popular TV One programming includes *R&B Divas, Unsung*, *The Rickey Smiley Show*, and *Celebrity Crime Files*.  If BET has a next-best substitute, it is TV One.

71.     Other networks that feature African American programming are not currently as popular as TV One and BET, feature different programming, or seek to appeal to a different audience.  Two such networks, GMC and Aspire, are described below.  Accordingly, such other networks would not satisfy a distributor's demand for a popular offering in the category.

72.     Viacom possesses substantial market power over the distribution of networks that feature Popular African American Programming.  Measured by ratings, Viacom's market share is approximately 77%, a level from which market power is readily inferred.  Demonstrating Viacom's market power, every one of the top 15 U.S. video distributors carries BET.  Even if the market included other networks that offer some African American programming, such as GMC and Aspire, Viacom's share would remain well over 60%.  Barriers to entry into the distribution of networks that feature Popular African American Programming are high.  The same barriers to entry and expansion that make it difficult to develop commercially critical networks make it difficult to offer a network that features Popular African American Programming.  Developing or acquiring quality African American oriented programming is expensive, and even when such programming is developed or acquired, there is significant risk that it will fail to resonate with

audiences, and new entrants must overcome the significant brand equity incumbents possess. Demonstrating these high barriers, TV One's ratings have not approached BET's since its 2004 launch.

### Popular Young Adult Programming

73.     There is an alternative distinct market for the distribution of networks that feature Popular Young Adult Programming.  Such networks (i) feature programming that appeals to a specific group – here, teenagers and young adults seeking pop culture-oriented programming; and (ii) are highly rated.  Popular Young Adult Programming is a category that a video distributor must offer in its channel line-up or risk losing a substantial number of subscribers to competitors.  Because Popular Young Adult Programming is a commercially critical category, other networks are not reasonably interchangeable with networks that feature Popular Young Adult Programming.  A video distributor such as Cablevision would not substitute other networks for those featuring Popular Young Adult Programming in response to a significant price increase.  There is low cross elasticity of demand between networks that feature Popular Young Adult Programming and other networks.  And a hypothetical monopolist over the distribution of networks that feature Popular Young Adult Programming could successfully raise prices above competitive levels.

74.     Directly evidencing these realities, every one of the top 15 U.S. video distributors, accounting for nearly 95% of subscribers to traditional video distribution services, has long carried one or more networks that feature Popular Young Adult Programming.  And, as alleged above, Viacom has succeeded in raising the rates for its Popular Comedy Programming offering, MTV, during a period in which MTV's ratings have declined.

75.     As alleged above, Viacom's MTV network has no reasonable substitute.  But if the relevant market were expanded to distribution of networks that feature Popular Young Adult Programming, that market might also include MTV2 and E!, but no other networks.

76.     MTV2, another Viacom network, features youth and young-adult male oriented programming, including music-based, reality, irreverent humor, and scripted programs.  MTV2 hit programs include music based programs *Sucker Free Countdown*, *The Dub Magazine Project*, and *Funk Flex Full Throttle*; sports and action oriented programs *Bellator Fighting Championships*, *The Dudesons*, *Nitro Live Circus*, and *Lingerie Football League*; and original programming *Guy Code* and *Hip Hop Squares*.  Although its target audience skews somewhat younger (ages 15 to 25), and its programming is more male oriented, MTV 2 offers programming similar to MTV and likewise targets the "millennial" generation (indeed, Viacom markets both MTV and MTV2 as key networks for "young people").

77.     E!, distributed by NBCUniversal, likewise features entertainment and pop culture programming and includes reality-based programs appealing to young adult audiences.  E!'s key programs include *Keeping up with the Kardashians*, *Married to Rock*, *The Soup*, *Fashion Police*, *Chelsea Lately, E! News,* and *Ice Loves Coco*.  Although E!'s target audience skews a bit older than MTV's, and although E! offers some more news-focused shows in addition to scripted and reality programs, some of E!'s programming is substantially similar to the other networks that feature Popular Young Adult Programming, MTV and MTV2.  Although neither E! nor MTV2 is as highly rated as MTV, those networks likely comprise a video distributor's next-best substitutes for MTV.

78.     Other networks do not belong in the same market as MTV, MTV2, and E!, because those networks offer different programming, target a different audience, or are not

32

popular enough to constitute alternatives.  For instance, another Viacom network, VH1, features music and pop-culture themed programming.  But VH1's target audience (18 to 49) is older and skews more female than MTV's.  Another example is Bravo, which offers some programming centered on entertainment and pop culture, including reality programs.  But like VH1, Bravo's target audience skews older.  Fuse, another young-adult focused network that features music-themed programming, has struggled to gain popularity.  Accordingly, a market of networks that feature Popular Young Adult Programming would not include these or any other networks.

79.     Because Viacom has exclusive rights to MTV and MTV2, Viacom possesses at least a 65% share of the relevant market (as measured by ratings), a level from which market power is readily inferred.  Viacom would possess market power even if the market were expanded to include VH1 and Bravo (which target a different audience) or networks that offer similar programming but lack strong ratings.  If the market included all these networks, too, Viacom's share measured by ratings would still exceed 50%.

80.     Barriers to entry into the market for distribution of networks featuring Popular Young Adult Programming are high.  The same barriers to entry and expansion that make it difficult to develop commercially critical networks make it difficult to offer a network that features Popular Young Adult Programming.  Developing or acquiring quality young adult oriented programming is expensive, and even when such programming is developed or acquired, there is significant risk that it will fail to resonate with audiences, and new entrants must overcome the significant brand equity incumbents possess.

### 3.     **Geographic Market**

81.     The relevant geographic dimension of each tying product market is nationwide.  Viacom licenses its networks nationwide.  The other networks described above are available for

distribution nationwide.  Cablevision and other video distributors seek to license programming from sources with rights to license programming within the United States.

