UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

CABLEVISION SYSTEMS CORPORATION  :
and CSC HOLDINGS, LLC,      : Case No.: 13 CIV 1278 (LTS)(JLC)
               :
      Plaintiffs,     :
               :
      vs.       :
               :
VIACOM INTERNATIONAL INC. and BLACK :
ENTERTAINMENT TELEVISION LLC,   :
               :
      Defendants.    :

------------------------------------------------------------------x

## MEMORANDUM OF LAW OF VIACOM INTERNATIONAL AND BLACK ENTERTAINMENT TELEVISION IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Joseph F. Tringali
Peri L. Zelig
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:   (212) 455-2000

*Attorneys for Defendants*

Kenneth R. Logan,
  *Of Counsel.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS .................................................................... 6

ARGUMENT .......................................................................................... 9

I.   CABLEVISION FAILS TO ALLEGE THE ESSENTIAL
     ELEMENTS OF A SECTION 1 TYING CLAIM ............................... 9

     A.   The Complaint Fails Adequately to Allege
          Foreclosure in the Tied Product Market .............................. 10

     B.   The Complaint Fails Adequately to Allege a
          Plausible Tying Product Market in Which Viacom
          Possesses Appreciable Market Power .................................... 19

          1.   *A Single Network "Brand" Does Not
               Constitute a Legally Cognizable Tying
               Product Market* ............................................................ 20

          2.   *Cablevision's Alternative, Gerrymandered
               Markets Alleged in the Complaint are
               Implausible and Require Dismissal* ........................... 23

II.  CABLEVISION FAILS TO ALLEGE A SEPARATE
     CAUSE OF ACTION BASED ON AN ABROGATED
     THEORY OF "BLOCK BOOKING" ................................................. 26

III. CABLEVISION'S DONNELLY ACT CLAIM SHOULD BE
     DISMISSED FOR THE SAME REASONS AS THE
     SECTION 1 TYING CLAIM ............................................................ 28

IV.  CABLEVISION'S REQUESTED RELIEF TO SEVER THE
     LICENSE AGREEMENT IS IMPROPER AND SHOULD BE
     STRICKEN FROM THE COMPLAINT .......................................... 29

CONCLUSION ....................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*305 E. 24th Owners Corp. v. Parman Co.*, 714 F. Supp. 1296
(S.D.N.Y. 1989) ............................................................................................................ 13

*Abdul-Rahman v. City of N.Y.*, No. 10 CIV. 2778, 2012 WL
1077762 (E.D.N.Y. Mar. 30, 2012) ............................................................................ 15

*AIG Fin. Prods. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 675
F. Supp. 2d 354 (S.D.N.Y. 2009)................................................................................. 15

*Americap, Inc. v. ADJ Corp.*, No. 80 Civ. 2630 (RWS), 1980 WL
1891 (S.D.N.Y. Sept. 5, 1980) .................................................................................... 13

*Animal Sci. Prods. v. China Nat. Metals & Minerals Imp. & Exp.*,
702 F. Supp. 2d 320 (D.N.J. 2010) ............................................................................. 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................... 2, 9, 18

*AT&T v. United States*, 32 Fed. Cl. 672 (1995) ............................................. 30

*Belfiore v. N.Y. Times*, 654 F. Supp. 842 (D. Conn. 1986)....................... 25, 26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................. 9

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ...................... 1, 11, 12

*Brokke v. Stauffer Chem. Co.*, 703 F. Supp. 215 (D. Conn. 1988) ................ 30

*Cancall PCS, LLC v. Omnipoint Corp.*, No. 99 Civ. 3395 (AGS),
2001 WL 293981 (S.D.N.Y. Mar. 26, 2001) .............................................................. 11

*Carell v. Shubert Org.*, 104 F. Supp. 2d 236 (S.D.N.Y. 2000)....................... 21

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008)............ 19, 24

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)....................... 25

*Coniglio v. Highwood Servs.*, 495 F.2d 1286 (2d Cir. 1974) ......................... 11

*Country Pointe at Dix Hills Home Owners Ass'n v. Beechwood
Org.*, 21 Misc. 3d 1110(A) (N.Y. Sup. Ct. 2008) ..................................................... 28, 29

*Deep South Pepsi–Cola Bottling Co. v. PepsiCo, Inc.*, No. 88 CIV.
6243 (PKL), 1989 WL 48400 (S.D.N.Y. May 2, 1989) ............................................. 20

*Discovision Assocs. v. Disc Mfg.*, Nos. Civ. A. 95-21-SLR, 95-
345-SLR, 1997 WL 309499 (D. Del. Apr. 3, 1997) .................................................. 16

*Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173
(S.D.N.Y. 2006) ............................................................................................................. 7

*E&G Gabriel v. Gabriel Bros.*, No. 93 CIV. 0894 (PKL), 1994 WL
369147 (S.D.N.Y. July 13, 1994)................................................................................ 20

*E&L Consulting v. Doman Indus.*, 472 F.3d 23 (2d Cir. 2006)....................... 10, 13, 19

*Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495 (1969) ............................................ 13

*Friedman v. Adams Russell Cable Servs.–N.Y.*, 624 F. Supp. 1195 (S.D.N.Y. 1986) .......................................................................................... 11

*GEM Advisors v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308 (S.D.N.Y. 2009) ........................................................................................ 30

*Ginett v. Computer Task Grp.*, 962 F.2d 1085 (2d Cir. 1992) ..................................... 30

*Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011) ......................................... 18

*Global Disc. Travel Servs. v. Trans World Airlines*, 960 F. Supp. 701 (S.D.N.Y. 1997) ...................................................................................... 22

*Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514 (2d Cir. 1989) ................................................................................ 10

*Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792 (1st Cir. 1988) ....................................................................................................... 16

*Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143 (S.D.N.Y. 2002) ........................................................................................ 15

*Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327 (S.D.N.Y. 2003) ............................... 29

*Hudson Motors P'ship v. Crest Leasing Enters.*, 845 F. Supp. 969 (E.D.N.Y. 1994) ........................................................................................ 31

*Ill. Tool Works Inc. v. Indep. Ink.*, 547 U.S. 28 (2006) ............................................... 27

*In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 WL 1458025 (N.D. Cal. May 21, 2009) ................................................... 18

*In re Set-Top Cable Television Box Antitrust Litig.*, Nos. 08 MD 1995, 08 Civ. 7616 (PKC), 2011 WL 1432036 (S.D.N.Y. Apr. 8, 2011) .................................................................................................. 10, 19

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ...................... 14, 19, 27

*Kaye v. D'Amato*, No. 05-CV-982, 2008 WL 5263746 (E.D. Wis. Dec. 18, 2008) ......................................................................................... 18

*Kelly v. Kosuga*, 358 U.S. 516 (1959) ........................................................................ 31

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504 (9th Cir. 1989) .................................................................................... 13

*Linville v. O&K Trojan, Inc.*, No. 91-CV-284S, 1994 WL 117363 (W.D.N.Y. Mar. 31, 1994) ..................................................................... 29

*Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) .................... 32, 33

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) .......................... 26

*Mediacom Commc'ns Corp. v. Sinclair Broad. Grp.*, 460 F. Supp. 2d 1012 (S.D. Iowa 2006) .................................................................. 27

*Moccio v. Cablevision Sys.*, 208 F. Supp. 2d 361 (E.D.N.Y. 2002) ............................................. 11

*Munno v. Town of Orangetown*, 391 F. Supp. 2d 263 (S.D.N.Y. 2005) ...................................................................................................... 15

*Pepsico, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243 (S.D.N.Y. 2000) ...................................................................................................... 25

*Pitchford v. PEPI, Inc.*, 531 F.2d 92 (3d Cir. 1976) .................................................... 28

*Pyramid Co. of Rockland v. Mautner*, 581 N.Y.S.2d 562 (Sup. Ct. 1992) ............................................................................................... 28, 29

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ................................................................................................. 24

*Re-Alco Indus. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387 (S.D.N.Y. 1993) ...................................................................... 20, 23

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) .......................................................... 17

*Rooney v. Columbia Pictures Indus.*, 538 F. Supp. 211 (S.D.N.Y. 1982) ...................................................................................................... 31

*S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869 (11th Cir. 1998) ................................................................................... 16

*Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674 (S.D.N.Y. 1987) ...................................................................................................... 20

*Shop & Save Food Mkts. v. Pneumo Corp.*, 683 F.2d 27 (2d Cir. 1982) ...................................................................................................... 16

*Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96 CIV. 3231 (RPP), 2001 WL 396521 (S.D.N.Y. Apr. 19, 2001) ........................ 17

*Slaney v. Int'l Amateur Athletic Fed.*, 244 F.3d 580 (7th Cir. 2001) ............................ 18

*Smith Mach. Co. v. Hesston Corp.*, 878 F.2d 1290 (10th Cir. 1989) ..................... 12, 28

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt.*, 414 F. App'x 372 (2d Cir. 2011) ................................................................. 10

*Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08 CIV. 3669(DLC), 2009 WL 435299 (S.D.N.Y. Feb. 23, 2009) ................................. 10

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832 (S.D.N.Y. 1988) ................................................................................ 32

*Theatre Party Assocs. v. Shubert Org.*, 695 F. Supp. 150 (S.D.N.Y. 1988) ...................................................................................... 20, 24

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) .................................................... 20

*United Magazine Co. v. Murdoch Magazines Distribution*, 146 F. Supp. 2d 385 (S.D.N.Y. 2001) ............................................................... 19, 21, 28

*United States v. Loew's, Inc.*, 371 U.S. 38 (1962) ........................................................ 27

*United States v. Paramount Pictures*, 334 U.S. 131 (1948) ........................................ 27

*United States v. Solvents Recovery Serv. of New England*, 496 F. Supp. 1127 (D. Conn. 1980) ........................................................ 29

*Viacom Int'l Inc. v. Tandem Prods*, 526 F.2d 593 (2d Cir. 1975) .............................. 31

*Wechsler v. Hunt Health Sys.*, 216 F. Supp. 2d 347 (S.D.N.Y. 2002) ........................................................ 31

*Yentsch v. Texaco, Inc.*, 630 F.2d 46 (2d Cir. 1980) ........................................ 10, 13, 16

## Rules

Fed. R. Civ. P. 12(b)(6) ........................................................ 9

Fed. R. Civ. P. 12(f) ........................................................ 29

## Treatises

IX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2011) ........................................................ 28

## PRELIMINARY STATEMENT

Defendants Viacom International Inc. and Black Entertainment Television LLC (collectively "Viacom") respectfully submit this memorandum, together with the Declaration of Joseph Tringali ("Tringali Decl."), in support of their motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Complaint filed by Plaintiffs Cablevision Systems Corporation and CSC Holdings, LLC (collectively, "Cablevision").

Although Cablevision purports to challenge the alleged tie of programming services in this action, it does so only months after being successful in having had *dismissed* a lawsuit challenging that same conduct by *it* and others brought by consumers of cable and satellite distributors. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 573 (Nov. 5, 2012) ("*Brantley*"). In *Brantley*, a putative class of cable and satellite subscribers sued both programmers and distributors—including Cablevision and Viacom—challenging the programmers' alleged practice of selling multi-channel cable packages. Defendants in that case—including Cablevision—persuaded the district court to dismiss the case, the Ninth Circuit to affirm that dismissal, and the Supreme Court to deny certiorari, all on the basis that the complaint alleged no cognizable harm to competition as required to state a viable tying claim under Section 1 of the Sherman Act in the absence of foreclosure from the programming market of competing programming services. As Cablevision (and the other *Brantley* defendants) argued to the Supreme Court: "This Court has repeatedly emphasized the need to demonstrate foreclosure in tying cases, both under the rule of reason and the *per se* doctrine." Tringali Decl. Ex A (Defendants' Brief in Opposition to Petition for Writ of Certiorari, 133 S. Ct. 573 (2012) (No. 12-171)) at 11.[1]

---

[1]   Similarly, in the district court, Cablevision and the other distributor defendants argued: "The courts have held, across a broad range of contexts, that vertical, non-price restraints

And when the *Brantley* plaintiffs pointedly deleted their original conclusory allegation of foreclosure and defendants in turn successfully moved to dismiss on that basis alone, defendants—including Cablevision—stated: "It is now clear that Plaintiffs added the [original] foreclosure allegations to the [Second Amended Complaint] simply in order to survive a motion to dismiss, not because those allegations had any substance."  Tringali Decl. Ex. C (Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint, No. CV 07-6101 CAS (VBKx) (June 12, 2009)) at 2.  Having successfully argued that foreclosure of competing programmers was a necessary element of any tying claim and that any allegation of foreclosure would not have "any substance," Cablevision cannot credibly now allege that the very same rival programmers are somehow foreclosed because of the very same conduct.  *See infra* Section I.A.

Moreover, Cablevision's allegations of foreclosure are contradicted not only by its own prior arguments in *Brantley* but also by the very allegations it makes in this case.  As explained below, its foreclosure allegations fail as a matter of law because they pertain only to Cablevision itself, not to the market for programming as a whole.  And even as to Cablevision, they are deficient because Cablevision *never* alleges that it would have *carried* an otherwise foreclosed programming service if it did not carry Viacom's Suite Networks.  Instead, Cablevision conspicuously says only that it would have *considered* carrying other services. Further, the allegations do not meet the level of plausibility required by the Supreme Court.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Cablevision (which, in 2012, had a net income of more than $230 million on net revenues of nearly $7 billion, and carries approximately 550 cable

---

(such as those challenged here) cannot adversely affect competition—and thus, cannot unreasonably restrain trade—unless they have the effect of *foreclosing competition* or *excluding competitors* from a relevant market."  Tringali Decl. Ex. B (Distributor Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, No. CV 07-6101 CAS (VBKx) (C.D. Cal. Dec. 21, 2007)) at 13 (emphasis in original).

channels) claims that it could not carry nascent cable channels solely because it would be required to spend money to do so and that carrying an insignificant handful of excess Viacom channels would force Cablevision either to dedicate other network capacity to these channels or drop a similarly trivial number of its least valuable channels.  Further, Cablevision also cannot plausibly explain how a market with more than 800 cable television networks (not to mention internet and broadcast networks) has been the victim of foreclosure of "a not insubstantial amount of interstate commerce," a distinct prerequisite of a tying claim.  *See infra* Section I.A.

Equally unavailing are Cablevision's allegations as to the supposed relevant product markets in which Viacom holds market power, another required element of any viable antitrust claim.  Cablevision's alleged markets not only make no sense and have been rejected numerous times by the courts, they are also flatly contradicted by the very positions Cablevision itself has consistently and repeatedly taken with the courts, the Federal Communications Commission ("FCC"), and the Securities and Exchange Commission ("SEC").  *See infra* Section I.B.

While Cablevision now alleges that each of MTV, Nickelodeon, Comedy Central and BET is its own relevant product market and has no real substitutes (Compl. ¶¶ 31–39), it has consistently represented to courts, the FCC, and the SEC that programming services operate in "highly competitive markets" and that *no* service "can make or break the competitive viability" of any cable or satellite distributor.  To cite just a few examples of Cablevision's prior admissions, it has stated:

- "Rainbow Media Holdings'[2] programming networks operate in highly competitive markets . . . . The business of distributing programming

---

[2]    Until recently, Rainbow Media Holdings was owned by Cablevision and distributed programming services to cable and satellite distributors and, as such, competed against Viacom in the distribution of programming services.  Some of its programming services

networks to cable television systems and other multichannel video programming distributors is highly competitive.  Our programming networks face competition from other programming networks for the right to be carried by a particular cable system or other multichannel video programming distribution system, and for the right to be carried on the service tier that will attract the most subscribers.  Once our programming network is selected by a cable or other multichannel video programming distribution system for carriage, that network competes for viewers not only with the other channels available on the system, but also with off-air broadcast television, pay-per-view channels and video on demand channels, as well as online services, mobile services, radio, print media, motion picture theaters, DVDs, and other sources of information, sporting events and entertainment."  Tringali Decl. Ex. D (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 16, 2011)) at 16; Ex. E (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 25, 2010)) at 14–15.

- "Ongoing trends toward audience fragmentation continue to dilute the importance to viewers of any single programming network, undercutting claims that access to RSN [regional sports network] programming is required for an MVPD [multichannel video programming distributor] to be successful. . . . The fragmentation of the cable audience across the hundreds of available channels means that no single channel—even an RSN—represents so great a proportion of overall viewing as to render it essential for an MVPD to offer to attract subscribers."  Tringali Decl. Ex. F (Comments of Cablevision Systems Corp., *In re* The Regional Sports Network Marketplace, 27 FCC Rcd. 154 (2012) (No. 11-128)) at 10.

- "In a mature competitive marketplace, no single programming service— including an RSN—can make or break the competitive viability (or lack thereof) of an MVPD in any particular local market.  To the contrary, mature markets are and should be characterized by product differentiation, not homogeneity."  *Id*. at  2.

- "In this mature competitive marketplace, no single programming service—including an RSN—can be deemed to be critical to the competitive viability of an MVPD in any particular local market." Tringali Decl. Ex. G (Reply Comments of Cablevision Systems Corp., *In re* The Regional Sports Network Marketplace, 27 FCC Rcd. 154 (2012) (No. 11-128)) at 1.

---

include AMC, IFC, and Sundance Channel.  *See* Tringali Decl. Ex. D (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 16, 2011)) at 2.

- "[C]onsumers today are much less likely to accord dispositive significance to any single network due to their purchase of video in a bundle . . . ." Tringali Decl. Ex. F (Comments of Cablevision Systems Corp., *In re* The Regional Sports Network Marketplace, 27 FCC Rcd. 154 (2012) (No. 11-128)) at 5.

