UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

| | |
|---|---|
| CABLEVISION SYSTEMS CORPORATION and CSC HOLDINGS, LLC, | : |
| | : Case No.: 13 CIV 1278 (LTS)(JLC) |
| | : |
| Plaintiffs, | : |
| | : |
| vs. | : |
| | : |
| VIACOM INTERNATIONAL INC. and BLACK ENTERTAINMENT TELEVISION LLC, | : |
| | : |
| Defendants. | : |

-----------------------------------------------------------------x

### MEMORANDUM OF LAW OF VIACOM INTERNATIONAL AND BLACK ENTERTAINMENT TELEVISION IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Joseph F. Tringali
Peri L. Zelig
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:   (212) 455-2000

*Attorneys for Defendants*

Kenneth R. Logan,

*Of Counsel.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 6

ARGUMENT ....................................................................................................................... 9

I.    CABLEVISION FAILS TO ALLEGE THE ESSENTIAL ELEMENTS OF A
      SECTION 1 TYING CLAIM ................................................................................. 10

      A.    The Amended Complaint Fails Adequately to Allege Foreclosure in the
            Tied Product Market ................................................................................... 11

            1.    Cablevision has not sufficiently alleged market-wide foreclosure of
                  competition ....................................................................................... 14

            2.    Cablevision's conclusory allegations concerning other distributors fail
                  to demonstrate market-wide foreclosure .......................................... 19

            3.    Cablevision's allegations as to its own purchasing decisions remain
                  speculative and implausible .............................................................. 21

      B.    The Amended Complaint Fails Adequately to Allege a Plausible Tying
            Product Market in Which Viacom Possesses Appreciable Market Power ........... 23

            1.    A single network "brand" does not constitute a legally cognizable
                  tying product market .......................................................................... 24

            2.    Cablevision's alternative, gerrymandered markets alleged in the
                  Amended Complaint are implausible and require dismissal ................... 28

II.   CABLEVISION FAILS TO ALLEGE A SEPARATE CAUSE OF ACTION
      BASED ON AN ABROGATED THEORY OF "BLOCK BOOKING" ........................ 32

III.  CABLEVISION'S DONNELLY ACT CLAIM SHOULD BE DISMISSED FOR
      THE SAME REASONS AS THE SECTION 1 TYING CLAIM .................................... 34

IV.   CABLEVISION'S REQUESTED RELIEF TO SEVER THE LICENSE
      AGREEMENT IS IMPROPER AND SHOULD BE STRICKEN FROM THE
      AMENDED COMPLAINT ..................................................................................... 35

CONCLUSION ................................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*Abdul-Rahman v. City of N.Y.*, No. 10 Civ. 2778, 2012 WL 1077762 (E.D.N.Y. Mar. 30, 2012) ................................................................................................17

*AIG Fin. Prods. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 675 F. Supp. 2d 354 (S.D.N.Y. 2009) ...........................................................................................17

*Americap, Inc. v. ADJ Corp.*, No. 80 Civ. 2630 (RWS), 1980 WL 1891 (S.D.N.Y. Sept. 5, 1980) ...................................................................................................13

*Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705 (2d Cir. 1989) ............................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...........................................................................9, 16, 20, 22

*AT&T v. United States*, 32 Fed. Cl. 672 (1995) ............................................................................36

*Bansavich v. McLane Co.*, No. 3:07cv702 (WWE), 2008 WL 4821320 (D. Conn. Oct. 31, 2008) ..................................................................................................16

*Belfiore v. N.Y. Times*, 654 F. Supp. 842 (D. Conn. 1986) ...................................................31, 32

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...........................................................................9

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012)..................................1, 12, 15, 18

*Brokke v. Stauffer Chem. Co.*, 703 F. Supp. 215 (D. Conn. 1988)................................................36

*Cancall PCS, LLC v. Omnipoint Corp.*, No. 99 Civ. 3395 (AGS), 2001 WL 293981 (S.D.N.Y. Mar. 26, 2001) ..............................................................................11

*Carell v. Shubert Org.*, 104 F. Supp. 2d 236 (S.D.N.Y. 2000) .....................................................25

*CDC Techs., Inc. v. IDEXX Labs. Inc.*, 186 F.3d 74 (2d Cir. 1999) ............................................14

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008) .....................................23, 29

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ....................................................31

*Coniglio v. Highwood Servs.*, 495 F.2d 1286 (2d Cir. 1974) ........................................................13

*Country Pointe at Dix Hills Home Owners Ass'n v. Beechwood Org.*, 21 Misc. 3d 1110(A) (N.Y. Sup. Ct. 2008)...............................................................................34, 35

*Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173 (S.D.N.Y. 2006) ................................7

*E&G Gabriel v. Gabriel Bros.*, No. 93 CIV. 0894 (PKL), 1994 WL 369147 (S.D.N.Y. July 13, 1994)...................................................................................................24

*E&L Consulting v. Doman Indus.*, 472 F.3d 23 (2d Cir. 2006) ........................................10, 11, 19

*Friedman v. Adams Russell Cable Servs.–N.Y.*, 624 F. Supp. 1195 (S.D.N.Y. 1986) .................11

*GEM Advisors v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308 (S.D.N.Y. 2009) .................36

*Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011) .........................................................16

*Global Disc. Travel Servs. v. Trans World Airlines*, 960 F. Supp. 701 (S.D.N.Y. 1997)............27

*Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514 (2d Cir. 1989) ..........................................................................................................................10

*Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143 (S.D.N.Y. 2002)................................17

*Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327 (S.D.N.Y. 2003) ..................................................35

*Hudson Motors P'ship v. Crest Leasing Enters.*, 845 F. Supp. 969 (E.D.N.Y. 1994).................37

*Ill. Tool Works Inc. v. Indep. Ink.*, 547 U.S. 28 (2006) ................................................................33

*In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 WL 1458025 (N.D. Cal. May 21, 2009) ........................................................................................................16

*In re Set-Top Cable Television Box Antitrust Litig.*, Nos. 08 MD 1995, 08 Civ. 7616 (PKC), 2011 WL 1432036 (S.D.N.Y. Apr. 8, 2011) ...........................................10, 23

*In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987 (N.D. Cal. 2010) ....................................16, 18

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ..................................11, 13, 15, 23

*Kaye v. D'Amato*, No. 05-CV-982, 2008 WL 5263746 (E.D. Wis. Dec. 18, 2008) ....................16

*Kelly v. Kosuga*, 358 U.S. 516 (1959) .........................................................................................37

*Levitch v. Columbia Broad. Sys. Inc.*, 495 F. Supp. 649 (S.D.N.Y. 1980) ..................................25

*Linville v. O&K Trojan, Inc.*, No. 91-CV-284S, 1994 WL 117363 (W.D.N.Y. Mar. 31, 1994) ......................................................................................................................35

*Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ......................................................................38, 39

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) ............................................32

*Mediacom Commc'ns Corp. v. Sinclair Broad. Grp.*, 460 F. Supp. 2d 1012 (S.D. Iowa 2006) ........................................................................................................................33

*Mimms v. Carr*, No. 09-CV-5740(NGG)(LB), 2011 WL 2360059 (E.D.N.Y. June 9, 2011) ...................................................................................................................20

*Moccio v. Cablevision Systems*, 208 F. Supp. 2d 361 (E.D.N.Y. 2002) .......................12

*Munno v. Town of Orangetown*, 391 F. Supp. 2d 263 (S.D.N.Y. 2005) .......................17

*Pepsico, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243 (S.D.N.Y. 2000) .......................31

*Pitchford v. PEPI, Inc.*, 531 F.2d 92 (3d Cir. 1976)......................................................34

*Pyramid Co. of Rockland v. Mautner*, 581 N.Y.S.2d 562 (Sup. Ct. 1992) ............34, 35

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997)..............29

*Re-Alco Indus. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387 (S.D.N.Y. 1993) .............25

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) .........................................................................................................21

*Rite Aid Corp. v. Am. Express Travel Related Servs.*, 708 F. Supp. 2d 257 (E.D.N.Y. 2010) ...............................................................................................................38

*Rooney v. Columbia Pictures Indus.*, 538 F. Supp. 211 (S.D.N.Y. 1982) ....................37

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994) .......17, 22

*Rubinstein v. Dep't Stores Nat'l Bank*, No. 12 Civ. 8054 (AJN), 2013 WL 3817767 (July 22, 2013) .....................................................................................................35

*S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869 (11th Cir. 1998) ........14, 22

*Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674 (S.D.N.Y. 1987).......................25

*Shop & Save Food Mkts. v. Pneumo Corp.*, 683 F.2d 27 (2d Cir. 1982) .....................21

*Slaney v. Int'l Amateur Athletic Fed.*, 244 F.3d 580 (7th Cir. 2001) ...........................16

*Smith Mach. Co. v. Hesston Corp.*, 878 F.2d 1290 (10th Cir. 1989) ...........................15

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt.*, 414 F. App'x 372 (2d Cir. 2011)...........................................................................................................10

*Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08 CIV. 3669 (DLC), 2009 WL 435299 (S.D.N.Y. Feb. 23, 2009) .................................................................................10

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832 (S.D.N.Y. 1988)................38

*Theatre Party Assocs. v. Shubert Org.*, 695 F. Supp. 150 (S.D.N.Y. 1988) ...........24, 29

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ...............................................................24, 25

*United Magazine Co. v. Murdoch Magazines Distrib.*, 146 F. Supp. 2d 385 (S.D.N.Y. 2001) ..............................................................................................................................23, 26

*United States v. Loew's, Inc.*, 371 U.S. 38 (1962) .......................................................................33

*United States v. Paramount Pictures*, 334 U.S. 131 (1948) ........................................................33

*Viacom Int'l Inc. v. Tandem Prods.*, 526 F.2d 593 (2d Cir. 1975) ..............................................37

*Wechsler v. Hunt Health Sys.*, 216 F. Supp. 2d 347 (S.D.N.Y. 2002) .........................................37

*Yentsch v. Texaco, Inc.*, 630 F.2d 46 (2d Cir. 1980) .......................................................10, 13, 21

## Federal Rules

Fed. R. Civ. P. 12(b)(6) ..................................................................................................................9

Fed. R. Civ. P. 12(f) .....................................................................................................................35

## Other Authorities

IX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2011) .................................34

Defendants Viacom International Inc. and Black Entertainment Television LLC (collectively, "Viacom") respectfully submit this memorandum, together with the Declaration of Joseph Tringali ("Tringali Decl."), in support of their motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Amended Complaint filed by Plaintiffs Cablevision Systems Corporation and CSC Holdings, LLC (collectively, "Cablevision").

