# EXHIBIT A

No. 12-171

═══════════════

IN THE

# Supreme Court of the United States

———————

ROB BRANTLEY, DARRYN COOK, WILLIAM AND BEVERLEY
COSTLEY, PETER G. HARRIS, CHRISTIANA HILLS, MICHAEL
B. KOVAC, MICHELLE NAVARRETTE, JOY PSACHIE, AND
JOSEPH VRANICH, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

*Petitioners,*

v.

NBC UNIVERSAL, INC., VIACOM, INC., THE WALT DISNEY
COMPANY, FOX ENTERTAINMENT GROUP, INC., TURNER
BROADCASTING SYSTEM, INC., TIME WARNER CABLE INC.,
COMCAST CORPORATION, COMCAST CABLE
COMMUNICATIONS, LLC, COXCOM, INC., THE DIRECTV
GROUP, INC., ECHOSTAR SATELLITE L.L.C., AND
CABLEVISION SYSTEMS CORPORATION,

*Respondents.*

———————

**On Petition for a Writ of Certiorari to the United
States Court of Appeals for the Ninth Circuit**

———————

## BRIEF IN OPPOSITION

———————

WILLIAM KOLASKY
JONATHAN E. NUECHTERLEIN
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 PENNSYLVANIA AVENUE,
N.W.
WASHINGTON, D.C.  20006
TELEPHONE:  (202) 663-6000
FACSIMILE:  (202) 663-6363
*Counsel for Respondent The Walt
Disney Company*

GLENN D. POMERANTZ
DAVID C. DINIELLI
FRED A. ROWLEY, JR.
    *Counsel of Record*
MUNGER, TOLLES & OLSON LLP
355 S. GRAND AVE., 35TH FL.
LOS ANGELES, CA  90071-1560
TELEPHONE:  (213) 683-9100
FACSIMILE (213) 687-3702
FRED.ROWLEY@MTO.COM
*Counsel for Respondent Fox
Entertainment Group, Inc.*

JOSEPH F. TRINGALI
PAUL SIRKIS
SIMPSON THACHER &
BARTLETT LLP
425 LEXINGTON AVENUE
NEW YORK, NY 10017-3954
TELEPHONE: (212) 455-2000
FACSIMILE: (212) 455-2502

CHET A. KRONENBERG
SIMPSON THACHER &
BARTLETT LLP
1999 AVENUE OF THE STARS
29TH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: (310) 407-7500
FACSIMILE: (310) 407-7502
*Counsel for Respondent Viacom,
Inc.*

RONALD C. REDCAY
JOHN D. LOMBARDO
ARNOLD & PORTER LLP
777 SOUTH FIGUEROA STREET
44TH FLOOR
LOS ANGELES, CA 90017-5844
TELEPHONE: (212) 243-4000
FACSIMILE: (213) 243-4199
*Counsel for Respondent
NBC Universal*

ROBERT A. SACKS
SULLIVAN & CROMWELL LLP
1888 CENTURY PARK EAST
LOS ANGELES, CA 90067
TELEPHONE: (310) 712-6600
FACSIMILE: (310) 712-8800
*Counsel for Respondent
Cablevision Systems Corporation*

PETER T. BARBUR
CHRISTOPHER D. BELELIEU
CRAVATH, SWAINE & MOORE LLP
825 EIGHTH AVENUE
NEW YORK, NY 10019
TELEPHONE: (212) 474-1155
FACSIMILE: (212) 474-3700

BRYAN A. MERRYMAN
WHITE & CASE LLP
633 WEST FIFTH STREET
SUITE 1900
LOS ANGELES, CA 90071-2007
TELEPHONE: (213) 620-7700
FACSIMILE: (213) 452-2329
*Counsel for Respondent
Turner Broadcasting System, Inc.*

DANIEL G. SWANSON
JAY SRINIVASAN
GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE
46TH FLOOR
LOS ANGELES, CA 90071
TELEPHONE: (213) 229-7000
FACSIMILE: (213) 229-7520
*Counsel for Respondent
CoxCom, Inc.*

RICHARD R. PATCH
SUSAN K. JAMISON
LAUREN S. KOWAL
COBLENTZ, PATCH, DUFFY
& BASS LLP
ONE FERRY BUILDING, SUITE 200
SAN FRANCISCO, CA 94111
TELEPHONE: (415) 391-4800
FACSIMILE: (415) 989-1663

(i)

## QUESTION PRESENTED

Does a complaint that challenges vertical bundling agreements under the rule of reason but does not allege any injury to competition in the form of either exclusion of competitors or horizontal collusion state a claim under section 1 of the Sherman Act?

(ii)

## RULE 29.6 STATEMENT

Respondent NBC Universal, Inc., (now known as NBCUniversal Media, LLC) has two parent corporations that are publicly traded and own more than 10% of Respondent's stock:  Comcast Corp. and General Electric Co.

Respondent Viacom, Inc. has no parent corporation and no publicly traded corporation owns 10% or more of its stock.

Respondent The Walt Disney Company has no parent corporation and no publicly traded corporation owns 10% or more of its stock.

Respondent Fox Entertainment Group, Inc.'s parent corporation is News Corporation, which is publicly traded.

Respondent Turner Broadcasting System, Inc.'s parent corporation is Historic TW, Inc., whose parent corporation is Time Warner Inc., which is publicly traded.

Respondent Time Warner Cable Inc., has no parent corporation and no publicly traded corporation owns 10% or more of its stock.

Respondent Comcast Corporation has no parent corporation and no publicly traded company owns 10% or more of its stock.

Respondent Comcast Cable Communications, LLC's parent company is Comcast Holdings Corporation, whose parent company is Comcast Corporation, which is publicly traded.

Respondent CoxCom, Inc.'s parent corporation is Cox Communications, Inc., a privately held corporation.

(iii)

Respondent The DIRECTV Group, Inc.'s parent corporation is DIRECTV, which is publicly traded.

Respondent DISH Network L.L.C., as successor to Respondent EchoStar Satellite L.L.C., is a wholly owned subsidiary of DISH DBS Corporation, whose parent corporation is DISH Orbital Corporation, whose parent corporation is DISH Network Corporation, which is publicly traded.

Respondent Cablevision Systems Corporation ("CSC") has no parent company.  T. Rowe Price Group, Inc. owns 10% or more of CSC's Class A common stock.

(iv)

# TABLE OF CONTENTS

**Page**

QUESTION PRESENTED ......................................... i

RULE 29.6 STATEMENT ......................................... ii

I.    SUMMARY OF THE ARGUMENT.................1

II.    REASONS FOR DENYING THE
PETITION .......................................................5

    A.    The Decision Below Correctly
Applies Settled Law And Does
Not Conflict With Decisions Of
This Or Any Other Court ...................... 5

        1.    The "Tiering" Provisions
Cannot Be Found Unlawful
Solely Because They Limit
The Manner In Which
Distributors Compete ................. 5

        2.    Vertical Restraints Are Not
Illegal Just Because They
Allegedly Have Effects --
Increased Prices And
Choice Reduction -- That
Also Be Produced By
Horizontal Agreements ............... 8

        3.    Consistent With This
Court's Precedent, The
Decision Below Correctly
Concludes That Foreclosure
Is An Essential Element Of
A Bundling Claim ...................... 10

    B.    Every Circuit Court To Address
The Question Agrees That
Foreclosure Is A Necessary
Element Of A Bundling Claim............. 12

(v)

## TABLE OF CONTENTS
(continued)

**Page**

C.  Certiorari Is Not Otherwise
    Warranted............................................. 14

III.  CONCLUSION..............................................18

(vi)

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Bd. of Trade of City of Chicago v. United States,*
   246 U.S. 231 (1918) ................................................ 5

*Blough v. Holland Realty, Inc.,*
   574 F.3d 1084 (9th Cir. 2009) ............................ 12

*Cascade Health Solutions v. Peacehealth,*
   515 F.3d 883 (9th Cir. 2008) ............................... 12

*Chroma Lighting v. GTE Prods. Corp.,*
   111 F.3d 653 (9th Cir. 1997) ............................... 12

*Coniglio v. Highwood Servs., Inc.,*
   495 F.2d 1286 (2d Cir. 1974)............................... 13

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
   433 U.S. 36 (1977) ........................................ 2, 4, 7

*E & L Consulting, Ltd. v. Doman Indus. Ltd.,*
   472 F.3d 23 (2d Cir. 2006)..................................... 7

*Foremost Pro Color, Inc. v. Eastman Kodak Co.,*
   703 F.2d 534 (9th Cir. 1993) ............................... 12

*Fortner Enter., Inc. v. United States Steel Corp.,*
   394 U.S. 495 (1969) ............................................. 15

(vii)

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Grappone, Inc. v. Subaru of New England, Inc.*,
  858 F.2d 792 (1st Cir. 1988)................................. 13

*Hirsh v. Martindale-Hubbell, Inc.*,
  674 F.2d 1343 (9th Cir. 1982) ............................. 12

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
  547 U.S. 28 (2006) .................................................. 3

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ........................................ 3, 11, 15

*Kestenbaum v. Falstaff Brewing Corp.*,
  575 F.2d 564 (5th Cir. 1978) ................................. 7

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ......................................passim

*O.S.C. Corp. v. Apple Computer, Inc.*,
  601 F. Supp. 1274 (C.D. Cal. 1985),
  *aff'd*, 792 F.2d 1464 (9th Cir. 1986)...................... 6

*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
  555 U.S. 438 (2009) ............................................... 6

*Pitchford Scientific Instruments Corp. v. PEPI, Inc.*,
  531 F.2d 92 (3d Cir. 1976)..................................... 8

(viii)

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Reifert v. South Cent. Wis. MLS Corp.*,
   450 F.3d 312 (7th Cir. 2006) ............................... 13

*Standard Oil Co. of N.J. v. United States*,
   221 U.S. 1 (1911) .................................................... 5

*Times-Picayune Pub. Co. v. United States*,
   345 U.S. 594 (1953) ........................................ 11, 12

*Town Sound & Custom Tops, Inc. v. Chrysler
   Motors Corp.*,
   959 F.2d 468 (3d Cir. 1992)................................. 13

*United States v. Blue Cross Blue Shield of
   Mich.*,
   809 F. Supp. 2d 665 (E.D. Mich. 2011)............... 16

*United States  v. Colgate & Co.*,
   250 U.S. 300 (1919) ............................................... 6

*United States v. Loew's*,
   371 U.S. 38 (1962) ........................................... 3, 11

**TREATISES**

VIII Phillip E. Areeda & Herbert Hovenkamp,
   *Antitrust Law* ¶ 1609a (2d ed. 2002) .................... 7

(ix)

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**OTHER AUTHORITIES**

*Give us a la carte channel pricing*, Los Angeles
    Times (July 13, 2012) at
    http://articles.latimes.com/2012/jul/13/busin
    ess/la-fi-lazarus-20120713) .................................... 1

Shapiro & Varian, Information Rules 300
    (Harv. Bus. School Press, 1998)........................... 15

## I.  SUMMARY OF THE ARGUMENT

The decision below is based on sound and long-recognized antitrust precedents; it reaches a result that is patently correct; and it is fact-bound and presents no circuit conflict.  Certiorari should be denied.

Petitioners, who are cable and satellite television subscribers, challenged a series of parallel but concededly non-collusive vertical agreements between television Programmers and television Distributors under section 1 of the Sherman Act.[1]  The gist of the complaint is that because these vertical agreements allegedly require the distributors to bundle the channels in "tiers" when they resell the channels to consumers, Petitioners allegedly end up paying for channels they do not want.  Petitioners alleged injury to themselves in the form of increased prices and reduced consumer choice, but they *did not* allege any injury to competition.  The Ninth Circuit concluded that the complaint was deficient and that the district court had properly dismissed it.  That disposition was unexceptional and was not in conflict with decisions of other circuits or of this Court.

The decision below, which concludes that selling a bundle of products does not necessarily violate the Sherman Act, even when some purchasers might prefer to buy only some of the bundled products, has received little notice in the world of antitrust law.  This is because the decision below applies standard "rule of reason" antitrust analysis, which is the

---

[1] Petitioners alleged that Programmers (such as NBC Universal and Disney) sell television channels to Distributors (such as Time Warner Cable and DIRECTV), who resell those channels to subscribing consumers.  *E.g.*, App. 75.

2

accepted method for evaluating all "agreements between firms operating at different levels of a given product market (referred to as 'vertical agreements')." App. 10. This Court has established the parameters of the rule of reason's application to vertical agreements in a series of cases dating at least back to *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977), and leading most recently to the Court's application of the rule of reason to vertical price agreements in *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).

Although Petitioners contend that the Ninth Circuit applied a "rigid and formulaic approach," Petition 16, the court in fact applied the same flexible, fact-specific analysis courts apply in most rule-of-reason cases. In particular, the court recognized that some vertical agreements and some bundling arrangements can harm competition, but it found that Petitioners had alleged no facts that could support a finding of injury to competition under the rule of reason here:

*First*, the decision below observed that vertical agreements violate section 1 only when they cause "injury to competition." App. 11 (citing *Continental T.V.*, 433 U.S. at 54-57).

*Second*, the decision noted that, in some contexts, vertical agreements can injure competition by "foreclos[ing] competitors from entering or competing," thereby "reducing the competitive threat those competitors would pose," or by "facilitating horizontal collusion." App. 10-11 (citing *Leegin*, 551 U.S. at 893, 897-98).

*Third*, the decision concluded that the tiering agreements, by which "must have" channels are sold along with less popular channels, are close analogs to

3

"tying" or "bundling" agreements. These are a species of vertical agreement that -- after much judicial experience over the last century -- this Court has concluded can injure competition in some contexts. In particular, tying/bundling agreements can "'create barriers to entry of new competitors in the market for the tied product,'" App. 11 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984), *abrogated in part on other grounds by Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006)), and "'force buyers into giving up the purchase of substitutes for the tied product.'" App. 11 (quoting *United States v. Loew's*, 371 U.S. 38, 45 (1962), abrogated in part on other grounds by *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006)).

**Fourth**, the decision noted that Petitioners did not make, and indeed disavowed any attempt to make, allegations of "the types of injuries to competition that are typically alleged to flow from tying arrangements." App. 16 (citing *Loew's*, 371 U.S. at 45). That is, Petitioners declined to allege that the tiering agreements have any exclusionary effect on other sellers of television channels or force buyers to forgo purchasing channels they might prefer.

**Fifth**, the decision observed that this Court's precedent establishes that the other purported effects of the tying agreements -- specifically, a limitation on the manner in which distributors can resell the channels, and higher prices and reduced consumer choice -- do not constitute injuries to competition. App. 17-19 (citing *Continental T.V.*, 433 U.S. at 46, 54-55 (limiting the locations at which distributor resells is not injury to competition), *Leegin*, 551 U.S. at 895-97 and *Continental T.V.*, 433 U.S. at 55 (price increases and choice reduction are not injuries to

4

competition).

The decision below concluded that, because the complaint contained no allegations of injury to competition that would be cognizable under this Court's precedents, dismissal was proper. This logical analysis, applying long-settled principles, is wholly unremarkable, and does not warrant this Court's review. The decision below does not create any circuit split. It has generated no significant judicial or academic discussion or criticism of its antitrust implications.[2] Petitioners assert that review would offer an "opportunity" for this Court to "clarify" various principles of law (relating to pleading standards and analysis of "industry-wide restraints"). *Cf*. Petition 2. But it is plain that Petitioners' real dispute is only with the Ninth Circuit's application of settled principles. This Court generally does not grant review to consider requests for fact-bound error correction, and here there is no error to correct. In short, the decision below does not provide a justification for the grant of certiorari.

---

[2] Petitioners cite a July 13, 2012 Los Angeles Times article, entitled *Give us a la carte channel pricing*. Petition at 2 n.1 (citing http://articles.latimes.com/2012/jul/13/business/la-fi-lazarus-20120713). This article is an opinion piece discussing a public business dispute between a particular Programmer and a particular Distributor. It says nothing about whether antitrust law ought to prohibit the agreements at issue in this case. Indeed, the article does not mention this case at all.

5

## II.  REASONS FOR DENYING THE PETITION

### A. The Decision Below Correctly Applies Settled Law And Does Not Conflict With Decisions Of This Or Any Other Court

#### 1. The "Tiering" Provisions Cannot Be Found Unlawful Solely Because They Limit The Manner In Which Distributors Compete

Throughout this litigation, Petitioners have disclaimed any intention to allege that the bundling and tiering agreements at issue are the result of horizontal collusion or that they constitute per se unlawful tying agreements.  Instead, Petitioners' main argument, rejected by the Ninth Circuit, is that the requirements imposed by individual Programmers through their separate, vertical agreements with individual Distributors can be found to violate section 1 of the Sherman Act under the rule of reason solely on the basis that they "suppress competition among distributors," thereby restricting consumer choice and increasing consumer prices, even if they do not foreclose competition at the programming level.  Petition 1.  This argument does not raise an issue worthy of certiorari and conflicts with over a century of antitrust law.

As this Court first recognized in *Standard Oil*,[3] and then reiterated in *Chicago Board of Trade*, "Every agreement concerning trade, every regulation of trade, restrains.  To bind, to restrain, is of their very essence." *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918).  The Court has also

---

[3] *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 58 (1911).

6

consistently recognized that, "In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal," *United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919), "as well as the prices, terms, and conditions of that dealing." *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.,* 555 U.S. 438, 448 (2009).

Consistent with these principles, this Court and the lower courts have regularly upheld vertical agreements through which a supplier limits the manner in which its products are distributed – for example, by restricting the distributor to a specified territory, by prescribing how the products should be displayed, or by requiring the distributor to have trained sales persons.   All of these vertical agreements restrict consumer choice by denying the possibility that the distributor might sell the product in some different area or manner;[4] and many of these agreements impose costs on distributors and thus might lead to higher prices.   But those ordinary consequences do not make these agreements unlawful under the antitrust laws.   As the leading antitrust treatise explains, "the antitrust laws have not condemned manufacturer-dealer agreements mandating a dealer's location, the nature or design of its premises, minimum hours of business, repairs, warranties, or quality control, maintenance of warehousing facilities or showrooms, a certain level

---

[4] *See, e.g., O.S.C. Corp. v. Apple Computer, Inc.,* 601 F. Supp. 1274, 1291 n.8 (C.D. Cal. 1985) ("A vertical non-price restraint, by definition, limits in some manner the ability of a manufacturer's dealers to compete with each other . . . ."), *aff'd,* 792 F.2d 1464 (9th Cir. 1986).

7

of inventories, a certain mixture of goods and services, advertising, or other product promotion." VIII Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1609a, at 114 (2d ed. 2002).[5]

This Court has, for example, long permitted manufacturers to restrict the locations from which retailers may sell their products, even though the restrictions plainly limit competition among distributors and may lead to less choice and higher prices. *See Cont'l T.V.*, 433 U.S. at 54-55; *see also E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006) (allegation that an exclusive distributorship means that customers "have fewer options . . . and are now required to pay artificially inflated prices, [] by itself, is not a sufficient allegation of harm to competition").

This Court extended this reasoning to vertical price maintenance in *Leegin*. There, the Court held that vertical price agreements are not unlawful just because they suppress competition among distributors by specifying minimum resale prices, "absent a further showing of anticompetitive conduct." *Id*. at 879. This "further showing" might include, for example, a demonstration that the restraint was adopted by the manufacturers to facilitate coordinated pricing or foreclose sales from competitors at the manufacturer level or that the restraint was adopted at the behest of a powerful

---

[5] *See, e.g., Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir. 1978). In *Kestenbaum*, the plaintiff distributor argued that the defendant's advertising and warehouse location requirements increased its costs and that evidence of "increased prices and reduced output" were sufficient to show injury to competition. *Id*. at 572. The court rejected that argument, holding that higher prices were not themselves injury to competition.

8

distributor or group of distributors to facilitate coordinated pricing or foreclose sales from competitors at the distribution level. *Id.* at 891-92. Here, Petitioners "disavow[ed] any intent to allege that the practices engaged in by Programmers and Distributors foreclosed rivals from entering or participating in the upstream or downstream markets." App. 17.

Consistent with these decisions, the lower courts have also regularly upheld "full line forcing" agreements in which a manufacturer requires distributors to carry its entire line of product, except in circumstances where the plaintiffs can demonstrate that the agreement foreclosed sales from rival manufacturers by cutting off important channels of distribution. *See, e.g., Pitchford Scientific Instruments Corp. v. PEPI, Inc.,* 531 F.2d 92, 101 (3d Cir. 1976) (holding that "there can be no liability under a full-line forcing count absent a showing of foreclosure of competition"). Here, rather than pleading any "further showing," Petitioners "disavow[ed] any intent to allege that the practices engaged in by Programmers and Distributors foreclosed rivals from entering or participating in the upstream or downstream markets." App. 17.

### 2. Vertical Restraints Are Not Illegal Just Because They Allegedly Have Effects -- Increased Prices And Choice Reduction -- That Also Be Produced By Horizontal Agreements

Petitioners assert that their complaint states a claim because the injuries they allege – higher prices and reduced choice – are "identical" or "analogous" to those that "would flow from a cartel among distributors to impose the same bundles at issue in

9

this case." Petition 2. That is incorrect as a matter of this Court's settled jurisprudence and does not warrant the grant of certiorari.

Petitioners contend that *Leegin* supports this argument, Petition 3-5, but the *Leegin* Court squarely rejected that reasoning. The Court noted that *Dr. Miles*, decided 100 years ago, "treated vertical agreements a manufacturer makes with its distributors as analogous to a horizontal combination among competing distributors," but explained that "later cases . . . *rejected* the approach of reliance on rules governing horizontal restraints when defining rules applicable to vertical ones." *Leegin*, 551 U.S. at 888 (emphasis added).

The Court proceeded to explain that, although both vertical agreements and horizontal combinations "can lead to higher prices," the antitrust laws do not view the two as analogous because a manufacturer (unlike a retail cartel) "has no incentive to overcompensate retailers with unjustified margins" and will ordinarily impose a restraint only when "it believes this conduct will lead to increased demand despite higher prices." *Id.* at 896-97. Thus, to state a claim based on a vertical agreement, a plaintiff must do more than simply allege the existence of an agreement and cite an effect, like higher prices or reduced choice, in a downstream market. Instead, *Leegin* makes clear that vertical restraints may be anticompetitive only when they are used to organize or enforce a cartel or to exclude, or "foreclose," sales from the competitors of the party imposing the restraints. *Id.* at 926-27.

Petitioners' argument not only conflicts with *Leegin*, but also, if accepted, would have broad, unjustifiable consequences. Virtually all vertical agreements have *some* effects similar to those that

10

could result from collusion.  Imagine, for example, that a manufacturer assigns two separate territories to two separate retailers.  The effect – that the two retailers will not directly compete with each other – could also be achieved through collusion, but vertical territorial restrictions have never been found to be illegal for that reason alone.[6]

### 3. Consistent With This Court's Precedent, The Decision Below Correctly Concludes That Foreclosure Is An Essential Element Of A Bundling Claim

The decision below also was correct in concluding that this case, at bottom, is a "bundling" or "tying" case and that courts uniformly have required plaintiffs in such cases to allege and prove foreclosure.  The Ninth Circuit's ruling that bundling can injure competition only if it threatens to foreclose sales from rivals in the upstream market is supported by a long line of cases in this Court and the lower courts.  Again, there is nothing in the court of

---

[6] It would be nonsensical to hold that vertical restraints are illegal just because they produce "effects," like higher prices or reduced choice, that if accomplished directly through horizontal collusion would make the collusion illegal.  Such a rule would prohibit virtually all vertical restraints, including common business practices such as requirements that retailers engage in certain marketing, place products on specified shelves, provide minimum services, offer warranties, or sell particular brands exclusively; requirements that movie theaters not show motion pictures to the public until their release dates; and requirements that television shows be available to viewers only during certain time slots.  All of these restrictions could be effected through horizontal collusion at the manufacturer or retailer level.  But there is no support for the assertion that the possibility of a "cartel-like effect," on its own, could make the vertical restrictions illegal.

11

appeals' reasoning that justifies review by this Court under the standards applicable to the grant of certiorari.

This Court has repeatedly emphasized the need to demonstrate foreclosure in tying cases, both under the rule of reason and the per se doctrine. As it explained in *Jefferson Parish*, "[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984).

There is nothing to the contrary in *United States v. Loew's,* 371 U.S. 38 (1962). There, consistent with its later decision in *Jefferson Parish,* the Court explained that tying arrangements "are an object of anti-trust concern for two reasons—they may force buyers into giving up the purchase of substitutes for the tied product and they may destroy the free access of competing suppliers of the tied product to the consuming market." *Id.* at 44-45. Despite the efforts by Petitioners to construe this language otherwise, both concerns cited by the Court in *Loew's* stem from forcing consumers to give up the purchase of substitutes *from other sellers*, thereby foreclosing those sales from rival sellers – not, as alleged here, from forcing consumers to purchase products they otherwise would not have bought. *Loew's* and *Jefferson Parish* are both consistent with the Court's earlier decision in *Times-Picayune Pub. Co. v. United States,* 345 U.S. 594 (1953), where the Court held that a newspaper's practice of bundling together advertising in its morning and afternoon editions could not violate section 1 under the rule of reason

12

without evidence to "demonstrate that the . . . advertising contracts unduly handicapped" the newspaper's only competitor. *Id.* at 886. Thus, there is no need to "clarify" the long line of cases that have consistently held that in a tying case such as this one, plaintiffs must allege foreclosure of competition. *Cf.* Petition 19.

## B. Every Circuit Court To Address The Question Agrees That Foreclosure Is A Necessary Element Of A Bundling Claim

The decision below does not create a circuit split or deviate from the decisions of other courts of appeals.

*First*, the Ninth Circuit, following the rule set forth in *Jefferson Parish*, has consistently required proof of foreclosure to support a tying or bundling claim. *See Blough v. Holland Realty, Inc.,* 574 F.3d 1084, 1089 (9th Cir. 2009) (holding that when "the tied product is completely unwanted by the buyer," a bundling arrangement is not unlawful "because there is no adverse effect on competition in the tied product market"); *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 912 (9th Cir. 2008) ("Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product."); *see also Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 543 (9th Cir. 1993) ("the essence of a *per se* unlawful tying arrangement . . . is that it *forecloses* competition in the market for the tied product or products") (emphasis in original), *overruled on other grounds, Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 657 (9th Cir. 1997); *Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1349 n.19 (9th Cir. 1982)

13

(rejecting argument that tying arrangements might violate the antitrust laws simply "because they intrude upon consumers' freedom of choice by compelling the purchase of unwanted products"). The court of appeals' decision in this case is in accord.

*Second*, other circuits likewise require a showing of foreclosure to support a tying or bundling claim. *See, e.g.*, *Reifert v. South Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006) (dismissing complaint by customer on ground that "[f]orcing a buyer to purchase a product he otherwise would not have purchased is insufficient to establish the foreclosure of competition"); *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 796 (1st Cir. 1988) (Breyer, J.) ("tying would hurt the Buyer or consumer only when it first hurts firms seeking to sell the tied product"); *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292-93 & n.13 (2d Cir. 1974); *see also Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 488 (3d Cir. 1992) (affirming summary judgment against tying claim, despite acknowledging that "some customers would be most happy purchasing every option or feature à la carte"). The Ninth Circuit's decision is no outlier, and does not conflict with any decision from any other circuit.

In their effort to escape this long and consistent line of precedent, Petitioners argue that the Ninth Circuit was guilty of "a rigid and formulaic approach" when it categorized their claim as bundling and then applied these precedents to it. Petition 15-16. But Petitioners themselves refer to the alleged restraints as "bundling" throughout both their Complaint and their Petition, *see, e.g.*, Petition 6-8, and offer no support in this Court's precedents or the decision of any court of appeals to suggest that the Ninth Circuit should *not* have relied on decisions involving other

14

forms of bundling in determining what is needed to allege injury to competition from bundling in this particular case.  As Justice Breyer has reminded us, "law, unlike economics, is an administrative system, the effects of which depend upon the content of rules and precedents only as they are applied by judges and juries in courts and by lawyers advising their clients."  *Leegin*, 551 U.S. at 914 (Breyer, J., dissenting).  As the long line of precedent cited above shows, the courts have consistently recognized, based on years of experience, that bundling can injure competition only where it forecloses competition, and Petitioners have abjured any such allegations.

## C.  Certiorari Is Not Otherwise Warranted

Petitioners assert several other grounds for certiorari, but none has merit.  They argue, for example, that the decision below errs in declining to address the theory that bundling can facilitate "price discrimination," which Petitioners assert ought to be cognizable as injury to competition.  As an initial matter, the argument is not even properly presented in a petition for certiorari because Petitioners did not emphasize it below and the Ninth Circuit did not address it.  "Price discrimination" has never been the crux of this case; by Petitioners' own assertion, this case principally is a "consumer class action charging deprivation of choice and overcharge," Petition 12 (quoting App. 68), not a case about the possible effects of indirect price discrimination.  The decision below does not even *mention* this price-discrimination theory, let alone offer a holding on how such allegations ought to be evaluated in some other case.  Certiorari plainly is not warranted in order to analyze a theory that Petitioners barely preserved, and that the decision below does not discuss.

15

In any event, Petitioners' theory of price discrimination is unsound on the merits and would not warrant the grant of certiorari even if it had been addressed. Despite the negative connotations of its name, price discrimination is ubiquitous and often desirable, as modern economic analysis confirms.[7] But even if price discrimination were undesirable, it would still not be a cognizable theory of injury to competition. Although Petitioners contend that price discrimination can increase monopoly profits, that is just another way of saying that it enables a firm to raise prices to some of its customers. And as the court of appeals correctly held, courts have long recognized that price increases are not injury to competition. App. 18-19. Price discrimination may disadvantage some consumers while benefiting others, but that issue has nothing to do with whether *competition* has been harmed. For this reason, no court has ever held illegal a tying or bundling arrangement that did not foreclose competition simply because it may have facilitated price discrimination and thereby raised prices.

This Court has never held or implied otherwise. Petitioners cite to a *concurring* opinion in *Jefferson Parish* (the very case holding that tying claim requires an exclusionary effect in the tied product market) and a *dissenting* opinion in a 1969 case, *Fortner Enterprises.* Petition 26-27 & n.6 (citing *Jefferson Parish*, 466 U.S. at 35 (O'Connor, J., concurring) and *Fortner Enter., Inc. v. United States Steel Corp.*, 394 U.S. 495, 513-14 (1969) (White, J., dissenting)). These citations simply reinforce the point that no court has *held* that "price

---

[7] *See*, *e.g.*, Shapiro & Varian, Information Rules 300 (Harv. Bus. School Press, 1998).

16

discrimination" alone constitutes injury to competition. The Petition does not present an opportunity to revisit the issue.

Nor does the decision below have any of the sweeping implications that Petitioners conjure. The decision is appropriately narrow and fact-bound; indeed, as Petitioners themselves suggest, this case is "unique." Petition 11. The specific holding is that *these particular plaintiffs* did not adequately plead that *these particular* bundling restrictions injured competition because *these particular plaintiffs* chose not to plead that the restrictions had any exclusionary effect. App. 17. The decision below does not "immunize" any conduct from antitrust scrutiny.[8]

Nor does the Petition present an opportunity to clarify the Court's recent decisions holding that allegations must "plausibly" state a claim to relief. App. 3 ("The Court would also have the opportunity to clarify standards governing a motion to dismiss under *Twombly* and *Iqbal*."). Nothing about this case depends on the plausibility of Petitioners' allegations about the bundling practices or the plausibility of their purportedly anticompetitive effects. Rather, the complaint failed because Petitioners eschewed any viable theory of injury to competition, regardless of

---

[8] Petitioners assert, for example, that the decision below will impair the ability of the government to protect consumers from vertical agreements with collusive effects through recent challenges to "most favored nations clauses" in the health care industry. Petition 4. Petitioners' argument disregards that the Justice Department has challenged these contractual provisions on the theory that they *foreclose* sales from rivals of the parties imposing the restraints -- the precise theory that Petitioners deliberately dropped in the instant case, leading to its dismissal. *See*, *e.g.*, *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665 (E.D. Mich. 2011).

17

how plausibly, specifically, or definitively they pleaded their factual allegations. The assertion that the Court should grant certiorari to clarify pleading standards is nothing more than another attempt by Petitioners to create a "compelling reason[]" where none exists.

Finally, Petitioners urge that review of this case could provide guidance as to the application of the rule of reason to "industry-wide" restraints. Petition 3. But Petitioners have made clear (and the decision below reflects) that Petitioners challenge purely vertical restraints; there are no allegations of *any* horizontal coordination among either the Programmers or the Distributors. Petition 13 (case is founded on a "series of parallel vertical restraints").

Petitioners have suggested in prior briefing that the purportedly anticompetitive effects of the various separate vertical agreements should be *aggregated* together for purposes of determining whether their *collective* benefits outweighed their *collective* detriments. App. 21 (describing and rejecting argument for aggregation of anticompetitive effects). But the decision below did not address the propriety of "aggregating" anticompetitive effects of separate vertical agreements to which Petitioners allude. Rather, as the decision recognized, Petitioners had not alleged that *any* of the vertical agreements resulted in *any* injury to competition. App. 22. The holding that none of the alleged restraints caused any cognizable injury to competition moots the question whether any purported anticompetitive effects of the "industry-wide" restraints should be aggregated. In other words, zero plus zero equals zero. *Cf.* App. 22. Consequently, this case does not present an opportunity to consider whether the effects of separate vertical agreements that *do* cause

18

cognizable injuries to competition should be aggregated.[9]

## III. CONCLUSION

For all the foregoing reasons, the petition should be denied.

Respectfully submitted,

WILLIAM KOLASKY
JONATHAN E. NUECHTERLEIN
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20006
TELEPHONE: (202) 663-6000
FACSIMILE: (202) 663-6363
*Counsel for Respondent The Walt Disney Company*

GLENN D. POMERANTZ
DAVID C. DINIELLI
FRED A. ROWLEY, JR.
*Counsel of Record*
MUNGER, TOLLES & OLSON LLP
355 S. GRAND AVE., 35TH FL.
LOS ANGELES, CA 90071-1560
TELEPHONE: (213) 683-9100
FACSIMILE (213) 687-3702
FRED.ROWLEY@MTO.COM
*Counsel for Respondent Fox Entertainment Group, Inc.*

---

[9] Petitioners' repeated complaints that the Ninth Circuit "misread" the complaint, or gave its allegations a "selective reading," plainly do not justify review. *See* Petition 23 (Ninth Circuit "selectively ignored" allegations), 24 ("The Ninth Circuit Mischaracterized The Complaint"); 25 (the decision constitutes a "transparent misreading"). *Cf.* Supreme Court Rule 10 ("A petition for certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law."). Nor does the suggestion that this Court should grant review for the facially improper purpose of "shaping" the future distribution of television justify review. *Cf.* Petition 3.

19

JOSEPH F. TRINGALI
PAUL SIRKIS
SIMPSON THACHER &
BARTLETT LLP
425 LEXINGTON AVENUE
NEW YORK, NY 10017-3954
TELEPHONE: (212) 455-2000
FACSIMILE: (212) 455-2502

CHET A. KRONENBERG
SIMPSON THACHER &
BARTLETT LLP
1999 AVENUE OF THE STARS
29TH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: (310) 407-7500
FACSIMILE: (310) 407-7502
*Counsel for Respondent Viacom, Inc.*

RONALD C. REDCAY
JOHN D. LOMBARDO
ARNOLD & PORTER LLP
777 SOUTH FIGUEROA STREET
44TH FLOOR
LOS ANGELES, CA 90017-5844
TELEPHONE: (212) 243-4000
FACSIMILE: (213) 243-4199
*Counsel for Respondent*
*NBC Universal*

ROBERT A. SACKS
SULLIVAN & CROMWELL LLP
1888 CENTURY PARK EAST
LOS ANGELES, CA 90067
TELEPHONE: (310) 712-6600
FACSIMILE: (310) 712-8800
*Counsel for Respondent*
*Cablevision Systems Corporation*

PETER T. BARBUR
CHRISTOPHER D. BELELIEU
CRAVATH, SWAINE & MOORE LLP
825 EIGHTH AVENUE
NEW YORK, NY 10019
TELEPHONE: (212) 474-1155
FACSIMILE: (212) 474-3700

BRYAN A. MERRYMAN
WHITE & CASE LLP
633 WEST FIFTH STREET
SUITE 1900
LOS ANGELES, CA 90071-2007
TELEPHONE: (213) 620-7700
FACSIMILE: (213) 452-2329
*Counsel for Respondent*
*Turner Broadcasting System, Inc.*

DANIEL G. SWANSON
JAY SRINIVASAN
GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE
46TH FLOOR
LOS ANGELES, CA 90071
TELEPHONE: (213) 229-7000
FACSIMILE: (213) 229-7520
*Counsel for Respondent*
*CoxCom, Inc.*

RICHARD R. PATCH
SUSAN K. JAMISON
LAUREN S. KOWAL
COBLENTZ, PATCH, DUFFY
& BASS LLP
ONE FERRY BUILDING, SUITE 200
SAN FRANCISCO, CA 94111
TELEPHONE: (415) 391-4800
FACSIMILE: (415) 989-1663

# EXHIBIT B

FILED

2007 DEC 21  PM 3:44

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

1  Arthur J. Burke (State Bar No. 229589)
2  Arthur.Burke@dpw.com
   DAVIS POLK & WARDWELL
3  1600 El Camino Real
   Menlo Park, California 94025
4  Telephone:  (650) 752-2000
   Facsimile:   (650) 752-2111
5
6  *Attorney for Defendant*
   COMCAST CABLE
7  COMMUNICATIONS, LLC

8  *[Attorneys for Other Distributor Defendants*
9  *Listed on Following Pages]*

10              UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
11                    WESTERN DIVISION

12  ROB BRANTLEY, DARRYN            )  CASE NO. CV07-06101 CAS(VBKx)
    COOKE, WILLIAM and BEVERLY     )
13  COSTLEY, CHRISTIANA HILLS,     )
    MICHAEL B. KOVAC, MICHELLE     )
14  NAVARRETTE, TIMOTHY J.         )
15  STABOSZ and JOSEPH VRANICH,    )  **DISTRIBUTOR DEFENDANTS'**
    individually and on behalf of all others )  **NOTICE OF MOTION AND**
16  similarly situated,            )  **MOTION TO DISMISS**
                                   )  **PLAINTIFFS' FIRST AMENDED**
17              Plaintiffs,        )  **COMPLAINT FOR DAMAGES**
                                   )  **AND INJUNCTIVE RELIEF FOR**
18       v.                        )  **VIOLATIONS OF THE**
                                   )  **SHERMAN ANTITRUST ACT (15**
19  NBC UNIVERSAL, INC., VIACOM,   )  **U.S.C. § 1); MEMORANDUM OF**
20  INC., THE WALT DISNEY          )  **POINTS AND AUTHORITIES**
    COMPANY, FOX                   )
21  ENTERTAINMENT GROUP, INC.,     )
    TIME WARNER INC., TIME         )  Judge:      Hon. Christina A. Snyder
22  WARNER CABLE INC., COMCAST     )
    CORPORATION, COMCAST CABLE     )
23  COMMUNICATIONS, LLC,           )  Date:       March 10, 2008
    COXCOM, INC., THE DIRECTV      )  Time:       10:00 a.m.
24  GROUP, INC., ECHOSTAR          )  Courtroom: 5
25  SATELLITE L.L.C., CHARTER      )
    COMMUNICATIONS, INC. and       )
26  CABLEVISION SYSTEMS            )
    CORPORATION,                   )
27                                 )
               Defendants.         )
28                                 )
                                   )

CONFORMED

Sanford M. Litvack (State Bar No. 177721)
slitvack@hhlaw.com
David R. Singer (State Bar No. 204699)
drsinger@hhlaw.com
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Fax: (310) 785-4601

David Dunn (*pro hac vice*)
ddunn@hhlaw.com
HOGAN & HARTSON LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

*Attorneys for Defendant*
CHARTER COMMUNICATIONS, INC.


Richard R. Patch (State Bar No. 88049)
rrp@cpdb.com
Susan K. Jamison (State Bar No. 131867)
skj@cpdb.com
Lauren S. Kowal (State Bar No. 224976)
lsk@cpdb.com
COBLENTZ, PATCH, DUFFY & BASS LLP
One Ferry Building, Suite 200
San Francisco, CA 94111-4213
Telephone: (415) 391-4800
Fax: (415) 989-1663

*Attorneys for Defendant*
ECHOSTAR SATELLITE L.L.C.

1   Jeffrey S. Davidson (State Bar No. 143633)
    jdavidson@kirkland.com
2   Melissa D. Ingalls (State Bar No. 174861)
    mingalls@kirkland.com
3   Christopher T. Casamassima (State Bar No. 211280)
    ccasamassima@kirkland.com
4   KIRKLAND & ELLIS LLP
5   777 South Figueroa Street
    Los Angeles, CA 90017
6   Telephone: (213) 680-8400
7   Fax: (213) 680-8500

8   *Attorneys for Defendant*
    THE DIRECTV GROUP, INC.
9

10

11  Daniel G. Swanson (State Bar No. 116556)
    dswanson@gibsondunn.com
12  Jay Srinivasan (State Bar No. 181471)
    jsrinivasan@gibsondunn.com
13  Wyatt E. Bloomfield (State Bar No. 240943)
    wbloomfield@gibsondunn.com
14  GIBSON, DUNN & CRUTCHER LLP
15  333 So. Grand Avenue, 46th Floor
    Los Angeles, CA 90071-3197
16  Telephone: (213) 229-7000
    Fax: (213) 229-7520
17
    *Attorneys for Defendant*
18  COXCOM, INC.

19

20

21

22

23

24

25

26

27

28

Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Teena-Ann V. Sankoorikal (*pro hac vice*)
tsankoorikal@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Fax: (212) 474-3700

Bryan A. Merryman (State Bar No. 134357)
bmerryman@whitecase.com
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071-2007
Telephone: (213) 620-7700
Fax: (213) 452-2329

*Attorneys for Defendant*
TIME WARNER CABLE INC.


Robert A. Sacks (State Bar No. 150146)
sacksr@sullcrom.com
Diane L. McGimsey (State Bar No. 234953)
mcgimseyd@sullcrom.com
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067
Telephone: (310) 712-6600
Fax: (310) 712-8800

*Attorneys for Defendant*
CABLEVISION SYSTEMS CORPORATION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on March 10, 2007, at 10:00 a.m., or as soon thereafter as may be heard before the Honorable Christina A. Snyder, in Courtroom No. 5 located at 312 N. Spring Street, Los Angeles, California, 90012, defendants Time Warner Cable Inc., Comcast Cable Communications, LLC, CoxCom, Inc., the DIRECTV Group, Inc., EchoStar Satellite L.L.C., Charter Communications, Inc., and Cablevision Systems Corp., pursuant to Rule 12 of the Federal Rules of Civil Procedure, will and hereby do move the Court for an Order dismissing plaintiffs' First Amended Complaint For Damages And Injunctive Relief For Violations of the Sherman Antitrust Act (15 U.S.C. § 1) for failure to state a claim;

PLEASE TAKE FURTHER NOTICE that this Motion is based upon this Notice of Motion, Motion and the attached Memorandum of Points and Authorities, all pleadings, records and papers on file in this action, and on any such further or other matter the Court deems proper at the hearing on this motion;

PLEASE TAKE FURTHER NOTICE that this Motion is made following the conference of counsel pursuant to Local Civil Rule 7-3, which took place on November 21, 2007; and

1         PLEASE TAKE FURTHER NOTICE that any opposition to the relief

2    requested herein must be filed by February 8, 2008, with reply to follow on or before

3    February 29, 2008 pursuant to the Stipulation and Order entered on December 7,

4    2007.

5    Dated: December 21, 2007        Respectfully Submitted,

6                      DAVIS POLK & WARDWELL

7

8                  By

9                      ARTHUR J. BURKE

10                     DAVID B. TOSCANO
                       RAJESH S. JAMES

11                     *Attorneys for Defendant*
                       COMCAST CABLE

12                     COMMUNICATIONS, LLC

13                     (Signed with permission for all distributor

14                     defendants)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 4

    A.    The Parties ................................................................................. 4

    B.    The Alleged Relevant Market ................................................... 5

    C.    The Challenged Conduct and Relief Sought ............................ 6

ARGUMENT ...................................................................................................... 7

I.    THE AMENDED COMPLAINT FAILS
    TO PLEAD A SHERMAN ACT SECTION 1
    CLAIM AND MUST BE DISMISSED ................................................. 7

    A.    The Amended Complaint Fails to Allege
         Injury to Competition in a Relevant Market ............................. 8

        1.    The Amended Complaint Fails Adequately
            to Allege Product and Geographic Markets ..................... 8

        2.    The Amended Complaint
            Fails to Allege Market Power ......................................... 10

        3.    The Amended Complaint Fails
            to Allege an Injury to Competition ................................. 12

        4.    Plaintiffs Fail to State a Claim for
            "Tying" or "Block Booking" ........................................... 14

    B.    The Complaint Does Not Plead
         an Unlawful Agreement .......................................................... 16

II.    PLAINTIFFS LACK STANDING TO
    PURSUE THEIR CLAIMS ................................................................ 19

    A.    Plaintiffs Fail to Allege Antitrust Injury ................................ 20

        1.    Plaintiffs Do Not Participate in
            the Alleged Relevant Market .......................................... 20

i

2.    Plaintiffs Fail to Allege
Causation or Injury-in-Fact .............................................. 21

B.    Plaintiffs' Claims Are Barred
Under *Illinois Brick* ......................................................... 22

C.    Plaintiffs' Damages Claims Are Speculative,
Would Require Complex Apportionment, and
Risk Duplicative Recovery ........................................ 23

CONCLUSION ........................................................................... 25

ii

1  where no individual defendant "attract[ed] a dominant share of the viewing

2  audience"); *accord R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 619 F. Supp.

3  441, 451 n.8 (N.D. Cal. 1985) ("aggregating individual defendant's market shares"

4  improper absent "evidence that the defendants acted jointly"), *aff'd on other grounds*,

5  890 F.2d 139 (9th Cir. 1989) (en banc).

6  In sum, plaintiffs' failure to plead a relevant market or market power is

7  fatal to the Amended Complaint.[5]

8  ### 3.   The Amended Complaint Fails to Allege

9  ### an Injury to Competition.

10  In addition to the deficiencies with respect to market definition and

11  market power pleadings, the Amended Complaint is also deficient because it fails to

12  allege facts indicating that the challenged vertical agreements have had an adverse

13  effect on competition in any relevant market. "Proof that the defendant's activities

14  had an impact upon competition in a relevant market is an *absolutely essential*

15  *element* of the rule of reason case," and "failure to allege injury to competition is a

16  proper ground for dismissal." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812–13

17  (9th Cir. 1988) (emphasis added); *Les Shockley Racing, Inc.*, 884 F.2d at 508;

18  *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979). The Amended

19  Complaint contains only conclusory allegations of injury to competition and alleges

20  no facts indicating that the conduct of which plaintiffs complain has impaired

21

22  [5] Plaintiffs may not attempt to establish market power by reliance upon their allegation that cable subscription rates have risen over the past ten years. (FAC

23  ¶ 46.) As discussed below (*see infra* I.A.3), they do not tether this alleged rate increase to any anticompetitive conduct. "[P]ricing effects absent a further showing

24  of anticompetitive conduct . . . are generally consistent with both procompetitive and

25  anticompetitive theories," *Leegin*, 127 S. Ct. at 2718 (internal quotation marks omitted), and as such, cannot support a Section 1 claim, *Twombly*, 127 S. Ct. at 1974.

26  Moreover, plaintiffs do not even define the retail market in which these alleged price increases occurred. A plaintiff may not avoid the requirement of defining a relevant

27  market and pleading facts showing market power by vaguely alleging that the price of an unspecified product has risen in an undefined market. *See Republic Tobacco*

28  *Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004).

-12-

1   competition in any market. *See Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d

2   729, 735 (9th Cir. 1987) (affirming dismissal of complaint because plaintiff relied

3   solely upon "conclusory language regarding the elimination of competition").

4           The courts have held, across a broad range of contexts, that vertical,

5   non-price restraints (such as those challenged here) cannot adversely affect

6   competition—and thus, cannot unreasonably restrain trade—unless they have the

7   effect of *foreclosing competition* or *excluding competitors* from a relevant market.[6]

8   As the court explained in *Masimo Corp. v. Tyco Health Care Group, L.P.*, No. CV-

9   02-4770-MRP, 2006 U.S. Dist. LEXIS 29977 (C.D. Cal. Mar. 22, 2006), in rule of

10   reason cases, "'[o]nly those arrangements whose 'probable' effect is to 'foreclose'

11   competition in a substantial share of the line of commerce affected violate the

12   antitrust laws." *Id.* at *8.

13           The Amended Complaint does not plead facts demonstrating (or even

14   suggesting) that the alleged vertical agreements have had the effect of foreclosing

15   competition or excluding competitors from any relevant market.  Instead, plaintiffs

16   allege only that defendants' conduct "deprived consumers of choice" and "forced

17   them to pay for cable channels they do not want and do not watch" (ostensibly in

18   some market other than the specifically alleged "relevant market").  (FAC ¶ 5.)

19   Simply put, this is not injury to competition.  As the U.S. Supreme Court has

20   explained (in the context of a tying claim), "[w]hen a purchaser is 'forced' to buy a

21   product he would not have otherwise bought . . . there can be no adverse impact on

22

---

23           [6] *See, e.g., Western Parcel Express v. UPS of Am.*, 190 F.3d 974, 976, 976 n.1
24   (9th Cir. 1999) (volume discount contracts "did not foreclose consumers from
     entering into contracts with other delivery service providers" and therefore did not
25   unreasonably restrain trade in violation of Section 1); *Omega Envtl., Inc. v. Gilbarco,
     Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) ("Exclusive dealing is an unreasonable
26   restraint on trade only when a significant fraction of buyers or sellers are frozen out
     of a market by the exclusive deal." (internal quotation marks omitted)); *Barry
27   Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.)
28   (applying "substantial foreclosure" test to partial requirements contract), *cited with
     approval by Omega Envtl.*, 127 F.3d at 1162.

-13-

1  competition because no portion of the market which would otherwise have been

2  available to other sellers has been foreclosed." *Jefferson Parish*, 466 U.S. at 16.[7]

3       Indeed, several courts, relying on the Supreme Court's statement, have

4  dismissed antitrust claims by cable subscribers that they were "forced" to purchase

5  additional "unwanted" channels on the ground that such claims fail to demonstrate

6  any exclusion of competitors or injury to competition.  In *Belton v. Comcast Cable*

7  *Holdings, LLC*, 151 Cal. App. 4th 1224, 60 Cal. Rptr. 3d 631 (2007), for example,

8  the court held that cable subscribers did not state an antitrust tying claim by alleging

9  that they were forced to purchase basic television programming that they did not

10 want in order to receive FM or music services from defendant.  Since plaintiffs

11 would not otherwise have purchased the basic cable television programming, the

12 alleged business practice "could not have foreclosed or injured competition." *Id.* at

13 1234–36.  Similarly, in *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 78 Cal. Rptr.

14 2d 133 (1998), the court rejected plaintiffs' attempt to state an unlawful "tying"

15 claim based on the theory that defendant required them to purchase broadcast

16 channels as a prerequisite for purchasing satellite and premium cable channels. *Id.* at

17 543–45.  The plaintiffs there (as in this case) had conceded that they would not buy

18 broadcast channels at all if not for the challenged conduct: "This concession

19 establishes that the challenged practice has no effect on competition in the tied

20 product market." *Id.* at 543.

21    **4.    Plaintiffs Fail to State a Claim for**

22         **"Tying" or "Block Booking."**

23       The Amended Complaint casually invokes a number of antitrust

24 buzzwords associated with vertical restraints of trade, like "tying" and "block

25 booking."  Plaintiffs accomplish nothing, however, "merely by dressing [their

26 _____

27  [7] *See also Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1349 n.19 (9th
   Cir. 1982) ("[I]ntru[sion] upon consumers' freedom of choice by compelling the

28 purchase of unwanted products . . . has been implicitly rejected by the Supreme Court
   as a sufficient independent basis for antitrust liability.").

-14-

# EXHIBIT C

RANDALL LEE (State Bar No. 152672)
randall.lee@wilmerhale.com
WILMER CUTLER PICKERING HALE and DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

A. DOUGLAS MELAMED (*pro hac vice*)
douglas.melamed@wilmerhale.com
STEVEN F. CHERRY (*pro hac vice*)
steven.cherry@wilmerhale.com
BRIAN M. SIMMONDS (*pro hac vice*)
brian.simmonds@wilmerhale.com
WILMER CUTLER PICKERING HALE and DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
THE WALT DISNEY COMPANY

[*Attorneys for Other Moving Defendants
Listed on Following Pages*]

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| ROB BRANTLEY, et al., | ) CASE NO. CV07-06101 CAS (VBKx) |
| Plaintiffs, | ) **DEFENDANTS' MEMORANDUM** |
| | ) **OF POINTS AND AUTHORITIES IN** |
| vs. | ) **SUPPORT OF MOTION TO** |
| | ) **DISMISS PLAINTIFFS' THIRD** |
| NBC UNIVERSAL, INC., et al., | ) **AMENDED COMPLAINT FOR** |
| | ) **DAMAGES AND INJUNCTIVE** |
| Defendants. | ) **RELIEF FOR VIOLATIONS OF THE** |
| | ) **SHERMAN ANTITRUST ACT (15** |
| | ) **U.S.C. § 1); DEFENDANTS'** |
| | ) **OPPOSITION TO PLAINTIFFS'** |
| | ) **MOTION TO ADJUDICATE THAT** |
| | ) **FORECLOSURE IS NOT AN** |
| | ) **ELEMENT OF PLAINTIFFS'** |
| | ) **ANTITRUST INJURY** |
| | ) |
| | ) DATE: July 13, 2009 |
| | ) TIME: 10:00 a.m. |
| | ) PLACE: Courtroom 5 |
| | ) |
| | ) Hon. Christina A. Snyder |

Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

Bryan A. Merryman (State Bar No. 134357)
bmerryman@whitecase.com
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071-2007
Telephone: (213) 620-7700
Facsimile: (213) 620-7700

*Attorneys for Defendants*
TURNER BROADCASTING SYSTEM, INC. and
TIME WARNER CABLE INC.


RONALD C. REDCAY (State Bar. No. 67236)
Ronald.Redcay@aporter.com
JOHN D. LOMBARDO (State Bar No. 187142)
John.Lombardo@aporter.com
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

*Attorneys for Defendant*
NBC UNIVERSAL

GLENN D. POMERANTZ (State Bar No. 112503)
Glenn.Pomerantz@mto.com
DAVID C. DINIELLI (State Bar No. 177904)
David.Dinielli@mto.com
ELISABETH J. NEUBAUER (State Bar No. 241116)
Elisabeth.Neubauer@mto.com
MUNGER TOLLES & OLSON LLP
355 South Grand Avenue, Thirty Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213)687-3702

*Attorneys for Defendant*
FOX ENTERTAINMENT GROUP, INC.

1    KENNETH R. LOGAN (*pro hac vice*)
2    klogan@stblaw.com
     JOSEPH F. TRINGALI (*pro hac vice*)
3    jtringali@stblaw.com
     SIMPSON THACHER & BARTLETT LLP
4    425 Lexington Avenue
     New York, NY  10017
5    Telephone:  (212) 455-2000
     Facsimile: (212) 455-2502
6
7    CHET A. KRONENBERG (State Bar No. 222335)
     ckronenberg@stblaw.com
8    SIMPSON THACHER & BARTLETT LLP
     1999 Avenue of the Stars, 29th Floor
9    Los Angeles, CA  90067
     Telephone:  (310) 407-7500
10   Facsimile:  (310) 407-7502
11
     *Attorneys for Defendant*
12   VIACOM, INC.
13
     Robert A. Sacks (State Bar No. 150146)
14   sacksr@sullcrom.com
     Diane L. McGimsey (State Bar No. 234953)
15   mcgimseyd@sullcrom.com
     SULLIVAN & CROMWELL LLP
16   1888 Century Park East
     Los Angeles, CA  90067
17   Telephone:  (310) 712-6600
     Facsimile:  (310) 712-8800
18
19   *Attorneys for Defendant*
     CABLEVISION SYSTEMS CORPORATION
20
21   Arthur J. Burke (State Bar No. 229589)
     Arthur.Burke@dwp.com
22   DAVIS, POLK & WARDWELL
     1600 El Camino Real
23   Menlo, CA  94025
     Telephone:  (650) 752-2000
24   Facsimile:  (650) 752-2111
25
     *Attorney for Defendants*
26   COMCAST CORPORATION and
     COMCAST CABLE COMMUNICATIONS, LLC
27
28

1    Daniel G. Swanson (State Bar No. 116556)
     dswanson@gibsondunn.com
2    Jay Srinivasan (State Bar No. 181471)
     jsrinivasan@gibsondunn.com
3    GIBSON, DUNN & CRUTCHER LLP
     333 So. Grand Avenue, 46th Floor
4    Los Angeles, CA 90071-3197
     Telephone: (213) 229-7000
5    Facsimile: (213) 229-7520

6    *Attorneys for Defendant*
7    COXCOM, INC.

8
     Richard R. Patch (State Bar No. 88049)
9    rrp@cpdb.com
     Susan Jamison (State Bar No. 131867)
10   skj@cpdb.com
     Lauren S. Kowal (State Bar No. 224976)
11   lsk@cpdb.com
     COBLENTZ, PATCH, DUFFY & BASS LLP
12   One Ferry Building, Suite 200
     San Francisco, CA 94111-4213
13   Telephone: (415) 391-4800
     Facsimile: (415) 989-1663
14

15   *Attorneys for Defendant*
     DISH NETWORK L.L.C., as successor to
16   ECHOSTAR SATELLITE L.L.C.

17
     Jeffrey S. Davidson (State Bar No. 143633)
18   jeffrey.davidson@kirkland.com
     Melissa D. Ingalls (State Bar No. 174861)
19   melissa.ingalls@kirkland.com
     Christopher T. Casamassima (State Bar No. 211280)
20   chris.casamassima@kirkland.com
     KIRKLAND & ELLIS LLP
21   777 South Figueroa Street
     Los Angeles, California 90017
22   Telephone: (213) 680-8400
     Facsimile: (213) 680-8500
23

24   *Attorneys for Defendant*
25   THE DIRECTV GROUP, INC.

26

27

28

---

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 4

I.   WHERE NO HORIZONTAL AGREEMENT IS ALLEGED, INJURY
     TO THE COMPETITIVE PROCESS MUST BE SHOWN BY
     EXCLUSION OR FORECLOSURE OF RIVALS ......................................... 6

     A.   Vertical Distribution Agreements That Restrict Consumer Choice
          or Cause Higher Prices Do Not, Without More, Violate Section 1 ....... 7

     B.   Conduct That "Overcharges" Consumers  Does Not Violate the
          Antitrust Laws Absent Harm to the Competitive Process ..................... 9

II.  THE LAW IS CLEAR THAT BUNDLING IS LAWFUL ABSENT
     HORIZONTAL AGREEMENT OR FORECLOSURE OF RIVALS ........... 11

III. THE CASES ON WHICH PLAINTIFFS RELY ARE NOT TO THE
     CONTRARY AND DO NOT SUPPORT PLAINTIFFS' MOTION ........... 13

     A.   The Cases on Which Plaintiffs Principally Rely Illustrate the Flaw
          in Their Motion ................................................................................. 14

     B.   Plaintiffs' Other Authorities Are Similarly Inapposite ....................... 15

CONCLUSION ....................................................................................................... 21

# **INTRODUCTION**

Plaintiffs' Third Amended Complaint (TAC) challenges under Section 1 of the Sherman Act, 15 U.S.C. § 1, various vertical agreements between individual Programmer Defendants and individual Distributor Defendants that allegedly require the sale of video programming to subscribers in bundles or packages, rather than a la carte. The TAC alleges that these wholesale agreements restrict retail consumers' ability to choose the programming they will purchase and cause those consumers who would otherwise purchase only a few programming channels to spend more money on video programming than they would prefer.[1]

On two previous occasions, this Court has addressed the requirement that, in order to state a claim under the antitrust laws, Plaintiffs in this case must allege that the vertical agreements they challenge cause "injury to competition" by foreclosing competing programmers. On the first occasion, this Court granted the defendants' motion to dismiss the First Amended Complaint (FAC) (with leave to amend) because Plaintiffs had failed to allege such foreclosure. (March 10, 2008 Minute Order (Doc. 100) at 5–7.) In particular, in a section of its order entitled "**Pleading of Injury to Competition,**" the Court noted that "[t]he FAC pleads neither a horizontal agreement nor exclusion of competitors." (*See id.* at 7.)

Plaintiffs attempted to cure this pleading deficiency by inserting new allegations into the Second Amended Complaint (SAC) to the effect that "independent channels . . . are excluded because the programmer contracts require the distributors to take all the programmers' channels." (*See* SAC (Doc. 107 (3/20/2008)) ¶ 44.) Relying on these new allegations, the Court denied defendants' challenge to the SAC. The Court again devoted several pages in its written order to the injury to competition requirement. (*See* June 25, 2008 Minute Order (Doc. 120) at 4–6 (again entitled "**Pleading of Injury to Competition**").) The Court permitted

---

[1] The TAC does not allege that any subscription agreements between the Distributors and their retail customers themselves violate the Sherman Act.

the case to proceed because the SAC "include[d] allegations of competitor exclusion caused by the allegedly anticompetitive behavior."  (*See id.* at 4.)

Now, almost a year after filing the SAC specifically to add the allegations of foreclosure, Plaintiffs have filed the TAC, amending their claims by deleting the very foreclosure allegations on which the Court had relied in denying Defendants' motions to dismiss the SAC.  Plaintiffs contend that the deleted allegations have "no place" in this action and concede that those allegations are "not what the plaintiffs' claim is about."  (*See* Joint Rep. re March 9, 2009 Status Conf. (Doc. 171 (3/5/2009)) at 2.)  It is now clear that Plaintiffs added the foreclosure allegations to the SAC simply in order to survive a motion to dismiss, not because those allegations had any substance.

Plaintiffs' Motion To Adjudicate is, in effect, a motion for reconsideration of the Court's prior decisions requiring them to plead foreclosure of competitors.  The purported basis for the motion are two recent decisions that, Plaintiffs assert, "have made abundantly clear that deprivation of choice coupled with a net consumer welfare loss constitute[s] '*antitrust injury.*'"  (*See* Pls.' Mem. at 2 (emphasis added)).  Plaintiffs argue, on the basis of these decisions, that their "case is perfected by proof of deprivation of choice and overcharge" (*id.* at 1), which they define as "the additional amount consumers, in the aggregate, pay for the networks they want to watch as compared to what they would pay if separate pricing (a la carte offerings) were available" (*id.* at 1 n.1).[2]

Plaintiffs' argument is based on a fundamental confusion of two distinct elements of a private antitrust claim: the requirement of harm to the

---

[2]    Because both Plaintiffs' Motion To Adjudicate and Defendants' Motion To Dismiss are made on the pleadings, this memorandum assumes that the facts alleged by the TAC are true.  Should Plaintiffs' case be allowed to proceed, however, Defendants intend vigorously to dispute those allegations.  In addition, because these motions are made on the pleadings, the Court should disregard the additional assertions made in Plaintiffs' memorandum (many of which Defendants vigorously dispute), but not in the TAC.  (*See* March 10, 2008 Minute Order (Doc. 100) at 3–4 & n.2.)

competitive process ("injury to competition") needed to establish an antitrust *violation*, and the requirement that the plaintiff suffered a cognizable injury caused by the violation ("antitrust injury") sufficient to establish its antitrust *standing*. *See, e.g., E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 28 n.3 (2nd Cir. 2006) ("[T]he failure to allege harm to competition is analytically distinct from failure to plead antitrust injury . . . ."). The TAC does not state an antitrust claim because it does not allege injury to *competition*. *See, e.g., American Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir. 1996) (under the rule-of-reason, plaintiffs must show "an actual injury to competition occurs"); *E & L Consulting, Ltd.*, 472 F.3d at 28 n.3 ("a violation of the antitrust laws . . . under Section 1, must involve an injury to competition").[3]

The two recent cases on which Plaintiffs rely—*Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991 (9th Cir. 2008), and *Ross v. Bank of America*, 524 F.3d 217 (2d Cir. 2008)—may or may not support the broad proposition that "deprivation of choice" might constitute a cognizable injury in cases where there is injury to competition, but neither case can in any way be read to suggest that deprivation of consumer choice can satisfy a plaintiff's burden to plead and prove the separate element of *injury to competition*. As we explain below, the court in *Theme Promotions* emphasized that the violation there entailed an injury to competition from the foreclosure of rivals, and *Ross* involved alleged injury to competition from a horizontal agreement among competitors.

---

[3] The Distributor Defendants are filing contemporaneously herewith a Motion to Dismiss the TAC on the ground that Plaintiffs are indirect purchasers of television programming and thus lack standing to challenge the agreements between the Programmers and the Distributors. The injury to competition issue addressed here is generally regarded as antecedent to the standing issue. *See Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1318 (9th Cir. 1996). In any case, if the Court considers and grants the standing motion, it should necessarily dismiss the TAC as to all Defendants, including the Programmer Defendants, who are only indirect suppliers of Plaintiffs.

Plaintiffs are correct that "Congress designed the Sherman Act as a 'consumer welfare prescription.'"  (Pls.' Mem. at 11 (quoting *NCAA*, 468 U.S. at 107, 104 S. Ct. at 2963).)  But as even the cases they cite make clear, that goal is effectuated through protecting the competitive process, not by judicial prohibition of all "restrictions on consumer choice that harm consumer welfare."  (Pls.' Mem. at 11 (capitalization modified).)  Antitrust law protects consumers only from harm caused by injury to the competitive process.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995); *Geneva Pharmaceuticals Tech. Corp.*, 386 F.3d 485, 489 (2d Cir. 2004); *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 794 (1st Cir. 1988) (Breyer, J.).  Because the TAC does not allege injury to the competitive process, it should be dismissed with prejudice.

## **ARGUMENT**

To state a Section 1 claim, a plaintiff must allege, not only that it was harmed by the defendants' agreement, but also that the agreement injured competition.  *E.g., Austin v. McNamara*, 979 F.2d 728, 730 (9th Cir. 1992); *Eizonas, Inc. v. Dollar Sav. & Trust Co.*, 12 F.3d 212, 1993 WL 501597 at *2 (6th Cir. 1993) ("Allegations of facts which, if proven, would establish injury to competition are an essential element of a claim under section 1 of the Sherman Act.").  Some types of agreements, such as horizontal price fixing, are presumed to injure competition and are thus unlawful per se.  *See, e.g., Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S. Ct. 1551, 1562, 60 L. Ed. 2d 1 (1979); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50, 97 S. Ct. 2549, 2557, 53 L. Ed. 2d 568 (1977).  Antitrust claims regarding other types of agreements, such as the vertical agreements challenged by the TAC, are assessed under the rule of reason and require the plaintiff to prove actual harm to the competitive process.  *Alliance Shippers, Inc. v. Southern Pacific Transp. Co.*, 858 F.2d 567, 570 (9th Cir. 1988) ("An essential element of a Section 1 violation under the rule of reason is injury to competition in the relevant market.").

- 4 -

# EXHIBIT D

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | MB Docket No. 11-128 |
| The Regional Sports Network | ) | |
| Marketplace | ) | |

**COMMENTS OF CABLEVISION SYSTEMS CORPORATION**

Michael E. Olsen
Senior Vice President, Legal
   Regulatory and Legislative Affairs
Cablevision Systems Corp.
1111 Stewart Avenue
Bethpage, NY 11714
(516) 803-2300

Howard J. Symons
Christopher J. Harvie
Ernest C. Cooper
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
   AND POPEO, P.C.
701 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C.  20004
(202) 434-7300

September 9, 2011

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY ...........................................................................................1

I.      GUARANTEED ACCESS TO RSNs IS NOT NECESSARY TO ENSURE MVPD
        COMPETITION ....................................................................................................................3

II.     CONSUMER WELFARE IS ENHANCED WHEN RSNs ARE EMPLOYED AS A
        COMPETITIVE DIFFERENTIATOR ..............................................................................11

III.    THE COMMISSION SHOULD ESTABLISH A MECHANISM TO ALLOW FOR
        THE REMOVAL OF CONSTRAINTS ON RSN DISTRIBUTION IN
        COMPETITIVE VIDEO MARKETS ................................................................................13

IV.     THE COMMISSION SHOULD ALLOW THE EXCLUSIVITY BAN TO SUNSET
        IN 2012 ...............................................................................................................................18

CONCLUSION................................................................................................................................19

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| The Regional Sports Network | ) |
| Marketplace | ) |

MB Docket No. 11-128

## COMMENTS OF CABLEVISION SYSTEMS CORPORATION

Cablevision Systems Corporation ("Cablevision") hereby submits these comments in
response to the Commission's Public Notice in the above-captioned proceeding.[1/] As
demonstrated below, and as Congress intended, substantial multichannel video programming
distributor ("MVPD") competition prevalent today in many local markets around the country has
eliminated any need for the ban on exclusivity or other regulatory restrictions on the distribution
of regional sports networks ("RSNs") to MVPDs.

## INTRODUCTION AND SUMMARY

The case for subjecting RSNs to a special set of rules, at best suspect in 2006, is now no
longer viable.  Government-guaranteed access to RSNs – and, indeed, to any programming – is
no longer necessary to ensure that consumers have a meaningful choice of viable video service
providers.

With the entry of AT&T and Verizon into the video marketplace since 2006, residents in
numerous markets throughout the country have a choice of four strong and durable MVPDs.
Each of these distributors offers hundreds of channels of video programming and thousands of

---

[1/]　　　*See Media Bureau Seeks Comments on the Regional Sports Network Marketplace*, MB Docket
No. 11-128, Public Notice, DA 11-1238 (July 26, 2011) ("Public Notice").  *See also Applications for*
*Consent to the Assignment and/or Transfer of Control of Licenses, Adelphia Communications Corp.,*
*Assignors to Time Warner Cable, Inc., Assignees, et al.*, Memorandum Opinion and Order, 21 FCC Rcd
8203, 8836-39, Appendix B (2006) ("*Adelphia Order*").

hours of sports programming.  Each of the four MVPDs competing in these markets – DirecTV,

Dish Network, AT&T or Verizon, and the incumbent cable operator – have invested billions of

dollars in sunk costs deploying and operating multi-service, video-capable networks.  The

telephone companies have enhanced their competitive position by offering their video services as

part of a bundle comprising Internet, voice, and wireless service.  In addition, both the Internet

and, increasingly, the wireless components of these multi-service bundles have themselves

become significant platforms for accessing sports programming.

  In a mature competitive marketplace, no single programming service – including an RSN

– can make or break the competitive viability (or lack thereof) of an MVPD in any particular

local market.  To the contrary, mature markets are and should be characterized by product

differentiation, not homogeneity.   For example, the nation's second largest MVPD, DirecTV,

has been able to leverage the popularity of the National Football League for over a decade, with

its exclusive Sunday Ticket offering and has made this offering a significant part of its

competitive strategy.  Cable operators, however, are restricted in their ability to pursue similar

strategies.  Meanwhile, another MVPD, Dish Network has made a strategic business decision to

drop carriage of RSNs in some local markets, and there are other instances in which MVPDs

have declined or deferred carriage of RSNs.  Given the maturity and durability of MVPD

competition, the Commission should allow distribution of RSNs to be governed by market forces

and consumer preference, rather than regulatory mandates.

  Mandated sharing rules for RSNs discourage programming innovation and, by requiring

the fruits of innovation to be shared, diminish differentiation and reduce consumer welfare.  As

detailed more fully below, the instances in which MVPDs voluntarily refrain from carrying

RSNs, the provision of video as part of a multi-service bundle, and the phenomenon of cord-

cutting – in which households forego all multichannel video services in favor of video accessible via the Internet – belie assertions that special rules should be written to ensure guaranteed access to RSNs.  Such government intervention is also a departure from the norms of both copyright and antitrust law, and denies consumers the investment and innovation benefits associated with allowing content to be used by distributors as a product differentiator.

In this proceeding – and in the upcoming proceeding on the sunset of the program access rules' exclusivity ban – the Commission should be eliminating, rather than perpetuating, continued government regulation of the wholesale video program distribution marketplace.  The vigorous competition in a growing number of local video markets around the country argues strongly against the continued imposition of constraints on all vertically-integrated programmers, not just on RSNs.  At a minimum, to the extent the Commission does not lift this twenty-year-old regulation entirely, it should seek to apply it with more rigor and discipline, tailored to the competitive landscape in a given local market to ensure that the burdens of the mandate are lifted where they are no longer demonstrably necessary.

## I.    GUARANTEED ACCESS TO RSNS IS NOT NECESSARY TO ENSURE MVPD COMPETITION

Developments in the marketplace over the last five years demonstrate that government-guaranteed access to RSNs is not necessary to foster video competition and consumer choice.  The video marketplace already was competitive in 2006, with consumers having a choice among the incumbent cable company, DirecTV, which is today the second largest MVPD in the country, and Dish Network, the third largest MVPD.  Today, however, there are even more choices for consumers.  In particular, Verizon and AT&T are now among the ten largest MVPDs in the country.  Their entry has permanently altered the competitive dynamic in scores of local marketplaces around the country.  Both Verizon and AT&T are among the largest

communications companies in the world, with enterprise value in the $150-200 billion range, annual profits of $6 billion and $19 billion respectively, and relationships with millions of households across the country as a result of their century-long local telephone monopoly and position as a dominant providers of wireless service.  Verizon and AT&T have invested billions of dollars in deploying a video-capable network and can offer an integrated "quadruple play" of video, telephone, Internet, and wireless service.

Verizon and AT&T exemplify the substantial change in the nature of video competition that has taken place in the last five years, since both provide video as part of a multi-service bundle.  The development of the multi-service bundle as the primary way in which consumers purchase MVPD services from both telco video providers and incumbent cable operators has significant ramifications for the instant proceeding – as well as the upcoming exclusivity sunset proceeding – since, according to a paper from Bruce Owen of Economists, Inc.,[2] such bundles reduce "the competitive significance of any given video network."  Verizon has described its FiOS triple play bundle as a "powerful offer [that] remains the center of our consumer strategy."[3]  Shortly after entering the New York video market in 2006, Verizon revealed that approximately 80% of its video subscribers "have the triple play product."[4]  Likewise, AT&T

---

[2]      Bruce Owen, *Bundling Undermines the RSN Presumption* ("Owen Paper"), attached as Exhibit K to *Verizon Telephone Companies and Verizon Services Corp. v. Madison Square Garden, L.P. and Cablevision Systems Corp.*, File No. CSR-8185-P, Defendants' Answer to Verizon's Supplement to Program Access Complaint (October 12, 2010).

[3]      Q3 2008 Verizon Earnings Call, October 27, 2008.

[4]      "Verizon at CIBC World Markets Media, Internet and Telecom Conference," May 10, 2006.  *See also New Horizon for Verizon*, THE JOURNAL NEWS (WESTCHESTER COUNTY NEW YORK), Aug. 27, 2006 ("About 80 percent of FiOS TV customers get all three services").

has reported that "[m]ore than 90 percent of U-verse TV customers bundle high speed Internet, and nearly 70 percent add IP voice."[5/]

Importantly, the regression analysis in the *Adelphia Order* – which serves as the sole empirical basis for the RSN condition adopted in that order, as well as the RSN presumption adopted in the *2010 Program Access Order* – made no attempt at all to assess the impact of RSN withholding on an MVPD that offers video as part of a triple- or quadruple-play of communications service.[6/]  To the contrary, that analysis – which was conducted early in 2006 just as Verizon was entering the video market – only examined the impact of RSN withholding on the expected penetration level of DBS providers furnishing only a standalone offering of video service.  As Owen explains, consumers today are much less likely to accord dispositive significance to any single network due to their purchase of video in a bundle:

> A consumer deciding whether to subscribe to [a telco's] video service usually is choosing a bundle of non-video services as well. These other services are not trivial—telephone service and Internet access are complex, multidimensional and important to consumers.   It is likely that at least some consumers who would have attached importance to the presence or absence of a particular programming element will no longer do so, or will do so to a lesser extent, once they must also

---

[5/]     AT&T Annual Report 2009, at 3, available at http://www.att.com/gen/investor-relations?pid=9186.  *See also* Jim O'Niell, *AT&T boldly goes to the edge of the, well, U-verse: A conversation with U-verse VP Jeff Weber*, FIERCE IPTV, Aug. 10, 2010, *at* http://www.fierceiptv.com/story/t-boldly-goes-edge-well-u-verse-conversation-u-verse-vp-jeff-weber/2010-08-10 (*Jeff Weber, AT&T Vice President of U-verse and Video Products:* "[W]e get 95, 96, 97 percent of the time, when a customer buys TV service, they usually get broadband. And 70 percent of the time they're taking voice, so all of that, three out of four TV customers have at least three services. So they have three or four, including wireless service, with us.").

[6/]     *See* Owen Paper, at 5 ("The [Adelphia] study did not consider effects on wireline MVPDs that primarily sell bundles of services rather than a stand-alone video offering. It did not consider effects arising from exclusivity of HD RSNs where SD RSNs were available instead. It did not consider the effects of bundled service offerings.").  To the extent that non-video services were taken into account at all in the *Adelphia* study, they were considered only as a possible offering by the incumbent cable operator, and not by the MVPD subject to the withholding – an assumption that is wholly inapposite in the instant proceeding.  *See Adelphia Order*, Appendix D, ¶ 15 ("INTERNET is an indicator variable taking on the value of 1 when the responding cable system offers high-speed Internet access.").

evaluate the multiple features associated with non-video portions of the MVPDs' packages.[7]

In today's 400 channel, multi-service marketplace featuring video offerings from four different multi-billion companies with substantial sunk investments in video distribution networks, it is no longer tenable to claim that the competitive viability of DirecTV, Dish Network, AT&T, or Verizon – each of which is comparable to, or larger than Cablevision in terms of subscriber counts and enterprise value – depends upon guaranteed access to RSN programming.

To the contrary, the evidence in the marketplace suggests that such regulatory intervention is unnecessary. Verizon has entered and flourished in New York and New Jersey and AT&T in Connecticut, notwithstanding their lack of guaranteed access to the terrestrially delivered MSG HD and MSG+ HD networks.[8] While they filed formal complaints with the Commission over their lack of access to an RSN, Verizon executives continue to tout their FiOS TV offering in New York and New Jersey as "a great success." They have stated that consumer response to FiOS TV in those areas has been "truly remarkable" and "nothing short of astounding"; that the company is "thrilled with where the [FiOS TV] investment is" in New York City; and that it is "selling the heck out of" FiOS TV in portions of New York where it is deployed.[9] Likewise, AT&T executives have publicly declared that "U-verse demand is very high" in Connecticut, that residents in that state "love the product," and that the company is "way

---

[7]      *See* Owen Paper, at 7.

[8]      *Verizon Telephone Companies and Verizon Services Corp. v. Madison Square Garden, L.P. and Cablevision Systems Corp.*, CSR-8185-P, Defendants' Answer to Verizon's Supplement to Program Access Complaint, at 24-51, 42 (Oct. 12, 2010) ("Answer to Verizon Supplement"); *AT&T Services, Inc. and Southern New England Telephone Company D/B/A AT&T Connecticut v. Madison Square Garden, L.P. and Cablevision Systems Corp.*, CSR-8185-P, Defendants' Answer to AT&T's Supplement to Program Access Complaint, at 28-57 (Jan. 6, 2011) ("Answer to AT&T Supplement").

[9]      Answer to Verizon Supplement at 24-25, 42.

ahead" of the competition in Connecticut and adding more subscribers "than any of our cable competitors" in recent quarters.[10]

There are numerous other examples of MVPDs successfully competing notwithstanding the absence of an RSN from their channel lineup.  Dish Network, for instance, has never carried YES (the network of the Yankees) in New York,[11] it discontinued carriage of CSN California last year,[12] and its President and CEO has stated that, going forward, carriage of any RSN programming in New York "may not make sense" for the company.[13]  Nonetheless, Dish Network continues to thrive as the third largest MVPD in the country, even as its CEO has suggested that it may be strategically advantageous to forego carriage of RSNs in many markets: "If you've got three competitors and they all have the sports programming, then there's probably a real good path for somebody[.]  [F]or 1 of the 4 not to carry the sports programming would have a great strategic advantage for certain customers."[14]

In New Orleans, both DirecTV and Dish Network opted not to carry Cox Sports Television, which features games played by the New Orleans Hornets and the LSU Tigers, even

---

[10]    Answer to AT&T Supplement at 29-30.

[11]    *Dish Network Drops Fox Cable Networks*, BUSINESS WIRE, Oct. 1, 2010, *at* http://www.businesswire.com/news/home/20101001006388/en/DISH-Network-Drops-Fox-Cable-Networks ("And DISH has refused to carry the YES Network, the television home of the New York Yankees.").

[12]    Mike Reynolds, *Dish Disconnects CSN California After Losing Arbitration Decision*, MULTICHANNEL NEWS, Nov. 24, 2010, *at* http://www.multichannel.com/article/460326-Dish_Disconnects_CSN_California_After_Losing_Arbitration_Decision.php.

[13]    *See* Conference Call Transcript, DISH – Q1 Dish Network Corp. Earnings Conference Call, May 2, 2011, at 10.

[14]    *Id.  See also* Will Richmond, *Not A Sports Fan? You're Getting Sacked By Your Cable Company For At Least $2 Billion Per Year*, BUSINESS INSIDER, Feb. 8, 2011 ("[I]f you subscribe to pay-TV services and are not a sports fan (or are just a casual one), you are paying a lot of money each month for very expensive sports-oriented cable TV channels, which you mostly don't watch. This degree of wasteful overspending, which could amount to at least $2 billion every year (as I'll detail below), creates a mile-wide opportunity for entertainment-oriented over-the-top entrants to prosper.").

though it had been offered to them for distribution.[15]  Indeed, DirecTV still does not carry the

local regional sports networks in either New Orleans or Portland, Oregon. [16]

Consumer surveys introduced into evidence in Cablevision's ongoing program access

complaint proceedings with Verizon and AT&T demonstrated that the presence or absence of the

two RSNs at issue in the complaints – MSG HD and MSG+ HD – is "extremely low in . . .

importance as a reason for subscribers obtaining, switching or staying with a particular [MVPD]

service."[17]  In addition, the Commission's recent endorsement of the theory that there is some

partial substitutability between an RSN and a local broadcast station,[18] further undermines

claims that RSNs are composed of unique, non-replicable programming that require a special set

of rules.[19]  Indeed, thousands of hours of sports programming is available from television

---

[15]      *See Adelphia Order* at n.502.

[16]      Mike Farrell, *DirecTV Could Pare Some Networks*, MULTICHANNEL NEWS, Dec. 2, 2010, *at*
http://www.multichannel.com/article/460578-DirecTV_Could_Pare_Some_Networks.php.

[17]      *See* Answer to Verizon Supplement at 51-54; Answer to AT&T Supplement at 58-61.

[18]      *Applications of Comcast Corp., General Electric Company and NBC Universal, Inc. to Assign
and Transfer Control of FCC Licenses*, MB Docket No. 10-56, Reply of American Cable Association,
Attachment A, William Rogerson, "A Further Economic Analysis of the Proposed Comcast-NBCU
Transaction," at 27 (June 21, 2010) ("While I agree that local broadcast stations and RSNs carry different
types of programming, I completely reject the assertion that this somehow implies that these two types of
networks cannot be partial substitutes for one another. To the extent that substitutability between
networks is caused simply by the fact that subscribers value increases in variety at a decreasing rate, it is
perfectly possible and reasonable that two very different types of networks could be partial substitutes for
one another in the sense that the value of adding one of the two networks decreases conditional on the
other network already being carried.").

[19]      *Applications of Comcast Corp., General Electric Company and NBC Universal, Inc. to Assign
and Transfer Control of FCC Licenses*, Memorandum Opinion and Order, FCC 11-4, Appendix B, ¶ 53
(Jan. 20, 2011) ("ACA's economist argues that the combination of a RSN and local broadcast station
under the same ownership will result in higher programming fees. This follows from a bilateral
bargaining model.  If the two networks are at least partial substitutes from the perspective of MVPDs,
then the joint venture will be able to obtain a higher price for the two programming assets due to the
unavailability of this substitute programming if the two sides fail to reach an agreement."); *see id.*, ¶ 55
(finding that "joint ownership of these two types of programming assets in the same region allowed the
joint venture to charge a higher price for the RSN relative to what would be observed if the RSN and the
local broadcast affiliate were separately owned").

networks other than RSNs.[20]  Further, RSNs do not even carry any regular season and playoff games played by NFL teams, do not televise any MLB post-season contests, and typically do not carry most playoff games played by NBA and NHL teams.

The amount of professional sports video content available over the Internet is growing exponentially.[21]  Major League Baseball, the National Basketball Association, the National Hockey League, and Major League Soccer each make their games available over the Internet to broadband subscribers.[22]  DirecTV, in connection with announcing its exclusive distribution deal for Major League Baseball's out-of-market package, "Extra Innings," argued that the availability of games on the Internet offers an alternative source of sports programming for MVPD subscribers:

> [B]aseball fans will continue to be able to watch their favorite teams in a variety of ways. . . . [E]very single game carried on Extra Innings will remain available online through MLB.com.  . . . Internet video is improving . . . subscribers who

---

[20]     The New York market, for example, is saturated with sports programming from a range of outlets, including ESPN, ESPN2, TNT, TBS, FX, ABC, CBS, NBC, Fox Broadcasting, WWOR, WPIX, Versus, the NFL Network, the NHL Network, the NBA Network, and the MLB Network.

[21]     *See, e.g.*, Josh Catone, *Baseball Everywhere: How MLB Is Innovating With Digital Media*, MASHABLE, Aug. 28, 2011, *at* http://mashable.com/2011/08/26/mlb-digital-media/ ("Starting in 2002, MLB began broadcasting livestreams of games over the Internet. . . . MLB currently serves up 9 million video streams each day, including 1 million live streams. Additionally, they have 2 million paid subscribers to MLB.tv and their At Bat mobile apps (which also stream video)."); *Online Overtime; Now the Internet Can Bring Live Sports Action to Fans 365 Days a Year*, WASHINGTON POST, Jan. 29, 2006. *See also*, Josh Halliday, *YouTube bids to become home of live sport online*, GUARDIAN, Feb. 23, 2011 ("YouTube is bidding to become the home of live sports broadcasting online, announcing new talks with the US National Basketball Association and National Hockey League.").

[22]     *See,* MLB.TV *at* http://mlb.mlb.com/index.jsp (providing information on subscription to view Major League Baseball games over the Internet); NBA League Pass *at* http://www.nba.com/home/leaguepass/index.html (providing information on subscription to view National Basketball Association games over the Internet); NHL Game Center Live, *at* https://gamecenter.nhl.com/nhlgc/secure/gclsignup?intcmpid=nhl.com:gcl:vdsbnv&nav-video-gcl (providing information on subscription to view National Hockey League games over the Internet); Match Day Live, at https://mdl.mlssoccer.com/mlsmdl/secure/registerform (providing information on subscription to view Major League Soccer games over the Internet).

choose not to (or cannot) subscribe to DirecTV will still be able to watch the games of their choice.[23/]

Ongoing trends toward audience fragmentation continue to dilute the importance to viewers of any single programming network, undercutting claims that access to RSN programming is required for an MVPD to be successful. "Thirty years ago, the vast majority of Americans had 13 or fewer channels to choose from, and only three major TV networks to watch. Ten years ago, few had more than 30 channels and only four major networks to watch. Today, most Americans have hundreds of channels to watch . . . ."[24/] The fragmentation of the cable audience across the hundreds of available channels means that no single channel – even an RSN – represents so great a proportion of overall viewing as to render it essential for an MVPD to offer to attract subscribers. In addition, the phenomenon of cable "cord cutting" – subscribers cancelling their cable service in favor of obtaining programming from a combination of over-the-air broadcasters and Internet video sources – further suggests that subscribers do not consider RSN programming essential, or else they would not be willing to leave their cable service that may have RSN programming that is not available from other sources.[25/]

---

[23/]     Letter from Chase Carey, President and CEO, DirecTV, to Monica Shah Desai, Chief, Media Bureau, Federal Communications Commission, at 5 (Mar. 2, 2007) ("DirecTV 'Extra Innings' Letter").

[24/]     *TV's reach and frequency problem*, THE MEDIA ONLINE, Aug. 29, 2011, *at* http://themediaonline.co.za/2011/08/tvs-reach-and-frequency-problem/.

[25/]     *See, e.g.*, Henry Blodget, *Cable Cord Cutting: It's Real And Coming To Households Near You*, BUSINESS INSIDER, Oct. 9, 2010, *at* http://www.businessinsider.com/cable-cutting-its-real-and-coming-to-households-near-you-2010-10#ixzz1XBbGZaVE; *See also* Will Richmond, *Not A Sports Fan? You're Getting Sacked By Your Cable Company For At Least $2 Billion Per Year*, BUSINESS INSIDER, Feb. 8, 2011 ("For non-fans and casual fans that are mainly interested in entertainment-oriented programming, awareness of attractive substitutes like Netflix and Hulu Plus is escalating, along with the proliferation of connected devices that enable viewing them on the big TV. Over time more and more of these people are likely to conclude there's a mismatch between what they really watch vs. what they're spending on services").

## II.   CONSUMER WELFARE IS ENHANCED WHEN RSNS ARE EMPLOYED AS A COMPETITIVE DIFFERENTIATOR

Lifting regulatory constraints on distribution of RSNs would enhance consumer welfare by enabling that content to be used as a product differentiator, thereby promoting innovation, investment and new services.  Ordinarily, businesses are free to select the distributors for their products and the forced sharing of assets is exceptional.  Product differentiation strategies and exclusive arrangements are standard business practices in the media and communications business.[26/]  By contrast, forced sharing of assets with rivals is "exceptionally drastic"[27/] because, among other reasons, compelling firms to share their legitimate competitive advantages with others undermines incentives to invest.[28/] Thus, the U.S. antitrust enforcement "[a]gencies will not require the owner of intellectual property to create competition in its own technology."[29/] And the courts likewise recognize that the presumptive right under the antitrust laws to refuse to license copyright works "creates a system of incentives that promotes consumer welfare in the long term by encouraging investment."[30/]

The fact that sports programming is popular with some segment of subscribers does not justify a prohibition on its use as a product differentiator.  As the Commission itself has

---

[26/]   *See, e.g.*, *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358 (3d Cir. 1996) (upholding film distributor's grant of exclusive license for certain first-run films to film exhibitor); *Three Movies v. Pacific Theaters, Inc.*, 828 F.2d 1395 (9th Cir. 1987) (upholding summary judgment where defendant allowed only one of two competitors first-run movie rights); *In re Independent Serv. Orgs. Antitrust Litig. CSU, LLC v. Xerox*, 203 F.3d 1322, 1325 (Fed. Cir. 2000); *id.* at 1328 ("[T]he owner of a copyright, if it pleases, may refrain from vending or licensing and content [itself] with simply exercising the right to exclude others from using its property.").

[27/]   3B PHILLIP E. AREEDA AND HERBERT HOVENKAMP, ANTITRUST LAW ¶ 773b3, at 246 (3d ed. 2008).

[28/]   *Id.* ¶ 773e, at 257.

[29/]   U.S. Dep't of Justice and Federal Trade Commission, Antitrust Guidelines for the Licensing of Intellectual Property ("IP Guidelines") § 3.1, at 7 (Apr. 6, 1995).

[30/]   *In re ISO Antitrust Litig.*, 203 F.3d at 1328-29 (quoting *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186-87 (1st Cir. 1994)).

observed, the issue is not whether any particular firm in the marketplace – including the market

leader – "has advantages," but is rather "whether any such advantages preclude the effective

functioning of a competitive market."[31]  By way of analogy, there are undoubtedly many

consumers who would have considered switching to Verizon's wireless service offering over the

last three years if only they could use their iPhones on that network.[32]  The fact that they were

not able to do so enhanced consumer welfare by forcing Verizon to compete harder, spurring its

offering of Android phones and other feature-rich wireless devices, and thereby benefitting

consumers by fostering more choice and more competition.

Each of the MVPDs competing against Cablevision in the Northeast seeks to differentiate

its offerings to attract customers.  For example, DirecTV touts its exclusive offering of NFL

Sunday Ticket.[33] Dish Network emphasizes that it has more HD channels than other providers

and emphasizes its foreign language offerings.[34]  Both Verizon and AT&T highlight their

"quadruple play" capabilities, their carriage of particular services not offered by some incumbent

cable operators (such as the NFL Network), their HD offerings and other unique features.[35]  This

---

[31]     *See Competition in the Interstate Interexchange Marketplace*, Report and Order, 6 FCC Rcd. 5880, 5891-92 (1991)).

[32]     *Study Finds iPhone owners want to switch to Verizon*, REUTERS, Sept. 22, 2010 ("Close to half of Apple Inc iPhone users in the United States would be 'very interested' in dumping AT&T Inc for Verizon Wireless as a service provider, according to a study from professionals service firm Deloitte.");  *Report: 1.4 million AT&T iPhone users would switch to Verizon*, USA TODAY, Sept. 21, 2010, *available at* http://content.usatoday.com/communities/technologylive/post/2010/09/report-14-million-att-iphone-users-would-switch-to-verizon/1.

[33]     *See* DirecTV, NFL Sunday Ticket *at* http://www.directv.com/DTVAPP/content/sports/nfl?footernavtype=-1;

[34]     *See* Dish Network at http://www.dishnetwork.com/; *id. at* http://www.dishnetwork.com/international/default.aspx;

[35]     *See, e.g.*, Todd Spangler, *AT&T Touts U-verse Quad-Play with Up to $60 Monthly Savings*, MULTICHANNEL NEWS, May 18, 2010 (quoting Joey Schultz, vice president of consumer marketing for AT&T's Mobility and Consumer Markets unit, as saying "With more than three-fourths of our U-verse customers taking a triple or quad-play bundle, we know this is an option consumers want and can't get from cable"); Press Release, AT&T, AT&T and ESPN Bring Fans Interactive Coverage of the 2010 FIFA

sort of product differentiation benefits consumers by driving rivals to invest in new products and offerings, enhance the quality of their service and develop new pricing and packaging strategies. The Commission should enhance consumer welfare by foregoing continued reliance on crude regulatory tools that bar the use of RSNs as a product differentiator.

## III.   THE COMMISSION SHOULD ESTABLISH A MECHANISM TO ALLOW FOR THE REMOVAL OF CONSTRAINTS ON RSN DISTRIBUTION IN COMPETITIVE VIDEO MARKETS

At a minimum, the last five years underscore that there is no justification for continued monolithic assessment of the impact of RSNs on MVPD competition.   The importance of RSNs can vary depending upon the competitive characteristics of the local marketplace, including the nature of local MVPD competition, the number of RSNs in the local market, the number of sports carried on a given RSN, the type of sports programming featured, the success or popularity of the teams being shown, and whether competing MVPDs have access to some or all games in at least one format (HD v. SD).   Neither the RSN conditions in the *Adelphia Order* nor the *per se* ban on exclusivity arrangements, however, offer any mechanism for varying – or eliminating – regulatory intervention depending upon the competitive characteristics of the local

---

World Cup™ Across Multiple Screens (June 1, 2010) (touting "exclusive U.S. Men's National Team content on AT&T U-verse TV"); Press Release, AT&T, AT&T U-verse TV Significantly Expands HD Channel Lineup and Ethnic Programming; U-verse TV Strengthens HD Channel Lead Over Cable; Adds Chinese, Polish, Russian, French and European-Sports Packages (Oct. 27, 2008) ("With the additions, U-verse TV offers more than 75 HD channels — exceeding the HD channel lineups offered by the major local cable providers in every U-verse market."); George Winslow, *AT&T's U-verse Adds Over 30 HD Nets*, MULTICHANNEL NEWS, Nov. 4, 2008 ("'We are now beating cable [on HD] in every U-verse market by a lot,' said Dan York, executive vice president of content and programming at AT&T Converged Services."); Press Release, Verizon, Verizon's New 'Quad-Play' Bundle Offers Customers Wireless Calling With Home Phone, TV and Broadband in Money-Saving Combinations (Oct. 19. 2009) (describing the Verizon "quad play" bundle as a "plan[ ] that cable can't offer"); Press Release, Verizon, Verizon's 2008 Network Expansion Projects in New York Topped $1.34 Billion in Expenditures (Feb. 25, 2009) ("FiOS TV now offers more than 500 total channels - featuring more than 100 HD channels in all of Verizon's New York markets, more HD than any local cable TV company, including Cablevision, Time Warner or Comcast."); Answer to Verizon Supplement at n.55 (describing a Verizon advertisement saying "For 24/7 NFL action, you've got to get FiOS TV.  That's because you can't get NFL Network with Cablevision").

marketplace.   Such a circumstance makes no sense and does not comport with both statutory and

constitutional directives to limit regulatory interference with distribution of programming content

only to circumstances where such constraints are necessary to ensure competition.[36]

The courts and the Commission have emphasized that mandatory asset-sharing

arrangements like the program access law are appropriate only where a "granular analysis" of

local market conditions demonstrates that competition will be impaired absent the provision of

unbundled network elements to competitors.[37]   In considering the merits of market-by-market

relief from asset-sharing obligations imposed on the telephone companies, the Commission has

held that "it could be appropriate to conclude, based on sufficient facilities-based competition,

particularly from cable companies, that the state of local competition might justify forbearance

from unbundling obligations."[38]   Such a conclusion is equally true with respect to asset-sharing

---

[36]      47 U.S.C. § 548(c)(5) (authorizing retention of the exclusivity ban only if it is "necessary to preserve and protect competition and diversity in the distribution of video programming"); Cablevision Sys. Corp. v. FCC, No. 10-1062, Slip Op. at 24 (D.C. Cir. June 10, 2011) (applying intermediate scrutiny to the FCC's program access rules, under which the rules are Constitutional only if they "further[ ] an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest").  *See also, e.g.*, *Implementation of the Cable Television Consumer Protection And Competition Act of 1992; Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act; Sunset of Exclusive Contract Prohibition*, Report and Order, 17 FCC Rcd. 12124,¶ 8 (2002) (explaining that in adopting program access restrictions, "Congress recognized that exclusivity can be a legitimate business practice where there is competition.").

[37]      *See, e.g.*, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 FCC Rcd. 16978, ¶ 118 (2003) ("*Triennial Review Order*") (citing *United States Telecom Ass'n v. FCC,* 290 F.3d 415, 422 (D.C. Cir. 2002) ("*USTA I*")) (subsequent history omitted); *Unbundled Access to Network Elements*, 20 FCC Rcd. 2533, ¶ 8 (2005) ("*Triennial Review Remand Order*") (noting *USTA I* rejected national sharing obligations because they were "insufficiently 'granular'" and "did not account for differences in particular markets and particular customer classes"), *aff'd Covad Commc'ns Co. v. FCC*, 450 F.3d. 528, 544 (D.C. Cir. 2006) (noting that that "*USTA I* and *USTA II* require a nuanced application of a 'granular' impairment standard, which incorporates competitive variations within and across markets").

[38]      *Petition of ACS of Anchorage, Inc., Pursuant to Section 10 of the Communications Act of 1934, as Amended, for Forbearance from Sections 251(c)(3) and 252(d)(1) in the Anchorage Study Area*, 22 FCC Rcd. 1958, ¶ 5 (2007).

obligations applicable to cable operators.[39]   Indeed, both Verizon and AT&T have argued

vigorously that asset-sharing arrangements should not be applied in competitive local markets.[40]

For example, in Cablevision's Eastern footprint in New York, New Jersey, and

Connecticut many consumers have a choice of up to five MVPDs.  While Cablevision is the

ninth largest MVPD nationally,[41] most residents in areas served by the company also can obtain

service from the second largest MVPD in the nation, DirecTV; the third largest MVPD, Dish

Network; and either the seventh largest MVPD, Verizon, or the eighth largest MVPD AT&T.

Further, some can obtain service from the sixteenth largest MVPD, RCN.[42]

Cable industry experts have concluded that, in terms of video competition, "the best part

of this competitive show is within the Long Island, New York, New Jersey and Connecticut

areas."[43]   Executives in the television and communications businesses have confirmed the

---

[39]     *Cf. Unbundled Access to Network Elements, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Memorandum Opinion and Order, 20 FCC Rcd 2533, ¶ 2 (2004) (noting benefits of using "unbundling authority in a more targeted manner").

[40]      *See e.g. Unbundled Access to Network Elements*, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, WC Docket 04-313, Comments of Verizon, at 7-8 (Oct. 4, 2004) ("[T]he Commission must make a finding of impairment with respect to particular geographic markets and market segments before it imposes a UNE obligation in each such market."); *Cbeyond, Inc., Petition for Expedited Rulemaking to Require Unbundling of Hybrid, FTTH, and FTTC Loops Pursuant to 47 U.S.C. § 251(c)(3) of the Act*, WC Docket No. 09-223, Reply Comments of AT&T, Inc., February 22, 2010, at 18, *quoting Covad Communications Co. v. FCC*, 450 F.3d 528, 534 (D.C. Cir. 2006)("The fact that CLECs can viably compete without UNEs . . . precludes a finding that the CLECs are impaired.").

[41]     *See* National Cable & Telecommunications Association, Top 25 Multichannel Video Programming Distributors as of March 2011, *at* http://www.ncta.com/Stats/TopMSOs.aspx, updated with June 30, 2011 subscriber data from the following sources: AT&T Quarterly Earnings – 2Q 2011, Financial and Operational Results, *at* http://www.att.com/gen/investor-relations?pid=282; Press Release, Cablevision Systems Corporation, Cablevision Systems Corporation Reports Second Quarter 2011 Results (Aug. 9, 2011), *available at* http://www.cablevision.com/investor/index.jsp; Verizon 2Q Investor Quarterly, Second Quarter 2011, *available at* http://www22.verizon.com/investor/investor.portal.

[42]     *See* note 41, *supra*.

[43]     Michael Hopkins, *Battling Video Markets*, THE BRIDGE, Dec. 9, 2008, *at* http://www.mediabiz.com/thebridge/?release_id=150.

competitiveness of the New York video market.[44]  Other industry observers have described the New York video market as "fiercely" competitive, remarked upon the "stiff competition" there, and noted that "Verizon's aggression" is putting "cable giants. . . under increasing pressure."[45] The FCC has declared all of New York City, as well as virtually all other franchise areas in New York where Verizon's FiOS TV video service is offered, to be subject to "effective competition" for cable television under the standards set forth in the Communications Act.[46]

Further, there are four different regional sports networks offering New York-centric sports programming to MVPD subscribers – YES, SportsNet New York, MSG, and MSG+ – in addition to numerous out-of-market regional sports networks.  Video programming distributors in the New York area have the ability to distribute thousands of professional and college sporting events, including hundreds of games played by local teams, over more than a dozen networks – most of which are unaffiliated with cable.[47]  In contrast, the instances of RSN withholding in Philadelphia and San Diego that were highlighted in the *Adelphia Order* involved RSNs that had

---

[44]       Transcript, *Harmonic at Morgan Keegan "Summer in the City" Technology Conference*, Aug. 11, 2009 (CFO for Harmonic remarking on the "intense competition" between Verizon and the incumbent cable operators in New York City); Todd Spangler, *Cable Show 2010: RCN To Take TiVo Premiere To New York City In June*, MULTICHANNEL NEWS, May 12, 2010, http://www.broadcastingcable.com/article/452565-Cable_Show_2010_RCN_To_Take_TiVo_Premiere_To_New_York_City_In_June.php (TiVo's CEO alluding to "the highly competitive New York City" video market).

[45]       *See* Brooks Barnes and Brian Stelter, *In Cable Delivery, Rivals Are Pouncing*, NEW YORK TIMES, July 11, 2010, *at* http://www.nytimes.com/2010/07/12/business/media/12disney.html.

[46]       *See Cablevision Systems New York City Corp. Petition for Determination of Effective Competition in Brooklyn and Bronx, New York (CUIDs NY1413 and 1414)*, Memorandum Opinion and Order, 24 FCC Rcd 1798 (MB 2009); *Time Warner Cable, Inc. Petitions for Determination of Effective Competition in Two Communities in the State of New York*, Memorandum Opinion and Order, 23 FCC Rcd 17038 (MB 2008).  *See also, e.g.*, *Cablevision Systems Long Island Corp., Cablevision Systems Suffolk Corp., CSC Holdings, Inc., and Cablevision of Brookhaven, Inc. Petition for Determination of Effective Competition in Seven Communities in New York State*, Memorandum Opinion and Order, 24 FCC Rcd 4877 (MB 2009); *Cablevision of Raritan Valley, Inc., Cablevision of New Jersey, Cablevision of Monmouth, Petitions for Determination of Effective Competition*, Memorandum Opinion and Order, 19 FCC Rcd 6966 (MB 2004).

[47]       *See* note 20, *supra*.

exclusive rights to broadcast all local professional sports contests in their respective markets.[48]
In Philadelphia, Comcast SportsNet is the only RSN televising games of professional teams
(including MLB's Phillies, the NBA's 76ers, NHL's Flyers) and faces no competition from other
local RSNs, so when Comcast SportsNet was withheld, no local professional sports games were
available to viewers of competing MVPDs.  In New York, however, even without access to MSG
HD and MSG+ HD Verizon is able to carry games from several RSNs, including YES (in both
SD and HD) (with New York Yankees and New Jersey Nets games), SportsNet New York (in
both SD and HD) (with New York Mets games), and carries all the games shown on standard
definition MSG and MSG+ services.  Likewise, in Connecticut, AT&T carries all of the local
professional sports games of the many professional teams in that market by virtue of its carriage
of several RSNs, including YES (in both SD and HD) (with New York Yankees and New Jersey
Nets games), SportsNet New York (in both SD and HD) (with New York Mets games), NESN
(in both SD and HD) (with Boston Red Sox and Boston Bruins games), Comcast SportsNet New
England (in both SD and HD) (with Boston Celtics games), and also carries all games shown on
the standard definition MSG and MSG+ services.

    In short, the characteristics of local markets in terms of MVPD competition, number of
RSNs and local sports programming outlets, the mix of professional sports involved (and even
the success of the teams featured), and the amount of withholding involved can vary dramatically
across different geographic areas.  But the monolithic application of both the *Adelphia* RSN
conditions and the *per se* ban on exclusivity precludes consideration of significant differences in
competition and market characteristics in local markets.  Removing those constraints in any local
market with robust competition would promote consumer welfare by encouraging innovation and

---

[48]     See Adelphia Order ¶ 30; John Eggerton, *DirecTV, Dish Formally Ask For Access To Comcast
SportsNet Philadelphia*, MULTICHANNEL NEWS, June 25, 2010.

investment in programming and allowing for product differentiation among distributors,

providing consumers with more choice and more competition.

## IV.  THE COMMISSION SHOULD ALLOW THE EXCLUSIVITY BAN TO SUNSET IN 2012

As demonstrated above, competition has obviated the need for any special restrictions on

the distribution of RSNs.  More generally, the exclusivity ban on cable-affiliated programming is

scheduled to sunset next year.[49]  With 10 years having elapsed after the initial extension of the

ban – and 20 after its enactment by Congress – it is past time for the Commission to

acknowledge that competitive conditions in the video marketplace have obsolesced the need for

this restriction.  The D.C. Circuit strongly suggested as much when it approved the most recent

extension of the ban:

> We anticipate that cable's dominance in the MVPD market will have diminished still more by [2012], and expect that at that time the Commission will weigh heavily Congress's intention that the exclusive contract prohibition will eventually sunset. Petitioners are correct in pointing out that the MVPD market has changed drastically since 1992. We expect that if the market continues to evolve at such a rapid pace, the Commission will soon be able to conclude that the exclusivity prohibition is no longer necessary to preserve and protect competition and diversity in the distribution of video programming.[50]

The Commission should act swiftly to make clear that the exclusivity ban will not be

extended again and that the marketplace will be permitted to function without this unnecessary

restriction that restricts innovation and competition rather than enhancing them.

---

[49]     *See* 47 C.F.R. § 76.1002(c)(6) (providing that the prohibition on exclusive contracts in the Commission's program access rules "shall cease to be effective on October 5, 2012," unless extended by the Commission "in a proceeding to be conducted in the year preceding such date").

[50]     *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1314 (D.C. Cir. 2009).

**CONCLUSION**

For the reasons set forth above, the Commission should eliminate regulatory constraints on RSN distribution, such as those imposed by the program access rules' exclusivity ban and the *Adelphia Order* RSN conditions.

Respectfully submitted,

__/s/ Howard J. Symons_____

| | |
|---|---|
| Michael E. Olsen | Howard J. Symons |
| Senior Vice President, Legal | Christopher J. Harvie |
|    Regulatory and Legislative Affairs | Ernest C. Cooper |
| Cablevision Systems Corp. | MINTZ, LEVIN, COHN, FERRIS, GLOVSKY |
| 1111 Stewart Avenue |    AND POPEO, P.C. |
| Bethpage, NY 11714 | 701 Pennsylvania Avenue, N.W. |
| (516) 803-2300 | Suite 900 |
| | Washington, D.C.  20004 |
| | (202) 434-7300 |

September 9, 2011

19

# EXHIBIT E

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | MB Docket No. 11-128 |
| The Regional Sports Network | ) | |
| Marketplace | ) | |

### REPLY COMMENTS OF CABLEVISION SYSTEMS CORPORATION

Michael E. Olsen
Senior Vice President, Legal,
   Regulatory and Legislative Affairs
Cablevision Systems Corp.
1111 Stewart Avenue
Bethpage, NY 11714
(516) 803-2300

Howard J. Symons
Christopher J. Harvie
Ernest C. Cooper
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
   AND POPEO, P.C.
701 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C.  20004
(202) 434-7300

September 26, 2011

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ...................................................................................1

I.  THE SUCCESS OF VERIZON'S FIOS TV AND AT&T's U-VERSE OFFERINGS,
    EVEN IN MARKETS WHERE THEY LACK ACCESS TO MSG HD AND MSG+ HD,
    UNDERSCORE THE ABSENCE OF NEED FOR CONTINUED REGULATORY
    RESTRICTIONS ON RSN DISTRIBUTION .........................................................................2

    A.  Notwithstanding Its Claims to the Contrary, Verizon Has Emerged As a Strong
        and Successful Competitor in the New York Market, Even Without Carriage of
        MSG HD and MSG+ HD............................................................................................3

    B.  The Absence of MSG HD and MSG+ HD From AT&T's Channel Lineup Has
        Not Hindered Its Ability to Compete Effectively and Successfully in Connecticut......9

CONCLUSION....................................................................................................................13

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | MB Docket No. 11-128 |
| The Regional Sports Network | ) | |
| Marketplace | ) | |

### REPLY COMMENTS OF CABLEVISION SYSTEMS CORPORATION

Cablevision Systems Corporation ("Cablevision") hereby submits these reply comments in response to the Commission's Public Notice in the above-captioned proceeding.[1]

### INTRODUCTION AND SUMMARY

As demonstrated in Cablevision's initial comments, government-guaranteed access to regional sports networks ("RSNs") is no longer necessary to ensure that consumers have a meaningful choice of viable video service providers, due to the onset of competition in the multichannel video programming distributor ("MVPD") market.[2]  The entry of AT&T and Verizon into the video marketplace since 2006 has provided millions of residents in numerous markets throughout the country with a choice of four strong and durable MVPDs, each offering hundreds of channels of video programming and thousands of hours of sports programming.  In this mature competitive marketplace, no single programming service – including an RSN – can be deemed to be critical to the competitive viability of an MVPD in any particular local market.  Consequently, Cablevision urged the Commission to recognize the competitiveness of current

---

[1]     *See Media Bureau Seeks Comments on the Regional Sports Network Marketplace*, MB Docket No. 11-128, Public Notice, (July 26, 2011).  *See also Applications for Consent to the Assignment and/or Transfer of Control of Licenses, Adelphia Communications Corp., Assignors to Time Warner Cable, Inc., Assignees, et al.*, 21 FCC Rcd 8203, 8836-39, Appendix B (2006) ("*Adelphia Order*").

[2]     *See generally*, *Regional Sports Network Marketplace*, MB Docket No. 11-128, Comments of Cablevision Systems Corporation (Sept. 9, 2011) ("Cablevision Comments").

video services markets and allow distribution of RSNs to be governed by market forces and consumer preference, rather than regulatory mandates.

The contentions by Verizon and AT&T that the viability and success of their video programming offerings is contingent upon government-guaranteed access to regional sports networks (RSNs) [3/] is wholly belied by their strong performance in the markets where they compete without access to MSG HD and MSG+ HD.  The New York City metropolitan area, which includes the areas where Verizon and AT&T compete with Cablevision, features more competition and offers more choice for video consumers than any other marketplace, and Verizon and AT&T are, by their own accounts, thriving in this intensely competitive marketplace.  The absence of MSG HD and MSG+ HD from their channel lineups – the subject of program access complaints highlighted in their respective comments – does not in any way significantly hinder either AT&T or Verizon from being strong and durable competitors in this market, fully able to attract and retain hundreds of thousands of video subscribers.  Their success is a testament to the need to eliminate – rather than perpetuate – government restrictions on the distribution of RSN programming.

I.     **THE SUCCESS OF VERIZON'S FIOS TV AND AT&T's U-VERSE OFFERINGS, EVEN IN MARKETS WHERE THEY LACK ACCESS TO MSG HD AND MSG+ HD, UNDERSCORE THE ABSENCE OF NEED FOR CONTINUED REGULATORY RESTRICTIONS ON RSN DISTRIBUTION**

As detailed below, Verizon and AT&T's own words and accomplishments in the New York, New Jersey, and Connecticut markets unequivocally demonstrate that neither company is significantly hindered by the absence of the MSG HD and MSG+ HD RSNs from their channel

---

[3/]     *See generally*, *Regional Sports Network Marketplace*, MB Docket No. 11-128, Comments of AT&T (Sept. 9, 2011) ("AT&T Comments"); *Regional Sports Network Marketplace*, MB Docket No. 11-128, Comments of Verizon (Sept. 9, 2011) ("Verizon Comments").

lineups.  To the contrary, each has been able to compete vigorously and successfully and to become a major market force without that programming.

### A. Notwithstanding Its Claims to the Contrary, Verizon Has Emerged As a Strong and Successful Competitor in the New York Market, Even Without Carriage of MSG HD and MSG+ HD

Verizon's comments contend that lack of access to MSG HD and MSG+ HD significantly hinders its competitive viability,[4] but that claim is refuted by statements from Verizon officials, marketplace data, and Verizon's business and marketing strategies.

The most recent Verizon quarterly financial report details continued strong performance of Verizon's FiOS TV offering, even in the New York markets where it lacks access to MSG HD and MSG+ HD.  The second quarter 2011 Verizon earnings report highlighted 20 percent year-over-year growth in FiOS revenue, which exceeded more than $2 billion for the first time, and continued significant increase in new FiOS TV subscribers, with 184,000 video service additions to a total of 3.85 million FiOS TV customers.[5]  Analysts noted that FiOS "remains a steady grower with both in-line subscriber additions and solid ARPU growth."[6]  Meanwhile, despite its access to the MSG HD and MSG+ HD RSNs, the number of Cablevision video subscribers declined in the second quarter, with analysts citing heightened competition from FiOS TV as a contributing factor.[7]  Analysts reviewing Cablevision's second quarter results highlighted promotions from Verizon that were causing "defections from Cablevision," with one noting that

---

[4]     Verizon Comments at 14.

[5]     *See e.g.* Todd Spangler, *FiOS Sizzles in Verizon's Q2, Topping $2 Billion*, MULTICHANNEL NEWS, July 22, 2011.

[6]     *See id.*

[7]     *See* Alex Sherman, *Cablevision Slumps after Profit Trails Estimates on Video-Customer Losses*, BLOOMBERG, Aug. 9, 2011, *at* http://www.bloomberg.com/news/2011-08-09/cablevision-profit-trails-estimates.html?cmpid=yhoo; Mark Gongloff, *Cablevision Didn't Get the Crash Over Memo*, WSJ.COM, Aug. 9, 2011, *at*  http://blogs.wsj.com/marketbeat/2011/08/09/cablevision-didnt-get-the-crash-over-memo/?mod=yahoo_hs.

"Verizon is becoming very aggressive on the promotional side . . . ."[8]  Another analyst observed

in a note on Cablevision's quarter, "We believe heightened competition from Verizon FiOS has

pressured both subscriber and financial results YTD."[9]

Since first entering the video services market with its FiOS TV offering in 2006, Verizon

quickly vaulted into the list of the top ten MVPDs in the country, with the number of FiOS TV

subscribers in the New York market more than doubling in 2008.[10]  Since that time, FiOS TV

has continued to grow and has now passed Cablevision to become the seventh largest MVPD in

the country.[11]  Verizon recently reported that its overall FiOS TV subscribership now totals

3.848 million,[12] exceeding the number of video subscribers served by Cablevision.[13]

Verizon's continued growth reflects the ongoing surge in competition from telephone

company video providers, which rapidly expanded their video network footprints nationally from

9.1 million households at the beginning of 2008 to nearly 30 million at the end of the first quarter

of 2010.[14]  During that same time, telephone company video subscribers more than quadrupled

from 1.2 million to 5.3 million, with 61% stating they switched from cable.[15]  While subscriber

growth in 2009 and 2010 was flat or negative for every incumbent cable operator and DBS

---

[8]      *Id.*

[9]      *Cablevision Systems, Quick Comment: 2Q Subs and Margins Under Pressure*, MORGAN
STANLEY, Aug. 9, 2011.

[10]     *Id.* at 26.

[11]     *See* National Cable & Telecommunications Association, Top 25 Multichannel Video
Programming Distributors as of March 2011, *at* http://www.ncta.com/Stats/TopMSOs.aspx.

[12]     Verizon Communications, Financial and Operating Information as of June 30, 2011, *at*
http://www22.verizon.com/idc/groups/public/documents/adacct/2011_2q_foi_pdf.pdf.

[13]     *See* Press Release, Cablevision Systems Corporation, Cablevision Systems Corporation Reports
Second Quarter 2011 Results (Aug. 9, 2011).

[14]     *See Verizon Telephone Companies and Verizon Services Corp. v. Madison Square Garden, L.P.
and Cablevision Systems Corp.*, CSR-8185-P, Defendants' Answer to Verizon's Supplement to Program
Access Complaint, at 26 (Oct. 12, 2010) ("Defendants' Answer to Verizon Supplement").

[15]     *Id.* at 26-27.

provider in the list of top 10 MVPDs in the country, Verizon's FiOS TV service increased its subscribership by nearly 45% during that same period.[16]

Verizon's own officials have spoken glowingly of the company's performance in the New York market.  Despite lack of access to the MSG HD and MSG+ HD RSNs, Verizon reported that it experienced "a great first year for FiOS TV in New York City," that FiOS TV had been having "great success in the suburban areas around the city," and that the response to FiOS TV from New Jersey consumers had been "nothing short of astounding."[17]  In early 2010 update on the rollout of FiOS TV in New York City, Verizon noted that it had expanded into 140 additional neighborhoods in 2009 (more than doubling the number served at launch in 2008) and served a total of 810,000 households in the City.[18]  A Verizon official stated that "[r]ollout of FiOS TV is on the fast track in the city," and that "[c]onsumers across the city contact us each day asking when Verizon FiOS will be in their neighborhoods."[19]  Commenting on the pace of the FiOS TV rollout in New York City, a Verizon official noted that the company was "thrilled with where this investment is."[20]  Overall, Verizon's Chief Financial Officer reported that the company is "very satisfied with where we are from a FiOS perspective."[21]

Elsewhere in New York State, Verizon has reported similar success.  Verizon itself characterized FiOS TV as a "formidable competitor to cable and satellite" in the New York market.[22]  Marking the two-year anniversary of FiOS in New York State, a Verizon official

---

[16]     *Id.* at 27.

[17]     *Id.* at 24.

[18]     *Id.*

[19]     *Id.*

[20]     *Id.*

[21]     *Id.*

[22]     *Id.* at 24-25.

lauded the "wonderful customer response" and remarked that: "Watching FiOS TV expand in our state has been truly remarkable, as we launch the service to more and more communities and see customers signing up in droves."[23/]  Verizon reported that in New York "[e]ach and every day consumers are dropping their cable company and taking hold of the fiber-optic advantages, including incredible pictures and sound clarity as well as innovative new services."[24/]  Verizon officials stated in October 2009 that the company has "had great success with our FiOS TV product in just the short time it's been in the central New York market." [25/]  In April 2010, Verizon's CFO stated that "the entire FiOS initiative continues to be very successful and we saw very positive levels of customer additions for both FiOS TV and Internet this quarter."[26/]

Verizon reported at the end of 2009 that it is now "the largest TV provider in New Jersey, exceeding Comcast and Cablevision, in terms of total locations served."[27/]  A Verizon official stated that "[c]ustomers in New Jersey have enthusiastically embraced FiOS, which offers a suite of services that old-fashioned cable companies just can't match."[28/]  According to the president of Verizon New Jersey, "hundreds of thousands of [New Jersey] customers have gladly welcomed FiOS into their homes and said goodnight to their disco-era cable company."[29/]

Verizon's strategic business decisions also demonstrate that the absence of the MSG HD and MSG+ HD RSNs is not harming its ability to compete effectively in the New York market. For example, notwithstanding Verizon's claims of competitive impairment in the New York

---

[23/]    *Id.* at 25.

[24/]    *Id.*

[25/]    *Id.*

[26/]    *Id.* at 26.

[27/]    *Id.* at 25.

[28/]    *Id.*

[29/]    *Id.*

DMA, Verizon raised its rates for FiOS TV in New York in 2009.[30]  A Verizon executive explained that the company was "feeling good enough about its brand position that it could charge a premium price even as it tried to steal customers from cable."[31]  *The New York Times*, reporting on that rate increase, remarked that "[i]t takes a lot of moxie to raise prices in a deep recession, particularly when you are the newcomer to a hotly competitive market."[32]  Rate hikes for the Verizon FiOS TV service continued in 2010, with Verizon raising prices for one of its packages by 21%, doubling early termination fees on FiOS TV contracts, and expected to raise prices for other video packages by $10 to $20 a month.[33]  By contrast, Cablevision's 2010 rate increases averaged about 3% for its customers.[34]

In addition, while press reports suggested that Verizon was pulling back from its FiOS TV rollout in some markets in 2010, Verizon's robust expansion in the New York area continued.[35]  Although Verizon reportedly "abandoned efforts" in 2010 to rollout FiOS TV in Boston, Baltimore, and Alexandria, Virginia, as well as other markets, the company said it would "continue to expand in markets it has already entered, including New York City."[36]  Verizon gave no reason for slowing its rollout of FiOS TV elsewhere, other than to say that "[i]t's nearing its completion" and that the company "met our objective."[37]  Verizon indicated, however, that it continues plans to aggressively sell FiOS TV in places like the New York area where it has been

---

[30]    *Id.* at 40.

[31]    *Id.* at 40-41.

[32]    *Id.* at 41 citing Saul Hansell, *Verizon Raises FiOS Prices, but Hardly Mentions It, NY* TIMES.COM, June 22, 2009, *at* http://bits.blogs.nytimes.co3tn/2009/06/22/verizon-raises-fios-prices-but-hardly-mentions-it/.

[33]    *Id.*

[34]    *Id.*

[35]    *Id.*

[36]    *Id.*

[37]    *Id.* at 41-42.

deployed:  "We're selling the heck out of it in those areas," according to a Verizon official.[38/]
Nielsen estimated that by mid-2010 Verizon had spent more than $10 million in advertising its
FiOS TV offering in the New York metropolitan area.[39/]  Verizon's decision to pull back from
deploying FiOS TV in markets where there would be no issues associated with access to HD
RSNs, while continuing to expand and sell aggressively in the New York DMA, belies claims
that its ability to compete is harmed by the absence of the MSG HD and MSG+ HD.

Verizon's advertising and marketing campaigns demonstrate that its ability to offer
customers a compelling video service has in no way been hindered by the absence of the MSG
HD and MSG+ HD RSNs.  Verizon has highlighted its sports offerings as a competitive
differentiator to Cablevision and other operators, boasting that "FiOS TV is the best place to
watch sports," [40/] that "FiOS TV is the best place to watch basketball and all other sports
programming," and that "FiOS TV is a baseball fan's seat behind home plate."[41/]  Verizon also
advertises its HD program services as a competitive differentiator to Cablevision and other
operators, with Verizon ads that claim that FiOS TV has more HD than Cablevision and is "the
only service to consider for customers who want the best HD experience."[42/]  Verizon revealed
that a key centerpiece of its promotional and marketing campaigns in the New York area has
been to "tout high definition channel superiority," and that the strategy for the rollout of FiOS
TV in New York City was to "differentiate Verizon from its competitors by emphasizing the
superiority of its all-digital FiOS TV service and extensive high-definition programming."[43/]

---

[38/]        *Id.* at 42.

[39/]        *Id.*

[40/]        *Id.*

[41/]        *Id.* at 43.

[42/]        *Id.* at 44.

[43/]        *Id.* at 44-45.

Verizon has continued to highlight its HD offerings to potential subscribers in the New York marketplace, along with other differentiating capabilities and features.[44/]  Verizon's emphasis on sports and HD in its advertising makes clear it believes that even without the MSG HD and MSG+ HD RSNs it can effectively compete for sports fans who are HD viewers.

> **B.    The Absence of MSG HD and MSG+ HD From AT&T's Channel Lineup Has Not Hindered Its Ability to Compete Effectively and Successfully in Connecticut**

AT&T similarly highlights in its comments the company's complaint against Cablevision and Madison Square Garden. L.P., claiming its lack of to MSG HD and MSG+ HD "inhibit[s] [AT&T's] ability to offer subscribers . . . a viable competitive alternative."[45/]  But as is the case with Verizon, AT&T's own assessment of its competitive abilities, as well as objective measures of its performance in the Connecticut market, demonstrate that AT&T in fact competes very effectively without access to the MSG HD and MSG+ HD RSNs.

First, by AT&T's own account, the U-verse TV offering continues to be a strong and unequivocal commercial success in Connecticut, quickly expanding to be available in more than 100 communities across the state.[46/]  By the end of 2010, U-verse TV passed 545,000 homes in Connecticut, with AT&T expecting that number to rapidly exceed 700,000.[47/]  President of AT&T Connecticut, Rodney Smith, told a reporter in 2010 that "we added more U-verse TV subscribers last quarter than any of our cable competitors,"[48/] and that "Connecticut customers

---

[44/]    *Id.*

[45/]    AT&T Comments at 14.

[46/]    *AT&T Services, Inc. and Southern New England Telephone Company D/B/A AT&T Connecticut v. Madison Square Garden, L.P. and Cablevision Systems Corp.,* CSR-8196-P, Defendants' Answer to AT&T's Supplement to Program Access Complaint, at 29 (Jan. 6, 2011) ("Defendants' Answer to AT&T Supplement").

[47/]    *Id.*

[48/]    *Id.*

have really embraced U-verse" and "love the product."[49/]  AT&T has stated that it is "really

happy" with "the growth and success we're seeing around U-verse," that the service has enjoyed

"tremendous growth," and that Connecticut in particular "has been a very strong performer for

the company."[50/]  AT&T officials have also remarked that in Connecticut, U-verse TV "demand

is very high," and that "[a] lot more residents and communities are looking for it." [51/]

AT&T has described U-verse as "one of the big drivers in the continued improvement in

consumer revenues."[52/]  The company "expect[s] U-verse revenue to continue to grow and

margins to continue to improve, and this will drive further improvement in our overall consumer

financials."[53/]  AT&T boasts that its U-verse TV offering "bring[s] consumers across the Nutmeg

State a new era of video competition."[54/]  In announcing a recent expansion into an additional

Connecticut community, AT&T said its U-verse services offer "an unmatched experience for

customers" and a "better choice" for consumers in Fairfield County who "want to break free

from cable."[55/]  Describing AT&T's success in competing against cable companies in

Connecticut, one AT&T official stated, "We've been way ahead [of the competition]" and

"We've done some damage."[56/]  AT&T's CFO recently remarked that "U-verse is the fastest-

growing pay-TV business in the country, with momentum continuing into the fourth Quarter,"

reiterating that "customers love the product" and that 2010 would close "with U-verse making a

positive contribution to wireline margins on an annualized revenue stream of almost $5

---

[49/]     *Id.*

[50/]     *Id.*

[51/]     *Id.*

[52/]     *Id.*

[53/]     *Id.* at 29-30.

[54/]     *Id.* at 30.

[55/]     *Id.*

[56/]     *Id.*

billion."[57] Connecticut publications reported on AT&T's "'aggressive' expansion plans" that portend "a full-scale war over Internet, phone and television service is on the horizon" in the state, while AT&T reported that "about 60% of the customers signing up for AT&T's U-verse services are switching from cable competitors."[58]

AT&T's U-verse growth in Connecticut has been so substantial that the company has been "ramping up its workforce to keep up with service demand in Connecticut."[59]  In August 2010 the company held a two-day job fair in New Haven and Rocky Hill, Connecticut, to recruit new employees as "U-verse technicians," and held a second job fair in Norwalk "to fill 100 open positions" the company attributed at least partially to "the growth of its TV service."[60]  Despite the absence of MSG HD and MSG+ HD, AT&T's recent forecast was that in Connecticut, U-verse TV will continue to show "pretty aggressive expansion in the next year or so."[61]

Second, AT&T's strategic business decisions demonstrate the company's ability to compete effectively in Connecticut despite lack of the MSG HD and MSG+ HD RSNs.  AT&T continues to make major investments in expanding its services in Connecticut.  Between 2007 and 2009, AT&T invested almost $825 million in expanding its Connecticut networks.[62] Further, there has been "a heavy concentration" of AT&T marketing efforts in the towns of Fairfield County, where Cablevision provides service.[63]  AT&T officials have described

---

[57] *Id.*

[58] *AT&T Services, Inc. and Southern New England Telephone Company d/b/a AT&T Connecticut v. Madison Square Garden, L.P. and Cablevision Systems Corp.*, CSR-8196-P, Answer to Program Access Complaint, at 53 (Sept. 17, 2009) ("Defendants' Answer to AT&T Complaint").

[59] Defendants' Answer to AT&T Supplement at 33.

[60] *Id.*

[61] *Id.* at 47.

[62] *Id.*

[63] *Id.* at 48.

Connecticut as "one of the most competitive environments" for cable and telecommunications services in the country,[64] yet AT&T raised its rates for U-verse TV in Connecticut by up to 11% in early 2010.[65]  Raising rates in a highly competitive market during an economic downturn is not indicative of a company that considers its competitive viability to be significantly hindered.

Third, AT&T's advertising and marketing campaigns demonstrate that its ability to offer customers a compelling video service has in no way been hindered by the absence of the MSG HD and MSG+ HD RSNs.  AT&T advertisements boast that "AT&T U-verse customers know that there's really only one way to watch TV, especially the big game."[66]  Notwithstanding the absence of MSG HD and MSG+ HD from its lineup, AT&T continues to trumpet the strength of its sports program offerings, highlighting, for example, its carriage in New Haven and Hartford of "New England's most watched sports network," NESN (which features Boston Red Sox and Boston Bruins games), as well as its carriage of "one of the most watched regional sports networks in the country," YES.[67]  Last year, AT&T announced the launch of NBA TV on U-verse, stating that the addition "gives our U-verse TV customers access to even more exciting sports content, and in stunning HD."[68]  Recent AT&T U-verse advertisements proclaim that "You've never seen the game like this."[69]  The emphasis that AT&T places on its sports programming services and features belies any suggestion that the absence of MSG HD and MSG+ HD has somehow hobbled its ability to compete effectively in Connecticut.

---

[64]      *Id.* at 48-49.

[65]      *Id.* at 49.

[66]      *Id.* at 49-50.

[67]      *Id.* at 49.

[68]      *Id.*

[69]      *Id.*

## CONCLUSION

For the reasons set forth in Cablevision's initial comments in this proceeding and summarized above, the Commission should eliminate regulatory constraints on RSN distribution, such as those imposed by the program access rules' exclusivity ban and the *Adelphia Order* RSN conditions.  Contrary contentions by Verizon and AT&T that the viability and success of their video programming offerings is contingent upon government-guaranteed access to RSNs are unsupported by convincing evidence and wholly belied by the strong performance of each of the companies in markets where they compete without access to RSNs.

Respectfully submitted,

Michael E. Olsen
Senior Vice President, Legal,
   Regulatory and Legislative Affairs
Cablevision Systems Corp.
1111 Stewart Avenue
Bethpage, NY 11714
(516) 803-2300


September 26, 2011

      ___/s/_____
Howard J. Symons
Christopher J. Harvie
Ernest C. Cooper
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
   AND POPEO, P.C.
701 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C.  20004
(202) 434-7300

# EXHIBIT F

Final Version

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

OCT - 8 2008

RECEIVED

IN THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

Nos. 07-1425, 07-1487

CABLEVISION SYSTEMS CORPORATION
AND COMCAST CORPORATION,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

Respondents.

On Petitions for Review of
an Order of the Federal Communications Commission

BRIEF FOR PETITIONERS

HENK BRANDS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1615 L Street, N.W., Suite 1300
Washington, DC 20036
(202) 223-7300

DAVID P. MURRAY
RYAN WALLACH
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
(202) 303-1000

*Counsel for Comcast Corporation*

October 8, 2008

HOWARD J. SYMONS
CHRISTOPHER J. HARVIE
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
701 Pennsylvania Ave., N.W., Suite 900
Washington, D.C. 20004
(202) 434-7300

*Counsel for Cablevision Systems Corp.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.   Parties and Amici:

The petitioners here are Cablevision Systems Corporation and Comcast Corporation.  The respondents here are the Federal Communications Commission and the United States of America. Intervenors on behalf of respondents are AT&T Inc., EchoStar Satellite LLC, and Verizon.  Participating as an amicus supporting respondents is the Broadband Service Providers Association.  The parties who filed comments before the agency are listed in Appendix A to the order under review.

### B.   Ruling Under Review:

*Implementation of the Cable Television Consumer Protection and Competition Act of 1992 and Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act — Sunset of Exclusive Contract Prohibition*, Report and Order, 22 FCC Rcd 17791 (2007) [JA 424].  A summary of the FCC's decision was published in the Federal Register on October 4, 2007.  *See* 72 Fed. Reg. 56645.

### C.   Related Cases:

This matter has not previously been before this Court.  Counsel are aware of no related cases currently pending in this Court or in any other court.

# TABLE OF CONTENTS

Page:

Amended Corporate Disclosure Statement . . . . . . . . . . . . . . . . . .   xiv

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Statement of Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Statutes and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

      A. The Exclusivity Rule  . . . . . . . . . . . . . . . . . . . . . . . . . .   3

      B. The 2002 Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

      C. The 2007 Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

Summary of the Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

I.    THE FCC MISAPPREHENDED THE STANDARD
     GOVERNING THE CIRCUMSTANCES UNDER WHICH
     IT MAY PREVENT THE EXCLUSIVITY RULE FROM
     SUNSETTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

     A.    The FCC Erred in Equating Harm to Competitors
          with Harm to Competition . . . . . . . . . . . . . . . . . . .   36

     B.    The FCC Erred in Interpreting the Term "Necessary."   41

II.   UNDER ANY LEGAL STANDARD, THE FCC WAS
     REQUIRED TO ALLOW THE EXCLUSIVITY RULE TO
     SUNSET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

**Page:**

A.    Today's Competitive Marketplace Precludes
      Widespread Withholding . . . . . . . . . . . . . . . . . . . . .   44

B.    The FCC's Own Calculations in Appendix C Predict
      Insignificant Withholding . . . . . . . . . . . . . . . . . . .   50

      1.    Appendix C's Methodology Is Skewed To
           Overstate Withholding . . . . . . . . . . . . . . . . . . .   50

      2.    Despite Appendix C's Skewed Methodology, the
           Amount of Withholding That It Predicts Is Small   55

C.    The Exclusivity That May Occur Without The Ban
      Would Not Harm Competition and Would Benefit
      Consumers . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

III.   THE FCC ERRED IN REFUSING TO NARROW THE
       EXCLUSIVITY RULE . . . . . . . . . . . . . . . . . . . . . . . . .   63

A.    The FCC Should Have Adopted Proposed
      Exemptions Based on the Status of the Cable
      Operator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   63

B.    The FCC Should Have Exempted New and Niche
      Programming. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67

II.   THE ORDER UNDER REVIEW SHOULD BE
     VACATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

## Statement of Jurisdiction

Section 628(c)(2)(D) of the Communications Act, enacted as part of the Cable Television Consumer Protection and Competition Act of 1992,[1] required the FCC to promulgate a rule that would "prohibit exclusive contracts for satellite cable programming . . . between a cable operator and a satellite cable programming vendor in which a cable operator has an attributable interest . . . ."[2] After conducting a notice and comment rulemaking proceeding, the FCC promulgated the rule in 1993.[3] We will here refer to it as the exclusivity rule.

Section 628(c)(5) of the Communications Act provides: "Sunset Provision. — The prohibition required by paragraph (2)(D) shall cease to be effective 10 years after [the date of enactment of this section], unless the Commission finds, in a proceeding conducted during the last year of such 10-year period, that such

---

[1] Pub. L. No. 102-385, 106 Stat 1460, § 19.

[2] 47 U.S.C. § 548(c)(2)(D).

[3] *Implementation of Sections 12 and 19 of the Cable Television Consumer Protection and Competition Act of 1992; Development of Competition and Diversity in Video Programming Distribution and Carriage*, First Report and Order, 8 FCC Rcd 3359 (1993); s*ee* 47 C.F.R. § 76.1002(c)(2) ("No cable operator shall enter into any exclusive contracts . . . for satellite cable programming . . . with a satellite cable programming vendor in which a cable operator has an attributable interest . . . .").

prohibition continues to be necessary to preserve and protect competition and diversity in the distribution of video programming."[4]  In 2002, the FCC issued an order in which it purported to find that the prohibition continued to be necessary and in which it announced that, five years later, it would "again determine whether the exclusivity prohibition continues to be necessary."[5]  In the order under review, the agency again purports to "find that the exclusive contract prohibition continues to be necessary," and "retain[s] it again for five years, until October 5, 2012."[6]

The order under review, which was a final order that disposed of all parties' claims, was published on October 4, 2007, at 72 Fed. Reg. 56645.  Cablevision filed a timely petition for review on October 19, 2007.  Comcast filed a timely

---

[4] 47 U.S.C. § 548(c)(5).

[5] *Implementation of the Cable Television Consumer Protection and Competition Act of 1992; Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act — Sunset of Exclusive Contract Prohibition*, Report and Order, 17 FCC Rcd 12124, ¶ 80 (2002) ("*2002 Order*").

[6] *Implementation of the Cable Television Consumer Protection and Competition Act of 1992; Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act — Sunset of Exclusive Contract Prohibition, Review of the Commission's Program Access Rules and Examination of Programming Tying Arrangements*, Report and Order and Notice of Proposed Rulemaking, 22 FCC Rcd 17791, ¶ 1 (2007) ("*2007 Order*").

petition for review on December 3, 2007.  This Court has jurisdiction pursuant to

47 U.S.C. § 402(a) and 28 U.S.C. § 2342.

## Statement of Issues

I.    Whether the FCC misapprehended the standard governing the circumstances
      under which it may prevent the exclusivity rule from sunsetting.

II.   Whether, under the correct standard, the FCC was required to allow the
      exclusivity rule to sunset.

III.  Whether the FCC erred in refusing to narrow the exclusivity rule.

IV.   Whether the order under review should be vacated.

## Statutes and Regulations

Pertinent statutes and regulations are set forth in the Addendum to this brief.

## Statement of Facts

### A.    The Exclusivity Rule.

As part of the 1992 Cable Act, Congress enacted a "program access"

provision that was intended to ensure that potential competitors to cable operators

(*e.g.*, DBS operators and telephone companies) would have access to cable

programming services (*e.g.*, CNN, HBO, the Discovery Channel).  The legislative

history indicates that Congress was concerned that cable operators had ownership

interests in many popular cable programming services, and that cable operators

would be able to stifle competition from other multichannel video programming

- 3 -

distributors ("MVPDs") by withholding those programming services from new entrants.[7]  An important part of the program access provision is Section 628(c)(2)(D), which required the FCC to adopt a rule that would "prohibit exclusive contracts for satellite cable programming . . . between a cable operator and a satellite cable programming vendor in which a cable operator has an attributable interest."[8]

That Congress imposed such a prohibition is remarkable.  Exclusivity agreements are common throughout the economy.[9]  For example, K-Mart has an exclusive agreement with Martha Stewart, AT&T Wireless has an exclusive

---

[7] *See* S. Rep. No. 102-92, at 28 (1991) ("The Committee believes that exclusivity can be a legitimate business strategy where there is effective competition.  Where there is no effective competition, however, exclusive arrangements may tend to establish a barrier to entry and inhibit the development of competition in the market."); *see also 2002 Order* ¶ 7 ("[T]he structure and legislative history of the 1992 Cable Act suggest that Congress believed it unlikely that new market entrants could compete effectively unless they could gain access to vertically integrated, satellite delivered programming.  It was this programming that Congress believed incumbent providers had both the incentive and the ability to deny to new competitors.  In terms of the nature of the competitors it anticipated, Congress explicitly expected competition to incumbent cable operators to develop from cable overbuilders, MMDS operators, SMATV systems, and DTH satellite providers (C-band and DBS).").

[8] *See* 47 U.S.C. § 548(c)(2)(D).

[9] *See, e.g.*, Andria Cheng, *Retailers Seek More Exclusives*, Wall St. J., July 2, 2008.

- 4 -

agreement with Apple for the iPhone, and DIRECTV has an exclusive agreement with the NFL for the "Sunday Ticket" package. It is generally accepted — and the FCC itself has acknowledged — that exclusive agreements can benefit consumers by strengthening competitors' incentives to innovate, to invest, and to differentiate their products from those of their rivals.[10]

It is also well-accepted that prohibiting exclusive agreements between parts of the same firm (*i.e.*, requiring a firm to share the fruits of its own investments with competitors) is particularly disfavored.[11] There is an obvious concern that any compelled-sharing regime would blunt the incentive to create facilities that are required to be shared — both for the firm that is forced to surrender the fruits of its investment and for the firm that receives them.[12] Thus, sharing obligations of this

---

[10] *See, e.g.*, *2007 Order* ¶ 63 ("We recognize the benefits of exclusive contracts and vertical integration cited by some cable MSOs, such as encouraging innovation and investment in programming and allowing for 'product differentiation' among distributors.").

[11] *See generally* Phillip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L. J. 841 (1989).

[12] *See, e.g.*, *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004) ("Compelling . . . firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."); *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 428-29 (1999) (Breyer, J., concurring in part and dissenting in part) ("a

kind have generally been imposed only in limited circumstances — with respect to discrete physical facilities that have true natural-monopoly characteristics (such as "local loops" in a telephone network).[13]

Video-programming services are not physical facilities; rather, they are bundles of intellectual property. Video-programming services certainly do not have natural-monopoly characteristics: the market for video-programming services is vibrantly competitive.[14] Thus, insofar as video-programming services are concerned, exclusive agreements can have a particularly salutary effect: they allow

---

sharing requirement may diminish the original owner's incentive to keep up or to improve the property by depriving the owner of the fruits of value-creating investment, research, or labor"); *id.* at 429 ("Nor can one guarantee that firms will undertake the investment necessary to produce complex technological innovations knowing that any competitive advantage deriving from those innovations will be dissipated by the sharing requirement."); *United States Telecom Ass'n v. FCC*, 290 F.3d 415, 429 (D.C. Cir. 2002) ("mandatory unbundling comes at a cost, including disincentives to research and development").

[13] *See, e.g., AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 429 (1999) (Breyer, J., concurring in part and dissenting in part) ("as one moves beyond the sharing of readily separable and administrable physical facilities, say, to the sharing of research facilities, firm management, or technical capacities, [the downsides of sharing] can become more severe"); IIIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 773 at 196 (2002) ("The strongest claims of essentiality are resources that constitute natural monopolies . . . .").

[14] *See generally* Cablevision Comments Appendix B ("Wallsten Report"), Part IV [JA 125].

cable operators to invest in risky new services secure in the knowledge that, if the services turn out to be successful, they will not have to share the upside with competitors (who, naturally, are not interested in sharing the downside of failures).[15] For example, cable operators, having close ties to local communities, are well positioned to create local and regional news services, and some cable operators have done so.[16] A requirement to share services that turn out successful blunts the incentive to create new services of that kind, to the detriment of consumers.

That Congress nonetheless imposed a sharing obligation with respect to video-programming services likely resulted from industry conditions that prevailed in 1992. At the time, there were far fewer video-programming services than there

---

[15] *See generally id.* at 4; *see also United States Telecom Ass'n v. FCC*, 290 F.3d 415, 424 (D.C. Cir. 2002) ("Some innovations pan out, others do not. If parties who have not shared the risks are able to come in as equal partners on the successes, and avoid payment for the losers, the incentive to invest plainly declines.").

[16] *See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Twelfth Annual Report, 21 FCC Rcd 2503, ¶ 185 (2006) ("*Twelfth Annual Report*").

are today, and many of them were cable-affiliated.[17]  In addition, because meaningful competitive entry at the MVPD level had yet to occur, withholding came at little or no cost.[18]  Moreover, at the time, potential entrants had not yet sunk any investments.  These facts, which no longer prevail, raised the concern that withholding might deter their entry completely.

Even so, no doubt cognizant of the incentive effects of compelled sharing, Congress viewed its ban on exclusivity as temporary.  Under the terms of the statute, the exclusivity rule "shall cease to be effective 10 years after [the date of enactment of this section], unless the Commission finds, in a proceeding conducted during the last year of such 10-year period, that such prohibition continues to be necessary to preserve and protect competition and diversity in the distribution of video programming."[19]  As the FCC would later observe, the statute thus "creates a presumption that the rule will sunset."[20]

---

[17] *See* H.R. Rep. No. 102-628, at 41 (1992) ("there are 68 nationally delivered cable video networks, 39 of which, or 57 percent, have some ownership affiliation with the operating side of the cable industry").

[18] *See, e.g., 2007 Order* ¶¶ 44, 60; *2002 Order* ¶ 37.

[19] 47 U.S.C. § 548(c)(5).

[20] *2002 Order* ¶ 16.

- 8 -

that significant withholding is not feasible in today's competitive market conditions. The massive changes to the competitive landscape also render it implausible that the limited exclusivity that would occur would harm competition: withholding would neither drive rival MVPDs out of business nor seriously impair their ability to compete. And any lack of access to withheld programming would be more than compensated for by improved incentives (for both cable operators and competing MVPDs) to invest in new, high quality programming that benefits consumers.

## A. Today's Competitive Marketplace Precludes Widespread Withholding.

As shown above, the competitive landscape has changed dramatically since 1992. *See supra*, pp. 11-13. Vertically integrated video-programming services are now in a distinct minority. As of June 2006, the FCC reported that there were over 565 national programming networks, of which only a small minority were vertically-integrated networks owned by cable operators. *See* FCC Nov. 27, 2007, Press Release; *see also* Comcast Comments at 14 [JA 175] (noting that the percentage of vertically integrated national programming networks has declined to 13.5 percent). The explosion in the number of alternate programming networks

- 44 -

means that most services have close substitutes. Competitive MVPDs can obtain an immense amount of programming irrespective of their access to video-programming services that are affiliated with cable operators. This eliminates the ability of cable operators to use withholding to block rivals. For example, in 1992, there may have been a plausible argument that withholding of CNN would harm DBS and other new providers. Today, there are numerous substitutes, such as Fox News, CNBC, and MSNBC, available to competitive MVPDs. Withholding CNN, therefore, would not cause DBS operators any appreciable harm.

Moreover, where cable operators do own programming, any incentive they might have to withhold it would be limited to those geographic areas in which they own cable systems — not nationwide. *See 2007 Order* ¶ 60 ("[V]ertically integrated programmers are likely to have the incentive to withhold programming only when their affiliated cable operators have a sufficient share of the distribution market to minimize the impact of foregone subscription and advertising revenues from denying access to other distributors."); *Applications for Consent to the Assignment and/or Transfer of Control of Licenses, Adelphia Communications Corp.*, Memorandum Opinion and Order, 21 FCC Rcd 8203, ¶ 175 (2006) ("*Adelphia Order*") (recognizing that, insofar as cable operators enter into

- 45 -

exclusive agreements, they can and do permit the programmer to sell to MVPDs with which they do not compete). Even in those limited geographic areas, the availability of a vast array of available programming that is not vertically integrated with cable operators further reduces the incentives for them to withhold, since rival MVPDs are far more likely to find good programming substitutes.

Over the same time period, MVPDs that compete with traditional cable companies have gained substantial market share. This also reduces the profitability — and thus the prospect — of widespread withholding. In 1992, cable operators were the dominant distributors of multichannel video programming, serving almost all subscribers. *See 2002 Order* ¶ 46. As of today, competing MVPDs have attracted more than 32 percent of subscribers nationwide. The two DBS providers, DIRECTV and EchoStar, offer ubiquitous nationwide service and are now the second and third largest MVPDs in the United States, respectively. And, in just two years, new entrant Verizon has attracted over a million subscribers, becoming one of the top ten cable operators in the country. Press Release, Verizon Communications Inc., Verizon Tops 1 Million FiOS TV Customers (Jan. 28, 2008).

The growth in customers served by non-cable MVPDs has significantly increased the costs and risks of pursuing an anti-competitive foreclosure strategy through exclusivity. *See* Cablevision Comments at 16, App. B at 11 [JA 90, 135]; Cablevision Reply Comments at 9 [JA 296]; Comcast Comments at 19-21 [JA 180-82]; Comcast Reply Comments at 9-10 [JA 331-32]. A cable operator's most popular (in the FCC's parlance, "must have") affiliated programming typically garners the highest licensing fees and advertising revenues. *See* Cablevision Comments at 17 [JA 91]. Withholding this programming would result in immediate and substantial losses in revenues to the network. *Id.* [JA 91]. A foreclosure strategy would be plausible, therefore, only if large numbers of subscribers switched from competing MVPDs to the cable operator to access the withheld programming. Yet, the record showed that it is highly unlikely subscribers would switch to a cable operator solely to obtain a withheld network in numbers significant enough to eliminate MVPD rivals or allow cable operators to reap monopoly profits.

DBS, for example, has become a strong competitor. DIRECTV and EchoStar both offer local broadcast signals, abundant HD programming, feature-rich set-top boxes, and their own unique and exclusive programming (*e.g.,*

- 47 -

exclusive NFL and "March Madness" packages that are perennially strong

marketing assets). Cablevision Comments App. A at 1-6 [JA 107-112]; Comcast

Comments at 6-8 [JA 167-69]. The FCC's fear that DBS subscribers would switch

just to obtain a withheld programming network is flatly inconsistent with the

Commission's recent assertion that a number of factors reduce the likelihood of

such an outcome. The FCC claimed that, "due to switching costs, consumers are

reluctant to switch MVPDs except when there is a large benefit." *Cable*

*Horizontal and Vertical Ownership Limits*, Fourth Report and Order and Further

Notice of Proposed Rulemaking, 23 FCC Rcd 2134, ¶ 70 (2008). "DBS providers

typically require customers to agree to one year service commitments to receive

subsidized equipment and installation," and "DirecTV requires customers who do

not have a sufficiently high credit score to pay an upfront fee . . . that is paid back

to them in the form of credits [in] $5 increments over 40 to 60 months." *Id.* ¶ 70

n.236. Thus, according to the FCC itself, competition from DBS and other

MVPDs has diminished any prospect that cable operators could achieve subscriber

switching at anywhere near levels that would decrease competition or diversity of

programming in the MVPD market.

The FCC also disregarded that there has been relatively little exclusivity even when allowed under current FCC rules. These rules permit cable operators to enter into exclusive contracts with independent programmers. For instance, a cable operator could, under current rules, enter into an exclusive agreement with the Disney Channel. Although vertical integration may make exclusivity easier (*i.e.*, by internalizing contracting issues over the size of the exclusivity premium, safeguards against breach, etc.), there are few barriers that prevent MVPDs and independent programmers from entering into such arrangements. Yet, the amount of exclusivity that has been obtained by cable operators through such contracts has been small. *See* Cablevision Reply Comments at 9 [JA 296] (noting that "the Commission itself has stated that 'in many instances, the economic incentive of vertically integrated programmers will be to make their programming available to as many MVPD outlets as possible'") (citing *2002 Order* ¶ 53).

The FCC's assertion that significant withholding of programming would occur without a ban, therefore, is simply implausible. The FCC has thus failed to sustain its burden to show, by "substantial evidence," that the harms that it predicts are "are real, not merely conjectural." *Supra*, pp. 32, 33.

- 49 -

# EXHIBIT G

Morningstar® Document Research℠

# FORM 10-K

## CSC HOLDINGS LLC - N/A

**Filed: February 16, 2011 (period: December 31, 2010)**

Annual report with a comprehensive overview of the company

*The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.*

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C.  20549

# FORM 10-K

(Mark One)

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended <u>December 31, 2010</u>

OR

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 [NO FEE REQUIRED]

For the transition period from _____ to _____

| Commission File <u>Number</u> | Registrant; State of Incorporation; <u>Address and Telephone Number</u> | IRS Employer <u>Identification No.</u> |
|---|---|---|
| 1-14764 | **Cablevision Systems Corporation** <br> Delaware <br> 1111 Stewart Avenue <br> Bethpage, NY  11714 <br> (516) 803-2300 | 11-3415180 |
| 1-9046 | **CSC Holdings, LLC** <br> Delaware <br> 1111 Stewart Avenue <br> Bethpage, NY  11714 <br> (516) 803-2300 | 27-0726696 |

Securities registered pursuant to Section 12(b) of the Act:

Title of each class:

Name of each Exchange on which Registered:

<u>Cablevision Systems Corporation</u>

Cablevision NY Group Class A Common Stock

New York Stock Exchange

<u>CSC Holdings, LLC</u>

None

Securities registered pursuant to Section 12(g) of the Act:

<u>Cablevision Systems Corporation</u>   None
<u>CSC Holdings, LLC</u>   None

Indicate by check mark if the Registrants are well-known seasoned issuers, as defined in Rule 405 of the Securities Act.

Cablevision Systems Corporation   Yes ☒   No ☐
CSC Holdings, LLC   Yes ☐   No ☒

Indicate by check mark if the Registrants are not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Cablevision Systems Corporation   Yes ☐   No ☒
CSC Holdings, LLC   Yes ☐   No ☒

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Indicate by check mark whether the Registrants (1) have filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrants were required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Cablevision Systems Corporation          Yes ☒     No ☐
CSC Holdings, LLC                         Yes ☒     No ☐

Indicate by a check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrants' knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Cablevision Systems Corporation          ☐
CSC Holdings, LLC                         ☐

Indicate by check mark whether the Registrants have submitted electronically and posted on their corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files).

Cablevision Systems Corporation          Yes ☒     No ☐
CSC Holdings, LLC                         Yes ☒     No ☐

Indicate by check mark whether each Registrant is a large accelerated filer, accelerated filer, non-accelerated filer or smaller reporting company.  See definition of large accelerated filer and accelerated filer in Exchange Act Rule 12b-2.

|  | Large accelerated filer | | Accelerated filer | | Non-accelerated filer | | Smaller reporting company | |
|---|---|---|---|---|---|---|---|---|
| Cablevision Systems Corporation | Yes ☒ | No ☐ | Yes ☐ | No ☐ | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| CSC Holdings, LLC | Yes ☐ | No ☐ | Yes ☐ | No ☐ | Yes ☒ | No ☐ | Yes ☐ | No ☐ |

Indicate by check mark whether the Registrants are shell companies (as defined in Rule 12b-2 of the Exchange Act).

Cablevision Systems Corporation          Yes ☐     No ☒
CSC Holdings, LLC                         Yes ☐     No ☒

Aggregate market value of the voting and non-voting common equity held by non-affiliates of Cablevision Systems Corporation computed by reference to the price at which the common equity was last sold on the New York Stock Exchange as of June 30, 2010:  $5,779,402,596

Number of shares of common stock outstanding as of February 11, 2011:

| Cablevision NY Group Class A Common Stock  - | 236,562,507 |
|---|---|
| Cablevision NY Group Class B Common Stock  - | 54,148,223 |
| CSC Holdings, LLC Interests of Member  - | 14,432,750 |

CSC Holdings, LLC meets the conditions set forth in General Instruction I(1)(a) and (b) of Form 10-K and is therefore filing this Form with the reduced disclosure format applicable to CSC Holdings, LLC.

Documents incorporated by reference - Cablevision Systems Corporation intends to file with the Securities and Exchange Commission, not later than 120 days after the close of its fiscal year, a definitive proxy statement or an amendment to this report filed under cover of Form 10-K/A containing the information required to be disclosed under Part II, Item 5 and Part III of Form 10-K.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| Part I | | | |
| | 1. | Business | 1 |
| | 1A. | Risk Factors | 27 |
| | 1B. | Unresolved Staff Comments | 37 |
| | 2. | Properties | 37 |
| | 3. | Legal Proceedings | 38 |
| | 4. | Submission of Matters to a Vote of Security Holders | 39 |
| Part II | | | |
| | 5. | Market for the Registrants' Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 40 |
| | 6. | Selected Financial Data | 44 |
| | 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 49 |
| | 7A. | Quantitative and Qualitative Disclosures About Market Risk | 110 |
| | 8. | Financial Statements and Supplementary Data | 112 |
| | 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 112 |
| | 9A. | Controls and Procedures | 112 |
| | 9B. | Other Information | 113 |
| Part III | | | |
| | 10. | Directors and Executive Officers and Corporate Governance | * |
| | 11. | Executive Compensation | * |
| | 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholders Matters | * |
| | 13. | Certain Relationships and Related Transactions, and Director Independence | * |
| | 14. | Principal Accountant Fees and Services | * |
| Part IV | | | |
| | 15. | Exhibits and Financial Statement Schedules | 114 |

\* Some or all of these items are omitted because Cablevision intends to file with the Securities and Exchange Commission, not later than 120 days after the close of its fiscal year, a definitive proxy statement or an amendment to this report filed under cover of Form 10-K/A containing the information required to be disclosed under Part II, Item 5 and Part III of Form 10-K.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

## PART I

Item 1.      Business

This combined Annual Report on Form 10-K is separately filed by Cablevision Systems Corporation ("Cablevision") and CSC Holdings, LLC, formerly CSC Holdings, Inc. ("CSC Holdings" and collectively with Cablevision, the "Company" or the "Registrants").

### Cablevision Systems Corporation

Cablevision is a Delaware corporation which was organized in 1997.  Cablevision owns all of the outstanding membership interests in CSC Holdings and its liabilities include approximately $2.2 billion of senior notes which amount does not include approximately $754 million of its senior notes held by Newsday Holdings LLC, its 97.2% owned subsidiary.  The $754 million of notes are eliminated in Cablevision's consolidated financial statements and are shown as notes due from Cablevision in the consolidated deficiency of CSC Holdings.  Cablevision has no operations independent of its CSC Holdings subsidiary.

### CSC Holdings

CSC Holdings is one of the largest cable operators in the United States based on the number of basic video subscribers.  We also operate cable programming networks, entertainment businesses, telecommunications companies and a newspaper publishing business.  As of December 31, 2010, we served approximately 3 million basic video subscribers in and around the New York metropolitan area and approximately 300,000 basic video subscribers in Montana, Wyoming, Colorado and Utah, acquired in December 2010 (see discussion of the Bresnan Cable acquisition below), making us the fifth largest cable operator in the United States based on the number of basic video subscribers.  We believe that our cable television systems comprise the largest metropolitan cluster of cable television systems under common ownership in the United States (measured by number of basic video subscribers).  Through our wholly-owned subsidiary, Rainbow Media Holdings LLC ("Rainbow Media Holdings"), we have ownership interests in national and international programming networks.  As discussed below, we are currently moving forward with the proposed spin-off of Rainbow Media Holdings.  Through Cablevision Lightpath, Inc. ("Optimum Lightpath"), our wholly-owned subsidiary, we provide telephone services and high-speed Internet access to the business market.  In addition, we own approximately 97.2% of Newsday LLC which operates a newspaper publishing business.  We also own regional news and high school sports programming services, a motion picture theater business and a cable television advertising sales business.

We classify our operations into three segments: Telecommunications Services; Rainbow; and Other.  Our Telecommunications Services segment includes our cable television business, including its video, high-speed data, and Voice over Internet Protocol ("VoIP") operations and the operations of the commercial high-speed data and voice services provided by Optimum Lightpath.  It also includes the operations of Bresnan Cable which was acquired in December 2010 (see discussion below).  Our Rainbow segment consists principally of our interests in national programming networks, including AMC, WE tv, IFC, and Sundance Channel, and IFC Entertainment.  Our Other segment includes the operations of (i) Newsday, which includes the Newsday daily newspaper, amNew York, Star Community Publishing Group, and online websites including newsday.com and exploreLI.com., (ii) our motion picture theater business ("Clearview Cinemas"), (iii) the News 12 Networks, our regional news programming services, (iv) the MSG Varsity network, our network dedicated entirely to showcasing high school sports and activities, (v) our cable television advertising company, Rainbow Advertising Sales Corporation ("RASCO"), and (vi) certain other businesses and unallocated corporate costs.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

In addition, we own 21,477,618 shares of Comcast Corporation ("Comcast") common stock that we received in connection with asset sales in prior years and that we monetized through the execution of prepaid forward contracts, that have been collateralized by an equivalent amount of Comcast common stock.

Proposed Distribution of Rainbow Media Holdings

On December 16, 2010, the Company announced that Cablevision's Board of Directors authorized Cablevision's management to move forward with the leveraged spin-off of Rainbow Media Holdings to Cablevision's stockholders (the "Rainbow Distribution").  The Rainbow Distribution would be structured as a tax-free pro rata distribution to stockholders and is expected to be completed by mid-year 2011, subject to necessary approvals.  As part of the Rainbow Distribution, a refinancing of what will be the new Rainbow Media Holdings would create new debt, a portion of which would be used to repay all outstanding Rainbow National Services LLC ("RNS") debt and approximately $1.25 billion of Cablevision and/or CSC Holdings debt.  It is anticipated that the Rainbow Distribution would be in the form of a pro rata distribution to all stockholders of Cablevision, with holders of Cablevision New York Group ("CNYG") Class A common stock receiving Class A shares in Rainbow Media Holdings and holders of CNYG Class B common stock receiving Class B shares in Rainbow Media Holdings.  Both Cablevision and Rainbow Media Holdings would continue to be controlled by the Dolan family through their ownership of Class B shares.

The new Rainbow Media Holdings' assets will include the Rainbow segment, which consists of:

- National programming networks: primarily AMC, WE tv, IFC, and Sundance Channel;
- IFC Entertainment, an independent film business that consists of multiple brands - including IFC Films, IFC Productions and the IFC Center; and
- Rainbow Network Communications, a full service network programming origination and distribution company, delivering programming to the cable, satellite and broadcast industries.

Businesses that will remain a part of Cablevision include the Telecommunications Services segment, Newsday and other businesses included in the Other segment.

Completion of the Rainbow Distribution is subject to a number of external conditions, including receipt of a private letter ruling from the Internal Revenue Service ("IRS"), the filing and effectiveness of a Form 10 with the Securities and Exchange Commission and the finalization of the terms and conditions of the required financing, as well as final approval by Cablevision's Board of Directors.  In late November 2010, the Company submitted a private letter ruling request to the IRS.

Acquisition of Bresnan Cable

On December 14, 2010, BBHI Holdings LLC ("Holdings Sub"), BBHI Acquisition LLC ("Acquisition Sub") and CSC Holdings,  each of which is a wholly-owned subsidiary of Cablevision, consummated the acquisition of Bresnan Broadband Holdings, LLC ("Bresnan Cable").  The purchase price was approximately $1.366 billion subject to final working capital and certain other adjustments.  The acquisition was financed using an equity contribution by CSC Holdings of $395 million, which CSC Holdings borrowed under its revolving credit facility, and debt consisting of an undrawn $75 million revolving credit facility, a $765 million term loan facility and $250 million 8.0% senior notes due 2018.

Distribution of Madison Square Garden

On February 9, 2010, Cablevision distributed to its stockholders all of the outstanding common stock of Madison Square Garden, Inc. ("Madison Square Garden"), a company which owns the sports, entertainment and media businesses previously owned and operated by the Company's Madison Square Garden segment (the "MSG Distribution").  The MSG Distribution took the form of a distribution by Cablevision of one share of Madison Square Garden Class A Common Stock for every four shares of CNYG Class A Common Stock held of record at the close of business in New York City on January 25, 2010 (the "MSG Distribution Record Date") and one share of Madison Square Garden Class B Common Stock for every four shares of CNYG Class B Common Stock held of record on the MSG Distribution Record Date.  For additional information concerning the MSG Distribution, see "Item 8.  Financial Statements and Supplementary Data" and our Current Report on Form 8-K filed on February 10, 2010.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

**Telecommunications Services**

General

Cable television is a service that delivers multiple channels of video programming to subscribers who pay a monthly fee for the services they receive.  Video signals are received over-the-air, by fiber optic transport or via satellite delivery by antennas, microwave relay stations and satellite earth stations and are modulated, amplified and distributed over a network of coaxial and fiber optic cable to the subscribers' television sets.  Cable television systems typically are constructed and operated pursuant to non-exclusive franchises awarded by local and state governmental authorities for specified periods of time.

Our cable television systems offer varying packages of video service.  In our New York metropolitan service area, the video service is marketed under the Optimum and iO brand names.  Our cable television systems in Montana, Wyoming, Colorado and Utah (the "Bresnan Cable service area") currently use the Bresnan name to market video product offerings.  Our video services may include, among other programming, local broadcast network affiliates and independent television stations, certain other news, information and entertainment channels such as CNN, CNBC, ESPN, and MTV, and certain premium services such as HBO, Showtime, The Movie Channel, Starz!/Encore and Cinemax.  We also offer digital video service, which enables customers to receive video on demand and subscription video on demand services, as well as additional viewing channels.

Our cable television revenues are derived principally from monthly fees paid by subscribers.  In addition to recurring subscriber revenues, we derive revenues from the sales of pay-per-view movies and events, video on demand and subscription video on demand program services, from the sale of advertising time on advertiser supported programming and from installation and equipment charges.  Certain services and equipment provided by substantially all of our cable television systems are subject to regulation.  See "Regulation - Cable Television."

We also provide high-speed data services using our cable television broadband network.  High-speed data services are provided to customers through a cable modem device.  The high-speed data service is marketed as "Optimum Online" in the New York metropolitan service area and as "Bresnan OnLine" in the Bresnan Cable service area.

The Company offers VoIP technology services exclusively to our Optimum Online subscribers, marketed as "Optimum Voice" in the New York metropolitan area.  The Company also offers VoIP technology services to customers in the Bresnan Cable service area, marketed as "Bresnan Digital Phone".

Through Optimum Lightpath, a business broadband service provider, we provide telecommunications services to the business market in the greater New York metropolitan area.  Optimum Lightpath provides converged data, Internet and voice solutions to mid-sized and large businesses, hospital systems, municipalities, and school systems.  As of December 31, 2010, Optimum Lightpath serviced 4,400 buildings.  Optimum Lightpath has built an advanced fiber optic network extending more than 4,350 route miles (225,000 fiber miles) throughout the New York metropolitan area.

In addition, Bresnan Business Services provides high-speed data, voice, and video solutions to business and institutions of all sizes within the Bresnan Cable service area.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

The following table sets forth certain statistical data regarding our video, high-speed data and VoIP operations as of the dates indicated:

| | As of December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | New York Metropolitan Service Area 2010 | Bresnan Cable Service Area 2010(1) | Total 2010 | 2009 | 2008 |
| | (in thousands, except per subscriber amounts) | | | | |
| **Revenue Generating Units:** | | | | | |
| Basic Video Customers(2) | 3,008 | 306 | 3,314 | 3,063 | 3,108 |
| Digital Video Customers | 2,906 | 205 | 3,111 | 2,893 | 2,837 |
| High-Speed Data Customers | 2,653 | 239 | 2,892 | 2,568 | 2,455 |
| Voice Customers | 2,138 | 131 | 2,269 | 2,052 | 1,878 |
| Total Revenue Generating Units | 10,705 | 881 | 11,586 | 10,576 | 10,278 |
| **Total Voice Lines**(3) | 2,731 | 148 | 2,879 | 2,577 | 2,300 |
| **Customer Relationships**(4) | 3,298 | 350 | 3,648 | 3,314 | 3,325 |
| **Homes Passed**(5) | 4,882 | 650 | 5,532 | 4,829 | 4,732 |
| **Penetration:** | | | | | |
| Basic Video Customers to Homes Passed | 61.6% | 47.1% | 59.9% | 63.4% | 65.7% |
| Digital Customers to Basic Penetration | 96.6% | 66.9% | 93.9% | 94.4% | 91.3% |
| High-Speed Data Customers to Homes Passed | 54.3% | 36.8% | 52.3% | 53.2% | 51.9% |
| Voice Customers to Homes Passed | 43.8% | 20.2% | 41.0% | 42.5% | 39.7% |
| **Average Monthly Revenue per Basic Video Customer ("RPS")**(6) | $ 150.68 | * | * | $ 144.03 | $ 134.85 |

_____
\* Not meaningful.

(1) Reflects data related to Bresnan Cable which was acquired by the Company on December 14, 2010.

(2) Basic video customers represent each customer account (set up and segregated by customer name and address), weighted equally and counted as one subscriber, regardless of size, revenue generated, or number of boxes, units, or outlets. In calculating the number of customers, we count all customers other than inactive/disconnected customers. Free accounts are included in the customer counts along with all active accounts, but they are limited to a prescribed group such as our current and retired employees. Such accounts are also not entirely free, as they typically generate revenue through pay-per-view or other services for which they must pay. Free status is not granted to regular customers as a promotion. We count a bulk commercial customer, such as a hotel, as one customer, and do not count individual room units at that hotel. In counting bulk residential customers such as an apartment building, we count each subscribing family unit within the building as one customer, but do not count the master account for the entire building as a customer.

(3) Total lines of voice service for the Telecommunications services segment.

(4) Customer relationships represent the number of customers who receive at least one of our services.

(5) Homes passed represent the estimated number of single residence homes, apartment and condominium units and commercial establishments passed by the cable distribution network in areas serviceable without further extending the transmission lines.

(6) RPS is calculated by dividing the average monthly U.S. generally accepted accounting principles ("GAAP") revenues for the Telecommunications Services segment, less the revenue attributable to Optimum Lightpath for the fourth quarter of each year presented by the average number of basic video customers served by our cable television systems for the same period. For purposes of this calculation, both revenue and average number of basic video customers exclude our Optimum Lightpath operations because Optimum Lightpath's third-party revenues are unrelated to our cable television system customers.

(4)

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

Subscriber Rates and Services; Marketing and Sales

**New York Metropolitan Service Area**

*Basic Cable*

Our cable television systems offer a government mandated broadcast basic level of service which generally includes local over-the-air broadcast stations, such as network affiliates (e.g., ABC, NBC, CBS, FOX), and public, educational or governmental channels.

All of our cable television systems also offer an expanded basic package of services, generally marketed as "Family Cable", which includes, among other programming, news, information, entertainment, and sports channels such as CNN, AMC, CNBC, Discovery, ESPN and the Disney Channel.  For additional charges, our cable television systems provide premium services such as HBO, Showtime, The Movie Channel, Starz!/Encore and Cinemax, which may be purchased either individually or in tiers.

iO TV

iO TV, our digital video service, is available to Cablevision's entire New York metropolitan service area.  The digital video programming services currently offered to subscribers include:

- Over 475 channels of entertainment,
- Over 90 (38 in high-definition ("HD")) movie channels including multiple channels ("multiplexes") of HBO, Showtime, Cinemax, Starz!/Encore and The Movie Channel,
- Access to thousands of on-demand titles each month, including hit movies (most available in HD), classic, independent and international films, subscription on-demand services and free on-demand offerings,
- 46 channels of uninterrupted commercial-free digital music from Music Choice,
- iO Sports and Entertainment Pak including 29 sports channels (10 in HD),
- Seasonal sports packages from the National Basketball Association ("NBA"), National Hockey League ("NHL"), Major League Baseball ("MLB"), Major League Soccer ("MLS"), college football, and basketball,
- iO en espanol - over 35 Spanish language channels and World Picks Latino On Demand which offers 50 hours of Spanish-language programming every month,
- 29 channels of international programming from around the world,
- Over 115 channels available in HD, including local broadcast affiliates, local sports channels, premium networks like HBO and various other cable networks.  In addition, HD movies are available on demand for an additional fee,
- A collection of enhanced television applications including News 12 Interactive, Newsday TV (Long Island only), Optimum Autos, Optimum Homes, MSG Interactive, MSG Varsity, and CNET TV,
- Digital video recorder ("DVR") for iO service, giving subscribers the ability to record, pause and rewind live television, and
- a wide variety of free interactive games for the entire family.

Packaging of the iO TV product includes the iO Gold package currently priced at $102.95 per month.  iO Gold features over 350 all digital channels, including 90 premium movie channels (including 38 in HD).  In total there are over 110 HD channels included in the iO Gold package.  iO Silver, currently priced at $82.95 per month, includes everything in iO Gold except for Flix, Smithsonian and premium movie channels from HBO, Cinemax and The Movie Channel.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

The currently priced $11.95 per month iO package (which is included in iO Gold and iO Silver) can be added to any level of cable service and includes over 60 digital video channels including 20 in HD, 46 digital music channels from Music Choice, and access to video on demand programming.  Discount and promotional pricing is available when iO is combined with other service offerings.

Since our network serving our existing cable television systems has been upgraded to provide advanced digital video services, our sales efforts are primarily directed toward increasing our penetration to homes passed for all of our existing services.  We market our cable television services through in-person selling, as well as telemarketing, direct mail advertising, promotional campaigns and local media and newspaper advertising.

*Optimum Online*

Optimum Online is our high-speed Internet access offering in the New York metropolitan service area.  Optimum Online connects customers to the Internet using the same network that delivers our cable television service.  It is significantly faster than digital subscriber line ("DSL") and traditional dial-up services.  Optimum Online is available within the New York metropolitan service area.

Our plant is designed for download speeds to a maximum of: (i) 15Mbps downstream and 2Mbps upstream for our Optimum Online level of service, (ii) 30Mbps downstream and 5Mbps upstream for our Optimum Online Boost level of service, and (iii) 101Mbps downstream and 15Mbps upstream for our Optimum Online Ultra level of service.

Optimum Online is currently priced at $49.95 per month on an à la carte basis with Optimum Online Boost available for an additional charge of $14.95 per month.  Optimum Online Ultra is available at an additional charge of $55.00 per month.  Discount and promotional pricing are available when Optimum Online is combined with our other service offerings.

We have deployed a broadband wireless network ("WiFi") in commercial and high traffic locations across our New York metropolitan service area as a free value-added benefit to Optimum Online customers.  The WiFi feature, which is delivered via wireless access points mounted on our cable television broadband network, allows Optimum Online customers to access the service while they are away from their home or office.  WiFi has been activated across our Long Island, Bronx, Brooklyn, New Jersey, Westchester, and Connecticut service areas.

Optimum Online service includes access to the following complimentary features:

- Access to outdoor broadband WiFi across our New York metropolitan service area;
- Web and mobile access to DVR for iO, giving users the ability to remotely schedule and manage recordings; and
- Internet security software including anti-Virus, anti-spyware, personal firewall, and anti-spam protection.

*Optimum Voice*

Optimum Voice is a VoIP service available exclusively to Optimum Online subscribers and offer unlimited local, regional and long-distance calling any time of the day or night within the United States, Puerto Rico and Canada with popular calling features at one low, flat monthly rate of $34.95 per month.  Discount and promotional pricing is available when Optimum Voice is combined with other service offerings.

Optimum Voice includes many premium calling features, such as enhanced voicemail, call waiting, caller ID, caller ID blocking, call return, three-way calling, call forwarding, anonymous call blocker, among others.  My Optimum Voice allows customers to manage calling features, view their call history, and receive voicemails via the Internet.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

Optimum Voice for Business provides for up to 24 voice lines for small and medium businesses.  The service provides 14 important business calling features at no additional charge.  Optimum Voice for Business has recently introduced business trunking services with support for legacy telecom interfaces (PRI) and newer internet protocol interfaces (SIP).

Optimum Voice World Call provides customers 250 minutes per month of calling from their Optimum Voice phone to anywhere in the world, including up to 30 minutes of calling to Cuba, with certain restrictions, for a flat monthly fee of $19.95.

*Bundled Offers*

We offer several promotional packages with discounted pricing to existing and new customers who subscribe to one or more of our products as compared to the à la carte prices for each individual product.  We also offer other pricing discounts for certain products that are added to existing services.  For example, we offer an Optimum Triple Play package that is a special promotion for new customers or eligible current customers where our three products, iO TV, Optimum Online and Optimum Voice, are each available for $29.95 per month for a year, when purchased together.

**Bresnan Cable Service Area**

*Digital Cable*

Our digital video service is available to 99% of the homes passed in the Bresnan Cable service area.  The digital video services currently offered to subscribers include:

- Over 300 channels of entertainment,
- Premium movie channels including multiplexes of HBO, Showtime, Cinemax, Starz!/Encore and The Movie Channel,
- Access to thousands of on-demand titles each month, including hit movies (most available in HD), classic, independent and international films, subscription on-demand services and free on-demand offerings,
- 46 channels of uninterrupted commercial-free digital music from Music Choice,
- Digital Sports Tier with nine sports channels,
- Seasonal sports packages from the National Hockey League, MLB, Major League Soccer,  and college football and basketball,
- Over 50 channels available in HD in most markets, including local network channels, premium networks like HBO and various other popular cable networks. In addition, HD movies are available on demand,
- DVR service for Bresnan Digital Cable, giving customers the ability to record, pause and rewind live television, and
- Whole Home DVR giving customers the ability to record and play shows from any room in the home.

Packaging of the digital video product includes the "Digital Premier" package with more than 300 channels, and over 50 premium movie channels and HD programming services.  Other digital video, packages including Value Plus, Value, Classic Plus and Classic, offer similar levels of services as the Digital Premier package, except for differing premium movie channel options.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

### Bresnan OnLine

Bresnan OnLine, which offers high-speed data access, connects customers to the internet using the same network that delivers our cable television service in our Bresnan Cable service area.  It is significantly faster than DSL and traditional dial-up services.  Bresnan OnLine is available to 98% of the homes passed in our Bresnan Cable service area.

Current service speeds are:  (i) 8Mbps downstream and 384k upstream, (ii) 15Mbps downstream and 1Mbps upstream for our Speed Plus level of service, and (iii) 1.5Mbps downstream and 256k upstream for our Access level of service.

### Bresnan Digital Phone

Bresnan Digital Phone is a VoIP service that offers unlimited local, regional and long-distance calling within the United States, Canada and the U.S. Virgin Islands with popular calling features at one low, flat monthly rate.

Bresnan Digital Phone includes various premium calling features, such as call waiting, caller ID, three-way calling, voice mail, anonymous call rejection, automatic recall, call forwarding, among others. Bresnan Digital Phone allows customers to manage calling features, view their call history, and receive voicemails via the Internet.

Bresnan International Plans provide customers with up to 600 minutes per month of international calling  from their Bresnan Digital Phone to Mexico, Ireland and the United Kingdom, for an additional monthly fee.

Bresnan Digital Phone is available to 97% of the homes passed in our Bresnan Cable service area.

### Bundled Offers

We offer several promotional packages with discounted pricing to existing and new customers who subscribe to one or more of our products as compared to the à la carte prices for each individual product. We also offer other pricing discounts for certain products that are added to existing services.

### System Capacity

Our cable plant network in the New York metropolitan area uses state of the art technology including fiber optic cable.  The network is a minimum of 750 MHz two-way interactive system offering a combination of analog and digital channels, high-speed data and voice services.  Our cable plant network in the Bresnan Cable service area is on a state of the art hybrid fiber coaxial platform of which 90% of the plant is two-way with a minimum of 750 MHz capacity.

### Programming

Adequate programming is available to the cable television systems from a variety of sources, including from Rainbow Media Holdings, our wholly-owned subsidiary.  Program suppliers' compensation is typically a fixed, per subscriber monthly fee (subject to contractual escalations) based, in most cases, either on the total number of basic video subscribers of the cable television systems, or on the number of subscribers subscribing to the particular service.  The programming contracts are generally for a fixed period of time and are subject to negotiated renewal.  Cable programming costs have increased in recent years and are expected to continue to increase due to additional programming being provided to most subscribers, increased costs to produce or purchase cable programming and other factors.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

Franchises

The Company's cable television systems are operated in New York, New Jersey, Connecticut, Montana, Wyoming, Colorado and Utah under non-exclusive franchise agreements, where required by the franchising authority, with state and/or municipal or county franchising authorities.  Franchise agreements usually require payment of franchise fees and contain regulatory provisions addressing, among other things, terms for accessing the public rights of way, cable and Internet service to schools and other public institutions and insurance.  The terms and conditions of cable franchises vary from jurisdiction to jurisdiction.  Franchise authorities generally charge a franchise fee of not more than 5% of certain of our cable service revenues that are derived from the operation of the system within such locality.  The Company generally passes the franchise fee on to its subscribers, listing it as a separate item on the bill.

Franchise agreements are usually for a term of 5 to 15 years from the date of grant; most are 10 years.  Franchises usually are terminable only if the cable operator fails to comply with material provisions, and then only after complying with substantive and procedural protections afforded by the franchise and federal and state law.  As of December 31, 2010, our ten largest franchise areas comprised approximately 42% of our total basic video customers and of those, six franchises, including two in New York City, comprising approximately 1,015,000 basic video customers, are expired.  We are currently operating in these franchise areas under temporary authority and we are actively engaged in negotiations to renew these franchises or, in the case of two franchises (covering 194,000 basic video customers) we have completed renewal negotiations and are awaiting confirmation of those franchise renewals by state regulatory commissions.  The Company has never lost a franchise for an area in which it operates.  When a franchise agreement reaches expiration, a franchising authority may seek to impose new requirements, including requirements to upgrade facilities, to increase channel capacity and to provide additional support for local public, education and government access programming.  Negotiations can be protracted and, in New York and New Jersey, franchise agreements sometimes expire before a renewal is negotiated and finalized.  New York and New Jersey state laws provide that pre-existing franchise terms continue in force during the renewal negotiations until agreement is reached or one or both parties seek to pursue "formal" franchise remedies under federal law.  In approximately 40 municipalities in Montana, Wyoming, and Colorado, the Company operates its cable television systems without a franchise, pursuant to Section 621(b)(2) of the Federal Cable Act, which provides that no franchise is required in communities where the cable operator or its predecessor lawfully provided service as of July 1, 1984 and the municipality has not requested a franchise.  Federal law provides significant substantive and procedural protections for cable operators seeking renewal of their franchises.  See "Regulation - Cable Television."  Despite the Company's efforts and the protections of federal law, it is possible that one or more of the Company's franchises may be subject to termination or non-renewal or we may be required to make significant additional investments in response to requirements imposed in the course of the franchise renewal process.

Optimum Lightpath holds a franchise from New York City which grants rights of way authority to provide telecommunications services throughout the five boroughs.  The franchise expired on December 20, 2008 and renewal discussions with New York City are ongoing.  We believe we will be able to obtain renewal of the franchise and have received assurance from New York City that the expiration date of the franchise is being treated as extended until a formal determination on renewal is made.  Failure to ultimately obtain renewal of the franchise could negatively affect Optimum Lightpath's revenues.

(9)

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

**Rainbow**

General

We conduct substantially all of our programming activities through Rainbow Media Holdings.  Rainbow Media Holdings' businesses include ownership interests in national programming networks.

Rainbow Media Holdings' national programming networks include primarily AMC, WE tv, IFC, and Sundance Channel.

The following table sets forth estimated subscriber information as of December 31, 2010, 2009 and 2008 for the following national programming networks.  These businesses are wholly-owned subsidiaries of Rainbow Media Holdings.

| | Estimated Domestic Subscribers | | |
| --- | --- | --- | --- |
| | 2010 | 2009 | 2008 |
| | (in thousands) | | |
| National Programming Networks: | | | |
| AMC(1) | 96,400 | 95,200 | 94,500 |
| WE tv(1) | 76,800 | 74,900 | 72,000 |
| IFC(2) | 62,700 | 50,100 | 48,900 |
| Sundance Channel(3) | 39,900 | 37,900 | 30,800 |

(1)   Estimated U.S. subscribers as measured by Nielsen Media Research ("Nielsen").

(2)   Nielsen measurement of IFC subscriber numbers began in December 2010.  The 2009 and 2008 subscriber counts are based on internal management reports and represent viewing subscribers.

(3)   Subscriber counts are based on internal management reports and represent viewing subscribers because Sundance Channel is not measured by Nielsen.

National Programming Networks

*AMC*

With a comprehensive library of popular films, AMC offers movie-based entertainment for movie lovers.

AMC is available on cable television and other distribution platforms such as direct broadcast satellite ("DBS") and video programming offered by telephone companies in the United States and Canada.  It is principally carried on basic or expanded basic tiers for which subscribers do not have to pay a premium to receive the network.  Affiliation fee revenues are based on fees paid by the distributors for the right to carry the programming.

AMC's film library consists of films that are licensed from major studios such as Twentieth Century Fox, Warner Bros., Sony, MGM, NBC Universal, Paramount, and Buena Vista under long-term contracts, with sufficient films licensed under contract as of December 31, 2010 to meet its minimum film programming needs for at least the next thirty-six months.  AMC generally structures its contracts for the exclusive cable television right to air the films during identified windows. AMC's programming also includes Emmy and Golden Globe Award-winning or nominated original scripted dramatic television series such as *Mad Men, Breaking Bad* and *The Walking Dead*, occasional mini-series such as *Broken Trail* and *The Prisoner,* and unscripted series and packaged movie events such as *Storymakers, DVDtv* and *AMC News.*

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

*WE tv*

WE tv is a 24-hour programming network for women.  The programming is available on multiple platforms and features original and acquired series and specials as well as feature films.

WE tv's primetime schedule includes original programming, with the most successful series being *Bridezillas, My Fair Wedding, Amazing Wedding Cakes* and *Downsized*. Additionally, WE tv's programming includes acquired series such as *Ghost Whisperer, Charmed* and *Golden Girls*.  WE tv has the exclusive license rights to films and off-network series from major studios such as Paramount, Sony and Warner Bros. to supplement its original programming.  WE tv's library has sufficient films licensed under contract as of December 31, 2010 to meet WE tv's minimum film programming needs  for at least the next twenty-four months.

*IFC*

IFC is a programming network dedicated to independent films and complementary content inspired by the independent spirit.  IFC's original programming airs alongside a library of award-winning titles, feature-length films, independent films (domestically and internationally produced), documentaries, shorts, animation, and cult classics.

IFC's film library includes titles from IFC Entertainment's film production, film distribution and video-on-demand businesses (see "Other Services" below), as well as from major independent film distribution companies like Fox Searchlight, Sony Pictures Classics, Lionsgate Films and Miramax Films, with sufficient films licensed under contract as of December 31, 2010 to meet its minimum film programming requirements for at least the next twelve months.  IFC also features exclusive live coverage of notable international film events like the *Independent Spirit Awards* and *South by Southwest,* as well as original series such as *Portlandia, The Onion News Network, The Increasingly Poor Decisions of Todd Margaret* and *The Whitest Kids U'Know,* and original documentaries such as *Indie Sex* and the Emmy Award-nominated *Monty Python: Almost the Truth (The Lawyers Cut)*.

*Sundance Channel*

Sundance Channel offers audiences a diverse and engaging selection of films, documentaries, and original programs.  The programming is available on multiple platforms and features films, original series and specials.  Sundance Channel's library has sufficient films licensed under contract as of December 31, 2010 to meet its minimum film programming requirements for at least the next twelve months.  Sundance Channel's original series and destinations include Peabody Award-winning *Brick City*, *Full Frontal Fashion* and *Shoebox Sessions*. Sundance Channel also has mini-series such as the Golden Globe Award-winning *Carlos*.

Other Services

*IFC Entertainment*

IFC Entertainment encompasses Rainbow Media Holdings' film distribution and video-on-demand exhibition businesses and was created to extend the IFC brand beyond television.  IFC Entertainment consists of multiple brands, such as, IFC Films, IFC Midnight, and Sundance Selects, which distribute critically acclaimed independent films across all available media platforms, including via tangible home video, television, electronic downloading and video-on-demand.  IFC Films, IFC Midnight and Sundance Selects include new independent films and documentaries that are available on-demand on the same day that they are distributed theatrically.  IFC Festival Direct titles feature a wide selection of titles acquired from major international film festivals that premiere exclusively via on-demand platforms.  The on-demand services are currently offered to Cablevision's subscribers as well as being carried by other operators throughout the United States.  IFC Films released 42 films during 2010, IFC Midnight and Festival Direct released 41 titles during 2010 and Sundance Selects released 24 titles during 2010.  Recently released films include *The Killer Inside Me*, *The Human Centipede*, *Joan Rivers*, *Art of the Steal* and *Tiny Furniture*.

(11)

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

*Rainbow Network Communications*

Rainbow Network Communications, servicing primarily Rainbow Media Holdings' programming offerings, is a full service network programming origination and distribution company.  Its services include origination, transmission, video engineering, uplinking, encryption, affiliate engineering, technology consulting, transponder negotiation, content ordering, quality control and editing.  Rainbow Network Communications has a state of the art technology center that consolidates all master control/playback and uplink facilities in one location.  This center is fully digital which enables Rainbow Network Communications to process audio and video signals in both standard and high definition.

*VOOM HD Networks*

VOOM HD Holdings LLC ("VOOM HD") historically offered a suite of channels, produced exclusively in HD and marketed for distribution to DBS and cable operators ("VOOM").  VOOM was available in the United States only on the Company's cable television systems and DISH Network, LLC, formerly a subsidiary of EchoStar Communications Corporation ("DISH Network").  See "Item 3.  Legal Proceedings".

On December 18, 2008, the Company decided to discontinue funding the domestic offering of VOOM.  Subsequently, VOOM HD terminated the domestic offering of VOOM.  VOOM HD discontinued the VOOM International channel as of December 31, 2009.  VOOM HD currently distributes the Rush HD channel, a network dedicated to action and adventure sports, internationally.

**Other**

Newsday

Newsday (whose businesses were acquired on July 29, 2008) consists of the Newsday daily newspaper, amNew York, Star Community Publishing Group and online websites, including newsday.com and exploreLI.com.  Newsday also included Island Publications, which was shut down in December 2008.  The Company's consolidated results of operations for the year ended December 31, 2008 include the operating results of Newsday subsequent to July 29, 2008.

Our publications are distributed through both paid and free distribution in various ways across Long Island and the New York metropolitan area.  Our products include:

- the Newsday daily newspaper, which is primarily distributed on Long Island, New York and in the New York metropolitan area, with average paid circulation for the six months ended September 26, 2010 of approximately 315,000 on weekdays (a decrease of 11.8% over the comparable prior year period), approximately 296,000 on Saturdays (a decrease of 8.5% over the comparable prior year period) and approximately 376,000 on Sundays (a decrease of 9.2% over the comparable prior year period);
- amNew York, a free daily newspaper distributed in New York City, with average weekday circulation of approximately 351,000 for the six months ended September 26, 2010 an increase of approximately 7.6% over the comparable prior year period; and
- Star Community Publishing, a group of weekly shopper publications, distributes approximately 1,868,000 copies each week (for the six months ended September 26, 2010), a decrease of approximately 29.7% over the comparable prior year period, as Star Community Publishing ceased publishing certain unprofitable shopper publications serving the boroughs of New York City in December 2009.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

News 12 Networks

The regional news services provided by the Company include News 12 Long Island, News 12 New Jersey, News 12 Westchester, News 12 Connecticut, News 12 The Bronx, News 12 Brooklyn, News 12 Hudson Valley, and News 12 Interactive, as well as News 12 Traffic and Weather (collectively, the "News 12 Networks").  The News 12 Networks include seven 24-hour local news channels and five traffic and weather services dedicated to covering areas within the New York metropolitan area.  News 12 Networks is available to all subscribers throughout our footprint in the New York metropolitan area.

MSG Varsity

MSG Varsity, which launched in September 2009, is a network dedicated entirely to showcasing high school sports and activities.  This suite-of-services enables students to share their stories through a combination of television and interactive platforms.  One of the many compelling components of this programming service is the involvement of high schools throughout our footprint as co-producers of MSG Varsity's content, in addition to content created by our professional productions.  We have a licensing arrangement with Madison Square Garden permitting us to use "MSG Varsity" as the name of this programming service.  MSG Varsity is available to all subscribers throughout our footprint in the New York metropolitan area.

Clearview Cinemas

Cablevision's chain of tri-state area movie theatres, Clearview Cinemas feature, family, art and independent films.  Its exhibition facilities include Manhattan's famed Ziegfeld Theatre, a frequent and historic host to film premieres and events.

Clearview operates 46 movie theatres containing 243 screens in New York City, Westchester County, Rockland County, Long Island, Pennsylvania and New Jersey.

RASCO

RASCO is a cable television advertising company that sells local and regional commercial advertising time on cable television networks and offers advertisers the opportunity to target specific geographic and demographic audiences.

PVI Virtual Media Services LLC

PVI Virtual Media Services LLC was a wholly-owned subsidiary of the Company, which marketed a real time video insertion system that through patented technology placed computer generated electronic images into telecasts of sporting events and other programming.  Substantially all of the assets of PVI Virtual Media Services LLC were sold in December 2010.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

Investment in Comcast Common Stock

We also own 21,477,618 shares of Comcast common stock acquired in connection with the sale of certain cable television systems.  All of these shares have been monetized pursuant to collateralized prepaid forward contracts.  See "Item 7A.  Quantitative and Qualitative Disclosures About Market Risk" for a discussion of our monetization contracts.

**Madison Square Garden**

On February 9, 2010, Cablevision completed the MSG Distribution, which took the form of a distribution by Cablevision of one share of Madison Square Garden Class A Common Stock for every four shares of CNYG Class A Common Stock held of record on the MSG Distribution Record Date and one share of Madison Square Garden Class B Common Stock for every four shares of CNYG Class B Common Stock held of record on the MSG Distribution Record Date.  On January 12, 2010, the Company transferred to Madison Square Garden the Company's subsidiaries which owned, directly or indirectly, all of the partnership interests in Madison Square Garden, L.P.  As a result of the MSG Distribution, on February 9, 2010, the Company no longer consolidates the financial results of Madison Square Garden for the purpose of its own financial reporting and the historical financial results of Madison Square Garden have been reflected in the Company's consolidated financial statements as discontinued operations for all periods presented through the MSG Distribution date.

**Competition**

Cable Television

Our cable television systems operate in an intensely competitive environment, competing with a variety of other television programming delivery systems, including satellite-delivered signals, delivery systems of incumbent telephone companies and broadcast television signals available to homes within our market by over-the-air reception.

*Incumbent Telephone Companies.*  We face intense competition in the New York metropolitan service area from two incumbent telephone companies.  Verizon Communications, Inc. ("Verizon") and AT&T Inc. ("AT&T"), which offer video programming in addition to their voice and high-speed Internet access services to residential customers in this service area, compete across all of our telecommunications products.  Verizon has made promotional offers to customers in our New York metropolitan service area and we expect that they may make additional promotional offers in the future.  The attractive demographics of our service territory make this region a desirable location for investment in video distribution technologies by these companies.  Verizon has constructed fiber to the home network plant that passes a significant number of households in our New York metropolitan service area (currently approximately 40% of the households, according to our estimates).  Verizon has obtained authority to provide video service (it already has or needs no authority to provide phone and data services) for a majority of these homes passed, on a statewide basis in New Jersey and through numerous local franchises in New York and all of New York City, and in a small portion of Connecticut.   AT&T offers video service in competition with us in most of our Connecticut service area. See "Regulation" for a discussion of regulatory and legislative issues.  Verizon and AT&T also market DBS services in our New York metropolitan service area.  Each of these companies has significantly greater financial resources than we do.

*DBS.*  We also face competition from DBS service providers in our New York metropolitan service area and in our Bresnan Cable service area.  The two major DBS services, DISH Network and DirecTV, are available to the vast majority of our customers.  These services each offer over 300 channels of programming, including programming that is substantially similar to the programming that we offer.  Our ability to compete with these DBS services is affected by the quality and quantity of programming available to us and to them.  DirecTV has exclusive arrangements with the National Football League that gives it access to programming that we cannot offer.

(14)

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Competitors.*  Competitive service providers that utilize the public rights-of-way and operate an "open video system" ("OVS") are another source of video competition.  RCN Corporation is authorized to operate OVS systems that may compete with us in New York City.  Cable television systems also face competition from broadcast television stations and satellite master antenna television ("SMATV") systems, which generally serve large multiple dwelling units under an agreement with the landlord.  The FCC also has made radio spectrum available for the provision of multichannel video service, and cellular phone providers have begun to offer video content for viewing on wireless handsets.  These wireless video offerings are not subject to the same local franchise and other requirements applicable to cable television systems and services.  Another source of competition is the delivery of video content over the Internet directly to subscribers.  Cable television systems also compete with entities that make digital video recorded movies and programs available for home rental or sale.

There can be no assurance that these or other existing, proposed, or as yet undeveloped technologies will not become dominant in the future and render our cable television systems less profitable or even obsolete.

High-Speed Data

Our high-speed data offering in our New York metropolitan service area, Optimum Online, faces intense competition from other providers of high-speed Internet access, including Verizon and AT&T.  Our high-speed data offering in our Bresnan Cable service area, Bresnan OnLine, faces competition from Qwest Communications ("Qwest") and CenturyLink.  Qwest is being acquired by CenturyLink, subject to regulatory approval.  In addition, DBS providers have tested the use of certain spectrum to offer satellite-based high-speed data services.  Cellular phone providers are also increasing the speeds of their Internet access offerings, and the FCC has made other radio spectrum available for wireless high-speed Internet access.

VoIP

Our VoIP service in our New York metropolitan service area, Optimum Voice, faces intense competition from other providers of voice services, including carriers such as Verizon and AT&T.  Our VoIP service in our Bresnan Cable service area, Bresnan Digital Phone, faces competition from other carriers, such as Qwest and CenturyLink.  We must also negotiate interconnection agreements with these carriers.  Our VoIP services also face competition from other competitive providers of voice services, including wireless voice providers, as well as VoIP providers like Vonage that do not own networks but can provide service to any person with a broadband connection.

Optimum Lightpath and the Bresnan CLECs

Optimum Lightpath operates in the most competitive business telecommunications market in the country and competes against the very largest telecommunications companies - incumbent local exchange carriers ("ILECs"), other competitive local exchange companies ("CLECs") and long distance companies.  More specifically, Optimum Lightpath faces substantial competition from Verizon and AT&T, which are the dominant providers of local telephone and broadband services in their respective service areas.  We also operate CLECs in each state within the Bresnan Cable service area (the "Bresnan CLECs"), which compete against ILECs, Qwest and Century Link.  ILECs have significant advantages over Optimum Lightpath and the Bresnan CLECs, including greater capital resources, an existing fully operational local network, and long-standing relationships with customers.

While Optimum Lightpath and the Bresnan CLECs compete with the ILECs they also enter into interconnection agreements with ILECs so that their customers can make and receive calls to and from customers served by the ILECs and other telecommunications providers.  Federal and state law and regulations require ILECs to enter into such agreements and provide such facilities and services, at prices subject to regulation.  The specific price, terms and conditions of each agreement, however, depend on the outcome of negotiations between Optimum Lightpath and the Bresnan CLECs with each ILEC.  Agreements are also subject to approval by the state regulatory commissions.  Optimum Lightpath has entered into interconnection agreements with Verizon for New York, New Jersey and portions of Connecticut and with AT&T for portions of Connecticut, which have been approved by the respective state commissions.  Optimum Lightpath also entered into interconnection agreements with regional carriers in New York and New Jersey.  The Bresnan CLECs also have interconnection agreements in their service areas.  These agreements, like all interconnection agreements, are for limited terms and are required to be renegotiated, arbitrated and approved subject to the laws in effect at that time.

(15)

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Optimum Lightpath and the Bresnan CLECs also face competition from one or more competitive access providers and other new entrants in the local telecommunications and data marketplace, and competitive local exchange carriers.  In addition to the ILECs and other CLECs, other potential competitors capable of offering voice and broadband services include electric utilities, long distance carriers, microwave carriers, wireless telephone system operators (such as cellular, PCS, and specialized mobile radio), and private networks built by large end users.  A continuing trend toward business combinations and alliances in the telecommunications industry may create stronger competition for Optimum Lightpath and the Bresnan CLECs.

Programming and Entertainment

Rainbow Media Holdings' programming networks operate in highly competitive markets.  First, our programming networks compete with other programming networks to obtain distribution on cable television systems and other multichannel video programming distribution systems, such as DBS, and ultimately for viewing by each system's subscribers.  Second, our programming networks compete with other video programming distributors, including broadcasters and other programming entities, to secure desired entertainment programming.  In each of these markets, some of our competitors are large publicly held companies that have greater financial resources than we do.   In addition, Rainbow Media Holdings competes with these entities for advertising revenue.

It is difficult to predict the future effect of technology on many of the factors affecting Rainbow Media Holdings' competitive position.  For example, data compression technology has made it possible for most video programming distributors to increase their channel capacity, which may reduce the competition among programming networks and broadcasters for channel space.  On the other hand, the addition of channel space could also increase competition for desired entertainment programming and ultimately, for viewing by subscribers.  As more channel space becomes available, the position of our programming networks in the most favorable tiers of these distributors is an important goal.  Additionally, video content delivered directly to viewers over the Internet competes with our programming networks for viewership.

*Distribution of Programming Networks*

The business of distributing programming networks to cable television systems and other multichannel video programming distributors is highly competitive.  Our programming networks face competition from other programming networks for the right to be carried by a particular cable television system or other multichannel video programming distribution system, and for the right to be carried on the service tier that will attract the most subscribers.  Once our programming network is selected by a cable or other multichannel video programming distribution system for carriage, that network competes for viewers not only with the other channels available on the system, but also with off-air broadcast television, pay-per-view channels and video-on-demand channels, as well as online services, mobile services, radio, print media, motion picture theaters, DVDs, and other sources of information, sporting events and entertainment.

(16)

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

Important to our success in each area of competition Rainbow Media Holdings faces are the prices we charge for our programming networks; the quantity, quality and variety of the programming offered on our networks; and the effectiveness of our networks' marketing efforts.  The competition for viewers in the context of nonpremium programming networks directly correlates with the competition for advertising revenues with each of our competitors.

Our ability to successfully compete with other programming networks for distribution may be hampered because the cable television systems, DBS services or other systems through which we seek distribution may be affiliated with other programming networks.  In addition, because such affiliated cable television systems or DBS services may have a substantial number of subscribers, the ability of such programming networks to obtain distribution on affiliated cable television or DBS services may lead to increased affiliation and advertising revenue for such networks because of their increased penetration compared to our programming networks.  Even if such affiliated cable television or DBS operators carry our programming networks, there is no assurance that such cable television or DBS operators would not place their affiliated programming network on a more desirable tier, thereby giving the affiliated programming network a competitive advantage over our own.

New or existing programming networks with affiliations to desired broadcasting networks like NBC, ABC, CBS or FOX may also have a competitive advantage over our networks in obtaining distribution through the "bundling" of agreements to carry those programming networks with the agreements giving the cable television system or other distributor the right to carry a broadcast station affiliated with the broadcasting network.

An important part of our strategy involves exploiting identified niches of the viewing audience that are generally well-defined and limited in size.  Rainbow Media Holdings has faced and will continue to face increasing competition as other programming networks and online or other services are launched that seek to serve the same or similar niches.

*Sources of Programming*

We also compete with other programming networks to secure desired programming.  Although some of this programming is generated internally through our efforts in original programming, most of our programming is obtained through agreements with other parties that have produced or own the rights to such programming.  Competition for this programming will increase as the number of programming networks increases.  Other programming networks that are affiliated with programming sources such as movie or television studios or film libraries may have a competitive advantage over us in this area.

*Competition for Entertainment Programming Sources.*  With respect to the acquisition of entertainment programming, such as syndicated programs and movies, which are not produced or specifically for programming networks, our competitors include national commercial broadcast television networks, local commercial broadcast television stations, the Public Broadcasting Service and local public television stations, pay-per-view programs, and other programming networks.  Some of these competitors have exclusive contracts with motion picture studios or independent motion picture distributors or own film libraries.  Internet-based video content distributors may also emerge as competitors for the acquisition of content or the rights to distribute content.

*Competition for Advertising Revenue.*  The financial success of our programming businesses also depends in part upon unpredictable and volatile factors beyond our control, such as viewer preferences, the strength of the advertising market, the quality and appeal of the competing programming and the availability of other entertainment activities.  A shift in viewer preferences could cause our programming to decline in popularity, which could cause a decline in advertising revenues and could jeopardize renewal of our contracts with distributors.  A decline in available advertising expenditures by advertisers could also cause a decline in advertising revenues regardless of a change in viewer preferences, especially from increased competition by other programmers providing similar programming.  In addition, our competitors may have more flexible programming arrangements, as well as greater volumes of production, distribution and capital resources, and may be able to react more quickly to shifts in tastes and interests.

Source: CSC HOLDINGS LLC, 10-K, February 16, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# EXHIBIT H

Morningstar® Document Research℠

# FORM 10-K

## CSC HOLDINGS LLC - N/A

**Filed: February 25, 2010 (period: December 31, 2009)**

Annual report with a comprehensive overview of the company

*The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.*

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C.  20549

# FORM 10-K

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2009**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 [NO FEE REQUIRED]**

**For the transition period from                to**

| Commission File Number | Registrant; State of Incorporation; Address and Telephone Number | IRS Employer Identification No. |
|---|---|---|
| 1-14764 | **Cablevision Systems Corporation**<br>Delaware<br>1111 Stewart Avenue<br>Bethpage, NY 11714<br>(516) 803-2300 | 11-3415180 |
| 1-9046 | **CSC Holdings, LLC**<br>Delaware<br>1111 Stewart Avenue<br>Bethpage, NY 11714<br>(516) 803-2300 | 27-0726696 |

Securities registered pursuant to Section 12(b) of the Act:
Title of each class:

| | Name of each Exchange on which Registered: |
|---|---|
| Cablevision Systems Corporation<br>Cablevision NY Group Class A Common Stock | New York Stock Exchange |
| CSC Holdings, LLC | None |

Securities registered pursuant to Section 12(g) of the Act:

| | |
|---|---|
| Cablevision Systems Corporation | None |
| CSC Holdings, LLC | None |

Indicate by check mark if the Registrants are well-known seasoned issuers, as defined in Rule 405 of the Securities Act.

| | | |
|---|---|---|
| Cablevision Systems Corporation | Yes ☒ | No ☐ |
| CSC Holdings, LLC | Yes ☐ | No ☒ |

Indicate by check mark if the Registrants are not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

| | | |
|---|---|---|
| Cablevision Systems Corporation | Yes ☐ | No ☒ |
| CSC Holdings, LLC | Yes ☐ | No ☒ |

Indicate by check mark whether the Registrants (1) have filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrants were required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

| | | |
|---|---|---|
| Cablevision Systems Corporation | Yes ☒ | No ☐ |

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

CSC Holdings, LLC                                    Yes ☒        No ☐

Indicate by a check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrants' knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Cablevision Systems Corporation                     ☐
CSC Holdings, LLC                                    ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files).

Cablevision Systems Corporation                     Yes ☒        No ☐
CSC Holdings, LLC                                    Yes ☒        No ☐

Indicate by check mark whether each Registrant is a large accelerated filer, accelerated filer, non-accelerated filer or smaller reporting company.  See definition of large accelerated filer and accelerated filer in Exchange Act Rule 12b-2.

|  | Large accelerated filer | | Accelerated filer | | Non-accelerated filer | | Smaller reporting company | |
|---|---|---|---|---|---|---|---|---|
| Cablevision Systems Corporation | Yes ☒ | No ☐ | Yes ☐ | No ☐ | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| CSC Holdings, LLC | Yes ☐ | No ☐ | Yes ☐ | No ☐ | Yes ☒ | No ☐ | Yes ☐ | No ☐ |

Indicate by check mark whether the Registrants are shell companies (as defined in Rule 12b-2 of the Exchange Act).

Cablevision Systems Corporation                     Yes ☐        No ☒
CSC Holdings, LLC                                    Yes ☐        No ☒

Aggregate market value of the voting and non-voting common equity held by non-affiliates of Cablevision Systems Corporation computed by reference to the price at which the common equity was last sold on the New York Stock Exchange as of June 30, 2009:  $4,593,221,764

Number of shares of common stock outstanding as of February 19, 2010:

| Cablevision NY Group Class A Common Stock- | 247,653,989 |
| Cablevision NY Group Class B Common Stock- | 54,354,251 |
| CSC Holdings, LLC Interests of Member- | 14,432,750 |

CSC Holdings, LLC meets the conditions set forth in General Instruction I(1)(a) and (b) of Form 10-K and is therefore filing this Form with the reduced disclosure format applicable to CSC Holdings, LLC.

Documents incorporated by reference - Cablevision Systems Corporation intends to file with the Securities and Exchange Commission, not later than 120 days after the close of its fiscal year, a definitive proxy statement or an amendment to this report containing the information required to be disclosed under Part II, Item 5 and Part III of Form 10-K filed under cover of Form 10-K/A.

Table of Contents

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Part I |  |  |  |
|  | 1. | Business | 1 |
|  | 1A. | Risk Factors | 25 |
|  | 1B. | Unresolved Staff Comments | 35 |
|  | 2. | Properties | 35 |
|  | 3. | Legal Proceedings | 36 |
|  | 4. | Submission of Matters to a Vote of Security Holders | 38 |
| Part II |  |  |  |
|  | 5. | Market for the Registrants' Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 38 |

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

| | | |
|---|---|---:|
| 6. | Selected Financial Data | 42 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 47 |
| 7A. | Quantitative and Qualitative Disclosures About Market Risk | 109 |
| 8. | Financial Statements and Supplementary Data | 111 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 111 |
| 9A. | Controls and Procedures | 111 |

**Part III**

| | | |
|---|---|---:|
| 10. | Directors and Executive Officers of the Registrants | * |
| 11. | Executive Compensation | * |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related  Stockholders Matters | * |
| 13. | Certain Relationships and Related Transactions | * |
| 14. | Principal Accountant Fees and Services | * |

**Part IV**

| | | |
|---|---|---:|
| 15. | Exhibits and Financial Statement Schedules | 113 |

---

\*    Some or all of these items are omitted because Cablevision intends to file with the Securities and Exchange Commission, not later than 120 days after the close of its fiscal year, a definitive proxy statement or an amendment to this report containing the information required to be disclosed under Part II, Item 5 and Part III of Form 10-K filed under cover of Form 10-K/A.

Table of Contents

## PART I

Item 1.          Business

This combined Annual Report on Form 10-K is separately filed by Cablevision Systems Corporation ("Cablevision") and CSC Holdings, LLC (formerly CSC Holdings, Inc.) ("CSC Holdings" and collectively with Cablevision, the "Company" or the "Registrants").

### Cablevision Systems Corporation

Cablevision is a Delaware corporation which was organized in 1997.  Cablevision owns all of the outstanding membership interests in CSC Holdings and its liabilities include approximately $1.9 billion of senior notes which amount does not include approximately $682 million of its 8% senior notes contributed in July 2008 to CSC Holdings, which CSC Holdings contributed to Newsday Holdings LLC, its 97.2% owned subsidiary.  The $682 million of notes are eliminated in Cablevision's consolidated financial statements and are shown as notes due from Cablevision in the consolidated deficiency of CSC Holdings.  Cablevision has no operations independent of its CSC Holdings subsidiary.

### CSC Holdings

CSC Holdings is one of the largest cable operators in the United States based on the number of basic video subscribers.  We also operate cable programming networks, entertainment businesses, telecommunications companies and a newspaper publishing business.  As of December 31, 2009, we served approximately 3.1 million basic video subscribers in and around the New York City metropolitan area, making us the fifth largest cable operator in the United States based on the number of basic video subscribers.  We believe that our cable television systems comprise the largest metropolitan cluster of cable television systems under common ownership in the United States (measured by number of basic video subscribers).  Through our wholly-owned subsidiary, Rainbow Media Holdings LLC ("Rainbow Media Holdings"), we  have ownership interests in companies that produce and distribute national entertainment and regional news programming services , and a cable television advertising sales business.  Through Cablevision Lightpath, Inc. ("Optimum Lightpath"), our wholly-owned subsidiary, we provide telephone services and high-speed Internet access to the business market.  In addition, we own approximately 97.2% of Newsday LLC which operates  a newspaper publishing business .

On November 10, 2009, CSC Holdings, Inc., a wholly-owned subsidiary of Cablevision, converted its form of business organization from a Delaware corporation to a Delaware limited liability company pursuant to Section 266 of the Delaware General Corporation Law and Section 18-214 of the Delaware Limited Liability Company Act (the "Conversion"). Upon the Conversion, CSC Holdings, Inc. was converted into "CSC Holdings, LLC".

Through December 31, 2009, we classified our business interests into four segments: Telecommunications Services; Rainbow; Newsday; and Madison

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Square Garden.

Our Telecommunications Services segment includes our cable television business, including its video, high-speed data, and Voice over Internet Protocol ("VoIP") operations and the operations of the commercial high-speed data and voice services provided by Optimum Lightpath.

Our Rainbow segment consists principally of our interests in national  and regional television programming networks, including AMC, WE tv, IFC, Sundance Channel (as of June 16, 2008), and the News 12 Networks.   Rainbow also includes a cable television advertising sales business.

1

---

Table of Contents

Our Newsday segment consists of the Newsday daily newspaper, amNew York, Star Community Publishing Group, and online websites including newsday.com and exploreLI.com.

On February 9, 2010, Cablevision distributed to its stockholders all of the outstanding common stock of Madison Square Garden, Inc. ("Madison Square Garden"), a company which owns the sports, entertainment and media businesses previously owned and operated by the Company's Madison Square Garden segment (the "MSG Distribution").  The MSG Distribution took the form a distribution by Cablevision of one share of Madison Square Garden Class A Common Stock for every four shares of Cablevision NY Group Class A Common Stock held of record at the close of business in New York City on January 25, 2010 (the "Record Date") and one share of Madison Square Garden Class B Common Stock for every four shares of Cablevision NY Group Class B Common Stock held of record on the Record Date.  For additional information concerning the MSG Distribution, see "Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Item 8.  Financial Statements and Supplementary Data" and our Form 8-K filed on February 10, 2010.

In addition, we own or have interests in the following businesses and assets:

- the motion picture theater business of Clearview Cinemas, which operates 48 movie theaters containing 254 screens,
- PVI Virtual Media Services LLC, which markets a real time video insertion system that places computer generated electronic images into telecasts of sporting events and other programming,
- MSG Varsity network dedicated entirely to showcasing high school sports and activities, and
- the common stock of Comcast Corporation which we received in connection with asset sales in prior years and which we monetized through the execution of prepaid forward contracts, collateralized by an equivalent amount of the Comcast Corporation common stock.

**Telecommunications Services**

General

Cable television is a service that delivers multiple channels of video programming to subscribers who pay a monthly fee for the services they receive.  Video signals are received over-the-air, by fiber optic transport or via satellite delivery by antennas, microwave relay stations and satellite earth stations and are modulated, amplified and distributed over a network of coaxial and fiber optic cable to the subscribers' television sets.  Cable television systems typically are constructed and operated pursuant to non-exclusive franchises awarded by local and state governmental authorities for specified periods of time.

Our cable television systems offer varying packages of service marketed under the Optimum and iO brand names, which may include, among other programming, local broadcast network affiliates and independent television stations, certain other news, information and entertainment channels such as CNN, CNBC, ESPN, and MTV, and certain premium services such as HBO, Showtime, The Movie Channel, Starz!/Encore and Cinemax.  We also offer iO-branded digital video service, which enables customers to receive video on demand and subscription video on demand services, as well as additional viewing channels.

Our cable television revenues are derived principally from monthly fees paid by subscribers.  In addition to recurring subscriber revenues, we derive revenues from the sales of pay-per-view movies and events, video on demand and subscription video on demand program services, from the sale of advertising time on advertiser supported programming and from installation and equipment charges.  Certain services and equipment provided by substantially all of our cable television systems are subject to regulation.  See "Regulation - Cable Television."

2

---

Table of Contents

We also provide high-speed data services using our cable television broadband network.  High-speed data services are provided to customers through a cable modem device.  The high-speed data service, marketed as "Optimum Online", served approximately 2.6 million subscribers at December 31, 2009 for an overall penetration rate of 53.2% of the homes passed by our cable television network.  We believe that our high-speed data service penetration has been driven by superior quality and speed and, in part, by a large number of customers installing the necessary equipment without the need for a service call.

In addition, the Company offers VoIP technology services exclusively to our Optimum Online subscribers, marketed as "Optimum Voice."  As of December 31, 2009, we provided Optimum Voice services to approximately 2.1 million customers for an overall penetration rate of 42.5% of the homes passed by our cable television network and 79.9% penetration of our Optimum Online subscriber base.

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Through Optimum Lightpath, a business broadband service provider, we provide telecommunications services to the business market in the greater New York City metropolitan area.  Optimum Lightpath provides converged data, Internet and voice solutions to mid-sized and large businesses, hospital systems, municipalities, and school systems.  As of December 31, 2009, Optimum Lightpath serviced 3,800 buildings.  Optimum Lightpath has built an advanced fiber optic network extending more than 3,900 route miles (203,000 fiber miles) throughout the New York City metropolitan area.

The following table sets forth certain statistical data regarding our video, high-speed data and VoIP operations as of the dates indicated.

| | As of December 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| | (in thousands, except per subscriber amounts) | | |
| **Revenue Generating Units:** | | | |
| Basic Video Customers (1) | 3,063 | 3,108 | 3,123 |
| iO Digital Video Customers | 2,893 | 2,837 | 2,628 |
| Optimum Online High-Speed Data Customers | 2,568 | 2,455 | 2,282 |
| Optimum Voice Customers | 2,052 | 1,878 | 1,592 |
| Total Revenue Generating Units | 10,576 | 10,278 | 9,625 |
| | | | |
| **Customer Relationships** (2) | 3,314 | 3,325 | 3,317 |
| | | | |
| **Homes Passed by Cable** (3) | 4,829 | 4,732 | 4,679 |
| | | | |
| **Penetration:** | | | |
| Basic Video to Homes Passed | 63.4% | 65.7% | 66.8% |
| iO Digital to Basic Penetration | 94.4% | 91.3% | 84.1% |
| Optimum Online to Homes Passed | 53.2% | 51.9% | 48.8% |
| Optimum Voice to Homes Passed | 42.5% | 39.7% | 34.0% |
| Average Monthly Revenue per Basic Video Customer ("RPS") (4) | $ 144.03 | $ 134.85 | $ 125.10 |

(1)    Basic video customers represent each customer account (set up and segregated by customer name and address), weighted equally and counted as one subscriber, regardless of size, revenue generated, or number of boxes, units, or outlets.  In calculating the number of customers, we count all customers other than inactive/disconnected customers.  Free accounts are included in the customer counts along with all active accounts, but they are limited to a prescribed group such as our current and retired employees.  Such accounts are also not entirely free, as they typically generate revenue through pay-per-view or other services for which they must pay.  Free status is not granted to regular customers as a promotion.  We count a bulk commercial customer, such as a hotel, as one customer, and do not count individual room units at that hotel.  In counting bulk residential customers such as an apartment building, we count each subscribing family unit within the building as one customer, but do not count the master account for the entire building as a customer.

(2)    Number of customers who receive at least one of our services.

(3)    Homes passed by cable represents the estimated number of single residence homes, apartment and condominium units and commercial establishments passed by the cable distribution network in areas serviceable without further extending the transmission lines.

(4)    RPS is calculated by dividing the average monthly U.S. generally accepted accounting principles ("GAAP") revenues for the Telecommunications Services segment, less the revenue attributable to Optimum Lightpath, for the fourth quarter of

Table of Contents

each year presented by the average number of basic video customers served by our cable television systems for the same period.  For purposes of this calculation, both revenue and average number of basic video customers exclude our Optimum Lightpath operations because Optimum Lightpath's third-party revenues are unrelated to our cable television system customers.

Subscriber Rates and Services; Marketing and Sales

Basic Cable

Our cable television systems offer a government mandated broadcast basic level of service which generally includes local over-the-air broadcast stations, such as network affiliates (e.g., ABC, NBC, CBS, FOX), and public, educational or governmental channels.

All of our cable television systems also offer an expanded basic package of services, generally marketed as "Family Cable", which includes, among other programming, news, information, entertainment, and sports channels such as CNN, AMC, CNBC, Discovery, ESPN and the Disney Channel.  For additional charges, our cable television systems provide premium services such as HBO, Showtime, The Movie Channel, Starz!/Encore and Cinemax, which may be purchased either individually or in tiers.

iO, TV

iO, TV, our digital video service, is available to Cablevision's entire service area.  We ended 2009 with approximately 2.9 million iO subscribers.

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

The digital video programming services currently offered to subscribers include:

- Over 450 channels of entertainment,
- Over 90 movie channels including multiple channels ("multiplexes") of HBO, Showtime, Cinemax, Starz!/Encore and The Movie Channel,
- Access to thousands of on-demand titles each month:
  - Hit Hollywood movies (most available in high definition ("HD"), as well as older classics, independent favorites and international films,
  - Subscription on-demand services with programming from HBO, Showtime, Cinemax, Starz, Encore, Disney Channel , Anime Network, Howard TV, Playboy TV, IFC in Theaters, WWE Classics, The Jewish Channel, here! TV and Bollywood Hits On Demand,
  - Free on-demand offers programming from over 45 networks such as Discovery, MTV, Nickelodeon, Comedy Central, CNN, TLC, AMC, Univision, and Music Choice, as well as special interest and local programming,
- 46 channels of uninterrupted commercial-free digital music from Music Choice,
- iO Sports Pak with 25 sports channels (including 9 in high definition ("HD")) featuring college sports, golf, soccer, baseball, tennis, hockey, extreme sports, and recreational activities,
- Seasonal sports packages from the National Basketball Association ("NBA"), National Hockey League ("NHL"), Major League Baseball ("MLB"), Major League Soccer ("MLS"), college football and basketball,
- iO en espanol - over 35 Spanish language channels including programming from the Caribbean, Latin America, Spain, and Mexico.  Also included is World Picks Latino On Demand which offers 50 hours of Spanish-language programming every month, at no additional charge,

4

Table of Contents

- 24 channels of international programming from around the world, with channels from Brazil, the Philippines, Russia, France, Portugal, Italy, Poland, China, Japan, Korea, and India/Southeast Asia,
- Over 100 channels available in HD, including local channels such as WCBS, WABC, WNBC, WNYW (FOX), the CW, My9, and WNET (PBS), as well as local sports channels, MSG Network, YES Network, SportsNet NY, and MSG Plus.  Offerings also include HD channels from HBO, Cinemax, Showtime, IFC, Bravo, The Movie Channel, Starz!, Universal, ESPN, ESPN2, NHL Network, MLB Network, the Golf Channel, Versus, Fuse, CNN, CNBC, Food Network, HGTV, National Geographic Channel, HD Theater, Discovery Channel, Animal Planet, TNT, TBS, USA Network, WE, Speed, and FX.  In addition, HD movies are available on demand for an additional fee,
- A collection of enhanced television applications including News 12 Interactive, Newsday TV (Long Island only), Optimum Autos, Optimum Homes, MSG Interactive, MSG Varsity, and CNET TV,
- Digital video recorder ("DVR") for iO service, giving subscribers the ability to record, pause and rewind live television, and
- iO Games, a wide variety of interactive games offered in distinct packages including the Arcade Pak, Casino Pak, Variety Pak, Hits Pak, Sesame Street Games Pak, and Logic Pak.

Packaging of the iO TV product includes the iO Gold package currently priced at $99.95 per month.  iO Gold features over 340 all digital channels, including more than 90 premium movie channels and 100 high definition television ("HDTV") programming services.  iO Silver, currently priced at $79.95 per month, includes everything in iO Gold except for NBA TV, Flix, Smithsonian and premium movie channels from HBO, Cinemax and The Movie Channel.

The currently priced $11.95 per month iO package (which is included in iO Gold and iO Silver) can be added to any level of cable service and includes over 50 digital video channels including 17 HD video channels, 46 digital music channels from Music Choice, and access to video on demand programming. Discount and promotional pricing is available when iO is combined with other service offerings.

Since our network serving our existing cable television systems is upgraded to provide advanced digital video services, our sales efforts are primarily directed toward increasing our penetration to homes passed for all of our existing services.  We market our cable television services through in-person selling, as well as telemarketing, direct mail advertising, promotional campaigns and local media and newspaper advertising.

*Optimum Online*

Optimum Online is our high-speed Internet access offering.  Optimum Online connects customers to the Internet using the same network that delivers our cable television service.  It is significantly faster than digital subscriber line ("DSL") and traditional dial-up services.  Optimum Online is available to Cablevision's entire service area.

Our plant is designed for download speeds to a maximum of: (i) 15Mbps downstream and 2Mbps upstream for our Optimum Online level of service, (ii) 30Mbps downstream and 5Mbps upstream for our Optimum Online Boost level of service, and (iii) 101Mbps downstream and 15Mbps upstream for our Optimum Online Ultra level of service.

Optimum Online is currently priced at $49.95 per month on an a la carte basis with Optimum Online Boost available for an additional charge of $14.95 per month.  Optimum Online Ultra is available at an additional charge of $55.00 per month.  Discount and promotional pricing are available when Optimum Online is combined with other service offerings.

5

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The Company has deployed a broadband wireless network ("WiFi") in commercial and high traffic locations across its service areas as a free value-added benefit to Optimum Online customers.  The WiFi feature which is delivered via wireless access points mounted on the Company's cable television broadband network allows Optimum Online customers to access the service while they are away from their home or office.  WiFi has been activated across the Company's Long Island, Bronx, Brooklyn, New Jersey, Westchester, and Connecticut service areas.

Optimum Online service includes access to the following complimentary features:

- Access to outdoor broadband WiFi across the Company's service area;
- Web and mobile access to DVR for iO, giving users the ability to remotely schedule and manage recordings;
- Internet security software including anti-Virus, anti-spyware, personal firewall, and anti-spam protection; and
- Automated online backup of computer files.

We ended 2009 with approximately 2.6 million Optimum Online subscribers.

*Optimum Voice*

Optimum Voice is a VoIP service available exclusively to Optimum Online subscribers that offers unlimited local, regional and long-distance calling within the United States, Puerto Rico and Canada with popular calling features at one low, flat monthly rate.

With Optimum Voice, customers can call anywhere within the United States, Puerto Rico and Canada, any time of the day or night, and talk as long as they like at the current price of $34.95 per month.  Discount  and promotional pricing is available when Optimum Voice is combined with other service offerings.

Optimum Voice includes the following premium calling features, plus "My Optimum Voice":

- Enhanced Voicemail
- Call Waiting
- Caller ID
- Caller ID Blocking
- Call Return
- Three-Way Calling
- Call Forwarding
- Anonymous call blocker - blocks all calls to a Voice customer where a calling party does not display their name or number
- Anonymous calling - hides the Voice customer's name and number on all calls they make
- Find me - allows calls to a Voice customer's phone number to ring up to three additional phone lines, such as a cell phone or work number, simultaneously
- Call waiting with caller ID
- Busy Redial
- VIP Ringing - a Voice customer can designate up to 32 telephone numbers to ring with a second, distinct ring tone

6

Table of Contents

My Optimum Voice allows customers to manage calling features, view their call history, and receive voicemails via the Internet.

Optimum Voice World Call provides customers 250 minutes per month of calling from their Optimum Voice phone anywhere in the world including up to 30 minutes of calling to Cuba, with certain restrictions, for a flat monthly fee of $19.95.

Optimum Voice is available to Cablevision's service area.  We ended 2009 with approximately 2.1 million combined residential and business Optimum Voice customers.

*Bundled Offers*

We offer several promotional packages with discounted pricing to customers who subscribe to one or more of our products as compared to the a la carte prices for each individual product.  Our "Optimum Triple Play" family package currently offers iO TV, Optimum Online and Optimum Voice for $29.95 per month for each service for the first twelve months when purchased together.  A promotional package currently offers Optimum Online and Optimum Voice for $29.95 per month for each service for the first twelve months when purchased together.  We also offer other pricing discounts for certain products that are added to existing service.

<u>System Capacity</u>

Our cable plant network uses state of the art technology including fiber optic cable.  The network is a minimum of 750 MHz two-way interactive system

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

offering a combination of analog and digital channels, high-speed data and voice services.

<u>Programming</u>

Adequate programming is available to the cable television systems from a variety of sources, including from Rainbow Media Holdings, our wholly-owned subsidiary.  Program suppliers' compensation is typically a fixed, per subscriber monthly fee (subject to contractual escalations) based, in most cases, either on the total number of basic video subscribers of the cable television systems, or on the number of subscribers subscribing to the particular service.  The programming contracts are generally for a fixed period of time and are subject to negotiated renewal.  Cable programming costs have increased in recent years and are expected to continue to increase due to additional programming being provided to most subscribers, increased costs to produce or purchase cable programming and other factors.

<u>Franchises</u>

The Company's cable television systems are operated in New York, New Jersey and Connecticut under non-exclusive franchise agreements with state and/or municipal franchising authorities.  Franchise agreements usually require payment of franchise fees and contain regulatory provisions addressing, among other things, service quality, cable service to schools and other public institutions, insurance and indemnity bonds.  The terms and conditions of cable franchises vary from jurisdiction to jurisdiction.  Franchise authorities generally charge a franchise fee of not more than 5% of certain of our cable service revenues that are derived from the operation of the system within such locality.  The Company generally passes the franchise fee on to its subscribers, listing it as a separate item on the bill.

Franchise agreements are usually for a term of five to fifteen years from the date of grant; most are ten years.  Franchises usually are terminable only if the cable operator fails to comply with material provisions, and then only after complying with substantive and procedural protections afforded by the franchise and federal and state law.  As of December 31, 2009, our ten largest franchise areas comprised approximately 48% of our total basic video customers and of those, five franchises, including New York

7

---

<u>Table of Contents</u>

City, comprising approximately 959,000 basic video customers, are expired.  We are currently operating in these franchise areas under temporary authority and we are actively engaged in or have completed negotiations to renew these franchises.  The Company has never lost a franchise for an area in which it operates.  When a franchise agreement reaches expiration, a franchising authority may seek to impose new requirements, including requirements to upgrade facilities, to increase channel capacity and to provide additional support for local public, education and government access programming.  Negotiations can be protracted and franchise agreements sometimes expire before a renewal is negotiated and finalized.  State laws provide that pre-existing franchise terms continue in force during the renewal negotiations until agreement is reached or one or both parties seek to pursue "formal" franchise remedies under federal law.  Federal law provides significant substantive and procedural protections for cable operators seeking renewal of their franchises.  See "Regulation - Cable Television."  Despite the Company's efforts and the protections of federal law, it is possible that one or more of the Company's franchises may be subject to termination or non-renewal or we may be required to make significant additional investments in response to requirements imposed in the course of the franchise renewal process.

Optimum Lightpath holds a franchise from New York City which grants rights of way authority to provide telecommunications services throughout the five boroughs.  The franchise expired on December 20, 2008 and renewal discussions with New York City are ongoing.  We believe we will be able to obtain renewal of the franchise and have received assurance from New York City that the  expiration date of the franchise is being treated as extended until a formal determination on renewal is made.  Failure to ultimately obtain renewal of the franchise could negatively affect Optimum Lightpath's revenues.

**<u>Rainbow</u>**

<u>General</u>

We conduct substantially all of our programming activities through Rainbow Media Holdings.  Rainbow Media Holdings' businesses include ownership interests in national television programming networks and regional news networks.

Rainbow Media Holdings' national entertainment programming networks include AMC, WE tv, IFC, Sundance Channel (since June 2008), and Wedding Central (since the third quarter of 2009).  Rainbow Media Holdings also owns the News 12 Networks, which provide 24-hour local news, traffic and weather services dedicated to covering areas within the New York metropolitan area and also owns and operates Rainbow Advertising Sales Corporation, a cable television advertising company, among other businesses.

8

---

<u>Table of Contents</u>

The following table sets forth estimated subscriber information as of December 31, 2009, 2008 and 2007 for our programming businesses.  These businesses are wholly-owned subsidiaries of Rainbow Media Holdings.

| | Viewing Subscribers (a) | | |
| --- | --- | --- | --- |
| | **2009** | **2008** | **2007** |

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely.  The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law.  Past financial performance is no guarantee of future results.

| | (in thousands) | | |
|---|---|---|---|
| **Programming and Related Businesses** | | | |
| National Entertainment Programming Networks: | | | |
| AMC | 87,700 | 86,100 | 84,400 |
| WE tv | 62,500 | 61,000 | 57,200 |
| IFC | 50,100 | 48,900 | 44,600 |
| Sundance Channel(b) | 37,900 | 30,800 | — |
| Fuse(c) | 54,600 | 52,500 | 47,000 |
| | | | |
| Regional Sports Networks: | | | |
| MSG Network/MSG Plus(c) | 16,200 | 16,200 | 15,800 |
| | | | |
| Regional News Services: | | | |
| News 12 Services | 3,800 | 3,800 | 3,900 |
| News 12 Traffic and Weather | 2,700 | 3,000 | 2,800 |

(a)   Represents the number of subscribers to distributors' systems that receive the referenced programming network.
(b)   Sundance Channel was acquired on June 16, 2008.
(c)   Fuse, MSG Network and MSG Plus were part of the Company's Madison Square Garden segment.  Madison Square Garden was distributed to the stockholders of Cablevision in a transaction completed on February 9, 2010.

National Entertainment Programming Networks

*AMC*

With a comprehensive library of popular films, AMC offers movie-based entertainment for movie lovers.

AMC is available on cable television and other distribution platforms such as direct broadcast satellite ("DBS") and video programming offered by telephone companies in the United States, and in 2006 and 2007, the AMC service was launched by certain cable television operators in Canada.  It is principally carried on basic or expanded basic tiers for which subscribers do not have to pay a premium to receive the network.  Affiliate revenues are based on fees paid by the distributors for the right to carry the programming.

AMC's film library consists of films that are licensed from major studios such as Twentieth Century Fox, Warner Bros., Sony, MGM, NBC Universal, Paramount, and Buena Vista under long-term contracts, with sufficient films under contract as of December 31, 2009 to meet its minimum film programming needs for at least the next twelve months.  AMC generally structures its contracts for the exclusive cable television right to air the films during identified windows.  AMC's programming also includes Emmy and Golden Globe award winning/nominated original scripted dramatic television series such as  *Mad Men* and *Breaking Bad*, the mini-series *The Prisoner*, and unscripted series such as *Storymakers* and *AMC News*.

*WE tv*

WE tv is a 24-hour entertainment network for women.  The programming is available on multiple platforms and features original and acquired series and specials as well as feature films.

Table of Contents

WE tv's primetime schedule includes original programming, with the most successful series being  *Bridezillas, My Fair Wedding, The Locator, Amazing Wedding Cakes and Little Miss Perfect.*  Additionally, WE tv's programming includes acquired series such as *Ghost Whisperer, Charmed, Golden Girls, 20/20,* and *48 Hours*.  WE tv has the exclusive license rights to films and off-network series from major studios such as Paramount, Sony and Warner Bros. to supplement its original programming.  WE tv's library has sufficient films licensed under contract as of December 31, 2009 to meet WE tv's minimum film programming needs for at least the next twelve months.

*IFC*

IFC is a network dedicated to independent films and complementary content inspired by the independent spirit.  IFC's original programming airs alongside a library of award-winning titles, feature-length films, independent films (domestically and internationally produced), documentaries, shorts, animation, and cult classics.

IFC's film library includes titles from IFC Entertainment's film production, film distribution and video-on-demand businesses (see "Other Services" below), as well as from major independent film distribution companies like Fox Searchlight, Sony Pictures Classics, Lionsgate Films and Miramax Films, with sufficient films under contract as of December 31, 2009 to meet its minimum film programming requirements for at least the next twelve months.  IFC also features exclusive live coverage of notable international film events like the  *Cannes Film Festival* and the *Independent Spirit Awards* as well as original series such as *Z Rock, Bollywood Hero, The Media Project,* and *The Whitest Kids U'Know,* and original documentaries such as *This Film Is Not Yet Rated, New World Order* and *At the Death House Door*.

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any losses or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Sundance Channel*

Sundance Channel offers audiences a diverse and engaging selection of films, documentaries, and original programs, all unedited and commercial free.   The programming is available on multiple platforms and features films, original series and specials.   Sundance Channel's library has sufficient films licensed under contract to meet its minimum film programming needs for at least the next twelve months.  Sundance Channel's original series and destinations include *Iconoclasts, Spectacle: Elvis Costello With…,* and *THE GREEN* block of programming that is dedicated to the environment and includes *Big Ideas for a Small Planet, Architecture School, Eco Trip and The Lazy Environmentalist.*

*VOOM HD Networks*

VOOM HD Holdings LLC ("VOOM HD") historically offered a suite of channels, produced exclusively in HD and marketed for distribution to DBS and cable operators ("VOOM").  VOOM was available in the United States only on the Company's cable television systems and EchoStar Communications Corporation's ("EchoStar") DISH Network.  See "Item 3. Legal Proceedings".

On December 18, 2008, the Company decided to discontinue funding of the U.S. domestic offering of VOOM.  Subsequently, VOOM HD terminated the U.S. domestic offering of VOOM.  VOOM HD discontinued the VOOM International channel as of December 31, 2009.  VOOM HD currently distributes the Rush HD channel, a network dedicated to action and adventure sports, of the VOOM service internationally.

10

---

Table of Contents

Regional Services

*News 12 Networks*

The regional news services provided by the Company include News 12 Long Island, News 12 New Jersey, News 12 Westchester, News 12 Connecticut, News 12 The Bronx, News 12 Brooklyn, News 12 Hudson Valley, and News 12 Interactive, as well as News 12 Traffic and Weather (collectively, the "News 12 Networks").  The News 12 Networks include seven 24-hour local news channels and five traffic and weather services dedicated to covering areas within the New York metropolitan area.

Other Services

*IFC Entertainment*

IFC Entertainment encompasses Rainbow Media Holdings' film distribution and video-on-demand exhibition businesses and was created to extend the IFC brand beyond television.  IFC Entertainment consists of multiple brands, such as, IFC in Theaters, IFC Festival Direct and Sundance Selects, which distribute critically acclaimed independent films across all available media platforms, including via tangible home video, television, electronic downloading and video-on-demand.  IFC in Theaters and Sundance Selects titles are new independent films and documentaries that are available on-demand on the same day that they are distributed theatrically.  IFC Festival Direct titles feature a wide selection of titles acquired from major international film festivals that premiere exclusively via on-demand platforms.  The on-demand services are currently offered to Cablevision's subscribers as well as being carried by other operators throughout the United States.  IFC in Theaters and Sundance Selects released 48 titles during 2009 and IFC Festival Direct also released 48 titles during 2009.  Recently released films include *Che, Gomorrah, I Hate Valentine's Day, Summer Hours,* and *Antichrist.*

*Rainbow Network Communications*

Rainbow Network Communications, servicing primarily Rainbow Media Holdings' programming offerings, is a full service network programming origination and distribution company.  Its services include origination, transmission, video engineering, uplinking, encryption, affiliate engineering, technology consulting, transponder negotiation, content ordering, quality control and editing.  Rainbow Network Communications has a state of the art technology center that consolidates all master control/playback and uplink facilities in one location.  This center is fully digital which enables Rainbow Network Communications to process audio and video signals in both standard and high definition.

**Newsday**

Newsday (whose businesses were acquired on July 29, 2008) consists of the Newsday daily newspaper, amNew York, Star Community Publishing Group and online websites, including newsday.com and exploreLI.com.  Newsday also included Island Publications, which was shutdown in December 2008.  The Company's consolidated results of operations for the year ended December 31, 2008 include the operating results of Newsday subsequent to July 29, 2008.

Our publications are distributed through both paid and free distribution in various ways across Long Island and the New York metropolitan area.  Our products include:

- the Newsday daily newspaper, which is primarily distributed on Long Island, New York and in the New York metropolitan area, with average paid circulation for the six months ended September 27, 2009 of approximately 357,000 on weekdays (a decrease of 5.4% over the comparable prior year period), approximately 323,000 on Saturdays (a decrease of 4.1% over the comparable prior year period) and approximately 414,000 on Sundays (a decrease of 4.6% over the comparable prior year period);

11

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- amNew York, a free daily newspaper distributed in New York City, with average weekday circulation of approximately 327,000 for the six months ended September 27, 2009 an increase of approximately 1.4% over the comparable prior year period;
- Star Community Publishing, a group of weekly shopper publications, distributes approximately 2,659,000 copies each week (for the six months ended September 27, 2009), a decrease of approximately 1% over the comparable prior year period; and
- websites with average monthly page views and visitors for the six months ended September 27, 2009 of approximately 42 million and 3 million, respectively, which extend the reach and frequency of our products beyond their geographic print distribution area and onto the Internet.  Average monthly page views decreased approximately 36% over the comparable prior year period as Newsday pared back its focus on non-local content, however the number of unique visitors remained consistent with the comparable prior year period.

In October 2009, Newsday transitioned to a subscriber access model for a substantial portion of its newsday.com website's content.  The website is available for no additional charge to Newsday subscribers and to Optimum Online customers.

In December 2009, Newsday ceased the publishing of certain unprofitable shopper publications serving the boroughs of New York City.

**Madison Square Garden**

On February 9, 2010, Cablevision distributed to its stockholders all of the outstanding common stock of Madison Square Garden, a company which owns the sports, entertainment and media businesses previously owned and operated by the Company's Madison Square Garden segment.  The MSG Distribution took the form of a distribution by Cablevision of one share of Madison Square Garden Class A Common Stock for every four shares of Cablevision NY Group Class A Common Stock held of record on the Record Date and one share of Madison Square Garden Class B Common Stock for every four shares of Cablevision NY Group Class B Common Stock held of record on the Record Date.

**Other Businesses and Assets**

Clearview Cinemas operates 48 movie theaters containing 254 screens in the New York metropolitan area.

An indirect subsidiary of Rainbow Media Holdings owns a 90% interest in an entity, DTV Norwich LLC that holds  Federal Communications Commission ("FCC") licenses in 45 metropolitan areas in the United States, including New York, Miami, Los Angeles, and Cleveland, to provide multi-channel video distribution and data service ("MVDDS"), which could be used to distribute video, data or other applications to subscribers via terrestrial transmission facilities and rooftop antennas.

PVI Virtual Media Services LLC is a wholly-owned subsidiary of the Company, which markets a real time video insertion system that through patented technology places computer generated electronic images into telecasts of sporting events and other programming.

MSG Varsity, launched in September 2009, is a network dedicated entirely to showcasing high school sports and activities.  This suite-of-services enables students to share their stories through a combination of television and interactive platforms.  One of the many compelling components of this programming service is the involvement of high schools throughout our footprint as co-producers of MSG Varsity's content, in addition to content created by our professional productions.  We have a licensing arrangement with Madison Square Garden permitting us to use "MSG Varsity" as the name of this programming service.

12

Table of Contents

We also own 21,477,618 shares of Comcast common stock acquired in connection with the sale of certain cable television systems.  All of these shares have been monetized pursuant to collateralized prepaid forward contracts.  See "Item 7A.  Quantitative and Qualitative Disclosures About Market Risk" for a discussion of our monetization contracts.

**Competition**

Cable Television

Our cable television systems operate in an intensely competitive environment, competing with a variety of other television programming delivery systems, including satellite-delivered signals, delivery systems of incumbent telephone companies and broadcast television signals available to homes within our market by over-the-air reception.

*Incumbent Telephone Companies.*  We face intense competition from two incumbent telephone companies.  Verizon and AT&T Inc. ("AT&T"), which offer video programming in addition to their voice and high-speed Internet access services to residential customers in our service area, compete across all of our telecommunications products.  Verizon has made promotional offers to customers in our service area and we expect that they may make additional promotional offers in the future.  The attractive demographics of our service territory make this region a desirable location for investment in video distribution technologies by these companies.  Verizon has constructed fiber to the home network plant that passes a significant number of households in our service area (currently about one-third of the households according to our estimates).  Verizon has obtained authority to provide video service (it already has or needs no authority to provide phone and data services) for a majority of these homes passed, on a statewide basis in New Jersey and through numerous local franchises in New

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

York and all of New York City. Verizon has so far not indicated any plans to offer video service in Connecticut . AT&T offers video service in competition with us in most of our Connecticut service area. S ee "Regulation" and Item 1A. Risk Factors — "Our business is subject to extensive government regulation and changes in current or future laws or regulations could restrict our ability to operate our business as we currently do" for a discussion of regulatory and legislative issues. Verizon and AT&T also market DBS services in our service area. Each of these companies has significantly greater financial resources than we do.

*DBS.* We also face competition from DBS service providers. Two major DBS services, EchoStar's DISH Network and DirecTV, are available to the vast majority of our customers. These services each offer over 300 channels of programming, including programming that is substantially similar to the programming that we offer. Our ability to compete with these DBS services is also affected by the quality and quantity of programming available to us and to them. DirecTV also has exclusive arrangements with the NFL that gives it access to programming that we cannot offer.

*Other Competitors.* Competitive service providers that utilize the public rights-of-way and operate an "open video system" ("OVS") are another source of video competition. RCN Corporation is authorized to operate OVS systems that may compete with us in New York City. Cable television systems also face competition from broadcast television stations and satellite master antenna television ("SMATV") systems, which generally serve large multiple dwelling units under an agreement with the landlord. The FCC also has made radio spectrum available for the provision of multichannel video service, and cellular phone providers have begun to offer video content for viewing on wireless handsets. These wireless video offerings are not subject to the same local franchise and other requirements applicable to cable television systems and services. Another source of competition is the delivery of video programming over the Internet directly to subscribers. Cable television systems also compete with entities that make digital video recorded movies and programs available for home rental or sale.

There can be no assurance that these or other existing, proposed, or as yet undeveloped technologies will not become dominant in the future and render our cable television systems less profitable or even obsolete.

13

---

Table of Contents

High-Speed Data

Our high-speed data offering , Optimum Online, faces intense competition from other providers of high-speed Internet access, including Verizon and AT&T. In addition, DBS providers have tested the use of certain spectrum to offer satellite-based high-speed data services. Cellular phone providers are also increasing the speeds of their Internet access offerings, and the FCC has made other radio spectrum available for wireless high-speed Internet access.

VoIP

Our VoIP service, Optimum Voice, faces intense competition from other providers of voice services, including carriers such as Verizon and AT&T. We must also negotiate interconnection agreements with these carriers. Optimum Voice also faces competition from other competitive providers of voice services, including wireless voice providers, as well as VoIP providers like Vonage that do not own networks but can provide service to any person with a broadband connection.

Optimum Lightpath

Optimum Lightpath operates in the most competitive business telecommunications market in the country and competes against the very largest telecommunications companies - incumbent local exchange carriers ("ILECs"), other competitive local exchange companies ("CLECs") and long distance companies. More specifically, Optimum Lightpath faces substantial competition from Verizon and AT&T, which are the dominant providers of local telephone and broadband services in their respective service areas. ILECs have significant advantages over Optimum Lightpath, including greater capital resources, an existing fully operational local network, and long-standing relationships with customers.

While Optimum Lightpath and the ILECs are competitors, Optimum Lightpath must enter into interconnection agreements with each ILEC so that Optimum Lightpath's customers can make and receive calls to and from customers served by the ILECs and other telecommunications providers. Federal and state law and regulations require ILECs to enter into such agreements and provide such facilities and services, at prices subject to regulation. The specific price, terms and conditions of each agreement, however, depend on the outcome of negotiations between Optimum Lightpath and an ILEC. Agreements are also subject to approval by the state regulatory commissions. Optimum Lightpath has entered into interconnection agreements with Verizon for New York, New Jersey and portions of Connecticut and with AT&T for portions of Connecticut, which have been approved by the respective state commissions. Optimum Lightpath also entered into interconnection agreements with regional carriers in New York and New Jersey. These agreements, like all interconnection agreements, are for limited terms and are required to be renegotiated, arbitrated and approved subject to the laws in effect at that time.

Optimum Lightpath also faces competition from one or more competitive access providers and other new entrants in the local telecommunications and data marketplace, and competitive local exchange carriers. In addition to the ILECs and CLECs, other potential competitors capable of offering voice and broadband services include electric utilities, long distance carriers, microwave carriers, wireless telephone system operators (such as cellular, PCS, and specialized mobile radio), and private networks built by large end users. A continuing trend toward business combinations and alliances in the telecommunications industry may create stronger competition for Optimum Lightpath.

Programming and Entertainment

Rainbow Media Holdings' programming networks operate in highly competitive markets. First, our programming networks compete with other programming networks to obtain distribution on cable television systems and other multichannel video programming distribution systems, such as DBS, and ultimately for

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

viewing by each system's subscribers.  Second, our programming networks compete with

14

Table of Contents

other video programming distributors, including broadcasters and other programming entities, to secure desired entertainment programming.  In each of these markets, some of our competitors are large publicly held companies that have greater financial resources than we do.   In addition, Rainbow Media Holdings competes with these entities for advertising revenue.

It is difficult to predict the future effect of technology on many of the factors affecting Rainbow Media Holdings' competitive position.  For example, data compression technology has made it possible for most video programming distributors to increase their channel capacity, which may reduce the competition among programming networks and broadcasters for channel space.  On the other hand, the addition of channel space could also increase competition for desired entertainment programming and ultimately, for viewing by subscribers.  As more channel space becomes available, the position of our programming networks in the most favorable tiers of these distributors would be an important goal.  Additionally, video content delivered directly to viewers over the Internet competes with our programming networks for viewership.

*Distribution of Programming Networks*

The business of distributing programming networks to cable television systems and other multichannel video programming distributors is highly competitive.  Our programming networks face competition from other programming networks for the right to be carried by a particular cable system or other multichannel video programming distribution system, and for the right to be carried on the service tier that will attract the most subscribers.  Once our programming network is selected by a cable or other multichannel video programming distribution system for carriage, that network competes for viewers not only with the other channels available on the system, but also with off-air broadcast television, pay-per-view channels and video-on-demand channels, as well as online services, mobile services, radio, print media, motion picture theaters, DVDs, and other sources of information, sporting events and entertainment.

Important to our success in each area of competition Rainbow Media Holdings faces are the prices we charge for our programming networks; the quantity, quality and variety of the programming offered on our networks; and the effectiveness of our networks' marketing efforts.  The competition for viewers in the context of nonpremium programming networks directly correlates with the competition for advertising revenues with each of our competitors.

Our ability to successfully compete with other programming networks for distribution may be hampered because the cable television systems, DBS services or other systems through which we seek distribution may be affiliated with other programming networks.  In addition, because such affiliated cable television systems or DBS services may have a substantial number of subscribers, the ability of such programming networks to obtain distribution on affiliated cable television or DBS services may lead to increased affiliation and advertising revenue for such networks because of their increased penetration compared to our programming networks.  Even if such affiliated cable television or DBS operators carry our programming networks, there is no assurance that such cable television or DBS operators would not place their affiliated programming network on a more desirable tier, thereby giving the affiliated programming network a competitive advantage over our own.

New or existing programming networks with affiliations to desired broadcasting networks like NBC, ABC, CBS or FOX may also have a competitive advantage over our networks in obtaining distribution through the "bundling" of agreements to carry those programming networks with the agreements giving the cable system or other distributor the right to carry a broadcast station affiliated with the broadcasting network.

An important part of our strategy involves exploiting identified niches of the viewing audience that are generally well-defined and limited in size.  Rainbow Media Holdings has faced and will continue to face increasing competition as other programming networks and online or other services are launched that seek to serve the same or similar niches.

15

Table of Contents

*Sources of Programming*

We also compete with other programming networks to secure desired programming.  Although some of this programming is generated internally through our efforts in original programming, most of our programming is obtained through agreements with other parties that have produced or own the rights to such programming.  Competition for this programming will increase as the number of programming networks increases.  Other programming networks that are affiliated with programming sources such as movie or television studios, film libraries or sports teams may have a competitive advantage over us in this area.

*Competition for Entertainment Programming Sources.*  With respect to the acquisition of entertainment programming, such as syndicated programs and movies, which are not produced by or specifically for programming networks, our competitors include national commercial broadcast television networks, local commercial broadcast television stations, the Public Broadcasting Service and local public television stations, pay-per-view programs, and other cable programming networks.  Some of these competitors have exclusive contracts with motion picture studios or independent motion picture distributors or own film libraries.  Internet-based video content distributors may also emerge as competitors for the acquisition of content or the rights to distribute content.

*Competition for Advertising Revenue.*  The financial success of our programming businesses also depends in part upon unpredictable and volatile factors beyond our control, such as viewer preferences, the strength of the advertising market, the quality and appeal of the competing programming and the availability of other entertainment activities.  A shift in viewer preferences could cause our programming to decline in popularity, which could cause a decline

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010                                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

in advertising revenues and could jeopardize renewal of our contracts with distributors.  A decline in available advertising expenditures by advertisers could also cause a decline in advertising revenues regardless of a change in viewer preferences, especially from increased competition by other programmers providing similar programming.  In addition, our competitors may have more flexible programming arrangements, as well as greater volumes of production, distribution and capital resources, and may be able to react more quickly to shifts in tastes and interests.

Newsday

Newsday operates in a highly competitive market which may adversely affect advertising and circulation revenues.  Newsday faces significant competition for advertising revenue from a variety of media sources.  The most direct source of competition is other newspapers that reach a similar audience in the same geographic area.  Newsday also faces competition from magazines, shopping guides, yellow pages, websites, broadcast and cable television, radio and direct marketing; particularly if those media sources provide advertising services that could substitute for those provided by Newsday within the same geographic area.  Specialized websites for real estate, automobile and help wanted advertising have become increasingly competitive with our newspapers and websites for classified advertising and further development of additional targeted websites is likely.

Newsday and the newspaper industry generally have also experienced significant declines in advertising and circulation revenue as circulation and readership levels continue to be adversely affected by competition from new media news formats and less reliance on newspapers by some consumers as a source of news, particularly younger consumers.  A prolonged decline in circulation would have a material adverse effect on the rate and volume of advertising revenues.

16

Table of Contents

Clearview Cinemas

Clearview Cinemas as a smaller, regional film exhibitor, competes with a number of large theater chains and independent theaters with respect to acquiring licenses to films and attracting patrons.  The principal competitive factors in obtaining films from distributors include licensing terms, seating capacity, location, prestige of the theater chain and of the particular theater, and quality of projection and sound equipment.  Most of our competitors are in a stronger competitive position than Clearview Cinemas based upon these factors.  We believe that the principal competitive factors in attracting film audiences are the availability of marketable films, the location of theaters, theater comfort and environment, projection and sound quality, 3D capability, level of service and ticket price.  The theater exhibition industry also faces competition from other motion picture exhibition delivery systems, such as network, syndicated, on-demand and pay television; DVD, and other home video systems; DVD by mail services such as NetFlix and Red Box and the availability of films over the Internet.

**Regulation**

Cable Television

Our cable television systems are subject to extensive federal, state and local regulations.  Our systems are regulated under congressionally imposed uniform national guidelines, first set in the Cable Communications Policy Act of 1984 and amended by the Cable Television Consumer Protection and Competition Act of 1992 and the Telecommunications Act of 1996.

The following paragraphs describe the existing legal and regulatory requirements that are most significant to our business today.

*Franchising*.  The Federal Cable Act requires cable operators to obtain a franchise in order to provide cable service.  Regulatory responsibility for awarding franchises rests with state and local officials, who also regulate other aspects of the cable business such as system construction, customer service, and approval of transfers of cable franchises.  Federal law prohibits our franchising authorities from granting an exclusive cable franchise to us, and they cannot unreasonably refuse to award an additional franchise to compete with us.  New York, New Jersey and Connecticut have enacted comprehensive cable regulation statutes as well as consumer protection laws that are applicable to cable operators and other providers of video service.  These laws also apply to video services offered by Verizon and AT&T.  New Jersey and Connecticut permit video franchises on a statewide and more streamlined basis.  Verizon has taken advantage of the statewide franchise in New Jersey and AT&T has taken advantage of the statewide franchise in Connecticut.  Cablevision is also eligible for streamlined franchising under these laws.  Cablevision received and is operating under a statewide franchise in Connecticut.  In New York our systems are franchised by localities, subject to state-mandated franchise guidelines and state  approval.  State and local franchising authority, however, must be exercised consistently with federal law.  The Federal Cable Act authorizes states or localities to franchise our cable television systems on a non-exclusive basis but sets limits on their franchising powers.  It sets a ceiling on franchising authorities imposing franchise fees of not more than 5% of our gross revenues from our provision of cable television service.  It prohibits states and localities from requiring us to carry specific programming services, and protects us in seeking franchise renewals by limiting the factors a franchising authority may consider and requiring a due process hearing before denial of renewal.

*Rate Regulation*.  In some of our cable television systems, the rates for our basic service package are subject to regulation by franchising authorities in accordance with FCC rules.  These franchising authorities may also regulate the rates we charge for the installation and lease of the equipment used by subscribers to receive the basic service package, including equipment that may also be used to receive other packages of programming, and the installation and monthly use of connections for additional

17

Table of Contents

Source: CSC HOLDINGS LLC, 10-K, February 25, 2010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# EXHIBIT I



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------- x

SALVATORE MOCCIO, ROSE MOCCIO,
ROBERT GROSSMAN, NORMAN LEVINSOHN
and HOWARD WINSTON,

        As Individuals and as Class Representatives,

                          Plaintiffs,

             - against -

CABLEVISION SYSTEMS CORPORATION,
the YANKEENETS, INC., d/b/a NEW YORK
YANKEES, YANKEES ENTERTAINMENT AND
SPORTS NETWORK, LLC, and MSG NETWORK,
INC.;

                      Defendants.
------------------------------- x



FILED ORIGINAL
IN CLERK'S OFFICE
DISTRICT COURT E.D

★ APR 19 2002 ★
4130109

LONG ISLAND OFFICE

CV-02-2138 (TCP) (ETB)

---

## CABLEVISION SYSTEMS CORPORATION AND MSG NETWORK, INC.'S  MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

---

FARRELL FRITZ, P.C.
Attorneys for Defendants
Cablevision Systems Corporation and
MSG Network, Inc.
EAB Plaza, West Tower, 14th Floor
Uniondale, New York  11556
(516) 227-0700

Of Counsel :

Dolores Fredrich
George C. Pratt
Eric W. Penzer



## TABLE OF CONTENTS

Page

Table of Authorities ............................................................... ii

Statement of Facts ................................................................. 3

Point I ........................................................................... 6

STANDARD APPLICABLE TO A MOTION
TO **DISMISS** PURSUANT TO RULE 12(b)(6) ........................................... 6

Point II .......................................................................... 7

PLAINTIFFS HAVE FAILED TO PLEAD THE
REQUISITE ELEMENTS OF A RICO CLAIM ........................................... 7

Point III ......................................................................... 13

PLAINTIFFS' SHERMAN ACT CLAIM IS LEGALLY DEFICIENT ......................... 13

Point IV ......................................................................... 18

THE GENERAL BUSINESS LAW CLAIM MUST BE DISMISSED ......................... 18

Point V .......................................................................... 21

PLAINTIFFS FAIL TO STATE A BREACH OF CONTRACT CLAIM ....................... 21

Point VI ......................................................................... 22

AT A MINIMUM. PLAINTIFFS' REQUEST
FOR INJUNCTIVE RELIEF MUST BE STRICKEN ...................................... 22

Conclusion ....................................................................... 23

## Point III

## PLAINTIFFS' SHERMAN ACT CLAIM IS LEGALLY DEFICIENT

Plaintiffs' Sherman Act claim is skeletal. Plaintiffs do not specify in their complaint the particular sections of the Sherman Act that they alleged were violated. In fact, with respect to Cablevision and MSG, the antitrust claim consists of the following three paragraphs (aside from the obligatory "repeat and reallege" paragraph):

> **83.** Upon information and belief, Cablevision and MSGN, acting in concert, have appreciable market power to appreciably restrain trade in the market and have exerted their market power in an unreasonable manner to compel sales of the tied-in products, and the tie-in effects a substantial amount of interstate commerce.

> **85.** Upon information and belief, the Cablevision Defendants and the Yankee Defendants have acted in concert in employing their market power in an unreasonable way and have in so doing appreciably restrained trade, effecting a substantial amount of interstate commerce.

> **86.** Alternatively, the anti-competitive behavior complained of is of a type so inimical to competition as to be per se illegal.

Those allegations do not even provide the bare minimum details required to put Cablevision and MSG on notice as to what conduct is alleged to constitute the illegal "tying" referenced in passing in paragraph a3.

It appears from the introductory allegations of the complaint that plaintiffs are attempting to allege that Cablevision and/or MSG engaged in illegal activity by tying "receipt of the MSG programming to 'premium' packages of other channels which the customers may order only upon payment of an enhanced fee." *Id.* ¶ 23; *see also id.* ¶¶ 24-27. However, the conduct alleged does not provide a basis for a Sherman Act claim. In fact, it fails both as a matter of fact and as a matter of law.

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Yentsch v Texaco, Inc.,* 630 F.2d 46, 56 (2d

Cir. 1980) (internal quotations omitted).   The Second Circuit enumerated the elements of a tying claim

as follows:

> We have required allegations and proof of five specific elements
> before finding a tie illegal:  first, a tying and a tied product; second,
> evidence of actual coercion by the seller that forced the buyer to
> accept the tied product;  third, sufficient economic power in the
> tying product market to coerce purchaser acceptance of the tied
> product;  fourth, anticompetitive effects in the tied market;  and
> fifth, the involvement of a "not insubstantial" amount of interstate
> commerce in the "tied" market.

*Hack v. President and Fellows of Yale Coll.,* 237 F.3d 81, 86 (2d Cir. 2000), *cert. denied,* 112 S.Ct. 201

(2001).  This standard applies for tying claims under both the Sherman Act and the Clayton Act.  *See De*

*Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir. 1996).  It also governs claims under the Donnelly

Act, the New York State counterpart to the federal antitrust laws.  *See X.L.O. Concrete Corp. v.*

*Rivergate Corp.,* 611 N.Y.S.2d 786, 789 (1994) ("Donnelly Act, having been modelled on the Federal

Sherman Act of 1890, should generally be construed in light of Federal precedent") (internal citations

omitted).[4]

    As noted above, plaintiffs' allegations of an unlawful "tying" arrangement fail on the facts

and the law.  First, the allegations of the complaint are contradicted by the documents referenced in the

complaint.  While plaintiffs allege that Cablevision's subscribers must subscribe to a premium tier of

programming, *i.e.,* the "Family Cable" package, in order to purchase the MSG Network, *see* Compl. ¶

25, that is not the case.  The MSG Network may be purchased separately by the plaintiffs without

subscribing to a "premium" tier of programming.  *See* Falese Aff. ¶ 3 and Exhibit "A."

    Inasmuch as plaintiffs, in bringing this claim, "relie[d] heavily upon" the "terms and effect"

of Cablevision's rate card – which unequivocally establishes that the MSG Network may be purchased

independent of premium programming packages – the rate card is "'integral' to the complaint" and may

---

    4  Although plaintiffs assert no Donnelly Act claim in their complaint. the Donnelly Act is mentioned
in plaintiffs' Memorandum of Law.  *See* Pls.' Mem. of Law at 15.

## Conclusion

For the foregoing reasons, Cablevision and MSG respectfully request that their motion to dismiss the complaint be granted in its entirety.

Dated: Uniondale, New York
       April 19, 2002

FARRELL FRITZ, P.C.

By _____

    Dolores Fredrich (DF 1645)
    George C. Pratt (GP 476)
    Eric W. Penzer (EP 2154)
    Attorneys for Defendants
    Cablevision Systems Corporation and
    MSG Network, Inc.
    EAB Plaza
    West Tower, 14th Floor
    Uniondale, New York  11556
    (516) 227-0700

FFDOCS1\ **70** 58.

# EXHIBIT J

NO. 09-56785

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ROB BRANTLEY, DARRYN COOKE, WILLIAM and BEVERLEY COSTLEY, PETER G. HARRIS, CHRISTIANA HILLS, MICHAEL B. KOVAC, MICHELLE NAVARRETTE, JOY PSACHIE and JOSEPH VRANICH, individually and on behalf of all others similarly situated,

Plaintiffs/Appellants,

vs.

NBC UNIVERSAL, INC., VIACOM INC., THE WALT DISNEY COMPANY, FOX ENTERTAINMENT GROUP, INC., TURNER BROADCASTING SYSTEM, INC., TIME WARNER CABLE INC., COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC, COXCOM, INC., THE DIRECTV GROUP, INC., ECHOSTAR SATELLITE L.L.C., and CABLEVISION SYSTEMS CORPORATION,

Defendants/Appellees.

On Appeal from United States District Court
for the Central District of California
Case No. CV-07-06101 CAS
Honorable Christina A. Snyder, Judge Presiding

## DISTRIBUTOR APPELLEES' JOINT OPPOSITION BRIEF

Arthur J. Burke
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California  94025
Telephone: (650) 752-2000

*Additional Attorneys for Distributor Defendants/Appellees Listed on the Following Pages*

*Attorneys for Defendants/Appellees Comcast Corporation and Comcast Cable Communications, LLC*

Daniel G. Swanson
Jay Srinivasan
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue, 46th Floor
Los Angeles, CA  90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

*Attorneys for Defendant/Appellee*
*CoxCom, Inc.*


Robert A. Sacks
Diane L. McGimsey
Orly Z. Elson
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA  90067
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

*Attorneys for Defendant/Appellee*
*Cablevision Systems Corporation*


Jeffrey Davidson
Melissa D. Ingalls
Christopher T. Casamassima
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

*Attorneys for Defendant/Appellee The*
*DIRECTV Group, Inc.*

Richard R. Patch
Susan K. Jamison
Lauren S. Kowal
COBLENTZ, PATCH, DUFFY &
BASS LLP
One Ferry Building, Suite 200
San Francisco, CA  94111
Telephone: (415) 391-4800
Facsimile: (415) 989-1663

*Attorneys for Defendant/Appellee Dish*
*Network L.L.C., as successor to*
*EchoStar Satellite L.L.C.*


Katherine B. Forrest
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1155
Facsimile: (212) 474-3700

Bryan A. Merryman
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329

*Attorneys for Defendant/Appellee Time*
*Warner Cable Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Cablevision Systems Corporation ("Cablevision") is a publicly traded company.  Cablevision has no parent corporation.  T. Rowe Price Group, Inc. owns 10% or more of Cablevision's Class A common stock.

Comcast Corporation is a Pennsylvania corporation and is not a subsidiary of any other corporation.  Comcast Corporation is publicly traded on the Nasdaq National Market under the symbols "CMCSA" and "CMCSK."  The principal office address for Comcast is One Comcast Center, 1701 JFK Boulevard, Philadelphia, Pennsylvania  19103.  There is no publicly held corporation that owns 10% or more of the stock of Comcast Corporation.  Comcast Holdings Corporation is a Pennsylvania corporation wholly owned by Comcast Corporation.  Comcast Cable Communications, LLC is a Delaware limited liability company wholly owned by Comcast Holdings Corporation.

CoxCom, Inc. is a privately held corporation that is wholly owned by Cox Communications, Inc., another privately held corporation.

The DIRECTV Group, Inc. is a wholly owned subsidiary of DIRECTV.  DIRECTV is a publicly traded corporation.  No entity owns more than 10% of DIRECTV.

Dish Network L.L.C., as successor to EchoStar Satellite L.L.C., is a wholly owned subsidiary of EchoStar DBS Corporation.  EchoStar DBS

i

Corporation is a wholly owned subsidiary of EchoStar Orbital Corporation.

EchoStar Orbital Corporation is a wholly owned subsidiary of EchoStar

Communications Corporation.  EchoStar Communications Corporation is a

publicly traded company (NASDAQ: DISH).  No publicly held company directly

owns 10% or more of the stock of EchoStar Satellite L.L.C., however, through its

subsidiaries, EchoStar Communications Corporation indirectly owns 100% of the

stock of EchoStar Satellite L.L.C.

Time Warner Cable Inc., a publicly held corporation, does not have a

parent corporation.  No publicly held corporation owns ten percent (10%) or more

of its stock.

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF AUTHORITIES ....................................................................... v

STATEMENT OF JURISDICTION.............................................................. 1

STATEMENT OF THE ISSUES.................................................................. 1

STATEMENT OF THE CASE..................................................................... 2

STATEMENT OF FACTS .......................................................................... 6

SUMMARY OF ARGUMENT .................................................................... 9

STANDARD OF REVIEW ........................................................................ 12

ARGUMENT ........................................................................................ 13

I.     Plaintiffs' Claims Are Barred by the Rule of *Illinois Brick* ........................ 13

       A.     Plaintiffs Are Indirect Purchasers Alleging the Passing-On of
              an Overcharge Through a Multi-Tiered Distribution System .......... 14

       B.     Plaintiffs Cannot Avoid the Rule of *Illinois Brick* ........................... 17

              1.     This Court's *Delaware Valley* Decision
                     Controls and Bars the Invention of
                     Any New Exception to the Rule of *Illinois Brick* .................. 18

              2.     No Exception to *Illinois Brick*
                     Recognized by This Court Applies ........................................ 22

                     (a)     Own/Control Exception ................................................ 22

                     (b)     Co-Conspirator Exception ........................................... 25

II.     Plaintiffs Have Failed to Establish Antitrust Standing ..............................30

        A.      Plaintiffs Lack Standing to Assert Their
                Claims Because They Do Not Participate in
                the Same Market as the Alleged Wrongdoers ...................................32

        B.      Plaintiffs Lack Standing Because Distributors,
                Not Plaintiffs, Are the Direct Victims of the
                Programmer Defendants' Alleged Wrongdoing ..............................38

        C.      Plaintiffs' Damages Claims Are Speculative, Require
                Complex Apportionment, and Risk Duplicative Recovery .............43

CONCLUSION .....................................................................................................48

STATEMENT OF RELATED CASES ...............................................................49

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over Plaintiffs'

claims under 28 U.S.C. § 1331, and it dismissed Plaintiffs' Third Amended

Complaint ("TAC" or "Complaint") with prejudice for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6).  (ER 201.)  Plaintiffs' notice of

appeal was timely filed pursuant to Rule 4(a)(1)(A) of the Federal Rules of

Appellate Procedure.  (ER 202.)  This Court has jurisdiction to review the District

Court's final decision under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Plaintiffs claim to be retail cable and satellite television subscribers

who assert claims under Section 1 of the Sherman Act challenging the Programmer

Defendants' alleged use of market power to "coerce" or "force" television

distributors into involuntarily purchasing and reselling video programming in

"bundles."

1.   Are Plaintiffs, as indirect purchasers, precluded by *Illinois*

*Brick Co. v. Illinois*, 431 U.S. 720 (1977), from asserting claims under Section 1 of

the Sherman Act?

2.   Do Plaintiffs lack the requisite antitrust standing to assert those

claims under the principles articulated in *Associated General Contractors of*

*California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983)?

For the reasons set forth in this Brief, the answer to both of these related but independent questions is "yes."

These issues were presented to the District Court for decision, but the District Court dismissed Plaintiffs' Complaint on alternative grounds without reaching them. The District Court dismissed the Complaint on the basis that Plaintiffs did not plead the foreclosure of competing programming, and that such foreclosure is required for Plaintiffs' Sherman Act claims. For the reasons set forth in the Programmer Defendants' Answering Brief, the District Court's ruling was correct and should be affirmed by this Court. In the interest of brevity and judicial economy, the Distributor Defendants hereby join in the Programmer Defendants' Answering Brief. *See* Fed. R. App. P. 28(i).

## STATEMENT OF THE CASE

Plaintiffs claim to be retail subscribers to cable and satellite television. (ER 184: TAC ¶¶ 7-15.) [1] They have sued Defendants NBC Universal, Inc., Viacom, Inc., The Walt Disney Company, Fox Entertainment Group, Inc., and Turner Broadcasting System, Inc. (collectively, the "Programmer Defendants") and Defendants Time Warner Cable Inc., Comcast Corporation, Comcast Cable Communications, LLC, CoxCom, Inc., The DIRECTV Group, Inc., EchoStar

---

[1] "ER" refers to Appellants' Excerpts of Record; "SER" refers to Appellees' Supplemental Excerpts of Record.

# EXHIBIT K

Morningstar® Document Research℠

# FORM 10-K

## CSC HOLDINGS LLC - N/A

**Filed: February 28, 2013 (period: December 31, 2012)**

Annual report with a comprehensive overview of the company

*The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.*

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C.  20549

# FORM 10-K

(Mark One)

☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2012

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 [NO FEE REQUIRED]

For the transition period from _____ to _____

| Commission File Number | Registrant; State of Incorporation; Address and Telephone Number | IRS Employer-Identification No. |
|---|---|---|
| 1-14764 | **Cablevision Systems Corporation** <br> Delaware <br> 1111 Stewart Avenue <br> Bethpage, NY  11714 <br> (516) 803-2300 | 11-3415180 |
| 1-9046 | **CSC Holdings, LLC** <br> Delaware <br> 1111 Stewart Avenue <br> Bethpage, NY  11714 <br> (516) 803-2300 | 27-0726696 |

Securities registered pursuant to Section 12(b) of the Act:

Title of each class:                                                      Name of each exchange on which Registered:

Cablevision Systems Corporation
Cablevision NY Group Class A Common Stock                      New York Stock Exchange

CSC Holdings, LLC                                                        None

Securities registered pursuant to Section 12(g) of the Act:

Cablevision Systems Corporation                                      None
CSC Holdings, LLC                                                        None

Indicate by check mark if the Registrants are well-known seasoned issuers, as defined in Rule 405 of the Securities Act.

| | | | |
|---|---|---|---|
| Cablevision Systems Corporation | Yes ☒ | No ☐ |
| CSC Holdings, LLC | Yes ☐ | No ☒ |

Indicate by check mark if the Registrants are not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

| | | | |
|---|---|---|---|
| Cablevision Systems Corporation | Yes ☐ | No ☒ |
| CSC Holdings, LLC | Yes ☐ | No ☒ |

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Indicate by check mark whether the Registrants (1) have filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrants were required to file such reports), and (2) have been subject to such filing requirements for the past 90 days.

| | | | |
|---|---|---|---|
| Cablevision Systems Corporation | Yes ☒ | No ☐ |
| CSC Holdings, LLC | Yes ☒ | No ☐ |

Indicate by a check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405) is not contained herein, and will not be contained, to the best of the Registrants' knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

| | |
|---|---|
| Cablevision Systems Corporation | ☐ |
| CSC Holdings, LLC | ☐ |

Indicate by check mark whether the Registrants have submitted electronically and posted on their corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrants were required to submit and post such files).

| | | |
|---|---|---|
| Cablevision Systems Corporation | Yes ☒ | No ☐ |
| CSC Holdings, LLC | Yes ☒ | No ☐ |

Indicate by check mark whether each Registrant is a large accelerated filer, accelerated filer, non-accelerated filer or smaller reporting company. See definition of large accelerated filer and accelerated filer in Exchange Act Rule 12b-2.

| | Large accelerated filer | | Accelerated filer | | Non-accelerated filer | | Smaller reporting company | |
|---|---|---|---|---|---|---|---|---|
| Cablevision Systems Corporation | Yes ☒ | No ☐ | Yes ☐ | No ☐ | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| CSC Holdings, LLC | Yes ☐ | No ☐ | Yes ☐ | No ☐ | Yes ☒ | No ☐ | Yes ☐ | No ☐ |

Indicate by check mark whether the Registrants are shell companies (as defined in Rule 12b-2 of the Exchange Act).

| | | |
|---|---|---|
| Cablevision Systems Corporation | Yes ☐ | No ☒ |
| CSC Holdings, LLC | Yes ☐ | No ☒ |

Aggregate market value of the voting and non-voting common equity held by non-affiliates of Cablevision Systems Corporation computed by reference to the price at which the common equity was last sold on the New York Stock Exchange as of June 30, 2012: $2,697,914,833

Number of shares of common stock outstanding as of February 22, 2013:

| | |
|---|---|
| Cablevision NY Group Class A Common Stock - | 210,659,548 |
| Cablevision NY Group Class B Common Stock - | 54,137,673 |
| CSC Holdings, LLC Interests of Member - | 17,631,479 |

CSC Holdings, LLC meets the conditions set forth in General Instruction I(1)(a) and (b) of Form 10-K and is therefore filing this Form with the reduced disclosure format applicable to CSC Holdings, LLC.

Documents incorporated by reference - Cablevision Systems Corporation intends to file with the Securities and Exchange Commission, not later than 120 days after the close of its fiscal year, a definitive proxy statement or an amendment to this report filed under cover of Form 10-K/A containing the information required to be disclosed under Part III of Form 10-K.

Source: CSC HOLDINGS LLC, 10-K, February 28, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| Part I |  |  |  |
|  | 1. | Business | 1 |
|  | 1A. | Risk Factors | 20 |
|  | 1B. | Unresolved Staff Comments | 30 |
|  | 2. | Properties | 30 |
|  | 3. | Legal Proceedings | 31 |
|  | 4. | Mine Safety Disclosures | 31 |
| Part II |  |  |  |
|  | 5. | Market for the Registrants' Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 32 |
|  | 6. | Selected Financial Data | 36 |
|  | 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 41 |
|  | 7A. | Quantitative and Qualitative Disclosures About Market Risk | 92 |
|  | 8. | Financial Statements and Supplementary Data | 94 |
|  | 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 94 |
|  | 9A. | Controls and Procedures | 94 |
|  | 9B. | Other Information | 95 |
| Part III |  |  |  |
|  | 10. | Directors and Executive Officers and Corporate Governance | * |
|  | 11. | Executive Compensation | * |
|  | 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholders Matters | * |
|  | 13. | Certain Relationships and Related Transactions, and Director Independence | * |
|  | 14. | Principal Accountant Fees and Services | * |
| Part IV |  |  |  |
|  | 15. | Exhibits and Financial Statement Schedules | 96 |

\*     Some or all of these items are omitted because Cablevision intends to file with the Securities and Exchange Commission, not later than 120 days after the close of its fiscal year, a definitive proxy statement or an amendment to this report filed under cover of Form 10-K/A containing the information required to be disclosed under Part III of Form 10-K.

Source: CSC HOLDINGS LLC, 10-K, February 28, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

**PART I**

Item 1.      **Business**

This combined Annual Report on Form 10-K is separately filed by Cablevision Systems Corporation ("Cablevision") and CSC Holdings, LLC ("CSC Holdings" and collectively with Cablevision, the "Company" or the "Registrants").

**Cablevision Systems Corporation**

Cablevision is a Delaware corporation which was organized in 1997.  Cablevision owns all of the outstanding membership interests in CSC Holdings and its liabilities include approximately $2.9 billion of senior notes which amount does not include approximately $754 million of its senior notes held by Newsday Holdings LLC, its 97.2% owned subsidiary.  The $754 million of notes are eliminated in Cablevision's consolidated financial statements and are shown as notes due from Cablevision in total member's deficiency of CSC Holdings.  Cablevision has no operations independent of its CSC Holdings subsidiary.

**CSC Holdings**

CSC Holdings is one of the largest cable operators in the United States based on the number of video customers.  As of December 31, 2012, we served approximately 3.2 million video customers in and around the New York metropolitan area and in Montana, Wyoming, Colorado and Utah (the "Optimum West service area").  We believe that our cable television systems in the New York metropolitan area comprise the largest metropolitan cluster of cable television systems under common ownership in the United States (measured by number of video customers).  We also provide high-speed data (also referred to as high-speed Internet access) and Voice over Internet Protocol ("VoIP") services using our cable television broadband network.  Through Cablevision Lightpath, Inc. ("Lightpath"), our wholly-owned subsidiary, we provide telephone services and high-speed Internet access to the business market.  In addition, we own approximately 97.2% of Newsday LLC which operates a newspaper publishing business.  We also own regional news and high school sports programming services, a motion picture theatre business and a cable television advertising sales business.

We classify our operations into two reportable segments: Telecommunications Services and Other.  Our Telecommunications Services segment includes our cable television business, including our video, high-speed data, and VoIP operations and the operations of the commercial data and voice services provided by Lightpath.  It also includes the operations of our cable television systems in Montana, Wyoming, Colorado and Utah, which were acquired in December 2010.  Our Other segment includes the operations of (i) Newsday, which includes the Newsday daily newspaper, amNew York, Star Community Publishing Group, and online websites including newsday.com and exploreLI.com, (ii) our motion picture theatre business ("Clearview Cinemas"), (iii) the News 12 Networks, our regional news programming services, (iv) the MSG Varsity network, our network dedicated entirely to showcasing high school sports and activities and other local programming, (v) our cable television advertising company, Cablevision Media Sales Corporation ("Cablevision Media Sales"), and (vi) certain other businesses and unallocated corporate costs.  Refer to Note 18 to our consolidated financial statements included in this Annual Report on Form 10-K for financial information about our segments.

In February 2013, we entered into a purchase agreement pursuant to which Charter Communications Operating, LLC will acquire the Company's Bresnan Broadband Holdings, LLC subsidiary (Optimum West) for $1.625 billion in cash, subject to certain adjustments, including a reduction for certain funded indebtedness of Bresnan Cable. See further discussion below.

(1)

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

**Telecommunications Services**

*General*

Cable television is a service that delivers multiple channels of video programming to subscribers who pay a monthly fee for the services they receive.  Video signals are received over-the-air, by fiber optic transport or via satellite delivery by antennas, microwave relay stations and satellite earth stations and are modulated, amplified and distributed over a network of coaxial and fiber optic cable to the subscribers' television sets.  Cable television systems typically are constructed and operated pursuant to non-exclusive franchises awarded by local and state governmental authorities for specified periods of time.

Our cable television systems offer varying packages of video service.  Our video service is marketed under the Optimum brand name.  Our video services may include, among other programming, local broadcast network affiliates and independent television stations, certain other news, information, sports and entertainment channels such as CNN, AMC, CNBC, ESPN, MTV, The NFL Network and regional sports networks such as MSG Network, and certain premium services such as HBO, Showtime, The Movie Channel, Starz, Encore and Cinemax.  We also offer interactive video service, which enables customers to receive video on demand and subscription video on demand services, as well as interactive entertainment and advertising services.

Our cable television revenues are derived principally from monthly fees paid by subscribers.  In addition to recurring subscriber revenues, we derive revenues from the sales of pay-per-view movies and events, video on demand and subscription video on demand program services, from the sale of advertising time on advertiser supported programming and from installation and equipment charges.  Certain services and equipment provided by substantially all of our cable television systems are subject to regulation.  See "Regulation - Cable Television."

We also provide high-speed data services using our cable television broadband network.  High-speed data services are provided to residential and small business customers through a cable modem device.  The high-speed data service is marketed as "Optimum Online".

We offer VoIP technology services exclusively to our residential and small business Optimum Online customers, marketed as "Optimum Voice".

Through Lightpath, a business broadband service provider, we provide telecommunications services, such as Ethernet-based data, Internet, voice and video transport solutions and managed services, to the business market in the New York metropolitan area.  As of December 31, 2012, Lightpath had over 5,800 buildings connected to its fiber network.  Lightpath has built an advanced fiber optic network extending more than 5,200 route miles, which includes approximately 274,000 miles of fiber, throughout the New York metropolitan area.  Optimum Business Services provides similar products in our Optimum West service area.

*Superstorm Sandy*

On October 29, 2012, Superstorm Sandy made landfall in the New York metropolitan area, resulting in widespread power outages and service disruptions for almost 60% of our customers in this service area, as well as damage to certain portions of our cable network.  Although the majority of our impacted customers experienced temporary power outages, in certain areas of our footprint, the damage to customers' homes was significant.  We issued service outage credits to customers who contacted us once their power was restored.  We have also recorded estimated credits for customers who we expect will contact us.  Additionally, we have incurred significantly higher salary and overtime costs, third-party labor costs, and repair costs associated with the efforts needed to restore services.  As of December 31, 2012, customer service credits and incremental costs incurred, net of programming and other cost savings, were approximately $114.7 million, including capital expenditures of $5.6 million, for our Telecommunications Services Segment, and approximately $2.5 million for our Other Segment.  In addition to these costs, we experienced other negative financial impacts including lower revenue related to customers for whom we decided to temporarily suspend billing during the restoration of their homes, displaced homes and advertising cancelations.  We expect insurance recoveries related to storm damage and business interruption to be minimal.

(2)

Source: CSC HOLDINGS LLC, 10-K, February 28, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

For several weeks after the storm, our workforce was dedicated to restoring services to our customers as quickly as possible.  During this period we reduced our marketing and sales activities which resulted in lower sales and lower new customer connections.  We also suspended our normal non-pay collection procedures and disconnect policy to focus our customer service representatives and field service technicians on service restoration.  As a result, our customer statistics include delinquent customer accounts that exceed our normal disconnect date.  Of these delinquent accounts, we estimated the number of accounts that we believe will be disconnected in 2013 as our normal collection and disconnect procedures resume and our customer counts as of December 31, 2012 have been reduced accordingly.

The following table sets forth certain statistical data regarding our video, high-speed data and VoIP operations, excluding Lightpath, as of the dates indicated:

| | New York Metropolitan Service Area | | | Optimum West Service Area | | | Total [f] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | As of December 31, | | | | | |
| | 2012 [g] | 2011 | 2010 | 2012 | 2011 | 2010 [a] | 2012 [g] | 2011 | 2010 |
| | (in thousands, except per customer amounts) | | | | | | | | |
| Customer relationships [b] | 3,230 | 3,255 | 3,298 | 370 | 356 | 350 | 3,601 | 3,611 | 3,648 |
| Video customers [c] | 2,893 | 2,947 | 3,008 | 304 | 303 | 306 | 3,197 | 3,250 | 3,314 |
| High-speed data customers | 2,763 | 2,701 | 2,653 | 292 | 264 | 239 | 3,055 | 2,965 | 2,892 |
| Voice customers | 2,264 | 2,201 | 2,138 | 170 | 156 | 131 | 2,433 | 2,357 | 2,269 |
| **Serviceable passings** [d] | 4,979 | 4,922 | 4,882 | 667 | 662 | 650 | 5,646 | 5,584 | 5,532 |
| **Penetration:** | | | | | | | | | |
| Customer relationships to serviceable passings | 64.9% | 66.1% | 67.6% | 55.5% | 53.7% | 53.8% | 63.8% | 64.7% | 65.9% |
| Video customers to serviceable passings | 58.1% | 59.9% | 61.6% | 45.6% | 45.7% | 47.1% | 56.6% | 58.2% | 59.9% |
| High-speed data customers to serviceable passings | 55.5% | 54.9% | 54.3% | 43.8% | 39.9% | 36.8% | 54.1% | 53.1% | 52.3% |
| Voice customers to serviceable passings | 45.5% | 44.7% | 43.8% | 25.4% | 23.5% | 20.2% | 43.1% | 42.2% | 41.0% |
| **Average Monthly Revenue per Customer Relationship ("RPC")** [e] | $ 137.51 | $ 141.37 | $ 137.73 | $ 118.84 | $ 114.85 | N/A | $ 135.61 | $ 138.77 | N/A |
| **Average Monthly Revenue per Video Customer ("RPS")** [e] | $ 153.22 | $ 156.09 | $ 150.68 | $ 143.99 | $ 134.60 | N/A | $ 152.35 | $ 154.10 | N/A |

N/A     Not meaningful.
(a)     Reflects data related to Bresnan Cable, which was acquired by the Company on December 14, 2010.
(b)     Represents number of households/businesses that receive at least one of the Company's services (see footnote (g) below).

Source: CSC HOLDINGS LLC, 10-K, February 28, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

(c)  Video customers represent each customer account (set up and segregated by customer name and address), weighted equally and counted as one customer, regardless of size, revenue generated, or number of boxes, units, or outlets.  In calculating the number of customers, we count all customers other than inactive/disconnected customers (see footnote (g) below).  Free accounts are included in the customer counts along with all active accounts, but they are limited to a prescribed group such as our current and retired employees.  Most of these accounts are also not entirely free, as they typically generate revenue through pay-per-view or other pay services.  Free status is not granted to regular customers as a promotion.  We count a bulk commercial customer, such as a hotel, as one customer, and do not count individual room units at that hotel.  In counting bulk residential customers, such as an apartment building, we count each subscribing family unit within the building as one customer, but do not count the master account for the entire building as a customer.

(d)  Represents the estimated number of single residence homes, apartment and condominium units and commercial establishments passed by the cable distribution network in areas serviceable without further extending the transmission lines.

(e)  RPC is calculated by dividing the average monthly U.S. generally accepted accounting principles ("GAAP") revenues for the Telecommunications Services segment, less the revenue attributable to Lightpath, for the fourth quarter of each year presented by the average number of customer relationships served by our cable television systems for the same period.  RPS is calculated using these same revenues divided by the average number of video customers for the respective periods.  For purposes of this calculation, both revenue and average number of video customers exclude our Lightpath operations because Lightpath's third-party revenues are unrelated to our cable television system customers.

(f)  The sum of the customer data by service area may not equal the total amount presented due to rounding.

(g)  Amounts exclude customers that were located in the areas most severely impacted by Superstorm Sandy who we have been unable to contact and those whose billing we have decided to suspend temporarily during restoration of their homes.  These customers represent approximately 11 thousand customer relationships, 10 thousand video, 9 thousand high-speed data and 7 thousand voice.  Because of Superstorm Sandy, we suspended our normal collection efforts and non-pay disconnect policy.  As a result, the customer information in the table above includes delinquent customer accounts that exceed our normal disconnect timeline.  Of these delinquent accounts, we estimated the number of accounts that we believe will be disconnected in 2013 as our normal collection and disconnect procedures resume and our customer counts as of December 31, 2012 have been reduced accordingly (27 thousand customer relationships, 24 thousand video, 23 thousand high-speed data and 19 thousand voice).

**Subscriber Rates and Services; Marketing and Sales**

Video Services

Our cable television systems offer a government mandated broadcast basic level of service which generally includes local over-the-air broadcast stations, such as network affiliates (e.g., ABC, NBC, CBS, FOX), and public, educational or governmental channels.

Most of our cable television systems also offer an expanded basic package of services, generally marketed as "The Optimum Value Package", which includes, among other programming, news, information, entertainment, and sports channels such as CNN, CNBC, Discovery, ESPN, AMC, the Disney Channel, and regional sports networks such as MSG Network.  For additional charges, our cable television systems provide premium services such as HBO, Showtime, The Movie Channel, Starz, Encore and Cinemax, which may be purchased either individually or in tiers.

Our digital video programming services currently offered to subscribers, branded Optimum TV, include:

- Up to 555 standard definition and high definition ("HD") entertainment channels,

- Up to 85 premium movie channels including multiplexes of HBO, Showtime, Cinemax, Starz, Encore and The Movie Channel,

- Access to on-demand movies and other programming, including shows from the top broadcast and cable networks, and subscription on-demand,

- 46 channels of uninterrupted commercial-free digital music from Music Choice,

- Seasonal sports packages from the National Basketball Association, National Hockey League, Major League Baseball, Major League Soccer, college football and basketball, plus sports and entertainment packages with up to 39 channels,

- Up to 90 international channels from around the world,

- Up to 140 channels available in HD, including local broadcast affiliates, local sports channels, premium networks such as HBO and various other cable networks,

- A collection of enhanced television applications including News 12 Interactive, Newsday TV (Long Island only), Newsday Cars and Newsday Homes, MSG Interactive, Tag Games, and MSG Varsity, all in our New York metropolitan service areas,

- TV to Go, access via the Internet for customers in our New York metropolitan service area to content from over 20 providers such as HBO, Showtime, The NFL Network and Disney Channel, and

- DVR Plus, a remote-storage digital video recorder ("DVR") available in almost all of our New York metropolitan service area, giving subscribers the ability to record and play television programming from any digital set top box in the home.  We continue to offer a set top box DVR service giving subscribers the ability to record, pause and rewind live television.

(4)

Source: CSC HOLDINGS LLC, 10-K, February 28, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

Since 2011, in our New York metropolitan service area, we have offered a free Optimum App which was first made available for the iPad, iPod touch and iPhone, and more recently, for laptops, the Kindle Fire and select Android devices, with more Android devices being added regularly.  The Optimum App allows customers the ability to watch their channel lineup, stream on-demand titles and use the device as a remote to control their digital set top box, while in their home.  It also allows customers the ability to browse Optimum's program guide, search for programming, and schedule DVR recordings, inside and outside the home.

Packaging of our video product includes options with programming to suit the needs of our individual customers.  Offers include various levels of programming including premium channels, news, sports, children's, general entertainment, international channels and digital music at various price points.

Since our network serving our existing cable television systems has been upgraded to provide advanced digital video services, our sales and marketing efforts are primarily directed toward retaining our existing customers and increasing our penetration to homes passed for all of our existing services.  We market our video services through in-person selling, as well as telemarketing, direct mail advertising, promotional campaigns and local media and newspaper advertising.

Optimum Online

Optimum Online is our high-speed Internet access offering, which connects customers to the Internet using the same network that delivers our cable television service.

Our plant is designed for download speeds to a maximum of: (i) 15Mbps (megabits per second) downstream and 2Mbps upstream for our Optimum Online level of service, (ii) 30Mbps downstream and 5Mbps upstream for our Optimum Online Boost level of service, (iii) 50Mbps downstream and 8Mbps upstream for our Optimum Online Boost Plus level of service in our New York metropolitan service area, and (iv) 101Mbps downstream and 15Mbps upstream for our Optimum Online Ultra level of service in our New York metropolitan service area.

Optimum Online is available on an à la carte basis with Optimum Online Boost, Optimum Online Boost Plus or Optimum Online Ultra available for an additional charge per month.  Discount and promotional pricing are available when Optimum Online is combined with our other service offerings.

We have deployed a broadband wireless network ("WiFi") in commercial and high traffic locations across our New York metropolitan service area as a free value-added benefit to Optimum Online customers.  The WiFi feature, which is delivered via wireless access points mounted on our cable television broadband network, allows Optimum Online customers to access the service while they are away from their home or office.  WiFi has been activated across our Long Island, Bronx, Brooklyn, New Jersey, Westchester, and Connecticut service areas.  Our WiFi service also allows our customers to access the WiFi networks of Comcast Corporation ("Comcast"), Time Warner Cable Inc., and Bright House Networks, LLC.

Source: CSC HOLDINGS LLC, 10-K, February 28, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Table of Contents*

**Competition**

**Cable Television**

Our cable television systems operate in an intensely competitive environment, competing with a variety of other video programming providers and delivery systems, including incumbent telephone companies, satellite-delivered signals, internet-based programming and broadcast television signals available to homes within our market by over-the-air reception.

*Incumbent Telephone Companies.*  We face intense competition in the New York metropolitan service area from two incumbent telephone companies.  Verizon Communications, Inc. ("Verizon") and AT&T Inc. ("AT&T"), which offer video programming in addition to their voice and high-speed Internet access services to residential customers in this service area, compete across all of our telecommunications products.  Verizon has made and may continue to make promotional offers to customers in our New York metropolitan service area at prices lower than ours.  The attractive demographics of our service territory make this region a desirable location for investment in video distribution technologies by these companies.  Verizon has constructed fiber to the home network plant that passes a significant number of households in our New York metropolitan service area.  Verizon does not publicly report the extent of their build-out or penetration by area. We estimate that Verizon passes approximately half of the households in our New York metropolitan service area.  Verizon's passings in our service area are difficult to assess because they are based upon visual inspections and other limited estimating techniques, and therefore our estimate serves only as an approximation. Verizon has obtained authority to provide video service for a majority of these homes passed, on a statewide basis in New Jersey, in numerous local franchises in New York State, including all of New York City, and in a small portion of Connecticut.  AT&T offers video service in competition with us in most of our Connecticut service area.  This competition impacts our video revenue in these areas and may continue to do so in the future.  See "Regulation" for a discussion of regulatory and legislative issues.  Verizon and AT&T also market direct broadcast satellite ("DBS") services in our New York metropolitan service area.  Each of these companies has significantly greater financial resources than we do.

*DBS.*  We also face competition from DBS service providers in our New York metropolitan service area and in our Optimum West service area.  The two major DBS services, DISH Network and DirecTV, are available to the vast majority of our customers.  These services each offer programming that is substantially similar to the programming that we offer, at competitive prices.  Our ability to compete with these DBS services is affected by the quality and quantity of programming available to us and to them.  DirecTV has exclusive arrangements with the National Football League that gives it access to programming that we cannot offer.  We compete in our service areas with these DBS competitors by "bundling" our service offerings with products that the DBS companies cannot efficiently provide at this time, such as high-speed Internet access service, voice service and interactive services carried over the cable distribution plant.

*Other Competitors and Video Programming Sources.*  Another source of competition for cable television systems is the delivery of video content over the Internet directly to subscribers.  Consumers are able to watch much of this Internet-delivered content on Internet-ready television sets and mobile devices.  Cable television systems also face competition from broadcast television stations, entities that make digital video recorded movies and programs available for home rental or sale, satellite master antenna television ("SMATV") systems, which generally serve large multiple dwelling units under an agreement with the landlord and  service providers, and "open video system" ("OVS") operators.  RCN Corporation ("RCN") is authorized to operate OVS systems that compete with us in New York City.  The FCC also has made radio spectrum available for the provision of multichannel video service.

Source: CSC HOLDINGS LLC, 10-K, February 28, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

# EXHIBIT L

REDACTED – FOR PUBLIC INSPECTION

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| GAME SHOW NETWORK, LLC, | ) | MB Docket No. 12-122 |
| Complainant, | ) | File No. CSR-8529-P |
| | ) | |
| v. | ) | |
| | ) | |
| CABLEVISION SYSTEMS CORP., | ) | |
| Defendant | ) | |

TO:    Chief Administrative Law Judge Richard L. Sippel

**TRIAL BRIEF OF DEFENDANT CABLEVISION SYSTEMS CORP.**

Jay Cohen
Andrew G. Gordon
Gary R. Carney
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

Howard J. Symons
Tara M. Corvo
Robert G. Kidwell
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
701 Pennsylvania Avenue, N.W.,
Suite 900
Washington, D.C. 20004
(202) 434-7300

March 12, 2013

REDACTED – FOR PUBLIC INSPECTION

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..................................................................................... ii

Preliminary Statement ............................................................................................. 1

Procedural Posture and Issues To Be Determined ................................................. 7

Argument ................................................................................................................. 9

I.      THE LEGAL STANDARD ........................................................................... 9

II.     THERE IS NO DIRECT EVIDENCE THAT CABLEVISION DISCRIMINATED AGAINST GSN BASED ON AFFILIATION ................................................. 11

III.    THERE IS NO CIRCUMSTANTIAL EVIDENCE THAT CABLEVISION DISCRIMINATED AGAINST GSN BASED ON AFFILIATION ................................ 16

        A.      GSN and WE tv Are Not Similarly Situated ..................................... 16

                1.      The Networks ........................................................................ 16

                2.      The Target Programming of WE tv and GSN Is Different ..................... 17

                3.      The Actual Programming on WE tv and GSN Is Not Similar ................. 18

                4.      The Target Audiences of GSN and WE tv Are Different ..................... 21

                5.      The Actual Audiences of GSN and WE tv Are Different ..................... 23

                6.      Advertisers Do Not View WE tv and GSN to Be Similarly Situated ........ 25

                7.      WE tv Has Never Considered GSN to be a Competitor ..................... 27

        B.      Cablevision Did Not Treat WE or Wedding Central Better than GSN On the Basis of Affiliation ........................................................................ 29

IV.     CABLEVISION'S RE-TIERING DECISION DID NOT UNREASONABLY RESTRAIN GSN'S ABILITY TO COMPETE FAIRLY ................................ 30

V.      COMPELLING CABLEVISION TO CARRY GSN ON A MORE WIDELY PENETRATED TIER WOULD VIOLATE CABLEVISION'S FIRST AMENDMENT RIGHTS ..................................................................................................... 33

Conclusion ............................................................................................................ 34

i

REDACTED – FOR PUBLIC INSPECTION

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| GAME SHOW NETWORK, LLC, | ) | MB Docket No. 12-122 |
|     Complainant, | ) | File No. CSR-8529-P |
| | ) | |
|        v. | ) | |
| | ) | |
| CABLEVISION SYSTEMS CORP., | ) | |
|     Defendant | ) | |

TO:   Chief Administrative Law Judge Richard L. Sippel

**TRIAL BRIEF OF DEFENDANT CABLEVISION SYSTEMS CORP.**

Defendant Cablevision Systems Corporation ("Cablevision") respectfully submits this Trial Brief in the above-captioned program carriage complaint proceeding brought against Cablevision by Complainant Game Show Network, LLC ("GSN").[1]

**Preliminary Statement**

A network claiming to have been discriminated against with respect to the terms and conditions of carriage must show either direct evidence of discrimination or circumstantial evidence that it is similarly situated to an affiliated network that has received preferential treatment in the terms and conditions of carriage on the basis of affiliation.  The network has the further burden of proving that discrimination actually motivated the carriage decision.  And it must also prove that the discrimination unfairly restrained its ability to compete.

---

[1]    As used herein, "GSN" refers to both Game Show Network, LLC and/or the programming network owned by that entity, GSN.

REDACTED – FOR PUBLIC INSPECTION

GSN can do none of this.  GSN will not be able to discharge its burden to prove that the 2010 decision by Cablevision to move GSN from a broadly distributed tier of service to one less highly penetrated had anything at all to do with GSN's lack of affiliation with Cablevision.  Nor can GSN demonstrate that the repositioning had any meaningful impact on its ability to compete fairly in the marketplace.  And although GSN will assert that this case is a reprise of the *Tennis Channel* proceeding that should lead the Presiding Judge to the same result, the evidence, as opposed to the rhetoric, will demonstrate clearly that it is not.[2]

First, notwithstanding robust deposition and documentary discovery, there is a complete absence of evidence of discrimination on the basis of affiliation or non-affiliation.  No witness will testify and no document will demonstrate that the decision made with respect to GSN had anything to do with discrimination in favor of networks affiliated with Cablevision.  To the contrary, the undisputed evidence will prove that Cablevision's decision to re-tier GSN resulted from an analysis of the cost of the network compared to its limited value to Cablevision's subscribers.  Under increasing pressure from cable networks seeking higher subscriber fees and broadcast networks demanding significant payments for retransmission consent, Cablevision weighed the costs and benefits of continuing to offer GSN to all of its Expanded Basic cable subscribers and determined that the former outweighed the latter.  The result: █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[2]   Importantly, public reports of the recent argument in the D.C. Circuit put in doubt whether the Commission's ruling in *Tennis Channel, Inc.* v. *Comcast Cable Commc'ns*, Memorandum Opinion and Order, 27 FCC Rcd. 8508 (2012), will survive appellate scrutiny on First Amendment or other grounds.  *See* Mike Scarcella, *D.C. Circuit Appears Skeptical of FCC in Tennis Channel Case*, BLT: The Blog of Legal Times (February 25, 2013, 2:50 PM), http://legaltimes.typepad.com/blt/2013/02/dc-circuit-appears-skeptical-of-fcc-in-tennis-channel-case.html; Alina Selyukh, *Court Grills FCC, Tennis Channel in Comcast Discrimination Suit*, Reuters (February 25, 2013, 4:52 PM), http://www.reuters.com/article/2013/02/25/us-usa-fcc-comcast-tennis-idUSBRE91O16S20130225.

REDACTED – FOR PUBLIC INSPECTION

████████████████████████████████████████████████ Cablevision also took into account that its expired contract with GSN had not required GSN to be carried on a particular tier of service. Cablevision exercised its informed judgment that subscribers would not disconnect as a result of the reduced carriage and that loyal GSN viewers would, in fact, buy the tier of service where GSN was placed in order to continue to view the network. In short, Cablevision made a legitimate business decision to reduce the carriage of GSN; affiliation did not motivate that decision. For this reason alone, GSN cannot prevail on its program carriage complaint.

Nor will GSN fare any better in its attempt to prove circumstantial evidence of discrimination. To do so, GSN must prove that it is similarly situated to a network affiliated with Cablevision. As a result, GSN argues that it is similar to two women's programming networks affiliated with Cablevision: WE tv and Wedding Central. The evidence, however, shows that this is not so. GSN's own documents and the testimony of its executives will demonstrate that GSN is very different from WE tv and Wedding Central with respect to each of the relevant factors in a similarly situated inquiry:

- **Genre.** Cablevision's programming expert, Michael Egan, will testify that GSN and WE tv/Wedding Central have very different programming genres. Approximately █████ percent of GSN's programming falls within the Game Show and Gaming genres, whereas less than █████ percent of WE tv's programming fits in those genres. And █████ percent of WE tv's programming falls within ██████████ genres of Reality, Drama, Comedy, Movie, and News, whereas less than █████ percent of GSNs programming fits within any one of those genres.

REDACTED – FOR PUBLIC INSPECTION

claim that carriage on Cablevision systems is critical to its ability to reach its intended viewers, because Cablevision has no such market power.

Cablevision and other cable operators face significantly increased competition in the MVPD business.[116]  In New York alone, Cablevision faces intense competition from the two incumbent telephone companies, Verizon FiOS and AT&T, that offer video programming; as well as from the two major providers of DBS service, DISH and DIRECTV.  Competition is also increasing from a variety of new internet services that deliver television shows and movies to viewers without the need for a cable or satellite subscription.[117]  This intense competition debunks any notion that Cablevision  has bottleneck market power with respect to GSN.

GSN will not be able to prove that Cablevision's carriage decision unreasonably restrained its ability to compete fairly. Here are the facts:  GSN lost approximately ███████ subscribers in the New York metropolitan area as a result of Cablevision's re-tiering decision, ████████████████████████████████████████████████████████████ Cablevision subscribers who wished to continue to watch the network could either sign up for the Sports and Entertainment Pak (and thousands did) or they could switch to any of Cablevision's formidable competitors that carried GSN more broadly.[118]

GSN also argues that it is likely that other MVPDs will be emboldened by Cablevision's actions and will also reduce or delete the network from their systems.  But GSN's speculation is inconsistent with the facts.  Since learning of Cablevision's decision, GSN has ████████████████████████████████████████████████████████████

---

[116]   Montemagno Direct Test. ¶ 26-33.

[117]   *Id.*

[118]   *See* Orszag Direct Test. ¶ 143.

# EXHIBIT M

Arthur J. Burke (State Bar No. 229589)
Arthur.Burke@dpw.com
DAVIS POLK & WARDWELL
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111

*Attorney for Defendants*
COMCAST CORPORATION and
COMCAST CABLE
COMMUNICATIONS, LLC

*[Attorneys for Other Distributor Defendants*
*Listed on Following Pages]*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| ROB BRANTLEY, DARRYN COOKE, WILLIAM and BEVERLY COSTLEY, PETER G. HARRIS, CHRISTIANA HILLS, MICHAEL B. KOVAC, MICHELLE NAVARRETTE, JOY PSACHIE, TIMOTHY J. STABOSZ and JOSEPH VRANICH, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>NBC UNIVERSAL, INC., VIACOM, INC., THE WALT DISNEY COMPANY, FOX ENTERTAINMENT GROUP, INC., TIME WARNER INC., TIME WARNER CABLE INC., COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC, COXCOM, INC., THE DIRECTV GROUP, INC., ECHOSTAR SATELLITE L.L.C., CHARTER COMMUNICATIONS, INC. and CABLEVISION SYSTEMS CORPORATION,<br><br>        Defendants. | CASE NO. CV07-06101 CAS(VBKx)<br><br>**DISTRIBUTOR DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge:   Hon. Christina A. Snyder<br><br>Date:     June 16, 2008<br>Time:     10:00 a.m.<br>Courtroom: 5 |

Sanford M. Litvack (State Bar No. 177721)
slitvack@hhlaw.com
David R. Singer (State Bar No. 204699)
drsinger@hhlaw.com
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Fax: (310) 785-4601

David Dunn (*pro hac vice*)
ddunn@hhlaw.com
HOGAN & HARTSON LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

*Attorneys for Defendant*
CHARTER COMMUNICATIONS, INC.


Richard R. Patch (State Bar No. 88049)
rrp@cpdb.com
Susan K. Jamison (State Bar No. 131867)
skj@cpdb.com
Lauren S. Kowal (State Bar No. 224976)
lsk@cpdb.com
COBLENTZ, PATCH, DUFFY & BASS LLP
One Ferry Building, Suite 200
San Francisco, CA 94111-4213
Telephone: (415) 391-4800
Fax: (415) 989-1663

*Attorneys for Defendant*
ECHOSTAR SATELLITE L.L.C.

Jeffrey S. Davidson (State Bar No. 143633)
jdavidson@kirkland.com
Melissa D. Ingalls (State Bar No. 174861)
mingalls@kirkland.com
Christopher T. Casamassima (State Bar No. 211280)
ccasamassima@kirkland.com
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 680-8400
Fax: (213) 680-8500

*Attorneys for Defendant*
THE DIRECTV GROUP, INC.


Daniel G. Swanson (State Bar No. 116556)
dswanson@gibsondunn.com
Jay Srinivasan (State Bar No. 181471)
jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 So. Grand Avenue, 46th Floor
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Fax: (213) 229-7520

*Attorneys for Defendant*
COXCOM, INC.

Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Teena-Ann V. Sankoorikal (*pro hac vice*)
tsankoorikal@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Fax: (212) 474-3700

Bryan A. Merryman (State Bar No. 134357)
bmerryman@whitecase.com
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071-2007
Telephone: (213) 620-7700
Fax: (213) 452-2329

*Attorneys for Defendant*
TIME WARNER CABLE INC.


Robert A. Sacks (State Bar No. 150146)
sacksr@sullcrom.com
Diane L. McGimsey (State Bar No. 234953)
mcgimseyd@sullcrom.com
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067
Telephone: (310) 712-6600
Fax: (310) 712-8800

*Attorneys for Defendant*
CABLEVISION SYSTEMS CORPORATION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on June 16, 2008, at 10:00 a.m., or as soon thereafter as may be heard before the Honorable Christina A. Snyder, in Courtroom No. 5 located at 312 N. Spring Street, Los Angeles, California 90012, defendants Time Warner Cable Inc., Comcast Corporation, Comcast Cable Communications, LLC, CoxCom, Inc., the DIRECTV Group, Inc., EchoStar Satellite L.L.C., Charter Communications, Inc., and Cablevision Systems Corp., pursuant to Rule 12 of the Federal Rules of Civil Procedure, will and hereby do move the Court for an Order dismissing plaintiffs' Second Amended Complaint For Damages And Injunctive Relief For Violations of the Sherman Antitrust Act (15 U.S.C. § 1) for failure to state a claim;

PLEASE TAKE FURTHER NOTICE that this Motion is based upon this Notice of Motion, Motion and the attached Memorandum of Points and Authorities, all pleadings, records and papers on file in this action, and on any such further or other matter that the Court deems proper at the hearing on this motion;

PLEASE TAKE FURTHER NOTICE that this Motion is made following the conference of counsel pursuant to Local Civil Rule 7-3, which took place on April 8, 2008; and

1    PLEASE TAKE FURTHER NOTICE that any opposition to the relief

2 requested herein must be filed by May 20, 2008, with reply to follow on or before

3 June 6, 2008, pursuant to the Stipulation and Order entered on March 28, 2008.

4 Dated: April 22, 2008     Respectfully Submitted,

5             DAVIS POLK & WARDWELL

6

7         By _____

8           ARTHUR J. BURKE

           DAVID B. TOSCANO

9           RAJESH S. JAMES

           ROSANNA G. LIPSCOMB

10

11         *Attorneys for Defendants*

          COMCAST CORPORATION and

12         COMCAST CABLE

          COMMUNICATIONS, LLC

13

14         (Signed with permission for all distributor

          defendants)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION..................................................................................................1

THE SECOND AMENDED COMPLAINT ......................................................3

    A.    The Parties ..............................................................................3

    B.    The Alleged Relevant Market ................................................4

    C.    The Challenged Conduct ........................................................5

    D.    The Alleged Antitrust
           Violation and Relief Sought ..................................................6

ARGUMENT .........................................................................................................7

I.    PLAINTIFFS LACK
    ANTITRUST STANDING.........................................................................7

    A.    Plaintiffs' Claims Are Barred
           by *Illinois Brick*'s Indirect
           Purchaser Rule ........................................................................7

           1.    Plaintiffs' Modified
                Claims Do Not Satisfy
                the Co-Conspirator Exception..............................................8

           2.    *Shamrock Foods* Does
                Not Support Application
                of the Co-Conspirator Exception ......................................10

    B.    Plaintiffs Fail to Allege Antitrust Injury
           Because They Are Not Market Participants.................................13

    C.    Plaintiffs Do Not Otherwise Have
           Antitrust Standing Based Upon the
           *AGC* Factors .......................................................................16

II.    PLAINTIFFS FAIL TO STATE
    A SHERMAN ACT § 1 CLAIM .........................................................17

    A.    Plaintiffs Fail to Allege
           Injury to Competition ...........................................................17

i

Page(s)

1. The Alleged "Suppressed Competition"
Among Distributors Does Not Support a Claim ................18

2. The Alleged "Foreclosure" of Independent
Programmers Is Insufficient to Support a Claim ..............19

B. Plaintiffs Fail to Plead a
Legally Sufficient Relevant Market ...........................................21

C. Plaintiffs Fail to State
a Tying Claim ..................................................................................24

1. The Complaint Fails to Identify the Tying
and Tied Products or Product Markets...............................24

2. There Is No "Block Booking" or
"Full-Line Forcing" Claim ...................................................25

CONCLUSION ........................................................................................25

ii

1  above) to plead *a single unified product market*. By claiming that competition is

2  injured in a single product market, plaintiffs *preclude* the possibility of a viable tying

3  claim. *See, e.g., Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 614, 73

4  S. Ct. 872, 97 L. Ed. 1277 (1953) (where tying and tied product are in the same

5  market, "no leverage in one market excludes sellers in a second").

6      ## 2.    **There Is No "Block Booking" or "Full-Line Forcing" Claim**

7          As defendants have repeatedly pointed out, "block booking" is not a

8  separate and distinct antitrust claim, but is a form of tying. *See United States v.*

9  *Loew's*, 371 U.S. 38, 44, 83 S. Ct. 97; 9 L. Ed. 2d 11 (1962) (in a "block booking"

10  case, the principal issue is "whether specific tying arrangements violate Section 1 of

11  the Sherman Act"). Plaintiffs' attempts to characterize defendants' conduct as "full-

12  line forcing" are likewise unavailing. "Full-line forcing" is also a species of tying.

13  *See Jefferson Parish*, 466 U.S. 2, 13 n.19 (1984); *Bob Maxfield, Inc. v. Am. Motors*

14  *Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981) ("illegal tie-in" and "illegal full-line

15  forcing policy" are "substantively synonymous"); *W. Parcel Express v. UPS of Am.*,

16  1996-2 Trade Cas. (CCH) ¶ 71,648, at 78,568 (N.D. Cal. Dec. 3, 1996) ("simply a

17  form of tying arrangement"). Because plaintiffs' tying claim is deficient for multiple

18  reasons, their "block booking" and "full-line forcing" claims fail as well.

19      ## **CONCLUSION**

20          For the foregoing reasons, the SAC fails to state a claim against the

21  distributor defendants and should be dismissed with prejudice.

22  Dated:  April 22, 2008              Respectfully submitted,

23                                      DAVIS POLK & WARDWELL

24                                      By

25                                          ARTHUR J. BURKE

26                                      *Attorney for Defendants*
27                                      COMCAST CORPORATION and COMCAST
                                        CABLE COMMUNICATIONS, LLC
28                                      (Signed with permission for all distributor
                                        defendants)

-25-