UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CABLEVISION SYSTEMS CORPORATION and CSC HOLDINGS, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| -against- | ) ) |
| VIACOM INTERNATIONAL INC. and BLACK ENTERTAINMENT TELEVISION LLC, | ) ) ) |
| Defendants. | ) ) ) |

No. 13 CIV 1278 (LTS) (JLC)

## MEMORANDUM OF LAW OF CABLEVISION SYSTEMS CORPORATION AND CSC HOLDINGS, LLC IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Jerome C. Katz
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York  10036
(212) 596-9000

Mark S. Popofsky (*Admitted Pro Hac Vice*)
Mariel Goetz (*Admitted Pro Hac Vice*)
One Metro Center
700 12th Street, N.W.
Washington, D.C.  20005
(202) 508-4600

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 5

A.   Viacom's Market Power Over The Tying Networks ................................. 5

B.   Viacom Coerces Cablevision And Others Into Licensing The Tied Suite
     Networks ............................................................................................... 6

C.   Substantial Foreclosure, Competitive Harm, And Cablevision's Claims ............ 7

ARGUMENT ......................................................................................................... 9

I.    CABLEVISION'S COMPLAINT STATES A PER SE TYING CLAIM ...................... 9

A.   Viacom Misstates The Elements Of A Per Se Tying Claim ...................... 9

B.   Cablevision Sufficiently Alleges Substantial Tied Market Foreclosure .............. 13

C.   Viacom's Arguments Fail To Demonstrate Insufficient Foreclosure .................. 14

      1.   Viacom wrongly requires rule of reason pleading in a per se case ........... 14

      2.   Cablevision pleads actual and not speculative foreclosure ...................... 18

      3.   *Brantley* is inapposite .................................................................. 23

D.   Cablevision Sufficiently Alleges Valid Relevant Markets ......................... 24

      1.   Cablevision pleads valid markets based on programming type ................ 25

      2.   Cablevision pleads valid network-specific markets ............................... 31

      3.   Cablevision's prior statements are irrelevant ...................................... 33

II.   BECAUSE CABLEVISION STATES A PER SE TYING CLAIM THE COURT
      SHOULD SUSTAIN CABLEVISION'S OTHER CLAIMS ............................... 34

III.  THE COURT SHOULD DENY VIACOM'S MOTION TO STRIKE ...................... 34

A.   Cablevision's Proposed Mandatory Injunction Is Valid Permanent Relief ......... 34

B.   Viacom's Laches Argument Is Baseless ............................................... 37

      1.   Cablevision brought a timely antitrust suit ........................................ 37

      2.   Equity and the public interest preclude a laches defense ........................ 39

CONCLUSION ...................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
    960 F.2d 1020 (Fed. Cir. 1992) ...................................................................................39

*Ad/Sat v. Associated Press,*
    181 F.3d 216 (2d Cir. 1999) .......................................................................................26

*Airweld, Inc. v. Airco Inc.,*
    742 F.2d 1184 (9th Cir. 1984) .............................................................................38, 39

*Alaska Airlines Inc. v. United Airlines, Inc.,*
    948 F.2d 536 (9th Cir. 1991) ......................................................................................33

*Alternative Electrodes, LLC v. Empi, Inc.,*
    597 F. Supp. 2d 322 (E.D.N.Y. 2009) ........................................................................32

*Americap, Inc. v. ADJ Corp.,*
    No. 80 Civ. 2630, 1980 WL 1891 (S.D.N.Y. Sept. 5, 1980) .....................................12

*Anderson News, LLC v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012) ...................................................................................9, 22

*Andrea Theatres, Inc. v. Theatre Confections, Inc.,*
    787 F.2d 59 (2d Cir. 1984) .........................................................................................38

*Arista Records LLC v. Lime Group LLC,*
    532 F. Supp. 2d 556 (S.D.N.Y. 2007) ........................................................................30

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................................3, 9, 22

*Audell Petro. Corp. v. Suburban Paraco Corp.,*
    903 F. Supp. 364 (E.D.N.Y. 1995) .............................................................................21

*Bansavich v. McLane Co.,*
    No. 3:07cv702, 2008 WL 4821320 (D. Conn. Oct. 31, 2008) ....................................17

*Bel Canto Design, Ltd. v. MSS HiFi, Inc.,*
    No. 11 Civ. 6353, 2012 WL 2376466 (S.D.N.Y. June 20, 2012) ...............................25

*Belfiore v. New York Times Co.,*
    826 F.2d 177 (2d Cir. 1987), *aff'g* 654 F. Supp. 842 (D. Conn. 1986) ....................30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................3, 9, 22, 23

*Blank Productions, Inc. v. Warner/Chappell Music, Inc.*,
    11 Civ. 7927, 2013 WL 32806 (S.D.N.Y. Jan. 3, 2013).........................................23

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*,
    881 F. Supp. 860 (W.D.N.Y. 1994)...................................................................29

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ..........................................................2, 11, 15, 23, 24

*Camellia City Telecasters, Inc. v. Tribune Broad. Co.*,
    762 F. Supp. 290 (D. Colo. 1991).......................................................................27

*Cancell PCS, LLC v. Omnipoint Corp.*,
    No. 99 Civ. 3395, 2001 WL 293981 (S.D.N.Y. 2001) ...........................................12

*Carell v. Shubert Org.*,
    104 F. Supp. 2d 236 (S.D.N.Y. 2000)..............................................................32, 39

*CDC Techs., Inc. v. IDEXX Labs., Inc.*,
    186 F.3d 74 (2d Cir. 1999).............................................................................15, 33

*Coniglio v. Highwood Servs.*,
    495 F.2d 1286 (2d Cir. 1974) .............................................................................12

*Conopco, Inc. v. Campbell Soup Co.*,
    95 F.3d 187 (2d Cir. 1996)..................................................................................39

*In re Crude Oil Comm. Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012).....................................................................9

*Cruz v. Rose Assocs., LLC*,
    No. 13 Civ. 0112, 2013 WL 1387018 (S.D.N.Y. Apr. 5, 2013)................................22

*Danny Kresky Entrs. Corp. v. Magid*,
    716 F.2d 206 (3d Cir. 1983)................................................................................27

*Datagate v. Hewlett-Packard Co.*,
    60 F.3d 1421 (9th Cir. 1995) ....................................................................10, 11, 21

*DiscoVision Assocs. v. Disc Mfg Inc.*,
    No. Civ. A 95-21, 1997 WL 309499 (D. Del. Apr. 3, 1997)........................14, 19, 21

*E&L Consulting v. Doman Indus.*,
    472 F.3d 23 (2d Cir. 2006)..................................................................................12

*Emigra Group v. Fragomen, Del Rey, Bensen & Lowey, LLP,*
    612 F. Supp. 2d 330 (S.D.N.Y. 2009)..................................................................26

*Fort Wayne Telsat v. Ent't and Sports Prog. Network,*
    753 F. Supp. 109 (S.D.N.Y. 1990) ..............................................................27, 29

*Freeland v. AT&T Corp.,*
    238 F.R.D. 130 (S.D.N.Y. 2006) ....................................................................10

*Friedman v. Adams Russell Cable Servs.,*
    624 F. Supp. 1195 (S.D.N.Y. 1996)..................................................................12

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,*
    386 F.3d 485 (2d Cir. 2004)..........................................................................25

*Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.,*
    880 F.2d 1514 (2d Cir 1989)..............................................................12, 13, 19

*Grid Sys. Corp. v. Texas Instr.,*
    771 F. Supp. 1033 (N.D. Cal. 1991) ................................................................20

*Gumwood HP Shopping Partners, L.P. v. Simon Property Group, Inc.,*
    No. 3:11-CV-268, 2013 WL 3214983 (N.D. Ind. Mar. 13, 2013)........................13, 14, 15, 21

*H.L. Moore Drug Exch. v. Eli Lilly & Co.,*
    No. 76 Civ. 2817, 1980 WL 1959 (S.D.N.Y. Nov. 21, 1980) ....................................36

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
    377 F.2d 776 (3d Cir. 1967), *aff'd,* 392 U.S. 481 (1968) ......................................40

*Hayden Pub. Co. v. Cox Broad. Corp.,*
    730 F.2d 64 (2d Cir. 1984)............................................................................25

*Helprin v. Harcourt, Inc.,*
    277 F. Supp. 2d 327 (S.D.N.Y. 2003)................................................................36

*Hudson Motors P'ship v. Crest Leasing Enters, Inc.,*
    845 F. Supp. 969 (E.D.N.Y. 1994) ..............................................................36, 37

*Hynix Semiconductor Inc. v. Rambus Inc.,*
    No. CV-00-20905, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008)....................................26

*Illinois Tool Works Inc. v. Independent Ink, Inc.,*
    547 U.S. 28 (2006)....................................................................................34

*Int'l Boxing Club of New York, Inc. v. United States,*
    358 U.S. 242 (1959)....................................................................................28

*Int'l Salt Co. v. United States,*
   332 U.S. 392 (1947)..................................................................................................36

*Jefferson Parish Hosp. Dist No. 2 v. Hyde,*
   466 U.S. 2 (1984)...............................................................................10, 11, 13, 15, 17

*Kansas v. Colorado,*
   514 U.S. 673 (1995)..................................................................................................37

*Kelly v. Kosuga,*
   358 U.S. 516 (1959)..................................................................................................36

*Klehr v. A.O. Smith Corp.,*
   521 U.S. 179 (1997)..................................................................................................38

*Konik v. Champlain Valley Phys. Hosp. Med. Center,*
   733 F.2d 1007 (2d Cir. 1984)......................................................................................9

*Lennon v. Seaman,*
   63 F. Supp. 2d 428 (S.D.N.Y. 1999)..........................................................................37

*Levitch v. Columbia Broad. Sys., Inc.,*
   495 F. Supp. 649 (S.D.N.Y. 1980) .......................................................................32, 33

*Madison Square Garden (MSG) v. NHL,*
   No. 07 CV 8455, 2008 WL 4547518 (S.D.N.Y. Oct.10, 2008)..................................38

*Mathias v. Daily News, L.P.,*
   152 F. Supp. 2d 465 (S.D.N.Y. 2001).......................................................................30

*Matson v. Bd. of Educ.,*
   631 F.3d 57 (2d Cir. 2011)...........................................................................................9

*MCA TV Ltd. v. Public Interest Corp.,*
   171 F.3d 1265 (11th Cir 1999) .............................................................................18, 19

*Minpeco, S.A. v. Conticommodity Servs., Inc.,*
   116 F.R.D. 517 (S.D.N.Y. 1987)................................................................................40

*MLB Properties, Inc. v. Salvino, Inc.,*
   542 F.3d 290 (2d Cir. 2008).......................................................................................28

*Moccio v. Cablevision Sys. Corp.,*
   208 F. Supp. 2d 361 (E.D.N.Y. 2002) .......................................................................12

*National Gear & Piston, Inc. v. Cummins Power Sys., LLC,*
   861 F. Supp. 2d 344 (S.D.N.Y. 2012)........................................................................32

*National Soc'y of Prof'l Eng'rs v. United States,*
    435 U.S. 679 (1987)................................................................................................35

*National Souvenir Center, Inc. v. Historic Figures, Inc.,*
    728 F.2d 503 (D.C. Cir. 1984)...............................................................................38

*New York v. Kraft Gen. Foods, Inc.,*
    926 F. Supp. 321 (S.D.N.Y. 1995) .............................................................26, 29, 35

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.,*
    311 F. Supp. 2d 1048 (D. Colo. 2004).............................................................28, 29

*Paramount Pictures Corp. v. Johnson Broad., Inc.,*
    432 F. Supp. 2d 707 (S.D. Tex. 2006) .............................................................31, 34

*Paramount Pictures Corp. v. Johnson Broad. Inc.,*
    No. Civ A.H. 04 03488, 2006 WL 367874 (S.D. Tex. Feb. 15, 2006)........14, 18, 34

*Park v. Thompson Corp.,*
    No. 05 Civ. 2931, 2007 WL 119461 (S.D.N.Y. Jan. 11, 2007)..............10, 11, 12, 21

*Pitchford v. PEPI, Inc.,*
    531 F.2d 92 (3d Cir. 1976).....................................................................................17

*Re-Alco Indus. v. Nat'l Ctr. for Health Educ., Inc.,*
    812 F. Supp. 387 (S.D.N.Y. 1993) ........................................................................32

*Rite Aid Corp. v. Am. Express Travel Related Servs. Co.,*
    708 F. Supp. 2d 257 (E.D.N.Y. 2010) ..............................................................38, 39

*Rooney v. Columbia Pictures Indus.,*
    538 F. Supp. 211 (S.D.N.Y. 1982) ........................................................................36

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,*
    28 F.3d 1379 (5th Cir. 1994) ........................................................................15, 16, 17

