UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

CABLEVISION SYSTEMS CORPORATION :
and CSC HOLDINGS, LLC, : Case No.: 13 CIV 1278 (LTS)(JLC)
:
Plaintiffs, :
:
vs. :
:
VIACOM INTERNATIONAL INC. and BLACK :
ENTERTAINMENT TELEVISION LLC, :
:
Defendants. :
-------------------------------------------------------------x

## DECLARATION OF PERI L. ZELIG IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

I, Peri L. Zelig, make this declaration pursuant to 28 U.S.C. § 1746, and state as follows:

1.     I am an associate of the law firm of Simpson Thacher & Bartlett LLP, attorneys for Defendants Viacom International Inc. and Black Entertainment Television LLC in the above-captioned matter.  I am a member of the bar of the State of New York and of the United States District Court for the Southern District of New York.  I submit this Declaration in further support of Defendants' Motion To Dismiss Plaintiffs' Amended Complaint.  I am familiar with the facts and circumstances set forth herein, based on personal knowledge or the review of the attached documents or files maintained by my firm.

2.     Attached hereto as Exhibit A is a true and correct copy of excerpts from Programmer-Appellees' Answering Brief, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) (No. 09-56785), dated June 21, 2010.

3.     Attached hereto as Exhibit B is a true and correct copy of excerpts from Cablevision and MSG Network, Inc.'s Memorandum of Law in Support of Cross-Motion to

Dismiss Complaint, *Moccio v. Cablevision Sys. Corp.*, 208 F. Supp. 2d 361 (E.D.N.Y. 2002) (No. 02-civ-2138), dated Apr. 19. 2002.

4.      Attached hereto as Exhibit C is a true and correct copy of the Third Amended Complaint, *Brantley v. NBC Universal, Inc.*, No. CV 07-6101 CAS (VBKx) (C.D. Cal. Oct. 15, 2009), dated May 1, 2009.

5.      Attached hereto as Exhibit D is a true and correct copy of excerpts from Answer To Program Access Complaint, *In re* AT&T Servs., Inc. v. Madison Square Garden L.P. and Cablevision Sys. Corp. v. FCC, 26 FCC Rcd. 15871 (2011) (No. CSR-8196-P), dated Sept. 18, 2009.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of November, 2013, at New York, New York.

/s/ Peri L. Zelig

PERI L. ZELIG

# EXHIBIT A

C.A. No. 09-56785

# In the United States Court of Appeals for the Ninth Circuit

**ROB BRANTLEY, DARRYN COOKE, WILLIAM AND BEVERLY COSTLEY, PETER G. HARRIS, CHRISTIANA HILLS, MICHAEL B. KOVAC, MICHELLE NAVARRETTE, JOY PSACHIE AND JOSEPH VRANICH,**
*Plaintiffs /Appellants*,

v.

**NBC UNIVERSAL, INC., VIACOM, INC., THE WALT DISNEY COMPANY, FOX ENTERTAINMENT GROUP, INC., TURNER BROADCASTING SYSTEM, INC., TIME WARNER CABLE INC., COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC, COXCOM, INC., THE DIRECTV GROUP, INC., ECHOSTAR SATELLITE L.L.C., AND CABLEVISION SYSTEMS CORPORATION,**
*Defendants/Appellees.*

*On Appeal from the United States District Court for the Central District of California, Case No. CV-07-6101 CAS (VBKx) The Honorable Christina A. Snyder, United States District Judge*

## PROGRAMMER-APPELLEES' ANSWERING BRIEF

| | |
|---|---|
| Glenn D. Pomerantz<br>David C. Dinielli<br>Elisabeth J. Neubauer<br>MUNGER, TOLLES & OLSON LLP<br>355 South Grand Avenue, 35th Floor<br>Los Angeles, California 90071-1560<br>Telephone (213) 683-9100<br>Facsimile (213) 687-3702<br><br>Attorneys for Defendant/Appellee Fox Entertainment Group, Inc. | ***Attorneys for Other Programmer-Defendants/Appellees Listed on the Following Pages*** |

C.A. No. 09-56785

| | |
|---|---|
| Randall Lee<br>WILMER CUTLER PICKERING<br>HALE and DORR LLP<br>350 S. Grand Avenue, Suite 2100<br>Los Angeles, CA 90071<br>Telephone: (213) 443-5300<br>Facsimile: (213) 443-5400<br><br>William Kolasky<br>Steven F. Cherry<br>Brian M. Simmonds<br>WILMER CUTLER PICKERING<br>HALE and DORR LLP<br>1875 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20006<br>Telephone: (202) 663-6000<br>Facsimile: (202) 663-6363<br><br>Attorneys for Defendant/Appellee The<br>Walt Disney Company | Kenneth R. Logan<br>Joseph F. Tringali<br>SIMPSON THACHER &<br>BARTLETT LLP<br>425 Lexington Avenue<br>New York, New York 10017-3954<br>Telephone: (212) 455-2000<br>Facsimile: (212) 455-2502<br><br>Chet A. Kronenberg<br>SIMPSON THACHER &<br>BARTLETT LLP<br>1999 Avenue of the Stars, 29th Floor<br>Los Angeles, California 90067<br>Telephone: (310) 407-7500<br>Facsimile: (310) 407-7502<br><br>Attorneys for Defendant/Appellee<br>Viacom, Inc. |
| Katherine B. Forrest<br>CRAVATH, SWAINE & MOORE<br>LLP<br>825 Eighth Avenue<br>New York, NY 10019<br>Telephone: (212) 474-1155<br>Facsimile: (212) 474-3700<br><br>Bryan A. Merryman<br>WHITE & CASE LLP<br>633 West Fifth Street, Suite 1900<br>Los Angeles, CA 90071-2007<br>Telephone: (213) 620-7700<br>Facsimile: (213) 452-2329<br><br>Attorneys for Defendant/Appellee<br>Turner Broadcasting System, Inc. | Ronald C. Redcay<br>John D. Lombardo<br>ARNOLD & PORTER LLP<br>777 South Figueroa Street, 44th Floor<br>Los Angeles, CA 90017-5844<br>Telephone: (213) 243-4000<br>Facsimile: (213) 243-4199<br><br>Attorneys for Defendant/Appellee<br>NBC Universal |

C.A. No. 09-56785

## CORPORATE DISCLOSURE STATEMENT

Fox Entertainment Group, Inc.'s parent corporation is News Corporation, whose shares are traded on the NASDAQ stock exchange, and which is a publicly held corporation that owns more than 10% of Fox Entertainment Group, Inc.'s stock.

NBC Universal, Inc. is owned (through intermediate entities) by General Electric Company and Vivendi Universal, S.A., both of which are publicly held corporations. No other publicly held company owns more than 10% of the stock of NBC Universal, Inc.

No publicly held corporation beneficially owns 10% or more of the stock of Viacom, Inc.

No publicly held corporation beneficially owns 10% or more of the stock of The Walt Disney Company.

Turner Broadcasting System, Inc. is a wholly-owned subsidiary of Historic TW Inc., which is a wholly-owned subsidiary of Time Warner Inc. Time Warner Inc., a public-traded company, indirectly owns more than 10% of Turner Broadcasting System, Inc.'s stock.

# TABLE OF CONTENTS

**Page**

I    INTRODUCTION ..................................................................1

II   STATEMENT OF JURISDICTION ....................................6

III  STATEMENT OF THE ISSUES .........................................6

IV  STATEMENT OF THE CASE .............................................7

    A.    Nature Of The Case ....................................................7

    B.    Course Of The Proceedings And Disposition In The Court Below ........................................................................7

        1.    Plaintiffs' First Amended Complaint Is Dismissed For Failure To Allege Injury To Competition ..................7

        2.    Plaintiffs' Second Amended Complaint Alleges Foreclosure Of Programmers ....................................8

        3.    Plaintiffs File A Third Amended Complaint That Deletes All Foreclosure Allegations .........................9

        4.    The District Court Dismisses Plaintiffs' Third Amended Complaint For Failure To Plead Injury To Competition .........11

V    STATEMENT OF FACTS ...................................................12

    A.    Defendants And Their Products .................................12

    B.    The Challenged Restraints .........................................13

    C.    The Restraints' Purported Effects .............................14

VI   SUMMARY OF ARGUMENT ...........................................16

VII  STANDARD OF REVIEW ..................................................20

VIII ARGUMENT .......................................................................21

    A.    Plaintiffs Must Plead Injury To Competition, A Required Element Of Their Sherman Act Claim ..........21

        1.    Vertical Restraints Are Legal Unless Plaintiffs Plead And Prove That They Cause Injury To Competition .....21

        2.    Injury To Competition Is Distinct From And A Prerequisite To Antitrust Injury ...............................22

10946144.6

# TABLE OF CONTENTS
(continued)

B.     Plaintiffs' Third Amended Complaint Fails To Allege That The Challenged Contracts Cause Injury To Competition ........................26

    1.     Injury To Competition Requires Horizontal Collusion Or Foreclosure Of Rivals, Both Of Which Plaintiffs Have Expressly Disclaimed.................................................................26

        a.     The Restraints Challenged In This Case Are Akin To Tying, Bundling, Block-Booking And Full-Line Forcing Arrangements, All Of Which Are Legal Unless They Result In Foreclosure Of Competitors....................................................................29

            i.     Tying ................................................................30

            ii.     Full-Line Forcing ..................................................32

            iii.     Block-Booking ....................................................32

            iv.     Bundling ............................................................33

        b.     Foreclosure Also Is The Key Concern In Other Categories Of Vertical Restraints ...................................34

        c.     Prior Antitrust Challenges To Cable Bundling Have Failed Due To The Clear Absence Of Competitive Foreclosure..........................................35

        d.     Plaintiffs' Cited Authority Further Demonstrates That Their Section 1 Claim Fails In The Absence Of Allegations Of Horizontal Collusion Or Foreclosure Of Rivals .....................................................37

    2.     The Purported Effects Of The Challenged Restraints Do Not Demonstrate Injury To Competition...................................44

        a.     Restraints Do Not Injure Competition Simply Because They May Limit The Manner In Which Distributors Can Sell A Product ....................................44

        b.     Vertical Agreements Do Not Injure Competition Simply Because They Restrict Consumer Choice And Result In Higher Prices....................................47

# TABLE OF CONTENTS
### (continued)

**Page**

      i.    A Restraint Does Not Injure Competition Because It Results In Higher Prices For Consumers ...........................................................48

      ii.   Reduction In Consumer Choice Is Not Tantamount To Injury To Competition ...............53

   c.   Aggregating The Agreements Does Not Advance Plaintiffs' Claim............................................................55

IX     CONCLUSION..............................................................56

10946144.6

# I     INTRODUCTION

The district court correctly dismissed Plaintiffs' Third Amended Complaint for failure to state a Section 1 claim because Plaintiffs did not allege that cable affiliation agreements between television Programmers[1] and Distributors[2] have "injured competition" by foreclosing rival programmers.

Plaintiffs -- a putative class of television subscribers -- challenge a series of bilaterally negotiated vertical agreements between each Programmer and each Distributor under the Rule of Reason.  They allege that Programmers, through these agreements, require Distributors to resell particular networks in "bundled tiers."  Plaintiffs claim that these tiering requirements are an illegal restraint of trade because they restrict the choices available to consumers, allegedly forcing some consumers to pay more for cable television than they would pay if they could

---

[1]     The Programmers include Defendants NBC Universal, Inc., Viacom, Inc., The Walt Disney Company, Fox Entertainment Group, Inc., and Turner Broadcasting System, Inc.  They own copyrighted television programming, which they sell in bundles as channels.

[2]     The Distributors include Defendants Comcast Corporation, Comcast Cable Communications, LLC, CoxCom, Inc., The DIRECTV Group, Inc., Echostar Satellite L.L.C., Cablevision Systems Corp., and Time Warner Cable, Inc.  They purchase cable programming from Programmers and sell it to consumers in repackaged "bundled tiers" that include programming from each Programmer.

buy fewer channels.   Plaintiffs seek injunctive relief permitting consumers to subscribe only to those networks that they themselves select.  (*See* AOB at 4.)[3]

The district court properly dismissed Plaintiffs' effort to use the antitrust laws to regulate the way in which Programmers and Distributors package programming, holding that Plaintiffs had failed to allege an essential element of every Sherman Act violation: injury to competition.  As the Supreme Court recognized when it first adopted the Rule of Reason as the guiding principle for applying Section 1 nearly one hundred years ago, every contract restrains trade, but the Sherman Act outlaws only those restraints that are "unreasonably restrictive of competitive conditions." *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 58 (1911).

