UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
CABLEVISION SYSTEMS CORPORATION    :
and CSC HOLDINGS, LLC,                   :  Case No.: 13 CIV 1278 (LTS)(JLC)
                                           :
             Plaintiffs,             :
                                         :  **REDACTED PUBLIC VERSION**
                 vs.                  :
                                         :
VIACOM INTERNATIONAL INC. and BLACK   :
ENTERTAINMENT TELEVISION LLC,     :
                                       :
             Defendants.        :
-----------------------------------------------------------------x

## ANSWER AND COUNTERCLAIMS OF VIACOM INTERNATIONAL AND BLACK ENTERTAINMENT TELEVISION TO THE AMENDED COMPLAINT

Joseph F. Tringali
David Elbaum
Peri L. Zelig
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000

*Attorneys for Defendants*

Kenneth R. Logan,

*Of Counsel.*

Defendants Viacom International Inc. and Black Entertainment Television LLC (collectively, "Viacom"), by their undersigned attorneys, hereby state their answer to the Amended Complaint filed by Plaintiffs Cablevision Systems Corporation and CSC Holdings, LLC (collectively, "Cablevision").

1.      Viacom denies the allegations contained in Paragraph 1 to the extent such allegations concern or are directed against Viacom, except admits that it offers licensing rights to programming services such as Nickelodeon, Comedy Central, BET, and MTV and further admits that it at times refers to some of its programming services as "Core" services and some of its programming services as "Suite" services.  To the extent the allegations state a legal conclusion, such allegations do not require a response.

2.      Viacom denies the allegations contained in Paragraph 2, except admits that it at times refers to certain of its programming services as "Core" services and that Nickelodeon, Comedy Central, BET, MTV, VH1, TV Land, MTV2, and Spike TV have at one time or another been referred to as "Core" services, and that Viacom has the exclusive right to distribute those services.

3.      Viacom denies the allegations contained in Paragraph 3, except admits that Cablevision competes against both established and new distributors of video services.

4.      Viacom denies the allegations contained in Paragraph 4, except admits that it at times refers to certain of its programming services as "Suite" services and that Centric, CMT, CMT Pure Country, Logo, MTV Hits, MTV Jams, Nick Jr., Nick 2, Nicktoons, Palladia, Teen Nick, Tr3s, VH1 Classic, and VH1 Soul have at one time or another been referred to as "Suite" services, and that Viacom distributes such services.

5.      Viacom denies the allegations contained in Paragraph 5, except admits that reasonable alternatives to Viacom's Suite Networks abound as is true of Viacom's Core Networks as well.

6.      Viacom denies the allegations contained in Paragraph 6, except admits that in ▮▮▮ it entered into a licensing agreement with Cablevision that expired on ▮▮▮▮▮▮▮▮ ▮▮ .

7.      Viacom denies the allegations contained in Paragraph 7, except admits that it was involved in negotiations with Cablevision regarding a licensing agreement in 2012. To the extent the allegations concern Cablevision's beliefs, Viacom lacks knowledge of Cablevision's beliefs, and on that basis denies those allegations.

8.      Viacom denies the allegations contained in Paragraph 8, except admits that Cablevision and Viacom negotiated regarding the carriage of the Core and Suite Services, including the licensing fees to be charged, under various scenarios.

9.      Viacom denies the allegations contained in Paragraph 9, except admits that it entered into a licensing agreement with Cablevision on December 31, 2012.

10.      Viacom denies the allegations contained in Paragraph 10, to the extent such allegations concern or are directed against Viacom, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 10, including Cablevision's network capacity and budget for acquiring programming, and on that basis denies those allegations. To the extent the allegations state a legal conclusion, such allegations do not require a response.

11.      Viacom denies the allegations contained in Paragraph 11 to the extent such allegations concern or are directed against Viacom, and lacks knowledge or information

sufficient to form a belief as to the remaining allegations, and on that basis denies those allegations. To the extent Cablevision's allegations state a legal conclusion, no response is required.

12.     Viacom denies the allegations contained in Paragraph 12 to the extent such allegations concern or are directed against Viacom, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 12, and on that basis denies those allegations.

13.     Viacom denies the allegations contained in Paragraph 13, except admits that it at times refers to some of its programming services as "Core" services and some of its programming services as "Suite" services and that certain Core and Suite services are carried by several leading U.S. video distributors. To the extent the allegations state a legal conclusion, no response is required.

14.     Viacom denies the allegations contained in Paragraph 14 to the extent such allegations concern or are directed against Viacom, and lacks knowledge or information sufficient to form a belief as to what other distributors confirmed to Cablevision, and on that basis denies those allegations.

15.     Viacom denies the allegations contained in Paragraph 15. To the extent the allegations state a legal conclusion, no response is required.

16.     Viacom denies the allegations contained in Paragraph 16, except admits that Cablevision purports to seek the relief listed in the third sentence of Paragraph 16. To the extent the allegations state a legal conclusion, no response is required.

17.     Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17, and on that basis denies those allegations.

18.     Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18, and on that basis denies those allegations.

19.     Viacom denies the allegations contained in Paragraph 19, to the extent such allegations concern or are directed against Viacom, except admits that Viacom International Inc. is a Delaware corporation with its principal place of business located at 1515 Broadway, New York, New York; that Viacom Media Networks is a division of Viacom International Inc.; and that Viacom Media Networks was formerly known as MTV Networks and is involved with Viacom International Inc.'s media network business.

20.     Viacom admits that Black Entertainment Television LLC is a subsidiary of Viacom Inc. (the parent corporation of Viacom International Inc.) and is a Washington, D.C. limited liability company with its principal place of business located at 1235 W Street Northeast, Washington, District of Columbia.

21.     Viacom denies the allegations contained in Paragraph 21, to the extent such allegations concern or are directed against Viacom, except admits that it at times refers to some of its programming services as "Core" services and some of its programming services as "Suite" services and further admits that it entered into a licensing agreement with Cablevision in December 2012.

22.     Viacom admits that Cablevision purports to bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and seeks damages and injunctive relief pursuant to 15 U.S.C. §§ 15(a) and 26, and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  Viacom avers that the allegations contained in the second and third sentences of Paragraph 22 state legal conclusions to which no response is required.

23. Viacom avers that the allegation contained in Paragraph 23 states a legal conclusion to which no response is required, except admits that Viacom transacts business in this District.

24. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24, and on that basis denies those allegations.

25. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25, and on that basis denies those allegations.

26. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26, and on that basis denies those allegations, except admits that Cablevision faces competition from other video distributors, Internet-based multi-channel services, and free streaming platforms.

27. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27, and on that basis denies those allegations, except admits that Cablevision licenses networks from Viacom.

28. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28, and on that basis denies those allegations.

29. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29, and on that basis denies those allegations.

30. Viacom denies the allegations contained in Paragraph 30, to the extent such allegations concern or are directed against Viacom. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 30, and on that basis denies those allegations.

31.    Viacom denies the allegations contained in Paragraph 31, to the extent such allegations concern or are directed against Viacom.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 31, and on that basis denies those allegations.

32.    Viacom denies the allegations contained in Paragraph 32, to the extent such allegations concern or are directed against Viacom.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 32, and on that basis denies those allegations.

33.    Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33, and on that basis denies those allegations.

34.    Viacom denies the allegations contained in Paragraph 34, to the extent such allegations concern or are directed against Viacom. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 34, and on that basis denies those allegations.

35.    Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35, and on that basis denies those allegations.

36.    Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36, and on that basis denies those allegations.

37.    Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37, and on that basis denies those allegations.

38.    Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38, and on that basis denies those allegations.

39.    Viacom denies the allegations contained in Paragraph 39. To the extent the allegations state a legal conclusion, no response is required.

40.    Viacom denies the allegations contained in Paragraph 40, except admits that it offers licensing rights to programming services such as Nickelodeon, Comedy Central, BET, and MTV. To the extent the allegations purport to state a legal conclusion, no response is required.

41.    Viacom denies the allegations contained in Paragraph 41, except admits that it offers licensing rights to programming services such as Nickelodeon and further admits that Nickelodeon's programming has at one time or another included programs such as *SpongeBob SquarePants*, *The Fairly Oddparents*, *Victorious*, *Dora the Explorer*, *Teenage Mutant Ninja Turtles*, and *Supah Ninjas*. Viacom refers to Exhibit A of the 2012 Agreement at 8(b) for a further description of Nickelodeon.

42.    Viacom denies the allegations contained in Paragraph 42, except admits that in exchange for the right to distribute and have access to certain of Viacom's services, Cablevision is charged fees, that the cited per subscriber fees for Nickelodeon were charged in ███, ███, ███ and ███, and that the Nickelodeon rate card per subscriber fee for ███ and ███ is correctly stated. Viacom further admits that Nickelodeon is carried by several leading U.S. video distributors and refers to the 2012 Agreement for a full statement of its terms. To the extent the allegations state a legal conclusion, no response is required.

