UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                 :

CABLEVISION SYSTEMS CORPORATION and  :
CSC HOLDINGS, LLC,

                       :

          Plaintiffs,         :      Case No. 13 Civ. 1278 (LTS) (JLC)

                       :

         - against -      :

                       :

VIACOM INTERNATIONAL INC. and BLACK  :
ENTERTAINMENT TELEVISION LLC,

                       :

         Defendants.      :
-------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PLAINTIFFS TO PRODUCE DOCUMENTS PURSUANT TO DEFENDANTS' FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP
Eric Seiler
Hallie B. Levin
7 Times Square
New York, NY 10036

*Attorneys for Defendants*

July 1, 2015

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS .........................................................................................................4

ARGUMENT ............................................................................................................................11

I.    THE REQUESTED DOCUMENTS ARE RESPONSIVE AND
      RELEVANT. ...................................................................................................................11

II.   THE PROTECTIVE ORDER ADEQUATELY PROTECTS THE
      COMMERCIALLY SENSITIVE AND CONFIDENTIAL NATURE OF
      THIRD PARTY INFORMATION. ..................................................................................17

CONCLUSION.........................................................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Armstrong Pump, Inc. v. Hartman,
No. 10-cv-446S, 2014 WL 2830322 (W.D.N.Y. June 23, 2014) ...............................19

Brantley v. NBC Universal, Inc.,
675 F.3d 1192 (9th Cir. 2012) ...................................................................................11

Ciminelli v. Cablevision,
583 F. Supp. 158 (E.D.N.Y. 1984) .............................................................................16

City of New York v. Grp. Health Inc.,
649 F.3d 151 (2d Cir. 2011)........................................................................................12

CMedia, LLC v. LifeKey Healthcare, LLC,
216 F.R.D. 387 (N.D. Tex. 2003) ..........................................................................18, 19

Covelo Clothing, Inc. v. Atlandia Imports, Inc.,
No. 09-cv-2403, 2007 WL 4287731 (D. Colo. Dec. 5, 2007) ....................................19

Dealer Comp. Servs., Inc. v. Curry,
No. 12-cv-3457, 2013 WL 499520 (S.D.N.Y. Feb. 7, 2013) ......................................11

E&L Consulting Ltd. v. Doman Indus. Ltd.,
472 F.3d 23 (2d Cir. 2006)..........................................................................................11

Eastman Kodak Co. v. Image Tech. Servs., Inc.,
504 U.S. 451 (1992)....................................................................................................11

Ellis v. City of New York,
243 F.R.D. 109 (S.D.N.Y. 2007) .................................................................................11

Estee Lauder, Inc. v. Fragrance Counter Inc.,
189 F.R.D. 269 (S.D.N.Y. 1999) .................................................................................11

Gomez v. J.R. Hycee Conveyor Co.,
No. 06-cv-2827, 2008 WL 64675 (E.D.N.Y. Jan. 4, 2008)........................................18

In re Bank of New York Mellon Corp. Forex Trans. Litig.,
No. 12-md-2335, 2014 WL 2884726 (S.D.N.Y. June 26, 2014)................................11

In re Iams Co. Litig.,
No. C-3-90-014, 1992 WL 1258515 (S.D. Ohio July 23, 1992) ................................15

In re Myford Touch Consumer Litig.,
    No. C-13-3072, 2014 WL 4748101 (N.D. Cal. Sept. 10, 2014) ..................................18

In re Wireless Tel. Servs. Antitrust Litig.,
    385 F. Supp. 2d 403 (S.D.N.Y. 2005)...................................................................11, 16

Island Tobacco Co. v. R. J. Reynolds Indus., Inc.,
    513 F. Supp. 726 (D. Haw. 1981) ...............................................................................16

Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP,
    No. 03-cv-5560, 2007 WL 473726 (S.D.N.Y. Feb. 14, 2007) ....................................19

Moccio v. Cablevision Sys. Corp.,
    208 F. Supp. 2d 361 (E.D.N.Y. 2002) ........................................................................12

Oppenheimer Fund. Inc. v. Sanders,
    437 U.S. 340 (1978).....................................................................................................11

R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,
    199 F. Supp. 2d 362 (M.D.N.C. 2002), aff'd sub nom. R.J. Reynolds Tobacco
    Co. v. Philip Morris USA, Inc., 67 F. App'x 810 (4th Cir. 2003) ...............................15

Rebel Oil Co. v. Atl. Richfield Co.,
    51 F.3d 1421 (9th Cir. 1995) ......................................................................................14

Sun Pac. Mktg. Coop, Inc. v. DiMare Fresh, Inc.,
    No. 1:06-cv-1404, 2009 WL 4673900 (E.D. Cal. Dec. 4, 2009).................................19

Transp. Alliance Bank, Inc. v. Arrow Trucking Co.,
    No. 10-cv-016, 2011 WL 4964034 (N.D. Okla. Oct. 19, 2011).................................20

Turbine Components Corp. v. Sequa Corp.,
    No. 91-cv-1752, 1992 WL 6196 (S.D.N.Y. Jan. 3, 1992) ..........................................18

W. Res., Inc. v. Union Pac. R.R. Co.,
    No. 00-cv-2043, 2001 WL 1718370 (D. Kan. Sept. 12, 2001)...................................19