82.     Alternatively, a relevant geographic market includes the New York Designated Marketing Area ("DMA").  Cablevision operates, and seeks to distribute programming, in the New York DMA, among other areas.  Because the distribution of programming networks is non-rivalrous (consumption by one customer does not exhaust programming for others), programmers (including Viacom) do not view distribution of networks in other areas as a substitute for the distribution of those networks in the New York DMA.  Similarly, Cablevision does not view itself in competition for programming with distributors with which Cablevision does not compete for subscribers – for example, distributors who operate in wholly different geographical areas than Cablevision.  Although the New York DMA is an alternative market here, by contrast, in a consumer-facing antitrust case, the relevant geographic markets likely would be narrower than the New York DMA.

83.     Regardless of how the geographic market is defined, however, the result is the same: Viacom possesses substantial market power over the tying product(s) in numerous tying product markets.  As explained below, Viacom has wielded its substantial power over the four Tying Networks to compel Cablevision to distribute other programming – the Suite Networks – to harm competition, consumers, and Cablevision.

**VIACOM'S UNLAWFUL TYING ARRANGEMENT**

**C.     Viacom's Suite Networks And The Tied Market of General Programming**

84.     In addition to Viacom's eight Core Networks – Nickelodeon, Comedy Central, BET, MTV, MTV2, Spike, TV Land, and VH1 – Cablevision carries other Viacom networks.  Viacom describes these additional networks as its "Suite Networks."  The Suite Networks include Centric, CMT, CMT Pure Country, Logo, MTV Hits, MTV Jams, Nick 2, Nick Jr.,

Nicktoons, Palladia, TeenNick, Tr3s, VH1 Classic, and VH1 Soul.  Viacom also distributes a network called BET Gospel that Viacom lists as a Suite Network ███████████████ ████████████████████████████████████████████████████████████████ ████████.

85.     Centric, formerly known as BET on Jazz, BET Jazz, and BET J, is a general programming network focused on African American adults.

86.     CMT is a country music-oriented network that airs programming related to American country music, including music videos, reality shows, and taped concerts.

87.     CMT Pure Country focuses on country music-themed programs, with an emphasis on contemporary country music videos.

88.     Logo features original and syndicated programming including movies, dating shows, comedy programs, and reality programs designed to appeal to the LGBT community.

89.     MTV Hits is a music video network with programming consisting primarily of music videos for current hit music.

90.     MTV Jams, formerly known as MTVX, focuses on rap, R&B, hip-hop, and soul music-based programs, with an emphasis on music videos.

91.     Nick2 is an alternate time-zone feed of Nickelodeon, showing, in systems that also carry Nickelodeon, Nickelodeon's programming on a three-hour adjusted schedule.

92.     Nick Jr. is a network for preschoolers (children aged 2-5), focusing on educational-oriented content.

93.     Nicktoons features animated programming originally shown on Nickelodeon, as well as other animated and live-action programming.

94.     Palladia is a high definition music television network that features music and

music video-related programming from MTV, VH1, and CMT.

95.     TeenNick is a network focused on children and teenagers aged 9-17, including original and syndicated programming as well as certain Nickelodeon programming.

96.     Tr3s, formerly known as MTV Tr3s, MTV S, and MTV en Espanol, targets bilingual Latinos and others aged 12 to 34, featuring programming related to Latin American and American music.

97.     VH1 Classic is a music-oriented network focusing on music videos, concerts, and music-related programs, including programs that formerly aired on VH1.

98.     VH1 Soul focuses on soul, R&B, and similar music-themed programs, with an emphasis on music videos.

99.     In contrast to the Tying Networks, none of Viacom's Suite Networks features commercially critical programming.  Rather, the Suite Networks – many of which have low ratings – comprise networks that feature general programming, distribution of which is the tied market here.  The geographic scope of the tied product market of general programming is the same as the tying product market.

100.    General programming is non-local programming that does not fall into a commercially critical category.  Networks that feature general programming are significantly less important to a distributor such as Cablevision than networks that feature commercially critical programming (or, in the alternative as alleged above, networks that feature certain categories of commercially critical programming).  The absence of a particular general programming network, or a particular set of general programming networks, from a distributor's channel line-up is unlikely to jeopardize a video distributor's ability to attract or retain a substantial number of subscribers.  Rather, a video distributor such as Cablevision constructs its channel line-up so as

to attract subscribers and differentiate its packages, in part by selecting from among a wide set of competing sources of general programming.

101.    For example, and as further alleged below, if Viacom did not wield its substantial market power over the Tying Networks to compel Cablevision to distribute Suite Networks, Cablevision would consider a wide variety of alternatives to the Suite Networks that Cablevision distributes.  Some of these competing networks – foreclosed by Viacom's tie-in – offer programming similar to, and designed to appeal to the same audiences as, certain Suite Networks.  Other foreclosed competing networks offer programming that appears quite different from that of the Suite Networks.  That Cablevision would consider a wide range of alternative programming if not compelled to carry the Suite Networks evidences that the set of reasonable substitutes for a particular general programming network is broad.  Moreover, as that wide range of networks evidences, general programming networks can include networks that focus on specialized subject matters.  This broad set of reasonable substitutes contrasts with the very narrow, or nonexistent, set of reasonable substitutes for networks that feature popular programming in particular categories or networks that feature commercially critical programming, as alleged above.

102.    The market for distribution of general programming networks excludes networks that feature local programming, because an MVPD video distributor, such as Cablevision, generally must offer networks that feature local programming or else face significant subscriber losses.  A hypothetical monopolist over the range of networks that feature general programming could exercise market power, and cross elasticity of demand between general programming networks and other networks is low.

103.    Moreover, there is demand by video distributors for networks that feature general

programming that is separate from demand for each of the commercially critical Tying Networks (or, in the alternative, for networks that offer highly popular offerings in particular programming categories) that is efficient for programmers to meet separately.  A programmer such as Viacom that offers networks featuring commercially critical programming as well as networks that feature general programming could efficiently supply each network separately.