- "In today's 400 channel, multi-service marketplace featuring video offerings from four different multi-billion companies with substantial sunk investments in video distribution networks, it is no longer tenable to claim that the competitive viability of DirecTV, Dish Network, AT&T, or Verizon—each of which is comparable to, or larger than Cablevision in terms of subscriber counts and enterprise value—depends upon guaranteed access to RSN programming." *Id.* at 6.

- "A cable operator's most popular (in the FCC's parlance, 'must have') affiliated programming typically garners the highest licensing fees and advertising revenues. Withholding this programming would result in immediate and substantial losses in revenues to the network. A foreclosure strategy would be plausible, therefore, only if large numbers of subscribers switched from competing MVPDs to the cable operator to access the withheld programming. Yet, the record showed that it is highly unlikely subscribers would switch to a cable operator solely to obtain a withheld network in numbers significant enough to eliminate MVPD rivals or allow cable operators to reap monopoly profits." Tringali Decl. Ex I (Brief for Petitioners, *Cablevision Systems Corp. v. FCC*, 597 F.3d 1306 (D.C. Cir. 2010) (Nos. 07-1425, 07-1487)) at 47 (citations omitted).

Finally, in addition to the legal deficiencies regarding both the absence of cognizable foreclosure of rival programmers and the absence of a plausible relevant product market that require dismissal of the Complaint, Cablevision's requested equitable relief should be stricken. Cablevision's claim that it should somehow reap the benefit of its license of the Core Networks under the terms of the 2012 License Agreement but be relieved of the corresponding burdens—the agreed distribution of and payment for the Suite Networks—is improper as a matter of law. Cablevision was fully aware of the facts alleged in its Complaint at the time it negotiated this interrelated agreement—and, in fact, it alleges it has operated under these conditions as far back as 2008—and cannot now claim that it was negotiating a transaction with severable parts. In addition, Cablevision's Complaint is barred by the doctrine of laches

due to Cablevision's unreasonable delay in challenging the alleged bundling: Cablevision claims it was aware of the identical conduct in 2008, did nothing to challenge it, and entered into a similar agreement in 2012 without even a hint that less than two months after signing it, Cablevision would belatedly seek to challenge the alleged unlawful conduct it could have challenged at least as early as 2008.  *See infra* Section IV.

## STATEMENT OF FACTS

### A.   The Parties

Plaintiff Cablevision claims to be a "leading telecommunications and media company" that offers digital television, phone, and Internet services to customers in eight states. (Compl. ¶ 22.)  Cablevision licenses various cable programming services, such as ESPN, The Discovery Channel, and Nickelodeon, from various cable programmers, such as The Walt Disney Company, NBCUniversal, and Viacom, and repackages that programming and sells it to subscribers as part of its cable service.  (*See id.* ¶¶ 19, 28–29, 57, 77.)  Cablevision claims to operate in an "intensely competitive environment against both established and new distributors of video services" and alleges that it has "numerous competitors" including other traditional video distributors; satellite providers such as DISH Network and DIRECTV; "overbuilders"; telecommunications companies that offer video and other services over fiber optic networks, including Verizon and AT&T; and Internet-based services, including multi-channel services such as SkyAngel, and video streaming services such as Netflix, Hulu, Vudu, Apple.TV, and Google.TV.  (*Id.* ¶¶ 3, 24.)

Cablevision alleges that Defendant Viacom, through its Viacom Media Networks division, licenses the right to distribute the content on its television networks to distributors such as Cablevision.  (*See id.* ¶¶ 17, 19.)  Viacom's television networks consist of "Core Networks"— which include Nickelodeon, Comedy Central, BET, MTV, VH1, TV Land, MTV2, and Spike

TV—and "Suite Networks"—which include Centric, CMT, CMT Pure Country, Logo, MTV Hits, MTV Jams, Nick Jr., Nick 2, Nicktoons, Palladia, Teen Nick, Tr3s, VH1 Classic, and VH1 Soul.  (*Id.* ¶¶ 2, 4.)  Cablevision admits that Viacom spends enormous resources to develop, produce, purchase and market the content on its networks, all without any guarantee that any of its particular programming will be a commercial success.  (*See id.* ¶¶ 42–45.)  Viacom earns revenue both from license fees paid by Cablevision (*see id.* ¶ 28) and advertising revenues from Cablevision's carriage of its services.  (*See id.* ¶ 8.)

Cablevision alleges that the "advent of digital technology" has enabled Cablevision to offer subscribers an "extensive portfolio" of programming options that includes "hundreds of available channels and numerous services through a variety of packages."  (*Id.* ¶ 23.)  Of the approximately 550 channels that Cablevision offers to its customers,[3] Cablevision claims that Viacom's Suite Networks currently occupy only a trivial number of slots on its systems.  (*See id.* ¶ 10.)

## B.   The Alleged Markets

Cablevision alleges three alternative relevant product markets.  ***First***, Cablevision alleges that certain programming channels constitute "commercially critical networks" that distributors must offer or face a significant loss of subscribers.  (*Id.* ¶ 31.)  Viacom's "commercially critical networks" allegedly include four "Tying Networks"—Nickelodeon, Comedy Central, BET, and MTV—each of which, according to Cablevision, comprises its own

---

[3]    *See* CABLEVISION, *Optimum TV Channel List*, http://www.optimum.com/digital-cable-tv/included/digital-cable-channel-list.jsp (last visited May 1, 2013).  The Court is entitled to take judicial notice of information on Cablevision's website on a motion to dismiss if it wishes to do so.  *See Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006).

relevant market.  (*Id.* ¶¶ 31–39.)[4]  Cablevision claims that no other network is comparable to, or interchangeable with, any of the four alleged "Tying Networks" because all other networks lack the "high ratings"—notwithstanding the fact that Cablevision also alleges that ratings have decreased for every one of Viacom's Core Networks (*id.* ¶ 33)—and "strong following" that those networks enjoy, or offer "*somewhat* differently targeted programming."  (*See id.* ¶¶ 32, 34, 36, 38) (emphasis added).

   *Second*, Cablevision alternatively alleges that Viacom's "Core Networks," together as a whole, comprise a relevant product market of which Viacom has "a 100% share." (*Id.* ¶¶ 50–51.)

   *Third*, Cablevision alleges as another alternative that Nickelodeon, Comedy Central, BET, and MTV each fall into one of four separate programming categories, and each category comprises its own relevant product market.  It alleges that Nickelodeon falls within the category of Popular Children's Programming, that Comedy Central provides Popular Comedy Programming, BET provides Popular African American Programming, and MTV provides Popular Young Adult Programming.  (*Id.* ¶¶ 54, 61, 67, 73.)  Cablevision alleges that all other "general programming networks" are in a separate product market in which networks featuring general programming compete against one another, but do not compete against "commercially critical networks."  (*See, e.g.*, *id.* ¶ 26.)

## C.  The Agreement at Issue

   Licensing agreements between distributors and programmers contain numerous terms and conditions that are intensely negotiated.  (*See, e.g.*, *id.* ¶ 29.)  In connection with

---

[4]  Cablevision does not explain why Viacom's other so-called "popular" Core Networks— VH1, TV Land, MTV2, and Spike TV (*id.* ¶ 2)—do not also constitute alleged "Tying Networks."

Cablevision's recent negotiation with Viacom to renew its licensing agreements, Cablevision claims that Viacom "coerce[d]" Cablevision into agreeing to carry the Suite Networks by offering Cablevision a lower price for Viacom's "bundle" of programming services including the Core and Suite Networks, than for the Core Networks alone. (*Id.* ¶¶ 122–131.) Claiming that it had "no viable economic choice," Cablevision proceeded to negotiate an agreement with Viacom that covered the Core and Suite Networks, and the parties reached agreement concerning carriage of those services on December 31, 2012 (the "2012 License Agreement"). (*Id.* ¶¶ 130–131.) Cablevision initiated this lawsuit less than two months later.

## ARGUMENT

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining the adequacy of a complaint, a court must disregard the complaint's conclusory allegations and legal conclusions, which are not entitled to the assumption of truth, and determine whether the remaining "well-pleaded factual allegations" suggest that the plaintiff has a plausible—as opposed to merely conceivable—claim for relief. *Id.* at 679. Claims that do not cross the "'line from conceivable to plausible'" must be dismissed. *Id.* at 680 (quoting *Twombly*, 550 U.S. at 570). This rule is recognized as particularly important in the context of antitrust claims, given the heavy burdens of antitrust discovery. *See Twombly*, 550 U.S. at 558–59.