## PRELIMINARY STATEMENT

On the heels of signing a license renewal agreement with Viacom for distribution of cable programming services, Cablevision filed this lawsuit, claiming that the long-standing industry-wide practice of bundling cable programming services during licensing negotiations is a "diabolical and coercive scheme" that harms competition and consumers.  Notwithstanding the fact that Cablevision admits—indeed, touts—that it bundles the products it sells[1], Cablevision has nevertheless implored this Court to invalidate the licensing agreement as an invalid tying arrangement and to reform the contract to its liking so as to keep only the rates and terms it would like to have.  Pushing aside the colorful rhetoric in Cablevision's Amended Complaint, there is no basis in law or fact for Cablevision's demand.

Although Cablevision purports to challenge the alleged tie of programming services in this action, it does so only months after being successful in having had *dismissed* a lawsuit brought against *it* and others challenging that *same* conduct that was brought by consumers of cable and satellite distributors.  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 573 (Nov. 5, 2012) ("*Brantley*").  In *Brantley*, a putative class of cable and satellite subscribers sued both programmers and distributors— including Cablevision and Viacom—challenging the programmers' alleged bundling in selling

---

[1]     *See* Tringali Decl. Ex. G (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 16, 2011)) at 7 ("Bundled Offers").

multi-channel cable packages.  Defendants in that case—including Cablevision—persuaded the district court to dismiss the case, the Ninth Circuit to affirm that dismissal, and the Supreme Court to deny certiorari, all on the basis that the complaint alleged no cognizable harm to competition as required to state a viable tying claim under Section 1 of the Sherman Act because it failed to plead foreclosure from the programming market of competing programming services.  As Cablevision (and the other *Brantley* defendants) argued to the Supreme Court: "This Court has repeatedly emphasized the need to demonstrate foreclosure in tying cases, both under the rule of reason and the per se doctrine."  Tringali Decl. Ex. A (Defendants' Br. in Opp'n to Petition for Writ of Certiorari, 133 S. Ct. 573 (2012) (No. 12-171)) at 11.[2]

And when the *Brantley* plaintiffs pointedly deleted their original allegations of foreclosure and defendants in turn successfully moved to dismiss on that basis alone, defendants—including Cablevision—stated: "It is now clear that Plaintiffs added the [original] foreclosure allegations to the [Second Amended Complaint] simply in order to survive a motion to dismiss, not because those allegations had any substance."  Tringali Decl. Ex. C (Defendants' Mem. in Supp. of Motion to Dismiss Plaintiffs' Third Amended Complaint, No. CV 07-6101 CAS (VBKx) (June 12, 2009)) at 2.  Having successfully argued that foreclosure of competing programmers was a necessary element of any tying claim and that any allegation of foreclosure of programmers would not have "any substance," Cablevision cannot credibly now allege that

---

[2]    Similarly, in the district court, Cablevision and the other distributor defendants argued: "The courts have held, across a broad range of contexts, that vertical, non-price restraints (such as those challenged here) cannot adversely affect competition—and thus, cannot unreasonably restrain trade—unless they have the effect of *foreclosing competition* or *excluding competitors* from a relevant market."  Tringali Decl. Ex. B (Distributor Defendants' Mem. in Supp. of Motion to Dismiss Plaintiffs' First Amended Complaint, No. CV 07-6101 CAS (VBKx) (C.D. Cal. Dec. 21, 2007)) at 13 (emphasis in original).

the very same rival programmers are somehow foreclosed because of the very same alleged conduct. *See infra* Section I.A.

Cablevision, now on its second attempt, again fails as a matter of law to state a claim for tying because the Amended Complaint nowhere alleges that rival programmers are foreclosed from competing in the tied product market. Cablevision does not allege that any programmers are unable to enter the market. Cablevision does not allege that even a single programming service has been shut out of the programming market and, to the contrary, admits that programmers have many avenues by which to distribute their programming offerings and that competition for programming is "fierce." To supposedly buttress its claim, Cablevision relies entirely on allegations relating to its *own* distribution preferences and new assertions regarding the preferences of "several" other unnamed distributors. These allegations likewise fail to show foreclosure because they do not indicate that programmers are foreclosed from the programming market. Moreover, Cablevision's allegations regarding other distributors are wholly conclusory and are contrary to the position all of the distributors took in the *Brantley* case that any foreclosure allegations would not have "any substance."

Equally unavailing are Cablevision's allegations as to the supposed relevant product markets in which Viacom allegedly holds market power. Cablevision's contrived markets not only make no sense and have been rejected numerous times by the courts, they are also flatly contradicted by the very positions Cablevision itself has consistently and repeatedly taken with the courts, the Federal Communications Commission ("FCC"), and the Securities and Exchange Commission ("SEC"). *See infra* Section I.B.

While Cablevision now alleges that each of MTV, Nickelodeon, Comedy Central and BET is its own relevant product market and has no real substitutes (Am. Compl. ¶¶ 40–48),

it has consistently represented to the courts, the FCC, and the SEC that all programming services operate in "highly competitive markets" and that *no* service "can make or break the competitive viability" of any cable or satellite distributor.  To cite just a few examples of Cablevision's prior admissions, it has represented:

- "Ongoing trends toward audience fragmentation continue to dilute the importance to viewers of any single programming network, undercutting claims that access to RSN [regional sports network] programming is required for an MVPD [multichannel video programming distributor] to be successful. . . . The fragmentation of the cable audience across the hundreds of available channels means that no single channel—even an RSN—represents so great a proportion of overall viewing as to render it essential for an MVPD to offer to attract subscribers."  Tringali Decl. Ex. D (Comments of Cablevision Systems Corp., *In re* The Regional Sports Network Marketplace, 27 FCC Rcd. 154 (2012) (No. 11-128)) at 10.

- "In a mature competitive marketplace, no single programming service—including an RSN—can make or break the competitive viability (or lack thereof) of an MVPD in any particular local market.  To the contrary, mature markets are and should be characterized by product differentiation, not homogeneity."  *Id*. at  2.

- "In this mature competitive marketplace, no single programming service—including an RSN—can be deemed to be critical to the competitive viability of an MVPD in any particular local market."  Tringali Decl. Ex. E (Reply Comments of Cablevision Systems Corp., *In re* The Regional Sports Network Marketplace, 27 FCC Rcd. 154 (2012) (No. 11-128)) at 1.

- "[C]onsumers today are much less likely to accord dispositive significance to any single network due to their purchase of video in a bundle . . . ."  Tringali Decl. Ex. D (Comments of Cablevision Systems Corp., *In re* The Regional Sports Network Marketplace, 27 FCC Rcd. 154 (2012) (No. 11-128)) at 5.

- "In today's 400 channel, multi-service marketplace featuring video offerings from four different multi-billion companies with substantial sunk investments in video distribution networks, it is no longer tenable to claim that the competitive viability of DirecTV, Dish Network, AT&T, or Verizon—each of which is comparable to, or larger than Cablevision in terms of subscriber counts and enterprise value— depends upon guaranteed access to RSN programming."  *Id*. at 6.

- "A cable operator's most popular (in the FCC's parlance, 'must have') affiliated programming typically garners the highest licensing fees and advertising revenues.  Withholding this programming would result in immediate and substantial losses in revenues to the network.  A foreclosure strategy would be

plausible, therefore, only if large numbers of subscribers switched from competing MVPDs to the cable operator to access the withheld programming. Yet, the record showed that it is highly unlikely subscribers would switch to a cable operator solely to obtain a withheld network in numbers significant enough to eliminate MVPD rivals or allow cable operators to reap monopoly profits." Tringali Decl. Ex. F (Brief for Petitioners, *Cablevision Systems Corp. v. FCC*, 597 F.3d 1306 (D.C. Cir. 2010) (Nos. 07-1425, 07-1487)) at 47 (citations omitted).

- "Rainbow Media Holdings'[3] programming networks operate in highly competitive markets. . . . The business of distributing programming networks to cable television systems and other multichannel video programming distributors is highly competitive.  Our programming networks face competition from other programming networks for the right to be carried by a particular cable television system or other multichannel video programming distribution system, and for the right to be carried on the service tier that will attract the most subscribers.  Once our programming network is selected by a cable or other multichannel video programming distribution system for carriage, that network competes for viewers not only with the other channels available on the system, but also with off-air broadcast television, pay-per-view channels and video-on-demand channels, as well as online services, mobile services, radio, print media, motion picture theaters, DVDs, and other sources of information, sporting events and entertainment."  Tringali Decl. Ex. G (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 16, 2011)) at 16; Ex. H (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 25, 2010)) at 14–15.

Finally, Cablevision's requested equitable relief should be stricken.  Cablevision's claim that it should somehow reap the benefit of its license of the Core Networks under the terms of the 2012 License Agreement—but be relieved of the obligation to distribute and pay for the Suite Networks—is improper as a matter of law.  Cablevision was fully aware of the facts alleged in its Amended Complaint at the time it negotiated this interrelated agreement—and, in fact, it alleges it has operated under these conditions as far back as 2008.  And Cablevision itself alleges that the rates for the Core Networks were tied to the distribution of the Suite Networks so

---

[3]     Until recently, Rainbow Media Holdings was owned by Cablevision and distributed programming services to cable and satellite distributors and, as such, competed against Viacom in the distribution of programming services.  Some of its programming services include AMC, IFC, and Sundance Channel.  *See* Tringali Decl. Ex. G (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 16, 2011)) at 2.

it cannot now pretend that the terms are not inextricably linked.  In addition, Cablevision's Amended Complaint is barred by the doctrine of laches due to Cablevision's unreasonable delay in challenging the alleged bundling: Cablevision claims it was aware of the identical conduct in 2008, did nothing to challenge it, and entered into a similar agreement in 2012 without even a hint that less than two months after signing it, Cablevision would belatedly seek to challenge the alleged unlawful conduct it could have challenged at least as early as 2008.  *See infra* Section IV.

<u>**STATEMENT OF FACTS**</u>

**A.      The Parties**

Plaintiff Cablevision claims to be a "leading telecommunications and media company" that currently offers digital television, phone, and Internet services to customers in four states.  (Am. Compl. ¶ 24.)  Cablevision licenses various cable programming services, such as ESPN, The Discovery Channel, and Nickelodeon, from various cable programmers, such as The Walt Disney Company, NBCUniversal, and Viacom, and repackages that programming and sells it to subscribers as part of its cable service.  (*See id.* ¶¶ 25, 27.)  Cablevision claims to operate in an "intensely competitive environment against both established and new distributors of video services" and alleges that it has "numerous competitors" including other traditional video distributors; satellite providers such as DISH Network and DIRECTV; "overbuilders" such as RCN; telecommunications companies that offer video and other services over fiber optic networks, including Verizon and AT&T; and Internet-based services, including multi-channel services such as SkyAngel, and video streaming services such as Netflix, Hulu, Vudu, Apple.TV, and Google TV.  (*Id.* ¶¶ 3, 26, 137.)