*Rubinstein v. Dep't Stores Nat'l Bank,*
    No. 12 Civ. 8054, 2013 WL 3817767 (S.D.N.Y. July 22, 2013) ...........................36

*S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.,*
    138 F.3d 869 (11th Cir. 1998) ...............................................................................15

*In re Set-Top Cable Tel. Box Anti. Litig.,*
    No. 08 MD 1995, 2011 WL 1432036 (S.D.N.Y. Apr. 8, 2011) .............................12

*Shaw v. Rolex Watch, U.S.A., Inc.,*
    673 F. Supp. 674 (S.D.N.Y. 1987) ........................................................................32

*Simon-Whelan v. The Andy Warhol Found.*,
  No. 07 Civ. 6423, 2009 WL 1457177 (S.D.N.Y. May. 26, 2009).................................31, 32

*Smith Mach. Co. v. Hesston Corp.*,
  878 F.2d 1290 (10th Cir. 1989) ...............................................................15, 16, 18, 39

*Smith v. eBay Corp.*,
  No. C 0-03825, 2012 WL 27718 (N.D. Cal. Jan. 5, 2012) .......................................38

*Smugglers Notch Homeowners' Ass'n v. Smugglers Notch Mgmt.*,
  414 F. App'x 372 (2d Cir. 2011) ...................................................................12

*Specialty Minerals, Inc. v. Pluess-Staufer AG*,
  395 F. Supp. 2d 109 (S.D.N.Y. 2005)..............................................................34

*Storer Cable Commc'ns, Inc. v. City of Montgomery*,
  826 F. Supp. 1338, *vacated as moot* 866 F. Supp. 1376 (M.D. Ala. 1993)...........................31

*Synergetics USA, Inc. v. Alcon Labs, Inc.*,
  No. 08 Civ. 3669, 2009 WL 435299 (S.D.N.Y. Feb. 23, 2009) ................................12

*Telecor Commc'ns v. Sw. Bell Tel. Co.*,
  305 F.3d 1124 (10th Cir. 2002) ...................................................................28

*Theatre Party Assocs., Inc. v. Shubert Org., Inc.*,
  695 F. Supp. 150 (S.D.N.Y. 1988) ................................................................32

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001).................................................................25, 27, 31, 32

*Toys 'R' Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ......................................................................25

*Trans Sports, Inc. v. Starter Sportswear, Inc.*,
  No. 88-CV-1292, 1989 WL 29454 (N.D.N.Y. Mar. 21, 1989) ..............................28

*U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*,
  No. 12 Civ. 4873, 2012 WL 6136017 (S.D.N.Y. Dec. 11, 2012)..........................21

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
  7 F.3d 986 (11th Cir. 1993) ......................................................................30

*United Magazine Co. v. Murdoch Magazines Distrib., Inc.*,
  146 F. Supp. 2d 385 (S.D.N.Y. 2001)..............................................................32

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*,
  474 F. Supp. 2d 75 (D.D.C. 2007) ................................................................34

*United States v. Bausch & Lomb Optical Co.,*
    321 U.S. 707 (1944)...............................................................................35

*United States v. IBM Corp.,*
    163 F.3d 737 (2d Cir. 1998)......................................................................9

*United States v. Loew's, Inc.,*
    371 U.S. 38 (1962)..........................................................................16, 35

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam).......................................18, 20

*United States v. Visa U.S.A., Inc.,*
    344 F.3d 229 (2d Cir. 2003).....................................................................15

*United States v. Visa U.S.A., Inc.,*
    163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd,* 344 F.3d 229 (2d Cir. 2003).....24, 25, 26, 30, 31

*Untied States v. Glaxo Group,*
    410 U.S. 52 (1973)..........................................................................35, 36

*Viacom Int'l Inc. v. Tandem Prods., Inc.,*
    526 F.2d 593 (2d Cir. 1975).....................................................................36

*In re Visa Check/MasterMoney Anti. Litig.,*
    280 F.3d 124 (2d Cir. 2001)..........................................................9, 10, 13, 14

*Vitale v. Marlborough Gallery,*
    No. 93 Civ. 6276, 1994 WL 654494 (S.D.N.Y. July 5, 1994) .................................32

*In re Webkinz Anti. Litig.,*
    695 F. Supp. 2d 987 (N.D. Cal. 2010) .........................................................17

*Westman Commc'ns Co. v. Hobart Corp.,*
    541 F. Supp. 307 (D. Colo. 1982)...............................................................40

*In re Wireless Tel. Servs. Anti. Litig.,*
    385 F. Supp. 2d 403 (S.D.N.Y. 2005)................................................2, 10, 11, 13, 14

*In re Wireless Tel. Servs. Anti. Litig.,*
    No. 02 Civ. 2637, 2003 WL 21912603 (S.D.N.Y. Aug. 12, 2003) ...........................10

*Xpressions Footwear Corp. v. Peters,*
    885 F. Supp. 630 (S.D.N.Y. 1995) ...............................................................1

*Yentsch v. Texaco, Inc.,*
    630 F.2d 46 (2d Cir. 1980).......................................................... 11, 12, 13

*Zenith Radio Corp. v. Hazeltine Res., Inc.*,
    401 U.S. 321 (1971)................................................................................37

**STATUTES AND RULES**

Fed. R. Civ. P. 8(a) ...............................................................................9

Fed. R. Civ. P. 8(d)(2)...........................................................................31

**OTHER AUTHORITIES**

2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed. 2007) .....................................40

9 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed. 2011) .................11, 13, 14, 31

1 Herbert Hovenkamp *et al.*, IP and Antitrust (2012)..........................................................17, 34

Order, *In re Verizon*, FCC No. CSR-8185-P (Sept. 22, 2011), *available at*
    http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-11-1594A1.pdf .............................33

U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (2010), *available at*
    http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf....................................................26

Plaintiffs Cablevision Systems Corporation and CSC Holdings, LLC ("Cablevision") respectfully submit this memorandum and accompanying declaration in opposition to the motion of Defendants Viacom International Inc. and Black Entertainment Television LLC ("Viacom") to dismiss Cablevision's Amended Complaint ("AC" or "Complaint").

## PRELIMINARY STATEMENT

Cablevision pleads a straightforward *per se* antitrust tying case.  Viacom wielded its market power over four commercially critical Tying Networks (Nickelodeon, Comedy Central, BET, and MTV) to force Cablevision and other distributors to license for millions of dollars some dozen unwanted Suite Networks.  Viacom strong-armed Cablevision into the tie by threatening to impose a ten-figure penalty for a license to the Tying Networks if Cablevision declined to distribute the low-performing Suite.  If freed from Viacom's coercive tie, Cablevision and other distributors would license rival networks in place of Suite Networks. Cablevision accordingly pleads each element of a *per se* tying claim: (i) distinct tying and tied products; (ii) coercively tied together; (iii) appreciable market power over the tying product; and (iv) foreclosure by the tie of a not insubstantial dollar volume of tied market commerce.

Viacom does not dispute that it coerced Cablevision and other distributors into carrying Suite Networks by threatening massive penalties.  Instead, Viacom argues that Cablevision fails to allege (i) that the tie caused "anticompetitive effects," a requirement Viacom equates with "an actual adverse effect on competition"; and (ii) any cognizable tying product market.[1]  Viacom distorts the law and ignores Cablevision's well-pled allegations.  Indeed, Viacom is so desperate for this Court to ignore the facts Cablevision actually pleads that Viacom peppers its brief with

---

[1] Mem. of Law of Viacom Int'l and Black Entertainment Television LLC In Support of Their Motion to Dismiss, at 12, 23 ("Mem.") (internal quotations omitted).  Viacom is now restricted to those two grounds for dismissal. *See, e.g., Xpressions Footwear Corp. v. Peters*, 885 F. Supp. 630, 634 (S.D.N.Y. 1995) (citing cases).

irrelevant statements made by Cablevision in unrelated matters.  Viacom's diversions cannot erase what Cablevision's detailed allegations show:  Viacom's coercion of Cablevision and others into carrying Suite Networks constitutes *per se* illegal tying under the Sherman Act.

Viacom's argument that Cablevision fails to allege an "actual adverse effect on competition" misfires because Viacom wrongly seeks to smuggle into the *per se* rule an element required only in a rule of reason case.  The *per se* rule presumes anticompetitive effects from a coercive tie-in's foreclosure of a substantial volume of tied commerce (even $200,000 can suffice).  As Judge Cote explained, "where a tying arrangement may be condemned as illegal *per se*, plaintiffs ***need not allege, let alone prove***, facts addressed" to "anticompetitive effects in the tied market."  *In re Wireless Tel. Servs. Anti. Litig.*, 385 F. Supp. 2d 403, 414 (S.D.N.Y. 2005) (emphasis added).  Thus, Viacom's many ways of describing what, it says, Cablevision failed to plead – "market-wide foreclosure," "anticompetitive effects in the tied market," an "actual adverse effect on competition," "actual anticompetitive effects" (Mem. 14, 11, 12, 34) – are misdirected.  Each describes allegations that only the rule of reason might require.  *Brantley*, a case that rejected a rule of reason, not a *per se*, tying claim, is irrelevant for this dispositive reason.  It is not, as Viacom spins it, some silver bullet that requires dismissal here.

Viacom's arguments for grafting rule of reason proof onto Cablevision's *per se* claim are meritless.  Viacom points to "zero foreclosure" cases, where customers do not want any alternative to the tied product at all.  These cases are inapposite.  For one thing, this is not a zero foreclosure case (yet another distinction from *Brantley*, which was).  Cablevision and other distributors seek to carry foreclosed alternatives.  For another, although some courts reason that zero foreclosure ties threaten no competitive harm, this simply recognizes that such ties foreclose ***no*** commerce at all and, therefore, the basis for the *per se* rule's ***presumption*** of competitive

harm from foreclosure of a substantial volume of tied market commerce is absent. Courts'
recognition that zero foreclosure ties do not fit the rationale for *per se* (or any antitrust)
condemnation does not graft into the *per se* rule a need to plead "***actual*** anticompetitive effects."
Viacom also argues that rule of reason standards should apply because it engages in "line
forcing." But the very cases Viacom cites recognize that the *per se* rule continues to govern
when, as here, some ultimate customers must take the tied product.

Viacom's contention that Cablevision's foreclosure allegations are speculative also fails.
The Complaint (i) alleges that Cablevision and other distributors ***would*** carry non-Viacom
networks absent the tie; and (ii) identifies specific networks from which these distributors would
draw. These facts exceed what the *per se* rule requires. Viacom's argument that Cablevision
fails to allege tying beyond itself is twice flawed. First, Viacom's 2012 Tying Agreement with
Cablevision, which forecloses millions of dollars of tied market commerce, alone suffices to
sustain Cablevision's *per se* claim. Second, the facts pled amply support a plausible inference
that Viacom has imposed foreclosing ties on other major distributors. Indeed, several major
distributors have confirmed that Viacom wielded its power over the Tying Networks to force
them into carrying unwanted Suite Networks over alternatives. Viacom's gripe that Cablevision
does not advance every supporting fact it would advance at summary judgment overstates the
pleading burden *Twombly* and *Iqbal* impose.

Viacom's only other attack on Cablevision's *per se* claim – the scope of the relevant
market – is equally meritless. Market definition is a question of fact, and Cablevision details
how Viacom's four Tying Networks possess substantial market power in four category-specific
markets, including Highly Popular Children's Programming (for Nickelodeon) and Highly
Popular Comedy Programming (Comedy Central). Viacom argues that the market should be

3

defined from the perspective of a particular subscriber surfing channels from the couch. But Cablevision's allegations explain why customers select video packages, and distributors therefore assemble them, from a longer-term perspective – one that renders the set of networks that reasonably substitute for Viacom's commercially critical networks far narrower than all those accessible through a TV remote. Allegations more detailed than *Twombly/Iqbal* require show why, from the proper perspective, Cablevision validly confines the markets to the networks the Complaint includes. Viacom's contrary arguments merely pick factual fights for another day.

Viacom's market definition arguments also prove too much. Under Viacom's logic, no network – not even ESPN – could ever possess market power. But numerous courts have upheld markets – such as "quality syndicated programming," "quality sports programming," and "live music concerts" – analogous to those pled here. Viacom's archeological foray into Cablevision statements that no single network is essential to a major distributor's survival (Mem. 4) is a red herring. Market power means something less: the power to set supracompetitive prices. Cablevision's allegations that Viacom raised the Tying Networks' rates in the face of falling ratings amply evidence market power. Cablevision's alternative markets – in which each Tying Network belongs in its own market – are also valid. Viacom's argument that single-brand markets fail as a matter of law is wrong. Defeating Viacom's position, this Court has sustained a market limited to the works of Andy Warhol.