To survive a motion to dismiss, a Section 1 Rule of Reason claim must therefore allege that the alleged restraint injures competition.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).  The Supreme Court and lower courts consistently require plaintiffs in vertical restraint cases to plead and prove that the restraints they challenge injure competition either (a) through horizontal collusion; or (b) by foreclosing rivals.  Because Plaintiffs alleged neither collusion

---

[3]      "AOB" refers to Appellants' Opening Brief; "ER" refers to Appellants' Excerpts of Record; and "SER" refers to Defendants-Appellees' Joint Supplemental Excerpts of Record.

or foreclosure, the district court properly dismissed Plaintiffs' Third Amended Complaint.

Plaintiffs concede that they have alleged neither foreclosure nor horizontal collusion. Instead, they maintain that they can show the requisite injury to competition simply by alleging that the bundling of cable channels by the Programmers limits the manner in which retailers can compete against each other in a downstream retail market, or causes a reduction in choice or higher prices at the consumer level.

That is not the law. Courts mandate that plaintiffs challenging the legality of all categories of vertical restraints under the Sherman Act plead and prove injury to competition through horizontal collusion or foreclosure of rivals, whether those restraints are characterized as territorial restrictions, price restrictions, exclusive dealing agreements, "most favored nation" agreements, boycotts, tying arrangements, block-booking, full-line forcing, or bundling. Plaintiffs cite no case -- not one -- holding that a vertical restraint violates the Sherman Act in the absence of horizontal collusion or foreclosure of rivals. Nor do Plaintiffs offer any authority that would justify abandoning the bedrock requirement that they plead horizontal collusion or foreclosure of competitors simply because none of the labels "fits" the restraint they challenge, or because the resulting consumer injury purportedly is widespread.

Plaintiffs are correct that, in some circumstances, some courts have concluded that reduced choice and increased prices can constitute "antitrust injury." But "injury to competition" is distinct from "antitrust injury," and is a separate element of a Section 1 claim. The "antitrust injury" requirement mandates that private plaintiffs asserting an antitrust violation must plead and prove not only that they have suffered injury-in-fact (which they may do by showing reduced choice or increased price), but also that their injury *resulted from "injury to competition."* If there is no "injury to competition," there can be no "antitrust injury."

Although reduced choice and higher prices may constitute "antitrust injury" *when they result from a lessening of competition* (which is not alleged here), they are not sufficient by themselves to show the required injury to competition. As the Supreme Court has recognized repeatedly, all vertical restraints, by definition, restrict how a dealer competes with other dealers in selling a manufacturer's products. This may often reduce the choices dealers can offer consumers and possibly increase the prices they charge. *See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ("*Leegin*"). But those effects are not enough to condemn a restraint in the absence of facts showing that a restraint also harms interbrand competition either by excluding competing suppliers or by facilitating horizontal collusion. *Id.* at 895, 898.

Based on this principle, the Supreme Court and this Court have recognized that absent foreclosure, bundling is an entirely legitimate way for manufacturers to market their products, even in situations where it could lead to higher prices. *See Illinois Tool Works Inc. v. Independent Ink, Inc.,* 547 U.S. 28, 45 (2006) (bundling is "fully consistent with a free, competitive market"); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 895-97 (9th Cir. 2008). Were it not, bakers could not sell hot dog buns in packages of eight -- because some consumers might prefer fewer. Nor could publishers sell newspapers to consumers complete with each of the paper's separate sections (e.g., Sports, Calendar, Business, Food, etc.) -- because some consumers might not want some sections of the paper.

Plaintiffs' argument that choice reduction, even if accompanied by price increases, can suffice to show injury to competition constitutes a radical departure from nearly a century of antitrust decisions teaching that the Sherman Act is concerned only with the effect of a restraint on competition, not any collateral effects the restraint might have. *See Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 690 (1978) ("[T]he inquiry is confined to a consideration of impact on competitive conditions."). Competition is presumed to maximize consumer welfare, and courts have long been cautioned not to substitute their own judgment for the workings of a competitive marketplace. *See Standard Oil*, 221 U.S. at 65 (cautioning that a court may not "indulg[e] in general reasoning as to the

expediency or nonexpediency of having made the contracts"). The district court was right to dismiss Plaintiffs' complaint for failure to allege the requisite injury to competition. This Court should affirm.

## II    STATEMENT OF JURISDICTION

The district court had jurisdiction over this case, in which the underlying Complaint asserts a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, pursuant to 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. Judgment was entered by the district court on October 27, 2009 (ER 201), and Plaintiffs timely filed a notice of appeal on October 30, 2009 (ER 202). *See* Fed. R. App. P. 4(a)(1)(A).

## III    STATEMENT OF THE ISSUES

1.    Does Plaintiffs' Third Amended Complaint allege facts sufficient to demonstrate that the vertical agreements between the Programmers and Distributors actually cause injury to competition?[4]

---

[4]    Distributors' answering brief addresses Plaintiffs' lack of standing to pursue their claim. Programmers hereby join in the standing arguments raised by the Distributors.

## IV    STATEMENT OF THE CASE

### A.    Nature Of The Case

This appeal arises from the district court's order granting Defendants' motion to dismiss Plaintiffs' Third Amended Complaint with prejudice, and subsequent judgment in favor of Defendants.

### B.    Course Of The Proceedings And Disposition In The Court Below

The history of this case demonstrates why Plaintiffs ask this Court to relieve them of their obligation to plead and prove foreclosure of competing programmers. When the district court required Plaintiffs to plead foreclosure, they did so.  But, when discovery began, and Plaintiffs presumably realized it would be impossible to prove foreclosure given the prevalence of independent network carriage and the ever-increasing number of cable channels, they abandoned the effort.

#### 1.    Plaintiffs' First Amended Complaint Is Dismissed For Failure To Allege Injury To Competition

Plaintiffs' initial Complaint, filed on September 20, 2007, asserted two claims for relief -- one under Section 1 of the Sherman Act and another under Section 2 for "conspiracy to monopolize."  (SER 227-244.)  Then, on December 3, 2007,  Plaintiffs filed a First Amended Complaint ("FAC"), which asserted only one cause of action under Section 1.  (SER 200-226.)

Defendants moved to dismiss Plaintiffs' FAC for failure to state a claim and for lack of standing.  Defendants argued that Plaintiffs failed to allege that the

## VI    SUMMARY OF ARGUMENT

Plaintiffs have from this case's inception attempted to "reverse engineer" an antitrust claim from what they categorize as "consumer harm."  They start from allegations that some television consumers purportedly purchase packages of programming that include networks they would not elect to purchase on an a la carte basis, at a total price that Plaintiffs allege is higher than these consumers would pay if cable and satellite providers were able to offer packages that are smaller or different than those currently offered (a claim that is itself based on wildly speculative premises and conclusions).  From this, Plaintiffs reason that contracts between Programmers and Distributors that mandate "tiering" somehow must violate Section 1.

This is exactly the wrong way to determine whether the challenged agreements violate the antitrust laws.  The first step in any Section 1 analysis is to identify the agreement or agreements subject to challenge.  *See American Needle, Inc. v. National Football League*, 560 U.S. ___ (No. 08-661, May 24, 2010, Slip op. at 1).  The next step is to determine whether those agreements unreasonably restrain trade.  *See id.*  This requires pleading and proof that the challenged agreements have "injured competition."  *See, e.g.*, *Kendall*, 518 F.3d at 1047.  *If*

---

telecommunications information provided by the FCC to Congress"), *available at* http://energycommerce.house.gov/images/stories/Documents/PDF/Newsroom/fcc %20majority%20staff%report%20081209.pdf.

there is a substantive violation, the Court must then examine whether the private plaintiffs have standing to challenge the restraint by virtue of having suffered "antitrust injury" -- that is, actual injury that is causally related to the competition-reducing aspect of defendants' behavior and is the sort of injury against which the antitrust laws were designed to protect.  *See*, *e.g.*, Clayton Act §§ 4, 16, 15 U.S.C. §§ 15, 26; *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 335 (1990).

By contrast, Plaintiffs assert that their allegation that tiering requirements cause injury in the form of reduced choice and artificially high consumer prices "perfects" their antitrust claim.  This is incorrect.  Plaintiffs cannot "perfect" their claim until they first allege that the challenged agreements "injure competition."  If and only if Plaintiffs satisfy the "injury to competition" element of their Section 1 claim would the court turn to the distinct question of whether Plaintiffs' claimed injuries -- reduced choice and higher prices -- result from that injury to competition.  Allegations of reduced choice and/or high prices might suffice to show "antitrust injury" -- *if that injury results from the competition reducing aspect of conduct that violates Section 1.*  Yet such allegations do not eliminate Plaintiffs' burden to plead and prove that the restraints *actually injure competition* -- an antecedent requirement that Plaintiffs have failed to meet here.

As the Supreme Court has stated, "the primary purpose of the antitrust law is to protect interbrand competition"-- a fact that Plaintiffs ignore.  *See State Oil Co.*

*v. Khan*, 522 U.S. 3, 15 (1997).  Interbrand competition in this case is competition as between the television programmers to sell programming.  The TAC contains no allegations of "injury to competition" among the programmers -- for example, direct injury through horizontal collusion among the programmers (which Plaintiffs expressly disclaimed), or indirect injury through vertical agreements that have the effect of foreclosing rivals from this competition (which Plaintiffs also have expressly disclaimed).

Indeed, all types of vertical restraints courts have found illegal have involved the foreclosure of rivals.  Plaintiffs cite no contrary vertical restraint cases, and instead argue that this Court should not consider itself bound by the pleading and proof requirements applied in other categories of restraints.  That is disingenuous.  *Of course* this Court should look to pleading and proof requirements in claims challenging analogous restraints, such as tying, full-line forcing, block booking, and bundling claims, all of which have required foreclosure of rivals.

Although Plaintiffs argue that they do not need to plead or prove programmer foreclosure, they have failed to offer any other legally sufficient basis for finding injury to competition.

First, the fact that the tiering restrictions facially restrict the manner in which Distributors compete against one another is legally insufficient.  Virtually all vertical restraints that limit the competitive style or methods of retailers can be said

10946144.6

- 18 -

also to restrict the manner of downstream competition. That is their very nature and purpose.

Second, the fact that the tiering restrictions have allegedly resulted in increased prices or "overcharge" is legally insufficient. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) expressly held that vertical resale price maintenance agreements -- which necessarily and by design result in higher prices to consumers -- must be judged under the Rule of Reason. The *Leegin* Court expressly stated that vertical agreements affecting price could be found unlawful only upon a "further showing of anticompetitive conduct," i.e., injury to competition. *Id.* at 895. A finding that high prices themselves could constitute injury to competition would be completely contrary to the Supreme Court's holding in *Leegin*.

Third, the allegation that the tiering restrictions have allegedly reduced consumer choice is legally insufficient. Courts long have held that forcing buyers to purchase unwanted products is not itself illegal, absent foreclosure. *See Hirsch v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1349 n.19 (9th Cir. 1982) ("intrud[ing] upon consumers' freedom of choice by compelling purchase of unwanted products" is not a "sufficient independent basis for antitrust liability") (interpreting *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n.21 (1977)).

Plaintiffs would have this Court ignore the TAC's failure to allege injury to competition, and permit an antitrust plaintiff to make out a Section 1 claim simply by alleging consumer harm. This proposed standard is starkly at odds with nearly one hundred years of antitrust jurisprudence and runs counter to the decisions of both the Supreme Court and this Court, making injury to competition an essential element of any Section 1 claim.

For these reasons, the judgment of dismissal should be affirmed.

## VII   STANDARD OF REVIEW

The district court's ruling granting Defendants' motion to dismiss is subject to *de novo* review. *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 932 (9th Cir. 2007); *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004). The Court must determine whether Plaintiffs' TAC "contain[s] sufficient factual matter," which if accepted as true, "'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In the antitrust context, "[d]ismissal for failure to state a claim is appropriate where 'the complaint states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose.'" *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783

(9th Cir, 1996) (quoting *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987) (quotations and alteration omitted)).

## VIII  ARGUMENT

**A.**  **Plaintiffs Must Plead Injury To Competition, A Required Element Of Their Sherman Act Claim**

**1.**  **Vertical Restraints Are Legal Unless Plaintiffs Plead And Prove That They Cause Injury To Competition**

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Recognizing that nearly *every* contract binding parties to an agreed course of conduct amounts to some sort of "restraint of trade," the Supreme Court has limited the restrictions of Section 1 to bar only "unreasonable restraints." *State Oil Co.*, 522 U.S. at 10; *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984).