43.    Viacom denies the allegations contained in Paragraph 43, except admits that it offers licensing rights to programming services such as Comedy Central and further admits that Comedy Central's programming has at one time or another included programs such as *The Daily Show with Jon Stewart*, *The Colbert Report*, *Tosh.0*, *Key & Peele*, *South Park*,

*Futurama*, and *Workaholics*. Viacom refers to Exhibit A of the 2012 Agreement at 8(f) for a fuller description of Comedy Central.

44.    Viacom denies the allegations contained in Paragraph 44, except admits that in exchange for the right to distribute and have access to certain of Viacom's services, Cablevision is charged fees, the cited per subscriber fees for Comedy Central in ███, ███ and ███ were charged, and the cited Comedy Central rate card fee is correctly stated for ███ and ███. Viacom further admits that Comedy Central is carried by several leading U.S. video distributors and refers to the 2012 Agreement for a full statement of its terms. To the extent the allegations state a legal conclusion, no response is required.

45.    Viacom denies the allegations contained in Paragraph 45, except admits that it offers licensing rights to programming services such as BET and further admits that BET's programming has at one time or another included programs such as *Reed Between the Lines*, *Everybody Hates Chris*, *Girlfriends*, *The Sheards*, *The Game*, *Keyshia & Daniel: Family First*, *Rip the Runway 2013*, *Real Husbands of Hollywood*, *Baldwin Hills*, *106 & Park*, the *BET Awards*, *BET Honors*, *Black Girls Rock*, the *BET Hip Hop Awards*, *Sunday Best*, and the *Soul Train Awards*. Viacom refers to Exhibit A of the 2012 Agreement at 8(b) for a fuller description of BET.

46.    Viacom denies the allegations contained in Paragraph 46, except admits that in exchange for the right to distribute and have access to certain of Viacom's services, Cablevision is charged fees, and that the cited per subscriber fees for BET were charged in ███, ███ and ███. Viacom further admits that BET is carried by several leading U.S. video distributors and refers to the 2012 Agreement for a full statement of its terms. To the extent the allegations state a legal conclusion, no response is required.

47.     Viacom denies the allegations contained in Paragraph 47, except admits that it offers licensing rights to programming services such as MTV and further admits that MTV's programming has at one time or another included programs such as *Jersey Shore, Teen Mom, 16 and Pregnant, Money From Strangers, The Real World, Awkward., Teen Wolf,* the *MTV Video Music Awards,* and the *MTV Movie Awards.* Viacom refers to Exhibit A of the 2012 Agreement at 8(a) for a fuller description of MTV.

48.     Viacom denies the allegations contained in Paragraph 48, except admits that in exchange for the right to distribute and have access to certain of Viacom's services, Cablevision is charged fees, the cited per subscriber fees for ██, ██ and ██ were charged, and the MTV rate card fee in ██ and ██ was as cited. Viacom further admits that MTV is carried by several leading U.S. video distributors and refers to the 2012 Agreement for a full statement of its terms. To the extent that the allegations purport to state a legal conclusion, no response is required.

49.     Viacom denies the allegations contained in Paragraph 49, except admits that it possesses intellectual property rights over the programming services it offers that, among other things, confer on Viacom certain exclusive rights to license or otherwise distribute those services. To the extent the allegations purport to state a legal conclusion, no response is required.

50.     Viacom denies the allegations contained in Paragraph 50, to the extent such allegations concern or are directed against Viacom, and lacks knowledge of information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 50, and on that basis denies those allegations.

51.     Viacom denies the allegations contained in Paragraph 51, except admits that it at times refers to some of its programming services as "Core" services and some of its programming services as "Suite" services and further admits that it offers licensing rights to programming services such as MTV, Nickelodeon, Comedy Central, and BET. Viacom further admits that its Media Networks segment, which operates the "Core" and "Suite" services, incurs programming-related expenses, and that it has reported intending to spend approximately $3 billion on programming expenses in 2012.

52.     Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 52, and on that basis denies those allegations.

53.     Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53, and on that basis denies those allegations.

54.     Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 54, and on that basis denies those allegations.

55.     Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 55, and on that basis denies those allegations.

56.     Viacom denies the allegations and/or lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 56, and on that basis denies those allegations, except admits that the Disney Channel is a network affiliated with the Walt Disney Company.

57.     Viacom denies the allegations contained in Paragraph 57, to the extent such allegations concern or are directed against Viacom, except admits that it offers licensing rights to programming services such as MTV, for which it has incurred programming-related

expenses. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 57 and on that basis denies those allegations.

58. Viacom denies the allegations contained in Paragraph 58, to the extent such allegations concern or are directed against Viacom, and lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 58.

59. Viacom denies the allegations contained in Paragraph 59, to the extent such allegations concern or are directed against Viacom, and lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 59. To the extent such allegations purport to state a legal conclusion, no response is required.

60. Viacom denies the allegations contained in Paragraph 60. To the extent such allegations purport to state a legal conclusion, no response is required.

61. Viacom denies the allegations contained in Paragraph 61, except admits that several U.S. video distributors distribute what are defined as Viacom's Core services in the 2012 Agreement. To the extent such allegations purport to state a legal conclusion, no response is required.

62. Viacom denies the allegations contained in Paragraph 62. To the extent such allegations purport to state a legal conclusion, no response is required.

63. Viacom denies the allegations contained in Paragraph 63. To the extent such allegations purport to state a legal conclusion, no response is required.

64. Viacom denies the allegations contained in Paragraph 64, to the extent such allegations concern or directed against Viacom, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 64. To the extent the allegations purport to state a legal conclusion, no response is required.

65.     Viacom denies the allegations contained in Paragraph 65, except admits that it offers licensing rights to programming services such as Nickelodeon for a fee that depends on several factors.

66.     Viacom denies the allegations contained in Paragraph 66.  To the extent such allegations purport to state a legal conclusion, no response is required.

67.     Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67, and on that basis denies those allegations, except admits that the Disney Channel is affiliated with the Walt Disney Company and is a network that offers certain children- and teen-oriented programming that has at one time or another included programs such as *A.N.T. Farm*, *Good Luck Charlie*, *Jessie*, *Shake It Up*, and *Austin & Ally*.

68.     Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 68, and on that basis denies those allegations, except admits that the Cartoon Network is affiliated with the Time Warner Company and is a network that offers certain animated-related programming that has at one time or another included programs such as *Adventure Time*, *Ben 10*, *Destroy Build Destroy*, *Dude, What Would Happen?*, *Generator Rex*, *Hole in the Wall*, and *MAD*.

69.     Viacom denies the allegations contained in Paragraph 69, except admits that the Disney Channel, Cartoon Network, PBS, Sprout, Disney Junior, and Nick Jr. offer certain children-related programming, among other things.

70.     Viacom denies the allegations contained in Paragraph 70, except admits that The Hub and Disney XD offer certain children-related programming, among other things.

71.     Viacom denies the allegations contained in Paragraph 71, except admits that ABC Family offers certain children-related programming, among other things.

72.     Viacom denies the allegations contained in Paragraph 72, to the extent such allegations concern or are directed against Viacom, except admits that Nickelodeon is carried by several U.S. video distributors.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 72, and on that basis denies those allegations.

73.     Viacom denies the allegations contained in Paragraph 73, except refers to the article quoted and cited therein for a true and complete statement of its entire contents.

74.     Viacom denies the allegations contained in Paragraph 74.  To the extent such allegations purport to state a legal conclusion, no response is required.

75.     Viacom denies the allegations contained in Paragraph 75, except admits that it offers licensing rights to programming services such as Comedy Central for a fee that depends on several factors.

76.     Viacom denies the allegations contained in Paragraph 76.  To the extent such allegations purport to state a legal conclusion, no response is required.

77.     Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77, and on that basis denies those allegations, except admits that Adult Swim is a network that offers programming that has at one time or another included programs such as *Aqua Unit Patrol Squad 1*, *Childrens Hospital*, *Delocated*, *Eagleheart*, *Metalocalypse*, *Superjail!*, *NTSF: SD:SUV:*, *Robot Chicken*, and *Squidbillies*.

78. Viacom denies the allegations contained in Paragraph 78, except admits that FX, the Independent Film Channel, TBS, and Comedy.tv offer certain comedy-related programming, among other things.

79. Viacom denies the allegations contained in Paragraph 79, except admits that the USA Network and TNT offer certain comedy-related programming, among other things.

80. Viacom denies the allegations contained in Paragraph 80, to the extent such allegations concern or are directed against Viacom, except admits that Comedy Central is carried by several U.S. video distributors. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 80, and on that basis denies those allegations. To the extent the allegations purport to state a legal conclusion, no response is required.

81. Viacom denies the allegations contained in Paragraph 81, to the extent such allegations concern or are directed against Viacom, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 81, and on that basis denies those allegations. To the extent the allegations purport to state a legal conclusion, no response is required.

82. Viacom denies the allegations contained in Paragraph 82, except admits that it offers licensing rights to programming services such as BET for a fee that depends on several factors.

83. Viacom denies the allegations contained in Paragraph 83. To the extent the allegations purport to state a legal conclusion, no response is required.

84. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84, and on that basis denies those allegations,

14

except admits that TV One is a network that offers programming that has at one time or another included programs such as *R&B Divas*, *Unsung*, *The Rickey Smiley Show*, and *Celebrity Crime Files*.