**Statutes & Rules**

Fed. R. Civ. P. 26(b)(l) ........................................................................................................11

Fed. R. Civ. P. 34..................................................................................................................11

Fed. R. Civ. P. 37(a) ..............................................................................................................1

**Other Authorities**

Form 10-K, Cablevision Annual Report for fiscal year ended December 31, 2014,
    filed February 25, 2015, https://www.sec.gov/Archives/edgar/data/784681/
    000162828015001010/cvc-12312014x10k.htm ............................................................4

Trial Brief of Defendant Cablevision Sys. Corp, Game Show Network, LLC v.
    Cablevision Sys. Corp., MB Docket No. 12-122 (June 2, 2015), available at
    http://apps.fcc.gov/ecfs/document/view?id=60001076514 ........................................13

In the Matter of Revision of the Commission's Program Carriage Rules; Leased
    Commercial Access; Development of Competition and Diversity in Video
    Programming Distribution and Carriage, Second Report and Order in MB
    Docket No. 07-42 and Notice of Proposed Rulemaking in MB Docket No. 11-
    131, 26 FCC Rcd. 11494 (2011) ........................................................................13, 14

iv

Pursuant to Federal Rule of Civil Procedure 37(a), Defendants, Viacom International Inc. and Black Entertainment Television LLC (collectively, "Viacom"), respectfully submit this memorandum in support of their motion for an order compelling Cablevision Systems Corporation and CSC Holdings, LLC (collectively, "Cablevision") to produce documents pursuant to Defendants' First and Second Sets of Requests for Production of Documents, served on September 29, 2014, and December 1, 2014, respectively.

## PRELIMINARY STATEMENT

Viacom, a content provider that operates more than 200 services, including the cable television networks of MTV, VH1, CMT, Logo, BET, Centric, Nickelodeon, Nick Jr., TeenNick, Nicktoons, Nick at Nite, Comedy Central, TV Land, Spike and Tr3s, brings this motion to compel Cablevision, a cable provider, to produce certain key documents that Cablevision has conceded are responsive to pending discovery requests and ought to be produced.  The sole reason this motion is before the Court is because certain of Cablevision's third party business affiliates—other content providers (television networks) with which Viacom competes and Cablevision does business—object to Cablevision's production of documents containing confidential information pursuant to various agreements (including the agreements themselves), and have withheld their consent to Cablevision producing them.[1]  While some have

---

[1] To date, the third parties Cablevision has identified as objecting to Cablevision's production are: ABC Cable Networks Group and ESPN Enterprises, Inc., Asia TV USA Ltd., A&E Television Networks, LLC, CBS Corporation & Showtime, Discovery Communications LLC, Fox Cable Networks Services, LLC and Yankees Entertainment and Sports Network, LLC, Home Box Office, Inc., Madison Square Garden, Inc., MLB Network, Inc., NBC Universal TV Networks and SportsNet New York, Scripps Networks, Inc., TV One, Turner Network Sales, Inc. and Univision Communications Inc. (collectively, the "Objecting Third Parties") (Declaration of Rory A. Leraris in Support of Defendants' Motion to Compel Plaintiffs to Produce Documents Pursuant to Defendants' First and Second Sets of Requests for Production of Documents ("Leraris Decl."), ¶ 8.)  We note that the majority of Cablevision's third party programmers

questioned relevance—despite the agreement of both Plaintiffs and Defendants to this action that the documents in question <u>are responsive and discoverable</u>—their objections are driven by confidentiality concerns.  Those third party objections are without merit.

<u>First</u>, the documents at issue in this motion are discoverable in this case. Cablevision brought this case against Viacom in February 2013—two months after the parties reached an agreement pursuant to which Cablevision would continue carrying Viacom programming and offer it to subscribers of Cablevision services.  Cablevision's suit challenges that very agreement, claiming that it constitutes an illegal tying arrangement under Section 1 of the Sherman Act and New York state antitrust law. Specifically, Cablevision claims that Viacom used its alleged market power to coerce Cablevision into carrying channels it does not want to carry by offering a package, or "bundle", of Viacom channels to Cablevision at a discount to the aggregate price for the à la carte channels Cablevision wanted to carry.

As in any antitrust case, the issues of market definition and market power are integral to the elements of Cablevision's claims and Viacom's defenses.  Among other defenses available to it, Viacom can successfully defeat Cablevision's claims if it can show that the market for the alleged "tying" product (here, Viacom's allegedly most popular "Core" channels:  BET, Comedy Central, MTV and Nickelodeon) is not distinct from the market for the alleged "tied" product (here, Viacom's allegedly less popular "Suite" channels:  Centric, CMT, CMT Pure Country, Logo, MTV Hits, MTV Jams, Nick Jr., Nick 2, Nicktoons, Palladia, Teen Nick, Tr3s, VH1 Classic, and VH1 Soul). Similarly, and relatedly, Viacom can prevail by showing that when the relevant market in

whose information is contained in documents that Viacom has requested (and Cablevision has agreed are discoverable) have not objected to the production of their confidential information.  (<u>Id.</u> ¶ 9.)  In addition, NBA Properties, Inc. has withdrawn its objection.  (<u>Id.</u> ¶ 16.)

which the alleged tying products compete is defined properly, Viacom lacks antitrust market power.  None of these questions can be addressed in a vacuum.  The record must reflect a full picture of the broader commercial landscape in which Viacom and Cablevision operate, which includes contractual terms, pricing and structure and negotiation dynamics.  To this end, Viacom propounded document requests that sought, among other things, copies of Cablevision's affiliation and/or licensing agreements, rate information exchanged between Cablevision and third parties and other documents concerning negotiations and the terms of Cablevision's agreements with other programmers.  Cablevision has agreed to produce the requested documents but for the objections of its contractual counterparties.