104.     Viacom recognizes that it could easily supply its Tying (and Core) Networks separately from its general programming Suite Networks.  Viacom maintains a rate card that purports to specify rates for each Core and Suite Network or for taking particular combinations of networks.  Although, as alleged below, Viacom's rate card is structured to coerce an unlawful tie-in, that Viacom maintains an "a la carte" rate card demonstrates both that there is separate demand to license the individual Tying Networks apart from other programming and that it is efficient for a programmer such as Viacom to meet that demand.  For the same reasons, Viacom could also efficiently supply the Core Networks as a group separately from the Suite Networks.

105.     Viacom, however, is not content to permit its Suite Networks to compete on their merits against other sources of general programming.  Rather, as detailed below, Viacom has tied distribution of its Tying Networks to Cablevision's distribution of Viacom's Suite Networks, thereby foreclosing other general programming networks.

**D.     In ███ Viacom Wielded Its Power Over the Tying Networks To Compel Cablevision To Carry The Suite Networks**

106.     Cablevision originally licensed Suite Networks ██████.  Moreover, Viacom at times introduced new Suite Networks and gave Cablevision ██████████████. ███ ████████████████████████████████████ ███████████████████████████████████ ██████████████████████████. For example, █████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████. Likewise,

███████████████████████████████████████████

████████████████████████████████████████████████

██████.

107.    Cablevision's recent distribution of Suite Networks, by contrast, has not been

██████. At the end of █████, Cablevision's contract for distribution of Viacom's Core and

Suite Networks was set to expire (███████████████████████████████

█████████████████████████████████████████████████

████████████████). Cablevision sought to negotiate an agreement with Viacom under

which Cablevision would pay for and distribute only Viacom's Core Networks, but have no

obligation to distribute Suite Networks.

108.    The Core Networks include not only the commercially critical four Tying

Networks, but also four other networks popular with Cablevision's subscribers: (i) Spike, a

network that airs programming targeted primarily to men; (ii) TV Land, a network that airs

programming designed to appeal to older viewers; (iii) VH1; and (iv) MTV2, the latter two of

which are described above.  Although Cablevision wanted to continue to carry each Core

Network, Cablevision no longer wished to carry Suite Networks, which were not as popular as

the Core Networks and/or for which Cablevision believed it had better alternatives for scarce

bandwidth and programming dollars.

109.    In response, Viacom told Cablevision that a Core-only deal was a non-starter and

that Viacom would not consider any proposal that did not include Suite Networks.  Cablevision's

request for a Core-only agreement, Viacom explained, was "hostile."  Viacom also told

Cablevision that "we have an overall relationship for all of our services and you can't just take

some of them off."

110.    Viacom then engaged in the coercive tactics it was to repeat ██ years later.

Viacom clarified in late December ██ and early January ██ exchanges that, if Cablevision

did not wish to license all of the Core and Suite Networks, Cablevision could license networks at

rates specified by Viacom's then-operative "rate card" ("the ██ Rate Card").  Viacom,

however, acknowledged that the rates specified on the ██ Rate Card were structured to coerce

operators such as Cablevision to take both the Core and the Suite networks.  Viacom told

Cablevision that it "would not like" the rates specified on the rate card.

111.    Analysis of the rate card demonstrated why Cablevision "would not like" it.

Under the ██ Rate Card, Cablevision would pay significantly more for *only* the Core

Networks than Cablevision would pay for *both* the Core and Suite Networks combined under

Viacom's bundled proposal.  Specifically, under the ██ Rate Card, Cablevision would have

paid ████████ per year to take only the Core Networks; but Viacom's then-operative offer

called for Cablevision to pay ███████ per year to take the Core as well as the Suite.  In other

words, Cablevision would pay a yearly penalty of nearly *$██ million* (more than ███████) for the

Core in order to distribute other programming in place of the Suite Networks.

112.    On information and belief, none of the top 15 U.S. video distributors pay the rates

listed on Viacom's rate card.  Indeed, Viacom confirmed to Cablevision that the only distributors

that it permits not to carry Suite Networks, and therefore would have reason to invoke the rate

card, are small distributors that face severe bandwidth limitations.  The purpose of relegating a

significant video distributor such as Cablevision to the rate card in place of a customized deal is

to force that distributor to take Suite Networks.  Viacom brandished the ▮▮ Rate Card to Cablevision precisely because it left Cablevision no viable economic option except to avoid the near $▮ million per year penalty by negotiating a contract for both the Core and the Suite Networks.

113.     Cablevision, in fact, had no other viable economic option.  In recognition of the commercial importance of the Tying Networks that Viacom includes in the Core, Cablevision capitulated to Viacom's demands and agreed in January ▮▮ to carry both the Core and the Suite ("the ▮▮ Agreement").  As before, Viacom not only required Cablevision to carry the Suite Networks Cablevision already carried, but also required Cablevision to carry them ▮▮ ▮▮▮▮▮▮▮▮▮.  Following amendments to other agreements between Cablevision and Viacom, all contracts for carriage of Viacom's Core and Suite Networks were set to expire on ▮▮▮▮▮▮▮.

**E.     Viacom Repeats Its Abusive Tactics And Unlawfully Coerces Cablevision In 2012 To Continue To Carry Suite Networks**

114.     Because Viacom forced Cablevision to carry Suite Networks in ▮▮, a number of factors have exacerbated the costs to Cablevision of distributing Suite Networks.

115.     First, ***all*** of Viacom's Suite Networks distributed in Cablevision's eastern territories (which include territories principally in the New York DMA) have declined in popularity.  Cablevision's proprietary data gathered from subscribers' set-top boxes ("set-top box" or "STB" data) shows declines among Cablevision's subscribers for all Suite Networks in Cablevision's service areas (predominantly in the New York DMA).  This data shows, for example, that MTV Hits declined 72% from a yearly average STB rating of 0.29 in 2010 to 0.08 in 2012.  Likewise, VH1 Soul fell 75% from a yearly average STB rating of 0.20 in 2010 to just 0.05 in 2012.  Even Nick Jr., the most popular of the Suite Networks, dropped from a yearly

average STB rating of 1.68 to 0.71, amounting to a 57% decline.