## I.   CABLEVISION FAILS TO ALLEGE THE ESSENTIAL ELEMENTS OF A SECTION 1 TYING CLAIM

A plaintiff claiming an illegal tying arrangement must show each of the following elements: (1) a tying and a tied product; (2) evidence of actual coercion by the seller that forced the buyer to accept the tied product; (3) sufficient economic power in the tying product market to

9

coerce purchaser acceptance of the tied product; (4) anticompetitive effects in the tied product market; and (5) the involvement of a not insubstantial amount of interstate commerce in the tied product market. *E&L Consulting v. Doman Indus.*, 472 F.3d 23, 31 (2d Cir. 2006) (citing *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516–17 (2d Cir. 1989)); *see also Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt.,* 414 F. App'x 372 (2d Cir. 2011); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 58 (2d Cir. 1980); *In re Set-Top Cable Television Box Antitrust Litig.*, Nos. 08 MD 1995, 08 Civ. 7616 (PKC), 2011 WL 1432036, at *5 (S.D.N.Y. Apr. 8, 2011). Failure to sufficiently allege any one of these five elements warrants dismissal of the complaint. *See, e.g.*, *Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08 CIV. 3669(DLC), 2009 WL 435299, at *3–4 (S.D.N.Y. Feb. 23, 2009).

Cablevision fails to allege essential elements of its *per se* tying claim.[5] It does not adequately allege anticompetitive effects in the tied product market or an effect on a substantial amount of interstate commerce as a result of foreclosure of programming competitors of Viacom. Nor does Cablevision plausibly define a relevant tying product market in which Viacom possesses the requisite degree of market power to state a tying claim. Either failure is sufficient to warrant dismissal of the Complaint.

### A.    The Complaint Fails Adequately to Allege Foreclosure in the Tied Product Market

To establish the requisite anticompetitive effects of an alleged tying arrangement, a plaintiff must sufficiently allege that the purported tie forecloses rival sellers in the tied product market. *See, e.g.*, *E&L Consulting*, 472 F.3d at 32 ("[A]n antitrust defendant charged with

---

[5]    Cablevision has chosen to plead only a *per se* tying claim and does not allege a tying claim under the rule of reason. Although Viacom disputes that Cablevision's alleged tying claim should be analyzed as a *per se* violation, as opposed to under a rule of reason analysis, for purposes of this motion to dismiss, Cablevision's claims fail under either the *per se* or rule of reason framework.

illegal tying is entitled to some specificity as to the conduct alleged to be coercive, the customers who would have purchased a product elsewhere but for the coercion, the particular products sold as a result of the coercion, the anticompetitive effects in a specified market, and the effect on the business of the plaintiff."); *Coniglio v. Highwood Servs.*, 495 F.2d 1286, 1293 (2d Cir. 1974) (holding that plaintiff can assert tying claim only where it can prove foreclosure of competition and that tying arrangement must be shown to have been used "either to prevent competition or destroy it"); *Cancall PCS, LLC v. Omnipoint Corp.*, No. 99 Civ. 3395 (AGS), 2001 WL 293981, at *3–4 & n.1 (S.D.N.Y. Mar. 26, 2001) (holding that anticompetitive effects is a required element of a *per se* tying claim); *Friedman v. Adams Russell Cable Servs.–N.Y.*, 624 F. Supp. 1195, 1197 (S.D.N.Y. 1986) (rejecting argument that a plaintiff need not show anticompetitive effects in order to plead an illegal tying arrangement); *Moccio v. Cablevision Sys.*, 208 F. Supp. 2d 361, 374 (E.D.N.Y. 2002) ("Tying arrangements are illegal because they permit sellers to foreclose competition on the merits of the tied product by abusing market power in the tying product market.").

        In *Brantley*, where both Viacom and Cablevision were defendants and which challenged license agreements similar to the ones at issue in this case, the Ninth Circuit held that a plaintiff must allege an "actual adverse effect on competition" caused by the tying arrangement through foreclosure of rivals in the absence of any allegation of horizontal collusion.  675 F.3d 1192, 1200 (9th Cir. 2012) (quotation marks omitted).  The court held that the plaintiffs had failed to allege foreclosure of rivals because the complaint did not allege either "that Programmers' practice of selling 'must-have' and low-demand channels in packages excludes other sellers of low-demand channels from the market, or that this practice raises barriers to entry

into the programming market," or that the practice forces consumers to forego the purchase of alternative low-demand channels. *Id.* at 1201.

Having argued to the Ninth Circuit (as well as earlier to the district court and later to the Supreme Court in successfully opposing plaintiffs' petition for a writ of certiorari) that foreclosure of rival programming services was essential to state a viable claim and having prevailed on that basis,[6] Cablevision must now pay more than mere lip service to the foreclosure requirement. But it does not. The Complaint merely identifies a handful of independent programmers whose services Cablevision—a single customer in the tied product market—*might consider purchasing*. These allegations are legally insufficient to demonstrate the requisite foreclosure in the tied product market for several reasons.

First, Cablevision fails to allege facts demonstrating foreclosure of competitors in the tied product market as a whole. To show that a tying arrangement causes anticompetitive effects in the tied product market, a plaintiff must demonstrate market-wide foreclosure, not merely that a competitor in the tied product market is deprived of a single distribution outlet. *See Smith Mach. Co. v. Hesston Corp.*, 878 F.2d 1290, 1297 (10th Cir. 1989) ("[W]here a dealer is serving as an intermediate link in a distribution chain, if one manufacturer is foreclosed from selling to a dealer because of the arrangement, it is likely going to find another way to take its product to market, providing a profit potential continues to exist. In such a case, there is no

---

[6]     *See* Tringali Decl. Ex. H (Distributor Appellees' Joint Opposition Brief, 675 F.3d 1192 (No. 09-56785)) at 2 (asserting that district court properly "dismissed the Complaint on the basis that Plaintiffs did not plead the foreclosure of competing programming, and that such foreclosure is required for Plaintiffs' Sherman Act claims"); *see also* Tringali Decl. Ex. A (Defendants' Brief in Opposition to Petition for Writ of Certiorari, 133 S. Ct. 573 (2012) (No. 12-171)) at 11 ("This Court has repeatedly emphasized the need to demonstrate foreclosure in tying cases, both under the rule of reason and the *per se* doctrine."); *supra* pp. 1–2 & n.1.

ultimate foreclosure to the consumer of a choice of goods."); *see also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) ("This limitation on the reach of the Sherman Act is reflected in our repeated injunctions that section one claimants must plead and prove a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market."); *Americap, Inc. v. ADJ Corp.*, No. 80 Civ. 2630 (RWS), 1980 WL 1891, at \*4 (S.D.N.Y. Sept. 5, 1980) ("[Plaintiff] alleges that [defendant] has diverted revenue and sales from the plaintiff, and this has enabled the defendant [] to dominate and control a very substantial segment of the sales [in the tied product market].  At most, [plaintiff] has pleaded injury to its own business. What is required, however, is some claim that 'the illegal tying arrangement results in actual foreclosure of competition in the tied product market.'" (quotation marks and ellipses omitted) (quoting *Yentsch*, 630 F.2d at 58)).

Allegations that a single customer would have purchased alternative products in the tied product market absent the alleged tie-in are insufficient.  *See, e.g.*, *Yentsch*, 630 F.2d at 57  (holding that plaintiff failed to establish anticompetitive effects in the tied product market because "the question is whether [competitors in tied market] were foreclosed from selling to [plaintiff] and other Connecticut dealers because of [defendant's] policies . . . [and, *inter alia*, plaintiff] adduced no direct evidence that other service station dealers wanted to purchase other products in the tied markets"); *305 E. 24th Owners Corp. v. Parman Co.*, 714 F. Supp. 1296, 1307 (S.D.N.Y. 1989) (holding that plaintiff failed to establish anticompetitive effects in the tied product market because "[t]here must be . . . an effect on an 'appreciable number of buyers' in the tied product market" (quoting *Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495, 504 (1969))), *aff'd*, 994 F.2d 94 (2d Cir. 1993); *see also E&L Consulting*, 472 F.3d at 32 ("Even under notice pleading, an antitrust defendant charged with illegal tying is entitled to some

specificity as to . . . the customers who would have purchased a product elsewhere but for the coercion . . . .").

Moreover, absent sufficient allegations concerning market-wide foreclosure, Cablevision also cannot demonstrate that a substantial volume of commerce was affected by the alleged tie, which is a separate and distinct required pleading element. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984) ("If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law. It is for this reason that [the Court] ha[s] refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.").

The Complaint is devoid of any factual allegations that any distributor other than Cablevision would have purchased alternative programming in the tied product market absent Viacom's alleged conduct (or, indeed, whether Cablevision itself would have purchased alternative programming, as explained below). The only allegation in the Complaint relating to other distributors is Cablevision's suggestion that "[i]t is a reasonable inference that [other distributors'] carriage of Suite Networks is not voluntary, but rather reflects Viacom's successful employment of the coercive tactics Viacom deployed to force Cablevision to carry the Suite to force other distributors to forgo carrying substitute general programming networks." (Compl. ¶ 143; *see id.* ¶ 13.) But this conclusory statement says nothing about which other distributors would have decided to carry alternative networks but for Viacom's alleged conduct, what programming networks those distributors would have carried, or whether rival programming services have been foreclosed from competing due to the inability of other distributors who would otherwise carry those services' networks to do so because of Viacom's alleged conduct.