Cablevision alleges that Defendant Viacom, through its Viacom Media Networks division, licenses the right to distribute the content on its television networks to distributors such as Cablevision.  (*See id.* ¶¶ 19, 21.)  Viacom's television networks consist of "Core Networks"—

which include Nickelodeon, Comedy Central, BET, MTV, VH1, TV Land, MTV2, and Spike

TV—and "Suite Networks"—which include Centric, CMT, CMT Pure Country, Logo, MTV

Hits, MTV Jams, Nick Jr., Nick 2, Nicktoons, Palladia, Teen Nick, Tr3s, VH1 Classic, and VH1

Soul.  (*Id.* ¶¶ 2, 4.)  Cablevision admits that Viacom spends enormous resources to develop,

produce, purchase and market the content on its networks, all without any guarantee that any of

its programming networks will be a commercial success.  (*See id.* ¶¶ 51–55.)  Viacom earns

revenue both from license fees paid by Cablevision and advertising revenues from Cablevision's

carriage of its services.  (*See id.* ¶¶ 34, 55.)

> Cablevision alleges that the "advent of digital technology" has enabled

Cablevision to offer subscribers an "extensive portfolio" of programming options that includes

"hundreds of available channels and numerous services" depending on the package or tier of

service the customer elects to purchase from Cablevision.  (*Id.* ¶ 25.)  Of the approximately 580

channels that Cablevision offers to its customers,[4] Cablevision claims that Viacom's Suite

Networks currently occupy only a trivial number on its systems.  (*See id.* ¶ 10.)  Cablevision

further admits that it assembles bundled "packages" of channels which it markets directly to

consumers.  (*Id.* ¶¶ 27–28.)  Cablevision admits that it is "subject to a number of  constraints" in

determining the networks to include in a particular package, including regulatory requirements,

cost of programming and other "competitive factors" such as the prices that Cablevision can

charge for a network.  (*Id.* ¶ 29.)

---

[4]   *See* CABLEVISION, *Optimum Cable TV Channel Lineups*,
      http://www.optimum.com/channel_lineups.jsp (last visited Aug. 21, 2013).  The Court is
      entitled to take judicial notice of information on Cablevision's website on a motion to
      dismiss if it wishes to do so.  *See Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d
      173, 179 n.8 (S.D.N.Y. 2006).

### B.     The Alleged Markets

Cablevision alleges three mutually-contradictory alternative product markets.
*First*, it alleges that certain programming channels constitute "commercially critical networks"
that distributors must offer or face a significant loss of subscribers.  (*Id.* ¶ 29.)  Viacom's
"commercially critical networks" allegedly include four "Tying Networks"—Nickelodeon,
Comedy Central, BET, and MTV—each of which, according to Cablevision, comprises its own
relevant market.  (*Id.* ¶¶ 40–48.)[5]  Cablevision claims that no other network is comparable to, or
interchangeable with, any of the four alleged "Tying Networks" because all other networks lack
the "high ratings"—notwithstanding the fact that Cablevision also alleges that ratings have
decreased for every one of Viacom's Core Networks (*e.g.*, *id.* ¶ 42)—and "strong following" that
those networks enjoy, or offer somewhat "differently oriented programming."  (*See id.* ¶¶ 41, 43,
45, 47).

*Second*, Cablevision alternatively alleges that Viacom's "Core Networks,"
together as a whole, comprise a relevant product market of which Viacom has "a 100% share."
(*Id.* ¶¶ 60–61.)

*Third*, Cablevision alleges as yet another alternative that Nickelodeon, Comedy
Central, BET, and MTV each fall into one of four separate programming categories, and each
category comprises its own relevant product market.  It alleges that Nickelodeon falls within the
category of Popular Children's Programming, that Comedy Central provides Popular Comedy
Programming, BET provides Popular African American Programming, and MTV provides
Popular Young Adult Programming.  (*Id.* ¶¶ 64, 74, 81, 89.)

---

[5]     Cablevision does not explain why Viacom's other so-called "popular" Core Networks—
VH1, TV Land, MTV2, and Spike TV (*id.* ¶ 2)—do not also constitute alleged "Tying
Networks."

C.     **The Agreement at Issue**

Licensing agreements between distributors and programmers contain numerous terms and conditions that are intensely negotiated.  (*See, e.g.*, *id.* ¶ 34.)  In connection with Cablevision's recent negotiation with Viacom to renew its licensing agreements, Cablevision claims that Viacom "coerced" Cablevision into agreeing to carry the Suite Networks by offering Cablevision a lower price for Viacom's "bundle" of programming services including the Core and Suite Networks, than for the Core Networks alone.  (*Id.* ¶¶ 141–50.)  Claiming that it had "no viable economic choice," Cablevision proceeded to negotiate an agreement with Viacom that covered the Core and Suite Networks, and the parties reached agreement concerning carriage of those services on December 31, 2012 (the "2012 License Agreement").  (*Id.* ¶¶ 150–51.)  Cablevision initiated this lawsuit less than two months later.

<u>**ARGUMENT**</u>

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In determining the adequacy of a complaint, a court must disregard the complaint's conclusory allegations and legal conclusions, which are not entitled to the assumption of truth, and determine whether the remaining "well-pleaded factual allegations" suggest that the plaintiff has a plausible—as opposed to merely conceivable—claim for relief.  *Id.* at 679.  Claims that do not cross the "'line from conceivable to plausible'" must be dismissed.  *Id.* at 680 (quoting *Twombly*, 550 U.S. at 570).  This rule is recognized as particularly important in the context of antitrust claims, given the heavy burdens of antitrust discovery.  *See Twombly*, 550 U.S. at 558–59.

## I.   CABLEVISION FAILS TO ALLEGE THE ESSENTIAL ELEMENTS OF A SECTION 1 TYING CLAIM

A plaintiff claiming an illegal tying arrangement must show each of the following elements: (1) a tying and a tied product; (2) evidence of actual coercion by the seller that forced the buyer to accept the tied product; (3) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; (4) anticompetitive effects in the tied product market as a result of foreclosure of competitors; and (5) the involvement of a not insubstantial amount of interstate commerce in the tied product market.  *See, e.g.*, *E&L Consulting v. Doman Indus.*, 472 F.3d 23, 31 (2d Cir. 2006) (citing *Gonzalez v. St. Margaret's Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516–17 (2d Cir. 1989)); *Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt.*, 414 F. App'x 372, 374 (2d Cir. 2011); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56–58 (2d Cir. 1980); *In re Set-Top Cable Television Box Antitrust Litig.*, Nos. 08 MD 1995, 08 Civ. 7616 (PKC), 2011 WL 1432036, at *5 (S.D.N.Y. Apr. 8, 2011).  Failure to sufficiently allege any one of these five elements warrants dismissal of the complaint.  *See, e.g.*, *Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08 CIV. 3669 (DLC), 2009 WL 435299, at *3–4 (S.D.N.Y. Feb. 23, 2009).

Cablevision fails to allege essential elements of its *per se* tying claim.[6]  Because it fails to plead actual foreclosure, it does not adequately allege anticompetitive effects in the tied product market.  Nor does Cablevision plausibly define a relevant tying product market in which

---

[6]   Cablevision has chosen to plead only a *per se* tying claim and does not allege a tying claim under the rule of reason.  Although Viacom disputes that Cablevision's alleged tying claim should be analyzed as a *per se* violation, as opposed to under a rule of reason analysis, and notes that Cablevision sought and obtained dismissal of an identical claim alleging bundling of cable programming services under the rule of reason in *Brantley*, for purposes of this motion to dismiss, Cablevision's claims fail under either the *per se* or rule of reason framework.  *See supra* note 2 and accompanying text.

Viacom possesses the requisite degree of market power to state a tying claim.  Either failure is sufficient to warrant dismissal of the Amended Complaint.

> **A.      The Amended Complaint Fails Adequately to Allege Foreclosure in the Tied Product Market**

Allegations that a seller may engage in the ubiquitous practice of bundling or tying the sale of a high demand product at a particular price with the sale of a product of lower demand without specific allegations showing harm to competition are insufficient as a matter of law to state a claim for tying.[7]  Rather, a plaintiff must sufficiently allege that the purported tie causes anticompetitive effects in the tied product market by foreclosing rival sellers from competing in that market.  *See, e.g.*, *E&L Consulting*, 472 F.3d at 32 ("[A]n antitrust defendant charged with illegal tying is entitled to some specificity as to . . . the customers who would have purchased a product elsewhere but for the coercion, the particular products sold as a result of the coercion, [and] the anticompetitive effects in a specified market . . . ."); *Brantley*, 675 F.3d at 1201 ("[T]he complaint's allegations regarding the two separate tying arrangements do not, by themselves, constitute a sufficient allegation of injury to competition."); *Cancall PCS, LLC v. Omnipoint Corp.*, No. 99 Civ. 3395 (AGS), 2001 WL 293981, at *3–4 & n.1 (S.D.N.Y. Mar. 26, 2001) (holding that anticompetitive effects is a required element of a *per se* tying claim); *Friedman v. Adams Russell Cable Servs.–N.Y.*, 624 F. Supp. 1195, 1197 (S.D.N.Y. 1986) (rejecting argument that a plaintiff need not show anticompetitive effects in order to plead an illegal tying arrangement).

---

[7]      *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984) ("When the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised.").

When Cablevision has been sued by consumers alleging that Cablevision has engaged in illegal tying, including in *per se* cases, it has argued that foreclosure is a necessary element in tying claims, and courts have agreed.  For example, in *Moccio v. Cablevision Systems*, consumers, asserting both *per se* and rule of reason claims, alleged that Cablevision illegally conditioned receipt of the MSG Network on the purchase of "premium" tiers of service that forced subscribers to order programming packages that they did not want.  208 F. Supp. 2d 361, 375 (E.D.N.Y. 2002).  Cablevision argued that the elements of a tying claim include establishing anticompetitive effects in the tied market,[8] and the court likewise held that "[t]ying arrangements are illegal because they permit sellers to foreclose competition on the merits of the tied product by abusing market power in the tying product market." *Id.* at 374.  Most recently, in *Brantley*, where both Viacom and Cablevision were defendants and where the plaintiffs challenged license agreements similar to the ones at issue in this case, the Ninth Circuit agreed with the defendants and the district court that a plaintiff must allege an "actual adverse effect on competition" caused by the tying arrangement through foreclosure of rivals.  675 F.3d at 1200 (quotation marks omitted).  Having argued to the Ninth Circuit (as well as earlier to the district court and later to the Supreme Court in successfully opposing plaintiffs' petition for a writ of certiorari) that foreclosure of rival programming services is essential to state a viable tying claim under either the *per se* or rule of reason standards, and having prevailed on that basis,[9] Cablevision is now

---

[8]     *See* Tringali Decl. Ex. I (Cablevision and MSG Network, Inc.'s Mem. of Law in Supp. of Cross-Motion to Dismiss Complaint, *Moccio v. Cablevision Sys. Corp., et al.*, No. 02-civ-2138) at 14.