The Court should also deny Viacom's motion to strike the short-term license Cablevision seeks. This mandatory injunction would prevent Viacom from end-running a "go forth and sin no more" remedy. Viacom's severability objection is misdirection, because whether the Court can sever a void contract's terms does not control the scope of injunctive relief designed to prevent an antitrust violation's recurrence. Viacom's throw-away laches argument is similarly

meritless.  Cablevision sued promptly to challenge Viacom's 2012 tie.  Viacom's counter-intuitive argument for undue delay – that Cablevision's claim accrued when Viacom coerced Cablevision into a tie in 2008 – is wrong.  Viacom forced Cablevision into a new tying agreement with different terms in 2012, overt acts that gave rise to a fresh violation.  The public interest in antitrust enforcement also defeats laches.  At a minimum, factual issues preclude resolving the proper scope of injunctive relief on the pleadings.

## STATEMENT OF FACTS

**A.   Viacom's Market Power Over The Tying Networks**

Cablevision markets multiple channels of video programming to subscribers through a variety of packages (or tiers of service) (AC ¶¶ 25-27).  Cablevision is one of several traditional video distributors that offer such services (AC ¶ 26).  In assembling packages, video distributors seek to include a mix of networks that attract subscribers as a whole (AC ¶¶ 27-28).  Packages include, among other networks, commercially critical and general programming networks (AC ¶¶ 30-32).  Commercial realities such as limited programming budgets, constrained network capacity, and consumer demand restrict the number of networks that distributors such as Cablevision can include in particular packages (AC ¶¶ 29-39).

Viacom licenses four commercially critical networks: Nickelodeon, Comedy Central, BET, and MTV (AC ¶ 40) (the "Tying Networks").  Each network confers substantial market power (AC ¶¶ 40-59).  Each offers programming that "is very popular and highly valued by a substantial number of subscribers" and possesses substantial brand equity (AC ¶ 40).  Denial of access to any of these networks would likely cost a distributor significant subscribers (AC ¶¶ 31, 40-48).  Reflecting this reality, every one of the nation's top 15 video distributors, who account for 95% of roughly 100 million subscribers to traditional video services, has carried each of the Tying Networks for years (AC ¶ 40).  Viacom successfully raised rates for each Tying Network

while ratings fell (AC ¶¶ 42-48).  Viacom accordingly possesses "substantial market power no matter how the markets [here] are defined" (AC ¶ 3).

Cablevision alleges that market power can also be inferred from each Tying Network's substantial share of, and high barriers to entering, markets defined by the type of programming: Popular Children's Programming, Popular Comedy Programming, Popular African American Programming, and Popular Young Adult Programming (AC ¶¶ 62-98).  Cablevision describes the networks that belong in each market and details why other networks are not reasonably interchangeable (AC ¶¶ 66-97).  Less popular networks do not meet video distributors' demand for a popular offering in the category (AC ¶¶ 70, 78, 85, 96).  Networks that feature different programming are not reasonable substitutes because, as a result of those differences, those networks do not sufficiently constrain the pricing power of those networks in the markets (AC ¶¶ 71-97).  Cablevision alleges alternatively that each Tying Network's demonstrable power warrants placing each Viacom commercially critical network in its own market (AC ¶¶ 40-59).

**B.     Viacom Coerces Cablevision And Others Into Licensing The Tied Suite Networks**

Viacom also licenses, among other networks, a collection of general programming networks that Viacom calls its Suite Networks (AC ¶¶ 102-116).  In contrast to the Tying Networks, Suite Networks have numerous reasonable substitutes (AC ¶¶ 117-119).  Cablevision does not want to carry Viacom's Suite Networks and, absent Viacom's tie, would substitute other general programming networks in their place (AC ¶¶ 119, 157-165).  The cost to Cablevision of carrying the Suite Networks has significantly increased since the parties last negotiated their carriage (AC ¶¶ 134-140).  Meanwhile, each of the Suite Networks has declined in popularity (AC ¶¶ 135-136); and Cablevision finds itself "increasingly squeezed between the ever-greater demands made by programmers" and "intense competition for subscribers" (AC ¶ 138).

Accordingly, as the expiration of the parties' previous agreement neared, Cablevision sought to carry only the Core Networks (AC ¶ 141).[2] Viacom refused, and instead wielded its power over the Tying Networks to coerce Cablevision into licensing the Suite Networks (AC ¶¶ 134-150). Viacom told Cablevision that refusing the Suite was a non-starter, emphasizing that "it's all about the bundle" and has "always been about the bundle" (AC ¶ 143). When Cablevision persisted in seeking a Core-only offer, Viacom responded with a rate card that called for Cablevision to pay a ten-figure penalty for taking only the Core Networks (AC ¶¶ 144-145). Viacom knew that its rate card offer was no offer at all: Viacom's threatened billion-dollar-plus penalty for *not* taking the Suite exceeded Cablevision's entire programming budget (AC ¶ 146). The other option Viacom's "Hobson's Choice" left Cablevision – not licensing Viacom's Tying Networks – would risk substantial subscriber loss (AC ¶¶ 148-150).

Having no choice but to surrender to Viacom's coercive demands, Cablevision entered into the proposed tying arrangement on December 31, 2012 (the "2012 Tying Agreement" or "2012 Tying Arrangement") (AC ¶ 150). The 2012 Tying Agreement, among other things, compels Cablevision's distribution of the Suite Networks on highly penetrated (that is, widely sold) tiers (AC ¶¶ 39, 154), extracts huge rate increases (AC ¶ 152), omits terms from prior agreements (AC ¶ 153), and differs from the parties' prior agreements in other ways (AC ¶ 153).

## C.    Substantial Foreclosure, Competitive Harm, And Cablevision's Claims

By coercing Cablevision to carry the Suite Networks, Viacom's 2012 Tying Agreement "causes substantial foreclosure" of tied market commerce (AC ¶ 155). The Suite Networks account for 11 of the 60 general programming networks in Cablevision's "most popular (that is, widely sold) package" (AC ¶¶ 38, 166). Absent Viacom's "bald exercise of market power" over

---

[2] The Core Networks include the Tying Networks and four other Viacom networks Cablevision wants to license: MTV2, Spike, VH1, and TV Land (AC ¶ 2).

the Tying Networks, "Cablevision would distribute other general programming networks in place of Viacom's Suite Networks" (AC ¶¶ 156-157).  Cablevision identifies specific networks from which it would draw to replace the unwanted Suite Networks (AC ¶¶ 158-165).  Cablevision even indicates how many new networks it would launch absent Viacom's tie (AC ¶ 157).

Cablevision further details how Viacom's tying of the Suite Networks to commercially critical Tying Networks "harm[s] the competitive process not only in the New York DMA but also throughout most of the country" (AC ¶ 167).  Cablevision avers that "several other distributors – all among the top 15 distributors and serving subscribers in the millions across the United States – have confirmed" that Viacom "coerce[d] their current carriage of Suite Networks" (AC ¶ 168).  Cablevision also lists specific rival networks "from which some of these distributors would draw to replace [unwanted] Viacom Suite Networks" (AC ¶ 168).  Other distributors' corroboration that Viacom imposed foreclosing ties amply supports the "reasonable inference" that Viacom coerces such ties nationally (AC ¶ 167).  Cablevision further alleges how Viacom's tie, by hindering competition on the merits, harms Viacom's rivals:  "Additional distribution through even one additional top 15 distributor would enable" other networks "to compete more vigorously with Viacom's networks" (AC ¶ 169).  As confirmed by one Viacom rival, "anti-competitive" tie-ins such as Viacom's "keep independent networks like Ovation from competing on a level playing field" (AC ¶ 174) (internal quotations omitted).

Cablevision details how Viacom's tie-in harms consumers and Cablevision through the same mechanisms that it forecloses rival general programming networks from the tied market (AC ¶¶ 170-173).  Based on these allegations, Cablevision brings four claims: for (i) *per se* unlawful tying; (ii) *per se* unlawful block booking; (iii) a violation of New York law; and (iv) declaratory relief (AC ¶¶ 175-197).  Among other relief, Cablevision asks this Court to void the

unlawful 2012 Tying Agreement (AC ¶ 198(b)).  To prevent future violations, Cablevision also

seeks a mandatory injunction compelling Viacom to license the Core Networks on existing terms

pending the parties' negotiation of an agreement untainted by tying (AC ¶ 198(d)).

## ARGUMENT

Rule 8 requires a short and plain statement showing entitlement to relief.  Fed. R. Civ. P.

8(a).  A complaint must merely contain "sufficient factual matter" to suggest a "plausible" claim,

drawing all inferences in the plaintiff's favor.  *In re Crude Oil Comm. Futures Litig.*, 913 F.

Supp. 2d 41, 50 (S.D.N.Y. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) and *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility does not require "probability,"

*Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 184-85 (2d Cir. 2012), and a complaint

need not make "detailed factual allegations."  *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir.

2011).  Under these standards, Cablevision alleges a *per se* tying claim.

## I.    CABLEVISION'S COMPLAINT STATES A *PER SE* TYING CLAIM

### A.    Viacom Misstates The Elements Of A *Per Se* Tying Claim

Viacom's motion to dismiss falters because it misstates the elements of a *per se* tying

claim.  "The substantive elements of [an] illegal per se tying claim are (1) that the tying

arrangement affects a substantial amount of interstate commerce; (2) the two products are

distinct; (3) the defendant actually tied the sale of the two products; and (4) the seller has

appreciable market power in the tying market."  *In re Visa Check/MasterMoney Anti. Litig.*, 280

F.3d 124, 133 n.5 (2d Cir. 2001); *see also United States v. IBM Corp.*, 163 F.3d 737, 741 (2d Cir.

1998) (same elements); *Konik v. Champlain Valley Phys. Hosp. Med. Center*, 733 F.2d 1007,

1017 (2d Cir. 1984) (same elements).

Viacom's argument that Cablevision must also plead "anticompetitive effects in the tied

product market" (Mem. 11) – meaning an "actual adverse effect on competition" or "market-

wide" effects (Mem. 12, 14) (internal quotations omitted) – is wrong.  Viacom improperly seeks

to smuggle into a *per se* case the showing reserved for the rule of reason.  As Judge Cote

explained, "where a tying arrangement may be condemned as illegal *per se*, ***plaintiffs need not***

***allege, let alone prove, facts addressed to***" the "anticompetitive effects in the tied market"

element.  *In re Wireless Tel. Servs. Anti. Litig.*, 385 F. Supp. 2d 403, 414 (S.D.N.Y. 2005)

(emphasis added) (citing *Jefferson Parish Hosp. Dist No. 2 v. Hyde*, 466 U.S. 2, 15-16 (1984));

*Park v. Thompson Corp.*, No. 05 Civ. 2931, 2007 WL 119461, at *7 n.4 (S.D.N.Y. Jan. 11, 2007)

(same); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 137 (S.D.N.Y. 2006) (same); *In re Wireless*

*Tel. Servs. Anti. Litig.*, No. 02 Civ. 2637, 2003 WL 21912603, at *4 (S.D.N.Y. Aug. 12, 2003)

(same); *Visa*, 280 F.3d at 133 n.5 (contrasting *per se* and rule of reason elements).  Viacom

avoids these cases.

     Elemental principles explain why a plaintiff alleging a "*per se* violation" is "relieved of

the separate burden of showing an anticompetitive effect from the tying in the tied product

market."  *In re Wireless*, 385 F. Supp. 2d at 423.  Tying's *per se* rule ***presumes*** actual

anticompetitive effects when a coercive tie forecloses – that is, denies rivals access to – a not

insubstantial volume of tied market commerce.  *See Jefferson Parish*, 466 U.S. at 15-16;

*Datagate v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995).  "Indeed, at the heart of

the *per se* rule of tying is the intuition that where a seller has significant market power, one may

'presum[e] unreasonableness without the necessity of any analysis of the market context.'"  *In re*

*Wireless*, 385 F. Supp. 2d at 423 (quoting *Jefferson Parish*, 466 U.S. at 9).  Only when the *per se*

rule does not apply, and the rule of reason governs instead, must a plaintiff allege "an ***actual***

adverse effect on competition as a whole in the tied product market."  *Freeland*, 238 F.R.D. at

137 (internal quotations omitted); *Visa*, 280 F.3d at 133 n.5.