"The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1." *Leegin*, 551 U.S. at 885 (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).  The Rule of Reason "focuses directly on the challenged restraint's impact on competitive conditions," and the "inquiry mandated by the Rule of Reason is whether the challenged agreement is one that

promotes competition or one that suppresses competition." *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 688, 691 (1978).[7]

To state a Section 1 claim subject to the Rule of Reason, Plaintiffs must allege "evidentiary facts," that, if true, establish: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade . . .; (3) **which actually injures competition**." *Kendall*, 518 F.3d at 1047 (emphasis added). *See also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290-91 (9th Cir. 1979) ("Proof that the defendant's activities had an impact upon competition in a relevant market is an absolutely essential element of the rule of reason case."). "Whether specific conduct is anti-competitive[, i.e., whether it injures competition,] is a question of law." *SmileCare*, 88 F.3d at 783.

### 2. Injury To Competition Is Distinct From And A Prerequisite To Antitrust Injury

Separate and apart from injury to competition, Plaintiffs also must allege that they suffered "antitrust injury," i.e., some harm of the type that the antitrust

---

[7]     Certain types of restraints, such as horizontal price-fixing arrangements, are presumed to injure competition, and courts deem those agreements *per se* unlawful without subjecting them to the more rigorous analysis required by the Rule of Reason. *See, e.g., Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 19-20 (1979); *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49-50 (1977). Plaintiffs acknowledge, however, that the vertical restraints they challenge are not *per se* unlawful, and the Court should assess them under the Rule of Reason. (*See* AOB at 38.)

- 22 -

equally or more efficient competitor."); IX Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1711a, at 101 (2d ed. 2004) ("price discrimination is not a warrant for condemning a tie that is not objectionable on other grounds").

### ii. Reduction In Consumer Choice Is Not Tantamount To Injury To Competition

Similarly, reduction in "consumer choice" for some consumers cannot establish injury to competition. As the district court explained in its order dismissing Plaintiffs' FAC, while "a reduction in consumer choice can be a sign of anticompetitive effects," to state a Section 1 claim, Plaintiffs must plead "additional facts that would allow the Court or a jury to differentiate between lack of choice caused by harm to competition and lack of choice flowing from normal competitive processes." (SER 193.)

It is not enough for Plaintiffs to allege that each Programmer's alleged bundling caused Distributors to purchase programming they would not have acquired had they been able to "separately negotiate channel-by-channel," and that but for the agreements between Programmers and Distributors, Distributors would offer "unbundled" cable options to consumers. (ER 184 ¶¶ 43-44.) Antitrust law does not give buyers the right to demand that multi-product sellers, such as the Programmers, make their wares available in every possible combination. *See Hirsch*, 674 F.2d at 1349 n.19 (9th Cir. 1982) ("intrud[ing] upon consumers'

freedom of choice by compelling purchase of unwanted products" is not a "sufficient independent basis for antitrust liability") (interpreting *Continental T. V.*, 433 U.S. at 53 n.21); *Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 488 (3d Cir. 1992) (recognizing that "some customers would be most happy purchasing every option or feature a la carte," but finding such preferences insufficient to show "consumer injury through anticompetitive forcing.").[17]

Accordingly, in the absence of allegations demonstrating actual injury to competition (such as allegations of foreclosure of competitors or horizontal collusion), to the extent it relies on allegations of reduction in consumer choice to establish injury to competition, Plaintiffs' TAC fails to state a claim under Section 1. *Cf. Jefferson Parish*, 466 U.S. at 16 ("[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion

---

[17] This principle is underscored by the observation that, in the context of cable television, it is far from obvious that a "channel" -- as opposed to a particular television series, or even episode -- is the unit of entertainment "product" that some consumers might wish were offered a la carte. Some television watchers, for example, might want to watch "American Idol" (Fox) but not "Glee" (also on Fox); or some might want to watch only the final episode of American Idol, but not the preliminary episodes. Should all of these consumers be permitted to bring antitrust claims seeking to force Programmers and Distributors to sell their programming entertainment in the unit size and combination that the particular consumers most prefer?

- 54 -

of the market which would otherwise have been available to other sellers has been foreclosed.").

### c. Aggregating The Agreements Does Not Advance Plaintiffs' Claim

Finally, Plaintiffs suggest that this case is somehow different than others that came before because it involves multiple vertical agreements, whose aggregate effects somehow reflect a cognizable antitrust violation. This argument is conceptually flawed. Plaintiffs take an economic effect -- higher prices and diminished choice -- and assert that it is sufficient to state a Section 1 claim because it is widespread throughout the market. But consumer harm that does not flow from injury to competition is not actionable under the Sherman Act, no matter how widespread. Aggregating a series of agreements that individually are not alleged to injure competition cannot result in inferred injury to competition. For this reason, the dicta in *William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.*, 588 F.3d 659 (9th Cir. 2009) (per curiam) that Plaintiffs cite for the suggestion that bilateral contracts can be aggregated is irrelevant. Zero plus zero still equals zero. *See, e.g., Abcor Corp. v. AM Int'l*, 916 F.2d 924, 930-31 (4th Cir. 1990) (finding that aggregating a defendant's acts, none of which is anticompetitive individually, does not demonstrate an antitrust violation).

# IX    CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order dismissing the Third Amended Complaint with prejudice.

Respectfully submitted,

DATE:  June 21, 2010                     MUNGER, TOLLES & OLSON LLP

By:  ___/s/ David C. Dinielli_____
David C. Dinielli*

Counsel for Defendant/Appellee Fox Entertainment Group, Inc.

*With Permission for All Programmer-Defendants/Appellees*

# EXHIBIT B



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SALVATORE MOCCIO, ROSE MOCCIO,
ROBERT GROSSMAN, NORMAN LEVINSOHN
and HOWARD WINSTON,

      As Individuals and as Class Representatives,

                        Plaintiffs,

            - against -

CABLEVISION SYSTEMS CORPORATION,
the YANKEENETS, INC., d/b/a NEW YORK
YANKEES, YANKEES ENTERTAINMENT AND
SPORTS NETWORK, LLC, and MSG NETWORK,
INC.;

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FILED ORIGINAL
IN CLERK'S OFFICE
DISTRICT COURT E.D

★ APR 19 2002 ★
4130109

LONG ISLAND OFFICE

CV-02-2138 (TCP) (ETB)

---

## CABLEVISION SYSTEMS CORPORATION AND MSG NETWORK, INC.'S MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

---

FARRELL FRITZ, P.C.
Attorneys for Defendants
Cablevision Systems Corporation and
MSG Network, Inc.
EAB Plaza, West Tower, 14th Floor
Uniondale, New York 11556
(516) 227-0700

Of Counsel:

    Dolores Fredrich
    George C. Pratt
    Eric W. Penzer



# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................... ii

Statement of Facts ................................................................... 3

Point I ................................................................................. 6

STANDARD APPLICABLE TO A MOTION
TO **DISMISS** PURSUANT TO RULE 12(b)(6) .......................................... 6

Point II ................................................................................ 7

PLAINTIFFS HAVE FAILED TO PLEAD THE
REQUISITE ELEMENTS OF A RICO CLAIM ........................................... 7

Point III ............................................................................... 13

PLAINTIFFS' SHERMAN ACT CLAIM IS LEGALLY DEFICIENT ......................... 13

Point IV ............................................................................... 18

THE GENERAL BUSINESS LAW CLAIM MUST BE DISMISSED ......................... 18

Point V ................................................................................ 21

PLAINTIFFS FAIL TO STATE A BREACH OF CONTRACT CLAIM ....................... 21

Point VI ............................................................................... 22

AT A MINIMUM. PLAINTIFFS' REQUEST
FOR INJUNCTIVE RELIEF MUST BE STRICKEN ...................................... 22

Conclusion ............................................................................. 23

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

                                     x

SALVATORE MOCCIO, ROSE MOCCIO,
ROBERT GROSSMAN, NORMAN LEVINSOHN
and HOWARD WINSTON,

        As Individuals and as Class Representatives,

                             Plaintiffs,                    CV-02-2138 (TCP) (ETB)

              - against -

CABLEVISION SYSTEMS CORPORATION,
the YANKEES, INC., d/b/a NEW YORK YANKEES,
YANKEES ENTERTAINMENT AND SPORTS
NETWORK, LLC, and MSGNETWORK, INC.;

                             Defendants.
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ x

## CABLEVISION SYSTEMS CORPORATION AND MSG NETWORK, INC.'S  MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

        Defendants Cablevision Systems Corporation ("Cablevision") and Madison Square Garden,

L.P., sued herein as MSG Network, Inc. ("MSG"),[1] respectfully submit this memorandum of law in

support of their cross-motion to dismiss the complaint as against them pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  In addition, we rely upon the affidavits of Cablevision's Senior Vice

President Consumer Product Management Patricia Falese and Vice President of Customer Service

Rocky Boler, and the exhibits annexed thereto, in support of this motion.

---

   [1]   Contrary to the allegations in plaintiffs' complaint, MSG is not wholly owned by Cablevision. Through various corporate entities, it is owned 60% by Rainbow Media Holdings, Inc., which itself is 77.5% owned by Cablevision.  Through various other entities, FOX Sports Networks, LLC, an unrelated entity, owns the other 40% of MSG.  *See* Falese **Aff. ¶ 1 n.**1. In the interests of efficiency and economy, and given that defendants believe plaintiffs have completely failed to state any viable claims for relief, Cablevision and MSG have elected to appear on these motions through common counsel.

Simultaneously with this motion to dismiss the complaint, Cablevision and MSG are also opposing in a separate memorandum plaintiffs' motion for a preliminary injunction and for other relief. We ask the Court to consider the arguments advanced on this motion to dismiss in the context of our opposition to plaintiffs' motion for a preliminary injunction.

*     *     *

Plaintiffs and their counsel have chosen to use the federal court to air their opinions about matters that do not belong in any court, and their complaint should be summarily dismissed.  Simply put, plaintiffs have no constitutional, statutory, contractual or innate right to require Cablevision to negotiate for and obtain the rights to provide Yankees games to Cablevision subscribers.  **As** the federal statute governing cable communications recognizes, not even government – let alone cable subscribers such as plaintiffs – can order cable operators to offer particular programs to cable customers.  In fact, the relief sought here flies in the face of the First Amendment.

Plaintiffs thus have no viable claim to support the relief they seek in their complaint.  The fact is that none of the legal theories alleged in the complaint – even if valid claims were stated – could give rise to the extraordinary and unprecedented relief sought in the complaint.  Moreover, a review of the allegations set forth in the complaint compels the conclusion that each and every claim must be dismissed because none states any claim upon which relief may be granted.

**Point III**

**PLAINTIFFS' SHERMAN ACT CLAIM IS LEGALLY DEFICIENT**

Plaintiffs' Sherman Act claim is skeletal.  Plaintiffs do not specify in their complaint the particular sections of the Sherman Act that they alleged were violated.  In fact, with respect to Cablevision and MSG, the antitrust claim consists of the following three paragraphs (aside from the obligatory "repeat and reallege" paragraph):

> **83.**    Upon information and belief, Cablevision and MSGN, acting in concert, have appreciable market power to appreciably restrain trade in the market and have exerted their market power in an unreasonable manner to compel sales of the tied-in products, and the tie-in effects a substantial amount of interstate commerce.

> **85.**    Upon information and belief, the Cablevision Defendants and the Yankee Defendants have acted in concert in employing their market power in an unreasonable way and have in so doing appreciably restrained trade, effecting a substantial amount of interstate commerce.

> **86.**    Alternatively, the anti-competitive behavior complained of is of a type so inimical to competition as to be per se illegal.

Those allegations do not even provide the bare minimum details required to put Cablevision and MSG on notice as to what conduct is alleged to constitute the illegal "tying" referenced in passing in paragraph a3.

It appears from the introductory allegations of the complaint that plaintiffs are attempting to allege that Cablevision and/or MSG engaged in illegal activity by tying "receipt of the MSG programming to 'premium' packages of other channels which the customers may order only upon payment of an enhanced fee." *Id.* ¶ 23; *see also id.* ¶¶ 24-27.  However, the conduct alleged does not provide a basis for a Sherman Act claim.  In fact, it fails both as a matter of fact and as a matter of law.