85. Viacom denies the allegations contained in Paragraph 85.

86. Viacom denies that GMC is not a reasonable substitute for and does not belong in the same market as BET or TV One, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 86, and on that basis denies those allegations, except admits that GMC is a network affiliated with InterMedia Partners that offers programming that has at one time or another included programs such as *Touched by an Angel*, *7th Heaven*, *Sister, Sister*, *Moesha*, *Uplifting Pop*, *Uplifting Country*, and *Uplifting Urban* and furthers admits that GMC is now sometimes referred to as UP.

87. Viacom denies that ASPiRE is not a reasonable substitute for and does not belong in the same market as BET or TV One, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 87, and on that basis denies those allegations, except admits that ASPiRE is a network affiliated with Magic Johnson Enterprises that offers programming that has at one time or another included programs such as *The Root 100*, *I Spy*, *The Bill Cosby Show*, *ARiSE*, *Soul Train*, and *Now/Next Music*.

88. Viacom denies the allegations contained in Paragraph 88, to the extent such allegations concern or are directed against Viacom except admits that BET is carried by several U.S. video distributors. Viacom lacks knowledge or information sufficient to form a belief as to truth of the remaining allegations contained in Paragraph 88, and on that basis denies those allegations. To the extent the allegations purport to state a legal conclusion, no response is required.

89.     Viacom denies the allegations contained in Paragraph 89.  To the extent the allegations purport to state a legal conclusion, no response is required.

90.     Viacom denies the allegations contained in Paragraph 90, except admits that it offers licensing rights to programming services such as MTV for a fee that depends on several factors.

91.     Viacom denies the allegations contained in Paragraph 91.

92.     Viacom denies the allegations contained in Paragraph 92, except admits that it offers licensing rights to programming services such as MTV2 and further admits that MTV2's programming has at one time or another included programs such as *Sucker Free Countdown*, *The Dub Magazine Project*, *Funk Flex Full Throttle*, *The Dudesons*, *Nitro Live Circus*, *Guy Code*, and *Hip Hop Squares*.  Viacom refers to Exhibit A of the 2012 Agreement at 8(j) for a fuller description of MTV2.

93.     Viacom denies the allegations contained in Paragraph 93, except admits that E! is a network affiliated with NBCUniversal that offers programming that has at one time or another included programs such as *Keeping up with the Kardashians*, *Married to Jonas*, *The Soup*, *Fashion Police*, *Chelsea Lately*, *E! News*, and *Ice Loves Coco*.

94.     Viacom denies the allegations contained in Paragraph 94, except admits that it offers licensing rights to programming services such as VH1.

95.     Viacom denies the allegations contained in Paragraph 95, except admits that Bravo is a network that offers certain programming.

96.     Viacom denies the allegations contained in Paragraph 96, except admits that Fuse and ABC Family are networks that offer programming.

97.     Viacom denies the allegations contained in Paragraph 97, except admits that it offers licensing rights to programming services such as MTV and MTV2.

98.     Viacom denies the allegations contained in Paragraph 98.

99.     Viacom denies the allegations contained in Paragraph 99, except admits that Viacom offers certain of its services nationwide. To the extent the allegations state a legal conclusion, no response is required.

100.    Viacom denies the allegations contained in Paragraph 100. To the extent the allegations state a legal conclusion, no response is required.

101.    Viacom denies the allegations contained in Paragraph 101. To the extent the allegations state a legal conclusion, no response is required.

102.    Viacom denies the allegations contained in Paragraph 102, to the extent such allegations concern or are directed against Viacom, except admits that the 2012 Cablevision Agreement refers to certain of its programming services as "Core" services and to Nickelodeon, Comedy Central, BET, MTV, MTV2, Spike, TV Land, and VH1 as "Core" services, admits that the 2012 Cablevision Agreement refers to certain of its programming services as "Suite" services and to Centric, CMT, CMT Pure Country, Logo, MTV Hits, MTV Jams, Nick 2, Nick Jr., Nicktoons, Palladia, Teen Nick, Tr3s, VH1 Classic, VH1 Soul, as "Suite" services, which are carried by Cablevision under the 2012 Cablevision Agreement, and further admits that BET Gospel is sometimes referred to as a "Suite" Service.

103.    Viacom denies the allegations contained in Paragraph 103, except admits that it offers licensing rights to programming services such as Centric and further admits that Centric was formerly referred to by those names. Viacom refers to Exhibit A of the 2012 Agreement at 8(f) for a fuller description of Centric.

17

104.     Viacom denies the allegations contained in Paragraph 104, except admits
that it offers licensing rights to programming services such as CMT. Viacom refers to Exhibit A
of the 2012 Agreement at 8(d) for a fuller description of CMT.

105.     Viacom denies the allegations contained in Paragraph 105, except admits
that it offers licensing rights to programming services such as CMT Pure Country. Viacom
refers to Exhibit A of the 2012 Agreement at 8(m) for a fuller description of CMT for Country.

106.     Viacom denies the allegations contained in Paragraph 106, except admits
that it offers licensing rights to programming services such as Logo. Viacom refers to Exhibit A
of the 2012 Agreement at 8(r) for a fuller description of Logo.

107.     Viacom denies the allegations contained in Paragraph 107, except admits
that it offers licensing rights to programming services such as MTV Hits. Viacom refers to
Exhibit A of the 2012 Agreement at 8(p) for a fuller description of MTV Hits.

108.     Viacom denies the allegations contained in Paragraph 108, except admits
that it offers licensing rights to programming services such as MTV Jams and further admits that
MTV Jams was formerly referred to by other names. Viacom refers to Exhibit A of the 2012
Agreement at 8(k) for a fuller description of MTV Jams.

109.     Viacom denies the allegations contained in Paragraph 109, except admits
that it offers licensing rights to programming services such as Nick2 and Nickelodeon. Viacom
refers to Exhibit A of the 2012 Agreement at 8(i) for a fuller description of Nick 2.

110.     Viacom denies the allegations contained in Paragraph 110, except admits
that it offers licensing rights to programming services such as Nick Jr. Viacom refers to Exhibit
A of the 2012 Agreement at 8(l) for a fuller description of Nick Jr.

111.    Viacom denies the allegations contained in Paragraph 111, except admits that it offers licensing rights to programming services such as Nicktoons.  Viacom refers to Exhibit A of the 2012 Agreement at 8(q) for a fuller description of Nicktoons.

112.    Viacom denies the allegations contained in Paragraph 112, except admits that it offers licensing rights to programming services such as Palladia, MTV, VH1, and CMT. Viacom refers to Exhibit A of the 2012 Agreement at 8(u) for a fuller description of Palladia.

113.    Viacom denies the allegations contained in Paragraph 113, except admits that it offers licensing rights to programming services such as TeenNick. Viacom refers to Exhibit A of the 2012 Agreement at 8(w) for a fuller description of TeenNick.

114.    Viacom denies the allegations contained in Paragraph 114, except admits that it offers licensing rights to programming services such as Tr3s and further admits that Tr3s was formerly referred to by other names.  Viacom refers to Exhibit A of the 2012 Agreement at 8(l) for a fuller description of Tr3s.

115.    Viacom denies the allegations contained in Paragraph 115, except admits that it offers licensing rights to programming services such as VH1 Classic and VH1.  Viacom refers to Exhibit A of the 2012 Agreement at 8(c) for a fuller description of VH1.

116.    Viacom denies the allegations contained in Paragraph 116, except admits that it offers licensing rights to programming services such as VH1 Soul.  Viacom refers to Exhibit A of the 2012 Agreement at 8(m) for a fuller description of VH1 Soul.

117.    Viacom denies the allegations contained in Paragraph 117.  To the extent the allegations state legal conclusions, no response is required.

118.    Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118, and on that basis denies those allegations.

119.    Viacom denies the allegations contained in Paragraph 119, to the extent such allegations concern or are directed against Viacom, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 119, and on that basis denies those allegations.

120.    Viacom lacks knowledge or information sufficient to form a belief as to truth of the allegations contained in Paragraph 120, and on that basis denies those allegations. To the extent the allegations state a legal conclusion, no response is required.

121.    Viacom lacks knowledge or information sufficient to form a belief as to truth of the allegations contained in Paragraph 121, and on that basis denies those allegations. To the extent the allegations state a legal conclusion, no response is required.

122.    Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 122, and on that basis denies those allegations.

123.    Viacom denies the allegations contained in Paragraph 123, to the extent such allegations concern or are directed against Viacom.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 123, and on that basis denies those allegations.

124.    Viacom denies the allegations contained in Paragraph 124, except admits that Viacom has a rate card which includes rates for particular services.

125.    Viacom denies the allegations contained in Paragraph 125.

126.    Viacom denies the allegations contained in Paragraph 126, to the extent such allegations concern or are directed against Viacom, except admits that Cablevision has licensed Suite Services from Viacom.  Viacom lacks knowledge or information sufficient to form

a belief as to the truth of the remaining allegations contained in Paragraph 126, and on that basis denies those allegations.