Second, the operative protective order in this case, which now incorporates modifications that the parties proposed to further address some of the concerns raised by third parties, more than sufficiently protects the sensitive nature of any highly confidential third party material.  Viacom appreciates the third parties' concerns in this case—Viacom itself is protective over its commercially sensitive and confidential information.  However, Viacom and Cablevision anticipated these concerns at the outset of this litigation, and thus entered into a particularly robust protective order, which shields commercially sensitive information concerning the terms of third party affiliation agreements from disclosure to anyone beyond outside counsel, their experts and the Court.  In addition, Viacom agreed to further modify the protective order in an attempt to appease certain third parties' requests for greater protections, and to avoid seeking court intervention.  The amended protective order, which the Court recently entered, contains even more protections that, among other things, limit the topics on which outside counsel

3

that is given access to third party material can advise their clients.  These protections plainly protect the third parties' confidential information while still allowing Viacom to defend itself meaningfully against Cablevision's claims.

Accordingly, we respectfully request that the Court grant Viacom's motion to compel and order Cablevision to produce the documents it otherwise concedes can and should be produced but for the objections of third parties.

### **STATEMENT OF FACTS**

On December 31, 2012, Viacom and Cablevision executed a contract referred to as an affiliation agreement pursuant to which Cablevision agreed to distribute a package of Viacom video channels in exchange for lower cash payment rates than Cablevision would have paid to distribute only a portion of Viacom's video channels. This agreement followed a 2009 agreement between the parties pursuant to which Cablevision also agreed to distribute a package of Viacom's video channels in exchange for lower cash payment rates.[2]

On February 28, 2013, Cablevision brought its lawsuit against Viacom claiming violations of Section 1 of the Sherman Act and New York state antitrust law on the basis that the affiliation agreement constitutes an illegal tying arrangement.

---

[2] Bundling is a common business practice in the cable and video programming space.  Content providers commonly package video programming (e.g., shows, together as a single network, and often also as multiple networks together), which then are distributed in bundles to cable providers and other distributors.  Cablevision itself publicly touts its bundled cable programming services to subscribers.  See, e.g., Form 10-K, Cablevision Annual Report for fiscal year ended December 31, 2014, filed February 25, 2015, 5, https://www.sec.gov/Archives/edgar/data/784681/000162828015001010/cvc-12312014x10k.htm ("Bundled Offers[:]  We offer several promotional packages with discounted pricing to existing and new customers who subscribe to two or more of our products as compared to the à la carte prices for each individual product.  We also offer other pricing discounts for certain products that are added to existing services.  For example, we offer an 'Optimum Triple Play' package that is a special promotion for new customers or eligible current customers where our three products, video, high-speed data and voice, are each available at a reduced rate for a specified period, when purchased together.  We also offer promotional and other pricing discounts as part of our competitive and retention strategies.").

(Complaint (Dkt. No. 1).) Cablevision alleges that Viacom has market power over some "Core", or allegedly more popular channels, and that it used this power to force Cablevision to accept a bundle of channels which included "Suite", or allegedly less popular channels, that Cablevision did not want to carry, even at a lower price. Cablevision further alleges that, but for the purported tie, Cablevision would choose to carry certain other channels, but that its limited capacity has prevented it from doing so—notwithstanding the fact that since it filed its complaint, Cablevision has begun carrying certain of the channels it claimed it could not carry because of its agreement with Viacom.

On July 12, 2013, Cablevision amended its complaint (Dkt. No. 24) and on August 23, 2013, Viacom moved to dismiss the Amended Complaint ("Am. Compl.") (Dkt. No. 27). On June 20, 2014, the Court denied Viacom's motion (Dkt. No. 45), and on August 8, 2014, Viacom filed an Answer and Counterclaims to the Amended Complaint, alleging that Cablevision fraudulently induced Viacom into entering into the 2012 affiliation agreement. (Dkt. No. 50.) Viacom alleges that Cablevision entered the 2012 agreement intending to sue Viacom and claim the agreement was invalid, illegal and unenforceable, in an effort to have the Court rewrite the agreement to Cablevision's benefit. (Id.)