116.    Cablevision's eastern experience comports with national trends.  National ratings data show substantial declines in the daytime and primetime ratings for virtually all of the Viacom Suite Networks.  One source lists Logo and VH1 Classic, both Suite Networks, as among the 10 lowest-rated cable networks, for both prime-time and 24-hour-average viewing. At the same time, the number of networks offering quality general programming that Cablevision might prefer to carry over Suite Networks has increased.  This includes a greater number of HD channels.  Accordingly, the opportunity cost to Cablevision of carrying some dozen Suite Networks over alternatives has become more significant since the ▮▮ Agreement.

117.    Second, competition for video services – already intense in ▮▮ – has increased. Traditional competitors such as other cable providers, overbuilders, and satellite providers have continued to strengthen their offerings, deploying a slew of new services – including expanded VOD offerings, streaming on mobile devices, and high-speed Internet access.  In addition, there is even greater competition among Internet-based streaming video platforms, such as Netflix, Hulu, Amazon Instant Video, Apple TV, Xbox360, and numerous others.  Accordingly, competitive pressures to offer an increasingly differentiated video offering have increased; and, therefore, so too have the costs from the lost opportunities to differentiate incurred from being forced to carry the Suite.

118.    Third, Cablevision cannot meaningfully expand its overstretched programming budget to acquire additional programming.  Cablevision finds itself increasingly squeezed between the ever-greater demands made by programmers for the distribution of networks Cablevision already carries and intense competition for subscribers.  If not compelled to carry the Suite Networks, Cablevision could allocate funds paid to Viacom to instead purchase other

programming its subscribers would prefer over the Suite.

119.    Finally, Cablevision has deployed more capacity-intensive services to meet its subscribers' growing demand for video, Internet, and other services, making optimal allocation of scare bandwidth important.  Cablevision has a limited amount of capacity through which it distributes the myriad services it offers consumers, including high-speed Internet access, SD and HD channels, VOD and streaming services, and cloud-based remote DVR services, among others.  Since the ▮▮ Agreement, Cablevision has enhanced its offerings to subscribers and launched new services that require increasing amounts of bandwidth.  For example, the popularity and prevalence of HD channels have greatly increased since the ▮▮ Agreement, and subscribers increasingly demand a larger number of HD channels and offerings from distributors like Cablevision.  At the same time, Cablevision completed its transition to an all-digital network in its eastern territories.  Accordingly, Cablevision doubled the number of HD channels it offers from 70 at the end of 2008 to 140 as of December 2012.  These HD channels require many times the bandwidth of corresponding SD channels.  Cablevision's newly deployed cloud-based DVR service also utilizes significant bandwidth.

120.    As a result of these and other improvements in Cablevision's services, Cablevision today possesses only small amounts of uncommitted network bandwidth.  Although Cablevision plans to add additional network capacity, adding bandwidth costs millions of dollars and takes many months to deploy.  And it would not make business sense for Cablevision to take capacity away from other uses to launch new channels.  As a consequence, the opportunity cost to Cablevision of allocating scarce bandwidth to carry channels (including the Suite Networks) that its subscribers do not value over alternatives correspondingly has significantly risen.

121.    Accordingly, as the expiration date for Viacom's networks approached,

43

Cablevision once again sought from Viacom a carriage agreement that would not include the Suite Networks. But once again, Viacom refused to permit Cablevision to license the Core Networks alone and coerced Cablevision into distributing Suite Networks as a condition to obtaining access to any or all of Viacom's Tying Networks.

122.    On December 3, 2012, Cablevision and Viacom executives held a teleconference to discuss Cablevision's future carriage of Viacom's networks. During that discussion, Cablevision's Executive Vice President, Programming, Tom Montemagno, told Viacom that certain Core Networks were critically important to Cablevision but that Cablevision no longer wished to carry Suite Networks. Mr. Montemagno explained that Cablevision's subscribers are not interested in watching six MTV and four VH1 networks, and that Cablevision believed it could make better use of its resources on other networks and services.

123.    Viacom's Senior Vice President for Content, Distribution, and Marketing, Samantha Cooper, responded that a Core-only carriage agreement was a non-starter. Ms. Cooper emphasized that there could be no deal, from Viacom's perspective, that did not include the Suite Networks, and that "it's all about the bundle" and has "always been about the bundle." In short, Viacom made it clear that it would not consider any deal that did not include the Suite Networks.

124.    Following further telephone conversations during which little progress was made, on December 6, 2012, the parties held an in-person meeting in New York City. Ms. Cooper, speaking for Viacom, reiterated that Viacom would not consider a deal that did not include the Suite. Mr. Montemagno, for Cablevision, responded that Cablevision was simply not interested in carrying the Suite and wanted a Core-only deal. He asked Ms. Cooper for a proposal that would cover only the Core and not the Suite, but she responded that such a proposal would be "unproductive." Ms. Cooper said that she could send Cablevision Viacom's rate card; but, she

added, she lacked authority to provide a Core-only proposal to Cablevision.

125.   The next day, on December 7, 2012, Ms. Cooper transmitted by e-mail to Mr. Montemagno Viacom's current rate card ("the 2012 Rate Card").  The 2012 Rate Card listed prices for Viacom's Core Networks that, according to Ms. Cooper, are used with some of Viacom's affiliates.  Analysis of the 2012 Rate Card revealed that Cablevision would pay significantly more for only the Core Networks than what Cablevision would pay under Viacom's proposed renewal rate for both the Core and the Suite combined – just as with the 2008 Rate Card, but amounting to a much greater penalty than in 2008 for eschewing the Suite.

126.   Specifically, under the 2012 Rate Card, Cablevision would end up paying nearly $█ billion more, ███████████████████████, for carriage of *only* the Core Networks than Cablevision would pay under Viacom's November 1, 2012 offer for *both* the Core and Suite Networks.  This near $█ billion penalty for taking just the Core equated to a more than ███████ ████████ increase over Viacom's tied Core/Suite offer.  Likewise, if Cablevision carried *only* the Tying Networks, it would pay over $█ billion more under the 2012 Rate Card, and over █████ ████████ as much, than Cablevision would pay under Viacom's November 1, 2012 offer for *both* the Core and the Suite Networks.  Put differently, if Cablevision carried alternative networks in place of the Suite Networks, Viacom would massively penalize Cablevision no matter how that penalty is calculated.