The absence is particularly glaring given Cablevision's position was 180-degrees opposite throughout *Brantley.  See supra* pp. 1–2, 12.

Furthermore, Cablevision has not alleged that other programmers competing in the tied product market even require distribution by Cablevision in order to compete effectively in the alleged tied product market.  To the contrary, in public admissions before the FCC, Cablevision has asserted that independent programmers have numerous distribution outlets so that carriage by a particular distributor is not necessary to a programmer's ability to compete.[7] *See* Tringali Decl. Ex. J (Trial Brief of Defendant Cablevision Systems Corp., *In re* Game Show Network v. Cablevision Systems Corp., 27 FCC Rcd. 5113 (2012) (No. 12-122)) at 31 ("This intense competition [in the MVPD business] debunks any notion that Cablevision has bottleneck market power with respect to [Game Show Network].  GSN will not be able to prove that Cablevision's carriage decision unreasonably restrained its ability to compete fairly.").

Because Cablevision has only alleged that a single purchaser—Cablevision— would have considered purchasing alternative programming in the tied product market absent Viacom's alleged tie, not that competing programmers are foreclosed from the tied product

---

[7]     In considering a motion to dismiss, a court may take judicial notice of "party admissions made in public records whose authenticity is not in dispute," *Abdul-Rahman v. City of N.Y.*, No. 10 CIV. 2778, 2012 WL 1077762, at *3 (E.D.N.Y. Mar. 30, 2012), and of "'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action.'"  *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 268–69 (S.D.N.Y. 2005) (quoting *Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143, 173 (S.D.N.Y. 2002)) (taking notice of letters submitted to another court which "allegedly contain statements by plaintiff which contradict the factual allegations contained in the Complaint"); *see also, e.g.*, *AIG Fin. Prods. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 675 F. Supp. 2d 354, 363 (S.D.N.Y. 2009) (taking notice of party's representations before another court which undermine party's factual allegations); *Animal Sci. Prods. v. China Nat. Metals & Minerals Imp. & Exp.*, 702 F. Supp. 2d 320, 410 (D.N.J. 2010) (taking notice of plaintiff's statements made before the International Trade Administration which conflict with plaintiff's factual allegations before the court), *vacated and remanded on other grounds,* 654 F.3d 462 (3d Cir. 2011).

market as a whole, it has failed adequately to allege foreclosure of competing programmers or substantial impact on commerce, and its Complaint should be dismissed on that basis alone.

        *Second*, Cablevision conspicuously fails to allege *actual*, as opposed to merely *speculative*, foreclosure of rival programmers, even from its own cable line-up.  A tying claim must be based on *actual* foreclosure of rivals in the tied product market.  *See Shop & Save Food Mkts. v. Pneumo Corp.*, 683 F.2d 27, 30 (2d Cir. 1982) (holding that plaintiff must establish "that the illegal tying arrangement resulted in the actual foreclosure of competition in the tied product market"); *Yentsch*, 630 F.2d at 58 ("We require at least some showing that the illegal tying arrangement results in actual foreclosure of competition in the tied product market."). Speculation about anticompetitive effects is not enough.  *S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869, 877 (11th Cir. 1998); *see Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 799 (1st Cir. 1988) (Breyer, J.) (holding that plaintiff failed to prove tying claim when, "[f]or one thing, the record does not demonstrate an *actual* anticompetitive effect in the *tied* product market.  Rather, the district court found a *potential* effect" (emphasis in original) (citation omitted)); *cf. Discovision Assocs. v. Disc Mfg.*, Nos. Civ. A. 95-21-SLR, 95-345-SLR, 1997 WL 309499, at *9–10 (D. Del. Apr. 3, 1997) (holding that DMI sufficiently alleged foreclosure in the tied product market for compact disc replication and mastering technology by alleging that absent tying, "'DMI and other compact disc manufacturers *would* independently develop alternative technology or use the technology of the other competitors in the compact disc replication and mastering technology markets such as Philips, Sony, or Nimbus.'" (emphasis added) (quoting the complaint)).  Absent sufficient allegations concerning *actual*, not speculative, anticompetitive effects, Cablevision likewise cannot demonstrate substantial impact on commerce.

Cablevision's allegations concerning foreclosure of independent programmers are wholly speculative. The Complaint merely identifies certain networks that, absent Viacom's alleged tying, Cablevision says it "would be more likely to consider launching" (Compl. ¶ 141); networks that it is "considering launching . . . in the near future" but "would be more likely to launch" (*id*. ¶¶ 137, 139); networks that it "would be more likely to launch, or to launch sooner or more broadly" (*id.* ¶¶ 138, 139); and networks that it "would strongly consider carrying." (*Id.* ¶ 142.) Even for those networks that Cablevision alleges it would "consider" launching, Cablevision fails to make any factual allegations regarding price or volume of commerce impacted by the alleged tying.[8] Because the Complaint is devoid of any allegations concerning specific networks that Cablevision *would* distribute but for the fact that it is carrying the Suite Networks, it fails to allege adequately facts supporting *actual* anticompetitive effects involving a substantial amount of commerce.[9]

*Third*, Cablevision's contention that Viacom's alleged bundling practices foreclose competing networks is facially implausible, particularly in light of other allegations

---

[8]  The Complaint states, without reference to any particular network or programmer, that tens of millions of dollars of commerce is foreclosed. (*Id.* ¶ 155.)

[9]  In the prefatory "Nature of the Action" section, Cablevision indicates that it "would carry other networks on the numerous channel slots that Viacom's Suite Networks currently occupy." (*Id.* ¶ 10.) This general allegation lacks any factual detail as to the networks Cablevision would carry and conflicts with Cablevision's speculative allegations about channels it would *consider* carrying. It is therefore legally insufficient. In evaluating the sufficiency of a complaint, "the court will not credit conclusory statements unsupported by fact allegations . . . . Nor should a court accept allegations that are contradicted or undermined by other more specific allegations in the complaint . . . ." *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96 CIV. 3231 (RPP), 2001 WL 396521, at *1 (S.D.N.Y. Apr. 19, 2001); *see also Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself . . . .").

that Cablevision asserts.  *See Iqbal*, 556 U.S. at 678 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").  On a motion to dismiss, courts evaluate the plausibility of a claim by taking into account all well-pleaded factual allegations in the complaint, including those that may actually undermine the plaintiff's claim.  *See, e.g.*, *Kaye v. D'Amato*, No. 05-CV-982, 2008 WL 5263746, at *2 (E.D. Wis. Dec. 18, 2008) ("On a motion to dismiss . . . the court is not required to ignore facts alleged in the complaint that undermine the plaintiff's claim" (citing *Slaney v. Int'l Amateur Athletic Fed.*, 244 F.3d 580, 597 (7th Cir. 2001))), *aff'd*, 357 F. App'x 706 (7th Cir. 2009); *In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 WL 1458025, at *6 (N.D. Cal. May 21, 2009) (rejecting conspiracy claim where plaintiffs' own allegations undermined alleged motive by defendants to engage in price fixing); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) (dismissing complaint when "plaintiffs' own allegations undermine the inference plaintiffs advance"); *see also Iqbal*, 556 U.S. at 663–64 ("[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense.").

Cablevision has not plausibly alleged how Viacom's "forcing" it to carry a trivial and insignificant number of Suite Networks among its 550 channels in certain of Cablevision's territories prevents Cablevision from carrying alternative "general programming networks" and, thereby, forecloses competing networks from the tied product market.  Instead, Cablevision admits that the advent of digital technology has enabled it to offer subscribers "hundreds of available channels" (*id.* ¶ 23), and that, despite claiming bandwidth limitations, it concededly has "small amounts of uncommitted network bandwidth" (*id.* ¶ 120) and contrasts its situation with that of "small distributors that face severe bandwidth limitations."  (*Id.* ¶ 112.)  The Complaint is devoid of any allegations that Cablevision *cannot* use its uncommitted bandwidth

to distribute other general programming networks.  Rather, Cablevision's allegations indicate that it *does not want* to make purchases in the tied product market given its internal assessment of "optimal allocation" of its bandwidth (*see id.* ¶ 119): Cablevision admits, repeatedly, that the absence of any general programming network "is unlikely to cause a substantial number of subscribers to drop Cablevision's video services."  (*Id.* ¶¶ 26, 100.)  Moreover, Cablevision admits that it devotes "well over a billion dollars a year to license programming" services (*id.* ¶ 28), which include approximately 550 channels.  *See supra* note 3.  It is facially implausible that *Viacom's* alleged conduct is somehow causing Cablevision to forgo allocating any of its billion-dollar budget or bandwidth to alternative networks or somehow forecloses a not insubstantial amount of commerce.