[9]     *See* Tringali Decl. Ex. J (Distributor Appellees' Joint Opp. Br., 675 F.3d 1192 (No. 09-56785)) at 2 (asserting that district court properly "dismissed the Complaint on the basis that Plaintiffs did not plead the foreclosure of competing programming, and that such foreclosure is required for Plaintiffs' Sherman Act claims"); *see also* Tringali Decl. Ex. A (Defendants' Br. in Opp'n to Petition for Writ of Certiorari, 133 S. Ct. 573 (2012) (No. 12-171)) at 11 ("This Court has repeatedly emphasized the need to demonstrate

trying to run away from those correct statements of the law and argue that it need not allege

foreclosure in this case, presumably because it knows it cannot do so.   Indeed, Cablevision,

along with the other distributor defendants in *Brantley*, argued that any allegation of foreclosure

of programmers would not have "any substance."[10]   It cannot argue the opposite here now.

　　　　To demonstrate anticompetitive effects from illegal tying, a plaintiff must allege

that competitors are unable to enter or otherwise unable to compete in the tied product market

because of the alleged tying.  *See Jefferson Parish*, 466 U.S. at 14 (holding that tying is only

illegal when market power is "used to impair competition on the merits in another market" so as

to "harm existing competitors or create barriers to entry of new competitors in the market for the

tied product"); *Yentsch*, 630 F.2d at 57–58 (holding that in order to show anticompetitive effects

in the tied market, the question is whether competitors were foreclosed because of defendants'

policies); *Coniglio v. Highwood Servs.*, 495 F.2d 1286, 1293 (2d Cir. 1974) (holding that

plaintiff must prove foreclosure of competition and that tying arrangement must be shown to

have been used "either to prevent competition or destroy it"); *Americap, Inc. v. ADJ Corp.*, No.

80 Civ. 2630 (RWS), 1980 WL 1891, at *4 (S.D.N.Y. Sept. 5, 1980) (dismissing complaint when

plaintiff "at most" had "pleaded injury to its own business" but failed to plead that "'the illegal

tying arrangement results in actual foreclosure of competition in the tied product market.'"

(quoting *Yentsch*, 630 F.2d at 58)).

　　　　Cablevision's amended allegations still fail to actually allege foreclosure in the

tied product market.  Cablevision has not alleged that any programmer has actually been unable

---

foreclosure in tying cases, both under the rule of reason and the per se doctrine."); *supra* pp. 1–2 & n.1.

[10]　Tringali Decl. Ex. C (Defendants' Mem. in Supp. of Motion to Dismiss Plaintiffs' Third Amended Complaint, No. CV 07-6101 CAS (VBKx) (June 12, 2009)) at 2.

to enter the "general programming" market or is otherwise unable to compete because of

Viacom's alleged tie-in, either in the market as a whole or even on Cablevision's own systems.

The Amended Complaint merely identifies a handful of independent programmers—none of

whom is alleged to have been unable to enter or compete in the programming market—whose

services Cablevision alleges that it would "prefer" to buy and indicates that other distributors

accepted similar bundled distribution deals from Viacom.  These allegations remain legally

insufficient to demonstrate the requisite foreclosure of competition in the tied product market for

several reasons.

       1.     *Cablevision has not sufficiently alleged market-wide foreclosure of competition*

       Cablevision's Amended Complaint still fails to allege foreclosure of competition

in the tied product market as a whole.  First and foremost, Cablevisions makes *no* allegation that

a single programmer has been unable to enter or to otherwise compete in the programming

market.  This is not surprising because Cablevision argued in *Brantley* that any allegations of

foreclosure would not have "any substance."  Allegations that a single distributor purchases less

of a product in the tied market than it otherwise would absent the alleged tie are insufficient as a

matter of law: Such allegations say nothing as to whether competitors in the tied product market

are able to sell their products and compete in the market.  *See CDC Techs., Inc. v. IDEXX Labs.*

*Inc.*, 186 F.3d 74, 80 (2d Cir. 1999) (holding that there is no foreclosure "[i]f competitors can

reach the ultimate consumers of the product by employing existing or potential alternative

channels of distribution" (quotation marks omitted)); *S. Card & Novelty, Inc. v. Lawson Mardon*

*Label, Inc.*, 138 F.3d 869, 875 (11th Cir. 1998) ("'[R]equiring dealers to purchase a tied product

from the defendant need not impair consumers' purchases from his rivals who sell directly to

consumers or who continue to reach them through an ample number of other dealers.'" (quoting

14

IX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1725a, at 317 (1st ed. 1991)));

*Smith Mach. Co. v. Hesston Corp*., 878 F.2d 1290, 1298 (10th Cir. 1989) ("[A]s long as [a

manufacturer's] arrangement does not preclude [a competitor] from taking its [products] to

market, either through [plaintiff] or another distributor, competition has not been impaired; to the

contrary, it has been enhanced.").[11]

       Cablevision complains that it cannot carry the precise mix of general

programming networks that, absent the alleged tie, it might otherwise offer in order to maximize

the prices it can charge to its customers.  (*See* Am. Compl. ¶¶ 10–12.)  But these allegations do

not establish that independent programmers are unable to sell "general programming" or that

consumers are unable to buy it via other distribution methods.[12]  Allegations as to Cablevision's

thwarted preferences do not equate to an injury to competition.  *See Brantley*, 675 F.3d at 1201–

02 ("[A] statement that parties have entered into a contract that limits some freedom of action (in

this case, by circumscribing the distributors' ability to offer smaller packages or channels on an

unbundled basis) is not sufficient to allege an injury to competition."); *Smith Mach.*, 878 F.2d at

1297 ("It may be . . . that a dealer may suffer a loss of profit from not being able to carry every

product that it wishes.  But the Sherman Act does not protect a dealer's right to maximize

---

[11]    Moreover, absent sufficient allegations concerning market-wide foreclosure, Cablevision also cannot demonstrate that a substantial volume of commerce was affected by the alleged tie, which is a separate and distinct required pleading element.  *See Jefferson Parish*, 466 U.S. at 16 ("If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law.  It is for this reason that we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.")

[12]    For this reason, Cablevision's allegations regarding the value consumers place on certain "general programming" networks that Cablevision does not presently distribute are a red herring.  (Am. Compl. ¶¶ 158–64).  Cablevision nowhere alleges that these networks are unable to compete or that consumers or other distributors are unable to access them.  Whether Cablevision chooses to purchase them is irrelevant to whether there is market-wide foreclosure.

profits."); *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 998 (N.D. Cal. 2010) (dismissing

complaint when "[t]here is no factual allegation to support the contention that there was a lack of

choice in the [alleged tied markets] for *consumers*; there is merely an allegation that *Plaintiffs'*

choices of products within those markets with which to stock their limited shelf space, was

restricted" (emphasis in original)); *Bansavich v. McLane Co.*, No. 3:07cv702 (WWE), 2008 WL

4821320, at *4 (D. Conn. Oct. 31, 2008) ("The complaint sets forth allegations supportive of an

injury to plaintiff's business, but antitrust injury must represent an adverse effect on competition

as a whole in the relevant market rather than to plaintiff.").

            Indeed, *Cablevision itself* alleges that competition for programming is robust and

that independent programmers have many outlets beside Cablevision by which to distribute their

products.[13] Cablevision alleges that it operates in a "fierce competitive environment," and that in

addition to "traditional video distributors," there are many other buyers of programming,

including satellite providers like DISH Network and DIRECTV; "overbuilders" such as RCN;

companies like Verizon and AT&T that use fiberoptic networks; and Internet-based services

---

[13]     On a motion to dismiss, courts take into account all well-pleaded factual allegations in
the complaint, including those that may actually undermine the plaintiff's claim. *See,
e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) (dismissing
complaint when "plaintiffs' own allegations undermine the inference plaintiffs
advance"); *In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 WL 1458025,
at *6 (N.D. Cal. May 21, 2009) (rejecting conspiracy claim where plaintiffs' own
allegations undermined alleged motive by defendants to engage in price fixing); *Kaye v.
D'Amato*, No. 05-CV-982, 2008 WL 5263746, at *2 (E.D. Wis. Dec. 18, 2008) ("On a
motion to dismiss . . . the court is not required to ignore facts alleged in the complaint
that undermine the plaintiff's claim" (citing *Slaney v. Int'l Amateur Athletic Fed.*, 244
F.3d 580, 597 (7th Cir. 2001))), *aff'd*, 357 F. App'x 706 (7th Cir. 2009); *see also Iqbal*,
556 U.S. at 663–64 ("[D]etermining whether a complaint states a plausible claim is
context-specific, requiring the reviewing court to draw on its experience and common
sense.").

such as Netflix and Hulu.  (Am. Compl. ¶ 26.)[14]  Moreover, Cablevision admits that

programmers need not rely on intermediary distributors such as Cablevision but can stream their

networks directly to consumers over their websites.  (*Id.*)  According to Cablevision, this

"intense" competition has increased as "cable providers, overbuilders, and satellite providers

have continued to strengthen their offerings, deploying a slew of new services."  (*Id.* ¶ 137.)  As

a result, "competitive pressures" on distributors to "offer an increasingly differentiated video

offering have increased." (*Id.*); *see generally Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28

F.3d 1379, 1385 (5th Cir. 1994) (noting plaintiff's concern of losing business to other

distributors "belies its claim of injury to competition").

      Likewise, in public admissions before the FCC, Cablevision has asserted that

independent programmers have numerous distribution outlets so that carriage by a particular

distributor is not necessary to a programmer's ability to compete.[15]  *See* Tringali Decl. Ex. L

(Trial Brief of Defendant Cablevision Systems Corp., *In re* Game Show Network v. Cablevision

---

[14]    *See also* Tringali Decl. Ex. K (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 28, 2013)) at 10 ("Our cable television systems operate in an intensely competitive environment, competing with a variety of other video programming providers and delivery systems, including incumbent telephone companies, satellite-delivered signals, internet-based programming and broadcast television signals available to homes within our market by over-the-air reception.").

[15]    In considering a motion to dismiss, a court may take judicial notice of "party admissions made in public records whose authenticity is not in dispute," *Abdul-Rahman v. City of N.Y.*, No. 10 Civ. 2778, 2012 WL 1077762, at *3 (E.D.N.Y. Mar. 30, 2012), and of "'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action.'"  *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 268–69 (S.D.N.Y. 2005) (quoting *Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143, 173 (S.D.N.Y. 2002)) (taking notice of letters submitted to another court which "allegedly contain statements by plaintiff which contradict the factual allegations contained in the Complaint"); *see also AIG Fin. Prods. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 675 F. Supp. 2d 354, 363 (S.D.N.Y. 2009) (taking notice of party's representations before another court that undermined party's factual allegations).