The cases Viacom cites for demanding rule-of-reason "anticompetitive effects" for *per se* tying claims are not only distinguishable, but also fully comport with the principle that "[w]here a tying arrangement is illegal *per se*, a plaintiff need not establish the anticompetitive effects element." *Park*, 2007 WL 119461, at *7 n.4. Viacom's cases involve "zero foreclosure" – an exception that "ousts the per se rule." 9 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1723a, at 312 (3d ed. 2011). In a "zero foreclosure" case (and this is not one), the plaintiff wants no alternative to the tied product at all. *Id.* Because "zero foreclosure" ties cannot deny competitors *any* sales no matter how much commerce the tie affects – that is, there is no foreclosure – courts sometimes state that such ties threaten no "anticompetitive effects." *E.g.*, *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 57 (2d Cir. 1980) (no evidence any dealer "wanted to purchase other products in the tied markets"). By this formulation, courts merely mean that the *per se* rule's rationale for presuming anticompetitive effects from the dollar volume of tied sales is absent: "[n]o portion" of the tied market is "foreclosed" when "a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller." *Jefferson Parish*, 466 U.S. at 14-16. Courts do not mean that, when a tie *forecloses* a substantial volume of commerce (unlike in *Yentsch*), the *per se* rule *additionally* requires pleading actual anticompetitive effects. On the contrary, in a *per se* case, the "plaintiffs need not allege, let alone prove, facts addressed" to "anticompetitive effects in the tied market." *In re Wireless*, 385 F. Supp. 2d at 414; *accord Datagate*, 60 F.3d at 1425 (stressing need to "rigorously distinguish[]" the *per se* rule's foreclosure requirement from any need to show "substantial anticompetitive effects").

For this reason, Viacom's cases, which explain why "zero foreclosure" ties fail, do not support requiring "*actual* anticompetitive effects" in this *per se* case. *See, e.g., Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201 n.9 (9th Cir. 2012) (rejecting rule of reason claim because

11

"there is effectively 'zero foreclosure' of competitors"); *Yentsch*, 630 F.2d at 57-58; *Moccio v. Cablevision Sys. Corp.*, 208 F. Supp. 2d 361, 375-76 (E.D.N.Y. 2002) (same); *Cancell PCS, LLC v. Omnipoint Corp.*, No. 99 Civ. 3395, 2001 WL 293981, at *4-5 (S.D.N.Y. 2001) (same). Indeed, several of Viacom's cases involved no possible tied market competition. *See Coniglio v. Highwood Servs.*, 495 F.2d 1286, 1291 (2d Cir. 1974) (Buffalo Bills had complete tied market "monopoly" and no "potential competitors"); *Friedman v. Adams Russell Cable Servs.*, 624 F. Supp. 1195, 1197 (S.D.N.Y. 1996) ("Where the monopolist already possesses a lawful monopoly in both markets no competitors exist to suffer any ill effects."). None terminated *per se* tying claims for failure to allege actual anticompetitive effects where, as here, actual (rather than zero) foreclosure of a substantial volume of tied market commerce had been shown.[3]

Put differently, Viacom twists the language some courts use to explain why "zero foreclosure" ties fail by trying to convert those formulations into a requirement that a plaintiff in a *per se* case plead the effects that only the rule of reason might require. This Court should reject Viacom's legal alchemy, which would effectively eviscerate the *per se* rule in defiance of both the Supreme Court and the court of appeals; "the Second Circuit has not abandoned the *per se* rule." *Park*, 2007 WL 119461, at *7 n.4; *Gonzalez*, 880 F.2d at 1519-20. Whether the "zero foreclosure" exception (i) resides in the volume of commerce element; or (ii) defines a distinct

---

[3] *Compare Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1518-19 (2d Cir 1989) (remanding to determine whether "the alleged tie forecloses a 'not insubstantial' amount of potential sales"). Viacom's other cases terminated tying claims for other defects: *E&L Consulting v. Doman Indus.*, 472 F.3d 23, 31-32 (2d Cir. 2006) (failure to specify tie); *Smugglers Notch Homeowners' Ass'n v. Smugglers Notch Mgmt.*, 414 F. App'x 372, 375 (2d Cir. 2011) (deficient product market); *In re Set-Top Cable Tel. Box Anti. Litig.*, No. 08 MD 1995, 2011 WL 1432036, at *14 (S.D.N.Y. Apr. 8, 2011) (deficient geographic market); *Synergetics USA, Inc. v. Alcon Labs, Inc.*, No. 08 Civ. 3669, 2009 WL 435299, at *4 (S.D.N.Y. Feb. 23, 2009) (no coercion; zero foreclosure); *Americap, Inc. v. ADJ Corp.*, No. 80 Civ. 2630, 1980 WL 1891, at *4 (S.D.N.Y. Sept. 5, 1980) (bare allegation of diversion of revenues and sales; alternative rationale for dismissal). Cablevision's position here comports with *Moccio*, where plaintiffs failed to distinguish between *per se* and rule of reason theories.

"anticompetitive effects" element in a *per se* case, makes no substantive difference.

Cablevision's *per se* claim only requires allegations that Viacom's tie-in forecloses a not

insubstantial volume of tied market commerce. *See Jefferson Parish*, 466 U.S. at 15-16; *Visa*,

280 F.3d 133 n.5; *In re Wireless*, 385 F. Supp. 2d at 414.

**B.    Cablevision Sufficiently Alleges Substantial Tied Market Foreclosure**

When assessed under the proper standard that governs *per se* tying claims, Cablevision's

foreclosure allegations more than suffice. Under tying's *per se* rule, "the controlling

consideration is simply whether a total amount of business, substantial enough in terms of dollar

volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie." *Gumwood*

*HP Shopping Partners, L.P. v. Simon Property Group, Inc.*, No. 3:11-CV-268, 2013 WL

3214983, at *12-13 (N.D. Ind. Mar. 13, 2013) (citing the Supreme Court) (internal quotations

omitted); *see also Gonzales*, 880 F.2d at 1520. Cablevision alleges that it pays Viacom millions

of dollars each year for the tied Suite Networks (AC ¶ 152). This easily exceeds the low dollar-

volume threshold. *See, e.g.*, *Yentsch*, 630 F.2d at 58 (noting that the Supreme Court "found

$200,000 sufficiently substantial") (citing cases); 9 Areeda, *supra,* ¶ 1721b4, at 290 (same).

Viacom's coercion of other distributors into foreclosing ties (AC ¶¶ 14, 167-168) only

adds to the bar-clearing total. "'[T]he relevant figure is the total volume of sales tied by the sales

policy under challenge, not the portion of this total accounted for by the particular plaintiff who

brings suit.'" *Yentsch*, 630 F.2d at 58 (quoting *Fortner Enters. v. United States Steel Corp.*, 394

U.S. 495, 502 (1969)). Because Viacom forced others into ties, "[t]he volume of foreclosed

commerce nationwide accordingly" exceeds "hundreds of millions of dollars a year" (AC ¶ 183).

Cablevision also alleges that the "zero foreclosure" exception is inapplicable; that is, the

substantial volume of commerce Viacom's tie *affects* is also ***foreclosed***. Cablevision avers that,

absent the tie, it ***would*** license other general programming networks in place of the tied Suite

13

Networks, drawing from a specified set of networks (AC ¶¶ 157-165). Cablevision also alleges that, absent Viacom's coercing tie, other distributors would substitute non-Viacom networks in place of Suite Networks (AC ¶¶ 167-168). Accordingly, Cablevision's foreclosure allegations exceed the *per se* rule's low threshold.[4]

### C.   Viacom's Arguments Fail To Demonstrate Insufficient Foreclosure

Viacom advances a clutch of arguments why Cablevision has failed to allege legally sufficient foreclosure. None persuade.

### 1.   Viacom wrongly requires rule of reason pleading in a *per se* case

Viacom principally contends that Cablevision fails to plead "**market-wide** foreclosure of competition" (Mem. 14) (emphasis added). This argument fails because, as explained, the *per se* rule requires no such allegations. *See supra* Part I.A; *see also* 9 Areeda, *supra*, ¶ 1721, at 285 (explaining that the *per se* rule "'makes no reference'" to "'the share of that market foreclosed by the tie'" (quoting *Fortner*, 394 U.S. at 501)). Only the "rule of reason" can require allegations of "an adverse effect on competition as a whole." *Visa*, 280 F.3d at 133 n.5. Viacom's objection, that Cablevision does not allege how the tie "impact[s] competition in the market for general programming" (Mem. 21-22), is wrong for the same reason. "Analysis under the *per se* rule is, by definition, 'without inquiry into actual [tied] market conditions.'" *See In re Wireless*, 385 F. Supp. 2d at 414 (quoting *Jefferson Parish*, 466 U.S. at 15). Viacom's contention that "Cablevision makes *no* allegation that a single programmer has been unable to enter or otherwise

---

[4] *See, e.g.*, *DiscoVision Assocs. v. Disc Mfg Inc.*, No. Civ. A 95-21, 1997 WL 309499, at *9 (D. Del. Apr. 3, 1997) (upholding *per se* tying claim); *Gumwood*, 2013 WL 3214983, at *12-13 (upholding *per se* tying claim when plaintiff and others "would have preferred to lease elsewhere or on different terms"); *cf. Paramount Pictures Corp. v. Johnson Broad. Inc.*, No. Civ A.H. 04 03488, 2006 WL 367874, at *2 n.2 (S.D. Tex. Feb. 15, 2006) (claim that Paramount unlawfully tied rights to two shows – *Becker* and *The Parkers* – to distribution of two other shows – *Judge Judy* and *Judge Joe Brown* – survived summary judgment).

compete in the programming market" (Mem. 14) suffers from the same defect.  Under the *per se*

rule, anticompetitive effects are presumed from denying competitors ***access*** to a substantial

dollar volume of tied market commerce – that is, to the tied-up sales.  *See Jefferson Parish*, 466

U.S. at 16; *Gumwood*, 2013 WL 3214983, at *12-13.  Actual exclusion of a rival from the

***market*** (as opposed to foreclosure from ***sales***) is thus unnecessary.[5]

      Viacom's misleading citation of *Jefferson Parish* – the *per se* rule's cornerstone –

epitomizes Viacom's improper attempt to smuggle rule of reason analysis into the *per se* rule.

The passage Viacom cites (Mem. 13) describes certain competitive harms from tying.  But the

Court on the very next pages explains that the existence of such effects in a particular case is

unnecessary, because "*per se* condemnation" is "without inquiry into actual market conditions"

and the sole required impact is that "a substantial volume of commerce is foreclosed" by the tie.

466 U.S. at 15-16.  Tellingly, Viacom's other cases (Mem. 14-15) applied the rule of reason, not

the *per se* rule.  *See, e.g., Brantley*, 675 F.3d at 1201 n.9 (dismissing rule of reason claim); *CDC

Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80 (2d Cir. 1999) (applying "rule of reason"); *S.

Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869, 876 (11th Cir. 1998) (same);

*Smith Mach. Co. v. Hesston Corp.*, 878 F.2d 1290, 1298 (10th Cir. 1989) (same).  Because

Viacom does not seek dismissal on the ground that the *per se* rule is inapplicable (Mem. 10 n.6),

these cases lend Viacom no aid.

      While paying mere lip service to the *per se* rule, Viacom in substance asks the Court to

apply a rule of reason standard because the conduct Cablevision challenges can be labeled "full-

line forcing" (Mem. 34).  Viacom's request to mint a new exception to the *per se* rule lacks

---

[5] Viacom's description of actual anticompetitive effects is also cramped.  Conduct that hinders
(but does not eliminate) rivals by barring them from certain outlets can be anticompetitive.  *See
United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003).

foundation. Viacom's cases applied the rule of reason to certain ties of physical goods that only affected dealers because the facts showed zero foreclosure. For example, *Smith* granted summary judgment under the rule of reason in light of evidence that defendant's policy of requiring a distributor to list its full line – which did not bind any customer's purchase – threatened no foreclosure. 878 F.2d at 1296-97.[6] Cablevision's contrasting allegations show why Viacom's line-forcing cases do not justify creating a new exception to the *per se* rule here.

First, Viacom's tying arrangement does not present a circumstance where "***only*** dealers are subject to a tie." *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1383 (5th Cir. 1994). Programmers such as Viacom impose requirements "that specify, for example, that programming must be carried on one of a distributor's most widely ***purchased*** (that is, highly penetrated) packages or tiers" (AC ¶ 35) (emphasis added). Cablevision alleges that Viacom, through its tie-in to Cablevision, forced distribution of the Suite Networks on highly penetrated tiers (AC ¶¶ 39, 154). The Suite Networks, consequently, are carried in Cablevision's most popular package (AC ¶¶ 38, 154, 166). That package also contains the commercially critical Tying Networks.[7] Thus, unlike *Smith*, where the distributor merely had to ***carry*** the tied product, Viacom's tie ensures that subscribers ***widely buy*** the tied product. In these circumstances, Viacom's tie effectively "bind[s] ultimate consumers"; and the *per se* rule remains applicable because, as a result, the tie "may foreclose part of [the tied] market." *Taylor*, 28 F.3d at 1383 n.23.[8] Simply put, Viacom's cases, which concern dealers of physical goods, do not fit this case,

---

[6] *Smith* alternatively ruled that the tying clam failed *per se* analysis at summary judgment because a sufficient justification exonerated the tie. *See* 878 F.2d at 1297-98 (policy "enhanced" "competition" while "the likelihood" of "anticompetitive forcing [was] virtually nil"). Here, in contrast, Cablevision alleges that no justification supports Viacom's tie (AC ¶¶ 169-170, 184).