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Yentsch v Texaco, Inc.,* 630 F.2d 46, 56 (2d

Cir. 1980) (internal quotations omitted).   The Second Circuit enumerated the elements of a tying claim

as follows:

> We have required allegations and proof of five specific elements
> before finding a tie illegal:  first, a tying and a tied product; second,
> evidence of actual coercion by the seller that forced the buyer to
> accept the tied product;  third, sufficient economic power in the
> tying product market to coerce purchaser acceptance of the tied
> product;  fourth, anticompetitive effects in the tied market;  and
> fifth, the involvement of a "not insubstantial" amount of interstate
> commerce in the "tied" market.

*Hack v. President and Fellows of Yale Coll.,* 237 F.3d 81, 86 (2d Cir. 2000), *cert. denied,* 112 S.Ct. 201

(2001).  This standard applies for tying claims under both the Sherman Act and the Clayton Act.  *See De*

*Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir. 1996).  It also governs claims under the Donnelly

Act, the New York State counterpart to the federal antitrust laws.  *See X.L.O. Concrete Corp. v.*

*Rivergate Corp.,* 611 N.Y.S.2d 786, 789 (1994) ("Donnelly Act, having been modelled on the Federal

Sherman Act of 1890, should generally be construed in light of Federal precedent") (internal citations

omitted).[4]

    As noted above, plaintiffs' allegations of an unlawful "tying" arrangement fail on the facts

and the law.  First, the allegations of the complaint are contradicted by the documents referenced in the

complaint.  While plaintiffs allege that Cablevision's subscribers must subscribe to a premium tier of

programming, *i.e.,* the "Family Cable" package, in order to purchase the MSG Network, *see* Compl. ¶

25, that is not the case.  The MSG Network may be purchased separately by the plaintiffs without

subscribing to a "premium" tier of programming.  *See* Falese Aff. ¶ 3 and Exhibit "A."

    Inasmuch as plaintiffs, in bringing this claim, "relie[d] heavily upon" the "terms and effect"

of Cablevision's rate card – which unequivocally establishes that the MSG Network may be purchased

independent of premium programming packages – the rate card is "'integral' to the complaint" and may

---

[4]  Although plaintiffs assert no Donnelly Act claim in their complaint. the Donnelly Act is mentioned
in plaintiffs' Memorandum of Law.  *See* Pls.' Mem. of Law at 15.

be considered on the present motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 151 (2d Cir. 2002). Moreover, the complaint's allegation that Cablevision's subscribers must subscribe to a premium tier of programming, i.e., the "Family Cable" package, in order to purchase the MSG Network, see Compl. ¶ 25, is flatly contradicted by the rate care and, therefore, not entitled to a presumption of truth on the present motion. *See Matusovsky v. Merrill Lynch,* 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002); *Honess 52 Corp. v. Town of Fishkill,* 1 F. Supp. 2d 294, 296 (S.D.N.Y. 1998).

Further, as is described more fully in our Memorandum in Opposition to Preliminary Injunction, at page 6, federal law requires that customers subscribe first to a "basic service tier" in order to purchase any other program or service. *See* 47 U.S.C. § 543(b)(7) (2002); 8 F.C.C.R. 5631 ¶ 165 (1993), 1993 WL 757189. Thus, the requirement that a subscriber purchase "Broadcast Basic" from Cablevision in order to subscribe to the MSG Network is entirely consistent with controlling federal law.

Notably, a claim similar to that advanced by plaintiffs was made in a state court action, under the New York State counterpart to the Sherman Act, and was dismissed based upon the fact that the programming could be purchased separately. *See Bello v. Cablevision Sys. Corp.,* 587 N.Y.S.2d 1, 3 (2d Dep't 1992) ("a review of the Rate Card indicates that the programming services which are allegedly being tied may be purchased individually, and, therefore, no 'tying' claim may lie"). Thus, the indisputable facts do not support plaintiffs' "tying" claim.

However, even assuming the truth of the facts alleged in the complaint, and ignoring the numerous deficiencies in the pleading, the "tying" claim fails as a matter of law. Plaintiffs allege that in order to obtain the MSG Network they were forced to purchase programming, the "tied" product, that they would not have otherwise purchased. *See* Compl. ¶ 24.[5] The law is settled that no tying claim lies

---

[5]  Paragraph 24 of the complaint provides as follows: "This 'tying' of MSG programming to less desired channels and programming forces subscribers to order stations they do not wish to, ranging from the Food Network to the Game Show Network. in order to receive MSG and thus the exclusively-broadcast Yankee games."

where the purchaser would not have purchased the tied product at all absent compulsion. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 16 (1984) ("when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed").

The Supreme Court's enunciation in *Jefferson Parish* was recently applied by the court in *Cancall PCS, LLC v. Omnipoint Corp.,* No. 99 Civ. 3395 (AGS), 2001 WL 293981 (S.D.N.Y. March 26, 2001). There, the plaintiff alleged that one of the defendants (Omnipoint, a provider of wireless communication access and service) engaged in an unlawful tying arrangement by refusing to sell air time on its wireless network except to consumers who purchased handsets compatible with the network. *See id.* at *2-3. The court dismissed the action, noting that the plaintiff alleged that it would not have bought the tied product, *i.e.*, the handsets, absent the alleged tying arrangement:

> The Supreme Court's statement aptly describes the situation here. Cancall asserts that, but for the alleged tie, it would not have bought handsets for resale to consumers who already had handsets compatible with the Omnipoint PCS/GSM network. Since Cancall would not have bought the "extra" or "additional" handsets from any seller, no competition was foreclosed in the market for the tied product. *See Gonzalez v. St. Margaret's House Hous. Dev. Fund,* 880 F.2d 1514, 1518 (2d Cir. 1989) (doubtful that competition **was** foreclosed in tied market where, absent compelled link between housing and prepared meals, residents of housing development would probably not have purchased prepared meals at all); *Yentsch,* 630 F.2d at 57-58 (unlikely that there were anticompetitive effects in the tied market where testimony suggested that, absent compulsion, plaintiff would not have purchased tied products at all).

2001 WL 293981, at *5.

Because plaintiffs allege that they did not wish to purchase the premium programming, *i.e.*, the "tied" product, from a competitor of Cablevision. *see* Compl. ¶ 24, no injury to competition can result from the alleged tying arrangement.

It must also be noted that plaintiffs have not suffered any legally cognizable injury, never mind one for which the antitrust laws provide a remedy. It has, for many months, been common knowledge that the MSG Network has no legal ability to broadcast Yankees baseball games. If plaintiffs subscribed to Cablevision and/or the MSG Network for the sole purpose of watching Yankees games, they need not continue their subscriptions. They have the ability to downgrade their Cablevision service to unsubscribe to the MSG Network, or to discontinue their Cablevision service altogether. There is no injury.

*   *   *

For the foregoing reasons, plaintiffs' Sherman Act claim is legally deficient and mus  be dismissed.

.

# EXHIBIT C

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER (State Bar No. 26202)
DAVID W. KESSELMAN (State Bar No. 203838)
COURTNEY A. PALKO (State Bar No. 233822)
T. GIOVANNI (JOHN) ARBUCCI (State Bar No. 249811)
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone:    (213) 622-4222
Telecopier:   (213) 622-1656
Email: mblecher@blechercollins.com
Email: dkesselman@blechercollins.com
Email: cpalko@blechercollins.com
Email: jarbucci@blechercollins.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ROB BRANTLEY, DARRYN COOKE, WILLIAM and BEVERLEY COSTLEY, PETER G. HARRIS, CHRISTIANA HILLS, MICHAEL B. KOVAC, MICHELLE NAVARRETTE, JOY PSACHIE, and JOSEPH VRANICH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NBC UNIVERSAL, INC., VIACOM INC., THE WALT DISNEY COMPANY, FOX ENTERTAINMENT GROUP, INC., TURNER BROADCASTING SYSTEM, INC., TIME WARNER CABLE INC., COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC, COXCOM, INC.,THE DIRECTV GROUP, INC., ECHOSTAR SATELLITE L.L.C., and CABLEVISION SYSTEMS CORPORATION,<br><br>Defendants. | CASE NO.  CV07-06101 CAS(VBKx)<br><br>**CLASS ACTION**<br><br>THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AS TO ALL DEFENDANTS EXCEPT CHARTER COMMUNICATIONS, INC.<br><br>(15 U.S.C. § 1)<br><br>JURY DEMANDED |

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

4

1   Plaintiffs, on their own behalf and on behalf of all others similarly

2   situated, file this Third Amended Complaint seeking damages and

3   injunctive relief pursuant to 15 U.S.C. §§ 15 and 26, based on violations of

4   Section 1 of the Sherman Act (15 U.S.C. § 1),  and complain and allege as

5   follows:

6                                   I.

7                   **NATURE OF THE CASE**

8       1.  This consumer class action specifically challenges the written

9   contracts between the programmer defendants NBC Universal, Inc.,

10  Viacom Inc., The Walt Disney Company, Fox Entertainment Group, Inc.,

11  and Turner Broadcasting System, Inc. (collectively the "programmer

12  defendants"), and the distributor defendants Time Warner Cable Inc.,

13  Comcast Corporation, Comcast Cable Communications, LLC, Coxcom,

14  Inc., the Directv Group, Inc., Echostar Satellite L.L.C., Charter

15  Communications, Inc., and Cablevision Systems Corporation (collectively

16  the "distributor defendants") which, by the express terms of the

17  agreements, artificially restrain trade by impeding the development of a

18  properly functioning competitive market among and between cable,

19  satellite and telecommunications distributors for the distribution of cable

20  channels and programming to consumers.  These programmer defendants

21  own the vast majority of the channels offered to the public by the

22  distributors, and their market power stems from their control of

23  programming which distributors must have to function.  (See Exhibit 1

24  attached hereto and incorporated herein).  Under the terms of the written

25  contracts, the programmer defendants, by virtue of their market power (as

26  set forth more fully below), mandate that all distributors must (1) purchase

27  the entire output of a particular programmer, (2) offer their channels in a

28  prescribed manner within the expanded basic cable tier as directed by the

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 1 -

1   programmers, and (3) offer consumers access to expanded basic cable
2   television channels in the form of prepackaged bundled tiers at artificially
3   inflated prices; (distributors are prohibited from offering the channels on an
4   individual or unbundled basis) and (4) keep the terms of the written
5   contracts secret.   As a consequence, consumers are denied
6   the choices that a competitive market, free of artificial and anticompetitive
7   contractual restraints, would provide, including the opportunity to purchase
8   on an unbundled basis, thereby avoiding the supracompetitive surcharge
9   paid for forced bundles.  Indeed, the Federal Communications Commission
10  ("FCC") has issued an extensive report explaining that in a competitive
11  marketplace in which consumers are given choice by means of unbundled
12  offerings (based upon traditional economic notions of supply and demand)
13  "a consumer could cut his [or her] programming bills merely by electing to
14  purchase fewer networks."  FCC, *Further Report On the Packaging and*
15  *Sale of Video Programming Services to the Public* at 47 (February 9,
16  2006).  The FCC estimates that the typical American consumer is only
17  interested in watching 17 cable channels.  Therefore, the existing
18  requirement that consumers purchase 50 or more expanded basic cable
19  channels in the form of bundled tiers results in consumers paying inflated
20  prices for the channels they do want to watch.  The FCC estimates that the
21  failure to offer consumers the choice of purchasing unbundled cable
22  channels results in a total overcharge to consumers in excess of $100
23  million per year.
24       2.  The programmer defendants are media entities that collectively
25  own or control the major broadcast (free) television networks in the United
26  States.  These companies also own or control most of the major cable
27  channels.  The programming exhibited on these broadcast channels and
28  cable channels is usually "unique" and protected by copyright law.   Each

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 2 -

programmer defendant, because of its full or partial ownership of a broadcast channel and its ownership or control of multiple important cable channels, has a high degree of market power vis-a-vis all distributors. Accordingly, each programmer defendant can dictate to distributors (whether cable, satellite or fiber optics) that as a condition to purchasing each programmers' broadcast channel and its "must have" cable channels (together these are the tying product) the distributor must also acquire and resell to consumers all the rest of the cable channels owned or controlled by each programmer (together these are the "tied" product[s]).  As a consequence, distributors can offer consumers only prepackaged tiers of cable channels which consist of each programmers' entire offering of channels.  Distributors must agree they will not offer unbundled cable channels to consumers.  Moreover, the programmers specify how their channels or networks appear on either the basic or expanded basic tier. Finally, the contract obligates the distributor not to disclose these terms.  It is a commercial necessity that each distributor must have on its network each programmer's copyrighted major broadcast network (CBS, NBC, ABC, FOX, CW) and the most important copyrighted cable channels owned or controlled by each programmer defendant, each distributor is practically required to accept the contractual requirement that each distributor not offer unbundled cable channels to consumers.  These provisions operate as an enforcement mechanism to insure that each programmer can, without competing with any other programmer, require distributors to take its full product offering without serious negotiations. Accordingly, the programmers' market power has produced a relationship between programmers as a group, and distributors, as a group, which are the product of a distorted and anticompetitive market brought about by the exercise of market power by the programmer defendants who seek to

- 3 -

1   avoid competing with one another and with independent programmers for

2   access to distributor systems.  Each programmer defendant is aware of

3   this power and each exercises its own power to insure it can maximize its

4   revenues by selling its entire line of channels to distributors without serious

5   negotiation.  The programmers, collectively and individually, have no

6   economic incentive or interest to alter the existing market conditions

7   because any effort by even one programmer to offer unbundled cable

8   channels would undermine its ability to force purchase of all or

9   substantially all of its channels.  It is for this same reason that the

10   programmers exercise their market power and prevent the distributors from

11   offering cable channels to consumers on an unbundled basis.  The market

12   power of the programmers and the anticompetitive effects of their contracts

13   with distributors should be judged by assessing the aggregate effect of all

14   programmer-distributor contracts.