127.    Viacom denies the allegations contained in Paragraph 127, except admits



that in ▆▆▆ a licensing agreement between Viacom and Cablevision involving ▆▆▆▆▆▆▆ ▆▆▆▆▆▆ offered by Viacom was set to expire and further admits that a ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ offered by Viacom was set to expire in ▆▆▆.

128.    Viacom denies the allegations contained in Paragraph 128, except admits that it at times refers to certain of its programming services as "Core" services and that Spike, TV Land, VH1, and MTV2 have at one time or another been considered "Core" services.

129.    Viacom denies the allegations contained in Paragraph 129.

130.    Viacom denies the allegations contained in Paragraph 130.

131.    Viacom denies the allegations contained in Paragraph 131, except refers to the document cited therein for a true and complete statement of its entire contents.

132.    Viacom denies the  allegations contained in Paragraph 132, except admits that none of the top 15 U.S. video distributors pay the rates listed on the ▆▆▆ Rate Card.

133.    Viacom denies the  allegations contained in Paragraph 133, except admits that in ▆▆▆ it entered into a licensing agreement with Cablevision that was set to expire on ▆▆▆▆▆▆▆▆▆ and refers to that agreement for a true and complete statement of its entire contents.  Viacom further admits that Cablevision made payments to Viacom under that agreement.

134.    Viacom denies the allegations contained in Paragraph 134.

135.    Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 135, and on that basis denies those allegations.

136.   Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 136, and on that basis denies those allegations, except admits that it at times refers to certain of its programming services as "Suite" services and that Logo and VH1 Classic have at one time or another been considered "Suite" services.

137.   Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 137, and on that basis denies those allegations, except admits that the number and type of video distribution services have increased since ███,  including Internet-based streaming video services and Video On Demand services.

138.   Viacom denies the allegations contained in Paragraph 138, to the extent such allegations concern or are directed against Viacom.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 138, and on that basis denies those allegations.

139.   Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 139, and on that basis denies those allegations.

140.   Viacom lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 140, and on that basis denies those allegations.

141.   Viacom denies the allegations contained in Paragraph 141, except admits that during the negotiations of the 2012 Agreement, Cablevision made an initial proposal of a licensing agreement that did not include Suite Services but subsequently agreed to distribute Suite Services in the course of negotiating a fully-integrated agreement.

142.   Viacom denies the allegations contained in Paragraph 142, except admits that on or around December 3, 2012, Cablevision and Viacom executives held a teleconference to discuss a new licensing agreement for Viacom's services.

143.    Viacom denies the allegations contained in Paragraph 143, except admits that on or around December 3, 2012, Cablevision and Viacom executives held a teleconference to discuss a new licensing agreement for Viacom's services.

144.    Viacom denies the allegations contained in Paragraph 144, except admits that on or around December 6, 2012, Cablevision and Viacom executives held a meeting to discuss a new licensing agreement for Viacom's services.

145.    Viacom denies the allegations contained in Paragraph 145, except admits that the 2012 Rate Card was provided by Viacom to Cablevision in the course of the negotiations, and refers to the document cited therein for a true and complete statement of its entire contents.

146.    Viacom denies the allegations contained in Paragraph 146, and refers to the document cited therein for a true and complete statement of its entire contents.

147.    Viacom denies the allegations contained in Paragraph 147, and refers to the documents cited therein for a true and complete statement of their entire contents.

148.    Viacom denies the allegations contained in Paragraph 148.

149.    Viacom denies the allegations contained in Paragraph 149.

150.    Viacom denies the allegations contained in Paragraph 150, except admits that the parties proceeded to negotiate a licensing agreement that included the licensing of the Core and Suite Services, and other interdependent terms and conditions.

151.    Viacom denies the allegations contained in Paragraph 151, except admits it entered into a licensing agreement with Cablevision on December 31, 2012 and refers to that agreement for a true and complete statement of its entire contents.

152.    Viacom denies the allegations contained in Paragraph 152, except refers to the December 2012 licensing agreement for a true and complete statement of its entire contents.

153.    Viacom denies the allegations contained in Paragraph 153, except refers to the agreements mentioned therein for a true and complete statement of their entire contents.

154.    Viacom denies the allegations contained in Paragraph 154.

155.    Viacom denies the allegations contained in Paragraph 155.

156.    Viacom denies the allegations contained in Paragraph 156.

157.    Viacom denies the allegations contained in Paragraph 157, to the extent such allegations concern or are directed against Viacom. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 157, and on that basis denies those allegations.

158.    Viacom denies the allegations contained in Paragraph 158, to the extent such allegations concern or are directed against Viacom, except admits that Ovation is a network that offers programming that has at one time or another included programs such as *Royal Opulence*, *The Art Of*, *Culture Pop*, *Antiques Roadshow*, and *Smash*. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 158, and on that basis denies those allegations.

159.    Viacom denies the allegations contained in Paragraph 159, to the extent such allegations concern or are directed against Viacom, except admits that GMC is a network that offers certain programming. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 159, and on that basis denies those allegations.

160.    Viacom denies the allegations contained in Paragraph 160, to the extent such allegations concern or are directed against Viacom, except admits that Me-TV is a network that offers programming that has at one time or another included programs such as *The Mary Tyler Moore Show*, *Gunsmoke*, *Dragnet*, *Batman*, *The Bob Newhart Show*, *I Love Lucy*, *The Beverly Hillbillies*, *The Brady Bunch*, *M\*A\*S\*H*, and *Batman*. Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 160, and on that basis denies those allegations.

161.    Viacom denies the allegations contained in Paragraph 161, to the extent such allegations concern or are directed against Viacom, except admits that ASPiRE is a network that offers certain programming.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 161, and on that basis denies those allegations.

162.    Viacom denies the allegations contained in Paragraph 162, to the extent such allegations concern or are directed against Viacom, except admits that Retirement Living TV is a network that offers programming that has at one time or another included programs such as *The Art of Living*, *Boomer Initiative*, *AARP-My Generation*, *The Danger Zone*, *Family Pickle*, *Fix America*, *The Florence Henderson Show*, *Money Matters with Jean Chatzky*, and *Whole Body Health*.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 162, and on that basis denies those allegations.

163.    Viacom denies the allegations contained in Paragraph 163, to the extent such allegations concern or are directed against Viacom, except admits that Lifetime Movie Network is a network that offers certain programming.  Viacom lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 163, and on that basis denies those allegations.

164.   Viacom denies the allegations contained in Paragraph 164, to the extent such allegations concern or are directed against Viacom.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 164, and on that basis denies those allegations.

165.   Viacom denies the allegations contained in Paragraph 165, to the extent such allegations concern or are directed against Viacom.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 165, and on that basis denies those allegations.

166.   Viacom denies the allegations contained in Paragraph 166, to the extent such allegations concern or are directed against Viacom.  Viacom lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 166, and on that basis denies those allegations.

167.   Viacom denies the allegations contained in Paragraph 167.

168.   Viacom denies the allegations contained in Paragraph 168.

169.   Viacom denies the allegations contained in Paragraph 169, to the extent such allegations concern or are directed against Viacom, except admits that New York's DMA is a media center, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 169, and on that basis denies those allegations.

170.   Viacom denies the allegations contained in Paragraph 170.

171.   Viacom denies the allegations contained in Paragraph 171.

172.   Viacom denies the allegations contained in Paragraph 172.

173.   Viacom denies the allegations contained in Paragraph 173.

174.   Viacom denies the allegations contained in Paragraph 174, to the extent such allegations concern or are directed against Viacom, except refers to the articles quoted and cited therein for a true and complete statement of their entire contents.

175.   Viacom repeats and incorporates its answers in the above-referenced paragraphs as if fully stated herein.

176.   Viacom denies the allegations contained in Paragraph 176.  To the extent the allegations state a legal conclusion, no response is required.

177.   Viacom avers that the allegations contained in the first sentence of Paragraph 177 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Viacom denies the allegations contained in Paragraph 177.

178.   Viacom denies the allegations contained in Paragraph 178.  To the extent the allegations purport to state a legal conclusion, no response is required.

179.   Viacom denies the allegations contained in Paragraph 179.  To the extent the allegations purport to state a legal conclusion, no response is required.

180.   Viacom denies the allegations contained in Paragraph 180.  To the extent the allegations purport to state a legal conclusion, no response is required.

181.   Viacom denies the allegations contained in Paragraph 181.

182.   Viacom denies the allegations contained in Paragraph 182.  To the extent the allegations purport to state a legal conclusion, no response is required.

183.   Viacom denies the allegations contained in Paragraph 183.  To the extent the allegations purport to state a legal conclusion, no response is required.

184.    Viacom denies the allegations contained in Paragraph 184.  To the extent the allegations purport to state a legal conclusion, no response is required.

185.    Viacom denies the allegations contained in Paragraph 185.  To the extent the allegations purport to state a legal conclusion, no response is required.

186.    Viacom repeats and incorporates its answers in the above-referenced paragraphs as if fully stated herein.

187.    Viacom denies the allegations contained in Paragraph 187.  To the extent the allegations purport to state a legal conclusion, no response is required.

188.    Viacom avers that the allegations contained in Paragraph 188 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Viacom denies the allegations contained in Paragraph 188.