In September 2014, before the start of document production, Cablevision and Viacom entered into, and the Court approved, a Stipulation and Protective Order in this matter regarding the production of confidential materials. (Leraris Decl. ¶ 3.) The protective order, which subsequently was modified to add certain additional provisions (discussed further below) (id. ¶¶ 24-25; id. Ex. G) (the "Protective Order"), applies both

5

to parties and non-parties whose confidential information is disclosed in this matter and provides that "Discovery Materials[3] shall be used solely in connection with the prosecution or defense of this Action and not for any other purpose whatsoever." (Id. Ex. G ¶ 2.) Moreover, pursuant to the Protective Order, a producing party may designate any Discovery Material as "Confidential", "Highly Confidential—Attorneys' Eyes Only" or "Highly Confidential—Outside Counsel's Eyes Only", and further restrict its dissemination after production to the other side. (Id. Ex. G ¶ 2.) The Protective Order provides that the "Highly Confidential—Outside Counsel's Eyes Only" shall be applied to documents "that contain or constitute competitively sensitive terms (including, but not limited to, pricing terms), contained in or negotiated as part of entering into an affiliation agreement between a programmer and a distributor". (Id. Ex. G ¶ 7.) Access to materials designated "Highly Confidential—Outside Counsel's Eyes Only" is limited to "Outside Counsel of Record . . . and supporting personnel of such attorneys", outside consultants, testifying experts, witnesses who authored or previously received the material, the Court, and Court reporters, interpreters and videographers employed in connection with this Action.[4] (Id. Ex. G ¶ 15.)

---

[3] "Discovery Material" is defined in the Protective Order as "[a]ll documents, depositions and deposition exhibits, interrogatory answers, responses to requests for admission, responses to demands and any other written, recorded or graphic matter produced by or obtained from any Party or non-Party in the above-captioned Action". (Leraris Decl. Ex. G ¶ 1(d).)

[4] Additionally, the Protective Order provides that "Highly Confidential—Attorneys' Eyes Only" documents shall include documents that the designating party believes contain or reflect "highly sensitive proprietary information used by it in, or pertaining to, its business, including but not limited to highly sensitive financial data, contracts and agreements, business, research, development, proprietary, trade secrets, or commercial information, confidential employment information, highly confidential information furnished to the Producing Party by any third party, and other sensitive information the disclosure of which would be reasonably likely to pose a risk of significant harm to the competitive or financial position of the Producing Party, including if Disclosed to In-House Counsel substantially involved in negotiating affiliation agreements or the rendering of legal advice with respect to such negotiations". (Id. Ex. G ¶ 6.) Access to materials designated "Highly Confidential—Attorneys' Eyes Only" is limited to those individuals who have access to materials designated "Highly Confidential—Outside Counsel's Eyes Only" along with "[u]p to four (4) agreed upon In-House Counsel for the Parties herein (or non-Party) who are

6

In late 2014, each party served document requests and requested that the other produce their respective agreements with third party affiliates and documents relating to those agreements.  For example, Viacom sought the production of:

- "All documents relating to the negotiation or execution of affiliation or licensing agreements between Cablevision and any programmers for the distribution of video services" (Leraris Decl. Ex. B at Req. No. 109);

- "All documents relating to any programmer other than Viacom offering Cablevision an inducement of any kind to carry multiple services of the programmer, including, but not limited to, any discounts for licensing multiple programming services" (id. at Req. No. 111);

- "All documents relating to any programmer other than Viacom requiring Cablevision to license a certain programming service in order to obtain a license to carry another of the programmer's services or conditioning discounts or other improved terms or conditions on achieving additional distribution or penetration of such programmer's services" (id. at Req. No. 112);

- "Documents sufficient to show the targeted demographic of each channel offered by any Cablevision system and the ratings for each such channel for each Cablevision system" (Leraris Decl. Ex. C at Req. No. 2); and

- "All documents concerning the description of each channel offered by any Cablevision system contained in any Cablevision affiliation agreement with a programmer" (id. at Req. No. 3).[5]

Cablevision likewise requested the production of affiliation agreements and related documents between Viacom and its video distributors, including:

- "All documents concerning the negotiation of licensing agreements, affiliation agreements, distribution agreements, or any other agreements between Defendants and any Video Distributor for any rights to any Core Network, Suite Network, or any other Video Programming or network" (Leraris Decl. Ex. A at Req. No. 2); and

---

actively involved in the prosecution or defense of this litigation and who have no substantial involvement in the negotiation of affiliation agreements or the rendering of legal advice with respect to such negotiations" and in-house litigation support.  (Id. Ex. G ¶ 14.)

[5] To avoid burdening the Court with unnecessary exhibits, Viacom has attached the parties' responses and objections to the document requests (which include the document requests), but not the original document requests themselves, to the Leraris Declaration.

7

- "All documents concerning the distribution of any Core Network, Suite Network, or other Video Programming to any Over-The-Top ("OTT") or Online Video Distributor ("OVD"),[6] including without limitation provisions related to limitations or restrictions on the distribution, transmission, or access to any Core Network, Suite Network, or other Video Programming that any OTT or OVD may grant to any Video Distributor or its subscribers" (id. at Req. No. 39).

Between November 2014 and early March 2015, the parties met and conferred regarding their respective objections to various document requests and the creation of search terms. During these negotiations, the parties discussed their respective requests for affiliation agreements and related documents, and in particular limitations on which of the respective third party affiliates the parties would deem discoverable for purposes of negotiated search terms and document production. Such limitations were in part necessary in order to avoid the obligation of notifying every third party affiliate whose confidential information might be discoverable but for which notice obligations existed under the relevant agreements. The parties ultimately agreed that Viacom would produce documents concerning the forty largest multichannel video programming distributors (i.e., cable or satellite television companies, referred to in the industry as "MVPDs")[7] that distribute Viacom channels in the United States, and that Cablevision would produce documents concerning Cablevision's twenty largest programmers (including networks that compete with Viacom), along with the programmers whose content Cablevision has launched since June 1, 2012, and programmers that offer multiple services/channels. (Leraris Decl. ¶ 5.) The parties began document production in April 2015.