127.   As Viacom well knew, Cablevision could not afford to pay Viacom's ten-figure penalty to avoid carrying Suite Networks.  Indeed, the total penalty for avoiding distribution of Viacom's Suite Networks exceeded Cablevision's entire 2013 budget for programming.  Viacom's rate card offer for just the Core Networks or the Tying Networks thus was no offer at all.  Accordingly, on December 12, 2012, Cablevision asked Viacom once more to reconsider its

position and make a realistic rate proposal for a deal that excluded the Suite Networks.

However, Viacom continued to refuse to make any genuine Core-only offer to Cablevision.

Instead, Viacom reiterated by e-mail later on December 12, 2012, that Cablevision's only options

were to elect to pay the Rate Card prices or agree to a deal including both the Core and the Suite.

128.    Viacom's insistence on conditioning Cablevision's distribution of the Tying

Networks on Cablevision's continued carriage of the Suite Networks confronted Cablevision

with a Hobson's choice.  On the one hand, Cablevision could surrender to Viacom's demand that

it carry both the Core and the Suite; but if Cablevision did so, Cablevision would be foreclosed

from distributing alternative general programming in the channel slots the Suite Networks

occupied or allocating funds paid to Viacom to purchase other programming.

129.    On the other hand, Cablevision could refuse to accede to Viacom's tie-in.  But

refusing to negotiate with Viacom for both the Core and Suite networks would leave Cablevision

without the ability to distribute Viacom's Tying Networks.  As Cablevision told Viacom, it

would constitute financial suicide to pay ███████ the price Viacom initially offered for the

Core and the Suite Networks combined for *just* the Core Networks (or even ███████

Viacom's offer for just the Tying Networks), as the illusory prices on Viacom's rate card

specified.  Refusing Viacom's tying arrangement, therefore, would deprive Cablevision of the

ability to offer subscribers commercially critical networks.  Subscribers would be left without

access to programs such as *SpongeBob SquarePants* (Nickelodeon), *Jersey Shore* and the *MTV*

*Video Music Awards* (MTV), *The Daily Show with Jon Stewart* and *The Colbert Report*

(Comedy Central), and *106 & Park* and the *Soul Train Awards* (BET), to name just a few highly

popular programs shown on Viacom's Tying Networks.  The inability to distribute Viacom's

Tying Networks accordingly would threaten to severely handicap Cablevision as a video

distributor.  Cablevision would risk losing a substantial number of subscribers to rivals.

130.    Cablevision accordingly determined that it must capitulate to Viacom's demands. The prospect of losing the ability to distribute **any** of the Tying Networks alone or in combination with other Tying Networks was sufficient to coerce Cablevision into agreeing to carry the Suite Networks.  The prospect of losing access to **all** of Viacom's Tying Networks, as well as other Core Networks Cablevision sought, made the need to surrender even clearer. Cablevision accordingly told Viacom on December 14, 2012 that it had no viable economic choice except to proceed to negotiate an agreement that would provide for distribution of both the Core and Suite Networks.  The parties proceeded to negotiate an agreement that covered not only the Core Networks but also, as Viacom insisted, the Suite Networks.

131.    On December 31, 2012, Cablevision entered into Viacom's proposed tying arrangement for the Core and Suite Networks ("the 2012 Tying Agreement" or "2012 Tying Arrangement").  ████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████ ██████████████████████████████████ ███████████████████████████████████ ████████████████████████████████████████ ████████████████████████.  These networks tie up as many as 2 HD and 10 SD channels in Cablevision's eastern territories and, depending on the cable system at issue, up to 2 HD and 12 SD channels in Cablevision's western territories.

132.    The 2012 Tying Agreement, ███████████████████████, requires Cablevision to ██████████████████████████████████████

██████████████████████████████████████████████. The agreement

provides for a huge increase in the effective rates ascribed to the Core Networks from █████████

███████████████████████████, a ██████ increase, followed by ██████ increases that

yield a █████ compound annual growth rate over the life of the agreement (█████████████████

████████████████████████████████████████████

██████████████████████████). Although the agreement provides for a slight

effective rate decline in ██████ for Suite Networks (from ██████ per subscriber to █████), rates

increase ████████████████████████████████████, a compound annual

growth rate of █████ from █████████ (███████████████████████████████

████████████████████████████).██████████████████████████████

█████████████████████████ ███████████████ the 2012 Tying Agreement

requires Cablevision ██████████████████████████████████████████████████

████████.

133.    Throughout the negotiations leading up to this agreement, Viacom reiterated the

necessity of Cablevision taking both the Core and the Suite Networks despite Cablevision's clear

expression of its desire for a Core-only agreement.  Viacom even refused to consider

Cablevision's proposal that the Suite Networks be distributed on less penetrated tiers (which

could have mitigated at least some of the harm to Cablevision and its subscribers from forced

distribution of the Suite), telling Cablevision that "[a]nything that moves us backwards is not

going to work."

## HARM TO COMPETITION, CONSUMERS AND, CABLEVISION

134.    Viacom's 2012 Tying Arrangement causes substantial foreclosure that harms competition, consumers, and Cablevision.

135.    Because Cablevision must distribute Suite Networks rather than competing alternatives, the tie-in forecloses competing general programming that Cablevision would prefer to distribute absent the tie-in.  In other words, Viacom's tying arrangement hinders competing general programming networks not through competition on the merits, but rather through a bald exercise of market power.  This foreclosure of competition in turn deprives subscribers of the opportunity to enjoy superior programming and to get more out of what they pay for Cablevision's video services.