**B.**     **The Complaint Fails Adequately to Allege a Plausible Tying Product Market in Which Viacom Possesses Appreciable Market Power**

As a prerequisite to its Section 1 tying claim, Cablevision must allege separate tying and tied product markets and that Viacom has appreciable market power in the tying product market.  *See United Magazine Co. v. Murdoch Magazines Distribution*, 146 F. Supp. 2d 385, 398 (S.D.N.Y. 2001) ("[A]s a prerequisite to any antitrust claim, plaintiff must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." (quotation marks omitted)), *aff'd sub nom. United Magazine Co. v. Curtis Circulation*, 279 F. App'x 14 (2d Cir. 2008); *see also Jefferson Parish*, 466 U.S. at 21 ("It [is] clear that a tying arrangement cannot exist unless two separate product markets have been linked."); *E&L Consulting*, 472 F.3d at 31.  The plaintiff must allege a product market that is, at a minimum, "theoretically reasonable," *In re Set-Top Cable Television Box*, 2011 WL 1432036, at *8 (quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008)), and "theoretically plausible," *E&G Gabriel v. Gabriel Bros.*, No. 93 CIV. 0894 (PKL), 1994 WL

369147, at *2 (S.D.N.Y. July 13, 1994).  Courts have not hesitated to reject market allegations at the motion to dismiss stage "that make no economic sense."  *Id.* (quoting *Theatre Party Assocs. v. Shubert Org.*, 695 F. Supp. 150, 154 (S.D.N.Y. 1988)).  Indeed, courts frequently dismiss claims—like Cablevision's—that are characterized by "either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way."  *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001).

      1.     *A Single Network "Brand" Does Not Constitute a Legally Cognizable Tying Product Market*

The Complaint sets forth three alternative market definitions, the first of which alleges four separate tying product markets each composed exclusively of a single Viacom network—*i.e.*, a Nickelodeon tying market, a Comedy Central tying market, a BET tying market, and an MTV tying market.  (Compl. ¶¶ 31–39.)  By alleging such narrowly defined markets, Cablevision is taking the nonsensical position that each of MTV, Nickelodeon, Comedy Central and BET does not compete with any other programming service.

Attempts, like this, to define markets according to a single name brand have been consistently rejected by courts in this Circuit.  *See, e.g.*, *Todd*, 275 F.3d at 200 & n.3 (collecting cases); *Re-Alco Indus. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391–92 (S.D.N.Y. 1993) ("'The law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market.'" (quoting *Deep South Pepsi–Cola Bottling Co. v. PepsiCo, Inc.*, No. 88 CIV. 6243 (PKL), 1989 WL 48400, at *8 (S.D.N.Y. May 2, 1989))); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678 (S.D.N.Y. 1987) (collecting cases).  If a single brand could constitute a cognizable tying product market, every brand conceivably could have market power sufficient to trigger a tying violation: This is not the law.

*See Carell v. Shubert Org.*, 104 F. Supp. 2d 236, 265 (S.D.N.Y. 2000) ("To define the relevant product market as that group of products over which defendants' anticompetitive conduct exercises control . . . as an analytic matter reads the market definition step out of the Sherman Act." (alteration in original) (quotation marks omitted)).

   In support of its single-brand market allegations, Cablevision concedes that other networks offer similar programming and target similar audiences, but alleges that those other networks "lack the high ratings and strong following" that the Viacom networks enjoy or "offer somewhat differently targeted programming." (*See* Compl. ¶¶ 32, 34, 36, 38.)[10]  Courts have rejected similar arguments.  For example, in *United Magazine*, plaintiff magazine wholesalers alleged that magazine distributors engaged in illegal tying by requiring that wholesalers who wished to purchase "supertitles"—*i.e.*, the most popular magazines—from the distributors also purchase certain unwanted titles.  146 F. Supp. 2d at 397–98.  The court rejected the plaintiffs' allegation that the relevant tying product market was each of the supertitles and dismissed the complaint, holding that "'Courts in this District have rejected the proposition that allegedly unique products, by virtue of customer preference for that product, are markets unto themselves.'"  *Id.* at 398 (quoting *Carell*, 104 F. Supp. 2d at 265 (collecting cases)).  Likewise, this court has rejected Cablevision's contention that a single television network, by virtue of its popularity or distinctive programming, constitutes a relevant product market:

> The plaintiff's argument is analogous to a contention that a consumer is "locked into" Pepsi because she prefers the taste, or NBC because she prefers "Friends," "Seinfeld," and "E.R." A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and NBC is just another television network.

---

[10] Cablevision provides no factual allegations supporting its assertion that networks which offer differently targeted programming do not compete in the same market.  This inadequacy is also grounds for dismissal.  *See infra* Section I.B.2.

*Global Disc. Travel Servs. v. Trans World Airlines*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.).

Cablevision's allegation that each of MTV, Nickelodeon, Comedy Central and BET constitutes its own tying product market because of the popularity of those networks is also directly contradicted by Cablevision's own admissions before the Court of Appeals for the District of Columbia and the FCC. The Complaint alleges that Cablevision views certain networks, including the alleged "Tying Networks," as "commercially critical (or 'must have') because, if unable to offer their programming for a significant period of time, Cablevision would likely shed a substantial number of subscribers." (Compl. ¶ 25.) However, in arguing that the FCC should not restrict the ability of cable operators—such as Cablevision—to enter into exclusive distribution agreements with programmers, Cablevision asserted that "[t]he fragmentation of the cable audience across the hundreds of available channels means that no single channel . . . represents so great a proportion of overall viewing as to render it essential for an MVPD to offer to attract subscribers." Tringali Decl. Ex. F (Comments of Cablevision Systems Corporation, *In re* The Regional Sports Network Marketplace, 27 FCC Rcd. 154 (2012) (No. 11-128)) at 10. Similarly, Cablevision has conceded that "no single programming service . . . can be deemed to be critical to the competitive viability of an MVPD in any particular local market." Tringali Decl. Ex. G (Reply Comments of Cablevision Systems Corporation, *In re* The Regional Sports Network Marketplace, 27 FCC Rcd. 154 (2012) (No. 11-128)) at 1. Cablevision has made the same admission before the courts, directly contradicting its factual assertions here. *See* Tringali Decl. Ex. I (Brief for Petitioners, *Cablevision Systems Corp. v. FCC*, 597 F.3d 1306 (D.C. Cir. 2010) (Nos. 07-1425, 07-1487)) at 47 ("[T]he record showed that it is highly unlikely subscribers would switch to a cable operator solely to obtain a withheld network [not available

on a rival operator] in numbers significant enough to eliminate MVPD rivals or allow cable operators to reap monopoly profits.").

Cablevision's second alternative market allegation—that all of the Core Networks together constitute the tying market over which Viacom has a "100% share" (Compl. ¶¶ 50–51)—suffers from the same fatal flaw: Brands are not markets.  Moreover, Cablevision's contention that all of Viacom's "Core" networks comprise a single product market is devoid of any factual allegations explaining why Nickelodeon, Comedy Central, BET, MTV, VH1, TV Land, MTV 2 and Spike TV constitute an appropriate product market or why other networks such as NBC, Fox, ABC or CBS or programming services such as ESPN, Disney Channel, Bravo, TNT or many others are properly excluded.  Dismissal is appropriate "[i]f a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand."  *Re-Alco Indus.*, 812 F. Supp. at 391.

> 2. *Cablevision's Alternative, Gerrymandered Markets Alleged in the Complaint are Implausible and Require Dismissal*

Cablevision defines its third alternative tying product markets according to supposed characteristics of the Viacom networks that appeal to consumers in those alleged markets—*i.e.*, Popular Children's Programming, Popular Comedy Programming, Popular African American Programming, and Popular Young Adult Programming.  For instance, the Complaint alleges that BET is in a market (that, at most, "might" include only one other network) consisting of highly rated networks that "feature programming that appeals to . . . African American adults and young adults seeking African-American oriented programming."

(Compl. ¶¶ 67–69.)[11]  Cablevision's purported markets are legally insufficient because they clearly do not encompass all interchangeable substitute products.  *See Chapman*, 546 F.3d at 238 ("[W]here the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.'" (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997))); *see also, e.g.*, *Theatre Party Assocs.*, 695 F. Supp. at 155 (dismissing complaint when "market proposed by plaintiff does not include alternative sources of, and substitutes for, defendant's product which reflect commercial realities").  It defies logic that African American viewers are targeted only by BET and one other channel.  The same is true of the other categories.  How can categories as broad and encompassing as Young Adult Programming, Comedy Programming or Children's Programming be limited to only one other competing channel?  They cannot.  And, as shown above, Cablevision itself has said so numerous times in numerous ways to the federal courts and the FCC.