Systems Corp., 27 FCC Rcd. 5113 (2012) (No. 12-122)) at 31 ("This intense competition [in the MVPD business] debunks any notion that Cablevision has bottleneck market power with respect to [Game Show Network].  GSN will not be able to prove that Cablevision's carriage decision unreasonably restrained its ability to compete fairly.").

        Tellingly, when Cablevision identifies networks that it would "prefer" to distribute in lieu of Viacom's Suite Networks, it does not allege that any of these networks have been foreclosed from competing in the general programming market or that they have failed to obtain carriage on other distributors' systems or through one of the myriad distribution outlets that Cablevision has identified.  Cablevision again focuses only on its own distribution preferences and claims that carriage of these networks "would better enable Cablevision to attract or retain subscribers."  (Am. Compl. ¶ 158.)  While Cablevision asserts that absent the alleged tying, competitors in the general programming market would be able to "obtain greater advertising revenues, make larger investments in programming, and thereby compete more vigorously," (*id.* ¶ 169), Cablevision provides no factual allegations regarding the advertising revenues or programming investments of general programmers or how or to what extent they are affected by the alleged tying.  "[A] section one claimant may not merely recite the legal conclusion that competition has been restrained unreasonably."  *Brantley*, 675 F.3d at 1198 (quotation marks omitted).  "Conclusory allegations of anticompetitive effect are insufficient without supporting facts as to how competition in the tied markets has actually been reduced or harmed."  *Webkinz*, 695 F. Supp. 2d at 997 (quotation marks omitted).

        In short, Cablevision's allegations that independent programmers are deprived of a single distribution outlet—Cablevision's systems—are insufficient.

2.     *Cablevision's conclusory allegations concerning other distributors fail to demonstrate market-wide foreclosure*

Perhaps recognizing that it must allege market-wide, not Cablevision-only, foreclosure, Cablevision has peppered its Amended Complaint with vague and conclusory allegations regarding other distributors.  In its first Complaint, Cablevision guessed it to be "a reasonable inference" that other distributors were "coerce[d]" into carrying Viacom's general programming networks.  (Am. Compl. ¶¶ 13, 143.)  Cablevision retains this supposition (Am. Compl. ¶ 167), but now newly-asserts that "several" unnamed "video distributors" told Cablevision that Viacom "wielded its power" to "coerce their current carriage of Suite Networks."  (*Id.* ¶¶ 14, 168.)  These additional conclusory allegations do nothing to prop up Cablevision's claim.

First, all of the distributor defendants in *Brantley*[16] joined in the argument that any allegations of foreclosure of independent programmers would not have "any substance" so, if any of them are among Cablevision's mystery "video distributors," they, as well as Cablevision itself, may not now credibly claim the contrary here.

Second, Cablevision does not allege how many such distributors there are, the identity of the distributors, what the unidentified distributors said, or under what circumstances they said it.  The Court need not credit these newly-constructed,[17] anonymous, vague, conclusory, and hearsay allegations.  *See E&L Consulting*, 472 F.3d at 32 ("Even under notice

---

[16]     The distributor defendants in *Brantley* were Cablevision Systems Corporation, Comcast Corporation, CoxCom, Inc., Dish Network LLC, Time Warner Cable Inc. and The DIRECTV Group, Inc.

[17]     *See Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 707 (2d Cir. 1989) ("A party . . . cannot advance one version of the facts in [his] pleadings, conclude that [his] interests would be better served by a different version, and amend [his] pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." (alterations in original)).

pleading, an antitrust defendant charged with illegal tying is entitled to some specificity as to . . . the customers who would have purchased a product elsewhere but for the coercion . . . .”); *see also Iqbal*, 556 U.S. at 678 (“Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement.” (alteration in original) (quotation marks omitted)); *Mimms v. Carr*, No. 09-CV-5740(NGG)(LB), 2011 WL 2360059, at *8 (E.D.N.Y. June 9, 2011) (dismissing amended complaint when the “additional allegations do not add detail or plausibility” and consist of a “bare allegation” regarding “unidentified evidence” and an occurrence “at some unidentified time”).

Third, Cablevision does not allege which Viacom “Suite” networks the unidentified distributors allegedly carry; whether or not the unidentified distributors could currently choose to carry additional independent networks using excess bandwidth or by dropping other networks; if, or to what extent, absent the alleged tying, the unidentified distributors would carry additional independent networks; or what or how many networks they would otherwise carry.  Cablevision merely makes the conclusory and unattributed statements that “[t]hese distributors also carry virtually all of the Suite Networks” and “these distributors would in many instances carry alternative general programming networks.”  (Am. Compl. ¶¶ 167–68.)

Finally, the new conclusory allegations regarding other distributors do not cure the lack of any factual allegations that Viacom’s supposed conduct has had anticompetitive effects in the “general programming” market.  Cablevision has not alleged that programmers are unable to compete or sell general programming or that consumers are unable to buy general programming in the market as a whole.  The fact that certain distributors—Cablevision or

others—choose not to purchase certain networks is insufficient as a matter of law to allege the anticompetitive effects necessary for a tying claim.

3.    *Cablevision's allegations as to its own purchasing decisions remain speculative and implausible*

Despite having had the opportunity to re-plead, Cablevision still conspicuously qualifies the extent to which it would purchase alternative general programming absent the alleged tie-in, thereby failing to allege actual, as opposed to merely speculative, foreclosure of rival programmers even from its own cable line-up.  *See Shop & Save Food Mkts. v. Pneumo Corp.*, 683 F.2d 27, 30 (2d Cir. 1982) (holding that plaintiff must establish "that the illegal tying arrangement resulted in the actual foreclosure of competition in the tied product market"); *Yentsch*, 630 F.2d at 58 ("We require at least some showing that the illegal tying arrangement results in actual foreclosure of competition in the tied product market.").

The Amended Complaint merely identifies lists of networks that Cablevision says, absent the alleged tying, it "would be more likely to launch, or to launch sooner" and from which Cablevision says it "would draw."  (*Id.* ¶¶ 158–65.)[18]  In addition, although Cablevision alleges that Viacom "forces" it to distribute eleven general programming networks, Cablevision does not allege that instead it would carry eleven non-Viacom networks (*id.* ¶ 166)—at most, Cablevision baldly asserts that it would launch, and later makes explicit that it would only *consider* launching, six new networks.  (*See id.* ¶¶ 157–63).  Even this assertion is unsupported by factual allegations regarding if, how, or to what extent the launch of these unnamed networks

---

[18]    For some networks such as Ovation, Me-TV and Lifetime Movie Network, Cablevision alleges both that it "would be more likely to launch" them and that it would launch them sooner.  The Court need not accept these contradictory allegations.  *See Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted . . . by statements in the complaint itself . . . .").

would impact competition in the market for general programming.  Cablevision leaves the Court

to speculate about anticompetitive effects; but "[s]peculation about anticompetitive effects is not

enough."  *Roy B. Taylor*, 28 F.3d at 1385; *see S. Card*, 138 F.3d at 877.  Absent sufficient

allegations concerning *actual*, not speculative, anticompetitive effects, Cablevision likewise

cannot demonstrate substantial impact on commerce.

   Moreover, Cablevision's contention that Viacom's alleged bundling practices are

the reason that Cablevision chooses not to carry certain competing networks, thereby foreclosing

competition, is even more facially implausible in light of new allegations in the Amended

Complaint.  *See Iqbal*, 556 U.S. at 679 ("[O]nly a complaint that states a plausible claim for

relief survives a motion to dismiss.").  On a motion to dismiss, courts evaluate the plausibility of

a claim by taking into account all well-pleaded factual allegations in the complaint, including

those that may actually undermine the plaintiff's claim.  *See supra* note 13.

   The Amended Complaint alleges that in determining which networks to include in

a particular package, Cablevision is subject to a number of competing constraints including (i)

tiering requirements imposed by all programmers, (ii) bandwidth limitations, (iii) regulatory

requirements, (iv) total cost of programming, and (v) "competitive factors" which include the

prices that Cablevision can charge its customers for networks.  (*See* Am. Compl. ¶ 29.)

Cablevision has not plausibly alleged how, in the context of Cablevision's multi-factor

purchasing decisions, Viacom's "forcing" it to carry a trivial and insignificant number of Suite

Networks among its 580 total channels, forecloses competing networks from the tied product

market.  Rather, Cablevision's allegations indicate that it chooses when and whether to make

additional purchases in the tied product market given its internal assessment of "optimal

allocation" of its bandwidth.  (*See id.* ¶ 139.)  Cablevision admits, repeatedly, that the absence of

22

any general programming network "is unlikely to cause a substantial number of subscribers to drop Cablevision's video services."  (*Id.* ¶¶ 32, 118).  Cablevision also admits that it devotes "well over a billion dollars" yearly to license programming.  (*Id.* ¶ 34.)

Cablevision's allegations simply do not add up—it is facially implausible that *Viacom's* alleged conduct in negotiating for carriage of less than 2% of Cablevision's total channels is somehow causing Cablevision to forego allocating any of its billion-dollar budget or bandwidth to alternative networks.  Indeed, since the filing of its Complaint, Cablevision has launched two new "general programming" channels—Sprout and Glenn Beck's Blaze network[19]—belying its allegations as to foreclosure even on its own systems.

**B.      The Amended Complaint Fails Adequately to Allege a Plausible Tying Product Market in Which Viacom Possesses Appreciable Market Power**

As a prerequisite to its Section 1 tying claim, Cablevision must allege separate tying and tied product markets and allege that Viacom has appreciable market power in the tying product market.  *See United Magazine Co. v. Murdoch Magazines Distrib.*, 146 F. Supp. 2d 385, 398 (S.D.N.Y. 2001) ("[A]s a prerequisite to any antitrust claim, plaintiff must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." (quotation marks omitted)), *aff'd sub nom. United Magazine Co. v. Curtis Circulation*, 279 F. App'x 14 (2d Cir. 2008); *see also Jefferson Parish*, 466 U.S. at 21 ("It [is] clear that a tying arrangement cannot exist unless two separate product markets have been linked.").

In so doing, the plaintiff must allege a product market that is, at a minimum, "theoretically reasonable," *In re Set-Top Cable Television Box Antitrust Litig.*, Nos. 08 MD 1995, 08 Civ. 7616, 2011 WL 1432036, at *8 (quoting *Chapman v. N.Y. State Div. for Youth*,

---

[19]      *See* OPTIMUM, Program Guide, https://www.optimum.net/tv/guide (last visited Aug. 21, 2013) (listing channels 127 (Sprout) and 157 (Glenn Beck's The Blaze)).