[7] Optimum Products & Services, http://www.optimum.com/new-packages.jsp (last visited Oct. 3, 2013).

[8] Indeed, *Taylor* contrasted the conduct before it with *United States v. Loew's, Inc.*, 371 U.S. 38

which concerns ties that dictate the composition of video packages.[9]

Second, contrary to what Viacom contends (Mem. 16-17), Cablevision does not plead harm only to itself. Because "a substantial volume of [tied] commerce is foreclosed" by Viacom's coercive tie, Cablevision amply pleads the prerequisite for inferring "a substantial potential for impact on competition" to "justify *per se* condemnation." *Jefferson Parish*, 466 U.S. at 16. This alone defeats Viacom's argument. But Cablevision goes further, alleging facts showing how Viacom's tie-in harms competition on the merits (AC ¶ 156). Viacom strong-armed not only Cablevision, but also other top 15 video distributors into carrying Suite Networks (AC ¶ 167). These "traditional video distributors" – a category that includes, among others, Cablevision rivals DISH Network, DIRECTV, Verizon, and AT&T (AC ¶ 26) – account for "nearly 95% of [the 100 million] cable, satellite, and fiber-optic video service subscribers" nationwide (AC ¶ 167). Cablevision details how Viacom's tie-in to top distributors harms the competitive process (AC ¶¶ 156-165, 168-170). "Absent Viacom's tying arrangement, these and other general programming networks would face lower barriers to, and likely would obtain greater, distribution" and "compete more vigorously with Viacom's networks" (AC ¶ 169).

This allegation is not, as Viacom claims (Mem. 18), a legally insufficient bare conclusion. Cablevision details the "chicken and egg" problem programmers confront: limited distribution

---

(1962), where the Court condemned "purchases by television stations of desirable films [conditioned] on purchases of undesirable firms." 28 F.3d at 1383 n.23. "Consumers received transmission of both." *Id.* Some "part" of the market, therefore, was foreclosed even if customers could switch distributors. *Id.* So too here: where Viacom requires widely sold packages to contain Suite Networks, Viacom's tie plainly causes more than zero foreclosure. *See also* 1 Herbert Hovenkamp *et al.*, IP and Antitrust § 22.4a1, at 22-32 (2012) (noting the potential for such conditions to cause greater foreclosure than package licensing).

[9] Viacom's other cases are inapposite for the same reason. *See In re Webkinz Anti. Litig.*, 695 F. Supp. 2d 987, 996 (N.D. Cal. 2010) (no restraint on goods sold to consumers; harm only to plaintiff); *Bansavich v. McLane Co.*, No. 3:07cv702, 2008 WL 4821320, at *3-4 (D. Conn. Oct. 31, 2008) (no tying market power; harm merely to plaintiff); *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 100-01 (3d Cir. 1976) (failure to show foreclosure of "a substantial amount of commerce").

makes it harder to convince distributors to carry their networks (AC ¶ 55). Cablevision identifies

specific networks that (i) form the set from which Cablevision and other distributors would draw

to replace unwanted Viacom Suite Networks; and (ii) today enjoy only limited distribution yet

threaten Viacom's networks (*e.g.*, AC ¶¶ 86-87, 158-161, 168, 187). "Additional distribution

through even one additional top 15 distributor would enable" such networks "to compete more

vigorously with Viacom's networks" (AC ¶ 169). Indeed, one such rival applauded

Cablevision's attack on "anti-competitive practices that keep networks like Ovation from

competing on a level playing field" (AC ¶ 174) (internal quotations omitted).[10] Cablevision's

well-pled allegations thus contrast sharply with the facts in *Smith*. There, the court viewed the

plaintiff's tying claim as a device to thwart competition between two well-matched

manufacturers for one of many outlets; the only victim was the distributor itself. 878 F.2d at

1296-97. Cablevision, by contrast, alleges how Viacom's coercive scheme has the "potential for

impact on competition" to warrant maintaining the *per se* rule. *Jefferson Parrish*, 466 U.S. at 16.

Last, courts have consistently applied the *per se* rule to ties involving programming. *See,*

*e.g.*, *MCA TV Ltd. v. Public Interest Corp.*, 171 F.3d 1265, 1277-78 (11th Cir 1999) (refusing to

apply the rule of reason); *Paramount*, 2006 WL 367874, at \*2. Cablevision is unaware of any

authority to the contrary. This Court should reject Viacom's unsupported invitation to jettison

the *per se* rule in favor of applying the rule of reason here.

### 2.   Cablevision pleads actual and not speculative foreclosure

Viacom also advances a slew of contentions that boil down to an argument that

---

[10] Viacom's suggestion (Mem. 17) that free streaming fully substitutes for carriage by traditional
distributors merely creates a factual dispute. Although Cablevision competes with streaming
(AC ¶ 26), not all distribution channels are created equal. *See United States v. Microsoft Corp.*,
253 F.3d 34, 60-62 (D.C. Cir. 2001) (en banc) (per curiam) (unlawful to deter installation of
Netscape in "primary" distribution channels); *supra* note 5. Viacom would not need to strong-
arm distributors into carrying Suite Networks if free streaming reached consumers as effectively.

Cablevision's foreclosure allegations are speculative. Viacom distorts both Cablevision's allegations and the law.

*First*, Viacom faults Cablevision for not identifying with certainty which networks it would carry absent the tie. This omission, Viacom says, leaves Cablevision unable to allege the "actual" foreclosure needed to "demonstrate substantial impact on commerce" (Mem. 22). But legally sufficient foreclosure does not require certainty. It is enough that Viacom's tie forecloses "*options* for seeking alternative programming for the slot[s]" allocated to the Suite Network "with the funds now earmarked for" the Suite. *MCA*, 171 F.3d at 1280 (emphasis added); *see also Gonzalez*, 880 F.2d at 1519 (remanding to determine "total sales lost to *potential* competitors") (emphasis added). Cablevision's allegation that it "*would* distribute other general programming networks in place of Viacom's Suite Networks" (AC ¶ 157) (emphasis added) avers actual foreclosure under this test.

Cablevision nonetheless identifies a specific set of networks from which it and other distributors would draw to replace Suite Networks (AC ¶¶ 158-168); specifies how many new networks Cablevision likely would launch (AC ¶ 157); alleges that it would air new non-Viacom networks in other slots (AC ¶ 165); and avers that purchasing tied market programming can cost millions (AC ¶¶ 122, 152). As *DiscoVision* – a case Viacom previously cited but notably omits from its current papers – demonstrates, Cablevision's allegations more than suffice. There, the court held allegations that the tie "reduc[ed] the incentive to design around" defendant's technology where the plaintiff listed illustrative alternatives sufficient to aver "foreclosure[e] of competition." 1997 WL 309499, at *9-10 (denying motion to dismiss). Cablevision's averments that it *would* replace *all* Suite Networks from an identified set of networks are far more definite than the mere enhanced *incentive* to develop alternatives that *DiscoVision* held sufficient.

19

Viacom's proposed certainty rule defies not only the law, but also common sense. "The exact set of networks Cablevision would distribute absent Viacom's tie-in would depend on the options available to Cablevision at the time Viacom's unlawful conduct terminates" (AC ¶ 157). Viacom's position also confounds the principle that liability in exclusion cases cannot turn "on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct." *Microsoft*, 253 F.3d at 76-79.  To embrace Viacom's argument would only encourage wrongdoers such as Viacom to "take more" "anticompetitive actions." *Id.*

*Second*, Viacom contends that it is "facially implausible" that its tie is "the reason" Cablevision does not license other general programming networks, because Cablevision carries some 580 channels licensed with a billion-dollar budget (Mem. 22).  This argument, which ignores the distinction between types of networks, wars with Cablevision's factual allegations. Cablevision carries only some 65 general programming networks in total and 60 in its most popular package; Suite Networks account for 11 (or 17-18%) (AC ¶ 166).  Viacom's 580 and 2% figures are misdirection.  Cablevision further details the economic realities, such as depleted bandwidth, that limit Cablevision's ability to add general programming networks (AC ¶¶ 28-38).

Against this backdrop, the Complaint amply alleges how Viacom's tie-in displaces rivals (AC ¶¶ 138-140).  Viacom's Suite Networks tie-up millions of dollars, occupy scarce bandwidth, and reduce the value to Cablevision of alternatives (AC ¶¶ 138, 140, 152).  The cases recognize how such realities foreclose alternatives even though Cablevision may be free to purchase them. Forced to license Suite Networks from Viacom, Cablevision "may rationally decide that it is not economically desirable, or economically possible, to spend additional money for substantially similar licenses from a competitor." *Grid Sys. Corp. v. Texas Instrs.*, 771 F. Supp. 1033, 1038

(N.D. Cal. 1991).[11]   Viacom's construct that Cablevision can spend its way around Viacom's

foreclosing tie ignores the central lesson of these cases: buyers do not want to "pay twice" for the

tied product.   This is precisely why, Cablevision avers, doing so would be economically

irrational here (AC ¶ 140).   Viacom's causation quarrel cannot be "properly resolved on a motion

to dismiss."   *E.g.*, *U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, No. 12 Civ. 4873, 2012 WL

6136017, at *6 n.2 (S.D.N.Y. Dec. 11, 2012) ("causation" is a "question of fact").[12]

　　　　*Third*, Viacom faults Cablevision for failing to allege "market-wide foreclosure" (Mem.

15 n.11).   Viacom again distorts the law and ignores the Complaint.   As to the law: Viacom

suggests that, had it tied *only* to Cablevision, a "single purchaser" exception would oust the *per*

*se* rule (Mem 15 n.11).   But "the 'not insubstantial' requirement can be satisfied by the

foreclosure of the single purchaser, so long as the purchaser represents a 'not insubstantial'

dollar-volume of sales."   *Datagate*, 60 F.3d at 1425.   Because Cablevision serves nearly three

million subscribers (AC ¶ 38) and spends millions on the tied networks (AC ¶ 152), no "single

purchaser" exception bars Cablevision's claims.[13]   To the extent Viacom argues for more than a

substantial dollar volume of foreclosed tied commerce, Viacom merely repeats its baseless

---

[11] *See also DiscoVision*, 1997 WL 309499, at *9-10 (tie-in "reduce[d] the incentive to design around" the defendant's tied market technology); *Park*, 2007 WL 119461, at *9 ("BAR/BRI foreclosed [rival's] sales because students did not want to pay twice for MBE instruction."). Indeed, because Viacom's tie-in requires *use* of the tied product, foreclosure concerns are greater than with other package licenses. *See supra* note 8.

[12] Cablevision's launch of Blaze and Sprout fully comports with Cablevision's allegations that, absent the tie, it would launch *even more* networks *or launch other networks sooner* (AC ¶¶ 158-164).   The factors that affect the composition of packages are not static (AC ¶ 32-34).

[13] *See also, e.g., Gumwood*, 2013 WL 3214983, at *12-13 (following *Datagate*); *Audell Petro. Corp. v. Suburban Paraco Corp.*, 903 F. Supp. 364, 370-71 n.5 (E.D.N.Y. 1995) ("If the total [tied product] volume" was "sufficiently alleged to have been 'not insubstantial,' then arguably its plight would implicate the antitrust laws, notwithstanding [plaintiff's] status as a single purchaser." (citing Areeda)).   In any event, Cablevision itself comprises a material share of subscribers in one of the geographic markets alleged (AC ¶ 100).

argument for substituting rule of reason requirements in a *per se* case. *See supra* Part I.A.

As to the facts: Cablevision sufficiently pleads facts supporting a plausible inference that carriage of Suite Networks by top distributors is involuntary and that Viacom's tie-in forecloses hundreds of millions of dollars in tied market commerce (AC ¶ 167). Every one of the top 15 distributors carries not only the Tying Networks, but also Suite Networks (AC ¶ 167). *All* carry Suite Networks even though Viacom has raised rates (and not just to Cablevision) in the face of declining national ratings (AC ¶¶ 61, 136, 152). Corroborating Cablevision's allegation that Viacom's tie-in restrains trade across the country, "several other distributors – all among the top 15 distributors and serving subscribers in the millions" – have specifically confirmed that their current carriage of the Suite is coerced (AC ¶ 14, 168). Absent Viacom's tie, those distributors in many instances would replace Suite Networks with alternative general programming networks (AC ¶ 168). Cablevision even specifies the set of networks from which some of these distributors would draw to replace the unwanted Suite Networks (AC ¶ 168).