15       3.  The named cable provider defendants, Time Warner Cable, Inc.,

16   Comcast Cable Communications, LLC, Charter Communications, Inc.,

17   Cablevision Systems Corporation, and CoxCom, Inc., are the entities that

18   collectively dominate the distribution of channels for exhibition to the

19   public.  The two satellite provider defendants, The DIRECTV Group, Inc.,

20   and EchoStar Satellite L.L.C. (DISH) are the two largest providers of

21   broadcast and cable television via satellite in the United States.  More

22   recently, there has developed a third category of distributor, mainly

23   telephone companies (AT&T and Verizon) which transmit cable channels

24   to viewers via fiber optic cable. The distributor defendants, and the fiber

25   optic distributors, collectively control access to the homes in the United

26   States that desire to view cable channels. In a normal competitive market,

27   as opposed to the existing distorted, artificial, and anticompetitive market,

28   these three categories of distributors, who are competing with each other

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 4 -

1  to sign up consumers, would develop ways to differentiate themselves from
2  one another.  A principle way to accomplish this would be to offer
3  consumers channels either on an unbundled basis.  Because either a la
4  carte or smaller user friendly packages are actually or practicably
5  prohibited by the programmers' contracts with each distributor, the
6  consumer is forced to purchase the full tier of usually 50 or more channels
7  bundled together at a price that substantially exceeds a
8  market-based-price for the channels that the consumer desires to watch.

9      4.  The result of this series of written contractual restraints is that
10  there is little or no competition among programmers because each
11  defendant programmer has – and exercises – the market power to force
12  each distributor to take a full line of broadcast and cable channels and to
13  prohibit each distributor from reselling to consumers on an unbundled
14  basis.  Moreover, as explained above, competition among distributors for
15  consumer business has been significantly suppressed and eliminated
16  because their creativity in offering smaller packages or channels on an
17  unbundled basis has been circumscribed by the contract between each
18  distributor and each programmer which prohibits such offerings.  Dish
19  Network explained the problem in a January 4, 2008 filing with the FCC:
20  "The ability of providers [distributors] to test a la carte or new package tiers
21  in any comprehensive manner is limited by the contractual limitations
22  imposed by cable and broadcaster-affiliated content."

23      5.  Accordingly, there exists two levels of noncompetition in
24  connection with cable television exhibition in the United States which has
25  deprived consumers of choice and caused them to pay inflated prices for
26  cable television.  A recent study by the FCC concludes that the practices
27  described in this Complaint are costing the cable television consumers
28  about $100,000,000 per year in excess payments.

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 5 -

1    6.  This class action seeks to eliminate those provisions of the

2  contracts between (1) programmers and distributors and (2) distributors

3  and consumers which contain the unlawful offering to consumers of only

4  bundled or prepackaged bundled tiers so the market responds to the

5  forces of competition.  It also seeks reimbursement of overcharged

6  damages during the past four year statutory period.

7                                  II.

8                              **PARTIES**

9  **Plaintiffs and Class Representatives**

10    7.  Plaintiff ROB  BRANTLEY resides in Arlington, Virginia.  During

11  the period covered by this Complaint, plaintiff BRANTLEY has been and

12  continues to be a subscriber of cable programming services provided by

13  defendant COMCAST CORPORATION.  Plaintiff BRANTLEY does not

14  desire all of the channels that he is required to buy from defendant

15  COMCAST CORPORATION and would prefer to purchase specific

16  channels on an unbundled basis.

17    8.  Plaintiff DARRYN COOKE resides in Costa Mesa, California.

18  During the period covered by this Complaint, plaintiff COOKE has been

19  and continues to be a subscriber of cable programming services provided

20  by defendant TIME WARNER CABLE, INC.  Plaintiff COOKE does not

21  desire all of the channels that he is required to buy from defendant TIME

22  WARNER CABLE, INC. and would prefer to purchase specific channels on

23  an unbundled basis.

24    9.  Plaintiffs WILLIAM AND BEVERLEY COSTLEY, a married couple,

25  reside in San Pedro, California.  During the period covered by this

26  Complaint, the COSTLEY plaintiffs have been and continue to be

27  subscribers of broadcast satellite programming services provided by

28  defendant ECHOSTAR SATELLITE L.L.C.  Plaintiffs WILLIAM and

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 6 -

1  BEVERLY COSTLEY do not desire all of the channels that they are
2  required to buy from defendant ECHOSTAR SATELLITE L.L.C. and would
3  prefer to purchase specific channels on an unbundled basis.

4      10.  Plaintiff PETER G. HARRIS resides in Pasadena, California.
5  During the period covered by this Complaint, Plaintiff HARRIS has been
6  and continues to be a subscriber of cable programming services provided
7  by defendant CHARTER COMMUNICATIONS, INC.  Plaintiff HARRIS
8  does not desire all of the channels that he is required to buy from
9  defendant CHARTER and would prefer to purchase specific channels on
10 an unbundled basis.

11     11.  Plaintiff CHRISTIANA HILLS resides in San Pedro, California.
12 During the period covered by this Complaint, plaintiff HILLS has been and
13 continues to be a subscriber of cable programming services provided by
14 defendant COXCOM, INC.  Plaintiff HILLS does not desire all of the
15 channels that she is required to buy from defendant COXCOM, INC., and
16 would prefer to purchase specific channels on an unbundled basis.

17     12.  Plaintiff MICHAEL B. KOVAC resides in Berkeley, California.
18 During the period covered by this Complaint, plaintiff KOVAC has been and
19 continues to be a subscriber of broadcast satellite programming services
20 provided by defendant THE DIRECTV GROUP, INC.  Plaintiff KOVAC
21 does not desire all of the channels that he is required to buy from
22 defendant THE DIRECTV GROUP, INC., and would prefer to purchase
23 specific channels on an unbundled basis.

24     13.  Plaintiff MICHELLE NAVARRETTE resides in Playa del Rey,
25 California.  During the period covered by this Complaint, plaintiff
26 NAVARRETTE has been and continues to be a subscriber of broadcast
27 satellite programming services provided by defendant THE DIRECTV
28 GROUP, INC.  Plaintiff NAVARRETTE does not desire all of the channels

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

Printed on Recycled Paper

1  that she is required to buy from defendant THE DIRECTV GROUP, INC.,

2  and would prefer to purchase specific channels on an unbundled basis.

3  14. Plaintiff JOY PSACHIE resides in Riverdale, New York.  During

4  the period covered by this Complaint, Plaintiff PSACHIE has been and

5  continues to be a subscriber of cable programming services provided by

6  defendant CABLEVISION SYSTEMS CORPORATION.  Plaintiff PSACHIE

7  does not desire all of the channels that she is required to buy from

8  defendant CABLEVISION and would prefer to purchase specific channels

9  on an unbundled basis.

10  15. Plaintiff JOSEPH VRANICH resides in Irvine, California.  During

11  the period covered by this Complaint, Plaintiff VRANICH has been and

12  continues to be a subscriber of cable programming services provided by

13  defendant COXCOM, INC.  Plaintiff VRANICH does not desire all of the

14  channels that he is required to buy from defendant COX

15  COMMUNICATIONS, INC., and would prefer to purchase specific channels

16  on an unbundled basis.

17  **Defendants**

18  16.  Defendant NBC UNIVERSAL, INC. (hereinafter "NBC") is a

19  corporation organized and existing under the laws of the State of Delaware

20  with its principal place of business in New York, New York.  Defendant

21  NBC is a media entity engaged in, inter alia, the development and

22  production of entertainment, news and information to a global audience in

23  part through broadcast networks and cable television.

24  17.  Defendant VIACOM INC. (hereinafter "Viacom") is a corporation

25  organized and existing under the laws of the State of Delaware with its

26  principal place of business in New York, New York.  Viacom is a leading

27  global entertainment company engaged in, inter alia, the development and

28

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

Printed on Recycled Paper

1 production of cable and film programming and has a substantial interest in
2 a number of cable channels.

3     18. Defendant THE WALT DISNEY COMPANY (hereinafter
4 "Disney") is a corporation organized and existing under the laws of the
5 State of Delaware with its principal place of business in Burbank,
6 California. Defendant Disney is a media entity engaged in, <u>inter alia</u>, the
7 development and production of entertainment, news and information to a
8 global audience in part through broadcast networks and cable television.

9     19. Defendant FOX ENTERTAINMENT GROUP, INC. (hereinafter
10 "Fox") is a corporation organized and existing under the laws of the State
11 of Delaware with its principal place of business in Los Angeles, California.
12 Defendant Fox is a media entity engaged in, <u>inter alia</u>, the dissemination of
13 entertainment, news and information to a global audience in part through
14 broadcast networks, cable television and partial ownership of a satellite
15 provider.

16     20. Defendant TURNER BROADCASTING SYSTEM, INC.
17 (hereinafter "Turner") is a corporation organized and existing under the
18 laws of the State of Georgia with its principal place of business in Atlanta,
19 Georgia. Defendant Turner is a media entity engaged in, <u>inter alia</u>, the
20 development and production of entertainment, news and information to a
21 global audience in part through broadcast networks and cable television.

22     21. Defendant TIME WARNER CABLE, INC. (hereinafter "TWC") is
23 a corporation organized and existing under the laws of the State of
24 Delaware with its principal place of business in Stamford, Connecticut.
25 TWC is the second largest operator of cable television systems in the
26 United States.

27     22. Defendant COMCAST CORPORATION is a corporation
28 organized and existing under the laws of the State of Pennsylvania with its

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

Printed on Recycled Paper

13

principal place of business in Philadelphia, Pennsylvania. Defendant
COMCAST CABLE COMMUNICATIONS, LLC, is a corporation organized
and existing under the laws of the State of Delaware with its principal place
of business in Wilmington, Delaware (collectively "Comcast"). Comcast is
the largest operator of cable television systems in the United States with
approximately 24 million subscribers.

23. Defendant COXCOM, INC. (hereinafter "Cox") is a corporation
organized and existing under the laws of the State of Delaware with its
principal place of business in Atlanta, Georgia. Cox is the third largest
operator of cable television systems in the United States with
approximately 6.7 million subscribers.

24. Defendant THE DIRECTV GROUP, INC. (hereinafter
"DIRECTV") is a corporation organized and existing under the laws of the
State of Delaware with its principal place of business in El Segundo,
California. Defendant DIRECTV is the largest direct broadcast satellite
television provider in the United States with approximately 16 million
commercial and residential customers

25. Defendant ECHOSTAR SATELLITE L.L.C. (hereinafter
"EchoStar") is a corporation organized and existing under the laws of the
State of Nevada with its principal place of business in Englewood,
Colorado. Defendant EchoStar (which markets its services as DISH) is the
second largest direct broadcast satellite television provider in the United
States with more than 13 million subscribers.

26. Defendant CABLEVISION SYSTEMS CORPORATION
(hereinafter "CSC") is a corporation organized and existing under the laws
of the State of Delaware with its principal place of business in Bethpage,
New York. CSC is one of the larger operators of cable television systems
in the United States with approximately 3 million subscribers.