189.    Viacom denies the allegations contained in Paragraph 189.  To the extent the allegations purport to state a legal conclusion, no response is required.

190.    Viacom denies the allegations contained in Paragraph 190.  To the extent the allegations purport to state a legal conclusion, no response is required.

191.    Viacom repeats and incorporates its answers in the above-referenced paragraphs as if fully stated herein.

192.    Viacom denies the allegations contained in the first sentence of Paragraph 192.  Viacom avers that the allegations contained in the last sentence of Paragraph 192 purport to state a legal conclusion to which no response is required.

193.    Viacom denies the allegations contained in Paragraph 193.  To the extent the allegations purport to state a legal conclusion, no response is required.

194.    Viacom denies the allegations contained in Paragraph 194.  To the extent the allegations purport to state a legal conclusion, no response is required.

195.    Viacom repeats and incorporates its answers in the above-referenced paragraphs as if fully stated herein.

196.    Viacom denies the allegations contained in Paragraph 196, to the extent such allegations concern or are directed against Viacom.  Viacom avers that the remaining allegations contained in Paragraph 196 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Viacom denies the remaining allegations contained in Paragraph 196.

197.    Viacom admits that Cablevision purports to seek the alleged relief but denies that such relief is available to Cablevision.

198.    Viacom admits that Cablevision purports to seek a trial by jury on all issues so triable as a matter of right.

Viacom denies all allegations contained in the Amended Complaint (included headings and the "Prayers for Relief") not specifically admitted above and denies that Cablevision is entitled to any relief in this action.


## AFFIRMATIVE DEFENSES

Viacom states the following affirmative defenses without assuming the burden of proof on such defenses that would otherwise rest on Plaintiffs.  Nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to Plaintiffs' allegations.

## FIRST AFFIRMATIVE DEFENSE

The Amended Complaint fails to state a claim against Viacom upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims and requested remedies, including, but not limited to, plaintiffs' request to sever the 2012 Agreement so that it can discontinue its obligations regarding the "Suite Services" while continuing to enjoy all the benefits it received under the 2012 Agreement, are barred, in whole or in part, by their representations and warranties in Section 8(a) of the parties' 2012 Agreement.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims and requested remedies, including, but not limited to, plaintiffs' request to sever the 2012 Agreement so that it can discontinue its obligations regarding the "Suite Services" while continuing to enjoy all the benefits it received under the 2012 Agreement, are barred, in whole or in part, because they obtained the 2012 Agreement through fraud and/or fraudulent inducement, as described in more detail in the counterclaims asserted below.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and requested remedies, including, but not limited to its request for treble damages, are barred, in whole or in part, by the limitation of liability provision in Section 9(f) of the parties' 2012 Agreement.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of judicial estoppel.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to allege and have not suffered any cognizable antitrust injury.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered any injury in fact or damages caused by act or omission of Viacom.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack antitrust standing.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs lack standing to prosecute its state antitrust claims, in whole or in part, under N.Y. Gen. Bus. Law § 340.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' alleged damages, if any, are too speculative or remote, and because of the impossibility of the proof of these alleged damages.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and requested remedies, including, but not limited to, plaintiffs' request to sever the 2012 Agreement so that it can discontinue its obligations regarding the "Suite Services" while continuing to enjoy all the benefits it received under the 2012 Agreement, are barred, in whole or in part, by the doctrines of laches, estoppel, waiver, ratification, *in pari delicto*, failure to mitigate, and/or unclean hands.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and requested remedies, including, but not limited to, plaintiffs' request to sever the 2012 Agreement so that it can discontinue its obligations regarding the "Suite Services" while continuing to enjoy all the benefits it received under the 2012 Agreement, are barred, in whole or in part, because injuries alleged by Plaintiffs, to the extent any exist, were caused, in whole or in part, through forces in the marketplace over which Viacom has no control, or through acts or omissions on the part of the Plaintiffs.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any and all of Viacom's actions challenged by Plaintiff were lawful, justified, pro-competitive, constitute bona fide business practices, and were carried out in furtherance of Viacom's legitimate business interests.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because none of Viacom's actions challenged by Plaintiffs foreclosed competition within any properly defined market.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the Amended Complaint has insufficiently alleged a product and geographic market, Viacom does not have market power in any properly defined market, and is so vague and ambiguous as to deny Viacom notice of the markets alleged by Plaintiffs.

## RESERVATION OF RIGHTS TO ASSERT ADDITIONAL DEFENSES

Viacom has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other applicable defenses that may become available or

apparent during discovery in this matter.  Viacom reserves the right to amend or seek to amend

its answer and/or affirmative defenses.


## COUNTERCLAIMS

Defendants Viacom International Inc. and Black Entertainment Television LLC,

by their undersigned attorneys, hereby allege as follows:

### Nature Of The Action

1.      This case arises from Cablevision's fraudulent conduct—including both

express misrepresentations and fraudulent omissions—in inducing Viacom to enter into an

elaborately negotiated affiliation agreement.  Upon information and belief, at the time

Cablevision signed the agreement, Cablevision intended to claim it was invalid, illegal and

unenforceable despite Cablevision's contrary express representations to Viacom in the

agreement.  And, upon information and belief, at the time Cablevision signed the agreement, it

planned to challenge the agreement on that basis in order to invite the Court to rewrite it for its

benefit.

2.      Since the early days of the cable television industry, cable operators have

sought to negotiate lower rates for cable television programming services by offering additional

distribution to cable programmers, who can then monetize this distribution by selling advertising,

selling sponsorships, developing new programming ideas and through other means.  In this way,

cable operators reduce their costs, while cable programmers receive value in the form of the

additional distribution and other terms.  In recent years, these agreements have grown more

complex, as terms such as internet streaming rights, video on demand programming, local

advertising concessions, channel locations, marketing obligations, territories, responsibility for

compliance with legal obligations, responsibility for music performance rights, digital video recorder rights, the right to insert advertising digitally, and many other business matters must be resolved before an agreement can be concluded.

3.      Programmers like Viacom and distributors like Cablevision engage in protracted negotiations before ultimately reaching equipoise by agreeing upon the terms and conditions of their affiliation agreement and being bound by those interdependent terms and conditions. In the same way, each term and condition of the licensing agreement between Viacom and Cablevision dated December 31, 2012 (the "2012 Agreement") was interdependent on the other terms and conditions negotiated and agreed to by the parties.

4.      Cablevision wished to obtain the best possible terms for itself by negotiating a fully integrated agreement with a variety of gives and takes and engaged in fulsome negotiations towards that end. The negotiations leading to the 2012 Agreement took place over the span of four months, and required hundreds and hundreds of hours of time of executives and other employees of Viacom, including many of Viacom's most senior executives and affiliate sales representatives.

5.      But, unbeknownst to Viacom, Cablevision's negotiation and acceptance of the 2012 Agreement was a complete sham. Throughout the negotiations, Cablevision concealed from Viacom that it intended to challenge immediately the validity of the agreement after receiving the benefit of all the concessions it could obtain from Viacom. Upon information and belief, under Cablevision's secret plan, it pretended to negotiate in good faith, making numerous misrepresentations and concealing material facts, in order to obtain those concessions from Viacom and thereafter sue to declare the agreement void and release itself from the concessions that it had made to Viacom during the negotiations in order to obtain for itself numerous

favorable terms and conditions. Under Cablevision's secret plan, it would obtain all the benefits
it had negotiated to obtain and ask the Court to void the rest.

      6.      Despite its hidden intentions, Cablevision made a number of express and
implied misrepresentations to Viacom in order to induce a better bargain. Among these is an
express representation and warranty negotiated between Cablevision and Viacom and contained
in many drafts and in the final agreement with Viacom that the agreement constituted a "████

█████████████████" and that the "████████████████████████████

████████████████████████████████████████████████." Those
representations by Cablevision were intentionally false and misleading when made. Less than
two months after signing the agreement, Cablevision brought this action and directly
contradicted those express and implied representations in claiming that the agreement was
unlawful.

      7.      Through its misstatements and omissions, Cablevision fraudulently
induced Viacom to enter into the very agreement that it now challenges as unlawful. In addition,
each of the terms and conditions that were obtained by Cablevision in exchange for concessions
that would not have been made by Viacom absent those intentional misstatements and omissions
were also fraudulently induced. Viacom reasonably and justifiably relied on Cablevision's
representations and would not have entered into the 2012 Agreement had it known of
Cablevision's fraudulent scheme. Cablevision's fraudulent misconduct has caused damage to
Viacom for which Cablevision should be held accountable.

## Parties and Jurisdiction

      8.      Viacom International Inc. is a Delaware corporation with its principal
place of business located at 1515 Broadway, New York, New York. It is a subsidiary of Viacom

Inc. and its business includes the operation of Viacom Inc.'s multimedia brands such as MTV,

VH1, Nickelodeon, Comedy Central, and BET.

        9.      Black Entertainment Television LLC is Washington D.C. limited liability

company with its principal place of business located at 1235 W Street Northeast, Washington,

District of Columbia.

        10.     Cablevision Systems Corporation is a Delaware corporation with its

principal place of business located at 1111 Stewart Avenue, Bethpage, New York.