---

[6] "OTT" and "OVD" refer to distribution of video or television content over the internet.

[7] Viacom also agreed to produce agreements with its OTT/OVD partners, such as Apple, Hulu and Netflix, in response to document requests propounded by Cablevision. (Leraris Decl. ¶ 5 n.2.)

On May 7, 2015, Cablevision raised in a telephone conversation with Viacom, later memorialized in a letter, the fact that it had given notice to "entities for whom confidential information may be produced in response to Viacom's Requests for Production", and that several entities "have indicated that they object to the production of any information covered by non-disclosure obligations in Cablevision's affiliation agreements" and have taken the position that Cablevision may not produce such documents absent a Court order. (Leraris Decl. ¶ 7; id. Ex. D at 1.) Cablevision agreed that the documents in question are discoverable and confirmed it would not oppose a motion to compel, but nonetheless advised that it was "unable to produce documents concerning the carriage and affiliation agreements . . . including the underlying agreements themselves, absent a Court order". (Id. ¶ 7; id. Ex. D at 2.)

During the last week of May and throughout June 2015, counsel for Viacom held multiple telephonic meet-and-confers with the Objecting Third Parties. (Leraris Decl. ¶¶ 10-21, 27-31; Declaration of Eric Seiler ("Seiler Decl.") ¶¶ 3-6.) Counsel for Cablevision, Ropes & Gray LLP, took part in almost all of the conversations. (Leraris Decl. ¶ 10.) Unfortunately, all but one of the Objecting Third Parties have maintained their objections and will not consent to Cablevision's production.[8] (Id. ¶ 32.) Accordingly, Viacom and Cablevision agreed to seek relief from the Court in the form of motions to compel that neither party would oppose.

In an ongoing effort to resolve disputes with at least some of these third parties, Cablevision and Viacom also agreed to seek additional protections in the form of a modified protective order, which:  (1) clarifies that access to information or materials

_____

[8] Cablevision likewise had meet and confers in which Viacom participated with third party distributors Netflix, Hulu and Apple, all of which had raised objections to Viacom's production of documents. (Leraris Decl. ¶ 22.)

designated as "Highly Confidential—Outside Counsel's Eyes Only" shall be limited to "Outside Counsel of Record . . . who have no substantial involvement in Competitive Decision-Making"[9] (Leraris Decl. Ex. G ¶ 15(a)); (2) provides that in the event that a party seeks leave to file material containing non-party information designated as "Highly Confidential—Attorneys' Eyes Only" or "Highly Confidential—Outside Counsel's Eyes Only" under seal, the party must "within three days after seeking leave to file such material under seal provide written notice to any non-[p]arty whose . . . information is included in the material to be filed under seal" (id. Ex. G ¶ 20(a)); and (3) clarifies the existing language that the "Protective Order does not govern the conduct of public, in-court proceedings before the assigned Magistrate Judge or the assigned District Judge" by providing that "the Parties contemplate that the Magistrate Judge or the District Judge, as applicable, shall establish procedures for the disclosure of Protected Material in public, in-court proceedings, in view of the sensitive nature of certain material likely to be produced in this action".  (Id. Ex. G ¶ 3.)

On June 15, 2015, the parties submitted this proposed amended Protective Order for the Court's consideration, along with a letter which, inter alia, previewed the instant dispute for the Court and requested a briefing schedule that would allow third parties to move to intervene and oppose the motions to compel.  (Leraris Decl. ¶ 24.)  On June 18, 2015, the Court endorsed the amended Protective Order and the parties' proposed briefing schedule.  (Id. ¶ 25; id. Exs. F, G.)

---

[9] The Protective Order defines "Competitive Decision-Making" as "[a]dvice about or participation in the business decisions or the analysis underlying the business decisions of a Party or any competitor of a Designating Party, including advice regarding compliance or noncompliance with most-favored-nation provisions.  For the avoidance of doubt, Competitive Decision-Making does not include the provision of antitrust or litigation advice regarding business decisions or any other issues."  (Leraris Decl. Ex. G ¶ 1(q).)

**ARGUMENT**

When requested pursuant to Rule 34, material is discoverable and must be produced if it is non-privileged and "relevant to the subject matter involved in the action". Fed. R. Civ. P. 26(b)(l). Relevancy "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case". Oppenheimer Fund. Inc. v. Sanders, 437 U.S. 340, 351 (1978) (citing Hickman v. Taylor, 329 U.S. 495, 501 (1947)); see Ellis v. City of New York, 243 F.R.D. 109, 111 (S.D.N.Y. 2007). It is well-established that "[t]he discovery rules are to be given a broad and liberal construction to effectuate their purpose of ensuring that civil trials are not conducted in the dark". Dealer Comp. Servs., Inc. v. Curry, No. 12-cv-3457, 2013 WL 499520, at *1 (S.D.N.Y. Feb. 7, 2013) (Cott, M.J.) (quoting Estee Lauder, Inc. v. Fragrance Counter Inc., 189 F.R.D. 269, 274 (S.D.N.Y. 1999)); see In re Bank of New York Mellon Corp. Forex Trans. Litig., No. 12-md-2335, 2014 WL 2884726, at *2 (S.D.N.Y. June 26, 2014) (Cott, M.J.) (ordering document production "under the broad scope of discovery").