136.    For example, absent Viacom's tying arrangement, Cablevision would be more likely to launch, or to launch sooner, Ovation.  Ovation is an independent network focused on contemporary culture and the arts, including music, drama, dance, the decorative arts, and other forms of artistic expression.  Its programming includes filmed concerts, performances, and documentaries, as well as films, original and licensed series, and specials, including *Royal Opulence*, *A Chance to Dance*, *Design for Life*, *Antiques Roadshow*, and *So You Think You Can Dance*.  Cablevision viewers likely would place greater value on Ovation than certain low-performing Viacom Suite Networks and, therefore, carriage of Ovation in place of one or more of those networks would better enable Cablevision to attract or retain subscribers.

137.    Likewise, absent Viacom's tie-in, Cablevision would be more likely to launch, or launch earlier, the network GMC.  GMC, distributed by InterMedia Partners, is an African American oriented network, with an emphasis on family-friendly values and uplifting and musical entertainment.  Cablevision believes GMC would appeal to a substantial number of subscribers, and that a substantial number of subscribers would place more value on having

49

GMC in their cable channel line-up than Viacom's Suite Networks.  GMC today attracts an audience similar to Centric, a Viacom Suite Network; but Cablevision believes that, at some point, GMC might develop into a threat to take audience away from Viacom's BET network. Although Cablevision is considering launching GMC in the near future, Cablevision would be more likely to launch GMC, or to launch GMC sooner, if Viacom did not force Cablevision to distribute Viacom's Suite Networks.

138.     Cablevision, absent Viacom's tie-in, would also be more likely to launch, or to launch sooner or more broadly, Me-TV.  Me-TV, whose slogan is "Memorable Entertainment Television," is owned by Weigel Broadcasting and features classic television sitcoms, dramas and classic commercials from the 1950s through the 1980s.  Its programming includes *The Mary Tyler Moore Show*, *Gunsmoke*, *The Wild Wild West*, *Batman*, *The Bob Newhart Show*, *I Love Lucy*, *The Beverly Hillbillies*, *The Brady Bunch*, *M\*A\*S\*H*, and *Cheers*.  Me-TV targets an older audience of viewers aged 35-64, including baby boomers – a demographic that overlaps with the audience of Viacom's TV Land network.  Me-TV thus could threaten to take viewers away from Viacom's TV Land.  Cablevision viewers are likely to place a greater value on Me TV than low-performing Suite Networks.

139.     Cablevision, absent the tie-in, would also be more likely to launch, or to launch earlier, ASPiRE.  ASPiRE is another network focused on appealing to African American viewers.  ASPiRE, owned by Magic Johnson Enterprises, offers enlightening, entertaining, and positive programming targeted to African American families.  Its programming includes *The Root 100*, *I Spy*, *The Bill Cosby Show*, *ARiSE*, *Soul Train*, and *Now/Next Music*.  ASPiRE attracts an audience similar to, and is a threat to take viewers away from, Viacom's Centric network. Cablevision viewers likely would place greater value on ASPiRE than low-performing Suite

Networks.  Although Cablevision is considering launching ASPiRE in the near future,

Cablevision would be more likely to launch ASPiRE, or to launch ASPiRE sooner, if Viacom

did not force Cablevision to distribute Viacom's Suite Networks.

140.     In addition, absent Viacom's tie-in, Cablevision would be more likely to launch,

or to launch sooner, Retirement Living TV ("RLTV").  Like Viacom's TV Land network, RLTV

targets an older audience – principally viewers aged 50 and older.  RLTV thus could threaten to

take viewers away from TV Land.  RLTV's programming features a variety of news,

documentary, lifestyle, biography, and other shows designed to appeal to audiences at or near

retirement age.  Original series include *The Art of Living*, *Boomer Initiative*, *AARP—My

Generation*, *The Danger Zone*, *Family Pickle*, *Fix America*, *The Florence Henderson Show*,

*Money Matters with Jean Chatzky*, and *Whole Body Health*.  Cablevision viewers likely would

place greater value on RLTV than low-performing Suite Networks.

141.     These are merely examples of competing general programming networks that, if

not required to distribute the Suite Networks, Cablevision would consider adding to its line-up or

adding sooner.  Many of these examples show that Viacom's tie-in unlawfully forecloses

competition even if the tied markets were far narrower than general programming.  Other

networks Cablevision would be more likely to consider launching absent Viacom's tying

arrangement include Lifetime Movie Network, Outside TV, Justice Central, Blaze TV, additional

music choice channels (which could take audience away from Viacom's Palladia, VH1 Classic,

VH1 Soul, and MTV Hits networks), and additional foreign language channels (which have

particular appeal in the diverse and multicultural New York DMA), among others.

142.     In addition, absent Viacom's tie-in, Cablevision would likely carry additional HD

channels of numerous networks it already carries in SD.  For example, absent the tie-in,

Cablevision would strongly consider carrying HD versions of networks such as TV One, The Hub, the Military Channel, Fuel, Oxygen, the Home Shopping Network (HSN), and the Hallmark Channel, among others.  Cablevision would also likely consider launching additional HD foreign language channels including Zee TV (offering South Asian and Indian programming in Hindi), TV Japan (Japanese language programming), and MBC Korea (Korean language programming).  Cablevision already possesses the rights to carry many of these networks in HD, but lacks available bandwidth to launch these channels.  Some of these HD networks, such as TV One and The Hub, target similar demographics or offer similar programming as Viacom's Core or Suite Networks and thus could threaten to take audience away from those networks.

143.    The impact of the substantial foreclosure caused by Viacom's policy of tying Suite Networks to Core Networks extends beyond Cablevision and its subscribers to harm the competitive process not only in the New York DMA but also throughout most of the country. Every one of the top 15 video distributors in the United States, accounting as noted for nearly 95% of cable, satellite, and fiber-optic video service subscribers, distributes Viacom's Tying Networks in some portion of its service area.  These distributors also carry virtually all of the Suite Networks.  It is a reasonable inference that their carriage of Suite Networks is not voluntary, but rather reflects Viacom's successful employment of the coercive tactics Viacom deployed to force Cablevision to carry the Suite to force other distributors to forgo carrying substitute general programming networks.  Viacom's statement to Cablevision, made during the negotiation of the 2012 Tying Arrangement, that it does not compel very small video distributors that lack sufficient bandwidth to carry the Suite – thereby implying that Viacom wields the threat of charging rate card prices for Core Networks to force larger distributors to distribute the Suite – confirms this inference.