The Complaint is devoid of any allegations as to *why* the television viewing audience may plausibly be segmented into separate markets based on different, but overlapping, demographics and different, but overlapping, programming.  Cablevision alleges that it has determined to exclude certain networks from its proposed market definitions because those networks do not target the same exact demographic at all times as the Viacom networks or do not have the same mix of programming as the Viacom networks.  For instance, Cablevision alleges

---

[11]   Comedy Central is allegedly in a market of highly rated networks that feature programming that appeals to "adults and young adults seeking comedy entertainment"; MTV is allegedly in a market of highly rated networks that feature programming that appeals to "teenagers and young adults seeking pop culture-oriented programming"; and Nickelodeon is allegedly in a market of highly rated networks that feature programming that appeals to "children between the ages of 6 and 14."  (*Id.* ¶¶ 54, 61, 73.)

that TBS "does not belong in the market with Comedy Central" because TBS airs different types

of comedy programming than Comedy Central and also airs non-comedy programming (Compl.

¶ 65) and that VH1 and Bravo do not belong in the same market with MTV because their

audiences "skew" more female and older.  (*Id.* ¶ 78.)  Cablevision's circular logic as to why

TBS, VH1, and Bravo do not fit within Cablevision's narrowly-set market parameters does not,

however, support the appropriateness of Cablevision's formulation.  In fact, Cablevision's

admissions that TBS airs comedy programming, that VH1 "features music and pop-culture

themed programming," and that Bravo offers programming "centered on entertainment and pop

culture, including reality programs" supports *including*, not excluding, those networks in

Cablevision's proposed "Popular Comedy Programming" and "Popular Young Adult

Programming" markets, respectively.  (*Id.* ¶¶ 65, 78.)  And, self-evidently, viewers choose

between drama, comedy, sports and news at any point in time, and many networks serve a

variety of different audiences at any time and over time.  For example, the major broadcasters

also obviously serve young adults, African-Americans, children and those who enjoy comedy.

Courts routinely reject such gerrymandered "'strange red-haired, bearded, one-eyed man-with-a-

limp'" market definitions that define alleged markets based on the defendant's products—and the

plaintiff's desire to show market power—rather than the realities of competition.  *See Belfiore v.

N.Y. Times*, 654 F. Supp. 842, 846 (D. Conn. 1986) (quoting *City of Detroit v. Grinnell Corp.*,

495 F.2d 448, 457 n.4 (2d Cir. 1974)) (rejecting plaintiffs' attempt to define the relevant market

"from the product out"), *aff'd*, 826 F.2d 177 (2d Cir. 1987); *see also Pepsico, Inc. v. Coca-Cola

Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000) ("Obviously, the narrower the market defined by

plaintiffs, the easier it is to show possession of monopoly power in the relevant market.  Pepsico

has chosen to define the elements of the relevant market to suit its desire for high Coca-Cola

market share, rather than letting the market define itself." (quotation marks and citation omitted)), *aff'd*, 315 F.3d 101 (2d Cir. 2002).

Moreover, attempts to narrowly define media markets according to alleged consumer preference have been rejected by this Circuit and courts in this district.  For example, when the plaintiffs in *Belfiore* alleged a market consisting of "general interest daily newspapers directed primarily to upscale readers," the court held that plaintiffs' "awkward attempt to conform their theory to the facts they allege" was "implausible as a theoretical matter."  826 F.2d at 180 (quotation marks omitted).  Similarly, in *Mathias v. Daily News, L.P.*, the court rejected as "artificially constructed" plaintiffs' attempt to define the *Daily News* as its own market based on, *inter alia*, the newspaper being targeted towards a different audience than papers such as *The Wall Street Journal,* offering unique local content not found in other papers, and being visually different from other papers.  The court held:

> Some consumers may prefer the *Daily News* for any number of reasons.  But at a basic level, the *Daily News* is a newspaper, functionally interchangeable with many others, that competes in a market for readers of the news.  The Court cannot see the utility of further expending the limited resources of the parties and the judiciary to rediscover that simple concept.

152 F. Supp. 2d 465, 482–83 (S.D.N.Y. 2001).  Cablevision's attempt to gerrymander tying product markets to fit its alleged claims likewise should be rejected, and the Complaint should be dismissed on that independent basis.

## II.   CABLEVISION FAILS TO ALLEGE A SEPARATE CAUSE OF ACTION BASED ON AN ABROGATED THEORY OF "BLOCK BOOKING"

In addition to mislabeling Viacom's alleged conduct as unlawful "tying," Cablevision also incorrectly asserts that the conduct constitutes *per se* unlawful "block-booking." (Compl. ¶ 160.)  First, Cablevision has itself taken the position in *Brantley* that block-booking is nothing more than a form of tying, which should be dispositive here.  *See* Tringali Decl. Ex. K

(Distributors' Motion to Dismiss Second Amended Complaint, No. CV 07-6101 CAS (VBKx) (Apr. 22, 2008)) at 25.  Second, Cablevision's use of the term "block booking" seeks to resurrect an old line of Supreme Court decisions holding that the practice by major motion picture distributors of offering licenses to copyrighted popular movies only on the condition that movie theaters or television stations also license unpopular movies constituted a *per se* illegal tying arrangement.  *See United States v. Paramount Pictures*, 334 U.S. 131, 156–59 (1948); *United States v. Loew's, Inc.*, 371 U.S. 38, 44–50 (1962), *abrogated by Ill. Tool Works Inc. v. Indep. Ink.*, 547 U.S. 28 (2006) .  However, block-booking is no longer recognized as valid *per se* tying by the Supreme Court.  *See Indep. Ink.*, 547 U.S. at 44.[12]  As the Court held in *Independent Ink*, "tying arrangements involving patented products should be evaluated under the standards applied in cases like . . . *Jefferson Parish* rather than under the *per se* rule applied in . . . *Loew's*" and that while some tying arrangements are still unlawful, "that conclusion must be supported by proof of power in the relevant market rather than by a mere presumption thereof."  *Id*. at 42–43.  Since *Independent Ink* and the abolition of a special *per se* rule to intellectual property rights, no court has recognized block-booking as a cause of action.

Accordingly, a claim of "block booking" involving copyrighted programming is no different from any other arrangement where a manufacturer requires its distributor to carry its full line of products, which requires a showing of foreclosure in order to be considered anticompetitive.  Courts have consistently held that full-line forcing has the potential to enhance,

---

[12]    Though *Independent Ink* did not expressly address copyrights, subsequent lower court decisions have extended its reasoning to copyrights and other forms of intellectual property.  *See, e.g.*, *Mediacom Commc'ns Corp. v. Sinclair Broad. Grp.*, 460 F. Supp. 2d 1012, 1027 (S.D. Iowa 2006) (recognizing that, after *Independent Ink*, the uniqueness of copyrighted television programming was insufficient to establish economic power in market for tying product).

rather than limit, competition and, therefore, cannot be condemned absent some showing of actual anticompetitive effect.  *See Smith Mach.*, 878 F.2d at 1296 ("[C]ommon sense informs us that in most cases when, as here, the manufacturer does not prohibit a dealer from carrying competing lines, line forcing enhances interbrand competition by making [more products] available for sale to the public.") (affirming dismissal of full-line forcing claim against tractor manufacturer); *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 101 (3d Cir. 1976) ("[T]here can be no liability under a full-line forcing [theory] absent a showing of foreclosure of competition in a substantial amount of commerce."); IX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1725c at 334 (3d ed. 2011) ("Without . . . general foreclosure . . . adding the defendant's line to a dealer's shelves may enhance interbrand competition.").  Absent sufficient factual allegations showing how Viacom's challenged practices foreclose a substantial amount of competition from the relevant market, the Complaint fails to state a Section 1 claim based on "block booking." Therefore, Cablevision's "block-booking" claim is insufficient for the same reasons as its tying claim.

## III.   CABLEVISION'S DONNELLY ACT CLAIM SHOULD BE DISMISSED FOR THE SAME REASONS AS THE SECTION 1 TYING CLAIM

Cablevision's Donnelly Act claim is premised on the same alleged facts as Cablevision's Sherman Act tying claim (*see* Compl. ¶¶ 163–164) and "[t]he requirements for pleading tying claims under the Donnelly Act are identical to those of the Federal Sherman Antitrust Act."  *Country Pointe at Dix Hills Home Owners Ass'n v. Beechwood Org.*, 21 Misc. 3d 1110(A), at *9 (N.Y. Sup. Ct. 2008), *aff'd in part and remanded*, 915 N.Y.S.2d 117 (2011); *see United Magazine*, 146 F. Supp. 2d at 398 n.4; *Pyramid Co. of Rockland v. Mautner*, 581 N.Y.S.2d 562, 565 (Sup. Ct. 1992).  Under the Donnelly Act, as under the Sherman Act, "[a] plaintiff must allege: (1) two distinct products, i.e., a tying product and a tied product, (2)

economic coercion, (3) market power in the tying product market, (4) anti-competitive impact in the tied product market, and (5) involvement of a substantial amount of commerce." *Country Pointe*, 21 Misc. 3d 1110(A), at *9; *Pyramid*, 581 N.Y.S.2d at 565. Because, as discussed above, Cablevision has failed to sufficiently allege multiple elements of a tying claim under the Sherman Act, Cablevision's claim under the Donnelly Act also must be dismissed.