546 F.3d 230, 238 (2d Cir. 2008)), and "theoretically plausible," *E&G Gabriel v. Gabriel Bros.*, No. 93 CIV. 0894 (PKL), 1994 WL 369147, at *2 (S.D.N.Y. July 13, 1994).  Accordingly, courts have not hesitated to reject market allegations at the motion to dismiss stage "that make no economic sense."  *Id.* (quoting *Theatre Party Assocs. v. Shubert Org.*, 695 F. Supp. 150, 154 (S.D.N.Y. 1988)).  Indeed, courts frequently dismiss claims like Cablevision's that are characterized by "either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way."  *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001).

> 1. *A single network "brand" does not constitute a legally cognizable tying product market*

Just as it did in its original Complaint, Cablevision has set forth three mutually-contradictory alternative market definitions, the first of which alleges four separate tying product markets each composed exclusively of a *single* Viacom network—*i.e.*, a Nickelodeon tying market, a Comedy Central tying market, a BET tying market, and an MTV tying market.  (Am. Compl. ¶¶ 40–48.)  By alleging such narrowly defined markets, Cablevision is taking the nonsensical position that each of MTV, Nickelodeon, Comedy Central and BET does not compete with *any other* programming service.  Applying Cablevision's strained logic would mean that ABC does not compete with NBC, which does not compete with CBS, which does not compete with Fox because all four are so-called "commercially critical" networks.  Cablevision would therefore have the Court believe that, from an antitrust perspective, David Letterman, Jay Leno, and Jimmy Kimmel do not vie for ratings and advertising dollars; Fox's singing competition show *American Idol* does not compete against NBC's singing competition show *The Voice*; and *Good Morning America* on ABC does not go head-to-head against *The Today Show*

24

on NBC just because certain subscribers may have strong preferences for programming on a particular network and "expect video distributors such as Cablevision to carry those networks." (*Id.* ¶ 40.)  Cablevision's allegation defies precedent and common sense.  *See Levitch v. Columbia Broad. Sys. Inc.*, 495 F. Supp. 649, 665 (S.D.N.Y. 1980)  ("[G]iven the economic realities of the television industry, the only possibly relevant market is one in which the national viewing public is cast as the ultimate consumer. . . .  [W]hen viewed from the eyes of the national viewing audience, the news and documentary programs presented by [ABC, CBS, and NBC] are interchangeable commodities.") (quotation marks omitted).

Attempts, like Cablevision's, to define markets according to a single name brand have been consistently rejected by courts in this Circuit on motions to dismiss.  *See, e.g.*, *Todd*, 275 F.3d at 200 & n.3 (collecting cases that reject attempts to limit a product market to a single brand, franchise, or institution); *Re-Alco Indus. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391–92 (S.D.N.Y. 1993) (dismissing allegations that one particular brand of health education materials was a relevant product market, holding "[t]he law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market" (quotation marks omitted)); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678–79 (S.D.N.Y. 1987) (rejecting allegations that Rolex watches did not compete in market with other high quality watches).  If a single brand could constitute a cognizable tying product market, every brand conceivably could have market power sufficient to trigger a tying violation: This is not the law.  *See Carell v. Shubert Org.*, 104 F. Supp. 2d 236, 265 (S.D.N.Y. 2000) ("[T]o define the relevant product market as that group of products over which defendants' anticompetitive conduct exercises control . . . as an analytic matter reads the market definition step out of the Sherman Act." (alteration in original) (quotation marks omitted)).

25

In support of its single-brand market allegations, Cablevision concedes that other networks offer similar programming and target similar audiences, but alleges that those other networks "lack the high ratings and strong following" that the Viacom networks enjoy or offer somewhat "differently oriented programming."  (*See* Am. Compl. ¶¶ 41, 43, 45, 47.)[20]  Courts have rejected similar arguments.  For example, in *United Magazine*, plaintiff magazine wholesalers alleged that magazine distributors engaged in illegal tying by requiring that wholesalers who wished to purchase "supertitles"—*i.e.*, the most popular magazines—from the distributors also purchase certain unwanted titles.  146 F. Supp. 2d at 397–98.  The court rejected the plaintiffs' allegation that the relevant tying product market was each of the supertitles and dismissed the complaint, holding that "'[c]ourts in this [D]istrict have rejected the proposition that allegedly unique products, by virtue of customer preference for that product, are markets unto themselves.'"  *Id.* at 398 (quoting *Carell*, 104 F. Supp. 2d at 265).  Likewise, this court has rejected Cablevision's contention that a single television network, by virtue of its popularity or distinctive programming, constitutes a relevant product market:

> The plaintiff's argument is analogous to a contention that a consumer is "locked into" Pepsi because she prefers the taste, or NBC because she prefers "Friends," "Seinfeld," and "E.R."  A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and NBC is just another television network.

---

[20]   Cablevision provides no factual allegations to support its assertion that networks which offer differently targeted programming do not compete in the same market.  This inadequacy is also grounds for dismissal.  *See infra* Section I.B.2.  Further, Cablevision provides no allegations to support its claim that Viacom's market power is somehow demonstrated by the fact that Viacom charged higher rates despite declines in the ratings for Nickelodeon, Comedy Central, BET, and MTV.  (Am. Compl. ¶¶ 42, 44, 46, 48.)  Cablevision ignores that the rate increases for Viacom's services could have been comparable to the rate increases of other programmers' services or, alternatively, Viacom's prior rates could have been below-market altogether.  The Amended Complaint conveniently makes no such allegations.

*Global Disc. Travel Servs. v. Trans World Airlines*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997)

(Sotomayor, J.).

Cablevision's allegation that each of MTV, Nickelodeon, Comedy Central and

BET constitutes its own tying product market because of the popularity of those networks is also

directly contradicted by Cablevision's own admissions before the Court of Appeals for the

District of Columbia and the FCC.  The Amended Complaint alleges that Cablevision views

certain networks as "commercially critical (or 'must have') because, if unable to offer their

programming for a significant period of time, Cablevision would likely shed a substantial

number of subscribers."  (Am. Compl. ¶ 30.)  However, Cablevision has made admissions before

courts directly contradicting its factual assertions here.  *See* Tringali Decl. Ex. F (Brief for

Petitioners, *Cablevision Systems Corp. v. FCC*, 597 F.3d 1306 (D.C. Cir. 2010) (Nos. 07-1425,

07-1487)) at 47 ("[T]he record showed that it is highly unlikely subscribers would switch to a

cable operator solely to obtain a withheld network [not available on a rival operator] in numbers

significant enough to eliminate MVPD rivals or allow cable operators to reap monopoly

profits.").  Similarly, in arguing that the FCC should not restrict the ability of cable operators—

such as Cablevision—to enter into exclusive distribution agreements with programmers,

Cablevision asserted that "[t]he fragmentation of the cable audience across the hundreds of

available channels means that no single channel . . . represents so great a proportion of overall

viewing as to render it essential for an MVPD to offer to attract subscribers."  Tringali Decl. Ex.

D (Comments of Cablevision Systems Corporation, *In re* The Regional Sports Network

Marketplace, 27 FCC Rcd. 154 (2012) (No. 11-128)) at 10.  Finally, Cablevision has conceded

that "no single programming service . . . can be deemed to be critical to the competitive viability

of an MVPD in any particular local market."  Tringali Decl. Ex. E (Reply Comments of

Cablevision Systems Corporation, *In re* The Regional Sports Network Marketplace, 27 FCC

Rcd. 154 (2012) (No. 11-128)) at 1.[21]

        Cablevision's second alternative market allegation—that all of the Core Networks

together constitute the tying market over which Viacom has a "100% share" (Am. Compl. ¶¶ 60–

61)—suffers from the same fatal flaw: Brands are not markets.  This is nothing more than

another way of saying that ABC does not compete, at a bare minimum, against NBC, CBS, or

Fox, which courts have rejected.  Moreover, Cablevision's contention that all of Viacom's

"Core" networks comprise a single product market is devoid of any factual allegations

explaining why Nickelodeon, Comedy Central, BET, MTV, VH1, TV Land, MTV 2 and Spike

TV constitute an appropriate product market or why other networks such as NBC, Fox, ABC or

CBS or programming services such as ESPN, Disney Channel, Bravo, TNT or many others are

properly excluded.  Dismissal is appropriate "[i]f a complaint fails to allege facts regarding

substitute products, to distinguish among apparently comparable products, or to allege other

pertinent facts relating to cross-elasticity of demand."  *Re-Alco Indus.*, 812 F. Supp. at 391.

        2.      *Cablevision's alternative, gerrymandered markets alleged in the Amended Complaint are implausible and require dismissal*

        Cablevision defines its third alternative tying product markets according to

supposed characteristics of the Viacom networks that appeal to consumers in those alleged

markets—*i.e.*, Popular Children's Programming, Popular Comedy Programming, Popular

African American Programming, and Popular Young Adult Programming.  For instance,

---

[21]    Moreover, Cablevision's current attempts to retroactively label certain of Viacom's networks as "commercially critical" are belied by its prior 10-K filings, which fail to name Nickelodeon, Comedy Central, and BET as "must-have" networks despite naming other networks such as ABC, NBC, CBS, FOX, CNN, CNBC, Discovery, ESPN, AMC, and the Disney Channel as integral parts of its cable television service.  *See* Tringali Decl. Ex. K (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 28, 2013)) at 2, 4.

Cablevision alleges that BET, along with at most one other network, is in a market consisting of highly rated networks that "feature African American oriented programming" (Am. Compl. ¶ 81.)[22]  Cablevision's purported markets are legally insufficient because they clearly do not encompass all interchangeable substitute products.  *See Chapman*, 546 F.3d at 238 ("[W]here the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.'" (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997))); *see also Theatre Party Assocs.*, 695 F. Supp. at 155 (dismissing complaint when "market proposed by plaintiff does not include alternative sources of, and substitutes for, defendant's product which reflect commercial realities").   It defies logic that only BET and potentially one other channel, TV One, offer programming that appeals to African-American viewers while every other network on television (including NBC, ABC, Fox, CBS, the Disney Channel, and ESPN) does not.[23]  (Am. Compl. ¶ 84.)   The same is true of the other categories.  How can categories as broad and encompassing as Young Adult Programming, Comedy Programming or Children's Programming be limited to only one other competing channel?  They cannot.  And, as shown

---

[22]    Comedy Central is allegedly in a market of highly rated networks that feature "comedy programming oriented to adults and young adults"; MTV is allegedly in a market of highly rated networks that feature "young adult oriented pop culture programming"; and Nickelodeon is allegedly in a market of highly rated networks that feature "programming oriented to children between the ages of 6 and 14."  (Am. Compl. ¶¶ 64, 74, 89.)