Viacom's objection that Cablevision does not allege every conceivable fact evidencing Viacom's coercive tying to others (Mem. 19-20) is to no avail. *Twombly* and *Iqbal* require only that the facts pled plausibly support the inference sought. *See Anderson*, 680 F.3d at 189. The facts Cablevision pleads amply support the inference that the foreclosing impact of Viacom's tie-in extends well beyond Cablevision. The absence of "detailed" other supporting facts is beside the point. *Iqbal*, 556 U.S. at 678; *Cruz v. Rose Assocs., LLC*, No. 13 Civ. 0112, 2013 WL 1387018, at *1-2 (S.D.N.Y. Apr. 5, 2013) (*Twombly* and *Iqbal* "do not contemplate a heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8") (internal quotations omitted). Viacom's objection to "anonymous" allegations (Mem. 19) is also groundless. Viacom knows full well who it forced into distributing

22

the Suite Networks. Viacom can seek through discovery the identity of, and other details from, the distributors who corroborated that Viacom strong-armed them into foreclosing ties.[14]  For now, Cablevision has pled sufficient facts "to nudge" the inference that Viacom broadly imposes foreclosing ties "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### 3.  *Brantley* is inapposite

Last, the case Viacom trumpets the loudest – *Brantley* – provides no silver bullet for dismissal, but rather confirms that this Court should deny Viacom's motion. *Brantley* dismissed a rule of reason tying claim challenging a consumer-level tie because the plaintiff alleged no foreclosure at all.  675 F.3d at 1201.  Indeed, the *Brantley* plaintiffs "disavow[ed] any intent" to advance any foreclosure theory.  *Id.*  The court thus correctly recognized that "there is effectively 'zero foreclosure' of competitors."  *Id.* at 1201 n.9 (citation omitted).  In sharp contrast to zero foreclosure *Brantley*, Cablevision here amply alleges the substantial foreclosed volume of commerce required to satisfy the *per se* rule.  *See supra* Part I.B.  Moreover, because *Brantley* was a rule of reason and not a *per se* case, its requirement of an "actual adverse effect on competition," 675 F.3d at 1200 (internal quotations omitted), is inapplicable.  *See supra* Part I.A.

Seeking to distract the Court from these dispositive distinctions, Viacom contends that Cablevision's foreclosure allegations cannot be squared with the *Brantley* defendants' statements that withdrawn foreclosure allegations in that case lacked "any substance" (Mem. 13).  This is a ruse.  Cablevision details how the foreclosing impact of Viacom's tie is greater today (in 2013)

---

[14] *See, e.g., Blank Productions, Inc. v. Warner/Chappell Music, Inc.*, 11 Civ. 7927, 2013 WL 32806, at *4 (S.D.N.Y. Jan. 3, 2013) (denying motion to dismiss contributory copyright infringement claims even though complaint did not "specifically identify[] *which* third parties have infringed or exactly which songs have been copied," matters for "discovery").  Viacom's argument rings particularly hollow in light of its successful invocation of non-disclosure obligations to keep under seal certain terms of its distribution agreements.  Mem. of Law in Support of Defendants' Proposed Redactions, at 2 (Mar. 5, 2013) (D.N. 5).

than at the time of those statements (in 2009): Suite Networks are less popular; bandwidth is more precious; competition is more intense (AC ¶¶ 134-141). Recent statements from programmers and distributors attest that tie-ins such as Viacom's "unreasonably increase costs" while "blocking other market participants and new entrants" (AC ¶ 174) (internal quotations omitted). Other distributors' willingness to confirm that Viacom coerced them into foreclosing ties (AC ¶¶ 14, 168) only highlights changed circumstances since *Brantley*. Such corroboration is not, as Viacom spins it, industry-wide hypocrisy (Mem. 19).

To the extent *Brantley* is relevant at all, it points toward upholding Cablevision's claims. Although citing numerous papers from that case, Viacom noticeably omits the court's opinion upholding plaintiffs' (later withdrawn) foreclosure-based rule of reason claim. There, Judge Snyder found tying product market power sufficiently pled because plaintiffs averred, in a single paragraph, that "each programmer defendant owns at least one channel that is 'deemed by the industry as absolutely necessary' to the distributors."[15] Cablevision's far more robust market power allegations, as demonstrated below, more than suffice to sustain a *per se* claim.

**D.    Cablevision Sufficiently Alleges Valid Relevant Markets**

Cablevision sufficiently alleges market power to force a tie. Indeed, Cablevision *directly* alleges Viacom's market power over the four Tying Networks: Viacom has successfully raised rates for each Tying Network while ratings (*i.e.*, quality) fell; major distributors confirm that the Tying Networks are commercially critical; and all have long carried Viacom's Tying Networks (*e.g.*, AC ¶¶ 14, 41-42, 168). Tellingly, Viacom does not seriously contest Cablevision's direct evidence of market power.[16] Rather, Viacom only objects to the scope of the alleged markets.

---

[15] Popofsky Decl. Ex. A (In Chambers Order on Motion to Dismiss Second Amended Compl.), No. CV 07-6101 CAS, at 5 (Apr. 22, 2008); *see also* Ex. B (Second Amended Compl.).

[16] With good reason. *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 340 (S.D.N.Y.

Because "the object of the inquiry in defining the market" is to assess market power,[17] where Viacom focuses its aim shows that its objection is meritless. Market definition is "deeply fact-intensive" and courts "hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001). Cablevision's factual averments support legally cognizable markets that preclude dismissal here.

### 1.  Cablevision pleads valid markets based on programming type

First, Cablevision's markets describing types of programming – Popular Children's Programming, Popular Comedy Programming, Popular African American Programming, and Popular Young Adult Programming ("the Programming Markets") – are amply supported by both the facts and settled market definition principles.

Markets include all "reasonably interchangeable" products. *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Although paying lip service to this principle (Mem. 29), Viacom omits a critical aspect: *not* all "functionally interchangeable" products necessarily belong in the same market. *See id.* (holding that branded drug and its generic equivalent belonged in different markets even though "[i]t may seem paradoxical"). Rather, the issue is whether products outside the candidate market exert a sufficient competitive constraint (and thus belong in the market) or do not (and thus are excluded). *Id.* As one case put it: "Products are reasonably interchangeable *where there is sufficient cross-elasticity of demand*." *Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, No. 11 Civ. 6353, 2012 WL 2376466, at *10 (S.D.N.Y. June 20, 2012) (emphasis added) (internal quotations omitted); *see also Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70-71 (2d Cir. 1984) (same).

---

2001) (ability to raise rates without losing customers demonstrated market power), *aff'd*, 344 F.3d 229 (2d Cir. 2003). Nor does Viacom contest that Cablevision pleads market shares and entry barriers sufficient to infer market power, if the Complaint's markets are valid.

[17] *E.g.*, *Visa*, 163 F. Supp. 2d at 335; *Toys 'R' Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000).

Because cross-elasticity informs reasonable interchangeability, courts define markets using the "hypothetical monopolist" approach, a test long reflected in government antitrust guidelines.[18] Under this test, "a market is properly defined when a hypothetical profit-maximizing firm selling all of the products in that market" could "charge significantly more than a competitive price." *Visa*, 163 F. Supp. 2d at 335 (citing cases and the guidelines). The hypothetical monopolist approach starts with the defendant's product and adds the "next-best substitute."[19] A market is validly defined when the process of adding yet more successively distant substitutes yields a group of products that can exercise substantial market power. *See Visa*, 163 F. Supp. 2d at 335 (market is the "product or group of products" that meets the hypothetical monopolist test (internal quotations omitted)).

Each of Cablevision's Programming Markets is sufficiently alleged under these principles. For instance, Cablevision's allegations in support of its Popular Children's Programming market explain what the product is: "highly rated" networks featuring programming "oriented to children between the ages of 6 and 14" (AC ¶ 64). Cablevision further details which networks belong in the market – at most Nickelodeon, Disney Channel, and Cartoon Network (AC ¶¶ 64-69) – and why a hypothetical monopolist over such networks can exercise substantial market power. *See Visa*, 163 F. Supp. 2d at 335. Without any of those networks, a video distributor would "risk losing a substantial number of subscribers" (AC ¶ 64). Cross elasticity is accordingly low: distributors would not "substitute other networks for those featuring Popular

---

[18] *See, e.g., Emigra Group v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 352 (S.D.N.Y. 2009) (guidelines approach a "tool used to define a relevant market"); *Visa*, 163 F. Supp. 2d at 336; *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 360 (S.D.N.Y. 1995); *Ad/Sat v. Associated Press*, 181 F.3d 216. 228-29 (2d Cir. 1999) (also adopting the hypothetical monopolist approach); U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines § 4.1.1 (2010) ("Guidelines"), *available at* http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf.

[19] *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, 2008 WL 73689, at *3 (N.D. Cal. Jan. 5, 2008) (internal quotations omitted); Guidelines, *supra* note 18, § 4.1.1.

Children's programming in response to a significant price increase" (AC ¶ 64). Evidencing low

cross elasticity, every top-15 video distributor has carried Viacom's offering in the category for

years despite rising prices and declining ratings (AC ¶ 65). Cablevision also alleges facts

showing why low-rated networks (*e.g.*, The Hub; Disney XD) and networks that feature different

programming (*e.g.*, ABC Family; Sprout; PBS) do not exert a sufficient competitive constraint to

belong in the market (AC ¶¶ 69-71). Networks that feature other types of programming do not

meet a distributor's need for children's programming (AC ¶¶ 69, 71); low-rated children's

networks do not "satisfy a video distributor's demand for a popular [such] offering" (AC ¶¶ 69-

70). The hypothetical monopolist test, therefore, properly excludes these networks.

   Allegations as to the other Programming Markets are equally robust: Cablevision

identifies the contours of each with reference to cross elasticity of demand, explains why other

networks do constrain a hypothetical monopolist over the alleged market and, therefore, why

other networks are not reasonably interchangeable with those in the markets.[20]   The

Programming Markets thus "bear[] a rational relation to the methodolog[ies] courts prescribe to

define a market for antitrust purposes" and are "plausible." *Todd*, 275 F.3d at 200 (internal

quotations omitted). Confirming plausibility, courts have sustained other markets distinguished

by type and quality of programming – including markets for "quality sports programming," *Fort

Wayne Telsat v. Ent't and Sports Prog. Network*, 753 F. Supp. 109, 111-12 (S.D.N.Y. 1990), and

"quality syndicated programming," *Camellia City Telecasters, Inc. v. Tribune Broad. Co.*, 762 F.

Supp. 290, 291 (D. Colo. 1991); *cf. Danny Kresky Entrs. Corp. v. Magid*, 716 F.2d 206, 208, 213

---

[20] *See* AC ¶¶ 74-79 (Comedy), ¶¶ 81-87 (African American), ¶¶ 89-96 (Young Adult). Contrary
to Viacom's inartful swipe, Cablevision did *not* exclude ASPiRE from the Popular African
American Programming market because ASPiRE "offers positive images of African American
culture" (Mem. 29 n.23). ASPiRE's low ratings warrant its exclusion (AC ¶ 87). ASPiRE's
different type of programming also makes it a far more distant substitute for BET than closer
substitute TV One (AC ¶ 87).

(3d Cir. 1983) (reinstating jury verdict for block booking violation in "black-oriented, arena-size concert market"). Courts likewise have upheld markets for "rock music concerts," "live music concerts," and "rock radio" airplay, advertising, and promotion,[21] as well as for authentic sports team jackets,[22] and "championship boxing contests."[23]

Viacom's objections to the Programming Markets are meritless. First, Viacom contends that Cablevision fails to include "all interchangeable substitute[s]" (Mem. 29-31). The markets must include other networks, Viacom argues, because "viewers choose between" different types of programming "at any point in time" (Mem. 30-31). Viacom's argument defines the market from the wrong viewpoint. Cablevision's well-pled factual allegations explain why the market is not properly defined from the vantage point of a given subscriber surfing channels on the couch:

> Subscribers select video products based not on the particular program or channel a subscriber wishes to view at any particular moment in time, but rather on the set of networks subscribers wish to view over the life of their subscription. Distributors such as Cablevision accordingly do not select networks for their packages by reference to the preferences of any given subscriber at a particular moment in time. Rather, distributors seek to offer packages that include mixes of programming that subscribers will find attractive as a whole when selecting among competing video offerings.

(AC ¶ 28). In other words, the correct perspective for defining the market is that of a distributor assembling packages to market to subscribers as a whole.[24] Cablevision's allegations that, from this proper viewpoint, there are few reasonable substitutes for Viacom's flagship Nickelodeon

---

[21] *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1084, 1078, 1087-89 (D. Colo. 2004).

[22] *Trans Sports, Inc. v. Starter Sportswear, Inc.*, No. 88-CV-1292, 1989 WL 29454, at *3 (N.D.N.Y. Mar. 21, 1989).