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

*Printed on Recycled Paper*

# III.

## JURISDICTION AND VENUE

27.  Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for treble damages, injunctive relief, costs of suit and a reasonable attorneys' fee, against defendants for the injuries sustained by plaintiffs and Class members by reason of defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

28.  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1332(d) and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

29.  Venue is proper in this District pursuant to 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b) and (c) because each defendant maintains an office, may be found and/or transacts business within this District.  Moreover, many of the acts alleged in this Complaint giving rise to plaintiffs' claims occurred in, were directed from, and/or had effects in, this District.

# IV.

## CLASS ACTION ALLEGATIONS

30.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the following Class:

a.   All persons residing in the United States who subscribe to "expanded basic cable" provided by one of the cable television or direct broadcast satellite television provider defendants within four (4) years of the date of the filing of this Complaint ("Class").  Expressly excluded from the Class are defendants and their subsidiaries, affiliates, officers, directors,

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 11 -

1    and employees.

2    31.  Certification of the Class is appropriate pursuant to Fed. R. Civ.

3 P. 23(a).  The members of the Class are so numerous that joinder of all

4 members would be impracticable.  There are millions of households who

5 subscribe to cable television or direct broadcast satellite television.

6    32.  There are common questions of law or fact, among others,

7 including:

8          a.    Have the defendants engaged in collaborative

9                 activity to preclude cable/satellite subscribers

10               from securing unbundled cable programming

11               apart from "basic" cable service;

12          b.    Whether, as a result of the antitrust violation

13                as set forth in this Complaint, plaintiffs and

14               the Class are entitled to damages, equitable

15               relief or other relief, and the amount and nature

16               of such relief;

17          c.    Whether defendants acted on grounds

18               generally applicable to the Class, making

19               injunctive relief appropriate;

20          d.    Whether a Class can be certified pursuant

21               to Fed. R. Civ. P. 23(b)(3); and

22          e.    Whether, alternatively, a Class can be

23               certified pursuant to Fed. R. Civ. P. 23(b)(2).

24    33.  Plaintiffs' claims are typical of the claims of the Class, because

25 plaintiffs and all members of the Class were injured economically by the

26 same wrongful practices of defendants described in this Complaint.

27 Plaintiffs' claims arise from the same practices and course of conduct that

28 gave rise to the claims of the Class members, and are based on the same

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 12 -

legal theories.  There is an economic or dollar value that can be assigned to the cable subscribers' right to choose the channels he/she wishes to buy.  The economic value of this right to choose is common to all Class members.  The only difference between plaintiffs and individual members of the Class could be the amount of overcharge sustained, under an alternative damage analysis and this difference does not bar or in any way impair class certification.

34.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs' interests are the same as, and not in conflict with, the other members of the Class.  Plaintiffs' counsel is experienced in class action and complex litigation.

35.  Questions of law or fact common to the members of the Class predominate and a class action is superior to other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by Class members are likely to be in the millions of dollars, the individual damages incurred by each Class member resulting from the wrongful conduct alleged are, as a general matter, too small to warrant the expense of individual suits.  The likelihood of individual members of the Class prosecuting separate claims is remote and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. Plaintiffs know of no difficulty to be encountered in the management of this

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 13 -

1 action that would preclude its maintenance as a class action and
2 certification of the Class under Rule 23(b)(3) is proper.

3       36. Relief concerning plaintiffs' rights under the laws herein alleged,
4 and with respect to the Class, would be proper. Defendants have acted or
5 refuse to act on grounds generally applicable to the Class, thereby making
6 appropriate final injunctive relief or corresponding declaratory relief with
7 regard to members of each Class as a whole and certification of the Class
8 under Rule 23(b)(2) is proper.

9 **V.**

10 **NATURE OF TRADE AND COMMERCE**

11       37. The relevant product market in this case is multichannel video
12 programming services licensed and/or sold through multichannel video
13 programming distributors ("MPVDs") including cable television distributors
14 (including those named as defendants), direct broadcast satellite
15 distributors (including those named as defendants), and
16 telecommunications/fiber optic distributors to the consuming public.

17       38. The relevant geographic market is the United States as a whole.
18 There may also be appropriate submarkets delineated primarily by the
19 geographic area in which a particular cable system in enfranchised to
20 operate. While the restraints alleged herein operate nationally, they do so
21 in two stages: the contractual restraints on all distributors operate
22 nationally and are then imposed both nationally and locally by the
23 distributors to the detriment of consumers as explained herein.

24       39. Cable providers and direct broadcast satellite providers may
25 lawfully supply a bundled service known as "basic cable" which means a
26 tier or group of programming services (channels) to which a subscription is
27 required for access to other "tiers" of cable service offered by the cable
28 distributor and direct broadcast satellite distributor defendants. Basic

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

*Printed on Recycled Paper*

1    cable includes the retransmission of local television broadcast signals and

2    public, educational and government access channels.

3        40.  In 1992, the Cable Consumer Protection and Competition Act

4    became law.  That legislation was designed, _inter alia_ ,to insure that

5    broadcast stations (the major networks owned by programmers defendants

6    named herein) would be compensated for the retransmission of those

7    broadcast channels (and other channels) on cable.  This retransmission

8    consent "morphed into the bludgeon used by media conglomerates to

9    ensure their ancillary cable networks get favorable distribution in exchange

10   for allowing cable companies the right to use their network affiliates'

11   broadcast signals." Forbes, December 13, 2004, p. 166.

12       41.  Each programmer defendant owns television program(s) and

13   some interest in one or more television channels.  (See Exhibit 1).   For

14   example, NBC (80% of which is owned by General Electric Company)

15   operates the NBC broadcast network as well as cable channels USA

16   Network (the number one rated cable channel), Bravo, MSNBC a 24- hour

17   news channel and the Spanish-language network Telemundo.  NBC also is

18   a major producer of programming, including, among others, the series

19   "Law and Order."  Defendant Viacom operates MTV Networks, including

20   MTV, MTV2, Nickelodeon (the top rated children's channel), Spike,

21   Comedy Central, BET Networks and others, and is also a major developer

22   of television programming including The Real World, Sponge Bob Square

23   Pants, South Park and others.  Defendant Disney owns and operates the

24   broadcast channel ABC Television Network and all ESPN related cable

25   channels and the Disney channel.  Disney is also a major producer of

26   television programming.  Defendant Fox owns and operates broadcast and

27   cable channels, including Fox News,  FX and Fox Sports Net.  Finally,

28   defendant Turner owns part of the broadcast channel WB Network, (now

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 15 -

CW), CNN, TBS, Turner Classic Films, Court TV and the leading film cable
channel HBO. Turner is also a major programmer for television. Each of
these programmers has a major broadcast channel (CBS, NBC, ABC,
FOX, CW) and each programmer has, as explained above, cable channels
which are deemed by the industry as absolutely necessary for a cable,
satellite or fiber optic distributor to have available for resale to the
consuming public. This market power gives each programmer
extraordinary leverage in "negotiating" with distributors. As defendant Dish
Network explained in recent comments to the FCC, "Broadcasters . . .[are]
capitalizing on their power over broadcast programming – to acquire and
create cable networks . . .[t]hese regulated entities have used their power
to alter fundamentally the wholesale programming market."

42. Accordingly, there is a high degree of vertical integration in that
defendants collectively own most of the significant broadcast and cable
channels and are the dominant producers of television programming. For
example, in Los Angeles there are about 60 channels that comprise the
basic and expanded basic cable tiers. Of those 60 channels, thirteen (13)
are entirely or partly owned by NBC/GE, nine (9) by Viacom, seven (7) by
Fox, eleven (11) by Disney; Turner and Liberty Media combined own
another sixteen (16) channels. In short, the programmer defendants have
exercised market power to dominate the "expanded basic tiers."

43. Each of the programmer defendants, NBC, Viacom, Disney, Fox
and Turner sells or licenses its unique, copyright programming or channels
to the cable, satellite and telecommunications/ fiber optic distributors. In
so doing, the programmers defendants require the distributors to purchase
its broadcast and cable channels in a bundled package ("forced bundling").
If distributors want access to the major broadcast channels and the leading
cable channels, e.g. USA, ESPN, CNN, etc., they must also acquire the

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

Printed on Recycled Paper

programmers' full line of cable channels.  This forced bundling is mandated by written contracts, which are contracts in restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), because they require the distributors to acquire properties which, if unbundled, either they would not acquire at all, or would separately negotiate channel-by-channel based upon consumer demand.  The FCC has determined that if channels were sold on an unbundled basis, consumers would pay considerably less than the forced bundled price that derives from the programmers' market power. This practice of "forced bundling" is done by each programmer with the knowledge and anticipation that each other major programmer will do likewise and each does so with the intention to eliminate or suppress competition among and between the programmer defendants. These practices have undermined consumer choice , inflated prices for "cable" television and eliminated competition among and between the distributors.

44.  When required to purchase bundled channels, all distributors, including those named as defendants, repackage these offerings and distribute them to the consuming public in bundled tiers of channels, usually some 50 or more channels.  The distributors, including those named as defendants, do so because they are expressly required to do so in their respective written contracts with the programmer defendants which often designate exactly where on the expanded basic tiers their owned channels are to be offered.  Moreover, the contracts of each programmer expressly prohibits (or may do so indirectly by nature of the pricing structure) each distributor, including those named as defendants, from offering consumers less than the "forced bundled" tiers, i.e., unbundled expanded basic cable television channels.  As set forth below, numerous industry participants have made clear that but for programmer coercion

Printed on Recycled Paper

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  derived from their market power, they would offer such unbundled cable

2  channels to consumers:

3  • **Comments and of Charles W. Ergen, Chairman and CEO of**

4  **defendant EchoStar and Echo Star:**

5  "Unfortunately, the largest programmers, particularly those that

6  own a big  network, have the muscle to control the way that pay television

7  providers offer programming to consumers.";

8  "In most instances, a single carriage agreement is signed [with

9  programmers] to carry all content of a particular media company. . . .Such

10  bundling of must-have and other content in a single deal is a

11  well-established problem in the industry. . . .

12  Programmers do not merely seek carriage on a system, they

13  limit how their content can and cannot be provided. . . .These restrictions

14  on how MVPDs [Multichannel Video Programming Distributors] present

15  their packages curtail the ability of MVPDs to design alternative

16  programming packages."

17  These tiering limitations *coupled with bundling obligations*

18  hamper our ability to differentiate our product.  (Emphasis added).

19  • **Comments of Charles Dolan, Chairman of defendant**

20  **Cablevision and Cablevision:**

21  "Fundamentally, [a la carte] would be better for the consumer";

22  "...we do not believe in the long term that selling programming a la carte

23  will be detrimental to either programmers or cable operators.";

24  • **Comments of Robert Quinn, Senior Vice President of AT&T**

25  **and AT&T:**

26  "We will be happy to offer a la carte programming as long as

27  we are able to obtain access to the programming in that manner."  Indeed,

28  AT&T and other telecommunications companies initially announced that

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 18 -

22

1   they intended to enter the market and compete for consumers by offering

2   smaller, custom tailored packages of channels for consumers.  Those

3   efforts have been stymied by the market power of the programmers.

4          ●   **Comments of the American Cable Association**:

5          This association is comprised of small cable companies

6   throughout the United States.  In its submission to the FCC, the

7   association explained "how wholesale tying and bundling profoundly shape

8   the channel offerings of small and medium-sized cable companies" and

9   further acknowledges that "[e]ither channels are directly tied or the

10   economic penalty for not carrying them forces bundled carriage."   It

11   concluded that "[c]urrent wholesale programming and retransmission

12   consent practices cause substantial public interest harms."

13          ●   **Comments of Broadband Service Providers Association**.

14          This association is comprised largely of telephone companies

15   that compete to display content through fiber optic lines.  This group

16   advised the FCC "[s]uch wholesale programming practices that include

17   tying and bundling of content and the required placement on particular tiers

18   constrain the way MVPDs can package their services to subscribers and

19   their ability to respond to consumer demand in their competitive MVPD

20   markets."

21          Other industry participants, including Verizon and Mediacom, as well

22   as many smaller cable companies, have also publicly stated that they

23   would offer unbundled programming to their subscribers if the

24   programmers would permit them to do so.   Many small cable companies

25   have testified that they are coerced by programmers into taking channels

26   they do not want, and forced to resell them to consumers who similarly do

27   not want certain channels.