        11.     CSC Holdings, LLC is a Delaware limited liability company with its

principal place of business located at 1111 Stewart Avenue, Bethpage, New York.  It is a wholly-

owned subsidiary of Cablevision Systems Corporation and is one of the largest cable operators in

the United States.

        12.     The Court has jurisdiction over this counterclaim pursuant to its

supplemental jurisdiction under 28 U.S.C. § 1367(a) as this counterclaim arises from the same

nucleus of operative facts as the claims asserted by Cablevision and therefore forms part of the

same case or controversy under Article III of the Constitution.

## Factual Background

### Viacom Distributes Its Services Through Affiliates Who Negotiate
### Fully-Integrated Licensing Agreements

        13.     Viacom operates more than 200 services including MTV, VH1, CMT,

Logo, BET, Centric, Nickelodeon, Nick Jr., TeenNick, Nicktoons, Nick at Nite, Comedy Central,

TV Land, Spike, and Tr3s.

        14.     In connection with those services, Viacom also offers licenses of Video

On Demand, TV Everywhere, In-Home Streaming, and Live TV Rewind, among other features.

15.     Viacom distributes its services through affiliates across the country and around the world. These affiliates include cable television operators, such as Cablevision, Comcast, and Time Warner; direct-to-home satellite television operators, such as DirecTV and Dish; telecommunications operators such as Verizon FIOS; and video-on-demand services, such as Netflix and Hulu.

16.     In exchange for the right to distribute and have access to Viacom's services (which not only include cable channels but also "new media" technologies such as Video On Demand and TV Everywhere), affiliates provide two major revenue components to Viacom. First, affiliates pay licensing fees to Viacom, which are generally negotiated by taking into account the number of subscribers to whom the affiliates distribute the Viacom services and the per-subscriber rate paid by the affiliates as well as other terms, such as rights to stream to apps and the quantities of video on demand content. Second, Viacom also generates revenues from advertising sales, which depend on, among other things, the number of viewers of the Viacom services.

17.     Distribution through its affiliates also provides Viacom with the ability to launch new shows and cable network ideas, obtain sponsorship revenues, and experiment with new technologies. In addition, because Viacom invests a tremendous amount in producing and promoting television content, these networks provide Viacom with an additional way to benefit by providing an additional outlet for shows initially exposed on other networks.

18.     Because of these benefits, Viacom is often willing to accept lower cash license fee payments from affiliates based on the breadth and volume of the services that they license, their agreement to provide distribution for such services, and the other interdependent terms and conditions of a licensing agreement. Thus, for example, because Viacom has multiple

revenue sources, it may agree to accept lower cash license fees from an affiliate if, among other interrelated terms, the affiliate agrees to distribute a broader set of programming services, which will in turn generate additional advertising revenue for Viacom. Because of the prospect of advertising revenue, program suppliers, like Viacom, have an incentive to offer lower prices to affiliates, like Cablevision, in return for higher penetration and larger audience. As a result, programmers, like Viacom, typically offer lower license fees to affiliates who agree to make the content available to as many subscribers as possible.

19.     As a part of the integrated agreement, Viacom also provides rights to TV Everywhere, a product Viacom offers that allows customers to access Viacom programming they have paid for as part of their cable TV subscription on a variety of devices and rights to exploit a package of programming through Video On Demand, which according to Cablevision's website "gives you the freedom to play a show [on channels such as Nickelodeon] and watch it when you want it, and it's free." New media technologies such as Video On Demand and TV Everywhere have allowed Cablevision to tout that it "is a great time to be a Cablevision customer" with the "flexible and mobile viewing options on new devices, connectivity out of the home and easy tools to navigate through this expanding world of content options." The integrated agreement specifies terms such as the amount of programming that can be exploited on video on demand, the allocation between programmer and operator of advertising (including the responsibility for selling such programming), the nature of the devices and security requirements for video on demand and TV Everywhere and a variety of other matters. These terms vary depending on the terms of the overall agreement and relationship between the cable operator and Viacom.

**While Negotiating the 2012 Agreement With Viacom, Cablevision Intentionally Made Misstatements and Withheld Material Facts About Its Plan to Challenge the Validity of the Agreement and Request That a Court Rewrite It**

20.    In ▮▮▮, Viacom and Cablevision entered into a licensing agreement (the "▮ Agreement"). Pursuant to the ▮ Agreement, Cablevision licensed certain of Viacom's programming services. Eight of Viacom's services incorporated in the ▮ Agreement— Nickelodeon, Comedy Central, BET, MTV, VH1, TV Land, MTV2, and Spike TV—were later defined in the 2012 Agreement as "Core Services" and other of its services—including CMT, Logo, Centric, Nick Jr., TeenNick, Nicktoons, TR3s, and others—were later defined in the 2012 Agreement as "Suite Services." In addition, Cablevision negotiated for a wide variety of other terms that were more favorable to Cablevision than Viacom's standard terms and conditions.

21.    The ▮ Agreement was set to expire on ▮▮▮▮▮, and starting in the fall of 2012, Viacom and Cablevision engaged in negotiations on a new licensing agreement.

22.    In the 2012 negotiations, Cablevision sought to secure for itself a below-market deal. Cablevision wished to pay lower cash license fees for distribution of the Core Services (and license rights to additional new media content and technologies, among other things), but without providing the corresponding consideration to Viacom of distributing the Suite Services.

23.    On November 13, 2012, Viacom sent Cablevision a draft agreement, providing for distribution of the Core Services, Suite Services, and licensing rights to Video on Demand and TV Everywhere (▮▮▮▮▮▮▮ ▮▮▮▮▮). On December 3, 2012, Cablevision proposed to eliminate distribution of all Suite Services. Viacom believed Cablevision's proposal to be nothing more than a negotiating tactic

to secure the most favorable terms and conditions it could in the new agreement by threatening, but not intending, to drop the Suite Services.

24.     During a meeting on December 6, 2012, Cablevision made clear that its request to drop the Suite Services was not motivated by a desire to have more bandwidth available or to launch other non-Viacom services.  Tom Montemagno, Cablevision's, negotiator, confirmed to Samantha Cooper, a lead negotiator for Viacom, that bandwidth was not the driver in the negotiations.  And neither Mr. Montemagno nor anyone else from Cablevision indicated to Viacom that there were other services that Cablevision wanted to launch but could not because of bandwidth or financial limitations.  Instead, Cablevision was simply looking to obtain lower rates on certain Viacom services without providing Viacom with corresponding benefits in the bargain.  Viacom informed Cablevision that if it wished to discontinue licensing of the Suite Services, Cablevision would need to provide other value to Viacom for the loss of the value to Viacom from the Suite Services.

25.     In the days following the December 6, 2012 meeting, Ms. Cooper sent several follow-up email communications to Mr. Montemagno.  In those communications, Ms. Cooper reminded Mr. Montemagno that, under the ███ Agreement, Cablevision enjoyed payment of significantly lower cash license fees as a result of, among other things, its broad carriage of Viacom services.  Nonetheless, Ms. Cooper told Mr. Montemagno that if Cablevision wanted to negotiate an agreement for licensing of fewer Viacom services, Viacom was willing to do so, but that the overall value of the agreement needed to be in line with the value of the ███ Agreement.

26.     While Viacom engaged in negotiations with Cablevision regarding the possibility of Cablevision carrying only the Core Services, Viacom viewed its proposals as

negotiating tactics, just as it believed Cablevision's threat to drop carriage of the Suite Services was merely a negotiating tactic on Cablevision's part. Viacom had seen Cablevision use this exact tactic in negotiating the ▉ Agreement in order to obtain the rates it desired for the Viacom programming services it carried. In retrospect, Cablevision deliberately tried to position itself by the communications it sent to Viacom and the responses it intended to generate from Viacom so it could challenge the 2012 Agreement as illegal. However, Viacom was not aware that Cablevision was laying the groundwork for a lawsuit but rather believed it was engaged in good faith negotiations. In fact, any negotiation of a Core-only agreement quickly ended when Cablevision agreed to negotiate instead for carriage of both the Core and Suite Services, as well as additional new media content and technologies. The issue of carrying Suite Services was never raised again during the negotiations through the execution of the Agreement on December 31, 2012.

27.     By email dated December 17, 2012, Mr. Montemagno informed Ms. Cooper that Cablevision wished to negotiate a deal for licensing of the Core and Suite Services and provided Viacom with a draft agreement that provided for licensing of the Core and Suite Services as well as licensing rights to additional new media content and technologies. And in the following weeks, the parties engaged in numerous telephonic and email negotiations regarding licensing terms for a deal to include the Core Services and Suite Services as well as additional new media content and technologies, among other things.

28.     Cablevision proceeded to negotiate the 2012 Agreement over the following weeks at the end of December 2012 in a "business as usual" fashion in order to obtain the lower rates on the Core Services and other services without alerting Viacom that it secretly planned to challenge the 2012 Agreement as unlawful and ask a court to rewrite it. During that

period, Cablevision made a series of false and misleading statements, and concealed material facts, with the intent of deceiving Viacom and fraudulently inducing it to enter into the 2012 Agreement.