**I.    THE REQUESTED DOCUMENTS ARE RESPONSIVE AND RELEVANT.**

To prevail on its claim, Cablevision must establish the existence of a relevant market in which the alleged "tying" product competes and in which Viacom has market power. See In re Wireless Tel. Servs. Antitrust Litig., 385 F. Supp. 2d 403, 422-23 (S.D.N.Y. 2005); see also Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 468-69 (1992). Cablevision also must establish the existence of a distinct market in which the allegedly tied product competes. E&L Consulting Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 31 (2d Cir. 2006); see Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1201 n.8 (9th Cir. 2012) (observing that if the court viewed "each Programmer's block of

11

channels as a single product [as compared to two separate products, that] would preclude any argument that there was an illegal tying arrangement").

Defining the market requires careful consideration of the broader commercial landscape in which the parties operate.  Specifically, the parties will look to which products "are generally interchangeable or for which there is cross-elasticity of demand" in figuring out the appropriate bounds of the relevant product market. Moccio v. Cablevision Sys. Corp., 208 F. Supp. 2d 361, 377 (E.D.N.Y. 2002); see City of New York v. Grp. Health Inc., 649 F.3d 151, 155 (2d Cir. 2011).  Cablevision alleges that the tying product market, at its narrowest, consists of Viacom's allegedly most popular or "Core" channels—BET, Comedy Central, MTV and Nickelodeon—in which Viacom unsurprisingly holds a 100% market share and thus has market power.  (Am. Compl. ¶¶ 40-49.)  Cablevision alternatively alleges that the tying product market, at its broadest, consists of four genres of popular channels in which Viacom also allegedly has market power.  (Id. ¶¶ 62-98.)  Cablevision's third party agreements and related documents will be relevant to these issues in a variety of ways—which is why both parties have agreed they should be produced.  The relevance of these documents includes the following.

First, the affiliation agreements and related documents often contain heavily-negotiated target audience, demographics and content descriptions for channels. This information identifies, among other things, the characteristics of people who watch particular types of programming, the type of programming they might otherwise watch and the way in which content is developed to target particular demographics.  In other words, it provides key insights into who watches what and why.  This information will be directly relevant to the question of market definition.  Cablevision has alleged narrow

12

alternative product markets over which Viacom purportedly exercises market power. (See Am. Compl. ¶¶ 64, 74, 81, 89.)  In doing so, Cablevision has excluded from its alleged relevant markets a variety of programming that is substitutable for Viacom content and, therefore, must be included in the relevant market.  Information on the precise target audience, demographics and content descriptions that Cablevision has negotiated with respect to other programming will help inform the question of which programming is substitutable for Viacom content given the overlap between the types of viewers who watch Viacom programming as compared to other programming, and thus will go directly to the issue of whether Cablevision can establish its narrow alleged markets (which, we submit, it cannot).  See Trial Brief of Defendant Cablevision Sys. Corp., Game Show Network, LLC v. Cablevision Sys. Corp., MB Docket No. 12-122, 22, 28 (June 2, 2015), available at http://apps.fcc.gov/ecfs/document/view?id=60001076 514 (relying on the descriptions of Game Show Network's programming and target audiences, as set forth in Game Show Network's "affiliation agreements with MVPDs" and "presentations to distributors", in arguing that certain programming is not similarly situated);[10] see also In the Matter of Revision of the Commission's Program Carriage Rules; Leased Commercial Access; Development of Competition and Diversity in Video Programming Distribution and Carriage, Second Report and Order in MB Docket No. 07-42 and Notice of Proposed Rulemaking in MB Docket No. 11-131, 26 FCC Rcd. 11494, 11504 (2011) (hereinafter "Second Report & Order") (considering factors such as "target audience" and "target programming" in deciding whether certain programming is similarly situated).

---

[10] Cablevision redacted this programming and target audience information in the publicly-filed version of its brief.

13

Second, the prices and terms of carriage of Cablevision's other programmers, may inform what type of programming is in the same market, including whether there are in fact separate tying and tied product markets here or whether the tying and tied markets are really one larger market for general programming (as Viacom contends), and whether Viacom's pricing structure—in which the package of Core and Suite channels is discounted to the à la carte prices, is (as Viacom contends) market standard and pro-competitive.  Courts often assess pricing evidence in connection with defining a relevant market.  See Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1435 (9th Cir. 1995) ("[Plaintiff] introduced affidavits from an expert who said the two products were correlated in price, indicating that the products are substitutes for each other."); see also Second Report & Order at 11504 (courts consider such factors as "genre, ratings, license fee, target audience, target advertisers [and] target programming" in determining whether certain programming is similarly situated) (emphasis added).) This pricing information is found in the affiliation agreements at issue.