144.    The substantial foreclosure inflicted by Viacom's 2012 Tying Agreement harms not only competition, but also consumers by reducing output, quality, and consumer welfare. Viacom's tie-in deprives Cablevision's subscribers of programming they would find more valuable than the Suite Networks, but which Viacom's tying arrangement forecloses from distribution through Cablevision. Absent Viacom's tie-in, subscribers at a minimum would get more for what they pay for video services (that is, enjoy a lower quality-adjusted price). Those that switch away from Cablevision in search of other video programming options suffer because they must forego the substantial other benefits of subscribing to Cablevision or switch to a distributor that, for the reasons alleged above, is likely also subject to Viacom's foreclosing tie-in. And, as alleged above, the substantial foreclosure caused by Viacom's policy of tying Suite Networks to the Tying Networks likely harms other subscribers to other video services, both in the New York DMA and elsewhere.

145.    In addition, Viacom's tie-in harms Cablevision. If not foreclosed by Viacom's tie-in from distribution of more valuable programming, Cablevision could attract and retain more subscribers. Viacom's tie-in also deprives Cablevision of a way to differentiate its services in an increasingly crowded entertainment industry. Absent Viacom's foreclosure of competing general programming networks, Cablevision would have greater flexibility to assemble its programming packages to meet consumer demand. Instead, Viacom's tie-in hinders Cablevision's ability to differentiate its service from rivals, thereby further depriving Cablevision of subscribers (and profits) it otherwise could obtain or retain. Cablevision suffers these harms from Viacom's tie-in even if, absent the tie-in, Cablevision's total programming costs stayed the same. However, Viacom's unlawful tie-in additionally harms Cablevision because, absent

Viacom's tying arrangement, Cablevision would expect its total costs of acquiring programming, both from Viacom and overall, to be lower.

146.     The harm to competition, consumers, and Cablevision from Viacom's 2012 Tying Arrangement is precisely the harm the *per se* rule against tying is designed to prevent.  Viacom is leveraging its power over the Tying Networks to hinder competition in the distribution of general programming.  Cablevision's ongoing injury accordingly coincides with, reflects, and flows from the very harm to competition and consumers that the *per se* rule against tying guards against.

147.     Viacom benefits from its competition-reducing tying arrangement because, on information and belief, its policy of tying Suite Networks enables Viacom to make greater profits (from programming fees and advertising revenues) than it would absent the tie-in, while simultaneously comprising a practice that can serve to help insulate both its Core and Suite networks from competition, or potential competition, that could threaten over time to erode those profits.  Viacom's 2012 Tying Arrangement produces no, and cannot be explained by, any pro-consumer efficiency or justification.

## FIRST CAUSE OF ACTION

### *Per Se* Tying Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

148.     Cablevision repeats and realleges the allegations contained in paragraphs 1 through 147 as if fully set forth herein.

149.     Viacom's 2012 Tying Arrangement, which conditions distribution of Viacom's Tying Networks on distribution of its Suite Networks, constitutes a tying arrangement that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

150.     A tying arrangement is *per se* unlawful under the Sherman Act if (1) the tying arrangement affects a substantial amount of interstate commerce; (2) the two products are distinct; (3) the defendant actually tied the sale of the two products; and (4) the seller has

54

appreciable market power in the tying market.  Viacom's 2012 Tying Arrangement satisfies each element.

151.    The markets for distribution of each of Viacom's Tying Networks (Nickelodeon, Comedy Central, BET, and MTV) – the tying product markets here – are distinct from the market for distribution of general programming networks – the tied product market – for all the reasons alleged herein.  There is separate demand for each Tying Network and for general programming networks that is efficient for a supplier such as Viacom to meet separately.  The geographic component of each market is nationwide and, in the alternative, the New York DMA.

152.    Viacom, through its control over the rights to license and distribute the Tying Networks, has substantial market power in each of the tying product markets.  Viacom possesses 100% of each relevant tying market and Viacom's position is protected by substantial barriers to entry.

153.    Viacom alternatively possesses substantial market power over the following tying product markets: distribution of networks featuring Popular Children's Programming; distribution of networks featuring Popular Comedy Programming; distribution of networks featuring Popular African American Programming; and distribution of networks featuring Popular Young Adult Programming.  Viacom, as alleged above, possesses substantial market power in each of these tying product markets and Viacom's position is protected by high barriers to entry.  Viacom alternatively possesses market power over a market for the distribution of the Core Networks.

154.    Viacom has tied distribution of the Suite Networks, which compete in the separate market for the distribution of general programming networks, to the right to distribute any or all of Viacom's Tying Networks and, in the alternative, to distribution of the Core Networks.

Viacom refused to offer Cablevision, despite Cablevision's repeated requests, an economically viable offer for any or all of Viacom's Tying Networks apart from Viacom's Suite Networks. Viacom's effective refusal to offer Cablevision distribution of its Core Networks (including the Tying Networks) unless Cablevision distributed the Suite Networks actually coerced Cablevision to agree to carry the Suite Networks.  Viacom's power over any one, or subset of, the Tying Networks alone was sufficient to coerce Cablevision to carry the Suite Networks.

155.    Viacom's unlawful conditioning of distribution of the Tying Networks, and in the alternative of the Core Networks, on Cablevision's distribution of the Suite Networks causes more than sufficient foreclosure to trigger tying's *per se* rule.  Viacom's 2012 Tying Arrangement forecloses Cablevision from distributing other general programming networks. Cablevision's forced carriage of the Suite Networks diminishes Cablevision's need for other general programming.  The network capacity Cablevision must allocate to the slots currently occupied by the Suite Networks is unavailable for other networks.  The millions of dollars Cablevision must pay to take the Suite Networks are unavailable to license other general programming.  Viacom's 2012 Tying Agreement accordingly insulates the Suite Networks from competition on the merits from other general programming, which Viacom's tie-in forecloses Cablevision from distributing.  The foreclosure caused by Viacom's tying arrangement thus causes the very type of harm that the *per se* rule is designed to prevent.  And the volume of tied commerce the 2012 Tying Agreement alone forecloses is at least tens of millions of dollars over the next several years.  Viacom's anticompetitive policy of tying Suite Networks to the Tying Networks, moreover, forecloses competition beyond distribution through Cablevision (which serves approximately 3 million subscribers); it hinders competition on the merits nationwide, for all the reasons alleged above.  The volume of foreclosed commerce nationwide from Viacom's

policy of tying Suite Networks to distribution of its Core Networks (including the Tying

Networks) accordingly likely exceeds hundreds of millions of dollars a year.