## IV.   CABLEVISION'S REQUESTED RELIEF TO SEVER THE LICENSE AGREEMENT IS IMPROPER AND SHOULD BE STRICKEN FROM THE COMPLAINT

Cablevision asks the court to grant equitable relief and sever the 2012 License Agreement by requiring Viacom to license just the Core Networks to Cablevision under the terms of the purportedly illegal agreement. (*See* Compl. ¶ 170(b), (d).) Because this relief is unavailable as a matter of law based on the allegations of the Complaint, the court should strike Cablevision's requested relief. *See* Fed. R. Civ. P. 12(f).

Striking a request for injunctive relief is appropriate when the allegations in a complaint are insufficient as a matter of law to support a requested remedy. *See Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 339–41 (S.D.N.Y. 2003); *United States v. Solvents Recovery Serv. of New England*, 496 F. Supp. 1127, 1142–43 (D. Conn. 1980). When relief is requested that would require alteration of a contract, courts determine whether the complaint alleges sufficient facts to permit such relief. *See Helprin*, 277 F. Supp. 2d at 39–40 (evaluating whether allegations of the materiality of a breach and adequacy of money damages are sufficient to maintain a prayer for relief of recession); *see also id.* at 40 (concluding that plaintiff did not allege sufficient facts to maintain a claim for punitive damages); *Linville v. O&K Trojan, Inc.*, No. 91-CV-284S, 1994 WL 117363, at *21 (W.D.N.Y. Mar. 31, 1994) (striking request for punitive damages from complaint when punitive damages are not recoverable under the statutes

allegedly violated); *Brokke v. Stauffer Chem. Co*., 703 F. Supp. 215, 222 (D. Conn. 1988) (same).

A contract may be severed only when "'(1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalent.'" *GEM Advisors v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 327 (S.D.N.Y. 2009) (quoting *Ginett v. Computer Task Grp.*, 962 F.2d 1085, 1098 (2d Cir. 1992)). A contract is not severable when "by its terms and purposes, it contemplates that all of its parts are interdependent and common to one another." *Id.*; *see also AT&T v. United States*, 32 Fed. Cl. 672, 682 (1995) ("[T]here is a critical difference between an otherwise valid contract that contains a prohibited term or clause and a contract that is void from the inception. The former is amenable to reformation on the theory that the offensive provision is not significant enough to undermine the foundations of the contract . . . ."), *vacated on other grounds*, 177 F.3d 1368 (Fed. Cir. 1999). "Where the contents of the contract are clear, severability is a matter of law for the court to decide." *GEM Advisors*, 667 F. Supp. 2d at 327–28.

Cablevision admits that the provisions of the 2012 License Agreement regarding licensing of the Core Networks are interdependent with the provisions relating to the licensing of the Suite Networks and cannot be severed. Indeed, Cablevision's tying claim is premised on the allegation that Viacom conditioned the licensing of the Core Networks on the licensing of the Suite Networks, and Cablevision alleges that Viacom "would not consider any deal that did not include the Suite Networks." (Compl. ¶ 123.) Cablevision further alleges that had it wished to license the Core Networks without the Suite Networks, it would have been required to pay a penalty above the price of the Core and Suite Networks combined in the 2012 License Agreement. (*Id.* ¶ 126.) Moreover, Cablevision's Complaint describes a multifaceted contract

negotiation process concerning numerous terms and conditions including, *inter alia*, yearly effective rates, rate increases, carriage obligations, and which tiers networks are to be carried on. (*See, e.g.*, *id.* ¶¶ 106, 132.)  Accepting Cablevision's allegations as true, the 2012 License Agreement cannot be severed and reformed to contain just Cablevision's unilaterally preferred terms and conditions as to the Core Networks and relieving it of its obligations as to the Suite Networks.

Cablevision essentially asks the court to free it from what it claims to be an illegal contract requiring it to license the Suite Networks but allow it to continue receiving the benefits of the same agreement to license the Core Networks.  However, the Supreme Court does not permit parties to "reap the benefits of a contract and then seek to avoid the corresponding burdens."  *Viacom Int'l Inc. v. Tandem Prods.*, 526 F.2d 593, 599 (2d Cir. 1975) (citing *Kelly v. Kosuga*, 358 U.S. 516, 520–21 (1959) ("[T]he courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, of preventing people from getting other people's property for nothing when they purport to be buying it." (quotation marks omitted))); *accord Wechsler v. Hunt Health Sys.*, 216 F. Supp. 2d 347, 354 (S.D.N.Y. 2002).  Courts have rejected attempts by antitrust plaintiffs selectively to avoid their contractual obligations.  *See Kelly*, 358 U.S. at 518–21 (striking defense to breach of contract that contract violated the Sherman Act); *Rooney v. Columbia Pictures Indus.*, 538 F. Supp. 211, 229 (S.D.N.Y. 1982) ("Having accepted the considerable benefits of such contracts, Rooney cannot now avoid the corresponding obligations by his charge of a separate agreement among defendants in violation of the federal antitrust laws."), *aff'd*, 742 F.2d 117 (2d Cir. 1982); *see also Hudson Motors P'ship v. Crest Leasing Enters.*, 845 F. Supp. 969, 981 (E.D.N.Y. 1994) ("It is now well established that the remedy for violation of the antitrust law is not avoidance of payments due under a contract, but rather the

31

redress which the antitrust statute establishes,—a private treble damage action." (quotation marks and citation omitted)).  Accordingly, Cablevision's requested relief should be rejected and stricken from the Complaint.

Cablevision's request for equitable relief is also barred by laches.  Cablevision alleges that its purchase of the Suite Networks stopped being voluntary as early as 2008. (Compl. ¶ 107.)  However, Cablevision never challenged the alleged tying then but only now.  Its delay is unreasonable and prejudicial to Viacom, which would not have entered into the 2012 License Agreement had it known that Cablevision would seek to challenge it less than two months after the ink was dry.

Laches applies where a plaintiff, such as Cablevision here, though having knowledge of its claim, unreasonably delays in seeking redress to the detriment of the defendant. Courts look to "analogous" statutes of limitations in determining whether such delay exists. *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008); *see also Rite Aid Corp. v. Am. Express Travel Related Servs.*, 708 F. Supp. 2d 257, 272 (E.D.N.Y. 2010) (applying a "four-year period of laches" because the Clayton Act contained a four-year statute of limitations for damages claims).  Courts have dismissed Sherman Act claims for injunctive or equitable relief on laches grounds.  *See Madison Square* Garden, 2008 WL 4547518, at *10-11*; see also Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 841 (S.D.N.Y. 1988) ("The doctrine of laches . . . can be applied to equitable claims made under Section 16 of the Clayton Act.").

In *Madison Square Garden*, the National Hockey League Board issued a resolution in 1994 that granted the NHL the exclusive right to control the individual teams' trademarks and licensing.  2008 WL 4547518, at *2.  Licensing agreements executed in 1996

and 2006 continued this grant of rights in substantively the same form. *Id*. at *3. Madison Square Garden argued that the 2006 renewal constituted an "overt act" that started the statutory period running again. Judge Preska disagreed, concluding that the complaint did not allege any substantive change in the teams' rights of ownership over their trademarks and thus was not an "overt act." *Id*. at *10.

Here, the Complaint makes several references to how the negotiations in late 2012 were a continuation of conduct from four years earlier. For instance, Cablevision states that in 2008, Viacom "engaged in the coercive tactics it was to repeat four years later." (Compl. ¶ 110.) The Complaint also alleges that as in 2008, Cablevision would have to pay significantly more for only the Core Networks in 2012. (*Id.* ¶ 125.) Moreover, the section of the Complaint which describes the 2012 negotiations is titled, "Viacom Repeats Its Abusive Tactics And Unlawfully Coerces Cablevision In 2012 To Continue To Carry Suite Networks." (*Id.* at p. 41.)

Thus, Cablevision is barred by the laches doctrine from seeking equitable relief because it has unreasonably delayed in bringing a tying claim by never challenging the earlier license agreement but instead choosing to enter into yet another allegedly involuntary and coercive agreement in 2012.

## **CONCLUSION**

For the foregoing reasons, Defendant Viacom respectfully submits that

Cablevision's Complaint fails to state a claim for relief and should be dismissed in its entirety.

Dated:   May 8, 2013

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By:___/s/ Joseph Tringali_____
Joseph F. Tringali
Peri L. Zelig
425 Lexington Avenue
New York, NY 10017
Telephone:   (212) 455-2000
Facsimile:   (212) 455-2502

*Attorneys for Defendants Viacom International Inc.*
*and Black Entertainment Television LLC*

Kenneth R. Logan,
      *Of Counsel.*

34