[23]    Cablevision alleges that two other networks—GMC and ASPiRE—cannot be properly considered "Popular African American Programming" because those networks, unlike BET, emphasize "family-friendly values" and "positive images of African American culture."  (*See* Am. Compl. ¶¶ 85–87.)  Such programming, in Cablevision's view, does not appeal to BET's audience and cannot properly be considered in the same market. (*See id.* ¶ 85.)

above, Cablevision itself has said so numerous times in numerous ways to the federal courts and the FCC.

The Alleged Complaint is devoid of any allegations as to *why* the television viewing audience may plausibly be segmented into separate markets based on different, but overlapping, demographics and different, but overlapping, programming.  Cablevision alleges that it has determined to exclude certain networks from its proposed market definitions because those networks do not target the same exact demographic at all times as the Viacom networks or do not have the same mix of programming as the Viacom networks.  For instance, Cablevision alleges that TBS "does not belong in the market with Comedy Central" because TBS, whose slogan is "very funny," airs different types of comedy programming than Comedy Central and also airs non-comedy programming (Am. Compl. ¶ 78) and that VH1 and Bravo do not belong in the same market with MTV because their audiences "skew" more female and older.  (*Id.* ¶¶ 94– 95.)  Applying Cablevision's logic would mean that Comedy Central, which airs *The Daily Show with Jon Stewart* at 11:00 p.m., somehow operates in a different market (for antitrust purposes) than TBS, which airs *Conan* at the exact same time.

Cablevision's circular logic as to why TBS, VH1, and Bravo do not fit within Cablevision's narrowly-set market parameters does not, however, support the appropriateness of Cablevision's formulation.  In fact, Cablevision's admissions that TBS airs comedy programming, that VH1 "features music and pop culture themed programming," and that Bravo offers programming "centered on entertainment and pop culture, including reality programs" supports *including*, not excluding, those networks in Cablevision's proposed "Popular Comedy Programming" and "Popular Young Adult Programming" markets, respectively.  (*Id.* ¶¶ 78, 94, 95.)  And, self-evidently, viewers choose between drama, comedy, sports and news at any point

in time: Just because viewers fall into the targeted demographics of Comedy Central does not mean they do not watch NBC, ESPN, Bravo, or the Discovery Channel.[24]  Indeed, Cablevision acknowledges that cable distributors "seek to offer packages that includes *mixes of programming that subscribers will find attractive as a whole.*"  (*Id.* ¶ 28 (emphasis added).)

Moreover, Cablevision ignores that many networks—which it would have the Court exclude from its various market formulations—serve a variety of different audiences at any time and over time.  Major broadcasters, for instance, obviously try to appeal to young adults, African-Americans, children and those who enjoy comedy.   Cablevision's acrobatic attempts to exclude such networks simply because they attempt to appeal to many types of viewers should be ignored.  Courts routinely reject such gerrymandered "'strange red-haired, bearded, one-eyed man-with-a-limp'" market definitions that define alleged markets based on the defendant's products—and the plaintiff's desire to show market power—rather than the realities of competition.  *See Belfiore v. N.Y. Times*, 654 F. Supp. 842, 846 (D. Conn. 1986) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 457 n.4 (2d Cir. 1974)) (rejecting plaintiffs' attempt to define the relevant market "from the product out"), *aff'd*, 826 F.2d 177 (2d Cir. 1987); *see also Pepsico, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000) ("Obviously, the narrower the market defined by plaintiffs, the easier it is to show possession of monopoly power in the relevant market.  Pepsico has chosen to define the elements of the relevant market to suit

---

[24]   Cablevision, through Rainbow Media Holdings, owned and operated television networks that compete with programming services such as Viacom's.  Cablevision's networks included AMC, which airs shows such as *Mad Men* and *Breaking Bad*, as well as WE Tv, which airs shows such as *Bridezillas*.  Tellingly, although Cablevision describes how WE Tv is targeted at a female audience, Cablevision does not describe the competition for WE Tv as being only limited to other female-oriented networks.  Instead, Cablevision states that WE Tv and all of its other networks compete with all other programming over all distribution platforms.  Tringali Decl. Ex. G (Cablevision Systems Corp., Annual Report (Form 10-K) (Feb. 16, 2011)), at 4, 16–17.

its desire for high Coca-Cola market share, rather than letting the market define itself."
(quotation marks and citation omitted)), *aff'd*, 315 F.3d 101 (2d Cir. 2002).

       Moreover, attempts to narrowly define media markets according to alleged
consumer preference have been rejected by this Circuit and courts in this district.  For example,
when the plaintiffs in *Belfiore* alleged a market consisting of "general interest daily newspapers
directed primarily to upscale readers," the court held that plaintiffs' "awkward attempt to
conform their theory to the facts they allege" was "implausible as a theoretical matter."  826 F.2d
at 180 (quotation marks omitted).  Similarly, in *Mathias v. Daily News, L.P.*, the court rejected as
"artificially constructed" plaintiffs' attempt to define the *Daily News* as its own market based on,
*inter alia*, the newspaper being targeted towards a different audience than papers such as *The
Wall Street Journal,* offering unique local content not found in other papers, and being visually
different from other papers.  The court held:

> Some consumers may prefer the *Daily News* for any number of reasons.  But at a
> basic level, the *Daily News* is a newspaper, functionally interchangeable with
> many others, that competes in a market for readers of the news.  The Court cannot
> see the utility of further expending the limited resources of the parties and the
> judiciary to rediscover that simple concept.

152 F. Supp. 2d 465, 482–83 (S.D.N.Y. 2001) (dismissing the complaint).  Cablevision's attempt
to gerrymander tying product markets to fit its alleged claims likewise should be rejected, and
the Amended Complaint should be dismissed on that independent basis.

## II.    CABLEVISION FAILS TO ALLEGE A SEPARATE CAUSE OF ACTION BASED ON AN ABROGATED THEORY OF "BLOCK BOOKING"

       In addition to mislabeling Viacom's alleged conduct as unlawful "tying,"
Cablevision also incorrectly asserts that the conduct constitutes *per se* unlawful "block-booking."
(Am. Compl. ¶ 187.)  First, Cablevision has itself taken the position in *Brantley* that block-
booking is nothing more than a form of tying, which should be dispositive here.  *See* Tringali

32

Decl. Ex. M (Distributors' Mem. in Supp. of Motion to Dismiss Second Amended Complaint,

No. CV 07-6101 CAS (VBKx) (Apr. 22, 2008)) at 25.  Second, Cablevision's use of the term

"block booking" seeks to resurrect an old line of Supreme Court decisions holding that the

practice by major motion picture distributors of offering licenses to copyrighted popular movies

only on the condition that movie theaters or television stations also license unpopular movies

constituted a *per se* illegal tying arrangement.  *See United States v. Loew's, Inc.*, 371 U.S. 38,

44–50 (1962), *abrogated by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *United

States v. Paramount Pictures*, 334 U.S. 131, 156–59 (1948).  However, block-booking is no

longer recognized as valid *per se* tying by the Supreme Court.  *See Indep. Ink.*, 547 U.S. at 44.[25]

As the Court held in *Independent Ink*, "tying arrangements involving patented products should be

evaluated under the standards applied in cases like . . . *Jefferson Parish* rather than under the *per

se* rule applied in . . . *Loew's*" and that while some tying arrangements are still unlawful, "that

conclusion must be supported by proof of power in the relevant market rather than by a mere

presumption thereof."  *Id*. at 42–43.  Since *Independent Ink* and the abolition of a special *per se*

rule to intellectual property rights, no published opinion has recognized block-booking as a cause

of action.

        Accordingly, a claim of "block booking" involving copyrighted programming is

no different from any other arrangement where a manufacturer requires its distributor to carry its

full line of products, which requires a showing of foreclosure in order to be considered

---

[25]    Though *Independent Ink* did not expressly address copyrights, subsequent lower court decisions have extended its reasoning to copyrights and other forms of intellectual property.  *See, e.g.*, *Mediacom Commc'ns Corp. v. Sinclair Broad. Grp.*, 460 F. Supp. 2d 1012, 1027 (S.D. Iowa 2006) (recognizing that, after *Independent Ink*, the uniqueness of copyrighted television programming was insufficient to establish economic power in market for tying product).

anticompetitive.  Courts have consistently held that full-line forcing has the potential to enhance, rather than limit, competition and, therefore, cannot be condemned absent some showing of actual anticompetitive effect.  *See Smith Mach.*, 878 F.2d at 1296 ("[C]ommon sense informs us that in most cases when, as here, the manufacturer does not prohibit a dealer from carrying competing lines, line forcing enhances interbrand competition by making [more products] available for sale to the public.") (affirming dismissal of full-line forcing claim against tractor manufacturer); *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 101 (3d Cir. 1976) ("[T]here can be no liability under a full-line forcing [theory] absent a showing of foreclosure of competition in a substantial amount of commerce."); IX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1725c at 334 (3d ed. 2011) ("Without . . . general foreclosure . . . adding the defendant's line to a dealer's shelves may enhance interbrand competition.").  Absent sufficient factual allegations showing how Viacom's challenged practices foreclose a substantial amount of competition from the relevant market, the Amended Complaint fails to state a Section 1 claim based on "block booking."  Therefore, Cablevision's "block-booking" claim is insufficient for the same reasons as its tying claim.

## III.   CABLEVISION'S DONNELLY ACT CLAIM SHOULD BE DISMISSED FOR THE SAME REASONS AS THE SECTION 1 TYING CLAIM

Cablevision's Donnelly Act claim is premised on the same alleged facts as Cablevision's Sherman Act tying claim (*see* Am. Compl. ¶¶ 191–92) and "[t]he requirements for pleading tying claims under the Donnelly Act are identical to those of the Federal Sherman Antitrust Act."  *Country Pointe at Dix Hills Home Owners Ass'n v. Beechwood Org.*, 21 Misc. 3d 1110(A), at *9 (N.Y. Sup. Ct. 2008), *aff'd in part and remanded*, 915 N.Y.S.2d 117 (2011); *see United Magazine*, 146 F. Supp. 2d at 398 n.4; *Pyramid Co. of Rockland v. Mautner*, 581 N.Y.S.2d 562, 565 (Sup. Ct. 1992).  Under the Donnelly Act, as under the Sherman Act, "[a]

plaintiff must allege: (1) two distinct products, i.e., a tying product and a tied product, (2) economic coercion, (3) market power in the tying product market, (4) anti-competitive impact in the tied product market, and (5) involvement of a substantial amount of commerce." *Country Pointe*, 21 Misc. 3d 1110(A), at *9; *Pyramid*, 581 N.Y.S.2d at 565. Because, as discussed above, Cablevision has failed to sufficiently allege multiple elements of a tying claim under the Sherman Act, Cablevision's claim under the Donnelly Act also must be dismissed.