[23] *Int'l Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 249-52 (1959).

[24] *See Telecor Commc'ns v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132-33 (10th Cir. 2002) (defining market from pay phone location owners' perspective); *cf. MLB Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 330 (2d Cir. 2008) (Sotomayor, J.) (no dispute relevant market a licensing market). This perspective is derived from (and thus reflects) consumer demand (AC ¶ 28). *See also Nobody*, 311 F. Supp. 2d at 1077 (perspective for defining market depends on nature of claim).

and other Tying Networks make perfect sense and explain why Viacom's proffered counter-examples (Mem. 30, 24-25) miss the mark.  Even if some subscribers flip between *The Daily Show* and *Conan*, distributors seeking to appeal to subscribers *as a whole* do not view TBS as a reasonable alternative to Comedy Central (AC ¶ 78).  Indeed, the logic of Viacom's position would put *all* networks in the same market.  This obviously proves too much.  *See Fort Wayne*, 753 F. Supp. at 111-12 (upholding allegations that ESPN possesses power in "subscription television programming services for quality sports programming" market).

Second, Viacom objects that products outside each Programming Market share "overlapping" attributes with those Cablevision places in the markets (Mem. 30).  This observation merely picks factual fights.  Valid markets routinely exclude products that share some attributes of those within the markets.  Markets for "quality sports programming," "quality syndicated programming," "live music concerts," and "championship boxing contests," all upheld, prove this point.  *See also Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 869-71 (W.D.N.Y. 1994) (department stores and "general merchandise, apparel, and furniture" stores in different markets).  Cablevision alleges facts explaining why in-market networks are distributors' next-best substitutes for Viacom's Tying Networks, while those outside the market are not reasonable substitutes.  Viacom can try to redraw these lines after discovery; its claim of gerrymandering ignores that markets "need not – indeed cannot be – defined with scientific precision." *Kraft*, 926 F. Supp. at 360.  "That the outer edges of a market's boundaries" are "disputed does not mean that the market is illegally flawed." *Nobody*, 311 F. Supp. 2d at 1090.  Viacom's objection that networks Cablevision excludes try to attract some of the same viewers as in-market networks (Mem. 31) fails for the same reason and because Viacom defines the market from the wrong perspective.

Third, Viacom argues that it is improper to define "media markets according to alleged consumer preference" (Mem. 32). But market definition is always undertaken through "the eyes of consumers." *Visa*, 163 F. Supp. 2d at 335. Consumer preferences explain why cross elasticity of demand is high or low. *See, e.g., id.* at 336-37; *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995-98 (11th Cir. 1993) (distinct consumer demand, among other factors, warranted excluding a particular brand from the market). This applies equally to "media" markets. *See Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 576 (S.D.N.Y. 2007) ("consumers' preferences" supported confining market to "digital distribution" of copyrighted works over the Internet). Moreover, Viacom's argument again proves too much. Under Viacom's view, "quality sports programming" and similar sustained markets would be invalid for reflecting an "alleged consumer preference." Not surprisingly, Viacom's cases are inapposite. One wrongly asserted that functionally interchangeable products must occupy the same market. *See Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 483 (S.D.N.Y. 2001). Another granted summary judgment because the *evidence* failed to support a single-product market. *See Belfiore v. New York Times Co.*, 826 F.2d 177, 180-81 (2d Cir. 1987), *aff'g* 654 F. Supp. 842 (D. Conn. 1986). Viacom's contention that *Belfiore* precludes defining a market "from the product out" (Mem. 31) (internal quotations omitted) is mistaken. The hypothetical monopolist test for market definition, applied by numerous courts in this Circuit since *Belfiore*, employs precisely such an approach.[25]

In short, Viacom's objections to Cablevision's Programming Markets lack merit because those markets "bear[] a rational relation to the methodology courts prescribe to define a market

---

[25] *See supra* note 19 and accompanying text (explaining next-best substitutes). Cablevision also does not seek to define markets based on "the demographic profile of just some" viewers, 654 F. Supp. at 846, but rather based on the *type* of programming. *Belfiore* might reject, for example, a market of Comedy Programming directed to adults with a particular income level, degree, or job. *Id.* Cablevision's markets (*e.g.*, Popular Children's Programming) are not so confined.

for antitrust purposes" and are "plausible." *Todd*, 275 F.3d at 200 (internal quotations omitted).

### 2.   **Cablevision pleads valid network-specific markets**

Cablevision's allegations alternatively support placing each Tying Network in its own

market.   Cablevision avers that no network is reasonably interchangeable with, or has high cross

elasticity of demand with, each Tying Network (AC ¶¶ 40-48, 168).   In support, Cablevision

details how Viacom successfully and profitably raised rates for each Tying Network while

reducing quality (AC ¶¶ 42-48).   These allegations suffice to put each Tying Network in its own

market under the hypothetical monopolist test.   *See Visa*, 163 F. Supp. 2d at 335 (market is a

"'product *or* group of products'" that meets the hypothetical monopolist test) (emphasis added);

*Paramount Pictures Corp. v. Johnson Broad., Inc.*, 432 F. Supp. 2d 707, 709-10 (S.D. Tex. 2006)

(tying market limited to *Judge Judy* and *Judge Joe Brown* survived summary judgment); *Storer*

*Cable Commc'ns, Inc. v. City of Montgomery*, 826 F. Supp. 1338, 1355-56 (sustaining markets

for "ESPN's NFL football package and the Turner Network program service"), *vacated as moot*

866 F. Supp. 1376 (M.D. Ala. 1993).

Viacom offers only token objections to Cablevision's showing that each Tying Network

possesses substantial market power.[26]   Instead, Viacom argues that any a single-brand market is

legally invalid.   Viacom is wrong.   "Obviously, when a defendant makes a significant product for

which there is no reasonable substitute, then its 'single brand' is coextensive with the market."   9

Areeda, *supra*, ¶ 1739, at 125.   Indeed, rejecting Viacom's argument, this Court has upheld a

market limited to the works of Andy Warhol.   *See Simon-Whelan v. The Andy Warhol Found.*,

---

[26] Viacom's speculation as to why hiking rates while retaining customers in the face of falling ratings might not show market power (Mem. 26 n.20) merely raises a discovery issue.   Viacom's claim that Cablevision's markets are contradictory (Mem. 24) is wrong (markets and narrower submarkets can co-exist) and ignores that litigants can plead in the alternative.   *See* Fed. R. Civ. P. 8(d)(2).   Cablevision, in any event, need only sustain one of its eight markets (AC ¶ 181).

No. 07 Civ. 6423, 2009 WL 1457177, at *6 (S.D.N.Y. May. 26, 2009) (Swain, J.).  Other courts within the Second Circuit also recognize that single-brand markets are permissible.[27]

Viacom's cases do not control here.  They reflect "*failed* attempts to limit a product market to a single brand," because the facts did not support defining such markets consistent with the principles of cross elasticity and reasonable interchangeability.  *Todd*, 275 F.3d at 200 (emphasis added).[28]  Those cases do not, as this Court's decision in *Andy Warhol* shows, oust single-brand markets as a rule.  Here, Cablevision's allegations not only support single-brand markets under settled market definition principles, but also make economic sense.  *All* of the top 15 video distributors have carried each Tying Network for years and each is commercially critical (AC ¶¶ 40-48), a reality major distributors specifically confirmed (AC ¶ 168).  Moreover, Cablevision's arguments do not, as Viacom contends (Mem. 25), imply that every brand defines its own market.  Cablevision, for example, does not allege that Viacom's four other Core Networks (MTV2, VH1, TV Land, and Spike) possess such power.

*Levitch v. Columbia Broad. Sys., Inc.*, 495 F. Supp. 649 (S.D.N.Y. 1980), does not preclude the markets Cablevision advances here.  There, the court rejected single-network markets where the plaintiff's complaint *admitted* that each network was interchangeable with

---

[27] *See, e.g., Vitale v. Marlborough Gallery*, No. 93 Civ. 6276, 1994 WL 654494, at *4 (S.D.N.Y. July 5, 1994) (upholding market of "Jackson Pollock paintings"); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 372 (S.D.N.Y. 2012) ("a single brand of a product or service can be a relevant market") (internal quotations omitted); *Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 335 (E.D.N.Y. 2009) (same).

[28] *See, e.g., United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 398 (S.D.N.Y. 2001) (plaintiffs "do not even attempt to allege the absence of cross-elasticity"); *Carell v. Shubert Org.*, 104 F. Supp. 2d 236, 265 (S.D.N.Y. 2000) (complaint "failed to allege any plausible basis" why "other Broadway shows" are not "reasonably interchangeable" with "*Cats*"); *Re-Alco Indus. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 392 (S.D.N.Y. 1993) (plaintiff made "no showing" in support of market); *Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 154 (S.D.N.Y. 1988) (no "theoretically rational explanation" for market); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678 (S.D.N.Y. 1987) (distinct trademark did not warrant limiting the market).

others, no matter the perspective from which the market was defined. *See id.* at 667 (plaintiffs failed to "indicat[e] that one network's programming is somehow different from the others"). *Levitch*, moreover, involved a different level of the industry (selling programming to stations) in a different era. *See id.* at 664. The facts Cablevision pleads, by contrast, show why "the economic realities of the television industry *today*, *id.* at 665, warrant placing each Tying Network in its own market in this very different setting.[29]

### 3.   Cablevision's prior statements are irrelevant

Finally, Viacom seeks to distract the Court from Cablevision's sufficient market power allegations by pointing to Cablevision statements made elsewhere. Viacom's out-of-context snippets are irrelevant. Cablevision's position that "no single programming service" can "make or break *competitive viability*" (Mem. 4) (internal quotations omitted) (emphasis added) is entirely consistent with Viacom's Tying Networks' possession of substantial market power. Market power means something less than the power over "competitive viability," which invokes the far higher "essential facilities" standard.[30] Consistent with this distinction, Cablevision pleads that losing access to any Tying Network would likely cost Cablevision subscribers (AC ¶ 3) but does not claim that, as a result, it would be driven out of business. Cablevision's statements in different proceedings comport with the realities the Complaint pleads here.

---

[29] The Court need not rule on Cablevision's alternative allegation that the Core Networks comprise a relevant market (AC ¶¶ 60-61). Cablevision prudently included that allegation in the event Viacom argued that each network is not a distinct *product*, a contention Viacom did not (and can no longer) advance at this phase of the litigation. *See supra* note 1.

[30] *Compare Alaska Airlines Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991) (essential facility only if "power to *eliminate* competition") (citing Second Circuit cases) *with CDC*, 186 F.3d at 81 (market power "is the ability to raise price significantly above the competitive level") (internal quotations omitted). Cablevision unsuccessfully pressed the FCC to adopt the higher standard. *See* Order ¶¶ 43-46, *In re Verizon*, FCC No. CSR-8185-P (Sept. 22, 2011), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-11-1594A1.pdf.

## II.   BECAUSE CABLEVISION STATES A *PER SE* TYING CLAIM THE COURT SHOULD SUSTAIN CABLEVISION'S OTHER CLAIMS

Cablevision's second cause of action, for block booking, is sufficiently pled.  Block booking, as relevant here, is a form of tying where a licensor forces a distributor not only to take, but also exhibit, particular networks.  Because block booking compels use (not just purchase) of the tied product, it can present greater "foreclosure concerns" than other ties.[31]  Courts accordingly assess *per se* block booking under the same *per se* test that governs tying arrangements.  *See, e.g., Paramount Pictures*, 2006 WL 367874, at *2 n.2.[32]  The Court thus should sustain Cablevision's block booking claim for the same reasons given above.  Similarly, because the standards for pleading a *per se* tying and Donnelley Act claim "are identical" (Mem. 34) (citing cases), Cablevision's third claim is sufficiently pled.

## III.   THE COURT SHOULD DENY VIACOM'S MOTION TO STRIKE

Viacom moves to strike one (and only one) equitable remedy Cablevision seeks: a short-term mandatory injunction compelling Viacom to license the Core Networks to Cablevision on existing terms pending negotiation of a new agreement untainted by tying (AC ¶ 198(d)).  Viacom must demonstrate both prejudice and that the relief, no matter what the facts show, is unavailable as a matter of law.  *See Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 111-12 (S.D.N.Y. 2005).  Viacom cannot meet this "formidable" burden.  *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 474 F. Supp. 75, 79 (D.D.C. 2007).

### A.   Cablevision's Proposed Mandatory Injunction Is Valid Permanent Relief

Viacom's argument that the relief Cablevision seeks is "unavailable as a matter of law"

---

[31] 1 Hovenkamp, *supra*, § 22.4a1, at 22-32.