28

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

*Printed on Recycled Paper*

1    The reason these distributors are forced into accepting bundled tiers

2    that limit their ability to engage in legitimate competition for consumers

3    based upon custom channel offerings is because the programmers

4    defendants' market power (derived from their ownership and control of the

5    major broadcast networks, cable networks and the copyrighted

6    programming contained therein) prevents distributors from rejecting the

7    demands of the programmer defendants.

8    Finally, in an editorial in the National Review Online dated November

9    30, 2007, the issue of unbundled programming was analyzed and the

10   editorial states in part as follows:

11   "All channels thus benefit from the bundling model, which

12   allows them to access households *that might not otherwise be*

13   *interested in their programming.* For this reason, TV

14   programmers have signed contracts with cable companies that

15   prohibit a la carte sales. ..." (Emphasis added).

16   45.  Unbundling of cable channels is technologically and

17   economically practicable because it is offered in numerous foreign

18   countries including England, Canada, India, Hong Kong and Singapore.

19   No cable or direct broadcast satellite provider in the United States offers

20   cable channels to consumer subscribers on an unbundled basis.  Aside

21   from "basic cable," many consumers are, because of this bundled tier

22   distribution method, forced to pay inflated prices for the channels they do

23   want and do watch.  For example, an estimated 40% of cable subscribers

24   have little or no interest in sports and yet are required to accept the several

25   ESPN programming channels which constitute a significant part (and cost)

26   of the bundled tiered package and inflate the price paid by consumers for

27   the channels that consumers really want.  This produces an economic

28   discrimination in price among and between consumers.  Cable rates have

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 20 -

1   more than doubled in the past ten years.  Most cable channels are not
2   actually watched by the subscriber.  According to a Nielsen Media
3   research report, the average cable subscriber is forced to pay for 85
4   channels that he/she does not watch in order to obtain the approximately
5   16 channels he/she does watch.  This produces economic price
6   discrimination among consumers.  According to an Associated Press-Ipsos
7   poll, 78% of respondents would prefer to choose and pay for their own
8   tailored selection of channels.  The second Federal Communications
9   Commission study on this subject calculates that there is a net consumer
10  welfare loss of about $100,000,000 resulting from the programmer-
11  distributor contracts.

## VI.

## <u>VIOLATIONS ALLEGED</u>

### Violations of Section 1 of the Sherman Act (15 U.S.C. §1)

15  46.  Paragraphs 1- 45 are incorporated herein by reference with the
16  same force and effect as though set forth at this point in full.

17  47.  The foregoing series of contracts between the programmer
18  defendants and the cable and direct broadcast satellite provider
19  defendants constitutes a series of contracts and/or combinations among
20  and between the named defendants which unreasonably restrain trade and
21  commerce in the relevant product market in the United States in violation
22  of Section 1 of the Sherman Act.

23  48.  Consumers, including the named plaintiffs and the putative
24  Class, have been injured in their business and property because they have
25  been deprived of choice, and have paid inflated and discriminatory prices
26  for cable television programming.

27  49.  Competition, including price competition at the consumer level
28  for multi-channel video programming services has been, and will continue

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

Printed on Recycled Paper

25

1   to be restrained, suppressed or eliminated as a result of the contracts and
2   combinations described herein.

3       50.  Competitors, actual and potential, have been, and will continue
4   to be, restrained from vigorously competing with one another for selling
5   and acquiring cable programming services as a result of the contracts and
6   combination described herein.

7       51.  As a direct result of the unlawful actions of defendants, and each
8   of them, plaintiffs and Class members have been deprived of choice and
9   have paid significantly more for cable and satellite subscriptions than they
10  would have in the absence of the illegal agreements.  As a result, plaintiffs
11  and the Class have suffered antitrust injury in an amount not presently
12  known with precision but which is, at a minimum, millions of dollars.

13                      **Prayer for Relief**

14      WHEREFORE, plaintiffs, on behalf of themselves and others
15  similarly situated, pray:

16      1.  That this matter be certified as a class action with the Class
17  defined as set forth above under Fed. R. Civ. P. 23(b)(3), or in the
18  alternative Fed. R. Civ. P. 23(b)(2), and that the named plaintiffs be
19  appointed Class Representatives and their attorneys be appointed Class
20  Counsel;

21      2.  That judgment be entered against defendants, and each of
22  them jointly and severally, for the treble damages as a result of defendants'
23  violations of Section 1 of the Sherman Act, and that plaintiffs be awarded a
24  reasonable attorneys' fee and the costs of suit as required by Section 4 of
25  the Clayton Act;

26      3.  That the Court enter an order requiring defendants, and
27  each of them, to immediately cease the wrongful conduct as set forth
28  above and specifically enjoining defendants from unlawfully bundling

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

*Printed on Recycled Paper*

expanded basic cable channels and ordering defendant cable providers
and direct broadcast satellite providers to notify their subscribers that they
each can purchase on an unbundled basis except for "basic cable"; and

        4. For such other and further relief as to the Court may seem
just and proper.

Dated: May 1, 2009                BLECHER & COLLINS, P.C.
                                  MAXWELL M. BLECHER
                                  DAVID W. KESSELMAN
                                  COURTNEY A. PALKO
                                  T. GIOVANNI (JOHN) ARBUCCI

By:                                
                              Maxwell M. Blecher
                              Attorneys for Plaintiffs

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 23 -

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury pursuant to the Federal Rules of Civil Procedure, Rule 38(b) and Local Rule 38-1.

Dated: May 1, 2009

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER
DAVID W. KESSELMAN
COURTNEY A. PALKO
T. GIOVANNI (JOHN) ARBUCCI

By_____
Maxwell M. Blecher
Attorneys for Plaintiffs

#38545

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

*Printed on Recycled Paper*

# EXHIBIT 1

# WHO OWNS WHAT

| NETWORK | OWNER |
|---------|-------|
| ESPN | DISNEY |
| NICKELODEON | VIACOM |
| ESPN2 | DISNEY |
| TNT | TIME-WARNER |
| SCI-FI CHANNEL | NBC-UNIVERSAL |
| CNN | TIME-WARNER |
| DISNEY | DISNEY |
| CNBC | NBC-UNIVERSAL |
| BRAVO | NBC-UNIVERSAL |
| USA | NBC-UNIVERSAL |
| MTV | VIACOM |
| AMC | RAIBOW MEDIA |
| FOX NEWS CHANNEL | NEWS CORP (FOX) |
| FX | NEWS CORP (FOX) |
| ABC FAMILY | DISNEY |
| MSNBC | NBC-UNIVERSAL |
| TV LAND | VIACOM |
| DISCOVERY | DISCOVERY |
| NFL | NFL |
| CARTOON NETWORK | TIME-WARNER |
| ANIMAL PLANET | DISCOVERY |
| HISTORY CHANNEL | A & E (WITH NBC AND DISNEY) |
| TLC (THE LEARNING CHANNEL) | DISCOVERY |
| TRAVEL | DISCOVERY |
| BET | VIACOM |
| SPIKE | VIACOM |
| COMEDY CENTRAL | VIACOM |
| HGTV (HOME & GARDEN) | E.W. SCRIPPS |
| E! | COMCAST (WITH DISNEY) |
| TBS | TIME-WARNER |
| VH1 | VIACOM |
| OXYGEN | OXYGEN |

| THE WEATHER CHANNEL | LANDMARK COMM. |
|---|---|
| LIFETIME | LIFETIME ENTERTAINMENT (THE HEARST CORPORATION AND DISNEY) |
| A&E | A&E (WITH NBC AND DISNEY) |
| FOOD NETWORK | E. W. SCRIPPS |
| HALLMARK | CROWN MEDIA |
| COURT TV | TIME-WARNER |
| COUNTRY MUSIC TELEVISION | VIACOM |
|  |  |

<u>PROOF OF SERVICE</u>

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen and not a party to the within action; my business address is 515 South Figueroa Street, Suite 1750, Los Angeles, California 90071.

On **May 1, 2009**, I served the foregoing document(s) described as: **STIPULATION REGARDING FILING OF PLAINTIFFS' THIRD AMENDED COMPLAINT AND SETTING FORTH FORECLOSURE MOTION PROCEDURE** on the interested parties in this action as follows:

<u>Mailing Information for Case 8:04-cv-01455-CJC-AJW</u>
✔ (By CM/ECF): Pursuant to the Court's electronic filing and service system, a copy will be transmitted to the registered users.

**Manual Notice List**:  The following is the list of attorneys who are not on the list to receive e-mail notices for this case (who therefore require manual noticing).

Wyatt Evan Bloomfield
Gibson Dunn and Crutcher
333 South Grand Avenue
Los Angeles, CA 90071

☐ (By E-Mail): Pursuant to agreement by the parties, the foregoing document was transmitted via electronic mail to the addressee(s) indicated above.

✔ (By Mail): As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after deposit for mailing affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

EXECUTED ON **May 1, 2009**, at Los Angeles, California.

_____
Lorelei L. Gerdine

# EXHIBIT D

REDACTED -- FOR PUBLIC INSPECTION

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

DATE STAMP AND RETURN

|  |  |
|---|---|
| In the Matter of | ) |
|  | ) |
|  | ) |
| AT&T Services, Inc. and Southern New | ) |
| England Telephone Company d/b/a | ) |
| AT&T Connecticut, | ) |
|  | ) |
| Complainants, | ) |
|  | ) |
| v. | ) |
|  | ) |
| Madison Square Garden, L.P. and | ) |
| Cablevision Systems Corp., | ) |
|  | ) |
| Defendants | ) |
|  | ) |

File No. CSR-8196-P

FILED/ACCEPTED

SEP 1 7 2009

Federal Communications Commission
Office of the Secretary

## ANSWER TO PROGRAM ACCESS COMPLAINT

David Ellen
Michael E. Olsen
Cablevision Systems Corp.
1111 Stewart Avenue
Bethpage, NY 11714
(516) 803-2300

Lucinda Treat
Adam Levine
Madison Square Garden, L.P.
Two Penn Plaza
Eighth Floor
New York, NY 10121
(212) 465-6000

Howard J. Symons
Christopher J. Harvie
Ernest C. Cooper
Stefanie Z. Desai
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
701 Pennsylvania Avenue, N.W.
Suite 900
Washington, DC 20004
(202) 434-7300
hjsymons@mintz.com
cjharvie@mintz.com
ecooper@mintz.com
szdesai@mintz.com

Mark S. Popofsky
Ropes & Gray LLP
700 12th Street, NW, Suite 900
Washington, DC 20005
202-508-4600
Mark.Popofsky@ropesgray.com

September 17, 2009

## TABLE OF CONTENTS

ANSWER TO PROGRAM ACCESS COMPLAINT .................................................. 1

INTRODUCTION AND SUMMARY ..................................................................... 2

FACTUAL OVERVIEW ........................................................................................ 9

    A. Launch of MSG HD and MSG+ HD ........................................................ 9

    B. Terrestrial Distribution of MSG HD and MSG+ HD to Other MVPDs .............. 12

    C. AT&T's Entry into the Connecticut Market and Its Negotiations with MSG ...... 13

    D. Competition in the Video Marketplace .................................................. 15

ARGUMENT ...................................................................................................... 18

I.    THE CLAIMS IN THE COMPLAINT ARE BARRED BY THE TERMS OF THE
      OCTOBER 17, 2007 RELEASE EXECUTED BY AT&T ...................................... 18

II.   THE PROGRAMMING AT ISSUE IS TERRESTRIAL AND THEREFORE NOT
      SUBJECT TO THE PROGRAM ACCESS REQUIREMENTS .............................. 20

    A. The Complaint Seeks to Improperly Circumvent the Pending Commission
       Proceeding Addressing Access to Terrestrial Programming ............................. 21
    B. The Commission's Prior Rulings Make Clear that the Ambit of Section 628 Is
       Limited to "Satellite Cable Programming." ............................................... 23

III.  DEFENDANTS HAVE NOT ENGAGED IN UNFAIR METHODS OF
      COMPETITION IN VIOLATION OF SECTION 628(b) ...................................... 25

    A. As a Matter of Law, Denial of Access to Terrestrial Programming Cannot
       Constitute an Unfair Practice that Violates Section 628(b) ............................. 26
    B. The D.C. Circuit's Decision in *NCTA v. FCC* Provides No Basis for Departing
       From Commission Precedent Holding that Section 628(b) Does Not Reach Lack
       of Access to Terrestrial Programming .................................................... 29
    C. AT&T Has Not – and Cannot – Demonstrate that Defendants' Decision Not to
       License MSG HD and MSG+ HD Violates Section 628(b) ............................. 33
    D. Neither Antitrust Law nor Economics Support AT&T's Claims ........................ 57