29.     Mr. Montemagno  pretended throughout the last two weeks of December 2012 that the negotiations were proceeding in good faith by both sides.  For example, on December 19, 2012 at 8:56 pm, he wrote to Rick Baker, an attorney for Viacom, "Thanks for all your hard work and quick turn on this, Rick."  On December 30, 2012 at 11:56 pm, he wrote to Ms. Cooper, "We'll pick things up with you all tomorrow morning.  Have a good night and thanks for all your efforts today."  Those comments, and others during the negotiations, gave the false and misleading impression that Cablevision intended to reach a valid and legally binding integrated agreement for the distribution of Viacom's services, including both the Core Services and the Suite Services.

30.     During the last two weeks of December 2012, Cablevision and Viacom also engaged in extensive discussions concerning the rates for licensing both the Core Services and the Suite Services.  For example, on December 26, 2012 at 10:45 am and on December 30, 2012 at 10:57 am and 11:26, Mr. Montemagno emailed to Ms. Cooper and others at Viacom proposals for the rates for licensing of both the Core Services and Suite Services.  In addition, Mr. Montemagno and Ms. Cooper engaged in numerous telephonic negotiations regarding the rates for the Core Services and Suite Services.

31.     During that same period, Cablevision emailed to Ms. Cooper and others at Viacom numerous communications with marked-up versions of the proposed agreement, all of which provided for the distribution of both the Core Services and Suite Services as well as licensing rights to additional new media content and technologies.  Significantly, every draft of

the 2012 Agreement that was circulated by Cablevision contained a provision in which

Cablevision expressly represented that the Agreement " █████████████████████

███████" and further that the " ███████████████████████████████████

██████████████████████████████████████."



32.     The wording of those representations was the subject of specific focus and

negotiation by the parties and was, in fact, modified by Cablevision during the drafting process.

Specifically, in the draft agreement circulated by Cablevision on December 17, 2012,

Cablevision added the word " ███████" in the last clause of that provision.  Cablevision also

deleted an entire separate clause from that paragraph of the representations and warranties

section.  The drafts also included a provision that barred any liability for " ███████

████████████████████████████████████████████████

██████████████████."  Cablevision modified that provision in the draft it

circulated on December 17, 2012 as well.

33.     Cablevision also requested a longer term than Viacom for the 2012

Agreement and the license fees it contained for the Core Services, Suite Services, and additional

new media content and technologies.  In telephonic communications with Ms. Cooper in late

December, Mr. Montemagno requested that the agreement run through ███████.  And in

subsequent drafts of the agreement circulated by Cablevision to Viacom on December 26, 2012

at 10:45 am, December 27, 2012 at 3:13 pm, December 28, 2012 at 5:57 pm, December 30, 2012

at 4:15 pm, and December 31, 2012 at 9:52, Cablevision removed Viacom's notation of "T.B.D"

for the expiration date and inserted an expiration date of ███████.  Viacom ultimately

agreed to Cablevision's proposed expiration date because it was led to believe that Cablevision's

insistence on that longer term indicated satisfaction with the terms negotiated.

34.    Finally, in the 2012 Agreement signed by the parties on December 31, 2012, Cablevision affirmatively represented and warranted that the Agreement was valid and lawful. Section 8(a) of the Agreement provides:



The 2012 Agreement also included the broad limitation of liability provision quoted above.

35.    At no time did anyone from Cablevision inform Viacom that Cablevision believed that any of Viacom's conduct in the negotiation of the 2012 Agreement was illegal in any manner, that Cablevision intended to sue Viacom promptly upon entering into the proposed agreement to declare the Agreement void, or that Cablevision intended to request that a court rewrite the 2012 Agreement so that Cablevision could obtain license fees and other terms and conditions that it would not have been able to attain had it been honest in its negotiation with Viacom of the 2012 Agreement.

36.    Upon information and belief, Cablevision's statements to Viacom, made during negotiation sessions, in emails and phone calls, in draft agreements and in the final signed Agreement, were intentionally false and misleading. At the time it was making those statements, Cablevision intended to take a contrary position in its action against Viacom and claim that the 2012 Agreement was invalid and unenforceable and that it did not comply with applicable law. At the time it was making those statements, Cablevision had already made the secret decision that, once the 2012 Agreement was signed, it would ask a court to declare that the 2012 Agreement was not "valid and enforceable" and that it did not "comply in all material respects" with applicable laws, specifically the Sherman Act. Cablevision further knew that it intended to

44

seek treble damages, which are precluded under the limitation of liability provision in the 2012
Agreement.

37.     Cablevision also knew that if it had told Viacom the truth, and revealed its
secret plan, the negotiations would have come to a screeching halt. Ms. Cooper and many other
executives of Viacom would not have negotiated through the night on New Year's weekend had
they known of Cablevision's secret plan. And Viacom would never have signed the 2012
Agreement.

38.     Unbeknownst to Viacom, Cablevision's true intention throughout the
negotiations was to minimize the cash license fees it would pay Viacom on the Core Services
and receive other favorable terms and conditions, and also to make Viacom believe that it would
receive adequate consideration from the licensing of the Suite Services and other consideration.
Contrary to its representations throughout the negotiations, upon information and belief,
Cablevision intended to challenge the 2012 Agreement in the hope that a court would permit it to
enjoy those lower rates on the Core Services as well as other favorable terms and conditions
Cablevision obtained but without the corresponding licensing obligations of the Suite Services.

39.     For example, in an effort to reach an agreement with a reasonable overall
value acceptable to both parties, Viacom offered ███████████████████████████████████
█████████████████████████████████████████████████████████████████████. But
evidencing its concealed intent, on or about December 30, 2012, Mr. Montemagno told Ms.
Cooper, "Enough. No more movement on the Suite," and requested instead reductions to the
rates for the Core Services. Upon information and belief, at that time, Mr. Montemagno knew
that Cablevision planned to ask a court to rewrite the Agreement, so he preferred reductions in
the licensing rates for the Core Services over reductions in the rates for the Suite Services.

40.     Just weeks after signing the ▮▮▮-year agreement that it ostensibly desired, Cablevision sued Viacom and asked the Court to declare it void and rewrite it so Cablevision could drop its carriage of the Suite Services but enjoy its lower rates on the Core Services and the other favorable terms and conditions it negotiated. On December 31, 2012, the parties signed the 2012 Agreement. On February 26, 2013, Cablevision filed its Complaint against Viacom requesting that the Court rewrite the 2012 Agreement so as to permit Cablevision to no longer distribute the Suite Services but to continue to distribute the Core Services at the negotiated lower cash rates as well as to continue to enjoy all the other interdependent favorable terms and conditions Cablevision received in the 2012 Agreement. Nothing relevant to Cablevision's claims occurred in the eight weeks between the execution of the 2012 Agreement and Cablevision's suit, and indeed, Cablevision's Complaint and Amended Complaint were premised entirely on allegations regarding the agreement itself and events occurring prior to its signing.

41.     In its opposition to Viacom's motion to dismiss, Cablevision bragged that it had "promptly" filed this action after signing the 2012 Agreement. But the close temporal proximity between the execution of the 2012 Agreement and the filing of the Complaint only confirms that Cablevision planned all along to challenge the validity of the Agreement and that its representations and warranties in the Agreement were knowingly false when made.

**Viacom Reasonably Relied On Cablevision's Material Misstatements and Omissions And Has Suffered Damages As A Result**

42.     Cablevision's misstatements and omissions were material to Viacom's decision to enter into the 2012 Agreement and to Viacom's concessions on a wide variety of terms and conditions in that Agreement. Viacom entered into the 2012 Agreement and provided the lower rates and other favorable terms and conditions to Cablevision because of, and in reliance on, Cablevision's agreement to license the Core Services, the Suite Services, as well as additional new media content and technologies. If Cablevision had disclosed its true intent to Viacom, Viacom would not have entered into the integrated 2012 Agreement and would not have provided the Core Services to Cablevision at the rates it did nor provide other concessions.

43.     Viacom's reliance on Cablevision's material misstatements and omissions was reasonable in light of Cablevision's "business as usual" conduct during the negotiations described above. Indeed, Cablevision took steps to induce such reliance. After agreeing to carry Suite Services on December 17, 2102, Cablevision never expressed any dissatisfaction with carrying Suite Services again during the negotiations through the execution of the 2012 Agreement. In addition, while Viacom reasonably believed Cablevision proposed a longer term for the agreement because Cablevision was satisfied with the direction of the negotiations, Cablevision's true intention was to induce Viacom to agree to a longer term of lower cash payments on the Core Services and other terms beneficial to Cablevision in the hope that a court would remove its licensing obligations for the Suite Services.