Third, documents setting forth the history of Cablevision's negotiations with other programmers will reveal, among other things, relevant similarities and differences with respect to the back and forth regarding pricing and other terms and whether certain negotiation practices are market standard rather than coercive.  While Cablevision claims that the price disparity between à la carte Core channels and bundled Core and Suite channels was so great that they were coerced into taking the bundle (Am. Compl. ¶¶ 146-50), the fact-finder will need to assess Cablevision's course of conduct in the context of other negotiations, and in particular how Cablevision responded to other programmers who may have made similar pricing offers.  Viacom contends that its own

14

offer to Cablevision with respect to à la carte channels was just a starting point of negotiations and, in any event, was common industry practice with various pro-competitive justifications; the extent to which other programmers are making similar offers during various stages of negotiations thus may be relevant to Viacom's defenses.[11]

Fourth, Cablevision has alleged that Viacom has market power because it has the ability to raise prices for its "Core" channels—BET, Comedy Central, MTV and Nickelodeon—despite declines in ratings.  (Am. Compl. ¶¶ 42, 44, 46, 48.)  Broader pricing trends in the industry, including pricing discussions during the course of negotiations, will be relevant to Viacom's defense against this claim.  See In re Iams Co. Litig., No. C-3-90-014, 1992 WL 1258515, at *4 (S.D. Ohio July 23, 1992) (in response to a claim of supra-competitive prices, court looked to "industry-wide" price increases to find that prices did not reflect market power); see also R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 367 (M.D.N.C. 2002) (considering "industry-wide price increases" when evaluating antitrust claim), aff'd sub nom. R.J. Reynolds Tobacco Co. v. Philip Morris USA, Inc., 67 F. App'x 810 (4th Cir. 2003).   To the extent there have been changes in Viacom pricing to Cablevision, the fact-finder will need to understand how those changes fit into the overall pricing trends in the industry in order to reach findings about the significance, if any, of such pricing changes.  Without that comparative information—which will require identification of the specific prices charged

---

[11] Cablevision likewise looks to Viacom's alleged market practices in attempting to make its claims regarding coercion and market power.  (See, e.g., Am. Compl. ¶ 168 (alleging that "several other distributors . . . have confirmed that Viacom currently forces distribution of unwanted Suite Networks as a condition of obtaining the right to distribute the Tying Networks")).)  To allow Cablevision to make these allegations regarding Viacom's market practices more broadly without allowing Viacom to explore the market dynamics on the Cablevision side would be fundamentally unfair.

to Cablevision by specific competitors of Viacom—the fact-finder will be left to assess pricing evidence in a vacuum, which would lack any meaningful probative value.

Fifth, the extent to which other programmers are bundling content in their agreements with Cablevision, or seeking to bundle content during negotiations, may be relevant to whether Viacom's ability to bundle is reflective of an industry practice rather than market power.  See In re Wireless Tel. Servs. Antitrust Litig., 385 F. Supp. 2d at 422-23 (in response to plaintiff's claim that the "existence of market power can be inferred from the fact that each defendant imposes burdensome terms on consumers", the court looked to market practices and held that "[a] defendant's use of such contracts does not create an inference supporting a finding of market power, since each of the defendants (as well as service providers who are not defendants) offer service through similar contracts").[12]  While Cablevision claims that it could carry other channels but for the alleged Viacom tie (Am. Compl. ¶¶ 155-67)—notwithstanding the fact that it has continued to launch new channels since the complaint in this action was filed, including the very channels it said it was foreclosed from launching—the fact-finder in this case will need to analyze the claim of causation against the reality that many other programmers in the industry follow precisely the same efficient, pro-competitive practice of bundling (as does Cablevision itself).

---

[12] Similarly, evidence of bundling by other programmers could be relevant to Viacom's pro-competitive justifications for the challenged contractual provisions, an issue that is relevant regardless of whether the challenged provisions are analyzed under the rule of reason (as would be appropriate) or per se scrutiny (as Cablevision claims).  See Ciminelli v. Cablevision, 583 F. Supp. 158, 161-62 (E.D.N.Y. 1984) (noting that, even under per se scrutiny, Cablevision, the defendant, could establish pro-competitive justifications for an alleged tying arrangement); see also Island Tobacco Co. v. R. J. Reynolds Indus., Inc., 513 F. Supp. 726, 741 (D. Haw. 1981) ("Conduct may be motivated by legitimate business purposes, consistent with industry-wide practices, in which case there can be no anti-competitive effects.").

16

## II.    THE PROTECTIVE ORDER ADEQUATELY PROTECTS THE COMMERCIALLY SENSITIVE AND CONFIDENTIAL NATURE OF THIRD PARTY INFORMATION.

In maintaining their objections, certain third parties have argued that production of their licensing agreements, rate information and other commercially sensitive information will cause them to suffer competitive harm.  They have raised concerns that (1) if Cablevision is forced to produce their commercially sensitive information, outside counsel will use this information to disadvantage them in future business negotiations, and (2) even though the Protective Order provides that "competitively sensitive terms" will be marked "Highly Confidential—Outside Counsel's Eyes Only", in practice, their competitors (including but not limited to Viacom) may gain access to their information or otherwise benefit from it.

Viacom agrees that the information requested is commercially sensitive, and understands the third parties' preference to keep their confidential information to themselves.  However, Cablevision decided to initiate this antitrust litigation that, given the allegations in the Amended Complaint, requires discovery of Cablevision's and numerous third parties' affiliation agreements and related negotiation documents. Viacom and Cablevision have agreed upon, and the Court approved, an amended Protective Order that adequately addresses confidentiality-related concerns, including concerns of third parties.  The Objecting Third Parties have no basis to suggest that outside counsel for Viacom or Cablevision will fail to comply with the amended Protective Order's terms.[13]

---

[13] Cablevision's productions, along with third parties', are hosted exclusively on a vendor's highly encrypted review platform to which Viacom itself has no access.  (Leraris Decl. ¶ 6.)