156.    Viacom's conduct is anticompetitive because it reduces output, quality, and

programming diversity while increasing quality-adjusted prices.  Viacom has not pointed to, and

Cablevision is unaware of, any procompetitive rationale for Viacom's tie-in.  Even if such a

justification existed, any procompetitive benefits could likely be obtained by less restrictive

means and would not outweigh the competitive harm wrought by Viacom's tie-in.

157.    Viacom's tie-in occurs in the flow of, and substantially affects, interstate

commerce and injures Cablevision's business and property in violation of Section 1 of the

Sherman Act.

### SECOND CAUSE OF ACTION

### *Per Se* Block Booking Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

158.    Cablevision repeats and realleges the allegations contained in paragraphs 1

through 157 as if fully set forth herein.

159.    Viacom's conditioning of distribution of its Tying Networks, and in the

alternative of the Core Networks, on distribution of Suite Networks constitutes "block booking,"

which is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1.

160.    An arrangement comprises *per se* unlawful "block-booking," as relevant here,

where a party conditions the right to distribute programming over which the seller (or licensor)

possesses market power on the buyer's agreement to license or distribute other programming and

the coerced conditioned sale or license forecloses a not insubstantial amount of interstate

commerce.

161.    Viacom's above-described conduct meets each element of a *per se* block booking claim.  Viacom possesses substantial market power over the distribution of each of the Tying Networks and in the alternative distribution of the Core Networks.  Viacom has wielded its considerable market power to coerce Cablevision to license and distribute the Suite Networks as a condition of obtaining the right to distribute any or all of Viacom's Tying Networks.  Viacom's block booking arrangement forecloses Cablevision (and other distributors) from distributing general programming networks, which Cablevision would prefer to distribute in place of the Suite Networks. Viacom's block booking arrangement harms both consumers – who would prefer to receive programming other than the Suite Networks – as well as Cablevision, for all the reasons alleged above.

162.    Viacom's tie-in occurs in the flow of, and substantially affects, interstate commerce and injures Cablevision's business and property in violation of Section 1 of the Sherman Act.

### THIRD CAUSE OF ACTION

### Violations of the Donnelly Act (N.Y. Gen. Bus. Law § 340)

163.    Cablevision repeats and realleges the allegations contained in paragraphs 1 through 162 as if fully set forth herein.

164.    Viacom's conditioning of distribution of the Tying Networks, and in the alternative of the Core Networks, on distribution of Suite Networks violates the Donnelly Act, N.Y. Gen. Bus. Law § 340.  The Donnelly Act's prohibitions against tying mirror the Sherman Act's.

165.    Viacom's tie-in and block booking arrangement occurs in the flow of, and substantially affects, commerce and competition within the state of New York and injures Cablevision's business and property in the state of New York.

166.    Accordingly, for the same reasons that Viacom's conduct violates the Sherman Act, it also violates the Donnelly Act.

## FOURTH CAUSE OF ACTION

### Declaratory Judgment (28 U.S.C. §§ 2201 and 2202)

167.    Cablevision repeats and realleges the allegations contained in paragraphs 1 through 166 as if fully set forth herein.

168.    Actual and justiciable controversies within the meaning of 28 U.S.C. §§ 2201 and 2202 have arisen between Cablevision and Viacom as to whether Viacom's 2012 Tying Agreement violates federal and state law.

169.    Cablevision requests a binding declaration that Viacom's conditioning of distribution of any or all of its Tying Networks, and in the alternative the Core Networks, on distribution of Suite Networks constitutes an unlawful tying arrangement and/or unlawful block booking arrangement under federal and state law.

## DEMAND FOR JURY TRIAL

170.    Cablevision demands a trial by jury on all issues so triable as a matter of right.

## PRAYERS FOR RELIEF

WHEREFORE, Cablevision respectfully requests that this Court:

(a)    enter judgment in favor of Cablevision on Causes of Action 1 through 4 of the Complaint;

(b)    declare that Viacom's 2012 Tying Agreement is in violation of law and is null and void;

(c)    issue a permanent injunction barring Viacom from conditioning carriage of any or all of its Core Networks on Cablevision's licensing any or all of Viacom's Suite Networks or any other network;

(d)     to effectuate the relief specified in (c), issue a mandatory injunction requiring Viacom to grant Cablevision the right to distribute the Core Networks and related ancillary services on terms specified for those services set forth in the 2012 Tying Agreement;

(e)     award Cablevision treble the damages it has suffered, or will sustain, by reason of Viacom's unlawful conduct;

(f)     award Cablevision its reasonable attorneys' fees;

(g)     award Cablevision its costs; and

(h)     award all other relief that is just and proper.


Dated:  February 26, 2013

ROPES & GRAY LLP

By _____
        Jerome C. Katz
1211 Avenue of the Americas
New York, New York  10036
(212) 596-9000
Jerome.Katz@ropesgray.com

Mark S. Popofsky (*Motion for Admission Pro Hac Vice to be Filed*)
Mariel Goetz (*Motion for Admission Pro Hac Vice to be Filed*)
Ropes & Gray LLP
One Metro Center
700 12th Street, N.W.
Washington, D.C.  20005
(202) 508-4600
Mark.Popofsky@ropesgray.com
Mariel.Goetz@ropesgray.com

Attorneys for Plaintiffs
    Cablevision Systems Corporation and
    CSC Holdings, LLC