## IV.   CABLEVISION'S REQUESTED RELIEF TO SEVER THE LICENSE AGREEMENT IS IMPROPER AND SHOULD BE STRICKEN FROM THE AMENDED COMPLAINT

In its Amended Complaint, Cablevision again asks the Court to grant equitable relief and sever the 2012 License Agreement by requiring Viacom to license just the Core Networks to Cablevision under the terms of the purportedly illegal agreement. (*See* Am. Compl. ¶ 170(b), (d).) Because this relief is unavailable as a matter of law based on the allegations of the Amended Complaint, the Court should strike Cablevision's requested relief for all the reasons previously raised and explained below. *See* Fed. R. Civ. P. 12(f).

Striking a request for injunctive relief is appropriate when the allegations in a complaint are insufficient as a matter of law to support a requested remedy. *See Rubinstein v. Dep't Stores Nat'l Bank*, No. 12 Civ. 8054(AJN), 2013 WL 3817767 (July 22, 2013); *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 339–41 (S.D.N.Y. 2003). When relief is requested that would require alteration of a contract, courts determine whether the complaint alleges sufficient facts to permit such relief. *See Helprin*, 277 F. Supp. 2d at 39–40 (evaluating whether allegations of the materiality of a breach and adequacy of money damages are sufficient to maintain a prayer for relief of recession); *see also id.* at 40 (concluding that plaintiff did not allege sufficient facts to maintain a claim for punitive damages); *Linville v. O&K Trojan, Inc.*, No. 91-CV-284S, 1994 WL 117363, at *21 (W.D.N.Y. Mar. 31, 1994) (striking request for

punitive damages from complaint when punitive damages are not recoverable under the statutes allegedly violated); *Brokke v. Stauffer Chem. Co*., 703 F. Supp. 215, 222 (D. Conn. 1988) (same).

Plaintiffs cannot rewrite the agreement to take what they like and leave out what they do not want when they themselves admit the inclusion of the Core Networks at the specified rates was conditioned on distribution of the Suite Networks at those rates.  In these circumstances, the agreement pertaining to the Core Networks and the Suite Networks cannot be separated because, "by its terms and purposes, it contemplates that all of its parts are interdependent and common to one another."  *GEM Advisors v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 327 (S.D.N.Y. 2009); *see also AT&T v. United States*, 32 Fed. Cl. 672, 682 (1995) ("[T]here is a critical difference between an otherwise valid contract that contains a prohibited term or clause and a contract that is void from the inception.  The former is amenable to reformation on the theory that the offensive provision is not significant enough to undermine the foundations of the contract . . . ."), *vacated on other grounds*, 177 F.3d 1368 (Fed. Cir. 1999).

Cablevision admits that the provisions of the 2012 License Agreement regarding licensing of the Core Networks are interdependent with the provisions relating to the licensing of the Suite Networks.  Indeed, Cablevision's tying claim is premised on the allegation that Viacom conditioned the licensing of the Core Networks on the licensing of the Suite Networks, and Cablevision alleges that Viacom "would not consider any deal that did not include the Suite Networks."  (Am. Compl. ¶ 143.)  Cablevision further alleges that had it wished to license the Core Networks without the Suite Networks, it would have been required to pay a penalty above the price of the Core and Suite Networks combined under the 2012 License Agreement.  (*Id.* ¶ 146.)  Moreover, Cablevision's Amended Complaint describes a multifaceted contract

negotiation process concerning numerous terms and conditions including, *inter alia*, yearly effective rates, rate increases, carriage obligations, and the tiers that networks are to be carried on.  (*See, e.g.*, *id.* ¶¶ 126, 152.)  Accepting Cablevision's allegations as true, the 2012 License Agreement cannot be reformed to contain just Cablevision's unilaterally-preferred terms and conditions as to the Core Networks and relieve it of its obligations as to the Suite Networks.

Cablevision essentially asks the Court to free it from what it claims to be an illegal contract requiring it to license the Suite Networks but allow it to continue receiving the benefits of the same agreement to license the Core Networks.  However, the Supreme Court does not permit parties to "reap the benefits of a contract and then seek to avoid the corresponding burdens."  *Viacom Int'l Inc. v. Tandem Prods.*, 526 F.2d 593, 599 (2d Cir. 1975) (citing *Kelly v. Kosuga*, 358 U.S. 516, 520–21 (1959) ("[T]he courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, of preventing people from getting other people's property for nothing when they purport to be buying it." (quotation marks omitted))); *accord Wechsler v. Hunt Health Sys.*, 216 F. Supp. 2d 347, 354 (S.D.N.Y. 2002).  Courts have rejected attempts by antitrust plaintiffs to avoid their contractual obligations selectively.  *See Kelly*, 358 U.S. at 518–21 (striking defense to breach of contract that the contract violated the Sherman Act); *Rooney v. Columbia Pictures Indus.*, 538 F. Supp. 211, 229 (S.D.N.Y. 1982) ("Having accepted the considerable benefits of such contracts, Rooney cannot now avoid the corresponding obligations by his charge of a separate agreement among defendants in violation of the federal antitrust laws."), *aff'd*, 742 F.2d 117 (2d Cir. 1982); *see also Hudson Motors P'ship v. Crest Leasing Enters.*, 845 F. Supp. 969, 981 (E.D.N.Y. 1994) ("It is now well established that the remedy for violation of the antitrust law is not avoidance of payments due under a contract, but rather the redress which the antitrust statute establishes,—a private treble damage action." (quotation

marks and citation omitted)).  Accordingly, Cablevision's requested relief should be rejected and stricken from the Amended Complaint.

Cablevision's request for equitable relief is also barred by laches.  Cablevision alleges that its purchase of the Suite Networks stopped being voluntary as early as 2008.  (Am. Compl. ¶ 127.)  However, Cablevision never challenged the alleged tying until now.  Its delay is unreasonable and prejudicial to Viacom, which would not have entered into the 2012 License Agreement had it known that Cablevision would seek to challenge it before the ink was dry.

Laches applies where a plaintiff, such as Cablevision here, though having knowledge of its claim, unreasonably delays seeking redress to the detriment of the defendant. Courts look to "analogous" statutes of limitations in determining whether such delay exists. *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008); *see also Rite Aid Corp. v. Am. Express Travel Related Servs.*, 708 F. Supp. 2d 257, 272 (E.D.N.Y. 2010) (applying a "four-year period of laches" because the Clayton Act contained a four-year statute of limitations for damages claims).  Courts have dismissed Sherman Act claims for injunctive or equitable relief on laches grounds.  *See Madison Square Garden*, 2008 WL 4547518, at *10–11; *see also Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 841 (S.D.N.Y. 1988) ("The doctrine of laches . . . can be applied to equitable claims made under section 16 of the Clayton Act.").

In *Madison Square Garden*, the National Hockey League Board issued a resolution in 1994 that granted the NHL the exclusive right to control the individual teams' trademarks and licensing.  2008 WL 4547518, at *2.  Licensing agreements executed in 1996 and 2006 continued this grant of rights in substantively the same form.  *Id.* at *3.  Madison Square Garden (then as now owned by Cablevision) argued that the 2006 renewal constituted an

"overt act" that started the statutory period running again.  Judge Preska disagreed, concluding

that the complaint did not allege any substantive change in the teams' rights of ownership over

their trademarks and thus was not an "overt act."  *Id*. at *10.

Here, Cablevision has admitted that its negotiations with Viacom in late 2012

were merely a continuation of conduct from four years earlier.  For instance, Cablevision states

that in 2008, Viacom "engaged in the coercive tactics it was to repeat four years later," (Compl. ¶

110),[26] and Cablevision alleges that, "just as with" 2008, it would have had to pay significantly

more for only the Core Networks in 2012.  (Am. Compl. ¶ 145.)  Moreover, the section of

Cablevision's original Complaint which described the 2012 negotiations is titled, "Viacom

Repeats Its Abusive Tactics And Unlawfully Coerces Cablevision In 2012 To Continue To Carry

Suite Networks."  (Compl. at 41.)[27]

Thus, Cablevision is barred by the laches doctrine from seeking equitable relief

because it has unreasonably delayed in bringing a tying claim by never challenging the earlier

license agreement but instead choosing to enter into yet another allegedly involuntary and

coercive agreement in 2012.

---

[26]   In amending the original complaint, Cablevision deleted the word "repeat" and replaced it with "amplify."  (*See* Am Compl. ¶ 130.)

[27]   Compared to the original Complaint, Cablevision's Amended Complaint contains various additions, deletions, and revisions in an attempt to distinguish the 2012 License Agreement from earlier agreements.  (*See, e.g.*, Am. Compl. ¶ 153.)  But such changes cannot hide the fact that Viacom's alleged demand that the Core and Suite networks be "tied" together – and Cablevision's acceptance and re-acceptance of those terms – has remained "substantively the same."  *Madison Square Garden*, 2008 WL 4547518 at *3 .

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Viacom respectfully submits that Cablevision's Amended Complaint fails to state a claim for relief and should be dismissed in its entirety.

Dated: August 23, 2013

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By:   /s/ Joseph Tringali
          Joseph F. Tringali
          Peri L. Zelig
425 Lexington Avenue
New York, NY 10017
Telephone:   (212) 455-2000
Facsimile:   (212) 455-2502

*Attorneys for Defendants Viacom International Inc.*
*and Black Entertainment Television LLC*

Kenneth R. Logan,
      *Of Counsel*

## CERTIFICATE OF SERVICE

I, Lloyd Colona, hereby certify under the penalty of perjury that on August 23, 2013, I personally served a true and correct copy of the attached:

**- NOTICE OF MOTION TO DISMISS THE AMENDED COMPLAINT**

**- MEMORANDUM OF LAW OF VIACOM INTERNATIONAL AND BLACK ENTERTAINMENT TELEVISION IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**- DECLARATION OF JOSEPH F. TRINGALI IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

By Federal Express upon:

Mark S. Popofsky
Ropes & Gray LLP
One Metro Center
700 12th Street, N.W.
Washington, D.C. 20005

Dated:  New York, New York
        August 23, 2013

_____
Lloyd Colona

## CERTIFICATE OF SERVICE

I, Jessica Ortiz, hereby certify under the penalty of perjury that on August 23rd, 2013, at approximately 11:45 AM, I personally served a true and correct copy of the attached:

**- NOTICE OF MOTION TO DISMISS THE AMENDED COMPLAINT**

**- MEMORANDUM OF LAW OF VIACOM INTERNATIONAL AND BLACK ENTERTAINMENT TELEVISION IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**- DECLARATION OF JOSEPH F. TRINGALI IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

By-Hand upon:

Jerome Katz
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036

Dated:  New York, NY
August 23, 2013.

Jessica Ortiz