[32] Although *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006), abrogated *Loew*'s presumption of market power, Viacom is wrong (Mem. 33) that *Independent Ink* ousted otherwise applicable *per se* standards.  *See Johnson*, 432 F. Supp. 2d at 709-10 (denying summary judgment post-*Independent Ink* in tying case originally brought as block booking).

(Mem. 35) is meritless.  The mandatory relief Cablevision seeks is plainly within this Court's broad equitable discretion to award.  Antitrust remedies must not only terminate the violation, but also "avoid [its] recurrence."  *E.g.*, *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1987) (citing cases).  To achieve these goals, courts may enjoin otherwise lawful conduct, because "it is not necessary that all of the untraveled roads" to unlawful "ends be left open and that only the worn one be closed."  *Id.* at 698 (internal quotations omitted).  Applying these principles "to the exigencies of the particular case," antitrust courts have compelled licenses over defendants' objections.  *E.g.*, *Untied States v. Glaxo Group*, 410 U.S. 52, 64 (1973).

The proposed short-term mandatory injunction serves this goal of preventing a repeat violation.  Viacom could end run a "go forth and sin no more" remedy by refusing to offer economically viable terms for only the Tying Products, just as it did in 2012 (AC ¶¶ 145-147).  Cablevision would again face the same "Hobson's choice" that led it to succumb to Viacom's tie: accept the tie or leave its customers without the commercially critical Tying Networks (AC ¶¶ 148-150).  By protecting Cablevision's subscribers while the parties negotiate a lawful new agreement, the relief prevents Viacom from rendering a prohibitory injunction an empty gesture.  Here, in other words, "a mere prohibition of [Viacom's] precise scheme would be ineffectual to prevent restraints."  *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 727 (1944).[33]

Viacom's severability argument misses the mark.  Cablevision does not seek to reform the existing contract by excising terms relating to the Suite Networks.  Cablevision, after all, seeks to *void* the 2012 Agreement (AC ¶ 198(b)).  Rather, Cablevision requests that the Court use the existing Core Network terms as a baseline for fashioning a *new* short-term license

---

[33] Cablevision's proposed relief serves the same goal as that approved in *Loew's*.  To remedy unlawful tying, the Court there enjoined certain practices "to prevent distributors from subjecting prospective purchasers to a 'run-around.'"  371 U.S. at 55.

imposed as a remedy for a proven antitrust violation.  Viacom is free later to argue on a full

record that the terms of any mandatory relief should differ.  But whether the Court can sever

terms and still uphold the intent of the parties (Mem. 35) has nothing to do with the legal

permissibility of Cablevision's proposed remedy.  Defeating Viacom's argument, antitrust courts

have fashioned mandatory injunctions from a mix of existing and other terms over defendants'

objections that, absent the violation, they would have licensed on different terms or not at all.[34]

Not surprisingly, Viacom's cases are inapposite.  One set struck legally unavailable

relief.[35]  The relief Cablevision seeks, by contrast, is within this Court's discretion to award.

Others (Mem. 37) barred certain antitrust defenses to contract actions, often advanced to try to

avoid payment for value already received.[36]  In such cases, where courts can avoid becoming

"party to the carrying out" of "the very restraints forbidden by" the Sherman Act, courts enforce

contracts to "preven[t] people from getting other people's property for nothing."  *Kelly v. Kosuga*,

358 U.S. 516, 520-21 (1959).  But this principle is irrelevant here.  This is not a contract action;

Cablevision does not seek to avoid payment for rights already obtained under the 2012

Agreement (once that agreement is voided, there will be neither rights nor payment obligations);

and Cablevision will pay for the Core Networks under the terms the Court orders.  Viacom's

cases actually undermine its argument, because they urge antitrust victims to bring separate

Sherman Act suits (instead of asserting antitrust defenses in contract actions) – precisely what

---

[34] *See, e.g., Glaxo*, 410 U.S. at 64; *H.L. Moore Drug Exch. v. Eli Lilly & Co.*, No. 76 Civ. 2817, 1980 WL 1959, at *2 (S.D.N.Y. Nov. 21, 1980) (compelling short-term dealings) (citing cases); *see also Int'l Salt Co. v. United States*, 332 U.S. 392, 399 (1947).

[35] *See, e.g., Rubinstein v. Dep't Stores Nat'l Bank*, No. 12 Civ. 8054, 2013 WL 3817767, at *5 (S.D.N.Y. July 22, 2013); *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 339-40 (S.D.N.Y. 2003).  Viacom's other cases (Mem. 35-36) are to the same effect.

[36] *See, e.g., Viacom Int'l Inc. v. Tandem Prods., Inc.*, 526 F.2d 593, 599-60 (2d Cir. 1975); *Rooney v. Columbia Pictures Indus.*, 538 F. Supp. 211, 229-30 (S.D.N.Y. 1982); *Hudson Motors P'ship v. Crest Leasing Enters, Inc.*, 845 F. Supp. 969, 981 (E.D.N.Y. 1994).

Cablevision *did*. As Viacom quotes (Mem. 37): "It is now well established that the remedy for violation of the antitrust law" is "the redress which the antitrust statute establishes." *Hudson Motors*, 845 F. Supp. at 981. Because Cablevision seeks appropriate "redress" in a "separate action" charging a "violation of the antitrust laws," the proposed relief should not be stricken.

**B.    Viacom's Laches Argument Is Baseless**

Viacom's half-hearted other ground for striking the mandatory injunction – laches – also fails. Laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice." *Kansas v. Colorado*, 514 U.S. 673, 687 (1995). The equitable laches defense "is generally not appropriately raised in a motion to dismiss." *Lennon v. Seaman*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999). Viacom fails to show that Cablevision "can prove no set of facts to avoid the insuperable bar." *Id.*

**1.    Cablevision brought a timely antitrust suit**

Viacom cannot demonstrate that unreasonably delay "is clear on the face of the complaint." *Id.* Cablevision promptly brought this action less than three months after signing the 2012 Tying Agreement (AC ¶ 151). Undermining Viacom's feigned surprise, Cablevision repeatedly voiced its objections to the coerced tie right up to the agreement's signing (AC ¶ 154). Viacom's sole argument for unreasonable delay is based on the counter-intuitive premise that the four-year statute of limitations applicable to Cablevision's claims against the *2012* Tying Arrangement somehow started running in *2008* (Mem. 38). Viacom is wrong. A cause of action accrues "each time a plaintiff is injured by an act of the defendants." *Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S. 321, 338-39 (1971). Cablevision's claims relating to Viacom's 2012 acts self-evidently did not accrue in 2008, which involved different conduct.[37]

---

[37] Viacom's 2012 coercion caused fresh injury to competition, Cablevision, and consumers; the 2012 agreement's terms differed from those Viacom earlier exacted; and Viacom threatened a

But even if Viacom's 2012 acts, as a matter of law, marked a "continuation of conduct from four years earlier" (Mem. 39), Viacom engaged in new overt acts that restarted the limitations period. "Antitrust law provides that, in the case of a 'continuing violation,'" "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). A party imposing a tie engages in new overt acts when it "had the ability and actually did enforce the tie." *Airweld, Inc. v. Airco Inc.*, 742 F.2d 1184, 1190 (9th Cir. 1984). By coercing Cablevision into a new agreement in 2012, Viacom plainly showed "the ability and actually did enforce" a tie and, therefore, restarted the limitations period. *Id.* The differences between the 2012 and earlier agreement provide a separate reason for finding overt acts. The 2012 Tying Agreement charged higher rates (AC ¶ 152) and eliminated terms that existed in prior agreements (AC ¶ 153), among numerous other changes. As shown by a case Viacom cites, these differences establish new overt acts in 2012. *See Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 271 (E.D.N.Y. 2010) ("increases" to "discount fee" marked new overt acts under principles applied to tying cases); *see also Smith v. eBay Corp.*, No. C 0-03825, 2012 WL 27718, at *4-5 (N.D. Cal. Jan. 5, 2012) ("modification[s]" to tying policy restarted limitations period). Yet a third distinct reason Viacom's 2012 conduct gave rise to new overt acts is that it "maintain[ed] contractual relationships that directly affect[ed] competition in the tied product market." *National Souvenir Center, Inc. v. Historic Figures, Inc.*, 728 F.2d 503, 510 (D.C. Cir. 1984) (approved in *Andrea Theatres, Inc. v. Theatre Confections, Inc.*, 787 F.2d 59, 65 (2d Cir. 1986)).

*Madison Square Garden (MSG) v. NHL*, No. 07 CV 8455, 2008 WL 4547518 (S.D.N.Y. Oct.10, 2008), on which Viacom relies, is easily distinguished. There, plaintiffs' challenge to a

---

greater penalty for refusing the tie in 2012 than in 2008 (AC ¶¶ 130-141, 152-53).

2006 license renewal did "not allege any substantive change in the rights" MSG originally

granted the NHL in 1994. *See id.* at *10. In these circumstances, Judge Preska judged the

renewal "merely a reaffirmation of a previous act." *Id.* Here, in sharp contrast, Cablevision

alleges numerous ways in which the 2012 Tying Agreement's terms differed from the earlier

agreement (AC ¶¶ 152-153). As *Rite Aid* and *Smith* teach, and contrary to Viacom's argument

(Mem. 39 n.27), these differences in tying terms render Viacom's 2012 coercion new overt acts

rather than a reaffirmation. Moreover, *MSG* was not a tying case; but in tying cases (such as

this), fresh coercion gives rise to a new violation. *See Airweld*, 742 F.2d at 1190. At a minimum,

whether Cablevision brought an untimely suit cannot be decided on the face of the Complaint.

### 2. Equity and the public interest preclude a laches defense

Even if Viacom could show undue delay, it cannot now establish prejudice or a favorable

balance of the equities.[38] Viacom's defense of this suit cannot constitute prejudice. *See A.C.

Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992). Viacom

argues (creating issues of fact) that it would have not entered the 2012 Tying Agreement had it

predicted litigation (Mem. 38). But refusing to deal with Cablevision would have denied the

Tying Networks to millions of subscribers – just as Fox's refusal to deal with Cablevision

harmed subscribers in 2010 (AC ¶ 31). Viacom cannot claim prejudice from failure to take a

course that harms the public interest. Prejudice requires an ***inequitable*** change in its position for

the worse. *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996).

Viacom's laches defense also flouts the public interest, the "paramount" laches factor, *id.*

at 193-94, because Viacom, on its theory, could coerce Cablevision into foreclosing tying

---

[38] When, as here, a suit is brought within the limitations period, laches is not presumed and the
other elements – prejudice and the equities – must be shown. *See Carell v. Shubert Org., Inc.*,
104 F. Supp. 2d 236, 263 (S.D.N.Y. 2000) (rejecting laches defense). These factors "would
require the Court to consider matters outside of the pleadings." *Id.* (internal quotations omitted).

arrangements *in perpetuity*. Such an undermining of the Sherman Act "would be an affront to reason." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 377 F.2d 776, 795 (3d Cir. 1967) (rejecting similar argument and permitting antitrust suit in 1955 against a policy dating to 1912), *aff'd*, 392 U.S. 481, 502 n.15 (1968). "[T]he right to engage in ongoing anticompetitive conduct should not ordinarily be acquired by prescription." 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 320g, at 326 (3d ed. 2007).

Viacom implies that Cablevision acted inequitably by succumbing to the tie and then suing. This is groundless. Viacom knew it coerced Cablevision. The course Cablevision took furthers the public interest by securing subscribers' continued access to Viacom's commercially critical Tying Networks during this litigation.[39]  In short, by accepting Viacom's tie with a gun to its head, and then promptly invoking this Court's equitable powers to restrain Viacom's unlawful conduct, Cablevision acted in the finest traditions of its role as "a private attorney general." *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987).

## CONCLUSION

For the foregoing reasons, Viacom's motion to dismiss Cablevision's Amended Complaint should be denied.

Dated:  October 4, 2013

<div style="margin-left: 50%;">

Respectfully submitted,

ROPES & GRAY LLP

By  */s/*  Mark S. Popofsky

Jerome C. Katz
1211 Avenue of the Americas
New York, New York  10036

</div>

---

[39] Cablevision had no obligation to seek preliminary relief. *See Westman Commc'ns Co. v. Hobart Corp.*, 541 F. Supp. 307, 309-10 (D. Colo. 1982) (rejecting the suggestion as "ridiculous").

(212) 596-9000
Jerome.Katz@ropesgray.com

Mark S. Popofsky (*Admitted Pro Hac Vice*)
Mariel Goetz (*Admitted Pro Hac Vice*)
One Metro Center
700 12th Street, N.W.
Washington, D.C.  20005
(202) 508-4600
Mark.Popofsky@ropesgray.com
Mariel.Goetz@ropesgray.com

*Attorneys for Plaintiffs*
    *Cablevision Systems Corporation and*
    *CSC Holdings, LLC*