IV.  DEFENDANTS' REFUSAL TO LICENSE MSG HD AND MSG+ HD TO AT&T
      DOES NOT VIOLATE SECTION 628(c) ...................................................... 63

V.   DEFENDANTS HAVE NOT UNLAWFULLY EVADED THE PROGRAM
      ACCESS RULES ..................................................................................... 69

VI.  DEFENDANTS HAVE NOT VIOLATED THE "UNDUE INFLUENCE"
      PROVISION OF THE PROGRAM ACCESS RULES ......................................... 72

VII. DEFENDANTS HAVE NOT ENGAGED IN UNLAWFUL DISCRIMINATION BY
      DECLINING TO PROVIDE AT&T A LICENSE FOR MSG HD AND MSG+ HD 76

VIII. FORCED SHARING IS UNNECESSARY IN THE INSTANT CASE BECAUSE
COMPETITION HAS TAKEN FIRM ROOT IN THE AREAS WHERE
CABLEVISION COMPETES WITH AT&T ............................................................ 80

IX.   AT&T'S REQUEST FOR PENALTIES SHOULD BE DENIED............................. 82

IX.   RESPONSES TO NUMBERED PARAGRAPHS ...................................................... 83

CONCLUSION............................................................................................................................ 90

VERIFICATION............................................................................................................................ 1

CERTIFICATE OF SERVICE ....................................................................................................... 2

REDACTED -- FOR PUBLIC INSPECTION

## EXHIBIT 1

Jeremy I. Bulow and Bruce M. Owen, *Analysis of Competition and Consumer Welfare Issues in AT&T's Program Access and 628(b) Complaint Against Cablevision and Madison Square Garden*

REDACTED -- FOR PUBLIC INSPECTION

### Analysis of Competition and Consumer Welfare Issues in AT&T's Program Access and 628(b) Complaint Against Cablevision and Madison Square Garden

By Jeremy I. Bulow and Bruce M. Owen[1]

Cablevision Systems Corp. ("Cablevision") and Madison Square Garden L.P. ("MSG") have asked us to analyze from an economic perspective the AT&T complaint regarding the decision of Cablevision/MSG not to license its terrestrially-delivered MSG HD and MSG+ HD program services to AT&T for distribution to its U-verse subscribers in Connecticut. In its complaint, AT&T argues that this decision is anticompetitive because the lack of a license for MSG HD and MSG+ HD reduces AT&T's ability to provide a competing video service.[2]

We analyze these claims and conclude that:

1. AT&T provides no evidence of harm to consumers or to competition from the alleged refusal of Cablevision/MSG to provide MSG HD and MSG+ HD.

   a. MSG HD and MSG+ HD are not essential to successful entry or to the competitive effectiveness of MVPDs in Connecticut.

   b. AT&T does not demonstrate that either Cablevision or MSG has monopoly power.

   c. The fact that MSG HD and MSG+ HD are licensed to Cablevision's direct competitors DirecTV and RCN is strong evidence that there is no barrier here to efficient transactions, and therefore no need for compulsion. Conversely, the absence of a

---

[1] Jeremy Bulow is the Richard A. Stepp Professor of Economics at Stanford Business School. He served as the Director of the Bureau of Economics of the Federal Trade Commission from 1998-2001. Bruce Owen is the Morris M. Doyle Centennial Professor in Public Policy at Stanford. He served as chief economist of the Antitrust Division of the U.S. Department of Justice from 1979-1981.

[2] *AT&T Services, Inc. and Southern New England Telephone Company D/B/A AT&T Connecticut v. Madison Square Garden, L.P. and Cablevision Systems Corp.,* Program Access and Section 628(b) Complaint ("Complaint"), August 13, 2009.

REDACTED -- FOR PUBLIC INSPECTION

deal with AT&T therefore does not stand as evidence of anticompetitive purpose or effect.

2.  AT&T fails to demonstrate that Cablevision/MSG's strategy has anti-competitively harmed AT&T.

3.  There are important potential consumer welfare benefits from permitting Cablevision/MSG the freedom to pursue a competitive strategy of licensing its content to some competing distributors but not others. These potential benefits include—

    a.  Increased product differentiation, leading to a greater variety of video content and related services in the marketplace, resulting in services attuned to a wider variety of consumer tastes, and

    b.  Increased producer incentives to invest in the future innovative services, product attributes, and content that consumers value most highly.

### 1. Competition Analysis of AT&T's Complaint

An examination of the complaint and the available facts rules out the possibility that Cablevision/MSG's terrestrial exclusivity policy (vis-à-vis AT&T—as explained below, it is a selective licensing strategy, not a general policy) is harmful to competition. The fact that MSG HD and MSG+ HD are licensed to Cablevision's direct competitors DirecTV and RCN is strong evidence that there is no barrier here to efficient transactions, and therefore no need for compulsion. Conversely, the absence of a transaction between Cablevision/MSG and AT&T for the licensing of MSG HD or MSG HD+ therefore does not stand as evidence of anticompetitive purpose or effect.

The purpose of selective licensing is to permit Cablevision/MSG to differentiate its product from that of its closest competitors. Product differentiation is competition in "product space," and is

2

REDACTED -- FOR PUBLIC INSPECTION

[[end highly

confidential]].

In effect, then, AT&T's own data demonstrate that it enjoys [[begin highly confidential]]
[[end highly confidential]] *more* overall video sales per living unit passed in
Connecticut and [[begin highly confidential]]          [[end highly confidential]] *more*
HD sales per living unit passed in the state.  This is hardly evidence that AT&T has been badly
harmed in Connecticut and that it has been deprived of a "must have" product.

AT&T's only quantitative measure of injury is therefore meaningless. Just looking at AT&T's HD
penetration rate in Connecticut does not say anything about its *overall* penetration rate, and
AT&T's absolute success is what matters for the viability of the business.  Even a statistically
significant finding of some properly-measured effect on AT&T would not be sufficient to
indicate either the direction or the magnitude of the consumer welfare consequences, and
would merely underline the necessity for a consumer welfare measurement.

Furthermore, one of the reasons that AT&T may be doing relatively less well in selling to HD
customers in Connecticut than it is doing in terms of overall customer acquisition is
Cablevision's aggressive strategy of offering over 60 HD channels free to subscribers, compared
to AT&T's requirement that consumers pay a minimum of $10 more to receive HD. This pro-
consumer action by Cablevision would be expected to increase its relative share of customers
who upgrade to HD, relative to other markets where AT&T's cable competition may not
undertake such a pro-consumer strategy.

### c.     *AT&T's Claims of Unfair Competition*

AT&T claims that Cablevision/MSG's decision to license some distributors but not to license
AT&T qualifies as unfair competition and that an anticompetitive effect can be strongly inferred
from Cablevision/MSG's "sacrificing the short-term benefits" of licensing MSG and MSG+ in HD

REDACTED -- FOR PUBLIC INSPECTION

format to AT&T.[14] In fact, no evidence has been provided that Cablevision/MSG is sacrificing even short-term benefits. The decision not to accept AT&T's offer for the MSG HD and MSG+ HD rights means that Cablevision must live with **[[begin highly confidential]]**

**[[end highly confidential]]**, but Cablevision presumably believes the decision will yield immediate revenue increases because distinguishing itself from competitors will attract additional subscribers, and those additional subscribers will be more profitable to it than **[[begin highly confidential]]**

**[[end highly confidential]]**. No evidence has been provided, and it is facially implausible, that this decision will be profitable for Cablevision/MSG only in the long run by eliminating AT&T and other MVPDs as effective competitors.

AT&T also makes a claim that by denying it access to MSG HD and MSG+ HD Cablevision/MSG is requiring AT&T to engage in two-level entry.[15] But even taking the first level as HD RSNs, AT&T clearly is not foreclosed from competing because it has access to numerous such RSNs – and even with respect to the games specific to MSG, AT&T is not foreclosed because it has access to those games through its license to distribute MSG and MSG+.

AT&T cites Cablevision advertising that tells consumers that some competitors, including AT&T, do not offer MSG HD and MSG+ HD.[16] Even if it is true (as Cablevision hopes) that this difference makes Cablevision more attractive to consumers, it does not address the question of whether AT&T is precluded from providing alternative channel line-ups (and other services) that produce equivalent overall consumer welfare in the marketplace.

In 1992 Congress was concerned that vertically integrated cable operators, then the only distributors of retail "multichannel" video program services ("MVPDs"), would refuse to license programming under their control to direct broadcast satellite ("DBS") providers, the first of

---

[14] Complaint at ¶¶62, 70.

[15] Complaint at ¶73.

[16] Complaint at ¶¶62, 70-72.

REDACTED -- FOR PUBLIC INSPECTION

which were about to launch. The circumstances today are far different. As the D.C. Circuit recently observed in the course of vacating the Commission's cable ownership limit,

> [T]he record is replete with evidence of ever increasing competition among video providers: Satellite and fiber optic video providers have entered the market and grown in market share since the Congress passed the 1992 Act, and particularly in recent years. Cable operators, therefore, no longer have the bottleneck power over programming that concerned the Congress in 1992. Second, over the same period there has been a dramatic increase both in the number of cable networks and in the programming available to subscribers. . . . [There is] overwhelming evidence concerning 'the dynamic nature of the communications marketplace' 47 U.S.C § 533(f)(2)(E), and the entry of new competitors at both the programming and the distribution levels . . . .[17]

Today any given viewer can still be reached through the incumbent cable operator. But now the same viewer also can be reached via one (or in some cases two) cable operators, plus the local telephone company and two competing DBS systems (DirecTV and DISH)—bringing the number of competitors to at least four. Online video distribution is growing and wireless (3G and future 4G) distribution of video increasingly offers additional viewer alternatives.[18] In short, the

---

[17] Comcast Corporation v. F.C.C., D.C. Circuit No. 08-1114, August 28, 2009 slip op. at 14.

[18] The success of the iPhone, associated exclusively with AT&T 3G wireless service and including video content, is well-known. Verizon also offers wireless mobile video services (V Cast). (See http://support.vzw.com/faqs/V%20CAST/faq.html#item1.) YouTube is said to be in negotiations to add subscription-based motion picture content to its service, which is available on the iPhone as well as online. New York Times Online, September 3, 2009 http://www.nytimes.com/2009/09/03/technology/internet/03tube.html?scp=2&sq=youtube&st=cse Content providers are supplying increasing quantities of video service online. "More than a dozen TV networks— including broadcaster CBS Corp.— agreed to join Comcast Corp.'s nationwide test of an online-video subscription offering, as companies seek additional revenue streams amid the advertising slump." Nat Worden, TV Networks Join Comcast Web Test, WALL

REDACTED -- FOR PUBLIC INSPECTION

market in which cable operators compete with other video distribution channels has become at least as competitive in structure as the vast majority of commercial enterprise in the United States.

In summary, AT&T has not shown that Cablevision/MSG's conduct falls within established economic principles condemning anticompetitive behavior, constitutes an unfair method of competition, or hinders significantly AT&T's ability to compete; much less has AT&T demonstrated harm to consumers.

### 3. Consumer Benefits of Exclusivity

AT&T argues that Cablevision/MSG should be ordered to make its MSG HD and MSG+ HD services available to Cablevision's competitor, AT&T, at a reasonable price, on the grounds that AT&T is otherwise significantly hindered as a competitor. AT&T also claims that Cablevision/MSG's conduct has no efficiency rationale—i.e., that there are no benefits for consumers.

AT&T's complaints notwithstanding, it does not make sense from the perspective of sound economic policy for the Commission to require Cablevision/MSG to make the MSG HD programming services available to Cablevision's competitor, AT&T, at a regulated "reasonable" price. To do so could be anticompetitive (i.e., harmful to consumer welfare) because it would mandate a transaction that might be inefficient at the required price, or possibly at any price. Such a requirement also has the potential to affect pricing, investment, and innovation decisions in video distribution and related businesses.

Requiring firms to engage in such inefficient transactions discourages competition in the important dimension of programming content differentiation among MVPDs and among content providers. Indeed, the discretion to choose one's distribution channels, up to and

STREET JOURNAL ONLINE July 15, 2009 at
http://online.wsj.com/article/SB124760866232541453.html.