44.     Viacom's reliance on Cablevision's material misstatements and omissions was also reasonable in light of (i) the parties' prior course of dealing, (ii) Cablevision's positions in litigation under the Sherman Act and (iii) Cablevision's own business practices, as described below.

a. In the ▮▮▮ Agreement, Cablevision contracted with Viacom to distribute the Core Services, the Suite Services, and other services and, as in the 2012 Agreement, received lower cash payment Core Services rates in exchange. Cablevision abided by the ▮▮▮ Agreement for its full term of approximately ▮▮▮ years and did not sue Viacom on antitrust grounds or request that a court rewrite the agreement. Viacom reasonably believed that Cablevision would follow the same course for the 2012 Agreement, in which Cablevision also negotiated lower cash payment rates in exchange for distributing the Core Services, Suite Services, and other new media content and technologies.

b. In prior litigation, Cablevision was sued based on the very same conduct that Cablevision now challenges against Viacom. In response to those claims, Cablevision represented to the United States District Court for the Central District of California, the United States Court of Appeals for the Ninth Circuit, and the United States Supreme Court that the very practice it challenges against Viacom was proper and lawful, was to be evaluated under the rule of reason and not the per se standard, and resulted in no market foreclosure. Viacom had no reason to believe that Cablevision would take contrary positions in bringing an action against Viacom.

c. Both Cablevision and its affiliated programming entities publicly tout the fact that it bundled cable programming services to its cable subscribers, and that its own programming services and those of its affiliates were also bundled and rates discounted based on the volume of services licensed by the distributor. Indeed, in its all of its recent 10-K filings with the SEC, Cablevision has touted the use of

"bundling," stating: "Bundled Offers: We offer several promotional packages with discounted pricing to existing and new customers who subscribe to two or more of our products as compared to the à la carte prices for each individual product. We also offer other pricing discounts for certain products that are added to existing services." In addition, upon information and belief, when Cablevision owned MSG Networks it pushed its affiliates to distribute its music service, Fuse, by linking licenses to distribute its sports services with distribution of Fuse. For example, news media reported in October 2010 that MSG was in a dispute with Dish over MSG's insistence that distribution of its sports services be linked to distribution of Fuse.[1] According to another report in November 2010, a Dish spokesman said that "MSG has told us that their offer was 'take it or leave it.'"[2] News media also reported in February 2012 that MSG was in a similar dispute with Time Warner. Time Warner claimed that it was facing "unreasonable demands from Knicks boss and MSG executive chairman James Dolan to not only increase sports carriage rates by 53 percent, but also start running the little-seen music channel FUSE."[3] Upon information and belief, Cablevision or its affiliates also engaged in similar negotiating tactics with respect to other programming services, including regional sports networks and programming services of Rainbow Media.

1 *See* http://www.trentonian.com/article/TT/20101001/FINANCE01/310019991; *see also* http://blogs.buffalonews.com/live/2010/11/rift-lingers-between-dish-network-msg.html?ref=bipn ("According to Dish Network, part of the dispute related to a push for them to carry Fuse, a music channel owned by MSG.").

2 *See* http://blogs.buffalonews.com/live/2010/11/rift-lingers-between-dish-network-msg.html?ref=bipn.

3 *See* http://gigaom.com/2012/02/13/419-can-jeremy-lin-end-the-msgtime-warner-cable-war/.

45.     As a result of relying on Cablevision's material misstatements and omissions, Viacom has suffered damages, including the costs and fees arising out of this litigation.

## FIRST CAUSE OF ACTION

### Fraudulent Inducement

46.     Viacom repeats and realleges each of its foregoing allegations.

47.     Cablevision fraudulently induced Viacom to enter into the 2012 Agreement through intentional misrepresentations of material facts and fraudulent omissions of material facts when it owed Viacom a duty of disclosure.

48.     Upon information and belief, prior to, and at the time of, entering the 2012 Agreement, Cablevision intended to sue Viacom based on a claim that the 2012 Agreement was invalid and unlawful and to seek to rewrite the 2012 Agreement to grant Cablevision the right to distribute the Core Services while paying lower cash license fees and continuing to enjoy other terms and conditions favorable to Cablevision without any obligation to distribute the Suite Services.

49.     Cablevision omitted and withheld those material facts from Viacom in order to induce Viacom to enter the 2012 Agreement and to provide Cablevision with the right to distribute the Core Services at lower cash payment rates and to obtain other favorable terms and conditions.

50.     In light of its statements and conduct during the negotiations, Cablevision had a duty to disclose that it planned "promptly" to bring this action to challenge the validity of the 2012 Agreement and ask the Court to rewrite it.  Cablevision's failure to disclose that information rendered its affirmative statements and conduct during the negotiations and in the

final agreement materially false and misleading. Cablevision had a duty to correct those
misleading statements and actions.

51.     In addition, Cablevision had a duty to disclose because it possessed
superior knowledge about its intentions that was not readily available to Viacom and it knew that
Viacom would act on the basis of mistaken knowledge with respect to material facts.
Cablevision knew that Viacom's decisions with respect to the 2012 Agreement were based on a
mistaken understanding that Cablevision would not claim other than what it had represented and
warranted to Viacom—*i.e.*, the Agreement was valid, enforceable and lawful at the time it was
signed.

52.     Cablevision also made knowing and intentional misstatements of material
fact to Viacom concerning the validity, enforceability and legality of the 2012 Agreement,
among other things described above. Upon information and belief, Cablevision made those
material misrepresentations in order to induce Viacom to enter the 2012 Agreement and to
provide Cablevision with the right to distribute the Core Services at lower cash payment rates
and to obtain other favorable terms and conditions.

53.     Cablevision's misstatements and omissions concerned then-present
material facts and were collateral to the 2012 Agreement. Cablevision thereby breached a duty
that was separate and distinct from any duty created under the 2012 Agreement.

54.     Upon information and belief, Cablevision's egregious misstatements and
omissions were intentional and knowing and made with the clear and blatant intent to deceive
Viacom and to induce Viacom to enter into the 2012 Agreement.

55.     If Viacom knew of Cablevision's plan, Viacom would not have entered
into the 2012 Agreement and would not have agreed to provide Cablevision with the right to

distribute the Core Services at lower cash payment rates or to provide Cablevision other favorable rights, terms and conditions.

56.     Viacom, unaware of Cablevision's true plan, reasonably and justifiably relied on Cablevision's misstatements and omissions in entering into the 2012 Agreement and agreeing to provide Cablevision with the right to distribute the Core Services at lower cash payment rates and to provide Cablevision other favorable rights, terms and conditions.

57.     Viacom has suffered damages as a result of Cablevision's fraudulent and morally culpable conduct and wanton dishonesty, including Viacom's attorneys' fees, expenses and other losses incurred in connection with this litigation.

## SECOND CAUSE OF ACTION

### Declaratory Judgment (28 U.S.C. §§ 2201 and 2202)

58.     Viacom repeats and realleges each of its foregoing allegations.

59.     The provisions of the 2012 Agreement regarding licensing of the Core
Services are interdependent with the provisions regarding the licensing of the Suite Services as
well as other key provisions that included, but are not limited to: (i) the licensing of ████████
new media content and technologies; (ii) the removal or continuance of certain "██████████
████" provisions that Cablevision had benefitted from; and (iii) Cablevision's carriage
obligations for certain of Viacom's services.

60.     Because the 2012 Agreement was an integrated whole, the 2012
Agreement is not severable or subject to reformation.

61.     There exists an actual and justiciable controversy between Cablevision
and Viacom as to whether the 2012 Agreement is severable or subject to reformation.

62.     Consequently, a judicial declaration that the 2012 Agreement is not
severable or subject to reformation is necessary and appropriate at this time so that Viacom can
ascertain its rights and duties with respect to the 2012 Agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, Viacom prays as follows:

a)      That the action brought by Cablevision be dismissed with
prejudice and that Cablevision take nothing by its Amended Complaint;

b)      That judgment be entered in favor of Viacom and against
Cablevision with respect to the causes of action asserted in the Amended Complaint;

      c)      That judgment be entered in favor of Viacom and against Cablevision with respect to the causes of action asserted in Viacom's Counterclaims;

      d)      That the Court declare the 2012 Agreement is rescinded and is null and void;

      e)      That the Court declare the provisions of the 2012 Agreement regarding licensing of the Core Services are interdependent with the provisions regarding the licensing of the Suite Services as well as ▮▮▮▮ new media content and technologies and other favorable rights, terms and conditions provided to Cablevision, and that the 2012 Agreement is therefore not severable or subject to reformation;

      f)      That the Court award such actual damage as Viacom has suffered, or will sustain, by reason of Cablevision's unlawful conduct, together with such punitive or exemplary damages as the law shall permit and the jury shall find;

      g)      That the Court award Viacom reasonable costs and expenses including, but not limited to, attorneys' fees and costs of suit; and

      h)      That the Court award such other relief as may be appropriate.

## **JURY DEMAND**

Pursuant to the Seventh Amendment and Rule 38(b) of the Federal Rules of Civil Procedure, Viacom demands a trial by jury of all issues so triable.

Dated: July 31, 2014

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By: _____
     Joseph F. Tringali
     David Elbaum
     Peri L. Zelig
425 Lexington Avenue
New York, NY 10017
Telephone:  (212) 455-2000
Facsimile:  (212) 455-2502

*Attorneys for Defendants Viacom International Inc.*
*and Black Entertainment Television LLC*

Kenneth R. Logan,
    *Of Counsel*