17

Courts routinely compel the production of commercially sensitive information over the objection of parties and third parties on the basis of the existence of protective orders that, like the one in this case, limit the use of discovery material to the litigation at issues. See, e.g., Turbine Components Corp. v. Sequa Corp., No. 91-cv-1752, 1992 WL 6196, at *1 (S.D.N.Y. Jan. 3, 1992) (protective order that "precludes the use or disclosure of confidential information except for purposes of this litigation" adequately protects third party confidential information); Gomez v. J.R. Hycee Conveyor Co., No. 06-cv-2827, 2008 WL 64675, at *1 (E.D.N.Y. Jan. 4, 2008) ("protective order limiting the use of documents produced to this litigation" protects third party's "interest in keeping its propriety information confidential"); see also In re Myford Touch Consumer Litig., No. C-13-3072, 2014 WL 4748101, at *1 (N.D. Cal. Sept. 10, 2014) ("The Court believes that the claimed commercial sensitivity of the requested documents is an insufficient reason for [defendant] to refuse to produce documents relevant to Plaintiffs' requests:  the parties entered into a protective order that provides significant protections for commercially sensitive documents, and prohibits the use or disclosure of such documents outside the context of this litigation".).

Where, like here, the protective order in place limits the disclosure of commercially sensitive information to outside counsel's eyes only, or even attorneys' eyes only, objections regarding the production of such documents are particularly ineffective.  See CMedia, LLC v. LifeKey Healthcare, LLC, 216 F.R.D. 387, 391 (N.D. Tex. 2003) (ordering production of documents "subject to a protective order which restricts [] disclosure of privileged documents to the attorneys involved in the

18

litigation");[14] see also Sun Pac. Mktg. Coop, Inc. v. DiMare Fresh, Inc., No. 1:06-cv-

1404, 2009 WL 4673900, at *6 (E.D. Cal. Dec. 4, 2009) (ordering production of

documents subject to "protective order" limiting disclosure of "information . . . to the

parties' counsel, experts, consultants, their respective staff and/or employees, court

reporters and others agreed upon by the parties"); Covelo Clothing, Inc. v. Atlandia

Imports, Inc., No. 07-cv-2403, 2007 WL 4287731, at *1-2 (D. Colo. Dec. 5, 2007)

(attorneys' eyes only provision in protective order was sufficient to protect trade secret

from improper disclosure to competitor); W. Res., Inc. v. Union Pac. R.R. Co.,  No. 00-

cv-2043, 2001 WL 1718370, at *6 (D. Kan. Sept. 12, 2001) (attorneys' eyes only and

outside counsel's eyes only provisions in protective order were sufficient to protect

against disclosure of confidential information to competitor).

Finally, the fact that Cablevision's licensing agreements with third parties

contain non-disclosure or confidentiality provisions is irrelevant; courts routinely order

the production of information notwithstanding such provisions in the underlying contract.

See, e.g., Armstrong Pump, Inc. v. Hartman, No. 10-cv-446S, 2014 WL 2830322, at *3

(W.D.N.Y. June 23, 2014) (compelling production of third party information to

competitor notwithstanding "contractual confidentiality provision" where parties had

"stipulat[ed] to a protective order"); Kingsway Fin. Servs., Inc. v. Pricewaterhouse-

Coopers LLP, No. 03-cv-5560, 2007 WL 473726, at *3 (S.D.N.Y. Feb. 14, 2007) ("there

---

[14] CMedia is instructive as it also involved the production of commercially sensitive pricing information.  See 216 F.R.D. at 389-90.  Plaintiff, an advertising agent, sued defendant, a former client, for breach of contract.  Id. at 388.  Defendant counterclaimed for breach of contract alleging that plaintiff booked advertisements at rates excessive to those customarily paid.  Id.  Plaintiff served a subpoena on a third party, which was a direct competitor of plaintiff and had since replaced plaintiff as defendant's agent.  Id.  The subpoena sought documents showing prices charged for advertising placed by the third party on behalf of defendant.  Id.  The court ordered the production of the documents, subject to the limitations in the Protective Order.  Id. at 390.

19

is no privilege for documents merely because they are subject to a confidentiality agreement"); see also Transp. Alliance Bank, Inc. v. Arrow Trucking Co., No. 10-cv-016, 2011 WL 4964034, at *1 (N.D. Okla. Oct. 19, 2011) ("[c]onfidentiality is not a bar to discovery").

## **CONCLUSION**

For the foregoing reasons, Viacom respectfully requests that the Court grant the Motion to Compel Cablevision to Produce Documents Pursuant to Defendants' First and Second Sets of Requests for Production of Documents.

July 1, 2015

Respectfully submitted,

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP


        /s/ Eric Seiler
Eric Seiler
Hallie B. Levin
7 Times Square
New York, NY 10036
(212) 833-1100
eseiler@fklaw.com
hlevin@fklaw.com

*Attorneys for Defendants*

20